# EXHIBIT D



PRINCIPALITY OF LIECHTENSTEIN

**PRINCELY**

DISTINCT COURT

DISTRICT COURT

| | Exhibit | *IAG* |

**Please always refer to the case number**

06 HG.2024.210
ON 21

# PUBLIC ORAL HEARING

before the

**Princely District Court**

Vaduz, February 3, 2025

## Court officials present

**Judge:** Diana Kind                 **Clerk:** Mathias Spögler

## Case

**Applicant:**                 Zygmunt Józef Solorz, Meierhofstrasse 8, LI-
9495 Triesen
represented by Schurti Partners Rechtsanwälte
AG, Zollstrasse 2, LI-9490 Vaduz
additionally represented by Pitkowitz Foerster
Rechtsanwälte GmbH
Schwarzenbergplatz 3
1010 Vienna

**Respondents:**         1.    TiVi Foundation (FL-0002.394.367-5), Kirchstrasse
12, LI-9490 Vaduz
represented by Ritter Schierscher Rechtsanwälte
AG, Gewerbeweg 5, LI-9490 Vaduz

■     Page 2     ■

    2.  Piotr Mateusz Żak, ul. Ostrobramska 83 m. 1801A,
PL-04-175 Warsaw
represented by Roth + Partner Rechtsanwälte AG,
Landstrasse 40, P.O. Box 408, LI-9495 Triesen

    3.  Aleksandra Jadwiga Żak, 9950 Toluca Lake Ave,
US-91602 North Hollywood, CA
represented by Gasser Partner Rechtsanwälte,
Feldkircher Strasse 31, P.O. Box 246, LI-
9494 Schaan

    4.  Tobias Markus Solorz, Haldenweg 18, LI-
9495 Triesen
represented by Gasser Partner
Rechtsanwälte, Heiligkreuz 6, P.O. Box 484, LI-
9490 Vaduz

**Subject matter:**    Foundation supervision (disputed amount
CHF 100,000.00)

At the call of the case at 9:00 a.m., the following appear:

**For the Applicant:**    Attorney Simon Ott, Dr. Nikolaus Pitkowitz, Mag.
Peter Machherndl, Mag. Anton Gorton

**For
Respondent 1:**    Attorney Peter Schierscher, advisor; Foundation Board
member Katarzyna Tomczuk, with Attorneys Dr. Michael
Ritter and Dr. Matthias Niedermüller (for Tomasz Szeląg)
(from 5:00 p.m. onward, Attorney Fabian Rischka)

**For Respondent 2:**    Personally present with Attorneys Marco Ender and
Tobias Beck

**For
Respondent 3:**    Personally present with Attorneys Bernhard Motal and
Martina Knünz

**For Respondent 4:**    Personally present with Attorney Jochen Schreiber

It is recorded that by order of the District Court in case 06 CG.2024.184-63 dated December 4, 2024, which has become final, it was decided that the present petitions are to be dealt with and adjudicated in non-contentious proceedings (ON 3).

33

■     Page 3     ■

The Applicant then submits and petitions as stated in ON 2.

The Parties deny, submit, and petition as stated in ON 3. It is noted that the Applicant does not contest his submissions in ON 2.

Respondent 3 denies and makes submissions as stated in ON 5.

The Applicant denies and makes submissions as stated in ON 6.

Respondent 4 denies, submits, and petitions as stated in ON 12.

Respondent 2 denies the Applicant's submissions and submits and petitions as stated in ON 13.

Respondent 3 denies the Applicant's submissions and submits and petitions as stated in ON 14.

The Applicant denies the Respondents' submissions and further submits and petitions as stated in ON 19.

Respondent 3 denies and submits as stated in ON 20.

Respondent 4 denies the Applicant's submissions and further states as follows:

The Applicant's reply to the factual statements of Respondents 2–4 consists largely of an argument concerning the allegedly correct evaluation of evidence. No further comment will be made on this.

To clarify: even before the transfer of companies into the foundations—which in the case of the TiVi Foundation occurred only gradually and well after its establishment—principles concerning the allocation and control of assets and income had been agreed within the family. The details of these arrangements are irrelevant to the present proceedings.

It is true that Respondents 2–4 were seriously concerned about the secure implementation of these arrangements. Their concern was not that the Applicant

■    Page 4    ■

might change his mind—the handover of business leadership to the two sons was already well underway in 2024, as they had assumed key CEO positions in the most strategically important companies—but rather that third parties might at some point gain access to these assets, particularly if the Applicant were no longer able, for health reasons, to manage matters himself. This concern arose in part from the changes made in August 2023 (amendment of the Statutes and revocation of the declaration of death) without consultation with Respondents 2–4, from the assessment by BW, and from the unusual power of attorney presented on July 31, 2024, in favor of JM and his son.

Respondents 2–4 discussed this concern with their father on July 31 and August 1, 2024, and he agreed that a definitive limitation of his statutory rights vis-à-vis the Foundation was necessary. His key rights, including his sole beneficiary status during his lifetime, his veto right as Curator, and important positions such as chairman of supervisory boards, remained with the Applicant. Thus, the Applicant retained the control he desired. In practice, nothing was intended to change, not even in the composition of the Foundation Board, which had long been agreed upon between the Applicant and Respondents 2–4.

There was no plan on August 1, 2024, for Respondents 2–4 to take over the assets of the foundations. Respondents 2–4 had prepared nothing and relied on their father's advisors. In particular, there was no ambush or coercion of the Applicant.

Evidence:    -  as previously submitted
             -  Application by the Applicant for the promotion of Respondents 2
                and 4 dated June 14, 2024

The Applicant's reply also devotes no fewer than ten pages to legal issues and the legal opinions obtained on them. It may be taken as a sure sign of a weak legal position when one cannot present it briefly and clearly, and when, moreover, not just one but two private legal opinions on domestic law are deemed necessary to convince the court.

■    Page 5    ■

At its core, the question under foundation law is whether the founder, on August 2, 2024, could amend the Statutes—before issuing a declaration of death—in such a way that the "irrevocable" subsequent possibility of revocation of an effective declaration of death would be eliminated. The District Court can readily assess this without the need for private expert opinions.

Both private experts remain silent on the already presented and obvious elements of a systematic interpretation of the Statutes. First, the founder's right of amendment was comprehensive; only the foundation purpose and certain provisions in the By-Laws were excluded from this and expressly designated as unchangeable. Second, the provisions in the Statutes concerning the function of the declaration of death, specifically Article 13(2)2(i), explicitly refer only to the case of a declaration of death that has already been made. That situation did not yet exist when the Statutes were amended on August 2, 2024. When the declaration of death was issued later that same day, Article 13(2)2(iii) was no longer part of the Statutes. Third, the wording of Article 13(2)2(iii) states only that a declaration of death, once made, is itself irrevocably revocable; it does not state that this provision of the Statutes itself is unamendable.

Furthermore, the invocation of a prohibition on the extension of founders' rights—relied upon by the private experts (contrary, incidentally, to Jakob's own view in Jakob, Die liechtensteinische Stiftung [The Liechtenstein Foundation] (2008), para. 252)—actually argues against the Applicant's position. For, in that case, the introduction in 2023 of the revocability of an already effective declaration of death would itself have been such an invalid extension, whereas the abolition of that provision by deleting Article 13(2)2(iii) would be a permissible restriction of founders' rights. By deleting it on August 2, 2024, the Applicant relinquished his revocation option and thereby reduced, with respect to the mechanism of the declaration of death, his amendment rights.

The deletion of Article 13(2)2(iii) could be considered equivalent to a revocation (which, strictly speaking, it is not and which would not affect the admissibility of the deletion) only if a declaration of death had already existed—something that was not the case on August 2, 2024, since the Applicant first amended the

■    Page 6    ■

Statutes and then, on the basis of those amendments, issued a declaration of death. A lex specialis, as Schauer contends, concerning the Applicant's right of amendment, does not exist, since the subject matter of Article 13(2)2(iii) is entirely different. A partial waiver of amendment rights through a special provision would, moreover, not normally be presumed.

It was foreseeable that the Applicant would invoke the decision of the Higher Court in the protective measures proceedings 17 CG.2024.190 (ON 45) regarding the allegedly parallel provision of Article 13(2)2, last sentence, in the Statutes of the Solkomtel Foundation. However, the Solkomtel Statutes are from 2022; the Applicant's amendments in the TiVi Foundation in 2023—which were intended to make a declaration of death revocable even after the effective date of the deemed death—were not carried out at Solkomtel. In its prima facie assessment, the Higher Court in the Solkomtel case also overlooked that the possibility of multiple declarations of death—but not of revocation—was allowed only up to the effective date of the deemed death, i.e. in the period between the declaration and the date specified therein as taking effect. In 2022, the Applicant's intention was precisely to be able to repeatedly postpone the effective date of the deemed death by issuing a new declaration in time. The Higher Court may therefore not have realized (in its prima facie assessment) that the right to issue another declaration was meant to apply only during this "interim period," since in the amendments of August 2, 2024, there was no such interim period—the date of issue of the declaration of death and its effective date were identical. The right to issue a new declaration of death no longer applies after the effective date, both in the TiVi Statutes of 2022 and in the Solkomtel Statutes (cf. "during his lifetime").

As to the argument that the Applicant's amendment right under Article 13(2)1 of the Statutes "during his lifetime" should be understood only in the biological sense and not in the fictitious sense created by the declaration of death, reference need only again be made to Article 13(2)2(i), according to which the founder, by the effective date chosen in the declaration of death, rejects the application of the provisions "during his lifetime," thereby clearly encompassing Article 13(2)1 as well.

■    Page 7    ■

Respondent 2 filed a rejoinder with the Princely District Court on January 13, 2025. The following documents were submitted only in Polish or English:

Draft Statutes of the TiVi Foundation, August 2022 (Exhibit 2.6)
Email from Jerzy Modrzejewski dated May 30, 2022, with excerpt from attachment (Exhibit 2.9)
Email from Jerzy Modrzejewski dated August 19, 2022 (Exhibit 2.10)
Email from Jerzy Modrzejewski dated October 20, 2022, with excerpt from attachment (Exhibit 2.11)
Email from Jarosław Grzesiak dated August 7, 2024 (Exhibit 2.22)

These documents are hereby submitted to the Princely District Court in German translation.

In all other respects, Respondent 2 also contests the further submissions of the Applicant in his reply of January 28, 2025, and expressly joins in the further submissions of Respondents 3 and 4.

The Applicant contests and reserves the right to make further submissions.

Upon inquiry, it is recorded that no members of the press are present.
The facts and legal situation are discussed with the parties. The Judge then announces the

**Order to Take Evidence:**

Evidence shall be admitted and taken regarding all contradictory submissions of the parties, and in particular concerning the following topics and questions:

- Establishment of the Foundation
- "History" of the foundation documents, especially the "declaration of death"
- Events surrounding August 2, 2024
- Subsequent amendment of the foundation documents

38

■    Page 8    ■

through the following witnesses:

Witness Justyna Solorz ("JS")
Witness Jerzy Modrzejewski ("JM")
Witness Dariusz Wierzchucki ("DW")
Witness Jarosław Grzesiak ("JG")
Witness Philippe Senn ("PhS")
Witness Luca Castellazzi ("LC")
Witness Barbara Walch ("BW")
Witness Małgorzata Żak ("MZ")
Witness Małgorzata Nowrocka ("MN")

Personally heard party Zygmunt Solorz ("Applicant")
Personally heard party Tomasz Szeląg ("TS")
Personally heard party Katarzyna Tomczuk ("KT")
Personally heard party Piotr Żak ("Respondent 2")
Personally heard party Aleksandra Żak ("Respondent 3")

■    Page 9    ■

Personally heard party Tobias Solorz ("Respondent 4")

as well as the documents submitted by the parties.

The documents submitted by the Applicant are presented and discussed. They are made part of the record as follows:

| | | |
|---|---|---|
| Official confirmation dated August 22, 2024 | Exhibit | A |
| Statutes of the TiVi Foundation, as amended on November 29, 2023 | Exhibit | B |
| By-Laws of the TiVi Foundation, as amended on November 29, 2023 | Exhibit | C |
| Affidavit of the Plaintiff dated August 24, 2024 | Exhibit | D |
| Affidavit of Jerzy Modrzejewski dated August 24, 2024 | Exhibit | E |
| Affidavit of Justyna Kulka dated August 24, 2024 | Exhibit | F |
| Declaration on the amendment of the Statutes of Solkomtel, Notarial Deed A No. 6219/2024 ("Solkomtel Amendment Declaration") | Exhibit | G |
| Declaration on the amendment of the Statutes of TiVi, Notarial Deed A No. 6223/2024 ("TiVi Amendment Declaration") | Exhibit | H |
| Declaration "Resolution by Circular Procedure" pursuant to Article 7 of the Statutes of TiVi, Notarial Deed A No. 6228/2024 ("TiVi Curators' Declaration") | Exhibit | I |
| Declaration pursuant to Article 13(2)2 of the Statutes of Solkomtel, Notarial Deed A No. 6229/2024 ("Solkomtel Declaration of Death") | Exhibit | J |
| Declaration pursuant to Article 13(2)2(i) of the Articles of Association of TiVi, Notarial Deed A No. 6235/2024 ("TiVi Declaration of Death") (including translation) | Exhibit | K |
| "Standstill" Agreement of the parties dated August 3, 2024 (including translation) | Exhibit | L |
| Notice of challenge by the Plaintiff dated August 13, 2024 with acknowledgment of receipt by Tomasz Szeląg | Exhibit | M |

Emails by the Second Respondent regarding the (ineffective) "removal" of Tomasz Szeląg and Jarosław Grzesiak and the

■    Page 10    ■

| | | |
|---|---|---|
| invalid "appointment" and "acceptance declarations" by the Second Respondent and Zofia Jędrzejewska of August 14, 2024 (including translation) | Exhibit | N |
| Revocation of the Plaintiff's declaration of death dated August 17, 2024 (notarized and certified under Ref. No. 1557 by Public Notary Mag. Alexander Winkler) | Exhibit | O |
| Bundle of warning letters to the secondary beneficiaries and to the Foundation Board as well as to the Chairman of the Foundation Board dated August 17, 2024 (including transmission confirmations) | Exhibit | P |
| Email dated August 18, 2024 concerning acknowledgment of receipt of the letter of August 17, 2024 by Tomasz Szeląg (including translation) | Exhibit | Q |
| Letter dated August 20, 2024 concerning acknowledgment of receipt of the letter of August 17, 2024 by Jarosław Grzesiak (including translation) | Exhibit | R |
| Email to Philipp Senn dated August 21, 2024 with read receipt | Exhibit | S |
| Email from Attorney Paweł Rymarz dated August 18, 2024 (including translation) | Exhibit | T |
| Letter from Attorneys Paweł Rymarz and Krzysztof Sajchta dated August 20, 2024 (including translation) | Exhibit | U |
| Letter from Attorney Bernhard Motal dated August 20, 2024 | Exhibit | V |
| Information letter to the secondary beneficiaries regarding the impending (re-)amendment of the Statutes and inclusion of a forfeiture clause dated August 18, 2024 | Exhibit | W |
| Notarial deed dated August 19, 2024 on the amendment of the TiVi Statutes (Ref. No. 1559) | Exhibit | X |
| Notarial deed dated August 19, 2024 on the amendment of the TiVi By-Laws (Ref. No. 1560) | Exhibit | Y |
| Notarial deed dated August 19, 2024 on the precautionary removal and the confirmation or reaffirmation of the continued appointment of the actual members of the Foundation Board (Ref. No. 1561) | Exhibit | Z |

41

■   Page 11   ■

| | | |
|---|---|---|
| Email of the Second Respondent dated August 20, 2024 to Philipp Senn with declarations of resignation (including translation) | Exhibit | AA |
| Letter to Philipp Senn dated August 20, 2024 with acknowledgment of receipt | Exhibit | AB |
| Acknowledgment of receipt by the Chairman of the Foundation Board, Philipp Senn, for the original documents of the founder, dated August 20, 2024 | Exhibit | AC |
| Email correspondence of August 21 and 22, 2024 between Simon Ott, Philipp Senn, and Luca Castellazzi (request for inspection of foundation documents) | Exhibit | AD |
| Affidavit of Attorney Peter Machherndl dated August 25, 2024 | Exhibit | AE |
| Bundle of revocations of powers of attorney by TiVi together with emails of August 22, 2024; email from Philipp Senn of April 9, 2024; email from Philipp Senn of August 20, 2024 to Ms. Thoele; email from Piotr Żak to Philipp Senn of August 13, 2024 — each with translation; circular resolution concerning the powers of attorney of Solkomtel dated June 12, 2024 — with translation | Exhibit | AF |
| Email from Philipp Senn dated August 23, 2024, 5:14 p.m. | Exhibit | AG |
| Affidavit of Tomasz Szeląg dated August 25, 2024, with translation | Exhibit | AH |
| Information letter on impending amendments to the Statutes dated September 20, 2024 | Exhibit | AI |
| Statutes of TiVi as per notarial deed of September 24, 2024, Ref. No. 1595, recorded by Notary Mag. Alexander Winkler | Exhibit | AJ |
| By-Laws of TiVi as per notarial deed of September 24, 2024, Ref. No. 1597, recorded by Notary Mag. Alexander Winkler | Exhibit | AK |
| (Second) revocation of the declaration of death as per notarial deed of September 24, 2024, Ref. No. 1599, recorded by Notary Mag. Alexander Winkler | Exhibit | AL |
| Legal opinion by Prof. Jakob | Exhibit | AM |
| Legal opinion by Prof. Schauer | Exhibit | AN |

■    Page 12    ■

| | | |
|---|---|---|
| Legal opinion by Prof. Dr. Jozef Okolski | Exhibit | AO |
| By-Laws of the TiVi Foundation as amended on March 7, 2012 | Exhibit | AP |
| Statutes of the TiVi Foundation as amended on November 24, 2022 | Exhibit | AQ |
| Declaration of death dated May 29, 2023 | Exhibit | AR |
| Amendment to the declaration of death dated August 10, 2023 | Exhibit | AS |
| Founder's resolution amending the Statutes of the TiVi Foundation dated August 10, 2023 | Exhibit | AT |
| Revocation dated August 17, 2023 concerning the declaration of death of May 29, 2023 | Exhibit | AU |
| Written record of the questioning of the founder dated January 10, 2025 | Exhibit | AV |
| Legal opinion by Univ.-Prof. Dr. Martin Spitzer dated November 22, 2025 | Exhibit | AW |
| Medical certificate dated January 21, 2025 | Exhibit | AX |

The Respondents acknowledge conformity with the original and/or the authenticity of the documents and refer to their litigation position as to their correctness.

The documents submitted by Respondent 2 are presented and discussed. They are made part of the record as follows, with the translations submitted today added to the respective documents:

| | | |
|---|---|---|
| Official confirmation concerning TiVi Foundation dated September 23, 2024 | Exhibit | 2.1 |
| Court order dated October 26, 2024 in 06 HG.2024.133 (ON 71) | Exhibit | 2.2 |
| Court order and decision dated October 25, 2024 in 06 CG.2024.184 (ON 47) | Exhibit | 2.3 |
| Statutes, TiVi Foundation, dated November 29, 2023 | Exhibit | 2.4 |
| Statutes, TiVi Foundation, dated March 7, 2012 | Exhibit | 2.5 |
| Draft Statutes of the TiVi Foundation, August 2022 | Exhibit | 2.6 |
| Statutes, TiVi Foundation, dated November 24, 2022 | Exhibit | 2.7 |
| Statutes, TiVi Foundation, dated August 10, 2023 | Exhibit | 2.8 |
| Email from Jerzy Modrzejewski dated May 30, 2022 with excerpt from attachment | Exhibit | 2.9 |
| Email from Jerzy Modrzejewski dated August 19, 2022 | Exhibit | 2.10 |

■    Page 13    ■

| | | |
|---|---|---|
| Email from Jerzy Modrzejewski dated October 20, 2022 with excerpt from attachment | Exhibit | 2.11 |
| Affidavit of Aleksandra Żak dated September 20, 2024 with German translation | Exhibit | 2.12 |
| Declaration of death dated May 29, 2023 | Exhibit | 2.13 |
| List of supervisory board mandates | Exhibit | 2.14 |
| Resignation statement of Jarosław Grzesiak dated September 23, 2024 | Exhibit | 2.15 |
| Notarized declaration on the amendment of the Statutes of the TiVi Foundation dated August 2, 2024 | Exhibit | 2.16 |
| Notarized declaration concerning the circular resolution of the Foundation Board dated August 2, 2024 | Exhibit | 2.17 |
| Declaration of death in the form of a notarial deed dated August 2, 2024 | Exhibit | 2.18 |
| Affidavit of Piotr Żak dated September 7, 2024 with German translation | Exhibit | 2.19 |
| Affidavit of Tobias Solorz dated September 10, 2024 with German translation | Exhibit | 2.20 |
| By-Laws, TiVi Foundation, dated November 29, 2023 | Exhibit | 2.21 |
| Email from Jarosław Grzesiak dated August 7, 2024 | Exhibit | 2.22 |
| Agreement dated August 12, 2024 with German translation | Exhibit | 2.23 |
| Draft agreement dated August 12, 2024 with German translation | Exhibit | 2.24 |
| (Alleged) "declaration" of the founder dated August 13, 2024 | Exhibit | 2.25 |
| (Alleged) "Statutes," TiVi Foundation, dated August 19, 2024 | Exhibit | 2.26 |
| (Alleged) "Statutes," TiVi Foundation, dated September 24, 2024 | Exhibit | 2.27 |
| Court order dated September 10, 2024 (ON 4) in 05 NE.2024.4 | Exhibit | 2.28 |
| Legal opinion by Prof. Dr. hab. Wojciech Kocot dated September 8, 2024 | Exhibit | 2.29 |

The Applicant acknowledges conformity with the original and/or the authenticity of the documents and refers to their litigation position as to their correctness.

■    Page 14    ■

The documents submitted by Respondent 3 are presented and discussed. They are made part of the record as follows:

| | | |
|---|---|---|
| Official confirmation of the TiVi Foundation dated November 14, 2024 | Exhibit | 3.1 |
| By-Laws of the TiVi Foundation dated November 29, 2023 | Exhibit | 3.2 |
| Court order of the Princely District Court dated October 26, 2024 in 06 HG.2024.133 (ON 71) | Exhibit | 3.3 |
| Court order of the Princely District Court dated October 25, 2024 in 06 CG.2024.185 (ON 47) | Exhibit | 3.4 |
| Affidavit of Aleksandra Jadwiga Żak dated September 20, 2024 with German translation | Exhibit | 3.5 |
| By-Laws of the TiVi Foundation dated November 24, 2022 | Exhibit | 3.6 |
| Statutes of the TiVi Foundation dated November 24, 2022 | Exhibit | 3.7 |
| Statutes of the TiVi Foundation dated August 10, 2023 | Exhibit | 3.8 |
| Statutes of the TiVi Foundation dated November 29, 2023 | Exhibit | 3.9 |
| Notarized declaration on the amendment of the Statutes of the TiVi Foundation dated August 2, 2024 | Exhibit | 3.10 |
| Notarized declaration concerning the circular resolution dated August 2, 2024 | Exhibit | 3.11 |
| Declaration of death in the form of a notarial deed dated August 2, 2024 | Exhibit | 3.12 |
| Statutes of the TiVi Foundation dated March 7, 2012 / February 12, 2013 | Exhibit | 3.13 |
| Declaration of death dated May 29, 2023 | Exhibit | 3.14 |
| Statutes of the TiVi Foundation dated August 2, 2024 | Exhibit | 3.15 |
| List of supervisory board mandates | Exhibit | 3.16 |
| Affidavit of Tobias Markus Solorz dated September 10, 2024 with German translation | Exhibit | 3.17 |
| Affidavit of Piotr Mateusz Żak dated September 7, 2024 with German translation | Exhibit | 3.18 |
| "Standstill Agreement" dated August 3, 2024 with German translation | Exhibit | 3.19 |
| Agreement dated August 12, 2024 with German translation | Exhibit | 3.20 |
| Declaration of the founder dated August 13, 2024 | Exhibit | 3.21 |
| Invalid By-Laws dated August 19, 2024 | Exhibit | 3.22 |

■    Page 15    ■

| | | |
|---|---|---|
| Official confirmation of the TiVi Foundation dated September 23, 2024 | Exhibit | 3.23 |
| Affidavit of Tobias Markus Solorz dated September 18, 2024 with German translation | Exhibit | 3.24 |
| Letter from Attorney Pitkowitz dated September 19, 2024 | Exhibit | 3.25 |
| Revocations of gifts dated November 30, 2024, with German translation | Exhibit | 3.26 |
| Opinion by Prof. Dr. Wojciech Kocot dated September 8, 2024 | Exhibit | 3.27 |
| Email from Piotr Żak to Jarosław Grzesiak dated August 1, 2024 with draft declaration of death dated August 1, 2024 and attachment to the email, with German translation | Exhibit | 3.28 |
| Email from Piotr Żak to Dariusz Wierzchucki dated August 1, 2024 with German translation | Exhibit | 3.29 |
| Email from Piotr Żak to Dariusz Wierzchucki dated August 2, 2024 with German translation | Exhibit | 3.30 |
| Overview of the amendment of the declaration of death and of the Statutes | Exhibit | 3.31 |
| Powers of attorney from Zygmunt Solorz to Jerzy Modrzejewski, Dariusz Wierzchucki, and Piotr Modrzejewski dated April 25, 2024 with German translation | Exhibit | 3.32 |

The Applicant acknowledges conformity with the original and/or the authenticity of the documents and refers to their litigation position as to their correctness.

The documents submitted by Respondent 4 are presented and discussed. They are made part of the record as follows:

| | | |
|---|---|---|
| Application by the Applicant for the promotion/advancement of Respondents 2 and 4 dated June 14, 2024 | Exhibit | 4.1 |

**The witness** is examined:

**Dr. Barbara Walch,** born October 29, 1982, citizen of Liechtenstein, residing at Zollstrasse 16, 9494 Schaan, attorney-at-law, Roman Catholic, admonished to tell the truth, instructed pursuant to Section 321 of the Code of Civil Procedure.

■    Page 16    ■

It is recorded that the witness Walch is released by the Foundation from any possible confidentiality obligations for the present proceedings. The Applicant, Zygmunt Józef Solorz, does not release the witness from her duty of confidentiality.

How are or were you involved in the facts of this case?

In relation to the TiVi Foundation, I began an analysis of the foundation documents in the fall of 2023. These were purely legal matters. Later, probably in May 2024, I had dealings with the founder's representative in other matters. In the fall of 2023, I was engaged by the Foundation.

What was the Foundation's mandate in the fall of 2023, and what conclusions did you reach?

My problem is that I have not been released from confidentiality by the founder, and therefore I do not wish to make any statements about this.

Who specifically from TiVi gave you the mandate in the fall of 2023? D

At that time it was the Foundation Board members Jarek—I can't recall the surname—and Philipp Senn.

How did these gentlemen contact you?

It was in the context of a meeting. There were no written results.

Where did this meeting take place?

In my office premises.

■   Page 17   ■

Other than the two Foundation Board members and yourself, was anyone else present at this meeting?

No.

Which foundation documents were you to analyze on behalf of the Foundation?

I can't recall precisely; it was in the fall of 2023.

What issue were the Foundation Board members concerned about?

In my opinion I am bound by confidentiality here, as I have not been properly released.

Read, dictated, checked, agreed

The witness claims fees totaling CHF 500.00. The parties raise no objections.

**Ruling**

**The witness Walch's fee is set at CHF 500.00. The court treasury is instructed to transfer this amount to the witness Walch from the cost advance paid by Respondent 2.**

The parties and the witness waive the right to appeal and to a formal copy of the order.

The witness Senn declares by telephone that he is prepared to appear earlier for his testimony.

The witness examination begins at 10:30 a.m.

■  Page 18  ■

**The witness** is examined:

**Philipp Senn,** born June 17, 1969, citizen of Liechtenstein, residing at Im Riet 15, 9495 Triesen, tax advisor, admonished to tell the truth, instructed pursuant to Section 321 of the Code of Civil Procedure.

It is recorded that the witness Senn is released by the Foundation from any possible confidentiality obligations for the present proceedings. The Applicant, Zygmunt Solorz, does not release the witness Senn from his duty of confidentiality.

Because I have not been released from professional secrecy, I do not wish to make any statements.

**Questions by Respondent 3:**

What was your role at TiVi?

I was Chairman of the Foundation Board.

Did you attend the meeting between the Applicant and Respondents 2–4 that took place between July 31, 2024 and August 2, 2024?

No, I did not. I'm sorry, but I do not feel able to make any further statements. It is very difficult to distinguish what I may say, given that I have not been released.

How and from whom did you learn on August 2, 2024, of the issuance of the declaration of death?

In my view, that falls under professional secrecy.

Did you sign the Foundation Board resolution on the amendment of the Foundation's Statutes dated August 2, 2024?

■    Page 19    ■

In my view, that falls under professional secrecy.

Read, dictated, checked, agreed

The witness waives fees and is released at 10:39 a.m.

**The witness** is examined:
**Luca Castellazzi,** born December 18, 1972, citizen of Switzerland, residing at Glattbachstrasse 51, 8044 Zurich, commercial employee, admonished to tell the truth, instructed pursuant to Section 321 of the Code of Civil Procedure.

It is recorded that the witness Castellazzi is released by the Foundation from any possible confidentiality obligations for the present proceedings. The Applicant, Zygmunt Solorz, does not release the witness Castellazzi from his duty of confidentiality.

**Questions by Respondent 4:**

Were you working for the TiVi Foundation?

Yes, under the umbrella of AF Fiduciary Establishment, as an employee of AF Fiduciary Establishment.

Since when approximately?

For the Foundation?

Yes.

I took over the mandate internally in 2018 or 2019.

Were you involved in the amendments to the TiVi Statutes?

I do not wish to make any statements about that due to not being released.

■    Page 20    ■

Read, dictated, checked, agreed

The witness waives fees and is released at 10:45 a.m.

The hearing is recessed at 10:50 a.m.

The hearing resumes at 1:00 p.m. It is recorded that at 1:00 p.m. the interpreter for the English language, Alexander Scharfs, is present.

**The witness** is examined:

**Jarosław Grzesiak,** born April 27, 1966, citizen of Poland, residing at 13 Jaworoska Street, Konstancin-Jeziorna, attorney-at-law, business consultant, admonished to tell the truth, instructed pursuant to Section 321 of the Code of Civil Procedure.

It is recorded that the Applicant, Zygmunt Solorz, does not release the witness Grzesiak from his duty of confidentiality.

I am not bound by any duty of confidentiality; there is nothing from which I would have to be released. We are talking about professional confidentiality obligations.

I was admitted to the bar in Poland in 1995. I was a partner in a law firm for 22 years, first Dewey Ballantine and later Greenberg Traurig. For 21 years I managed the firm's partners in Poland. Since 2007 these law firms have provided services to the Applicant's companies. 80–90% of these concerned corporate mergers and acquisitions abroad, structured finance, and capital markets. We never represented the Applicant as a private individual. In 2020 the Applicant offered me a position as his right-hand man within his corporate group and family office. This is documented in the agreement between the Applicant

■    Page 21    ■

and me dated May 8, 2021. Under this agreement, at the Applicant's request,
I gave up my work as an attorney. I undertook to sell my partnership shares and
ceased practicing law as quickly as practicable, to make myself exclusively
available to the Applicant for the supervision of ownership structures. This was
publicly reported in the Polish press in accordance with my contract.

In that agreement, the Applicant also asked me to give up my profession, which
in Poland required submitting an application to the bar association to remove
myself from the list of active attorneys. I did this at the beginning of 2022 after
the financial closing of the previous fiscal year of my firm. This means that since
moving from my firm into employment with the Applicant, I have no longer been
an attorney and am not bound by attorney-client privilege under Polish law.
The only private confidentiality agreement I signed was at the Applicant's request
in September 2023; it is a private agreement and, according to the legal advice
I received here in Liechtenstein, such a private agreement does not fall under
attorney or medical secrecy, so I can answer the court's questions on this matter.
In my testimony, I will not disclose any trade secrets unrelated to this case.

*Applicant's statement:*

*The witness JG was named today by the Respondents. He received a detailed
written warning from the Applicant not to testify, which I repeat here:*

*JG remains registered as an attorney and as such is subject to a statutory
prohibition against giving evidence. His consulting contract concerned almost
entirely legal services for the Applicant personally. This contract also obliges him
to confidentiality. It contains a clause requiring that he communicate exclusively
with the Applicant in these matters.*

■   Page 22   ■

*It is also noted that by testifying today he is committing a criminal offense.*

I reject this assertion as entirely false and untrue. I consider it an unlawful threat against a witness, which is a serious criminal offense in both the United States and Poland. In Poland this would fall under Section 245 of the Penal Code. Threatening a witness is an offense against the court and the justice system of the relevant country, and I consider it as such. I have four legal opinions—one from Liechtenstein and three from Poland—confirming that since 2021 I have no longer been an attorney and could not provide legal services to the Applicant because I no longer hold the necessary license. Therefore, I regard it as my duty to appear before this court and to answer your questions, subject to the limitations I mentioned.

*Applicant's statement:*

*First, the witness does not deny that he remains listed as an attorney. Second, he does not deny that his consulting agreement binds him to confidentiality. Third, I point out that we are here in Liechtenstein and subject to Section 121 of the Criminal Code. The witness is therefore again instructed not to testify.*

Since 2022 I have been on the list of inactive attorneys and am therefore not permitted to practice law. The agreement dated May 8, 2021 expressly excludes legal services. I have twenty agreements with various companies of the Applicant that also state that I am not acting as an attorney, and therefore there is no attorney–client relationship between me and the Applicant.

**Questions  by Respondent 4:**

Are you also known by the name Jarek?

Yes, that is the Polish short form of Jarosław.

53

■   Page 23   ■

Were you friends with the Applicant?

I have known the Applicant since 2007. It began as an attorney–client
relationship. Around 2010 or 2011, after handling the acquisition of the company
Polkomtel for the Applicant, our relationship, at his initiative, became a
friendship. From 2012 to 2022, we not only worked together but spent virtually all
our holidays together; the Applicant visited me every year at my house in
Greece. We bought neighboring houses in France with the intention of retiring
there together. For ten years I spent more time with the Applicant than with any
other friend or family member. He called me his closest friend, and I treated him
as a mix between a father—since I lost mine early—and an older friend.
The Applicant also had a very close friendship with my children and my wife.
So I would say that for ten years we had a very close friendship.

Do you know anything about an agreement concerning the assets that were part
of the Applicant's first divorce?

No. I have heard of that agreement but have never seen it myself.

What were your main duties in your work for the Applicant's companies?

Over what period?

From the beginning.

From 2007 to 2021 my law firm primarily provided legal advice on acquisitions,
mergers, and the financial structure of the Applicant's group. This included, as is
publicly known, the stock market listing of Cyfrowy Polsat in 2008. That was the
largest IPO of the year. I had the pleasure of assisting the Applicant in acquiring
Polkomtel, the largest Polish mobile operator, in 2011. At that time it was the
largest leveraged finance transaction in Europe. We represented the Applicant's

■    Page 24    ■

group in financing the purchase of that company by raising 4 billion in debt. That was only the beginning of a long list. We handled mergers and acquisitions on a large scale, as the Applicant's group is the largest private company in Poland, and its acquisitions were likewise the largest in Poland.

What were your main duties when you began working exclusively for the Applicant in 2021?

The Applicant approached me as a friend in the fall of 2020, very shortly after his first COVID infection. He said he no longer needed me as a lawyer, but wanted me as the principal person working with him inside the group. Initially I refused and said I was perfectly able to perform these tasks through my law firm, but he said he needed me for three main reasons:

He needed someone he could fully trust who would ensure his safety when he signed documents within his organization at a time when his health was steadily deteriorating. He needed someone to bring the family—who did not get along particularly well with each other, namely his children, his ex-wife, and his current wife—onto common ground. And what finally persuaded me was that he needed someone he could trust completely to protect his children and heirs if he himself became too weak to do so. To that end he initially appointed me to all supervisory boards of his companies and to the Foundation Boards of the TiVi and Solkomtel Foundations.

Who initially handled the Applicant's second divorce?

I learned about the Applicant's second divorce as a friend, because of JM's inefficiency—he had been unable to bring the proceedings to a conclusion for ten years. The Applicant asked me to try a different approach to reach an amicable settlement with his then-wife and to end various civil and criminal proceedings that were still pending in 2021. I started with mediation/conversations within the

55

■   Page 25   ■

family, with the children, and as a friend I visited the second wife at the beginning of 2021.

Were you able to resolve the conflict—if so, when and how?

I started with the children. I explained to the Applicant that it would be impossible to maintain the structure within the foundations with 50% for Tobias and 25% each for Piotr and Aleksandra. He authorized me to speak with them about agreeing to an equal split within the foundations. From the perspective of Tobias—who at the time was entitled to 50%—that was asking a lot. I spent several months convincing them that they could only move forward as a team. I said an equal split—33% each—would be good for them because decisions within the foundations could then be made unanimously. The proposal envisaged an independent chair of the Foundation Board who would have the casting vote if they could not agree. The children agreed to this, which I consider, from Tobias's point of view, to be a good decision and a significant sacrifice for the sake of the family. That agreement was what I needed to approach Ms. Żak and tell her there was no longer a conflict between the children of different mothers. At the meeting with her in France, I persuaded her to waive all monetary claims against the Applicant in exchange for payments to the children. In December 2021 a settlement was concluded; JM was the attorney responsible for the Applicant. I conducted this mediation within the family and, in my view, united the family. Ms. Żak then withdrew all civil and criminal actions against the Applicant, and the children received monetary compensation in the form of gifts. In other words, Ms. Żak relinquished her claims because her children received the corresponding payments. This point is very important: the children agreed on the basis that new language would be introduced in the TiVi and Solkomtel foundations to reflect an equal one-third division. By "language" I mean a redrafting of the Statutes and By-Laws reflecting the new one-third split. This was finalized at the Applicant's house in Antibes, France, on August 19, 2022, and was signed by the Applicant and all his children, and regarded as final and

■     Page 26     ■

binding. It was a very moving day for all of us because it united the family, and it happened on Tobias's birthday, August 19—although Tobias was only connected with us by phone. These changes were entered in the Liechtenstein Commercial Register on November 24, 2022, which is Aleksandra's birthday.

Was the Applicant undergoing medical treatment in Switzerland at the beginning of 2022, and if so, did you accompany him?

Yes, the Applicant was in Switzerland for the whole of January 2022. In the first week he was accompanied by his then-wife, MN, but he asked me to be with him long-term to take care of business matters. So I joined during the first week and stayed with him until the end of January.

What issues were discussed there?

The question is too general.

Were foundation-related issues discussed there? Which ones?

Yes. Two topics in particular were discussed. First, the Applicant confided to me that I should handle the divorce from MN, which came as a shock. He explained that nothing should stand in the way of the foundations inheriting. And he feared that Polish inheritance law could have negative effects on his succession planning. The second issue concerning the foundations, which was discussed exhaustively, was that I should find a solution—not necessarily from a legalistic perspective but in real life—how to "have your cake and eat it too." By that I mean he wanted to avoid what he called the humiliating process of a court declaration of incapacity, which at that time was the only way to transfer control of the foundations to the children, the secondary beneficiaries, if his mental state

deteriorated to the point where he could no longer make his own decisions. He asked me how he could hand over power within the foundations if he noticed his mental faculties fading. At that time there were only two options: death or incapacity. I did not immediately find a solution, but we began discussing it then, and I promised to come up with something.

When and how was the instrument of the "declaration of death" presented and discussed?

As a concept—without finalized wording—it was presented at a brainstorming meeting the Applicant organized at one of his properties in Łąck, Poland. He convened this meeting specifically on this topic. I think it was in March (this can easily be verified); it was after he and his wife returned from vacation in Barbados. It was the first or second week after the outbreak of the war in Ukraine. Present were the Applicant, Piotr, Tobias, JM, TZ, Martin Dichans, and me. We discussed the topic together for two days, and I developed the concept that accommodated all of the Applicant's wishes. He would retain control because he would issue a declaration that included the founder's resignation or "civil death." The plan was for him to issue this declaration, for example, a year in advance, and to be able to extend the period at any time before it took effect if he still felt well at the relevant time. Before the effective date, he always had the right to extend the period. It was very important to him to keep this sovereign decision—that is, control—in his own hands, as he had always done. When I speak of "sovereignty" in light of where the lawyers wanted to go with this question, I mean that he wanted to spare himself the humiliation of being declared incapable by a court and to make that decision himself.

However, it was crystal-clear to everyone—especially the Applicant and JM—that once the declaration took effect, a point of no return had been reached; that is, after it took effect, he would have lost control over the foundations. There was

■    Page 28    ■

a discussion; everyone liked the concept; and JM, as counsel to the group, took over drafting the text.

This concept appealed to the Applicant, was agreed with the children on August 19, and—with minor changes by JM—was incorporated into Article 13(2) of the TiVi and Solkomtel Statutes, which were filed on November 24, 2022. The amended Statutes were signed by the Applicant and the children on August 19, 2022.

Whose wish was it to introduce this instrument?

The idea and the initial request came from the Applicant. After that brainstorming session, we were all satisfied with it—his children, JM, and everyone present.

Were these amendments to the Statutes considered final and celebrated accordingly?

Yes.

Let me add two sentences before JM objects. This wording was agreed and then introduced at TiVi. At Solkomtel it was handled analogously, but without JM's involvement, because by then the Applicant no longer trusted him. The wording, however, is the same. JM, having lost the Applicant's trust, was kept out of the Solkomtel transaction and had no access to the documents. So the TiVi wording was drafted by JM and used analogously at Solkomtel without his participation. The Solkomtel documents have the same wording, but JM did not have access to those documents.

Was the instrument of the declaration of death also prepared and implemented at the operating-company level, and if so, how?

■    Page 29    ■

No, it was not implemented at the company level. If you mean whether this wording was used elsewhere in Statutes or By-Laws, no—it concerns only TiVi and Solkomtel.

Was the concept—namely that the Applicant could name a specific future date for a transfer of control in the foundation—prepared at the company level?

I think we are mixing two different things. Within the foundations, as a cautious Foundation Board, we obtained various opinions—legal and financial—on what the transfer of control and its timing would mean for the foundations. There was extensive research, presented at Foundation Board meetings in Vaduz. The most important presentation was by legal counsel Baker McKenzie Zurich, which dealt with the details of higher asset valuation as a result of Article 13(2) taking effect, i.e., the transfer of control. We took advice only at the foundation level— not at the level of the underlying companies. When speaking about a change of control, one must be very careful because in corporate, tax, or banking law it can each mean something slightly different.

Were any concrete provisions made in financing agreements at the company level for such a change of control?

There may be a misunderstanding here, because the financing agreements of the operating companies—at the Applicant's specific request—have always included, over the last five or six years, a definition of change of control. By that we meant a permitted change of control without the need for consent or a waiver from the banks. It was always a very broad definition under which any transfer by the Applicant to his children within the framework of the foundations was a permitted change of control. By this I mean that both physical death and the Article 13(2) scenario were covered.

■    Page 30    ■

Approximately what bank financing volume are we talking about here?

That is a trade secret.

Do you recall how the TiVi Foundation Board was composed at the time when this declaration of death was inserted into the Statutes?

The chair of the Foundation Board was Philipp Senn, and the members were Tomasz Szeląg, Katarzyna Tomczuk, and myself.

Roughly speaking, what duties did TS perform on the Foundation Board and within the corporate group?

He is the CFO of both the corporate group and the Applicant's family office. The foundation did not have a CFO position. He was an ordinary board member with the corresponding financial expertise.

When and how was the Applicant's first declaration of death prepared and signed?

It was first prepared in September 2022, at another meeting of the Applicant and his children. This declaration had to be executed in the form of a notarial deed, so the first draft came from DW. But it was not signed at that time. The Applicant signed in May 2023.

When did the relationship between the Applicant and his current wife become known?

On November 1, 2022, during a business trip to Korea.

At that time and thereafter, did the current wife assume any functions in relation to the Applicant's work?

■    Page 31    ■

She was already an executive within the group—namely a board member of Polkomtel—for quite some time, four or five years. She also sat on one or two supervisory boards, including a bank owned by the Applicant. After the Applicant officially introduced her as his partner, she quite quickly took over most of my tasks; that is, she attended almost all business meetings together with the Applicant. Subsequently, in 2023 and 2024, the Applicant appointed her to numerous—up to 50—supervisory boards.

What functions did JM have at that time?

JM was, and is, the Applicant's principal legal counsel, and his law firm essentially functioned as the group's outsourced legal department.

When and how did you learn of the Applicant's revocation of the declaration of death?

On Friday, August 10, 2023, when the Applicant unexpectedly returned from vacation in the presence of Ms. Kulka, JM, and the notary DW. He made certain amendments to the Statutes—which had actually been considered final—and revoked his May 2023 declaration of death.

Were the children/secondary beneficiaries involved in this process?

No—neither they nor I. We learned of it the same day, but after the decision had been made. Neither the children nor I were present at the meeting where these resolutions were adopted.

How did you react?

With great disappointment. I had believed I had offered my friend solutions that were good for him and for his succession planning. In my opinion—which I also

conveyed to the Applicant, JM, and TS—the wording was very sloppy and ambiguous. Above all, I did not know how to translate the concept of "resurrection," i.e., resignation and resignation from resignation, into the real corporate world. I still have a problem with that. I asked JM whether he had a Liechtenstein legal opinion on this topic, and he said he had only an oral statement from a lawyer in Liechtenstein. That is important because it is the main reason why the Applicant asked to engage an independent Liechtenstein law firm to review the recent amendments to the Statutes. After discussions here in Vaduz, we therefore recommended the firm Walch & Partner of Schaan. They were officially commissioned by TiVi and Solkomtel in the fall of 2023 to conduct the review.

In 2023, after the August amendments to the Statutes, were there further changes—and if so, which ones?

Yes, there were at least three further rounds of amendments. The first followed a meeting between the Applicant and his children in September. Several changes were made; the most important was a closed list of secondary beneficiaries— meaning even the Applicant, as founder, could not add further secondary beneficiaries. That was adopted as a By-Law in September 2023. The second round was due to the fact that one of the secondary beneficiaries, Aleksandra, is a U.S. person for tax purposes. And the third round concerned a correction of JM's draft—a self-correction, to put it politely.

So, were the August 2023 amendments and the subsequent amendments also discussed within the Foundation Board?

The August amendments were not; the other three were. And, to protect the beneficiaries, the wording was changed so that future amendments had to be communicated to the beneficiaries before taking effect—in order to avoid a repeat of the situation in September.

■    Page 33    ■

What, specifically, was the mandate given to the firm Walch & Partner, and who gave it?

The concept of an independent legal review by a Liechtenstein firm was first approved by the Applicant; he also approved Dr. Walch's hourly rate. It concerned a general review of the foundation documents to determine whether amendments to the Statutes or By-Laws were necessary under Liechtenstein law for validity. At the meeting at Dr. Walch's office, PhS and I presented the concept, and later the Foundation provided all historical versions of the Statutes and By-Laws from 2012 to date. At the same time, we informed the Foundation Boards at the foundations about the engagement and the scope of the mandate—i.e., TS and Respondent 3 were also informed.

When and to whom were Dr. Walch's results presented?

They were presented at a meeting in December 2023 to PhS and me, and later at a second meeting in January 2024.

What results were presented?

Essentially, everything was in order. Liechtenstein foundation law is so flexible that founders' rights stand above the odd concept of "resurrection." The wording was that the law is so flexible that the founder can incorporate almost anything into the Statutes or By-Laws. This is also supported by decisions of the Austrian Supreme Court. However, Dr. Walch identified a different issue related to the transfer of assets ("true sale of assets"). As long as the founder reserves the right to take assets back from the foundation, third parties could claim that those assets were never truly transferred to the foundation. The problem was the accumulation of rights in the founder—as founder, Curator, and beneficiary— which, according to Dr. Walch, could ultimately allow the Applicant to reclaim assets.

■   Page 34   ■

Did you discuss this "true sale" issue with the Applicant?

Of course—immediately. As usual, not only with him but also with his children, and it was discussed in the Foundation Board as well. After the board meeting, I explained my view on it to JM in detail when we met at Munich Airport. That was on January 19, 2024, on the occasion of the Health Foundation's board meeting, which both JM and I attended.

How did these persons react to the issue?

Everyone was concerned. But it remained unresolved for a while. I asked whether Dr. Walch should be instructed to draft corresponding amendments to the Statutes and By-Laws, but I did not receive an instruction to engage her.

Subsequently, did you also discuss transferring company leadership to the sons?

Yes. As part of succession, the Applicant liked the idea of elevating his sons Piotr and Tobias to the highest management level of the companies. One can be a passive beneficiary or also participate in management, and it was the Applicant's wish that his sons do the latter. First, Piotr was appointed interim CEO of Polsat TV, the group's most important company. Then the Applicant decided that, if Tobias moved back to Poland—he was then living in Liechtenstein—and took the CEO posts at Polkomtel and Polsat TV, those appointments should be permanent. Tobias agreed, and the Applicant signed a corresponding internal document under which Piotr became CEO of Polsat and Tobias became CEO of all the other companies, to take effect on January 1, 2025. This lead time was necessary for Tobias to return to Poland.

■   Page 35   ■

**The hearing is recessed at 3:30 p.m. for 10 minutes.**

There was an important and dramatic discussion on this topic between me and the Applicant. We were in Kenya in March 2024. It was one of the rare occasions when Ms. Kulka was not present and we could speak one-on-one. I recommended both sons for the positions and, at the same time, asked the Applicant to let me step down and terminate our agreement. I explained that I was no longer doing what the original plan had been—being his right hand—because Ms. Kulka now held that position. I asked him to release me from summer 2024 so I could find other employment. The Applicant said I had done so much good for him over his life that I should stay with him for a long time yet, and that it did not matter that my remit had shrunk. I would be paid and be there to ensure that his children became his successors. I told him that put me in constant conflict with Ms. Kulka, who by then was his wife. His answer was: "You are a great man who should carry out this conflict with her, because someone has to do it." I asked him whether he was happy with our succession plan, and he confirmed that the idea of making Piotr and Tobias CEOs matched his wishes.

When was your last meeting with the Applicant?

The last one-on-one conversation was in May 2024. Ms. Kulka unexpectedly left him to go to the hairdresser. The Applicant immediately came to my office and we spent about an hour together. I again told him that it made little sense for me to be there arguing with Ms. Kulka and JM. He repeated that I was doing a good job and that my task was to ensure that no one deprived his children of their legacy.

At that time, did you know about a general power of attorney from the Applicant in favor of JM?

■    Page 36    ■

No.

Did you attend the meeting between the Applicant and the secondary beneficiaries during the period from July 31, 2024 to August 2, 2024?

No, at that time I was at my vacation home. I was not personally present at those meetings.

When and how did you learn about what was discussed at that meeting?

On July 31, 2024, I learned from Aleksandra, who arrived in Warsaw, that she had been at a meeting with the Applicant and JM. On that occasion, the new will was presented to her—and I do not know if to all secondary beneficiaries—and I learned then about the general power of attorney you asked me about earlier. That was everything I learned about this meeting on July 31.

What did you learn next, and when?

The first of August began with a call from Piotr, who told me that Aleksandra was feeling very unwell. He asked me to find a doctor who could make a house call at the office where we were. I spent about two and a half hours finding a doctor who first consulted with Aleksandra by phone and then came to the Polsat office. That was when I first heard from Aleksandra's husband what was planned. He told me, in the early afternoon of August 1, that the father was meeting with JM and the children, and that they were discussing the immediate transfer of certain rights to the children. He didn't go into detail, but said they were talking about transferring control of one of the foundations to the beneficiaries. He asked me if he could call a U.S. lawyer—Matthew Sperry, the main tax advisor for Aleksandra and her husband, and for their American family. His question was what risks there would be if the transfer happened immediately. I asked what he meant by "immediately," and he said, "this week." I reached Mr. Sperry, who was

■     Page 37     ■

on a flight with internet access, so he was able to talk with me. I explained the idea, and he asked whether I could also contact a second tax advisor, Marnin Michaels from Baker McKenzie, who was the group's tax advisor. He too was in the United States and also on a plane. So for about two hours I had frantic conversations with two tax advisors in different airplanes and time zones. Around 5 p.m. or 6 p.m., I got the answer that they would find a solution for the immediate U.S. tax implications, and I was able to report that back to Aleksandra and her husband. In the early evening, around 6 p.m. or 7 p.m., I began speaking with Aleksandra, who told me that a good meeting was taking place with JM present, that her father was doing well, and that they were planning the transfer for the next day. She asked how available I would be that evening and the next day, because the Applicant wanted to talk to me. But she said they were making progress and moving toward quick decisions on transferring the foundation. Later in the evening, around 7 p.m. or 8 p.m., Piotr contacted me asking if I could quickly send them the latest versions of the TiVi and Solkomtel Foundation Statutes and By-Laws, because they had agreed with the Applicant to present him with a written draft by the next day. I didn't have the documents with me; I got them from Ursula Tomask, who sent them to me, and I forwarded them to Piotr. I believe that can be verified in my company email account, to which I have not had access since September 13.

That evening Piotr had one or two more questions. He said it had been agreed with his father that Article 13.2 would be used as the mechanism for the transfer of control. If I recall correctly, he sent me the draft resignation declaration with Article 13.2, which looked exactly as it had on previous occasions, so I had no comments. They said it had been agreed with the Applicant that this would be a final transfer with no right of retransfer. He said he therefore planned to delete the wording introduced by JM in August 2023, which had allowed for a retransfer. I looked at the Statutes and made a few comments—especially that the Solkomtel Statutes contained a gap preventing the Applicant from receiving dividends, even though he remained a beneficiary. But I felt confident because

■    Page 38    ■

JM was present at the meeting and DW had already been asked to review the documents the next day. That was everything for the evening.

Did you have the impression that on August 1, 2024, only JM was present on-site as advisor, or was notary DW also there?

I know that JM was present at the meetings on July 31 and August 1, and that DW was only supposed to join on August 2. Aleksandra asked me to remain available because the Applicant wanted to call me that evening or the next day to discuss the matter, and that call indeed took place on August 2. It was at 3 p.m. Greek time and lasted 12 minutes.

What did you observe about developments the following day, August 2, 2024?

By August 2, I had understood what the Applicant and the beneficiaries were planning, and I asked them early that morning whether I could involve TS in these discussions, because the planned measures had numerous consequences for the companies. As I said, we had generally clarified such measures with the lawyers, but doing it all overnight was a challenge that gave me headaches. When I reviewed the implications under banking, securities, and antitrust law, I found that "change of control" means different things in each field—and that, from an antitrust perspective, the foundation was not controlled by anyone. The Applicant had shared control with his children but, as Curator, had retained part of it, so that control ultimately shifted to the foundation itself; and this downward shift in hierarchy is not a "change of control" in the strict sense.

Did you have telephone contact with the Applicant himself that day?

■    Page 39    ■

Yes, I was waiting for that call because I wanted to hear from the Applicant
whether he agreed with the situation. The call took place, and I personally
perceived that DW, the Applicant, and Aleksandra were on the other end of the
line—I don't know if anyone else was. I briefly described to the Applicant what
I had done to resolve the outstanding issues and whom I had contacted. He was
grateful, but he had a specific question: if he were to resign definitively as
founder on August 2, would there still be any risk if he retained the position of
Curator with a veto right? The question was raised in the context of the "true sale
of assets" issue and was later repeated by DW. I said that I was not a
Liechtenstein lawyer, but common sense told me that negative control of that
kind posed no risk; since JM was present, I nevertheless suggested checking in
Liechtenstein to make sure. At the time I was convinced that JM was present, as
he had been the previous day, but three days later I learned that he had gone on
vacation and had left his client on his own. I learned this from a conversation with
DW, who asked me questions while preparing the notarial deed. The Applicant
made a joke at the end of the call and said, "Let's do it."

Ten minutes later I got a call from Piotr, who told me I could inform TS about
what was happening. I did so, and TS immediately mobilized a large team in the
family office and the finance department to handle it. That was important
because people in Poland, Cyprus, and Liechtenstein were involved, and it was
a Friday afternoon during holiday season, so we had to make sure enough staff
were available. One or two hours later I received an email to the entire
Foundation Board of TiVi and Solkomtel with the Applicant's signed declaration
in the form of a notarial deed, amendments to the Statutes and By-Laws of the
foundations, and the Applicant's instruction, in his capacity as Curator, to
implement them immediately. He had a veto right as Curator but gave his
consent the same day. As was his duty, TS called the Applicant to verify—so as
to prevent fraud—whether this reflected his wishes, and I had the unpleasant
task of recalling PhS from a mountain hike in the Alps. In the end we reached
everyone, and TS obtained confirmation that it did correspond to the Applicant's

■    Page 40    ■

will, so we as the Foundation Boards of TiVi and Solkomtel passed the corresponding resolutions, which, according to our Liechtenstein lawyers, thereby became binding. It was very late at night, and it was the happiest day of my life, because I thought I had helped my friend transfer his legacy to his wonderful children, just as he had always wanted.

What happened the next day?

The next day began with a call from TS, saying that something else had to happen that evening because the Applicant was convening an urgent meeting, at which we were to be present around noon at company headquarters. Most people were physically present at that meeting in Warsaw; I joined mostly by phone. At that meeting the Applicant said he had changed his mind and wanted to withdraw the declarations from the day before. He immediately gave the floor to JM, who suggested we simply forget what had happened, destroy the corresponding documents, and move on with our lives. TS and I took the position that the changes were effective and that the new Statutes of TiVi and Solkomtel were in force. So if any amendments were to be made, they had to follow the new Statutes adopted the previous evening. I remember the discussion well—it lasted about an hour and a half. We all agreed to take two weeks to determine which rights of the children needed to be protected and what could be improved. The Applicant left that evening or the next day with his children to celebrate his birthday on his yacht—that was August 4. JM, TS, and I stayed behind to clean things up and find a creative solution to the problem.

What solutions did you propose?

From August 10 to August 23, I presented three proposed solutions to resolve this conflict. From that point onward, everyone—including the Applicant and Ms. Kulka—was included in the email distribution list. I began consulting with the

■    Page 41    ■

family and submitted three proposals by email: the first on August 7, the second
on August 10 or 11, and the last on August 22 or 23. The goal was to avoid
family conflict at all costs, and my task was to come up with ideas—not
necessarily to determine whether they would work. That was my job: to devise
possible solutions. My ideas included allowing the Applicant and his children to
select Foundation Board members from a long list of previously known names,
and appointing a second Curator whose sole right would be to block asset
transfers out of the foundations or changes to the beneficiaries' rights. All of
these proposals were aimed at giving the family the possibility to return the
Applicant to the status quo ante as of August 2. I received all of these
assignments directly from the Applicant. Each time he responded that he liked
the ideas. But each time, about an hour later, I received a call from JM, saying
that the Applicant didn't know what he was saying and had changed his mind.
The children decided to convince the Applicant that they were concerned for his
health and safety—not for their own financial interests. They therefore instructed
me to present a "maximum proposal," under which the Applicant could exclude
all of them as beneficiaries of the foundations except for one third beneficiary,
referred to in the proposal as the anchor beneficiary. I considered this proposal a
major sacrifice on the part of the children, but JM boycotted it, saying it was a
cheap trick because the secondary beneficiaries would retain control as
guardians of the children. I submitted this final proposal on Friday, August 23.
It was not accepted by the Applicant.

JM returned from Poland and said the Applicant only expected restoration of the
situation prior to August 2, and that his children should wait for his decision.
That was JM's proposal in the last week of August.

How did your departure from the TiVi Foundation Board come about?

I was dismissed by Piotr on August 14, after he asked me whether I would
represent the children in future disputes, and I replied that I had been hired by

■    Page 42    ■

the Applicant and would follow his instructions as long as they were legal. This was after three days of heated discussions about a compromise that ultimately failed. TS and I were both dismissed at the initiative of Piotr and Tobias—I don't know exactly who dismissed TS, but I was dismissed by Piotr on August 14. Then, apparently as a result of a Liechtenstein court decision based on a petition or an interim injunction, I was reinstated as a board member at the end of August. I resigned myself on September 19, after finding out that the Applicant had appointed JM in my place, which was for me a clear sign of loss of trust.

Were you asked by the Applicant to remove Piotr Żak from his position as CEO?

Yes.

How did you respond?

When I was reinstated to the Foundation Board in September pursuant to the court decision, I was confronted by the Applicant, Ms. Kulka, and JM with an ultimatum: either TS and I, within our authority as Foundation Board members, vote to remove Piotr, or we authorize JM to carry it out. And this is important to me because it marked the end of my long relationship with the Applicant. I said I would never do that—first, for ethical reasons, because he had hired me to protect his children, not to fire them. I would never have accepted the position had I known I would become an executor against the children. Secondly, that request was illegal: such a decision was the responsibility of the full Foundation Board, consisting of four members, and asking only TS and me violated the Statutes and contradicted the interim injunction, which prohibited actions outside the normal course of business. Therefore, I refused to sign or to authorize JM accordingly, and two days later, I was dismissed by the Applicant from all of my 45 positions.

■   Page 43   ■

**Questions by the Applicant's counsel:**

Did you receive the letter of February 1 from Attorney Ott, informing you that you were not released from confidentiality and, in the Applicant's view, should not testify?

No, I did not receive any letter from Mr. Ott, but I did receive one from the Applicant, which he signed and sent to me directly. I replied to him on Friday afternoon by email and also by registered mail, which he probably has not yet received.

What email addresses do you use?

I don't see the relevance of this question to the current proceedings, but if the court believes I must answer, I will.

Did you receive, at any of your email addresses, on Sunday, February 2, at 3:04 p.m., an email from Attorney Ott?

Quite simply, I have never received an email from that person. If the email was sent to my professional address, which was blocked by the Applicant, you know why it didn't arrive. My private email address is well known—even JM knows it. It's a Gmail address.

Is your consulting agreement with the Applicant, concluded in 2021, still in force?

No. JM notified me of the termination of that agreement with immediate effect on September 13, 2024, bearing the Applicant's signature. That constitutes a breach of contract, since the agreement was fixed-term and included no right of termination.

What remuneration did you receive under that consulting contract?

■    Page 44    ■

Yes, I received remuneration. I consider the question irrelevant.

Was €5 million per year agreed for these consulting activities?

I earned roughly the same as in my previous career as a lawyer. The fee was structured so that within five years I would earn the equivalent amount, compensating me for giving up my legal career. I had been a top lawyer in Poland for many years, with a corresponding income. I gave all of that up for the Applicant.

**The hearing is suspended at 5:25 p.m. for five minutes.**

Until the revocation of the first declaration of death in August 2023, did you assume that the Applicant would continue to extend it?

I don't understand the question.

My question is: until you learned that the declaration of death had actually been revoked, did you believe that the Applicant would continue postponing the effective date further into the future?

Yes, I assumed it worked as I had designed the concept—that he would keep postponing the entry into force of the declaration of death, until one day he no longer did so.

Are you familiar with the Applicant's notarial declaration of July 29, 2024?

No, I know only the document he presented on August 2.

After the disputes broke out in August 2024, did you still meet the children personally?

■    Page 45    ■

Daily—we work in the same office.

Under which law was the analysis of the "true sale of assets" issue carried out?

Under Liechtenstein law.

Was the issue also examined under Polish law?

Not to my knowledge. I don't know to what extent Polish law is relevant here. If it was an issue, that would have been JM's responsibility.

Who was asked, in the fall of 2023, for authorization to amend the foundation documents to resolve the "true sale" issue?

The Applicant. I'm not sure how relevant that is—there was no "no," but simply no "yes." I asked him more than three times for authorization, but never received a positive response. I also asked whether the amendments made at TiVi should be made at Solkomtel as well, and again never received a positive answer, up to August. That's why the Statutes differ.

I would like to make a final statement. The Applicant is a happy father. He has raised the best second generation among Poland's great entrepreneurs. In particular, Aleksandra was the love of his life, and he was very proud of his sons as well. What is happening here—and the threats that have been made—is a tragedy. I decided to testify in this case because the children deserve it.

*Counsel for the Applicant denies that any threats were made.*

Read, dictated, checked, agreed

■    Page 46    ■

The witness waives witness fees and is released at 5:45 p.m.

The judge announces the                                    **[h/w:] K. F.**
                                                           **Hearing date scheduled**
                              **Order:**                   **[h/w:] CAR IVSO**

**The hearing is continued for the taking of the offered evidence on Tuesday, February 4, 2025, at 8:30 a.m., Courtroom VHS 1.**

End:        5:50 p.m.
Duration:  7 hours

Signatures

[signatures]





Beilage ·/ AG

FÜRSTENTUM LIECHTENSTEIN
FÜRSTLICHES
LANDGERICHT

Aktenzeichen bitte immer anführen
06 HG.2024.210
ON 21

# ÖFFENTLICHE MÜNDLICHE VERHANDLUNG

vor dem

**Fürstlichen Landgericht**

Vaduz, 03.02.2025

## Anwesende Gerichtspersonen

**Richter:** Diana Kind               **Schriftführerin:** Mathias Spögler

## Rechtssache

**Antragsteller:**        Zygmunt Jozef Solorz, Meierhofstrasse 8, LI-
                          9495 Triesen
                          vertreten durch Schurti Partners Rechtsanwälte
                          AG, Zollstrasse 2, LI-9490 Vaduz
                          zusätzlich vertreten durch Pitkowitz Foerster
                          Rechtsanwälte GmbH
                          Schwarzenbergplatz 3
                          1010 Wien

**Antragsgegner:**    1.  TiVi Foundation (FL-0002.394.367-5), Kirchstrasse
                          12, LI-9490 Vaduz
                          vertreten durch Ritter Schierscher Rechtsanwälte
                          AG, Gewerbeweg 5, LI-9490 Vaduz

■    Seite 2    ■

2. Piotr Mateusz Zak, ul. Ostrobramska 83 m. 1801A,
   PL-04-175 Warschau
   vertreten durch Roth + Partner Rechtsanwälte
   AG, Landstrasse 40, Postfach 408, LI-9495 Triesen
3. Aleksandra Jadwiga Zak, 9950 Toluca Lake Ave,
   US-91602 North Hollywood CA
   vertreten durch Gasser Partner Rechtsanwälte,
   Feldkircher Strasse 31, P.O.Box 246, LI-
   9494 Schaan
4. Tobias Markus Solorz, Haldenweg 18, LI-
   9495 Triesen
   vertreten durch Marxer & Partner
   Rechtsanwälte, Heiligkreuz 6, Postfach 484, LI-
   9490 Vaduz

**wegen:**              Stiftungsaufsicht (BMG CHF 100'000.00)

Bei Aufruf der Sache um 09.00 Uhr erscheinen:

**Für den Antragsteller:**   RA Simon Ott, RA Dr. Nikolaus Pitkowitz, RA Mag.
                             Peter Machherndl, RA Mag Anton Gorton

**Für die**
**Antragsgegnerin zu 1.:**   RA Peter Schierscher, Beistand, Katarzyna Tomczuk
                             Stiftungsrätin,mit RA Dr Michael Ritter und RA Dr
                             Matthias Niedermüller (für Tomasz Szelag) (ab 17:00
                             Uhr RA Fabian Rischka)

**Für den Antragsgegner**    Persönlich mit RA Marco Ender, RA Tobias Beck
**zu 2.:**

**Für die**                  Persönlich mit RA Bernhard Motal, RA Martina Knünz
**Antragsgegnerin zu 3.:**

**Für den Antragsgegner**    Persönlich mit RA Jochen Schreiber

79

■    Seite 3    ■

zu 4.:

Festgehalten wird, dass mit Beschluss des Landgerichtes zu 06 CG.2024.184-63 vom 04.12.2024 rechtskräftig entschieden wurde, dass die gegenständlichen Begehren im ausserstreitigen Verfahren zu behandeln und entscheiden sind (ON 3).

Der AS bringt sodann vor und beantragt wie in ON 2.

Die Parteien bestreiten, bringen vor und beantragen wie in ON 3. Festgehalten wird, dass der AS sein Vorbringen in ON 2 nicht bestreitet.

Die AG3 bestreitet und teilt mit wie in ON 5.

Der AS bestreitet und teilt mit wie in ON 6.

Der AG4 bestreitet, bringt vor und beantragt wie in ON 12.

Der AG2 bestreitet das Vorbringen des AS und bringt vor und beantragt wie in ON 13.

Die AG3 bestreitet das Vorbringen des AS und bringt vor und beantragt wie in ON 14.

Der AS bestreitet das Vorbringen der AG und bringt weiter vor und beantragt wie in ON 19.

Die AG3 bestreitet und bringt vor wie in ON 20.

Der AG4 bestreitet das Vorbringen des AG und bringt weiter vor wie folgt:

Die Replik des AS zum Sachvortrag der AG2-4 besteht grossteils aus einem Vortrag zur vermeintlich richtigen Beweiswürdigung. Darauf wird nicht näher eingegangen.

■    Seite 4    ■

Zur Klarstellung: Schon vor der Einbringung von Gesellschaften in die Stiftungen, die bei der TiVi Foundation erst längere Zeit nach deren Gründung und schrittweise erfolgte, gab es innerhalb der Familie vereinbarte Grundsätze über die Zuteilung und Kontrolle von Vermögen und Erträgen. Die Details spielen für das vorliegende Verfahren keine Rolle.

Es ist richtig, dass die AG2-4 in ernster Sorge über die sichere Umsetzung dieser Vorgaben waren. Sie waren nicht in Sorge, dass der AS seine Meinung ändern könnte – die Übergabe der Unternehmensleitung an die beiden Söhne war 2024 in vollem Gang, indem sie Schlüsselpositionen als CEO in den strategisch wichtigsten Unternehmen übernahmen –, sondern dass Dritte irgendwann auf diese Vermögenswerte zugreifen könnten, vor allem wenn der AS gesundheitlich nicht mehr in der Lage sein wird, die Dinge selbst zu steuern. Diese Sorge war eine Folge u.a. der – ohne Absprache mit den AG2-4 vorgenommenen – Änderungen im August 2023 (Statutenänderung und Widerruf Ablebenserklärung), der Beurteilung durch BW, aber auch in der am 31.7.2024 präsentierten ungewöhnlichen Vollmacht an JM und dessen Sohn.

Die AG2-4 erörterten diese Sorge am 31.7. und 1.8.2024 mit ihrem Vater und er stimmte zu, dass eine definitive Einschränkung seiner statutarischen Rechte gegenüber der Stiftung erforderlich ist. Die für ihn wesentlichen Rechte, darunter die alleinige Begünstigtenstellung zu Lebzeiten, das Vetorecht als Kurator sowie wichtige Positionen als Aufsichtsratsvorsitzender, blieben beim AS. Damit behielt der AS die Kontrolle, die er wollte. Faktisch sollte sich nichts ändern, auch nicht in der Besetzung des Stiftungsrats, die damals ohnehin schon lange zwischen dem AS und den AG2-4 abgesprochen war.

Es gab am 1.8.2024 keinen Plan zur Übernahme des Vermögens der Stiftungen durch die AG2-4. Die AG2-4 hatten nichts vorbereitet und verliessen sich auf die Berater ihres Vaters. Insbesondere gab es keine Überrumpelung des AS.

Beweis:        - wie bisher
               - Antrag des AS zur Beförderung der AG2 und AG4 vom 14.6.2024

■    Seite 5    ▨

Der AS befasst sich in seiner Replik weiters auf nicht weniger als zehn Seiten mit Rechtsfragen und den dazu eingeholten Rechtsgutachten. Es kann als untrügliches Anzeichen für einen schwachen Rechtsstandpunkt gelten, wenn dieser nicht knapp und klar vorgetragen werden kann und wenn darüber hinaus nicht nur ein, sondern gleich zwei Privatgutachten zum inländischen Recht als notwendig erachtet werden, um das Gericht zu überzeugen.

Im Kern geht es stiftungsrechtlich um die Frage, ob der Stifter am 2.8.2024 die Statuten, noch vor der Abgabe einer Ablebenserklärung, dahin abändern konnte, dass die "unwiderrufliche" nachträgliche Widerrufsmöglichkeit einer wirksam gewordenen Ablebenserklärung entfällt. Das Landgericht kann diese Beurteilung leicht ohne Privatgutachten vornehmen.

Beide Privatgutachter schweigen zu den bereits vorgetragenen und naheliegenden Elementen einer systematischen Auslegung der Statuten. Erstens war das Abänderungsrecht des Stifters umfassend. Lediglich der Stiftungszweck und gewisse Regeln in den Beistatuten waren davon ausgenommen und konkret als unabänderlich bezeichnet. Zweitens beziehen sich die Regelungen, die in den Statuten nach Art.13(2)2.(i) über die Funktion der Ablebenserklärung angeführt werden, explizit nur auf den Fall einer bereits abgegebenen Ablebenserklärung. Dieser Fall lag bei der Statutenänderung am 2.8.2024 noch nicht vor. Als die Ablebenserklärung am 2.8.2024 abgegeben wurde, war Art.13(2)2.(iii) nicht mehr Teil der Statuten. Drittens besagt der Wortlaut in Art. 13(2)2.(iii) nur, dass die einmal abgegebene Ablebenserklärung selbst unwiderruflich widerrufbar ist. Von einer Unabänderbarkeit dieser Statutenbestimmung an sich ist nicht die Rede.

Hinzu kommt, dass die Heranziehung eines Verbots der Ausdehnung von Stifterrechten, auf die sich die Privatgutachter berufen – wohlgemerkt Jakob entgegen seiner eigenen Meinung in Jakob, Die liechtensteinische Stiftung (2008), Rz 252 –, gerade gegen den Standpunkt des AS spricht. Denn dann wäre einerseits schon die im Jahr 2023 erfolgte Einführung der Widerrufbarkeit einer bereits wirksam gewordenen Ablebenserklärung eine solche

82

■    Seite 6    ■

unwirksame Ausdehnung und andererseits wäre die Abschaffung derselben durch Streichung des Art. 13(2)2.(iii) eine zulässige Einschränkung von Stifterrechten. Durch die Streichung am 2.8.2024 gab der AS seine Widerrufsmöglichkeit auf und reduzierte mit Blick auf den Mechanismus der Ablebenserklärung seine Änderungsrechte.

Die Streichung von Art. 13(2)2.(iii) könnte auch nur dann einem Widerruf gleichkommen (was an sich schon nicht zutrifft und die Zulässigkeit der Streichung nicht berührt), wie Jakob meint, wenn bereits eine Ablebenserklärung vorlag, was gegenständlich am 2.8.2024 nicht der Fall war, weil der AS zuerst die Statuten abänderte und dann auf der Basis dieser Änderungen eine Ablebenserklärung abgab. Eine lex specialis, wie Schauer meint, zum Abänderungsrecht des AS liegt nicht vor, weil der Regelungsgegenstand von Art. 13(2)2.(iii) schlicht ein anderer ist. Ein teilweiser Verzicht auf Änderungsrechte durch eine Sonderbestimmung wäre zudem im Zweifel gerade nicht anzunehmen.

Es war vorhersehbar, dass der AS mit der Entscheidung des Obergerichts im Sicherungsverfahren zu 17 CG.2024.190 (dort ON 45) zur angeblichen Parallelbestimmung des Art. 13(2)2.letzter Satz in den Statuten der Solkomtel Stiftung argumentieren wird. Allerdings sind die Statuten der Solkomtel auf dem Stand von 2022; die Änderungen des AS bei der TiVi im Jahr 2023, die eine Widerrufbarkeit nach dem effektiven Eintrittsdatum des fingierten Ablebens ermöglichen sollten, wurden bei der Solkomtel nicht durchgeführt. Das Obergericht übersah in seiner prima facie-Beurteilung bei der Solkomtel auch, dass die Möglichkeit einer mehrfachen Abgabe der Ablebenserklärung – nicht jedoch ein Widerruf – jeweils nur bis zu effektiven Eintrittsdatum des fingierten Ablebens möglich war, also im Zeitraum zwischen der Abgabe der Ablebenserklärung und dem darin angegeben Eintrittsdatum. Es war im Jahr 2022 ja genau die Absicht des AS, das effektive Eintrittsdatum des fingierten Ablebens durch eine rechtzeitige neue Ablebenserklärung immer wieder verschieben zu können. Für das Obergericht war es möglicherweise deshalb nicht klar (in der prima facie-Beurteilung), dass das Recht auf Erneuerung nur in der „Übergangszeit" gelten sollte, weil es bei den gegenständlichen

Seite 7

Änderungen vom 2.8.2024 keine solche Übergangszeit gab (das Datum der Ausstellung der Ablebenserklärung und das Datum des Inkrafttretens waren identisch). Das Recht zur neuerlichen Abgabe einer Ablebenserklärung gilt jedoch nach dem Datum des Inkrafttretens nicht mehr, sowohl im Fall der TiVi-Statuten von 2022 als auch der Solkomtel-Statuten (arg. "zu seinen Lebzeiten").

Zum Argument, dass das Abänderungsrecht des AS gemäss Art. 13(2)1. der Statuten "zu dessen Lebzeiten" lediglich im biologischen Sinne und nicht in dem durch die Ablebenserklärung zu fingierende Sinne zu verstehen sei, genügt neuerlich der Verweis auf Art. 13(2)2.(i), wonach der Stifter mit dem in der Ablebenserklärung gewählten Eintrittsdatum die Anwendung der Bestimmungen, wie sie "zu seinen Lebzeiten" angewendet werden, ablehnt, womit klarerweise auch Art. 13(2)1. erfasst ist.

Der AG2 hat am 13.01.2025 eine Gegenäusserung beim Fürstlichen Landgericht eingebracht. Hierzu wurden folgende Dokumente lediglich auf Polnisch bzw. Englisch vorgelegt:

Entwurf der Statuten der TiVi Foundation vom August 2022 (Beilage 2.6)
E-Mail von Jerzy Modrzejewski vom 30.05.2022 samt Ausschnitt aus Anhang (Beilage 2.9)
E-Mail von Jerzy Modrzejewski vom 19.08.2022 (Beilage 2.10)
E-Mail von Jerzy Modrzejewski vom 20.10.2022 samt Ausschnitt aus Anhang (Beilage 2.11)
E-Mail von Jaroslaw Grzesiak vom 07.08.2024 (Beilage 2.22)

Hiermit werden dem Fürstlichen Landgericht die erwähnten Dokumente in der Übersetzung auf Deutsch vorgelegt.

Im Übrigen bestreitet der AG2 auch das weitere Vorbringen des AS in der Replik vom 28.01.2025 und schliesst sich den weiteren Vorbringen der AG3 und AG4 ausdrücklich an.

Der AS bestreitet und behält sich weiteres Vorbringen vor.

■    Seite 8    ■

Nach Umfrage unter den Anwesenden wird festgehalten, dass keine Pressevertreter anwesend sind.

Mit den Parteien wird die Sach- und Rechtslage erörtert. Sodann verkündet die Richterin den

### Beweisbeschluss:

Es wird Beweis zugelassen und aufgenommen zu gesamten widersprechenden Vorbringen der Parteien und insb folgenden Themen / Fragen:

- Errichtung der Stiftung
- „Historie" Stiftungsdokumente, insb „Ablebenserklärung"
- Vorfälle rund um den 02.08.2024
- Nachfolgende Änderung der Stiftungsdokumente

durch:

ZV Justyna Solorz („JS")
ZV Jerzy Modrejewski („JM")
ZV Dariusz Wierzchucki („DW")
ZV Jaroslaw Grzesiak („JG")
ZV Philippe Senn („PhS")
ZV Luca Castellazzi („LC")
ZV Barbara Walch („BW")
ZV Malgorzata Zak („MZ")
ZV Malgorzata Nowrocka („MN")

PV Zygmunt Solorz („AS")
PV Tomasz Szelag („TS")
PV Katarzyna Tomczuk („KT")
PV Piotr Zak („AG2")
PV Aleksandra Zak („AG3")

85

■    Seite 9    ■

PV Tobias Solorz („AG4")

sowie die von den Parteien vorgelegten Urkunden.

Dargetan und erörtert werden die vom Antragsteller gelegten Urkunden. Sie werden wie folgt zum Akt genommen:

| | | |
|---|---|---|
| Amtsbestätigung vom 22. August 2024 | Beilage | A |
| Statuten der TiVi Foundation idF vom 29. November 2023 | Beilage | B |
| Beistatuten der TiVi Foundation idF vom 29. November 2023 | Beilage | C |
| Eidesstättige Erklärung des Klägers vom 24. August 2024 | Beilage | D |
| Eidesstättige Erklärung des Jerzy Modrzejewski vom 24. August 2024 | Beilage | E |
| Eidesstättige Erklärung der Justyna Kulka vom 24. August 2024 | Beilage | F |
| Erklärung über die Änderung der Statuten der Solkomtel zu Urkunde A Nr. 6219/2024 ("Änderungserklärung Solkomtel") | Beilage | G |
| Erklärung über die Änderung der Statuten der TiVi zu Urkunde A Nr. 6223/2024 ("Änderungserklärung TiVi") | Beilage | H |
| Erklärung "Beschluss im Umlaufverfahren" gemäss Artikel 7 der Statuten der TiVi zu Urkunde A Nr. 6228/2024 ("Kuratorenerklärung TiVi") | Beilage | I |
| Erklärung gemäss Artikel 13 (2) 2 der Statuten der Solkomtel zu Urkunde A Nr. 6229/2024 ("Ablebenserklärung Solkomtel") | Beilage | J |
| Erklärung gemäss Artikel 13 (2) 2. (i) der Satzung der TiVi zu Urkunde A Nr. 6235/2024 ("Ablebenserklärung TiVi") (samt Übersetzung) | Beilage | K |
| "Stand-Still" Vereinbarung der Parteien vom 3. August 2024 (samt Übersetzung) | Beilage | L |
| Anfechtungserklärung des Klägers vom 13. August 2024 samt Empfangsbestätigung von Tomasz Szelag | Beilage | M |
| E-Mails des Zweitbeklagten zur (unwirksamen) "Abberufung" des Tomasz Szelag und Jaroslaw Grzesiak sowie unwirksame | | |

86

■ Seite 10 ■

| | | |
|---|---|---|
| "Bestellungs-" und "Annahmeerklärungen" des Zweitbeklagten und der Zofia Jedrzeyewska vom 14. August 2024 (samt Übersetzung) | Beilage | N |
| Widerruf der Ablebenserklärung des Klägers vom 17. August 2024 (beurkundet und beglaubigt zur GZ 1557 des öffentlichen Notars Mag. Alexander Winkler) | Beilage | O |
| Konvolut an Warnschreiben an die Zweitbegünstigten und an den Stiftungsrat sowie an den Stiftungsratspräsidenten vom 17. August 2024 (inkl Sendebestätigungen) | Beilage | P |
| E-Mail vom 18. August 2024 betreffend die Empfangsbestätigung des Schreibens vom 17. August 2024 von Tomasz Szelag (samt Übersetzung) | Beilage | Q |
| Schreiben vom 20. August 2024 betreffend die Empfangsbestätigung des Schreibens vom 17. August 2024 von Jaroslaw Grzesiak (samt Übersetzung) | Beilage | R |
| E-Mail an Philipp Senn vom 21. August 2024 samt Lesebestätigung | Beilage | S |
| E-Mail von RA Paweł Rymarz vom 18. August 2024 (samt Übersetzung) | Beilage | T |
| Schreiben von RA Paweł Rymarz und Krzysztof Sajchta vom 20. August 2024 (samt Übersetzung) | Beilage | U |
| Schreiben von RA Bernhard Motal vom 20. August 2024 | Beilage | V |
| Informationsschreiben an die Zweitbegünstigten über die bevorstehende (Rück-)Änderung der Statuten und Aufnahme einer Verfallsklausel vom 18. August 2024 | Beilage | W |
| Notariatsakt vom 19. August 2024 über die Änderung der Statuten der Tivi (GZ 1559) | Beilage | X |
| Notariatsakt vom 19. August 2024 über die Änderung der Beistatuten der Tivi (GZ 1560) | Beilage | Y |
| Notariatsakt vom 19. August 2024 über die vorsorgliche Abberufung und Bestätigung bzw. Bekräftigung der aufrechten Bestellung der tatsächlichen Stiftungsratsmitglieder (GZ 1561) | Beilage | Z |
| E-Mail des Zweitbeklagten vom 20. August 2024 an Philipp | | |

■    Seite 11    ▓

| | | |
|---|---|---|
| Senn samt Rücktrittserklärungen (samt Übersetzung) | Beilage | AA |
| Schreiben an Philipp Senn vom 20. August 2024 samt Übernahmebestätigung | Beilage | AB |
| Übernahmebestätigung des Stiftungsratspräsidenten Philipp Senn über den Erhalt der Originaldokumente des Stifters vom 20. August 2024 | Beilage | AC |
| E-Mail Korrespondenz vom 21. und 22. August 2024 zwischen Simon Ott, Philipp Senn und Luca Castellazzi (Aufforderung zur Einsichtnahme in Stiftungsdokumente) | Beilage | AD |
| Eidesstättige Erklärung von RA Peter Machherndl vom 25. August 2024 | Beilage | AE |
| Konvolut der Vollmachtswiderrufe durch die TiVi samt E-Mails vom 22. August 2024, E-Mail von Philipp Senn vom 9. April 2024, E-Mail von Philipp Senn vom 20. August 2024 an Frau Thoele, E-Mail von Piotr Zak an Philipp Senn vom 13. August 2024 – samt Übersetzung, Umlaufbeschluss betreffend die Vollmachten der Solkomtel vom 12. Juni 2024 – samt Übersetzung | Beilage | AF |
| E-Mail von Philipp Senn vom 23. August 2024, 17:14 Uhr | Beilage | AG |
| Eidesstättige Erklärung von Thomas Szelag vom 25. August 2024, samt Übersetzung | Beilage | AH |
| Informationsschreiben über bevorstehende Änderungen der Statuten vom 20. September 2024 | Beilage | AI |
| Statuten der TiVi idF des Notariatsaktes vom 24. September 2024 GZ 1595 aufgenommen von Notar Mag. Alexander Winkler | Beilage | AJ |
| Beistatuten der TiVi idF des Notariatsaktes vom 24. September 2024 GZ 1597 aufgenommen von Notar Mag. Alexander Winkler | Beilage | AK |
| (Erneuter) Widerruf der Ablebenserklärung idF des Notariatsaktes vom 24. September 2024 GZ 1599 aufgenommen von Notar Mag. Alexander Winkler | Beilage | AL |
| Rechtsgutachten Prof. Jakob | Beilage | AM |
| Rechtsgutachten Prof. Schauer | Beilage | AN |

88

■   Seite 12   ■

| | | |
|---|---|---|
| Rechtsgutachten des Prof. Dr. Jozef Okolski | Beilage | AO |
| Beistatut der TiVi Foundation idF vom 07.03.2012 | Beilage | AP |
| Statuten der TiVi Foundation idF vom 24.11.2022 | Beilage | AQ |
| Ablebenserklärung vom 29.05.2023 | Beilage | AR |
| Ablebenserklärung Änderung vom 10.8.2023 | Beilage | AS |
| Beschluss des Stifters über die Änderung der Statuten der TiVi Foundation vom 10.08.2023 | Beilage | AT |
| Widerrufserklärung vom 17.08.2023 bezüglich der Ablebenserklärung vom 29.05.2023 | Beilage | AU |
| Schriftliches Protokoll der Befragung des Stifters vom 10.01.2025 | Beilage | AV |
| Rechtsgutachten von Univ-Prof. Dr. Martin Spitzer vom 22.11.2025 | Beilage | AW |
| Ärztliche Bestätigung vom 21.01.2025 | Beilage | AX |

Die AG anerkennen die Übereinstimmung mit dem Original bzw. Echtheit der Urkunden und verweisen zur deren Richtigkeit auf ihren Prozessstandpunkt.

Dargetan und erörtert werden die AG2 gelegten Urkunden. Sie werden wie folgt zum Akt genommen, wobei die heute vorgelegten Übersetzungen zu den jeweiligen Urkunden genommen werden:

| | | |
|---|---|---|
| Amtsbestätigung TiVi Foundation vom 23.09.2024 | Beilage | 2.1 |
| Amtsbefehl vom 26.10.2024 zu 06 HG.2024.133 (ON 71) | Beilage | 2.2 |
| Amtsbefehl und Beschluss vom 25.10.2024 zu 06 CG.2024.184 (ON 47) | Beilage | 2.3 |
| Statuten TiVi Foundation vom 29.11.2023 | Beilage | 2.4 |
| Statuten TiVi Foundation vom 07.03.2012 | Beilage | 2.5 |
| Entwurf der Statuten der TiVi Foundation vom August 2022 | Beilage | 2.6 |
| Statuten TiVi Foundation vom 24.11.2022 | Beilage | 2.7 |
| Statuten TiVi Foundation vom 10.08.2023 | Beilage | 2.8 |
| E-Mail von Jerzy Modrzejewsky vom 30.05.2022 samt Ausschnitt aus Anhang | Beilage | 2.9 |
| E-Mail von Jerzy Modrzejewsky vom 19.08.2022 | Beilage | 2.10 |

89

 Seite 13

| | | |
|---|---|---|
| E-Mail von Jerzy Modrzejewsky vom 20.10.2022 samt Ausschnitt aus Anhang | Beilage | 2.11 |
| Eidesstattliche Erklärung Aleksandra Zak vom 20.09.2024 samt deutscher Übersetzung | Beilage | 2.12 |
| Ablebenserklärung vom 29.05.2023 | Beilage | 2.13 |
| Aufstellung Aufsichtsratsmandate | Beilage | 2.14 |
| Demissionserklärung Jaroslaw Grzesiak vom 23.09.2024 | Beilage | 2.15 |
| Notariell beglaubigte Erklärung über die Änderung der Statuten der TiVi Foundation vom 02.08.2024 | Beilage | 2.16 |
| Notarielle beglaubigte Erklärung zum Umlaufbeschluss des Stiftungsrates vom 02.08.2024 | Beilage | 2.17 |
| Ablebenserklärung in Form einer notariellen Urkunde vom 02.08.2024 | Beilage | 2.18 |
| Eidesstattliche Erklärung Piotr Zak vom 07.09.2024 samt deutscher Übersetzung | Beilage | 2.19 |
| Eidesstattliche Erklärung Tobias Solorz vom 10.09.2024 samt deutscher Übersetzung | Beilage | 2.20 |
| Beistatuten TiVi Foundation vom 29.11.2023 | Beilage | 2.21 |
| E-Mail von Jaroslaw Grzesiak vom 07.08.2024 | Beilage | 2.22 |
| Vereinbarung vom 12.08.2024 samt deutscher Übersetzung | Beilage | 2.23 |
| Entwurf Vereinbarung vom 12.08.2024 samt deutscher Übersetzung | Beilage | 2.24 |
| (Angebliche) "Erklärung" des Stifters vom 13.08.2024 | Beilage | 2.25 |
| (Angebliche) "Statuten" TiVi Foundation vom 19.08.2024 | Beilage | 2.26 |
| (Angebliche) "Statuten" TiVi Foundation vom 24.09.2024 | Beilage | 2.27 |
| Amtsbefehl vom 10.09.2024 (ON 4) zu 05 NE.2024.4 | Beilage | 2.28 |
| Legal Opinion von Prof. Dr. hab. Wojciech Kocot vom 08.09.2024 | Beilage | 2.29 |

Der Antragsteller anerkennt die Übereinstimmung mit dem Original bzw. Echtheit der Urkunden und verweist zur deren Richtigkeit auf ihren Prozessstandpunkt.

■    Seite 14    ■

Dargetan und erörtert werden die von der AG3 gelegten Urkunden. Sie werden wie folgt zum Akt genommen:

| | | |
|---|---|---|
| Amtsbestätigung der TiVi Foundation vom 14.11.2024 | Beilage | 3.1 |
| Beistatuten der TiVi Foundation vom 29.11.2023 | Beilage | 3.2 |
| Amtsbefehl des Fürstlichen Landgerichtes vom 26.10.2024 zu 06 HG.2024.133 (ON 71) | Beilage | 3.3 |
| Amtsbefehl des Fürstlichen Landgerichtes vom 25.10.2024 zu 06 CG.2024.185 (ON 47) | Beilage | 3.4 |
| Eidesstattliche Erklärung von Aleksandra Jadwiga Zak vom 20.09.2024 samt deutscher Übersetzung | Beilage | 3.5 |
| Beistatuten der TiVi Foundation vom 24.11.2022 | Beilage | 3.6 |
| Statuten der TiVi Foundation vom 24.11.2022 | Beilage | 3.7 |
| Statuten der TiVi Foundation vom 10.08.2023 | Beilage | 3.8 |
| Statuten der Tivi Foundation vom 29.11.2023 | Beilage | 3.9 |
| Notariell beglaubigte Erklärung über die Änderung der Statuten der TiVi Foundation vom 02.08.2024 | Beilage | 3.10 |
| Notariell beglaubigte Erklärung zum Umlaufbeschluss vom 02.08.2024 | Beilage | 3.11 |
| Ablebenserklärung in Form einer notariellen Urkunde vom 02.08 2024 | Beilage | 3.12 |
| Statuten der TiVi Foundation vom 07.03.2012 /12.02.2013 | Beilage | 3.13 |
| Ablebenserklärung vom 29.05.2023 | Beilage | 3.14 |
| Statuten der TiVi Foundation vom 02.08.2024 | Beilage | 3.15 |
| Aufstellung der Aufsichtsratsmandate | Beilage | 3.16 |
| Eidesstattliche Erklärung Tobias Markus Solorz vom 10.09.2024 samt deutscher Übersetzung | Beilage | 3.17 |
| Eidesstattliche Erklärung Piotr Mateusz Zak vom 07.09.2024 samt deutscher Übersetzung | Beilage | 3.18 |
| "Stand-still Agreement" vom 03.08.2024 samt deutscher Übersetzung | Beilage | 3.19 |
| Vereinbarung vom 12.08.2024 samt deutscher Übersetzung | Beilage | 3.20 |
| Erklärung des Stifters vom 13.08.2024 | Beilage | 3.21 |
| Ungültige Beistatuten vom 19.08.2024 | Beilage | 3.22 |

91

■    Seite 15    ■

| | | |
|---|---|---|
| Amtsbestätigung der TiVi Foundation vom 23.09.2024 | Beilage | 3.23 |
| Eidesstattliche Erklärung von Tobias Markus Solorz vom | | |
| 18.09.2024 samt deutscher Übersetzung | Beilage | 3.24 |
| Schreiben von RA Pitkowitz vom 19.09.2024 | Beilage | 3.25 |
| Schenkungswiderrufe vom 30.11.2024, samt deutscher | | |
| Übersetzung | Beilage | 3.26 |
| Gutachten von Prof. Dr. Wojciech Kocot vom 08.09.2024 | Beilage | 3.27 |
| E-Mail von Piotr Zak an Jaroslaw Grzesiak vom 01.08.2024 | | |
| samt Entwurf der Ablebenserklärung vom 01.08.2024 | | |
| samt Anhang zur E-Mail samt deutscher Übersetzung | Beilage | 3.28 |
| E-Mail von Piotr Zak an Dariusz Wierzchucki vom 01.08.2024 | | |
| samt deutscher Übersetzung | Beilage | 3.29 |
| E-Mail von Piotr Zak an Dariusz Wierzchucki vom 02.08.2024 | | |
| samt deutscher Übersetzung | Beilage | 3.30 |
| Übersicht über die Abänderung der Ablebenserklärung sowie | | |
| der Statuten | Beilage | 3.31 |
| Vollmachten von Zygmunt Solorz an Jerzy Modrzejewski, Darius | | |
| Wierzchucki und Piotr Modrzejewski vom 25.04.2024 samt | | |
| deutscher Übersetzung | Beilage | 3.32 |

Der Antragsteller anerkennt die Übereinstimmung mit dem Original bzw. Echtheit der Urkunden und verweist zur deren Richtigkeit auf ihren Prozessstandpunkt.

Dargetan und erörtert werden die von der AG4 gelegten Urkunden. Sie werden wie folgt zum Akt genommen:

| | | |
|---|---|---|
| Antrag des AS zur Beförderung der AG2 und AG4 | | |
| vom 14.6.2024 | Beilage | 4.1 |

Einvernommen wird **die Zeugln**
**Dr. Walch Barbara,** geboren am 29.10.1982, liechtenst Staatsbürgerin, wohnhaft in Zollstrasse 16, 9494 Schaan , Rechtsanwältin, römisch-katholisch, wahrheitsermahnt, belehrt nach § 321 ZPO:

92

Seite 16

Festgehalten wird, dass die Zeugin Waich von der Stiftung für das gegenständliche Verfahren von allfälligen Verschwiegenheitsverpflichtungen entbunden wird. Der Antragssteller Zygmunt Josef Solorz entbindet die Zeugin nicht von ihren Verschwiegenheitspflichten.

Wie sind / waren Sie den gegenständlichen Sachverhalt involviert?

Im Bezug auf die TIVI Foundation habe ich im Herbst 2023 begonnen eine Analyse der Stiftungsdokumente vorzunehmen. Das waren reine Rechtsthemen. Später, wahrscheinlich im Mai 2024 hatte ich in anderen Angelegenheiten mit dem Vertreter des Stifters zu tun. Im Herbst 2023 wurde ich von der Stiftung beauftragt.

Was war im Herbst 2023 der Auftrag der Stiftung und zu welchem Ergebnis sind sie gelangt?

Mein Problem ist, das ich vom Stifter nicht entbunden bin und deshalb möchte ich hierzu keinen Aussagen machen.

Wer konkret von der TIVI hat ihnen einen Auftrag im Herbst 2023 erteilt? D

Damals waren es die Stiftungsräte Jarek, ich weiss den Nachnamen nicht mehr und Phillip Senn.

Wie wurden sie von diesen Herren kontaktiert?

Das war im rahmen einer Sitzung. Und es gab keine schriftlichen Ergebnisse.

Wo hat diese Sitzung stattgefunden?

Bei mir in den Büroräumlichkeiten.

93

■    Seite 17    ■

War ausser diesen beiden Stiftungsratsmitgliedern und Ihnen sonst noch jemand an dieser Besprechung?

Nein.

Welche Stiftungsunterlagen sollten Sie analysieren, und zwar im Auftrag der Stiftung?

Ich kann mich nicht genau erinnern, es war im Herbst 2023.

Welche Problemstellung sahen diese Stiftungsratsmitglieder?

Hier bin ich der Meinung, dass ich der Verschwiegen verpflichtet bin, weil nicht korrekt entbunden.

L.d.k.E.

Die Zeugin macht Gebühren von gesamthaft CHF 500.00 geltend. Die Parteien erheben keine Einwendungen.

### Beschluss

Die Gebühren des Zeugin Walch werden im mit  CHF 500.00 bestimmt. Die Gerichtskasse wird angewiesen, diesen betrag von dem vom AG2 geleisteten Kostenvorschuss an die Zeugin Walch zu überweisen.

Die Parteien sowie der Zeugen verzichten auf Rechtsmittel sowie auf Beschlussausfertigung.

Der Zeuge Senn erklärt sich auf tel Rückfrage bereit, schon früher zur Zeugenaussage zu erscheinen.

Die Zeugeneinvernahme beginnt um 10:30 Uhr.

94

■    Seite 18    ■

Einvernommen wird **der Zeuge**
**Senn Philipp,** geboren am 17.06.1969, liechtenst Staatsbürger, wohnhaft in Im
Riet 15, 9495 Triesen, Steuerberater, wahrheitsermahnt, belehrt nach § 321
ZPO:

Festgehalten wird, dass der Zeuge Senn von der Stiftung für das
gegenständliche Verfahren von allfälligen Verschwiegenheitsverpflichtungen
entbunden wird. Der AS Zygmunt Solorz entbindet den Zeugen Senn nicht von
seinen Verschwiegenheitsverpflichtungen.

Aufgrund der Nichtentbindung vom Berufsgeheimnis möchte ich keine
Aussagen machen.

**Über Fragen des AG3:**

Was war Ihre Rolle bei der TIVI?

Ich war Stiftungsratspräsident.

Haben Sie an dem Treffen zwischen dem AS, den AG 2 – 4, dass zwischen
dem 31.07.2024 und dem 02.08.2024 stattgefunden hat, teilgenommen?

Nein, habe ich nicht. Es tut mir leid, ich sehe mich nicht in der Lage, eine
weitergehende Aussage zu machen. Es ist sehr schwierig zu unterschieden,
was ich aufgrund der Nichtentbindung aussagen darf und was nicht.

Wie und von wem haben Sie am 02.08.2024 von der Abgabe der
Ablebenserklärung erfahren?

Das fällt mE unter das Berufsgeheimnis.

Haben Sie den Stiftungsratsbeschluss über die Änderung der Stiftungsstatuten
vom 02.08.2024 unterzeichnet?

■    Seite 19        ■

Das fällt mE unter das Berufsgeheimnis.

L.d.k.E.

Der Zeuge verzichtet auf Gebühren und wird um 10.39 Uhr entlassen.

Einvernommen wird **der Zeuge**
**Castellazzi Luca**, geboren am 18.12.1972, schweiz Staatsbürger, wohnhaft in
Glattbachstrasse 51, 8044 Zürich, kaufm Angestellter, wahrheitsermahnt,
belehrt nach § 321 ZPO:

Festgehalten wird, dass der Zeuge Castellazzi von der Stiftung für das
gegenständliche Verfahren von allfälligen Verschwiegenheitsverpflichtungen
entbunden wird. Der AS Zygmunt Solorz entbindet den Zeugen Castellazzi
nicht von seinen Verschwiegenheitsverpflichtungen.

**Über Fragen des AG4:**

Waren Sie im Auftrag der TIV Foundation tätig?

Ja, unter dem Mantel der AF Fiduciary Est, als Angestellter der AF Fiduciary Est.

Seit wann ungefähr?

Für die Stiftung?

Ja.

Ich habe das Mandat 2018 oder 2019 intern übernommen.

Waren Sie in die Änderungen der Statuten der TIVI involviert?

Dazu möchte ich aufgrund der Nichtentbindung nicht aussagen.

96

■    Seite 20    ■

L.d.k.E.

Der Zeuge verzichtet auf Gebühren und wird um 10.45 Uhr entlassen.

Die Verhandlung wird um 10:50 Uhr unterbrochen.

Die Verhandlung wird um 13:00 Uhr fortgesetzt. Festgehalten wird, dass um 13:00 Uhr der Dolmetscher für die englische Sprache Alexander Scharfs erscheint.

Einvernommen wird **der Zeuge**
**Jaroslaw Grzesiak**, geboren 27.04.1966, poln Staatsbürger, wohnhaft in 13 Jaworoska Street, Kaostancin-Jezinor, Rechtsanwalt, Unternehmensberater, wahrheitsermahnt, belehrt nach § 321 ZPO:

Festgehalten wird, dass AS Zygmunt Solorz den Zeugen Grzesiak nicht von seinen Verschwiegenheitsverpflichtungen entbindet.

Ich bin an keine Verschwiegenheitspflicht gebunden, es gibt nichts, wovon ich entbunden werden müsste. Wir sprechen über berufl Verschwiegenheitspflichten.

Ich habe 1995 die Anwaltszulassung in Polen erhalten. Ich war 22 Jahre Partner einer Anwaltskanzlei, zunächst Dewy Balantine, und später Greenburg and Traurig. 21 Jahre lang habe ich die Partner dieser Kanzlei in Polen gemanagt. Seit 2007 haben diese Anwaltskanzleien Dienste für die Unternehmen des AS erbracht. 80-90% davon befassten sich mit Firmenfusionen und Zukäufen im Ausland, strukturierten Finanzen und Kapitalmärkten. Wir haben nie den AS als Privatperson vertreten. Im Jahre 2020 machte mir der AS ein Angebot, dass ich im Rahmen seines Konzerns und seines Familyoffices seine rechte Hand sein sollte. Das ist in der Vereinbarung zwischen dem AS und mir vom 08.05.2021 dokumentiert. Im Rahmen dieser Vereinbarung habe ich auf Wunsch des AS meine Tätigkeit als

97

■    Seite 21    ■

Anwalt zurückgelegt. Ich habe mich verpflichtet meine Anteile an der Kanzlei zu verkaufen und habe so schnell wie prakt möglich aufgehört, als Anwalt zu praktizieren, um dem AS meine Dienste exklusiv zur Verfügung zu stellen zur Überwachung der Eigentümerstruktur. Es wurde auch entsprechend in der poln Presse so kommuniziert wie es in meinem Vertrag stand.

In dieser Vereinbarung hat mich der AS auch gebeten, meinen Beruf aufzugeben, was in Polen bedeutete, dass ich einen Antrag an die Kammer stellen musste, um mich von der Liste der aktiv praktizierenden Anwälte zu entfernen. Das habe ich anfangs 2022 nach dem Rechnungsabschluss des vorigen Geschäftsjahres meiner Kanzlei getan. Das heisst, seit ich von meiner Kanzlei in das Beschäftigungsverhältnis zum AS gewechselt habe, bin ich kein Rechtsvertreter mehr und nach poln Recht nicht an das Anwaltsgeheimnis gebunden. Die einzige private Geheimhaltungsvereinbarung, die ich unterzeichnet habe, habe ich im September 2023 auf Ersuchen des AS unterzeichnet, es handelt sich um eine private Vereinbarung, und laut der Rechtberatung, die ich hier in FL bekommen habe, fällt eine solche Geheimhaltungsvereinbarung nicht unter das Anwalts- oder Arztgeheimnis, sodass ich Fragen des Gerichts dazu beantworten kann. In meiner Erklärung, werde ich keine Geschäftsgeheimnisse, die nichts mit dieser Sache zu tun haben, offenlegen.

*Der **Antragsteller** bringt vor:*

*Der Zeuge JG wurde heute von den AG namhaft gemacht. Er erhielt eine detaillierte schriftliche Aufforderung des AS nicht auszusagen, diese wiederhole ich hier:*

*JG ist nach wie vor als RA registriert und unterliegt als solcher einem gesetzlichen Aussageverbot. Sein Beratungsvertrag betraf fast zur Gänze rechtliche Leistungen für den AS persönlich. Dieser Vertrag verpflichtet ihn ebenfalls zur Vertraulichkeit. Der Vertrag enthält eine Verpflichtung, dass er ausschließlich mit dem AS in diesen Angelegenheiten zu kommunizieren hat.*

98

Seite 22

*Es wird auch darauf hingewiesen, dass er sich mit seiner heutigen Aussage strafbar macht.*

Ich verwerfe dieses Vorbringen als vollkommen falsch und unwahr. Ich betrachte das als illegale Bedrohung eines Zeugen, die in den USA und Polen eine schwere Straftat ist. In Polen wäre das § 245 des StGB. Die Bedrohung von Zeugen ist eine Straftat gegen das Gericht und die Rsp des betreffenden Landes und ich betrachte das als solche. Ich habe vier Gutachten, ein FL und drei polnisches, die besagen, das sich seit 2021 kein RA mehr bin und keine Rechtsdienstleistungen für den AS erbringen konnte, weil ich keine entsprechende Zulassung hatte. Deshalb sehe ich es als meine Pflicht an, hier vor Gericht zu erscheinen, und Ihre Fragen mit den genannten Ausnahmen zu beantworten.

*Der **Antragsteller** bringt vor:*

*Erstens bestreitet der Zeuge nicht, dass er noch in der RA Liste eingetragen ist. Zweitens bestreitet er nicht, dass ihn sein Beratungsvertrag zur Vertraulichkeit verpflichtet und drittens verweise ich darauf, dass wir hier in FL sind und auf § 121 StGB. Der Zeuge wird daher nochmals aufgefordert, nicht auszusagen.*

Ich bin seit 2022 auf der Liste der nichtaktiven Anwälte, darf den Anwaltsberuf also nicht ausüben. Die Vereinbarung vom 08.05.2021 schließt Rechtsdienstleistungen ausdrücklich aus. Ich habe 20 Vereinbarungen mit diversen Unternehmen des AS, die ebenfalls besagen, das sich nicht als Anwalt tätig bin und daher besteht kein Anwalts-Mandaten-Verhältnis zwischen mir und dem AS.

**Über Fragen des AG4:**

*Sind Sie auch unter dem Namen Jarek bekannt?*

Ja, das ist die poln Kurzform von Jaroslaw.

99

■        Seite 23

Waren Sie mit dem AS befreundet?

Ich kenne den AS seit 2007. Es begann als ein Anwalt-mandanten-Verhältnis.
Etwa 2010, 2011 nach dem Kauf des Unternehmens Polkomtel, das ich für den
AS abgewickelt habe, wurde unsere Beziehung auf Betreiben des AS eine
freundschaftliche. Von 2012-2022 haben wir nicht nur zusammengearbeitet,
sondern prakt sämtl Urlaube zusammen verbracht, der AS hat mich jedes Jahr
in meinem Haus in Griechenland besucht. Wir haben benachbarte Häuser in
Frankreich gekauft, in der Absicht, uns dort gemeinsam zur Ruhe zu setzen. In
diesen 10 Jahren habe ich mehr Zeit mit dem AS verbracht, als mit jedem
anderen Freund oder Familienmitglied. Er nannte mich meinen engsten
Freund. Und ich behandelte ihn wie eine Mischung aus einem Vater,
nachdem ich meinen früh verloren hatte, und einem älteren Freund. Der AS
hatte auch eine sehr enge freundschaftl Beziehung zu meinen Kindern und
meiner Frau. Also würde ich sagen, wir hatten 10 Jahre lang eine sehr enge
freundschaftl Beziehung.

Wissen Sie etwas über eine Vereinbarung zu den Vermögenswerten die Teil
der ersten Scheidung des AS waren?

Nein. Ich habe von dieser Vereinbarung gehört, sie aber nie selbst gesehen.

Was waren Ihre Hauptaufgaben in Ihrer Tätigkeit für die Unternehmen des AS?

In welchem Zeitraum?

Von Anfang an betrachtet.

Von 2007 – 2021 hat meine Anwaltskanzlei sich hauptsächl als Rechtsberater
um Ankäufe, Fusionen und die Finanzstruktur des Konzern des AS gekümmert.
Dazu gehört wie öffentl bekannt die Börsennotierung von CYFROWY Polsat
2008. Das war damals der grösste Börsengang des Jahres. Ich habe das
Vergnügen gehabt, den AS beim Erwerb von Polkomtel, dem grössten poln
Mobilbetreiber, im Jahr 2011 zu begleiten. Das war damals die grösste

100

leveraged financed Transaktion in Europa. Wir haben den Konzern des AS bei
der Finanzierung des Kauf dieses Unternehmens durch Aufnahme von 4 Mia
Schulden vertreten. Das ist nur der Anfang einer langen Liste. Wir haben uns
um Fusionen und Ankäufe im grossen Stil gekümmert, denn das Unternehmen
des AS ist das grösste Privatunternehmen in Polen und die Zukäufe waren
ebenfalls die grössten in Polen.

Was waren Ihre Hauptaufgaben, als Sie Ihre ausschliessliche Tätigkeiten für
den AS begannen im Jahr 2021?

Der AS hat sich als Freund im Herbst 2020 an mich gewandt. Sehr kurz nach
seiner ersten Covid Infektion. Er sagte, er brauche mich nicht mehr als Anwalt.
Sondern er wollte mich als die Hauptperson, die mit ihm zusammenarbeitet
innerhalb des Konzerns. Ursprüngl lehnte ich ab, und sagte, ich sei
vollkommen in der Lage, diese Tätigkeiten im Rahmen meiner Kanzlei zu
erbringen, aber er sagte er brauche mich aus drei Hauptgründen:

Er brauchte jmd, dem er voll und ganz vertrauen kann und der dafür sorg,
dass er sicher ist, wenn er innerhalb seiner Organisation Unterschriften leistet zu
einer Zeit wo es ihm gesundheitl immer schlechter ging. Er brauchte jmd, der
dafür sorgt, dass die Familie, die sich untereinander nicht besonders
wohlgesonnen war, sprich seine Kinder, seine Exfrau und seine aktuelle Frau,
auf einen gemeinsamen Nenner zu bringen. Und was mich schliesslich
überzeugt hat, war, dass er jmd brauchte, dem er voll und ganz vertraut, dass
er seine Kinder und Erben schützt, wenn er selbst dazu zu schwach sein sollte.
Dazu hat er mich usprüngl in sämtl Aufsichtsräte seiner Unternehmen und in
die Stiftungsräte der TIVI und Solkomtel Foundation bestellt.

Wer betreute zunächst die zweite Scheidung des AS?

Ich erfuhr als Freund von der zweiten Scheidung des AS aufgrund der
Ineffizient JM, weil er dieses Verfahren 10 Jahre lang nicht zum Abschluss
bringen konnte. Der AS bat mich einen anderen Ansatz zu versuchen, um zu
einer einvernehmlichen Lösung mit seiner damaligen Frau zu kommen und

■    Seite 25    ■

diverse Zivil- und Strafverfahren zu beenden, die zu diesem Zeitpunkt 2021
noch liefen. Ich begann mit einer Mediation/Gesprächen innerhalb der
Familie, mit den Kinder, und als Freund besuchte ich die zweite Frau Anfang
2021.

Konnten Sie den Konflikt lösen, ggfs wann und wie?

Ich habe mit den Kindern begonnen. Ich erklärte dem AS, dass es unmöglich
sie, die Struktur innerhalb der Stiftungen mit 50% für Tobias und mit 25% für Piotr
und Aleksandra beizubehalten. Er ermächtigte mich, mit ihnen zu sprechen,
ob sie mit einer Aufteilung zu gleichen Teilen innerhalb der Stiftungen
einverstanden wären. Das war aus Sicht von Tobias, der damals Anspruch auf
50% hatte, viel verlangt. Ich habe mehrere Monate damit verbraucht, sie zu
überzeugen, dass sie nur als Team vorangehen können. Ich sagte, eine
Aufteilung zu gleichen Teilen, also je 33% sei gut für sie, weil so einstimmige
Entscheidungen innerhalb der Stiftungen getroffen werden könnten. Der
Vorschlag sah einen unabhängigen Stiftungsratsvorsitzenden vor, der die
entscheidende Stimme hätte, falls sie sich nicht einigen könnten. Die Kinder
haben sich darauf geeinigt, was ich aus der Sicht von Tobias für eine gute
Entscheidung und ein grosses Opfer im Sinne der Familie halte. Diese Einigung
war das, was ich brauchte, um mich an Frau Zak zu wenden, um ihr zu sagen,
dass es keinen Konflikt mehr zwischen den Kindern unterschiedlicher Mütter
mehr gibt. Bei dem Treffen mit ihr in Frankreich überzeuge ich sie, alle
Geldforderungen gegenüber dem AS aufzugeben, im Austausch zu
Zahlungen an die Kinder. Im Dezember 2021 wurde ein Vergleich
geschlossen, der zuständige Anwalt für den AS war JM. Ich habe diese
Mediation im Rahmen der Familie durchgeführt und die Familie geeint aus
meiner Sicht. Daraufhin gab Frau Zak alle zivil- und strafrechtl Klagen gegen
den AS auf und die Kinder erhielten die Geldentschädigung in Form von
Schenkungen. Sprich Frau Zak gab ihre Ansprüche auf, weil ihre Kinder die
entsprechenden Zahlungen erhalten haben. Dieses Thema ist sehr wichtig, die
Kinder haben dem zugestimmt auf der Grundlage dass bei den Stiftungen TIVI
und Solkomtel eine neue Sprache eingeführt wird, die für die Aufteilung in
Drittel steht. Mit Sprache meine ich eine Neufassung der Statuten und

■    Seite 26    ▓

Beistatuten, die die neue Aufteilung in Drittel wiederspiegelt. Diese wurde im Haus des AS in Antibes/F am 19.08.2022 abgeschlossen und vom AS und all seinen Kindern unterzeichnet und als endgültig und verbindlich angesehen. Es war ein sehr bewegender Tag für uns alle, weil die Familie dadurch vereint war und es geschah am Geburtstag von Tobias am 19.08., wobei Tobias nur tel mit uns verbunden war. Im FL HR eingetragen wurden diese Änderungen am 24.11.2022, was der Geburtstag von Aleksandra war.

War der AS anfangs 2022 zu med Behandlungen in der Schweiz, wenn ja, haben Sie ihn begleitet?

Ja, der AS war den ganzen Jan 2022 in der Schweiz. Die erste Woche in Begleitung  seiner damaligen Ehefrau MN, aber er hat mich gebeten, dort langfristig bei ihm zu sein, um mich um die Geschäfte zu kümmern. Dh ich kam während der ersten Woche dazu und blieb bis Ende Jan bei ihm.

Welche Problemstellungen wurden dort erörtert?

Die Frage ist mir zu allgemein.

Wurden dort Fragen die Stiftungen betreffend erörtert? Und welche?

Ja. Insb wurden zwei Themen besprochen. Der AS offenbarte mir insgeheim, dass ich mich um die Scheidung von MN kümmern sollte, was ein Schock für mich war. Er erklärte mir, dass es kein Hindernis geben darf, das verhindert, das die Stiftungen erben. Und er befürchtete, dass das poln Erbrecht neg Auswirkungen auf seine Nachfolgeplanung haben könnte. Das zweite Problem mit den Stiftungen, das erschöpfend besprochen wurde, war, dass ich eine Lösung finden sollte, nicht unbedingt im rechtlichen Sinne, aber im wahren Leben, wie man den Kuchen behalten und doch essen könnte. Ich meine, er wollte den in seinen Worten erniedrigenden Prozess der Geschäftsunfähigkeitserklärung vermeiden, der der einzige Weg war damals, die Kontrolle der Stiftungen an die Kinder, die Zweitbegünstigten, weiterzugeben, falls sein Geisteszustand sich soweit verschlechtert, dass er

103

■    Seite 27    ▨

keine eigenen Entscheidungen mehr treffen kann. Er fragte mich, wie er die
Macht übergeben kann innerhalb der Stiftungen, falls er merkt, dass sein
Geisteszustand schwindet. Es gab damals nur zwei Möglichkeiten dafür,
nämlich den Tod oder die Geschäftsunfähigkeit. Ich kam nicht sofort auf eine
Lösung, aber wir begannen damals die Gespräche darüber und ich
versprach ihm, mir etwas einfallen zu lassen.

Wann und wie wurde das Instrument der „Ablebenserklärung" präsentiert und
erörtert?

Als Konzept, noch ohne festen Wortlaut, wurde es bei einem Brainstorming
Meeting präsentiert, die der AS organisiert hatte, das war in einem seinem
Anwesen in Polen, in Lack. Er berief diese Sitzung speziell zu diesem Thema
ein. Ich denke es war im März, aber das lässt sich leicht nachprüfen, es war
nach der Rückkehr von ihm und seiner Frau aus dem Urlaub aus Barbados. Es
war die erste oder zweite Woche nach Ausbruch des Ukrainekrieges.
Anwesend waren der AS, Piotr, Tobias, JM, TZ, Martin Dichans und ich. Wir
besprachen gemeinsamen zwei Tage lang dieses Thema und ich entwickelte
das Konzept, das alle Wünsche des AS berücksichtigte. Er behielt die
Kontrolle, weil er die Erklärung abgab, die den Rücktritt bzw den bürgerlichen
Tod des Stifters beinhaltete. Der Plan war, dass er diese Erklärung zB ein Jahr
im Voraus abgibt, und jederzeit vor Inkrafttreten die Frist verlängern kann,
wenn er sich zum betreffenden Zeitpunkt noch gut fühlt. Vor dem Datum des
Inkrafttretens hatte er stets das Recht zur Fristverlängerung. Es war ihm sehr
wichtig, diese souveräne Entscheidung, also die Kontrolle in seinen Händen zu
behalten, so wie er das immer getan hat. Wenn ich berücksichtigte wohin die
Anwälte mit dieser Frage wollen, dann meine ich mit Souveränität, er wollte
sich die Erniedrigung ersparen, vom Gericht für geschäftsunfähig erklärt zu
werden, sondern wollte die Entscheidung darüber selbst treffen.

Es war jedoch allen vollkommen klar, insb dem AS und JM, dass nach dem
Inkrafttreten ein point of no return erreicht war. Dh, dass er nach dem
Inkrafttreten die Kontrolle übe die Stiftungen verloren hatte. Es gab eine

104

◼ Seite 28 ◼

Diskussion, das Konzept gefiel allen, und JM übernahm die Ausarbeitung des Entwurfs. Da er als Anwalt für den Konzern tätig war.

Dieses Konzept gefiel dem AS, wurde mit den Kindern am 19.08. so vereinbart und mit kleineren Änderungen durch JM in Art 13.2 der Statuten der TIVI und der Solkomtel, die am 24.11.2022 hinterlegt wurden. Die so geänderten Statuten wurden am 19.08.2022 durch den AS und die Kinder unterzeichnet.

Wessen Wunsch war es jetzt, dieses Instrument einzuführen?

Die Idee und die ursprüngl Anforderung kam vom AS. Nach dieser Brainstorming Sitzung waren wir alle damit zufrieden, seine Kinder, JM und alle Anwesenden.

Wurden diese Änderungen an den Statuten als abschliessend betrachtet und entsprechend gefeiert?

Ja.

Ich möchte zwei Sätze ergänzen, bevor JM protestiert. Dieser Wortlaut wurde vereinbart und dann bei der TIVI eingeführt. Bei der Solkomtel wurde es analog gehandhabt, aber ohne Beteiligung von JM, weil der AS ihm zu diesem Zeitpunkt nicht mehr vertraute. Der Wortlaut ist jedoch derselbe. JM, der das Vertrauen des AS verloren hatte, wurde aus der Solkomtel Transaktion herausgehalten und hatte keinen Zugang zu den Unterlagen. Der Wortlaut bei der TIVI wurde also von JM ausgearbeitet und ohne seine Beteiligung analog bei der Solkomtel verwendet. Die Unterlagen für die Solkomtel haben denselben Wortlaut, aber JM hatte keinen Zugriff auf diese Unterlagen.

Wurde das Instrument der Ablebenserklärung auch auf Unternehmensebene vorbereitet und umgesetzt, falls ja, wie?

■   Seite 29   ■

Nein, es wurde nicht auf Unternehmensebene umgesetzt. Wenn Sie damit meine, ob dieser Wortlaut auch woanders in Statuten oder Beistatuten verwendet wurden, nein, das betrifft nur die TIVI und Solkomtel.

Wurde das Konzept, dass der AS ein bestimmtes Datum in der Zukunft für einen Kontrollübergang in der Stiftung benennen kann, auf Unternehmensebene vorbereitet?

Ich glaube, da vermischen wir zwei verschiedene Dinge. Innerhalb der Stiftungen, haben wir als vorsichtiger Stiftungsrat diverse Gutachten eingeholt, rechtlich, finanziell, was das und der Zeitpunkt der Kontrollübergabe für die Stiftungen bedeuten würde. Dazu gab es ausgiebige Recherchen, die bei Stiftungsratssitzungen in Vaduz präsentiert wurden. Die wichtigste Präsentation war vom Rechtsberater Baker Mc Kenzie Zürich, die sich mit den Details der Höherbewertung des Vermögens in Folge des Inkrafttretens des Art 13.2 bzw des Kontrollüberganges befasste. Wir haben uns nur auf der Ebene der Stiftungen – nicht jedoch auf Ebene der darunterliegenden Unternehmen hierzu beraten lassen. Beim Thema Kontrollübergang muss man sehr aufpassen, weil es aktien-, steuer- oder bankenrechtl jeweils etwas unterschiedl bedeuten kann.

Gab es konkret hinsichtl der Finanzierungsvereinbarungen auf Unternehmensebene irgendwelche Vorkehrungen für einen solchen change of control?

Es könnte hier ein Missverständnis vorliegen, weil Finanzierungsvereinbarungen der operativen Unternehmen auf besonderen Wunsch des AS in den letzten fünf oder sechs Jahren immer eine Definition des Kontrollübergangs enthielten, damit war ein zulässiger Kontrollübergang ohne die Notwendigkeit einer Zustimmung oder Verzichtserklärung seitens der Banken gemeint. Das war immer eine sehr weitgefasste Definition, laut der jede Übertragung vom AS an seine Kinder im Rahmen der Stiftungen ein zulässiger Kontrollübergang war. Damit meine ich, dass sowohl der physische Tod als auch der Fall des Art 13.02 damit abgedeckt war.

106

■    Seite 30    ■

Von welchem ungefähren Finanzierungsvolumen der Banken sprechen wir hier?

Das ist ein Geschäftsgeheimnis.

Können Sie sich erinnern, wie der Stiftungsrat der TIVI damals, als diese Ablebenserklärung in die Statuten eingefügt wurde, zusammengesetzt war?

Der Stiftungsratspräsident war Philippe Senn, Tomasz Szelag, Katarzyna Tomcuk und ich.

Ganz grob, welche Aufgaben erfüllte TS im Stiftungsrat und in der Unternehmensgruppe?

Er ist der CFO sowohl der Unternehmensgruppe als auch des Family Office des AS. In der Stiftung gab es den Posten des CFO nicht. Er war ganz normaler Stiftungsrat mit dem entsprechenden finanziellen Hintergrundwissen.

Wann und wie wurde die erste Ablebenserklärung des AS vorbereitet und unterzeichnet?

Sie wurde erstmalig im September 2022 vorbereitet, bei einem weiteren Treffen des AS und seinen Kindern. Diese Erklärung musste in Form eines Notariatsaktes erfolgen. Deshalb stammte der Erstentwurf von DW. Aber sie wurde zu diesem Zeitpunkt nicht unterzeichnete. Der AS unterzeichnete im Mai 2023.

Wann wurde die Beziehung des AS zu seiner heutigen Ehefrau bekannt?

Am 01.11.2022, anlässlich einer Geschäftsreise nach Korea.

Zu diesem Zeitpunkt und danach übernahm die heutige Ehefrau irgendwelche Funktionen in Bezug auf die Arbeiten des AS?

107

■  Seite 31  ▓

Sie war zu diesem Zeitpunkt schon Führungskraft in der Unternehmensgruppe, nämlich VR Mitglied der Polkomtel. Und zwar schon seit einiger Zeit, vier oder fünf Jahre. Sie sass auch in ein oder zwei Aufsichtsräten, ua in einer Bank, die dem AS gehörte. Nachdem der AS sie offiziell als seine Lebensgefährtin vorgestellt hatte übernahm sie relativ schnell die meisten meiner Aufgaben, dh sie war gemeinsam mit dem AS bei fast allen geschäftlichen Sitzungen anwesend. Anschliessend in den Jahren 2023, 2024 bestellte der AS sie in zahlreiche, bis zu 50 Aufsichtsräte.

Welche Funktionen hatte JM zu dieser Zeit?

JM war und ist der Hauptrechtsanwalt des AS und seine Kanzlei funktioniert quasi als outgesourcte Rechtsabteilung der Unternehmensgruppe.

Wann und wie haben sie vom Widerruf der Ablebenserklärung durch den AS erfahren?

Am Freitag, den 10.08.2023, als der AS unerwartet aus dem Urlaub zurückkehrte in Anwesenheit von Frau Kulka und JM und des Notars DW. ER nahm einige Änderungen an Statuten vor, die eigentlich als endgültig galten und widerrief seine Ablebenserklärung vom Mai 2023.

Waren die Kinder / Zweitbegünstigten in diesen Vorgang involviert?

Nein, weder sie noch ich. Wir erfuhren es noch am selben Tag, aber nachdem die Entscheidung gefallen war. Weder die Kinder noch ich waren bei der Sitzung anwesend, bei der diese Beschlüsse gefasst wurden.

Wie haben Si darauf reagiert?

Mit grosser Enttäuschung. Ich hatte geglaubt, meinem Freund Lösungen geboten zu haben, die für ihn und seine Nachfolgeplanung gut waren. Und in meiner Meinung, die ich auch dem AS, JM und TS mitteilte, war der Wortlaut

108

■    Seite 32    ▓

sehr schlampig und zweideutig. Va wusste ich nicht, wie das Konzept der Wiederauferstehung, also des Rücktritts und des Rücktritts vom Rücktritt, in die Welt des „real corporate world" zu übertragen ist. Damit habe ich bis heute ein Problem. Ich habe bei JM nachgefragt, ob er ein liechtenst Rechtsgutachten zu diesem Thema hat, und er erklärte, er habe nur eine mündl Auskunft von einem RA in Liechtenstein. Das ist wichtig, weil das der Hauptgrund ist, weshalb die AS gebeten hat, eine unabhängige liechtensteinische Anwaltskanzlei beizuziehen und die jüngsten Änderungen der Statuten prüfen zu lassen. Nach Gesprächen hier in Vaduz haben wir ihm daraufhin die Kanzlei von Schaan, Walch & Partner, empfohlen. Sie wurden offiziell im Herbst 2023 von der TIVI und der Solkomtel mit der Prüfung beauftragt.

Gab es im Jahr 2023 im Anschluss an diese Statutenänderung vom August noch weitere Änderungen an den Statuten, falls ja, welche?

Ja, es gab noch mindestens drei Mal weitere Änderungen. Die ersten aufgrund eines Treffens des AS mit seinen Kindern im September. Dabei wurden mehrere Änderungen vorgenommen, die wichtigste war eine geschlossene Liste der Zweitbegünstigten, dh selbst der AS als Stifter konnte diese Liste nicht um weitere Zweitbegünstigte ergänzen. Das wurde im September 2023 als Beistatut verabschiedet. Die zweite Änderungsrunde beruht darauf, dass eine der Zweitbegünstigte, Aleksandra, steuerrechtlich eine US Person ist. Und die dritte Änderungsrunde betraf eine Korrektur des Entwurfs des JM, also eine Selbstkorrektur, um es nett zu sagen.

Dh, diese Statutenänderung vom August 2023 und die nachfolgenden Änderungen wurden auch im Rahmen des Stiftungsrats besprochen?

Die Änderungen vom August nicht, die anderen drei Änderungen ja. Und zum Schutz der Begünstigten wurde der Wortlaut so geändert, dass zukünftige Änderungen zuerst den Begünstigten zu Kenntnis gebracht werden müssen, bevor sie in Kraft treten, um zu vermeiden, dass sich so eine Situation wie im September wiederholt?

109

Seite 33

Was war nun der konkrete Auftrag an die Kanzlei Walch & Partner und wer
erteilte diesen Auftrag?

Das Konzept einer unabhängigen rechtl Prüfung durch eine Kanzlei in FL
wurde zunächst durch den AS genehmigt, er genehmigte auch den
Stundensatz von Frau Dr Walch. Und es geht um eine allgemeine Prüfung der
Stiftungsunterlagen, ob im Sinne der Gültigkeit der Dokumente in FL
Änderungen an den Statuten oder Beistatuten nötig sind. Beim Treffen im Büro
von Frau Dr Walch präsentierten PhS und ich das Konzept und später legte die
Stiftung alle historischen Versionen der Statuten und Beistatuten vor, von 2012
bis dato. Gleichzeitig informierten wir die Stiftungsräte bei den Stiftungen über
die Mandatserteilung und den Umfang des Mandats, dh TS und AG3 waren
ebenfalls informiert.

Wann und wem gegenüber wurden die Ergebnisse von Frau Dr Walch
präsentiert?

Diese wurden bei einer Sitzung im Dezember 2023 PhS und mir präsentiert und
später bei einer zweiten Sitzung im Januar 2024.

Welche Ergebnisse wurden dort präsentiert?

Im Prinzip war alles iO. Das liechtensteinische Stiftungsrecht ist so flexibel, dass
Stifterrechte über dem merkwürdigen Konzept einer Wiederauferstehung
sehen. Der Wortlaut war, dass das Recht so flexibel ist, dass der Stifter sich fast
alles in den Statuten oder Beistatuten einfallen lassen kann. Dies ist auch
durch Erkenntnisse des öOGH gestützt. Frau Dr Walch kam jedoch auf ein
anderes Problem im Zusammenhang mit dem Vermögensopfer („true sale of
assets"). Solange der Stifter sich das Recht vorbehält, Vermögen von der
Stiftung zurückzunehmen, können Dritte behaupten, diese seien nie wirklich an
die Stiftung übertragen worden. Das Problem war die Anhäufung der Rechte
beim Stifter, Kurator und Begünstigtem, die letztlich dazu führen könnten, laut
Dr Walch, dass der AS Vermögen zurücknehmen könnte.

110

■   Seite 34   ▓

Haben Sie dieses Vermögensopferproblem mit dem AS besprochen?

Selbstverständlich, sofort. Und wie üblich nicht nur mit ihm sondern auch mit seinen Kindern und auch im Stiftungsrat wurde dies besprochen. Und nach der Stiftungsratssitzung habe ich JM ausführlich meine Meinung dazu erläutert, als wir uns am Flughafen in München trafen. Das war am 19.01.2024, anlässlich der Stiftungsratssitzung der Health Foundation, an der JM und ich teilnahmen.

Wie haben diese Personen auf dieses Problem reagiert?

Alle waren besorgt. Aber es blieb eine Weile ungelöst. Ich fragte, ob man Frau Dr Walch beauftragen sollte, entsprechende Änderungen der Statuten und Beistatuten zu entwerfen, aber ich habe nicht die Antwort bekommen, dass ich sie beauftragen sollte.

Haben Sie in weitere Folge noch die Übergabe der Unternehmensleitung an die Söhne erörtert?

Ja. Im Rahmen der Nachfolge gefiel dem AS die Idee, seine Söhne Piotr und Tobias in die höchste Führungsebene der Unternehmen zu führen. Man kann ein passiver Begünstigter sein oder sich auch an der Unternehmensführung beteiligen. Und es war der Wunsch des AS, dass seine Söhne letzteres tun. Zunächst wurde Piotr zum zwischenzeitlichen Vorstandsvorsitzenden der Polsat TV, dem wichtigsten Unternehmen der Gruppe, bestellt. Dann beschloss der AS, wenn Tobias wieder nach Polen zieht, damals lebte er in FL, und den Posten des Vorstandsvorsitzenden bei Polkomtel und Polsat TV übernimmt, sollten diese Bestellungen dauerhaft sein. Tobias stimmte dem zu und der AS unterzeichnete ein entsprechendes internes Dokument, laut dem Piotr zum Vorstandsvorsitzenden von Polsat und Tobias zum Vorstandsvorsitzenden aller anderen Unternehmen wurde, dies sollte zum 01.01.2025 in Kraft treten. Diese Frist war notwendig, dass Tobias nach Polen zurückkehren sollte.

111

Seite 35

**Die Verhandlung wird um 15:30 Uhr für 10 Min unterbrochen.**

Es gab eine wichtige und dramatische Diskussion zu diesem Thema zwischen mir und dem AS. Wir waren im März 2024 in Kenia. Es war eine der seltenen Gelegenheiten bei denen Frau Kulka nicht anwesend war und wir unter 4 Augen sprechen konnten. Ich empfahl beide Söhne für die Posten, gleichzeitig bat ich den AS zurücktreten und unseren Vertrag aufkündigen zu dürfen. Ich erklärte, dass ich nicht dass tat, was der ursprüngliche Plan war, seine rechte Hand zu sein, diese Position hatte nun Frau Kulka inne. Und ich bat ihm, mich ab Sommer 2024 frei zu stellen, das sich mir eine andere Beschäftigung zu finden. Der AS sagte, ich hätte ihm im Laufe seines Lebens so viel Gutes getan, dass ich noch lange bei ihm bleiben sollte, und es mache nicht aus, dass mein Aufgabenbereich geschrumpft sei. Ich würde bezahlt und dich sei da, dafür zu sorgen, dass seine Kinder seine Nachfolger würden. Ich erklärte ihm, dass mich das in einen Dauerkonflikt mit Frau Kulka versetze, die inzwischen seine Frau war. Seine Antwort war, Du bist ein grossartiger Mann, der diesen Konflikt mit ihr austragen soll, denn jemand muss es ja tun. Ich fragte ihn, ob er mit unserem Konzept der Nachfolgeregelung glücklich sei und er bestätigte, die Idee Piotr und Tobias zu Vorstandsvorsitzenden zu machen entspreche seinem Wunsch.

Wann war Ihre letzte Sitzung mit dem AS?

Das letzte Vieraugengespräch war im Mai 2024. Frau Kulka verliess ihn überraschenderweise und ging zum Frisör. Daraufhin kam der AS umgehend in mein Büro und wir verbrachten ca eine Stunde miteinander. Ich sagte ihm nochmals, dass es für mich wenig Sinn ergab, da zu sein und mit Frau Kulka und JM zu streiten. Er wiederholte nochmals, dass ich eine gute Arbeit mache und dass es meine Aufgabe sei, dafür zu sorgen, dass niemand seinen Kindern ihr Vermächtnis vorenthält.

Wussten Sie zu diesem Zeitpunkt von einer Generalvollmacht des AS zugunsten des JM?

112

■    Seite 36    ▓

Nein.

Haben Sie an dem Treffen des AS mit den Zweitbegünstigten im Zeitraum vom 31. Juli 2024 bis 02. August 2024 teilgenommen?

Nein, zu dieser Zeit war ich in meinem Ferienhaus. Ich war nicht persönlich bei diesen Treffen anwesend.

Wann und wie haben Sie über den Gegenstand dieser Besprechungen erfahren?

Am 31.07. erfuhr ich von Aleksandra, die in Warschau ankam, dass sie bei einem Treffen mit dem AS und JM war. Bei dieser Gelegenheit wurde ihr und ich weiss nicht ob allen Zweitbegünstigten das neue Testament vorgestellt und ich erfuhr bei dieser Gelegenheit von der Generalvollmacht, auf die Sie mich vorher angesprochen haben. Das war am 31.07. alles, was ich über dieses Treffen erfuhr.

Was haben Sie wann als Nächstes erfahren?

Der erste August begann damit, dass Piotr mich anrief und mir sagte, Aleksandra gehe es sehr schlecht. Er bat mich einen Arzt zu finden, der im Büro, in dem wir waren, einen Hausbesuch machte. Ich verbrachte zweieinhalbstunden damit einen Arzt besuchte, der Aleksandra zunächst tel betreut und dann ins Polsat Büro kam. Dann hörte ich erstmals vom Ehemann von Aleksandra, was geplant war. Er erzählte mir am frühen Nachmittag des 01.08., dass der Vater mit JM zusammensitzt und mit den Kindern, und dass sie über den unverzüglichen Übergang bestimmter Rechte an die Kinder sprechen. Er ging nicht ins Detail, aber er sagte, sie sprechen über den Übergang der Kontrolle an einer der Stiftungen an die Begünstigten. Er fragte mich, ob er einen Anwalt in der USA anrufen könne, Mattew Sperry, den Hauptsteuerberater für Aleksandra und ihren Ehemann bzw. ihre amerikanische Familie. Seine Frage war, welche Risiken bestehen, wenn die Übertragung sofort erfolgt. Ich fragte, was er mit sofort meint und er sagte,

113

■    Seite 37    ■

noch diese Woche. Ich fand Herrn Sperry, er war auf einem Flug mit Internet, sodass er mit mir telefonieren konnte. Ich erklärte ihm die Idee und er fragte mich, ob ich einen zweiten Steuerberater, Herrn Marnin Michaels von Baker Mc Kenzie, als Steuerberater der Unternehmensgruppe fragen könnte. Der war auch in den USA und auch in einem Flugzeug. Ich hatte also zwei Stunden lang hektische Gespräche mit zwei Steuerberatern in unterschiedlichen Flugzeugen und Zeitzonen. Gegen 17 oder 18 Uhr hatte ich die Antwort, dass sie eine Lösung für die unmittelbaren steuerlichen Auswirkungen in den USA finden würden und konnte dies an Aleksandra und ihren Ehemann zurückmelden. Am frühen Abend, 18 oder 19 Uhr, begann ich mit Aleksandra zu sprechen, die mir sagte, es finde eine gute Sitzung statt, bei der JM anwesend sei. Ihrem Vater gehe es gut. Und sie planten die Übertragung für den nächsten Tag. Sie fragte, wie weit ich diesen Abend und am nächsten Tag verfügbar sei, weil der AS mit mir sprechen wollte. Aber sie sagte, sie machen Fortschritte und seien dabei, schnelle Entscheidungen über die Übertragung der Stiftung zu machen. Später am Abend, um 19 oder 20 Uhr, kontaktierte mich Piotr, ob ich ihnen schnell die jüngste Version der Statuten und Beistatuten der TIVI und Solkomtel übermitteln könnten. Weil sie mit dem AS vereinbart hätten, ihm bis zum nächsten Tag einen schriftlichen Entwurf vorzulegen. Ich hatte die Statuten nicht bei mir, ich bekam sie von Ursula Tomask. Sie schickte mir die Unterlagen, ich leitete sie an Piotr weiter. Ich denke, das lässt sich in meinem Firmen-E-Mail-Account überprüfen, zu dem ich allerdings seit dem 13.09. keinen Zugang mehr habe.

Piotr hatte an diesem Abend noch ein, zwei weitere Fragen. Er sagte, es sei mit seinem Vater abgesprochen, dass Art 13.2 als Mechanismus zur Kontrollübergabe verwendet wird. Wenn ich mich recht erinnere schickte er mit den Entwurf der Rücktritterklärung gem Art 13.2, der genau so aussah wie bei früheren Gelegenheiten, sodass ich dazu keine Kommentare hatte. Sie sagten, es sei mit dem AS vereinbart, dass dies eine endgültige Übertragung ohne Recht zur Rückübertragung sei. Er sagte, er plane deshalb den von JM im August 2023 eingeführten Wortlaut zu löschen, laut dem eine Rückübertragung möglich sei. Ich schaute mit die Stauten an und machte einige Anmerkungen, insb dass in den Statuten der Solkomtel eine Lücke war,

114

■    Seite 38    ■

laut der der AS keine Dividenden beziehen konnte, obwohl er weiterhin Begünstigter war. Aber ich fühlte mich sicher, weil JM bei der Sitzung dabei war und DW bereits für den nächsten Tag gebeten worden war, sich die Dokumente anzuschauen. Das war glaube ich alle für den Abend.

Hatten Sie den Eindruck, dass am 01.08.2024 an Ort und Stelle als Berater nur JM anwesend war, oder war es auch der Notar DW?

Ich weiss, dass JM bei den Sitzungen am 31.07. und 01.08. dabei war, DW sollte erst am 02.08. dazustossen. Aleksandra bat mich, mich zur Verfügung zu halten, weil der AS mich noch am Abend oder am nächsten Tag anrufen wollte, um mit mir über das Thema zu sprechen, dieses Tel fand tatsächl am 02.08. statt. Das war 15 Uhr griechischer Zeit und dauerte 12 min.

Welche Wahrnehmungen hatten Sie zu den weiteren Entwicklungen am Folgetag, am 02.08.2024?

Am 02.08. hatte ich mittlerweile verstanden, was der AS und die Begünstigten planen und fragte sie ab dem frühen Morgen, ob ich TS in diese Gespräche involvieren kann, weil die geplanten Massnahmen zahlreiche Konsequenzen für die Unternehmen hatten. Wie gesagt, wir hatten diese Massnahmen generell mit den Anwälten abgeklärt, aber das von einem Tag auf den anderen zu machen, war eine Herausforderung, die mir Kopfschmerzen bereiteten. Als ich die Folgen in Sachen Bankrecht/Wertpapierrecht/Kartellrecht überprüfte, stellte ich fest, dass der Kontrollübergang je nach Rechtsdisziplin etwas anderes bedeutet und kartellrechtlich die Stiftung von niemanden kontrolliert wurde, weil der AS die Kontrolle mit seinen Kindern geteilt, aber als Kurator einen Teil der Kontrolle behalten hatte, sodass die Kontrolle letztlich auf die Stiftung selbst überging und dieser Übergang abwärts in der Hierarchie ist kein Kontrollübergang im eigentlichen Sinne.

Hatten Sie an diesem Tag auch tel Kontakt mit dem AS selbst?

115

Seite 39

Ja, ich wartet auf diesen tel Kontakt, weil ich vom AS hören wollte, ob er mit der Situation einverstanden ist. Es gab dieses Tel und ich habe selbst wahrgenommen, dass am anderen Ende der Leitung DW, der AS und Aleksandra anwesend waren, ob sonst noch jemand, weiss ich nicht. Ich habe dem AS kurz beschrieben, was ich unternommen hatte, um ungelöste Fragen zu lösen und wen ich diesbezüglich kontaktiert hatte. Er war dankbar dafür, aber er hatte eine spezielle Frage an mich. Die Frage war, wenn der AS endgültig von seiner Stellung als Stifter am 02.08. zurücktritt, ob es noch ein Risiko darstellt, wenn er das Amt des Kurators mit Vetorecht behält. Diese Frage wurde im Kontext des Vermögensopfers gestellt und von DW später wiederholt. Ich sagte, ich sei kein FL Rechtsanwalt, mein Hausverstand sagte mir jedoch, eine negative Kontrolle in diesem Sinne stelle kein Risiko dar, da ja JM anwesend war, schlug ich jedoch vor, in FL nachzufragen, ob das so iO ist. Ich war an diesem Tag davon überzeugt, dass JM wie am Vortag anwesend sei, stellte aber drei Tage später fest, dass er in den Urlaub gefahren war und seinen Mandanten alleine gelassen hat. Das erfuhr ich aus einem Gespräch mit DW, der mir Fragen stellte und die Notariatsakte vorbereiten wollte. Der AS machte einen Scherz am Ende des Tel und sagte, machen wir es.

Zehn Minuten später erhielt ich einen Anruf von Piotr, der mir sagte, ich hätte das Ok TS mitzuteilen, was los sei. Das tat ich und TS setzte unmittelbar ein grosses Team im Familyoffice und in der Finanzabteilung ein, um sich damit zu befassen. Das war wichtig, weil Personen in Polen, Zypern und FL involviert waren und es war Freitagnachmittag in der Urlaubzeit, sodass wir sicherstellen mussten, dass genügend Personal zur Verfügung stand. 1 bis 2 Std später erhielt ich eine E-Mail an den gesamten Stiftungsrat der TIVI und Solkomtel mit der unterzeichneten Erklärung des AS in Form eines Notariatsaktes, Änderungen der Statuten und Beistatuten der Stiftungen und der Anweisung des AS in seiner Eigenschaft als Kurator, sich sofort darum zu kümmern. Er hatte als Kurator ein Vetorecht, erteilte aber noch am selben Tag seine Zustimmung. Wie es seine Aufgabe war, rief TS beim AS an, um zur Vermeidung von Betrug anzufragen, ob es seinem Willen entspricht, und ich hatte die schreckliche Aufgabe, PhS von einer Bergtour in den Alpen zurückzubeordern. Schliesslich hatten wir alle gefunden und TS hatte die

116

Bestätigung, dass es dem Willen des AS entspricht, deshalb fassten wir als
Stiftungsräte der TIVI und Solkomtel die entsprechenden Beschlüsse, die laut
Auskunft unserer FL Anwälte damit bindend wurden. Es war sehr spät am
Abend und es war der glücklichste Tag meines Lebens, weil ich dachte, ich
hätte meinem Freund geholfen, sein Vermächtnis an seine phantastischen
Kinder zu übertragen, wie er es immer wollte.

Was geschah am Folgetag?

Der nächste Tag begann damit, dass ich einen Anruf von TS bekam, dass an
diesem Abend noch etwas geschehen müsse, weil der AS eine dringende
Sitzung einberufe, zu der wir um die Mittagszeit in der Unternehmenszentrale
anwesend sein sollten. Die meisten waren in Warschau persönl bei dieser
Sitzung anwesend, ich war grossteils per tel verbunden. Bei dieser Sitzung
sagte der AS, er habe seine Meinung geändert, und wollte die Erklärungen
vom Vortag wieder zurückziehen. Dann erteilte er unverzüglich JM das Wort,
der vorschlug, wir sollten einfach das Geschehene vergessen, die
entsprechenden Unterlagen vernichten und unser Leben weiterleben. TS und
ich vertraten die Meinung, dass die Änderungen wirksam waren und neue
Statuten der TIVI und der Solkomtel in Kraft waren. Also wenn Änderungen
vorzunehmen waren, dann gemäss den neuen am vorigen Abend
verabschiedeten Statuten. Ich erinnere mich gut an das Gespräch, es
dauerte ca 1 ½ Stunden, wir vereinbarten alle, uns 2 Wochen Zeit zu geben,
um festzustellen, welche Rechte der Kinder geschützt werden müssen und
was besser gemacht werden kann. AS fuhr an diesem Abend oder am
nächsten Tag mit seinen Kindern zu seinem Boot um seinen Geburtstag zu
feiern, das war am 04.08.. JM, TS und ich blieben zurück, um aufzuräumen und
eine kreative Lösung für das Problem zu finden.

Welche Lösungsvorschläge haben Sie eingebracht?

Vom 10. bis 23. August habe ich drei Lösungsvorschläge zur Bereinigung diese
Konflikts vorgebracht. Von da an waren alle, auch AS, Frau Kulka, im
Emailverteiler. Ich begann mit der Familie zu konferieren und unterbreitete per

■    Seite 41    ▓

Email drei Vorschläge, den ersten am 07.08., den zweiten am 10. bzw 11.08. den letzten am 22. bzw 23.08. Es ging darum, den Konflikt in der Familie zu vermeiden, koste es was es wolle und ich sollte mir was einfallen lassen, nicht unbedingt prüfen, ob es funktioniert. Das war mein Job, mir etwas einfallen zu lassen. Die Ideen umfassten, dass der AS und seine Kinder Stiftungsräte aus einer langen Liste bereits bekannter Namen auswählten, einen zweiten Kurator bestellen, der nur das Recht hat, Vermögensübertragungen von den Stiftungen weg oder Änderungen an den Rechten der Begünstigten zu verhindern. Alle diese Vorschläge zielten darauf ab, der Familie die Möglichkeit zu geben, den AS wieder in den status quo ante vom 02.08. zu versetzen. Alle diese Aufgaben erhielt ich direkt vom AS. Alle drei Mal antwortete der AS, ihm gefielen diese Ideen. Aber jeweils eine Stunde später erhielt ich ein Tel von JM, der Antragsteller wisse nicht was er sagt und habe seine Meinung geändert. Die Kinder beschlossen, den AS zu überzeugen, dass sie Sorgen um seine Gesundheit und Sicherheit haben, nicht um ihre eigenen finanziellen Interessen, daher wiesen sie mich an, einen Maximalvorschlag zu unterbreiten, dass der AS sie alle als Begünstigte der Stiftungen ausschliessen könne, mit Ausnahme des einzigen Drittbegünstigten, dieser wurde im Vorschlag Ankerbegünstigter genannt und dieser Vorschlag, den ich für ein grosses Opfers seitens der Kinder hielt, wurde von JM boykottiert, weil er sagte, dass sei ein billiger Trick, weil die Zweitbegünstigten die Kontrolle als Vormund der Kinder behielten. Diesen letzten Vorschlag übermittelte ich am Freitag, den 23.08.. Er wurde vom AS nicht akzeptiert.

JM kam aus Polen zurück und sagte, der AS erwarte nur, die Wiederherstellung des Zustandes vor dem 02.08. und seine Kinder sollten seine Entscheidung abwarten, das war der Vorschlag von JM in der letzten Augustwoche.

Wie kam es zu Ihrem Ausscheiden aus dem Stiftungsrat der TIVI Foundation?

Ich wurde am 14.08. von Piotr entlassen, nachdem er mich gefragt hatte, ob ich bei den zukünftigen Streitigkeiten die Kinder vertreten würde, und meine Antwort war, ich bin vom AS eingestellt worden und folge seinen

■  Seite 42  ■

Anweisungen, solange sie legal sind. Das war nach dreitägigen hitzigen Diskussionen zu einem Kompromiss, der dann nicht zustande kam. TS und ich wurden auf Betreiben von Piotr und Tobias entlassen, ich weiss nicht, wer genau TS entlassen hat, ich wurde von Piotr am 14.08. entlassen. Dann wurde ich anscheinend aufgrund einer Gerichtsentscheidung aus Liechtenstein, aufgrund eines Antrages oder einer EV, wieder als Stiftungsrat eingesetzt. Das war Ende August. Und am 19.09. bin ich selbst zurückgetreten. Nachdem ich festgestellt hatte, dass der AS JM an meiner Stelle bestellt hatte, das war für mich ein klares Zeichen des Vertrauensverlustes.

Wurden Sie vom AS gebeten, Piotr Zak von seiner Funktion als CEO abzuwählen?

Ja.

Wie haben Sie darauf reagiert?

Als ich aufgrund der Gerichtsentscheidung wieder im Stiftungsrat war im September und da wurde ich vom AS, Frau Kulka und JM vor die Alternative gestellt, dass entweder TS und ich im Rahmen unserer Befugnisse als Stiftungsräte für die Abwahl von Piotr stimmen oder JM eine Vollmacht erteilten, dass er das umsetzt. Und, das ist jetzt wichtig für mich, weil es das Ende meiner langjährigen Beziehung zum AS bedeutet. Ich sagte, ich würde das nie tun, ersten aus ethischen Gründen, weil er mich angestellt hat, um seine Kinder zu schützen, nicht zu feuern. Ich hätte diese Arbeit nie angekommen, wenn ich gewusst hätte, dass ich zum Vollstrecker gegen die Kinder werde. Und zweitens sei dieser Wunsch illegal, die Entscheidung sei Aufgabe des Stiftungsrates, dieser besteht aus vier Mitgliedern und nur TS und mich darum zu bitten, sei eine Verletzung der Statuten und widerspreche der EV, die Handlungen gegen den normalen Geschäftsverlauf untersagt. Deshalb weigerte ich mich zu unterschreiben oder JM eine entsprechende Vollmacht zu erteilen und ab zwei Tage darauf, wurde ich aus all meinen 45 Posten vom AS gefeuert.

119

■    Seite 43    ■

**Über Fragen des AS:**

Haben Sie den Brief vom 01.02. von Kollegen Ott erhalten, mit dem Sie darauf
hingewiesen werden, dass Sie nicht von der Verschwiegenheit entbunden
sind und nach Auffassung des AS nicht aussagen sollen?

Nein, ich habe kein Schreiben von Herrn Ott erhalten, sondern ein Schreiben
vom AS, das er unterzeichnet und mir direkt geschickt hat. Ich habe ihm am
Freitagnachmittag per Email geantwortet und ebenso per Einschreiben, dass
er wohl noch nicht erhalten hat.

Welche Emailadressen benutzen Sie?

Ich sehe kein Verknüpfung dieser Frage zum laufenden Verfahren, aber wenn
das Gericht der Meinung ist, ich müsse aussagen, dann mache ich das.

Haben Sie auf irgendeiner Ihrer verwendeten Emailadressen am Sonntag,
02.02., 15.04 Uhr, eine Email des Kollegen Ott erhalten?

Ganz einfach, ich habe noch nie eine E-Mail von dieser Person erhalten.
Wenn diese Email an meine berufl Emailadresse geschickt wurde die vom AS
blockiert wurde, wissen Sie, warum sie nicht angekommen ist. Meine private
Email ist allgemein bekannt, auch JM kennt sie. Es ist eine Gmail Adresse.

Ist Ihr Beratungsvertrag mit dem AS noch aufrecht, den Sie 2021
abgeschlossen haben?

Nein, JM hat mir die Kündigung dieses Vertrages mit sofortiger Wirkung am
13.09.2024 übermittelt, sie trug die Unterschrift des AS. Wobei es sich um eine
Vertragsverletzung handelt, weil der Vertrag befristet und ohne
Kündigungsrecht abgeschlossen wurde.

Welches Honorar haben Sie aus Beratungsvertrag erhalten?

120

Seite 44

Ja, ich habe ein Honorar erhalten. Ich erachte die Beantwortung der Frage als irrelevant.

Waren EUR 5 Mio pro Jahr für diese Beratungstätigkeiten vereinbart?

Ich habe ähnlich verdient, wie in meiner vorigen Karriere als Anwalt. Es war ein Honorar vereinbart, mit dem ich binnen fünf Jahren entsprechend verdienen sollte, sodass ich für die Aufgabe des Anwaltsberufes entschädigt wurde. Ich war jahrelang ein Topanwalt in Polen mit entsprechendem Verdienst. Ich habe alles für den AS aufgegeben.

**Die Verhandlung wird um 17.25 für fünf Minuten unterbrochen.**

Sind Sie bis zum Widerruf der ersten Ablebenerklärung im August 2023 davon ausgegangen, dass der AS diese Erklärung immer wieder verlängern wird?

Ich verstehe diese Frage nicht.

Meine Frage ist, bis zum Zeitpunkt, wo Sie erfahren haben, dass die Ablebenserklärung tatsächlich widerrufen wurde, haben Sie bis dahin geglaubt, dass der AS das effektive date weiter in die Zukunft verschieben wird?

Ja, ich ging davon aus, dass es so funktioniert, wie ich das Konzept vorgestellt habe und, dass er das Inkrafttreten der Ablebenserklärung immer weiter verschiebt, bis er es irgendwann einmal nicht mehr tut.

Kennen Sie die notarielle Erklärung des AS, die er am 29.07.2024 abgegeben hat?

Nein, ich kenne das von ihm am 02.08. vorgelegte Dokument.

Haben Sie nach Ausbruch der Streitigkeiten im August 2024 die Kinder noch persönlich getroffen?

121

■    Seite 45

Täglich, wir arbeiten im selben Büro.

Unter welchem Recht ist die Analyse zum Vermögensopfer erfolgt?

Nach liechtensteinischem Recht.

Hat man sich das Problem auch unter poln Recht angeschaut?

Nicht das ich wüsste. Ich weiss nicht, wieweit poln recht hier relevant ist. Wenn das ein Problem sein sollte, wäre das die Aufgabe von JM gewesen.

Wen hat man um Freigabe zur Anpassung der Stiftungsdokumente im Herbst 2023 zur Behebung der Problematik im Zusammenhang mit den Vermögensopfer gebeten?

Den AS. Ich weiss nicht, ob das relevant ist, es gab kein Nein, es gab einfach kein Ja. Ich habe ihn mehr als drei Mal um die Freigabe gebeten, aber nie eine pos Antwort erhalten. Ich habe ihn auch gefragt, ob die Änderungen, die bei der TIVI vorgenommen wurden, auch für die Solkomtei vorgenommen werden sollen und habe auch hier nie eine pos Antwort bekommen bis August. Deshalb sind die Statuten unterschiedlich.

Ich möchte eine abschliessend Erklärung abgeben. Der AS ist ein glücklicher Vater. Er hat die beste zweite Generation unter den grossen Unternehmern in Polen hervorgebracht. Insb Aleksandra war die Liebe seines Lebens und auch auf seine Söhne war er sehr stolz. Was hier geschieht und die Drohungen, die ausgesprochen werden, sind eine Tragödie. Ich habe beschlossen, in diesem Fall auszusagen, weil die Kinder es verdient haben.

*Seitens der ASV wird bestritten, dass Drohungen ausgesprochen wurden.*

L.d.k.E.

122

■ Seite 46 ■

Der Zeuge verzichtet auf Zeugengebühren und wird um 17:45 Uhr entlassen.

Die Richterin verkündet den

K F.

**Termin vorgemerkt**

CAM IV30

**Beschluss:**

**Sodann wird die Tagsatzung zur Aufnahme der angebotenen Beweise erstreckt auf DI, 04.02.2025, 08:30 Uhr, VHS 1.**

Ende:       17:50 Uhr
Dauer:      7 Stunden

Unterschriften

123