# EXHIBIT M

To the                                                              <u>06 HG.2024.133</u>
Princely Court of Justice
9490 Vaduz


APPLICANT:                          Zygmunt Józef Solorz
                                    Haldenweg 18, 9495 Thesen

                                    <u>represented by 1</u>:

                                    ## SCHURTI : PARTNERS
                                    RECHTSANWÄLTE AG | ATTORNEYS AT LAW LTD

                                    Zollstrasse 2 | 9490 Vaduz | Liechtenstein
                                    Tel. +41 44 244 2000 | mail@schurtipartners.com

                                    (Acting on the basis of the power of attorney pursuant to
                                    Article 6 of the Non-Contentious Proceedings Act in
                                    conjunction with Section 28(2) of the Code of Civil
                                    Procedure)

                                    <u>represented by 2</u>:
                                    Schwärzler Rechtsanwälte
                                    Austrasse 42, 9490 Vaduz

                                    ## schwarzler
                                    Rechtsanwälte | Attorneys at Law
                                    P.O. Box 824 L 29239 85 76
                                    Austrasse 42 liechtenstein@s-law.com

                                    (Acting on the basis of the power of attorney pursuant to
                                    Article 6 of the Non-Contentious Proceedings Act in
                                    conjunction with Section 28(2) of the Code of Civil
                                    Procedure)
                                    (Schurti Partners Rechtsanwälte AG as authorized recipient
                                    for service pursuant to Article 82 of the Lawyers' Act)

PARTIES TO THE PROCEEDING:          1.  Jarosław Grzesiak
                                        ul. Jaworowska 13, PL-05-510 Konstancin-Jeziorna
                                        <u>represented by</u>:
                                        Oberhuber Jenal Rechtsanwälte AG
                                        Wuhrstrasse 14, 9490 Vaduz
                                    2.  Tomasz Szelag
                                        Agiou Georgiou 32, 4529 Pyrgos Limassol, Cyprus
                                        <u>represented by</u>:
                                        Niedermüller Rechtsanwälte
                                        Werdenbergerweg 11, 9490 Vaduz
                                    3.  Piotr Mateusz Żak
                                        ul. Ostrobramska 83 m. 1801A, 04-175 Warsaw Poland
                                        <u>represented by</u>:
                                        Roth + Partner Rechtsanwälte AG
                                        Landstrasse 40, 9495 Thesen
                                    4.  Aleksandra Jadwiga Żak
                                        9950 Toluca Lake Ave, 91602 North Hollywood, CA
                                        USA

325

represented by:

Gasser Partner Rechtsanwälte

Feldkircher Strasse 31, 9494 Schaan

5.  Tobias Markus Solorz

Volante tower 1901, Marasi drive, UAE – Dubai

represented by:

Marxer & Partner Rechtsanwälte

Heiligkreuz 6, 9490 Vaduz

AFFECTED LEGAL ENTITY:         TiVi Foundation (FL-0002.394.367-5)

Industriering 14, 9491 Ruggell

represented by:

Ritter Schierscher Rechtsanwälte AG

Gewerbeweg 5, 9490 Vaduz

COURT-APPOINTED                Dr. Peter Schierscher, Attorney-at-Law

ADMINISTRATOR:                 Gewerbeweg 5, 9490 Vaduz

represented by:

Ritter Schierscher Rechtsanwälte AG

Gewerbeweg 5, 9490 Vaduz

SUBJECT:                       Supervisory proceedings (Disputed value: CHF 30,000.00)

**APPLICATION**
**FOR THE JUDICIAL REMOVAL OF A FOUNDATION BOARD MEMBER**

8 copies
Exhibits as per list

2

326

In the matter designated on the reverse, the Applicant and founder, Curator, and sole primary beneficiary, Mr. Zygmunt Solorz (hereinafter: the "**Founder**" or "**Applicant**") submits the following

APPLICATION

FOR THE REMOVAL OF MR. JAROSŁAW GRZESIAK

AS A MEMBER OF THE FOUNDATION BOARD

and states as follows.

1        Starting Point and the Facts to be Proven Here in the Principal Proceedings

   a)  Undisputed framework: break between the Founder and his former confidant

*1*        By letter dated March 4, 2025, the Founder's children, *i.e.*, Aleksandra Zak, Piotr Zak, and Tobias Solorz (hereinafter: the "**Children**"), as is known, appointed Mr. Jarosław Grzesiak (hereinafter: "**Mr. Grzesiak**") as a member of the Board of the TiVi Foundation (hereinafter: the "**Foundation**"). The provisional legal basis for this—*i.e.*, the court order of October 26, 2024—and the background to the ongoing dispute are matters of public record.

*2*        Between Mr. Grzesiak and the Founder—who, it is undisputed, is also the Curator and the sole primary beneficiary of the Foundation—there existed for many years a close professional as well as personal relationship. Mr. Grzesiak himself stated so in his testimony.[1] The Founder regarded him as his *"closest friend."*[2] In addition to the close personal relationship, since 2007 the core of Mr. Grzesiak's professional work (or that of his firm) was, in particular, the capital markets advisory work for the Founder's corporate group.[3] It is therefore established that Mr. Grzesiak was most closely connected with the Founder, both privately and professionally, for well over a decade.

*3*        It is likewise a matter of record and documented that there was a consulting agreement between Mr. Grzesiak and the Founder dated May 8, 2021,[4] with an annual salary of EUR 5,000,000.00 (plus bonus payments of approximately EUR 1,000,000.00 per year). In order to obtain this lucrative consulting contract from the Founder, Mr. Grzesiak (also by his own account) ended his career as an attorney.[5]

---

[1] Testimony of Jarosław Grzesiak of February 3, 2025, transcript (ON 21), p. 24 top (Exh. ./BD).

[2] Testimony of Jarosław Grzesiak of February 3, 2025, transcript (ON 21), p. 24 top and p. 25 (Exh. ./BD).

[3] *"[...] our relationship [...] a friendship [...] We bought neighboring houses in France with the intention of retiring there together [...] I spent more time with AS than with any other friend [...] He called me his closest friend [...] we had a very close friendship for 10 years [...] [...] He [note: the Founder] needed someone he could fully trust [...] in whom he had complete trust [...]";* see testimony of Jarosław Grzesiak of February 3, 2025, transcript (ON 21), p. 20 bottom (Exh. ./BD).

[4] Testimony of Jarosław Grzesiak of February 3, 2025, transcript (ON 21), p. 21 bottom (Exh. ./BD).

[5] Testimony of Jarosław Grzesiak of February 3, 2025, transcript (ON 21), p. 24 top and pp. 21 f & 25 and p. 20 bottom and p. 21 top (Exh. ./BD).

3

4  Moreover, from his own statements and those of the Children it emerges that around the court-notorious events of August 2, 2024, Mr. Grzesiak was in intensive contact with the Children and was <u>deeply involved</u> in those events.[6]

5  When, in August 2024 (still before the loss of the lucrative consulting agreement with the Founder), Piotr Zak asked Mr. Grzesiak whether he *would "represent the Children in the forthcoming disputes,"* Mr. Grzesiak declined—quite obviously because the patent conflict of interest in the present situation and his own professional as well as personal entanglement with the Founder were staring him in the face.[7]

6  It is likewise undisputed that a <u>rupture</u> then occurred in the personal and professional relations between the Founder and Mr. Grzesiak: The Founder had to terminate, with immediate effect for cause, the lucrative consulting agreement for Mr. Grzesiak (the effectiveness of this termination is contested by Mr. Grzesiak[8]), and removed him as a member of the Foundation Board (the effectiveness of this removal is also contested by Mr. Grzesiak and/or the Children). Shortly thereafter, in September 2024, Mr. Grzesiak himself resigned as a board member, because he regarded the Founder's removal as a *"clear sign of loss of trust."* [9]

7  By the termination, Mr. Grzesiak lost his multi-million income stream and his career as a lawyer had ended. Because of this unfavorable (but self-inflicted) outcome, he harbors deep personal animus toward the Founder. This former business relationship—ended in discord—remains pending as a disputed legal relationship (also sub judice). Mr. Grzesiak further claims to have "million-euro claims" outstanding against the Founder arising from that business relationship.

8  This reveals the double role to which Mr. Grzesiak has bound himself. Figuratively speaking, his right hand would have to decide impartially and objectively on the administration of the Foundation and thus also on distributions in favor of the Founder, while his left hand regards that very Founder as an adversary and is occupied with asserting claims against him on the basis of the terminated contractual relationship. It is virtually impossible that Mr. Grzesiak could bracket out this conflict—of enormous personal and financial magnitude—when exercising this office (to say nothing of the evident fact that he is abusing the office for acts of retaliation against his now-opponent).

---

[6] Statement of Piotr Żak of February 4, 2025 (ON 22), p. 6 top (*"As far as I know, JG was also contacted at that time to keep him informed about the discussions")*, p. 7 top (*"We ended the meeting, I went home and contacted JG [...] I spoke with him [...] about the necessary amendments to the Statutes")*, p. 9 top (*"[...] Someone then called JG and put him on speakerphone so he could explain the Curator's rights [...]"*). See also testimony of Jarosław Grzesiak of February 3, 2025, transcript (ON 21), p. 37 bottom.

[7] See demeanor and testimony of Jarosław Grzesiak of February 3, 2025, transcript (ON 21), p. 41 bottom.

[8] Testimony of Jarosław Grzesiak of February 3, 2025, transcript (ON 21), p. 43 bottom (Exh. ./BD) (*"[…] That constitutes a breach of contract, since the agreement was fixed-term and included no right of termination.")*

[9] Testimony of Jarosław Grzesiak of February 3, 2025, transcript (ON 21), p. 42 bottom (Exh. ./BD).

9      This already became apparent even before his appointment in February 2025, when Mr. Grzesiak, named as a witness by the Children, testified before the Princely Court of Justice at their behest, even though under the agreement of September 19, 2023,[10] under Polish professional law,[11] and under Liechtenstein foundation law he was bound[12] to comprehensive confidentiality (and had not been released by anyone—not even by the Foundation[13]).

10     Whether he assumes this role for the Children (in his view) for "upright" reasons or for monetary reasons is irrelevant: Without any cooling-off period, as the Founder's former "closest friend"[14] and professional legal advisor, he knowingly and willingly aligned himself immediately with the interests of the Founder's current litigation opponents; he breached his confidentiality obligations under two legal systems; and, in parallel, he himself claims to hold outstanding claims against the Founder. A "greater" conflict of interest is scarcely conceivable.

11     Because of the years-long professional and personal double role, Mr. Grzesiak also obtained deep insight into the Founder's personality, inner life, financial conduct, personal values, and business undertakings. He has knowledge of the Founder's financial and health circumstances, personal wishes, priorities, emotional triggers and steering mechanisms, as well as his moral and ethical principles. The improper exploitation of this knowledge in the exercise of the office of board member—on the Children's ticket—is manifestly threatened and, as will be shown below, has already occurred multiple times (see, in particular, on the ultra vires removals of the Founder, paras. 31 et seq.). That, indeed, was the very reason for his appointment by the Children.

12     As a board member, however, Mr. Grzesiak is legally obliged to administer the Foundation so that it fulfills its purpose—the benefiting of the Founder—as effectively as possible.[15] This sole beneficiary is, however, his own adversary. If he cannot fulfill this duty because of a conflict of interest, he must be removed. The deep personal (former) rootedness with the Founder and the personal conflict of interest resulting from the broken mandate

---

[10] See confidentiality undertaking of September 19, 2023 (Exh. ./BG).

[11] See Polish Code of Attorney Ethics and Resolution No. 140/2023 of the Supreme Bar Council of December 1, 2023—Regulations on the Practice of the Legal Profession in Solo Practices or Partnerships. Under Article 6(1)–(3) of the Law on the Bar, an attorney is obliged to keep confidential everything learned in connection with the provision of legal assistance. This professional duty of confidentiality is not time-limited. An attorney cannot be released from the duty of confidentiality with respect to information obtained in the course of legal assistance or case handling. Moreover, under Section 46 of the Code of Attorney Ethics, an attorney may not represent clients whose interests conflict with one another, even if those clients consent to such representation.

[12] *Heiss/Lorenz/Schauer,* Liechtensteinisches Stiftungsrecht[2], Article 220 para. 40; LES 2014, 19.

[13] See testimony of Jarosław Grzesiak of February 3, 2025, transcript (ON 21), pp. 20 f., showing no release by the Foundation (whereas other witnesses were released; see p. 16 top [witness Walch], p. 18 top [witness Senn], p. 19 top [witness Castellazzi]).

[14] Testimony of Jarosław Grzesiak of February 3, 2025, transcript (ON 21), p. 24 top and p. 25 (Exh. ./BD).

[15] *Gasser,* Liechtensteinisches Stiftungsrecht[2], Article 552 Section 24 para. 2 with refs. to LES 2002, 94.

relationship with the Founder (as well as the pending civil case[16] and criminal investigations in Poland[17]) exclude the possibility that Mr. Grzesiak can exercise the office of board member with the requisite impartiality and neutrality. There is therefore no way around his removal. Ultimately, removal is particularly compelled by the fact of the "suspended" legal relationship vis-à-vis the beneficiary: On the one hand, Mr. Grzesiak wishes to contest the effectiveness of the termination of the consulting agreement; on the other hand—one can already guess it—he does not wish to bear the consequences of this "legal view." Under his own legal view, he would then be obliged to continue to advise the Founder intensively and personally (because he would stand in an ongoing consulting relationship with the Founder that could not have been terminated). Nor does Mr. Grzesiak wish to forego his (alleged) claims against the Founder. It follows that (i) an allegedly ongoing consulting contract and (ii) allegedly outstanding multi-million claims stand between the beneficiary and a board member, while <u>at the same time</u> Mr. Grzesiak, as a board member, is to be given (iii) the levers of the Foundation by which he determines the scope of benefits to his now-opponent. It should go without saying that such "cherry-picking" and riding both horses is incompatible with continuing in this (to be neutrally staffed) office.

<u>Evidence:</u>   –   Personally heard party Jarosław Grzesiak
–   Witness Jerzy Modrzejewski, to be produced
–   Resignation declaration of Katarzyna Tomczuk dated March 3, 2025 (Exh. ./BB)
–   Appointment by the Children of Mr. Grzesiak dated *March 4*, 2025 (Exh. ./BC)
–   Testimony of Jarosław Grzesiak dated February 3, 2025, Transcript ON 21 (Exh. ./BD)
–   Confidentiality undertaking dated September 19, 2023 (Exh. ./BG)

   b)   These circumstances could not be taken into account in the provisional proceedings

13   In spring 2025, the Founder understandably did not accept Mr. Grzesiak's appointment without comment. The Founder filed precautionary objections with the Commercial Register and, by brief dated April 22, 2025, applied for the issuance of a court order directed against this appointment.

14   By order dated May 27, 2025, the Princely Court of Justice <u>dismissed</u> that provisional application. However, as to material factual submissions the Founder made in the provisional proceedings regarding the conflict of interest, the court could (at that time) make only *non liquet* findings. That was regrettable, but not especially surprising in a provisional proceeding, because ready means of proof (e.g., documents and the like) scarcely exist to prove personal animosities and the profound rift between the Founder and Mr. Grzesiak, and witnesses and the parties—unlike what is required here in the principal proceedings—were not examined.

---

[16] See statement of claim dated April 10, 2025 (Exh. ./BH).

[17] The proceedings are pending before the Regional Prosecutor's Office in Warsaw under file no. 2010-5-Ds.25.2025.

15    Based on the submissions then before it, the Princely Court of Justice could not, for example, find that there had been an open break between the Founder and Mr. Grzesiak. Nor could it find, for example, that there has been, since summer 2024, an openly waged conflict between the Founder and Mr. Grzesiak and that he "changed sides." Nor could it find that Mr. Grzesiak harbors deep personal animosity toward the Founder that he cannot, and will not, bracket out in his role as a Foundation Board member. All of that is, however, factual, as will be proven in these principal proceedings.

16    Moreover, after that decision denying the requested court order, additional events occurred that clearly evidence Mr. Grzesiak's animus toward the Founder. It is quite obvious that Mr. Grzesiak is pursuing a plan of action sought by the Children and, in carrying it out, does not shrink from conduct contrary to the Statutes (to name only one of several examples: stripping the Founder of power by removing him from positions guaranteed to him by the Statutes in the subsidiaries).

Evidence:          –    as previously submitted

2      Facts on the Conflict of Interest and on Mr. Grzesiak's Relationship with the Founder

  a)  Personal involvement of Mr. Grzesiak and the breakdown with the Founder

17    As stated, Mr. Grzesiak is not, and never was, an outsider; by his own account he was formerly the Founder's "closest friend," and they "spent practically all vacations together." [18] They bought neighboring houses in France with the intention of retiring there together. Mr. Grzesiak reports that he spent "more time" with the Founder "than with any other friend." Conversely, from his perspective, the Founder was likely his best friend. For ten years this close friendship developed to the point that Mr. Grzesiak treated the Founder "like a mixture of a father […] and an older friend," and the Founder saw in Mr. Grzesiak someone "he could fully trust."[19]

18    By Mr. Grzesiak's own account, this friendship was thus deeply personal and comparable to a father–son relationship.

19    This personal conflict situation—loss of the family-like father–son relationship followed by the breakdown—taken on its own must, viewed objectively, raise serious doubt as to whether a person who has fallen out completely, within a short time, with his closest friend, father figure, and neighbor can possibly exercise, impartially and objectively, the office of Foundation Board member of a foundation established by that person. As is well known, any

---

[18] Testimony of Jarosław Grzesiak of February 3, 2025, transcript (ON 21), p. 20 bottom (Exh. ./BD).

[19] "[...] our relationship [...] a friendship [...] We bought neighboring houses in France with the intention of retiring there together [...] I spent more time with AS than with any other friend [...] He called me his closest friend [...] we had a very close friendship for 10 years [...] [...] He [note: the Founder] needed someone he could fully trust [...] in whom he had complete trust [...]"; see testimony of Jarosław Grzesiak of February 3, 2025, transcript (ON 21), p. 20 bottom (Exh. ./BD).

appearance of bias is to be avoided, and at a minimum such a person must be charged with precisely that appearance of bias.

20    Here, however, matters did not stop at ("only") the personal falling-out: beyond the private rift, Mr. Grzesiak <u>also</u> executed a 180-degree turn in the sphere of interests and additionally aligned himself with the interests of the Children—the Founder's litigation opponents. From this rapid "change of sides" on the personal level it follows that Mr. Grzesiak never intended to set foot on neutral ground at all. A neutral and objective Foundation Board member does not act in this way; the personal-level conflict of interest is thus established.

21    The point is not whether this conduct is defensible legally, morally, or ethically (*quod non*). Nor is the point the blameworthiness of the breach of trust in private relations. The point here is that Mr. Grzesiak cannot, and will not, bracket out in the required impartial exercise of the Foundation Board office the knowledge entrusted to him as the "closest friend" and his intimately connected past with the Founder as a paternal friend, given the personal rupture. On the contrary: in <u>every</u> decision he makes as a Foundation Board member, he will allow this private disappointment and entanglement to flow in, because he cannot "think it away." Nor is this merely a potential risk (which would already suffice); rather, it has already materialized in the past.

22    **A former best and closest friend and confidant of the sole beneficiary of a foundation who, within a few weeks, falls out completely with that person and—without any "cooling-off period"—immediately thereafter aligns himself with the interests of the sole beneficiary's litigation opponents is excluded from exercising the office of Foundation Board member on grounds of bias. Such exceptional personal circumstances constitute good cause for removal, because pursuit of the foundation's purpose—implementing the Founder's intended beneficiary regime—cannot be assured with sufficient certainty if carried out by Mr. Grzesiak.**

<u>Evidence:</u>    –   Personally heard party Jarosław Grzesiak
            –   Witness Jerzy Modrzejewski, to be produced
            –   as before.

   b)  <u>Professional</u> involvement of Mr. Grzesiak: former mandate relationship, former attorney relationship, and ongoing litigation over multi-million claims

8

23    In addition to the personal breakdown, there is also a conflict of interest on the purely professional level that Mr. Grzesiak cannot bracket out (and indeed has no intention of doing so—quite the contrary). The consulting agreement of May 8, 2021,[20] with its enormous remuneration—on account of which Mr. Grzesiak ended his career as an attorney[21]—has already been mentioned.

24    Beyond that, however, Mr. Grzesiak also acted as an attorney for the Founder and his corporate group. It is incorrect, as Mr. Grzesiak attempted to portray during his examination in February 2025, that he "never personally" represented the Founder as counsel. This falsehood follows already from his own statements, according to which he advised the Founder (among other things) in his divorce disputes. The almost grotesque attempt to declare all of this "friendship" services, in order to try to conceal his obvious breach of professional confidentiality, fails already because there is documentary proof of this attorney relationship, and because the law, in cases of doubt, presumes legal services. In other words: Mr. Grzesiak did not advise the Founder free of charge for ten years in his private affairs "as a friend"—quite the opposite!

25    As stated at the outset, this attorney and consulting relationship ended in significant conflict. In Poland, as a result of the evident breach of confidentiality noted above, there is a court proceeding in which Mr. Grzesiak and the Founder now face each other as opposing parties.[22]

26    **A former legal advisor to the sole beneficiary of a foundation, with an annual remuneration exceeding EUR 5,000,000, who contests the effectiveness of the termination of that business relationship and still seeks to assert multi-million claims from that relationship against the beneficiary, is excluded from exercising the office of Foundation Board member on grounds of bias.**

27    **The foreseeable years-long litigation arising out of and in connection with the former consulting and mandate relationship does not emanate from the Founder (and certainly was not artificially created), but is the necessary consequence of Mr. Grzesiak's conduct, his adopted position, and his unfounded claims, whose origin long predates his appointment. A former business partner who asserts (unfounded) multi-million personal claims against the sole beneficiary of a foundation cannot at the same time be a Foundation Board member of that foundation, whose primary beneficiary is his litigation opponent.**

Evidence:    –    Personally heard party Jarosław Grzesiak
             –    Witness Jerzy Modrzejewski, to be produced
             –    as before.

---

[20] Testimony of Jarosław Grzesiak of February 3, 2025, transcript (ON 21), p. 21 bottom (Exh. ./BD).

[21] Testimony of Jarosław Grzesiak of February 3, 2025, transcript (ON 21), p. 24 top and pp. 21 f. & 25 (Exh. ./BD).

[22] See statement of claim dated April 10, 2025 (Exh. ./BH).

9

   c)   Criminal investigations in Poland

28     It has already been shown that Mr. Grzesiak was deeply involved in the well-known events of August 2, 2024. The precise role that Mr. Grzesiak played in connection with the statements of Piotr Żak is of interest to the Polish law enforcement authorities. For reasons of the integrity of the criminal investigation in Poland, and because investigations under Polish law are confidential, the Founder cannot disclose information other than that which is publicly available in the media or through official statements of the Prosecutor's Office.

29     It is, however, a fact that on July 25 the Regional Prosecutor's Office in Warsaw opened an investigation on suspicion that the Founder, on August 1 and 2, 2024, in Warsaw, had been induced to transfer his property rights to his own detriment. These rights concerned the TiVi Foundation and the Solkomtel Foundation. The suspected aim was to obtain a financial benefit by causing the victim to make declarations of intent leading to the transfer of assets, the value of which exceeded the statutory threshold for significant property by a factor of ten.

30     Information on the initiation of that investigation was made public and widely reported in the Polish media.

Evidence:      –    Personally heard party Jarosław Grzesiak

   d)   Partisan acts already carried out and breaches of duties as a Foundation Board member

   –   ***Disempowerment of the Founder: removal from statutorily guaranteed positions***

31     The matter here is not merely whether some "bias" merely "threatens" or whether the appearance of partiality exists. The fact that Mr. Grzesiak does not shrink from taking retaliatory measures against the Founder out of personal animosity is demonstrated strikingly by the events since April 10, 2025, through which the Founder was step by step stripped of his rights and finally removed from the corporate group.

32     As is well known, the Founder (even when submitting a so-called "declaration of death") has a <u>statutorily secured right</u> to retain his positions on the supervisory boards.[23] This right was also expressly confirmed by the Children in the amendment declaration of August 2, 2024, drafted by Piotr Żak.[24]

33     Nevertheless, the Foundation Board, on the basis of the (contested) resolution of July 21, 2025, is attempting to remove the Founder from <u>all</u> relevant supervisory board

---

[23] See Article 13(2)3.(iii) of the Statutes as amended November 29, 2023.

[24] See Amendment Declaration of August 2, 2024, p. 2 bottom (there: point (iv)).

positions and has already largely done so in practice. The "justification" cited in the—currently litigated—Foundation Board resolution of July 21, 2025, is not only riddled with inaccuracies and falsehoods; its sole purpose is to maintain the appearance that the Foundation Board engaged in serious deliberation before executing the statute-violating expulsion of the Founder. In truth, Mr. Grzesiak's sole aim was to humiliate the Founder and carry out the plan in favor of the Children—a plan that the Founder, as must now be noted with regret, had already anticipated shortly after Mr. Grzesiak's appointment. Only a few months ago, Mr. Grzesiak complained that because of the Founder he had to vacate forty-five positions and no longer had access to his email account; he is now repaying this one-for-one by exploiting his office against the Founder. This must be countered through his removal; otherwise confidence in the independent and neutral composition of a foundation board will be completely undermined by placing the declared adversary of the beneficiary at the levers of the foundation he created.

Evidence:  – Personally heard party Jarosław Grzesiak
           – Production of the file 06 HG.2025.122 (challenge to the resolution), in particular Exhibits ./A to ./J, as well as the motions filed under that case number for the removal of the court-appointed administrator

– ***Refused distributions in favor of the Founder***

34    The clear bias to the detriment of the Founder is evident—not only in his removal from all relevant supervisory board positions—but also from a financial perspective. Since Mr. Grzesiak's appointment, all of the Founder's distribution requests to the TiVi Foundation and the Solkomtel Foundation (with identical board composition) <u>have been rejected after weeks (!) of "consideration</u>." Whenever the Founder was even informed of the reasons for the rejection (or provided with the corresponding Foundation Board resolutions), these contained only empty platitudes and pseudo-reasons. For his most recent distribution request, which was rejected, he received no reasoning at all. This is all the more incomprehensible since it remains entirely unclear why the Foundation Board should have needed such a long period between the submission of the request and the two-line rejection, and why the Board did not—as its duty required—address in detail why the requested benefit was denied. Furthermore, the Foundation Board completely failed to make, in accordance with the foundation's purpose and in the interests of the (undisputedly) sole primary beneficiary, any "mediating counter-proposal" for a distribution or even to declare itself generally willing to do so.

35    The *procedure* is always the same: the Founder files a distribution request; the board of the foundation concerned lets weeks pass and then issues a brief pseudo-justification rejecting the request. The fact that the foundation's sole purpose is to <u>serve</u> its current sole beneficiary (the Founder) seems to have completely receded into the background. Legally construed, Mr. Grzesiak's actions and reasoning would apparently turn the foundation into an end in itself, whose only task is to increase its own assets. The same applies to information requests, which the Foundation Board also routinely rejects outright or leaves completely unanswered.

36    Bias is thus evident also from this perspective: Mr. Grzesiak seeks to cut off his adversary—the Founder, as sole beneficiary—from any profit. To do so he repeatedly invokes the pretext that "the interests of the foundation" do not permit such a distribution. If Mr. Grzesiak is allowed to proceed in this way and the manifest conflict of interest is ignored, abuse and arbitrariness in the exercise of the office of Foundation Board member will be given free rein, as unverifiable empty phrases would suffice to reject a distribution request clearly encompassed by the foundation's purpose.

Evidence:    –    Personally heard party Jarosław Grzesiak
             –    Distribution request concerning the Solkomtel Foundation dated July 30, 2025 (Exh. ./EL)
             –    Circular resolution of the Foundation Board of the Solkomtel Foundation dated August 18, 2025 (Exh. ./EM)
             –    Distribution request concerning the TiVi Foundation dated September 5, 2025 (Exh. ./EN)
             –    Distribution request concerning the Solkomtel Foundation dated September 5, 2025 (Exh. ./EO)
             –    Compilation of email correspondence between the Founder's counsel and the administrator in connection with the distribution requests and the obtaining of the Foundation Board resolutions thereon (Exh. ./EP)

–    ***Deliberate circumvention of the third Foundation Board member when required to implement the Children's plan***

37    The clear slant of Mr. Grzesiak's actions and his bias also follow from the fact that the foundation's Statutes, as amended by court order of October 26, 2024, exhibit in practice significant deficiencies in proper decision-making when adopting circular resolutions. Mr. Grzesiak consciously exploited these deficiencies in order to act in the name of the foundation in ways detrimental to the Founder.

38    As already set out[25] in detail in the present applications, Mr. Grzesiak was part of the strategy—of his own devising—to deliberately bypass the third Foundation Board member in resolutions intended to disadvantage the Founder. The acts from April 10, 2025, through July 21, 2025, have already been set forth in detail in the referenced applications, showing how Mr. Grzesiak subverted proper decision-making (the adoption of resolutions with adequate opportunity for participation by <u>all</u> organ members).

39    To avoid repetition, reference is made to the Founder's briefs already filed, in which the chronology of events, including the email correspondence and decision-making on individual resolution points, was set out in detail, along with the evidence cited there; those submissions are incorporated herein by reference as part of the present application for Mr. Grzesiak's removal.

---

[25] See the Founder's application for removal of May 16, 2025 (ON 121), supplemental filing of July 11, 2025 (ON 142), reply to the court-appointed administrator's statement of July 21, 2025, and supplemental statement to the application for removal of the court-appointed administrator of August 14, 2025. Should the Princely Court of Justice (contrary to expectation) deem it necessary in this proceeding as well to reproduce every event within the Foundation Board word for word, we request prior discussion and judicial guidance.

Evidence:      –  Personal testimony of the respondents
               –  The referenced applications in the present case 06 HG.2024.133, in particular the submissions filed (by the Founder and Mr. Szeląg) for the removal of Peter Schierscher, together with the evidence cited therein

–  _**Interim conclusion:** Mr. Grzesiak has no intention of exercising this office with the required neutrality and impartiality, as his prior actions demonstrate_

40    From Mr. Grzesiak's conduct—whereby immediately after his appointment (i) the Founder received no further distributions, (ii) the Founder was unlawfully removed from all supervisory board positions, and (iii) the decision-making mechanism was subverted whenever necessary to implement actions detrimental to the Founder—it follows that there is not merely a risk that Mr. Grzesiak "might take retaliatory measures" against the Founder, his now-opponent. This bias and partisanship have already materialized. Ultimately, through his actions, Mr. Grzesiak himself provides the best proof that he cannot, in exercising this office, bracket out his personal and professional conflict with the Founder, the sole beneficiary of the foundation.

e)    Deliberate breach of the duty of loyalty and confidentiality owed to the Foundation

41    It has already been shown above that Mr. Grzesiak violated his professional and contractual duty of confidentiality (under several legal systems at once) in an attempt to secure an advantage for the Children in proceedings 06 HG.2024.210. What is of particular significance for the present application for removal, however, is that Mr. Grzesiak, without any sense of shame, also unlawfully disclosed internal foundation information—information that came to his knowledge by virtue of his position as a Foundation Board member—during his examination of February 3, 2025, to the detriment of the Foundation. This breach is all the graver because, as a trained and practicing lawyer, Mr. Grzesiak must have known perfectly well that his conduct was unlawful, given that there had been a vigorous discussion before the start of his examination concerning the scope and existence of his confidentiality obligations.[26]

42    Although (i) the Founder had expressly not released Mr. Grzesiak from his duty of confidentiality, and although (ii) the Foundation likewise had not released him from that duty[27] (even though the Foundation did release other witnesses examined at that time—so this was clearly not an "oversight" limited to Mr. Grzesiak[28]), he nevertheless, at the prompting of the Children, extensively revealed internal foundation matters. The only limit he drew to his disclosures was at "business secrets," but—deliberately—he did not draw that line for all the other secrets that were entrusted to him or became known to him by virtue of his office as a Foundation Board member, but which—by Mr. Grzesiak's own intention—

---

[26] See testimony of Jarosław Grzesiak of February 3, 2025, transcript (ON 21), pp. 20 f.

[27] See testimony of Jarosław Grzesiak of February 3, 2025, transcript (ON 21), pp. 20 f., showing no release by the Foundation (whereas other witnesses were released; see p. 16 top [witness Walch], p. 18 top [witness Senn], p. 19 top [witness Castellazzi]).

[28] See transcript of February 3, 2025 (ON 21), p. 16 top [witness Walch], p. 18 top [witness Senn], p. 19 top [witness Castellazzi].

were meant to harm the Founder in the litigation. His claim that he was under a "duty" to make these statements of course does not cure this crystal-clear statutory violation.

43    Closely linked to the duty of loyalty, and indeed one of its further manifestations, is the duty of confidentiality incumbent upon every Foundation Board member, which, although not expressly regulated in the law, is universally recognized. Within the limits of the law, the foundation documents, and the obligations otherwise arising from the member's role, each Foundation Board member is obliged to maintain complete **silence toward everyone** about **all** internal foundation information entrusted to him or otherwise learned, whether accidentally or in the course of his mandate, and to ensure that foundation records do not come to the knowledge of unauthorized persons. All information in respect of which the Foundation objectively has an interest in keeping from outsiders must be treated as confidential. **This duty of confidentiality continues even after termination of the member's mandate**.[29]

44    **As is vividly demonstrated by his witness examination of February 3, 2025, Mr. Grzesiak knowingly and intentionally violated this duty. This breach is another piece of the mosaic and further proof that, when it comes to harming the Founder (as the Foundation's sole beneficiary), Mr. Grzesiak is incapable of respecting obligations or observing limits. Anyone who unlawfully discloses internal foundation information even before being appointed to the Foundation Board—because he is in an obvious personal and professional conflict with the Founder and sole beneficiary—will be all the more likely to do so once he again holds office as a Foundation Board member.**

Evidence:           –   Personally heard party Jarosław Grzesiak
                    –   Transcript of February 3, 2025 (ON 21 to 06 HG.2024.210)

   f)   Summary findings: The combination of conflicts is decisive

45    Conflicts of interest do not have to arise from a single event or circumstance. Some of these individual circumstances or events might, taken in isolation, perhaps not reach the "level" of a ground for removal. However, when one considers the totality of conflicts and divergences of interest concerning Mr. Grzesiak, it becomes apparent that the earlier legal reasoning of the Princely Court of Justice (albeit only in the provisional proceedings) was incorrect. The issue is <u>not</u> "a criminal proceeding" in Poland against Mr. Grzesiak as the ground for removal. <u>Nor</u> is it that Mr. Grzesiak might be a confidant of the Children on the Foundation Board. Each of those points taken alone would, of course, be unobjectionable. It is well understood that each side should be able to appoint a "trusted person."

---

[29] *Heiss/Lorenz/Schauer,* Liechtensteinisches Stiftungsrecht[2], Article 220 para. 40; LES 2014, 19.

46    Rather, with regard to Mr. Grzesiak, what is at stake is the <u>accumulation of countless circumstances and personal rifts</u> between him and the Foundation's sole primary beneficiary, the Founder—circumstances showing that Mr. Grzesiak cannot, and has not, set aside his personal animosity toward the Founder or the confidential information entrusted to him in the course of this office.

47    The issue is that the Children did <u>not</u> <u>appoint</u> Mr. Grzesiak merely because he <u>enjoys their confidence</u>. They appointed him quite deliberately <u>because</u> he had <u>broken the relationship of trust with the Founder</u> and had, in effect, been cast out by him.

48    Mr. Grzesiak is fully <u>aware</u> of this conflict of interest: during his witness examination he stated that, as Foundation Board member, he had been confronted by Piotr Żak and (with his consent) dismissed *"after he asked me whether I would represent the children in future disputes [...]"*.[30] Mr. Grzesiak then declined that request and preferred to be dismissed, because he had been *"appointed"* by the Founder. Interestingly, this conflict of interest—of which Mr. Grzesiak was at that time still aware—seems to have evaporated entirely since he lost his consultancy contract worth many millions of euros.

49    The former years-long professional and personal relationship of trust between Mr. Grzesiak and the Founder, the severe rupture in fall 2024, the continuing dispute over the multi-million-euro consultancy contract (together with allegedly outstanding claims), and the resulting obvious resentment toward the Founder collectively reach such a degree of gravity that retaining him in office has become intolerable if the foundation's purpose—the benefit of the Founder—is not to be jeopardized.

3    Legal Analysis

50    The legislature primarily addresses conflicts of interest in the exercise of the office of Foundation Board member by requiring that the member concerned recuse himself from decision-making in the individual case. That this form of conflict resolution is inadequate here is already shown by the fact that Mr. Grzesiak has not once recused himself in any resolution to date. He therefore evidently perceives no conflict of interest between himself and the Founder as sole beneficiary.

51    The next step to be examined is therefore the *ultima ratio*: removal from office. It must be determined under what circumstances case law recognizes conflicts of interest and how such conflicts are to be dealt with when, and to the extent that, they are of a permanent nature and cannot be eliminated by a one-off measure.

52    As far as conflicts of interest in corporate bodies are concerned, it is recognized that, <u>in the case of foundations, a higher standard of protection</u> is required because conflicts of interest

---

[30] Testimony of Jarosław Grzesiak of February 3, 2025, transcript (ON 21), p. 41 bottom.

in this context are "more dangerous."[31] Conflicts of interest vis-à-vis the beneficiaries of a foundation must be strictly avoided.[32] The Foundation Board is accordingly obliged to avoid any conflict between its <u>own</u> interests and those of the foundation and its stakeholders and, if such a conflict has already arisen, to eliminate it.[33] A conflict of interest may already exist even if the degree of incompatibility has not yet become absolute.[34] Persistent conflicts of interest—such as litigation with the foundation's beneficiaries—can render the board member concerned unfit for his position and necessitate his removal.[35] (The same must apply, moreover, to serious personal disputes between beneficiaries and board members.)

53   The Supreme Court has always required that the Foundation Board be composed <u>neutrally</u>.[36] The exercise of office must be impartial and guided solely by the interests of the foundation—and must be <u>ensured</u>, <u>not</u> merely <u>assumed</u>—[37]in order to preserve objectivity and to prevent conflicts of interest.[38] Persons who are subject to a permanent conflict of interest must be removed.[39] The Foundation Board is bound—contrary to what has recently been communicated to the Founder—**to serve the beneficiary (and no one else)** within the framework and limits of the foundation's purpose. A "self-serving foundation," the impression of which has lately been conveyed by the Foundation Board's pseudo-justifications invoking an abstract "interest of the foundation," is in fact prohibited.[40]

54   If a Foundation Board member, because of disputes with a beneficiary, lacks an objective perspective, he is subject to a conflict of interest.[41] Only "artificially" created grounds for removal are to be disregarded.[42] That the grounds for removal here are not "artificially created" is already proven by the fact that the conflict between Mr. Grzesiak and the Founder erupted long <u>before</u> his appointment as Foundation Board member. No one compelled the Children to appoint Mr. Grzesiak of all people to the Board, and no one compelled Mr. Grzesiak—already at that time in conflict with the Founder—to accept this office, which he should have declined.

55   For a Foundation Board member to be removed, there must be good cause that either endangers the interests of the foundation or makes it unreasonable for the foundation to keep the member in office. Whether good cause exists must always be assessed from the

---

[31] *Heiss/Lorenz/Schauer,* Liechtensteinisches Stiftungsrecht[2], Article 186 no. 23.

[32] LES 2010, 7; *Heiss/Lorenz/Schauer,* Liechtensteinisches Stiftungsrecht[2], Article 186 no. 27.

[33] Article 932a Section 66(1) of the Persons and Companies Act.

[34] *Gasser,* Liechtensteinisches Stiftungsrecht[2], Article 552 Section 24 para. 43a with refs. to B 07.09.2017, 07 HG.2015.270, LES 2017, 180, with reference to OGH in RIS-Justiz RS0114598.

[35] *Heiss/Lorenz/Schauer,* Liechtensteinisches Stiftungsrecht[2], Article 186 no. 29.

[36] LES 2010, 7 = GE 2009, 46, headnote 7.2.;*Heiss/Lorenz/Schauer,* Liechtensteinisches Stiftungsrecht[2], Article 552 Section 24 para. 24.

[37] *Heiss/Lorenz/Schauer,* Liechtensteinisches Stiftungsrecht[2], Article 186 paras. 17 and no. 30.

[38] *Gasser,* Liechtensteinisches Stiftungsrecht[2], Article 552 Section 24 para. 8 with refs. to LES 2010, 7.

[39] *Heiss/Lorenz/Schauer,* Liechtensteinisches Stiftungsrecht[2], Article 552 Section 24 para. 24; LES 2010, 7 = GE 2009, 46, headnote 7.2.;

[40] *Bösch,* Liechtensteinisches Stiftungsrecht (2005) 209; *Schwärzler/Hermann/Sahranavard,* PSR 2019/19, 98.

[41] *Heiss/Lorenz/Schauer,* Liechtensteinisches Stiftungsrecht[2], Article 186 para. 16.

[42] *Heiss/Lorenz/Schauer,* Liechtensteinisches Stiftungsrecht[2], Article 186 para. 16.

standpoint of the functioning of the private foundation—ultimately, <u>whether pursuit of the foundation's purpose can be ensured with sufficient certainty going forward</u>.[43]

56  By way of reminder—because this principle has lately been swept under the rug by the Foundation Board: a foundation is designed for the lasting <u>fulfillment of the purposes set by the founder</u>, with <u>the beneficiaries taking priority</u>. As a rule, its bodies possess only administrative powers, and their primary duty is to realize the foundation's purpose, which is the heart of the foundation.[44] <u>Here, that heart is the benefiting of the Founder (and not the benefiting of the foundation itself).</u>

57  Especially where—as here—fee disputes between beneficiaries and legal advisors or "side-switching" by legal advisors are concerned, the case law is particularly critical because of the threat of a dual role: for example, a director of a fiduciary founder of a foundation may not, even acting as an attorney, represent one successor in interest of the economic founder <u>against</u> another such successor.[45] The prohibition on such "side-switching" is, frankly, a matter of common sense. In addition, a lawyer serving as a foundation board member must, from the outset—if he is also representing a beneficiary as counsel and fee claims may (or will) arise—ensure a clear, preferably written arrangement on fees, any collateral securing those fees, and timely payment.[46] It is a cardinal duty of the board member concerned to avoid conflicts of interest from the very beginning. If this does not succeed, or if years-long disputes between a board member and the foundation's beneficiaries loom, achievement of the foundation's purpose will regularly be called into question or at least endangered. Even the potential (theoretical) risk of a conflict of interest disqualifies the legal advisor from accepting or performing the mandate.[47]

58  It is, moreover, irrelevant whether Mr. Grzesiak actually uses this knowledge against the interests of the foundation (whose purpose is to benefit the Founder), or whether he actually threatens to take retaliatory measures. In light of the actions outlined above, it is obvious that precisely this looming danger has already materialized multiple times.

59  Applied to the present case, this means that any one of the individual conflicts described above—each taken on its own—must already lead to Mr. Grzesiak's removal. Even if, here or there, one were disinclined to find the requisite "level" for removal in a single item, the sum of the above reasons creates a conflict situation of such gravity that removal of the board member concerned must follow. Neither the Foundation nor the Children would suffer any disadvantage thereby, as they can simply appoint a conflict-free board member who does not intend to misuse the office for acts of retaliation.

---

[43] LES 2010, 218(219).

[44] *Gasser,* Liechtensteinisches Stiftungsrecht[2], Article 552 Section 24 para. 2 with refs. to LES 2002, 94.

[45] *Gasser,* Liechtensteinisches Stiftungsrecht[2], Article 552 Section 24 para. 9 with refs. to B 27.11.1995, Hp 4/94-29, LES 1996, 150.

[46] *Gasser,* Liechtensteinisches Stiftungsrecht[2], Article 552 Section 24 para. 9.

[47] *Gasser,* Liechtensteinisches Stiftungsrecht[2], Article 552 Section 24 para. 9 with refs. to U 07.01.2009, 1 CG.2006.303, LES 2009, 202.

60    The bottom line is therefore as follows:

- **The profound personal rupture and the professional dispute between the Founder and Mr. Grzesiak broke out long <u>before</u> his appointment to the Foundation Board. "Artificially" manufactured grounds for removal by the Founder are therefore excluded.**

- **The consultancy agreement under which Mr. Grzesiak still seeks to assert multi-million claims against the Founder was likewise concluded—and terminated—<u>before</u> his appointment.**

- **Mr. Grzesiak was appointed despite already being embroiled in conflict and harboring personal animus toward the Founder; in light of the case law cited above, he should never have accepted this mandate. He himself admitted, during his examination on February 3, 2025, that he is subject to a conflict of interest in the present dispute.[48]**

- **Even if one were to set aside all the personal rifts and professional conflicts, Mr. Grzesiak in any event cannot exercise this office impartially for so long as the disputed legal relationship with the Founder over his (alleged) multi-million claims remains unresolved. Not only is achievement of the foundation's purpose concretely endangered; the circumstances set out above show that Mr. Grzesiak seeks to thwart that purpose out of a desire for retribution.**

- **He has already acted on that desire for retribution: since his appointment, the Founder, as sole beneficiary, has not received a single distribution from the foundation assets. The Founder has been removed from all relevant supervisory board positions, and his removal from further positions is in full swing.**

- **The objective perspective required of a Foundation Board member is lacking in Mr. Grzesiak, given the multitude of rifts and entanglements and his personal negative stance toward the Founder as primary beneficiary; this must lead to his removal.**

4    Applications

For all these reasons, the Founder submits the following

---

[48] Testimony of Jarosław Grzesiak of February 3, 2025, transcript (ON 21), p. 41 bottom.

## APPLICATION

that may it please the Princely Court of Justice, acting as foundation supervisory authority, to

1. schedule an oral hearing in this removal proceeding as the main proceeding for the taking of evidence and discussion of the legal issues;

2. remove Mr. Jarosław Grzesiak as a member of the Foundation Board of the TiVi Foundation;

3. declare this removal decision provisionally enforceable;

4. and order the respondents, jointly and severally, to reimburse the applicant's procedural costs, payable to the applicant's designated counsel.

Vaduz, October 13, 2025

SOT/AGO/fen

Costs are recorded:
(Amount in dispute: CHF 30,000.00)

| | | |
|---|---|---|
| Application TP 3A, 40% ES, | CHF | 1,108.80 |
| 25% stamp duty surcharge | CHF | 277.20 |
| VAT 8.1% | CHF | 112.26 |
| **Total** | **CHF** | **1,498.26** |

### LIST OF EXHIBITS

| | |
|---|---|
| Request for distribution concerning the Solkomtel Foundation dated July 30, 2025 | **./EL** |
| Circular resolution of the Foundation Board of the Solkomtel Foundation dated August 18, 2025 | **./EM** |
| Request for distribution concerning the TiVi Foundation dated September 5, 2025 | **./EN** |
| Distribution request concerning the Solkomtel Foundation dated September 5, 2025 | **./EO** |
| Compilation of email correspondence between the Founder's counsel and the administrator in connection with the distribution requests and the obtaining of the Foundation Board resolutions thereon | **./EP** |

19

An das
Fürstliche Landgericht
9490 Vaduz

06 HG.2024.133

ANTRAGSTELLER:

Zygmunt Józef Solorz
Haldenweg 18, 9495 Triesen

vertreten durch 1:

**SCHURTI : PARTNERS**
RECHTSANWÄLTE AG | ATTORNEYS AT LAW LTD

Zollstrasse 2 | 9490 Vaduz | Liechtenstein
Tel +41 44 244 2000 | mail@schurtipartners.com

(Berufung auf die erteilte Vollmacht gemäss Art. 6 AussStrG iVm § 28 Abs. 2 ZPO)

vertreten durch 2:

**Schwärzler Rechtsanwälte**
Austrasse 42, 9490 Vaduz
(Unter Berufung auf die erteilte Vollmacht gemäss Art. 6 AussStrG iVm § 28 Abs. 2 ZPO)
(Schurti Partners Rechtsanwälte AG als Zustellbevollmächtigte gemäss Art 82 RAG)

VERFAHRENSBETEILIGTE:

1. Jaroslaw Grzesiak
   ul. Jaworowska 13, PL-05-510 Konstancin-Jeziorna

   vertreten durch:

   Oberhuber Jenal Rechtsanwälte AG
   Wuhrstrasse 14, 9490 Vaduz

2. Tomasz Szelag
   Agiou Georgiou 32, 4529 Pyrgos Limassol, Cyprus

   vertreten durch:

   Niedermüller Rechtsanwälte
   Werdenbergerweg 11, 9490 Vaduz

3. Piotr Mateusz Żak
   ul. Ostrobramska 83 m. 1801A, 04-175 Warszawa Polen

   vertreten durch:

   Roth + Partner Rechtsanwälte AG
   Landstrasse 40, 9495 Triesen

4. Aleksandra Jadwiga Żak
   9950 Toluca Lake Ave, 91602 North Hollywood, CA USA

|  | | vertreten durch: |
| --- | --- | --- |
| | | Gasser Partner Rechtsanwälte |
| | | Feldkircher Strasse 31, 9494 Schaan |
| | 5. | Tobias Markus Solorz |
| | | Volante tower 1901, Marasi drive, UAE – Dubai |
| | | vertreten durch: |
| | | Marxer & Partner Rechtsanwälte |
| | | Heiligkreuz 6, 9490 Vaduz |
| BETROFFENE VERBANDSPERSON: | | TiVi Foundation (FL-0002.394.367-5) |
| | | Industriering 14, 9491 Ruggell |
| | | vertreten durch: |
| | | Ritter Schierscher Rechtsanwälte AG |
| | | Gewerbeweg 5, 9490 Vaduz |
| GERICHTLICH BESTELLTER BEISTAND | | Dr. Peter Schierscher, Rechtsanwalt |
| | | Gewerbeweg 5, 9490 Vaduz |
| | | vertreten durch: |
| | | Ritter Schierscher Rechtsanwälte AG |
| | | Gewerbeweg 5, 9490 Vaduz |
| WEGEN: | | Aufsichtsverfahren (Streitwert: CHF 30'000.00) |

## ANTRAG
## AUF GERICHTLICHE ABBERUFUNG EINES STIFTUNGSRATSMITGLIEDS

8-fach
Beilagen lt. Verzeichnis

2

345

In umseits näher bezeichneter Rechtssache stellt der Antragsteller und Stifter, Kurator als alleiniger Erstbegünstigter, Herr Zygmunt Solorz (in der Folge: "**Stifter**" oder "**Antragsteller**") nachstehenden

### ANTRAG
### AUF ABBERUFUNG DES HERRN JAROSLAW GRZESIAK
### ALS MITGLIED DES STIFTUNGSRATES

und führt dazu aus wie folgt.

1      Ausgangslage und die hier im Hauptverfahren zu beweisenden Fakten

  a)   Unstrittiger Rahmen: Bruch zwischen Stifter und seinem ehemaligen Vertrauten

*1*      Mit Schreiben datiert vom 4. März 2025 haben die Kinder des Stifters, *i.e.* Aleksandra Zak, Piotr Zak und Tobias Solorz (in der Folge: "**Kinder**") bekanntlich Herrn Jaroslaw Grzesiak (in der Folge: "**Herr Grzesiak**") als Mitglied des Stiftungsrates der TiVi Foundation (in der Folge: "**Stiftung**") bestellt. Die provisorische rechtliche Grundlage dafür – *i.e.* der Amtsbefehl vom 26. Oktober 2024 – und die Hintergründe der laufenden Auseinandersetzung sind notorisch.

*2*      Zwischen Herrn Grzesiak und dem Stifter, der gleichzeitig unstrittig auch Kurator und alleiniger Erstbegünstigter der Stiftung ist, bestand – soweit ist dies unbestritten – über viele Jahre ein enges berufliches, wie auch freundschaftliches Verhältnis. Dies hat Herr Grzesiak im Rahmen seiner zeugenschaftlichen Angaben selbst so ausgeführt.[1] Der Stifter habe ihn als "*engsten Freund*" gesehen.[2] Neben der engen persönlichen Beziehung sei die berufliche Kernaufgabe des Herrn Grzesiak (bzw. seiner Kanzlei) seit dem Jahr 2007 insbesondere auch die kapitalmarktrechtliche Beratung der Unternehmensgruppe des Stifters gewesen.[3] Damit steht fest, dass Herr Grzesiak mit dem Stifter privat wie auch beruflich weit über ein Jahrzehnt engstens verbunden war.

*3*      Ebenso ist notorisch und belegt, dass zwischen Herrn Grzesiak und dem Stifter ein Beratungsvertrag vom 8. Mai 2021[4] mit einem jährlichen Salär in Höhe von EUR 5.000.000,00 bestanden hat (zuzüglich Bonuszahlungen in Höhe von jährlich rund EUR 1.000.000,00). Um diesen lukrativen Beratervertrag vom Stifter erhalten zu können, hat Herr Grzesiak (auch nach seinen eigenen Angaben) seine Karriere als Rechtsanwalt beendet.[5]

---

[1] Zeugenaussage des Jaroslaw Grzesiak vom 3. Februar 2025, Protokoll (ON 21), S 24 oben (Blg ./BD).

[2] Zeugenaussage des Jaroslaw Grzesiak vom 3. Februar 2025, Protokoll (ON 21), S 24 oben und S 25 (Blg ./BD).

[3] "*[…] unsere Beziehung […] eine freundschaftliche […] Wir haben benachbarte Häuser in Frankreich gekauft, in der Absicht, uns dort gemeinsam zur Ruhe zu setzen […] habe ich mehr Zeit mit dem AS verbracht, als mit jedem anderen Freund […] Er nannte mich meinen engsten Freund […] wir hatten 10 Jahre lang eine sehr enge freundschaftliche Beziehung […] […] Er [Anm.: der Stifter] brauchte jmd, dem er voll und ganz vertrauen kann […] dem er voll und ganz vertraut […]*"; vgl Zeugenaussage des Jaroslaw Grzesiak vom 3. Februar 2025, Protokoll (ON 21), S S 20 unten (Blg ./BD).

[4] Zeugenaussage des Jaroslaw Grzesiak vom 3. Februar 2025, Protokoll (ON 21), S 21 unten (Blg ./BD).

[5] Zeugenaussage des Jaroslaw Grzesiak vom 3. Februar 2025, Protokoll (ON 21), S 24 oben und S 21 f & S 25 und S 20 unten und S 21 oben (Blg ./BD).

3

4    Darüber hinaus kam aus seinen eigenen Angaben und jenen der Kinder hervor, dass rund um die gerichtsnotorischen Ereignisse des 2. August 2024 sich Herr Grzesiak intensiv mit den Kindern ausgetauscht hat und er in diese Ereignisse <u>tief involviert</u> war.[6]

5    Als Piotr Zak Herrn Grzesiak damals im August 2024 (noch vor Verlust des lukrativen Beratungsvertrages mit dem Stifter) darauf angesprochen hat, ob er nicht "*bei den zukünftigen Streitigkeiten die Kinder vertreten würde*", hat Herr Grzesiak dies noch abgelehnt, ganz offensichtlich, weil ihm der offenkundige Interessenwiderstreit in der vorliegenden Konfliktsituation und seine eigene berufliche wie auch persönliche Verflechtung mit dem Stifter geradezu ins Auge gesprungen ist.[7]

6    Dass es anschliessend <u>zum Bruch</u> der persönlichen und beruflichen Beziehungen zwischen Stifter und Herrn Grzesiak kam, ist ebenso unstrittig: Der Stifter musste den für Herrn Grzesiak lukrativen Beratungsvertrag wegen Vorliegens von wichtigen Gründen mit sofortiger Wirkung auflösen (wobei die Wirksamkeit dieser Auflösung von Herrn Grzesiak bestritten wird[8]) und ihn als Stiftungsratsmitglied abberufen (wobei auch die Wirksamkeit dieser Abberufung von Herrn Grzesiak bzw. den Kindern bestritten wird). Kurz darauf ist Herr Grzesiak im September 2024 selbst als Stiftungsrat zurückgetreten, weil er die Abberufung durch den Stifter als "*klares Zeichen des Vertrauensverlusts*" angesehen hat.[9]

7    Herr Grzesiak verlor durch die Auflösung seine Einkommensquelle in Millionenhöhe und seine Karriere als Anwalt war beendet. Er hegt wegen diesem für ihn ungünstigen (aber selbstverschuldeten) Ergebnis tiefe persönliche Abneigung gegenüber dem Stifter. Diese im Unfrieden beendete ehemalige Geschäftsverbindung steht nach wie vor als (auch gerichtsanhängiges) strittiges Rechtsverhältnis im Raum. Herr Grzesiak behauptet weiters, aus dieser Geschäftsverbindung gegenüber dem Stifter offene "Millionenforderungen" zu haben.

8    Damit zeigt sich die Doppelrolle, der sich Herr Grzesiak selbst verschrieben hat. Bildlich gesprochen müsste die rechte Hand des Herrn Grzesiak nämlich unparteiisch und objektiv über die Administration der Stiftung und somit auch über Ausschüttungen zugunsten des Stifters entscheiden, während seine linke Hand ebendiesen Stifter als Gegner sieht und damit beschäftigt ist, auf Grund des aufgelösten Vertragsverhältnisses Ansprüche gegen diesen geltend zu machen. Es ist geradezu ausgeschlossen, dass Herr Grzesiak diesen Konflikt – der persönlich wie auch finanziell eine enorme Tragweite hat – bei der Ausübung dieses Amtes ausblenden kann (vom evidenten Faktum, dass er dieses Amt für

---

[6] Aussage von Piotr Zak vom 4. Februar 2025 (ON 22), S 6 oben ("*Soweit ich weiss, wurde auch JG damals kontaktiert, um ihn über die Gespräch auf dem Laufenden zu halten.*"), S 7 oben ("*Wir beendeten die Sitzung, ich fuhr nach Hause und kontaktierte JG […] Ich sprach mit ihm […] über die erforderlichen Änderungen an den Statuten*"), S 9 oben ("*[…] Daraufhin rief jemand JG an und stellte ihn auf Lautsprecher, sodass er die Rechte des Kurators erklären konnte […]*"). Siehe auch Zeugenaussage des Jaroslaw Grzesiak vom 3. Februar 2025, Protokoll (ON 21), S 37 unten.

[7] Siehe Aussageverhalten und Zeugenaussage des Jaroslaw Grzesiak vom 3. Februar 2025, Protokoll (ON 21), S 41 unten

[8] Zeugenaussage des Jaroslaw Grzesiak vom 3. Februar 2025, Protokoll (ON 21), S 43 unten (Blg ./BD) ("*[…] Wobei es sich um eine Vertragsverletzung handelt, weil der Vertrag befristet und ohne Kündigungsrecht abgeschlossen wurde.*")

[9] Zeugenaussage des Jaroslaw Grzesiak vom 3. Februar 2025, Protokoll (ON 21), S 42 unten (Blg ./BD).

4

Vergeltungsmassnahmen gegen seinen nunmehrigen Kontrahenten missbraucht, ganz zu schweigen).

9    Dies hat sich auch noch vor seiner Bestellung im Februar 2025 gezeigt, als Herr Grzesiak als von den Kindern namhaft gemachter Zeuge auf deren Zuruf vor dem Fürstlichen Landgericht ausgesagt, obwohl er nach der Vereinbarung vom 19. September 2023,[10] nach polnischem Berufsrecht[11] und nach liechtensteinischem Stiftungsrecht[12] zur vollumfassenden Verschwiegenheit verpflichtet gewesen wäre (und von niemandem – <u>auch nicht von der Stiftung</u>[13] – entbunden wurde).

10   Ob er diese Rolle zugunsten der Kinder (aus seiner Sicht) aus "redlichen" Gründen oder aus monetären Gründen einnimmt, ist irrelevant: Er hat ohne jedwede Abkühlungsphase als ehemals "engster Freund"[14] und anwaltlicher beruflicher Berater des Stifters sich wissentlich und willentlich sofort den Interessen der nunmehrigen Prozessgegner des Stifters angeschlossen, seine Verschwiegenheitspflichten nach zwei Rechtsordnungen gebrochen, während Herr Grzesiak flankierend dazu auch noch selbst offene Rechnungen gegenüber dem Stifter zu haben behauptet. Ein "Mehr" an Interessenwiderstreit ist gar nicht mehr auszudenken.

11   Infolge der jahrelangen beruflichen und persönlichen Doppelrolle hat Herr Grzesiak aber auch tiefen Einblick in die Persönlichkeit, das Seelenleben, die Finanzgebarung, die persönlichen Wertvorstellungen und die wirtschaftlichen Unternehmungen des Stifters erhalten. Er hat Kenntnisse über dessen finanzielle und gesundheitliche Verhältnisse, persönliche Wünsche, Prioritäten, emotionale Auslöser und Steuermechanismen, wie auch über seine moralischen bzw. ethischen Grundsätze. <u>Die unlautere Verwertung dieses Wissens im Rahmen der Ausübung des Amtes als Stiftungsrat auf dem Ticket der Kinder droht damit evidentermassen und hat sich, wie nachfolgend gezeigt wird, auch bereits mehrfach verwirklicht (siehe zu den statutenwidrigen Abberufungen des Stifters insbesondere Rz 31 ff).</u> Genau das war auch der Grund für seine Bestellung durch die Kinder.

12   Herr Grzesiak ist als Stiftungsrat aber gesetzlich verpflichtet, die Stiftung so zu verwalten, dass sie ihren Stiftungszweck – die Begünstigung des Stifters – bestmöglich erfüllt.[15] <u>Dieser einzige Begünstigte ist aber sein eigener Kontrahent.</u> Kann er diese Pflicht wegen eines Interessenwiderstreits nicht erfüllen, ist er abzuberufen. Die tiefe persönliche (ehemalige)

---

[10] Siehe Verschwiegenheitsverpflichtung vom 19. September 2023 (Blg ./BG).

[11] Siehe Polnischer Kodex der Anwaltsethik sowie die Entscheidung Nr. 140/2023 des Obersten Anwaltsrats vom 1. Dezember 2023 – Vorschriften über die Ausübung des Anwaltsberufs in Einzelkanzleien oder Partnerschaften. Gemäss Art. 6 Abs 1 bis 3 des Gesetzes über die Anwaltschaft ist ein Rechtsanwalt verpflichtet, über alles, was er im Zusammenhang mit der Erbringung rechtlicher Hilfe erfährt, Stillschweigen zu bewahren. Diese Pflicht zur beruflichen Verschwiegenheit ist zeitlich nicht begrenzt. Ein Rechtsanwalt kann nicht von der Pflicht zur Verschwiegenheit hinsichtlich der im Rahmen der rechtlichen Hilfe oder der Fallbearbeitung erlangten Informationen entbunden werden. Darüber hinaus darf ein Rechtsanwalt gemäss § 46 des Kodex der Anwaltsethik keine Mandanten vertreten, deren Interessen miteinander in Konflikt stehen, selbst dann nicht, wenn diese Mandanten einer solchen Vertretung zustimmen.

[12] *Heiss/Lorenz/Schauer*, Liechtensteinisches Stiftungsrecht[2] Art 220 Rz 40; LES 2014, 19.

[13] Siehe Zeugenaussage des Jaroslaw Grzesiak vom 3. Februar 2025, Protokoll (ON 21), S 20 f, wonach <u>keine Entbindung Seitens der Stiftung</u> ersichtlich ist (sehr wohl aber hinsichtlich der anderen Zeugen, vgl S 16 oben [ZV Walch], S 18 oben [ZV Senn], S 19 oben [ZV Castellazzi]).

[14] Zeugenaussage des Jaroslaw Grzesiak vom 3. Februar 2025, Protokoll (ON 21), S 24 oben und S 25 (Blg ./BD).

[15] *Gasser*, Liechtensteinisches Stiftungsrecht[2] Art 552 § 24 Rz 2 mwN zu LES 2002, 94.

Verwurzelung mit dem Stifter und der persönliche Interessenwiderstreit infolge der zu Bruch geratenen Mandatsbeziehung zum Stifter (wie auch das anhängige Zivilverfahren[16] und strafrechtliche Ermittlungsverfahren in Polen[17]) schliessen es aus, dass Herr Grzesiak das Amt des Stiftungsrates mit der gebotenen Unparteilichkeit und Neutralität ausüben kann. An seiner Abberufung führt daher kein Weg vorbei. Die Abberufung gebietet letztlich insbesondere auch der Umstand des "schwebenden" Rechtsverhältnisses zum Begünstigten: Herr Grzesiak will zwar einerseits die Wirksamkeit der Auflösung des Beratervertrages bestreiten, andererseits aber – man ahnt es bereits – die Konsequenzen für diese "Rechtsauffassung" nicht tragen: Nach seiner eigenen Rechtsauffassung wäre er nämlich dann dazu verpflichtet, den Stifter weiter intensiv und persönlich zu beraten (weil er ja in einem aufrechten Beratungsverhältnis zum Stifter steht, das nicht gekündigt werden hat können). Auf seine (angeblichen) Forderungen gegenüber dem Stifter will Herr Grzesiak ebenso nicht verzichten. Daraus folgt, dass ein (i) angeblich aufrechter Beratervertrag und (ii) angeblich offene Millionenforderungen im Raum zwischen Begünstigter und einem Stiftungsrat stehen, während Herr Grzesiak als Stiftungsrat (iii) <u>gleichzeitig</u> an die Schalthebel der Stiftung gelassen werden soll, mit denen er über das Begünstigungsausmass seines nunmehrigen Kontrahenten entscheidet. Dass eine solche "Rosinenpickerei" und Doppelgleisigkeit mit der Fortführung dieses (neutral zu besetzenden) Amtes unvereinbar ist, versteht sich eigentlich von selbst.

<u>Beweis:</u>
- PV Jaroslaw Grzesiak
- ZV Jerzy Modrzejewski, wird stellig gemacht
- Demissionserklärung der Katarzyna Tomczuk vom 3. März 2025 (Blg ./BB)
- Bestellung der Kinder des Herrn Grzesiak vom 4. März 2025 (Blg ./BC)
- Zeugenaussage des Jaroslaw Grzesiak vom 3. Februar 2025, Protokoll ON 21 (Blg ./BD)
- Verschwiegenheitsverpflichtung vom 19. September 2023 (Blg ./BG)

b) Im Provisorialverfahren konnten diese Umstände nicht berücksichtigt werden

13   Im Frühjahr 2025 wurde die Bestellung des Herrn Grzesiak vom Stifter nachvollziehbarerweise nicht kommentarlos hingenommen. Der Stifter hat vorsorgliche Einsprüche beim Handelsregister eingebracht und weiters mit Schriftsatz vom 22. April 2025 den Erlass eines Amtsbefehls beantragt, der sich gegen diese Bestellung richtete.

14   Mit Beschluss vom 27. Mai 2025 hat das Fürstliche Landgericht diesen Provisorialantrag damals jedoch <u>abgewiesen</u>. Zu massgeblichem Sachverhaltsvorbringen, welches der Stifter im Provisorialverfahren zum Interessenkonflikt vorgebracht hat, konnten jedoch (damals) nur *non-liquet* Feststellungen getroffen werden. Das war bedauerlich, aber im Rahmen eines Provisorialverfahrens nicht überaus verwunderlich, weil für den Beweis von persönlichen Animositäten und für die tiefen Verwerfungen zwischen dem Stifter und Herrn Grzesiak freilich parate Bescheinigungsmittel (etwa Urkunden udgl) kaum existieren und Zeugen und Parteien – anders als hier im Hauptverfahren geboten – nicht einvernommen wurden.

---

[16] Siehe Klage vom 10. April 2025 (Blg ./BH).
[17] Das Verfahren wird von der regionalen Staatsanwaltschaft in Warschau unter dem Aktenzeichen 2010-5-Ds.25.2025 geführt.

15    Nach den damaligen Ausführungen konnte das Fürstliche Landgericht etwa nicht feststellen, dass es zum offenen Bruch zwischen dem Stifter und Herrn Grzesiak gekommen ist. Ebenso wenig konnte etwa festgestellt werden, dass seit Sommer 2024 ein offen ausgetragener Konflikt zwischen dem Stifter und Herrn Grzesiak stattfindet und dass er die "Seiten gewechselt" habe. Ebenso konnte nicht festgestellt werden, dass Herr Grzesiak massive persönliche Animositäten gegenüber dem Stifter hegt, die er als Stiftungsrat nicht ausblenden kann und nicht ausblenden wird. All dies ist jedoch Tatsache, wie dies im vorliegenden Hauptverfahren unter Beweis zu stellen sein wird.

16    Im Übrigen haben sich nach dieser abweisenden Entscheidung zum beantragten Amtsbefehl weitere Ereignisse zugetragen, welche die Animositäten des Herrn Grzesiak gegenüber dem Stifter eindeutig belegen. Ganz offensichtlich verfolgt Herr Grzesiak einen zugunsten der Kinder angestrebten Tatplan und schreckt bei dessen Umsetzung nicht vor statutenwidrigem Verhalten (Entmachtung des Stifters durch Abberufung in den ihm statutarisch zugesicherten Positionen in den Tochtergesellschaften, um nur eines von mehreren Beispielen zu nennen) nicht zurück.

Beweis:    –    wie bisher

2    Fakten zum Interessenkonflikt und zum Verhältnis des Herrn Grzesiak zum Stifter

a)    Persönliche Involvierung des Herrn Grzesiak und Zerrüttung zum Stifter

17    Herr Grzesiak ist, wie ausgeführt, keine aussenstehende Person und war dies auch niemals, sondern nach seinen eigenen Angaben ehemaliger "*engster Freund*" des Stifters, die praktisch "*sämtliche Urlaube zusammen verbracht*" haben.[18] Sie hätten benachbarte Häuser in Frankreich gekauft, in der Absicht, sich dort gemeinsam zur Ruhe zu setzen. Herr Grzesiak berichtet, dass er mit dem Stifter "*mehr Zeit*" verbracht habe, "*als mit jedem anderen Freund*". *E contrario* war der Stifter wohl aus seiner Sicht sein bester Freund. Über zehn Jahre lang sei diese enge freundschaftliche Beziehung so gediehen, dass Herr Grzesiak den Stifter "*wie eine Mischung aus einem Vater […] und einem älteren Freund*" behandelt habe und der Stifter habe in Herrn Grzesiak jemanden gesehen, "*dem er voll und ganz vertrauen kann*".[19]

18    Schon nach den eigenen Angaben des Herrn Grzesiak war diese Freundschaft somit tief persönlich verwurzelt und mit einer Vater-Sohn-Beziehung vergleichbar.

19    Bereits diese persönliche Konfliktsituation durch Verlust der familienähnlichen Vater-Sohn-Beziehung und die anschliessende Zerrüttung – also allein die persönliche Ebene – für sich allein genommen muss bei objektiver Betrachtung starke Zweifel daran aufkommen lassen,

---

[18] Zeugenaussage des Jaroslaw Grzesiak vom 3. Februar 2025, Protokoll (ON 21), S S 20 unten (Blg ./BD).

[19] "*[…] unsere Beziehung […] eine freundschaftliche […] Wir haben benachbarte Häuser in Frankreich gekauft, in der Absicht, uns dort gemeinsam zur Ruhe zu setzen […] habe ich mehr Zeit mit dem AS verbracht, als mit jedem anderen Freund […] Er nannte mich meinen engsten Freund […] wir hatten 10 Jahre lang eine sehr enge freundschaftliche Beziehung […] […] Er [Anm.: der Stifter] brauchte jmd, dem er voll und ganz vertrauen kann […] dem er voll und ganz vertraut […]*"; vgl Zeugenaussage des Jaroslaw Grzesiak vom 3. Februar 2025, Protokoll (ON 21), S S 20 unten (Blg ./BD).

7

ob eine Person, die sich mit ihrem engsten Freund, Vaterfigur und Nachbar binnen kürzester Zeit völlig "zerkracht", überhaupt in der Lage sein kann, das Amt als Stiftungsrat der von dieser Person errichteten Stiftung unparteiisch und objektiv auszuüben. Bekanntlich ist <u>jeder</u> Anschein der Befangenheit zu vermeiden, und zumindest diesen Anschein der Befangenheit müsste sich eine solche Person vorwerfen lassen.

20    Vorliegend ist es aber gar nicht erst ("nur") bei den persönlichen Verwerfungen geblieben: Neben der privaten Zerrüttung hat Herr Grzesiak <u>zusätzlich</u> eine 180-Grad Kehrtwende in der Interessensphäre vollzogen und sich ergänzend den Interessen der Kinder – den Prozessgegnern des Stifters – angeschlossen. Aus diesem rapiden "Seitenwechsel" auf persönlicher Ebene folgt, dass Herr Grzesiak den Boden jedweder Neutralität gar nie betreten wollte. Ein neutral und objektiv handelnder Stiftungsrat handelt so nicht, wodurch der Interessenwiderstreit auf persönlicher Ebene feststeht.

21    Es geht nicht darum, ob dieses Verhalten rechtlich, moralisch oder ethisch vertretbar ist (*quod non*). Es geht auch nicht um die Vorwerfbarkeit des Vertrauensbruchs der privaten Beziehungen. Es geht hier darum, dass Herr Grzesiak dieses ihm als "engster Freund" anvertraute Wissen und seine private eng verbundene Vergangenheit zum Stifter als sein väterlicher Freund infolge des persönlichen Zerwürfnisses bei der gebotenen unparteiischen Ausübung des Stiftungsrates nicht ausblenden kann und nicht ausblenden wird. Im Gegenteil: Bei <u>jeder</u> Entscheidung, die er als Stiftungsrat trifft, wird er diese private Enttäuschung und Verflechtung miteinfliessen lassen, weil er das gar nicht "wegdenken" kann. Dies ist auch nicht nur ein potentielles Risiko (was bereits ausreichen würde), sondern hat sich in der Vergangenheit bereits verwirklicht.

22    **Ein ehemals bester und engster Freund und Vertrauensmann des einzigen Begünstigten einer Stiftung, der sich binnen weniger Wochen mit diesem persönlich völlig überwirft und sich ohne jede "Abkühlphase" unmittelbar danach den Interessen der Prozessgegner des einzigen Begünstigten anschliesst, ist von der Ausübung des Amtes als Stiftungsrat wegen Befangenheit ausgeschlossen. Solche aussergewöhnlichen persönlichen Umstände stellen einen wichtigen Grund für die Abberufung dar, weil die Verfolgung des Stiftungszwecks bei Vollziehung der vom Stifter vorgesehenen Begünstigtenregelung durch Herrn Grzesiak nicht mit ausreichender Sicherheit gewährleistet ist.**

<u>Beweis:</u>        –   PV Jaroslaw Grzesiak
                       –   ZV Jerzy Modrzejewski, wird stellig gemacht
                       –   wie bisher.

b)    <u>Berufliche</u> Involvierung des Herrn Grzesiak: Ehemaliges Mandatsverhältnis, ehemaliges Anwaltsverhältnis und andauernder Rechtsstreitigkeiten um Forderungen aus Millionenhöhe

23    Neben der persönlichen Zerrüttung liegt auch auf der rein beruflichen Sphäre ein Interessenwiderstreit vor, der von Herrn Grzesiak nicht ausgeblendet werden kann (und dies

8

hat er auch gar nicht vor, ganz im Gegenteil). Der Beratungsvertrag vom 8. Mai 2021[20] mit dem enormen Salär, für den Herr Grzesiak seine Karriere als Rechtsanwalt beendet hat[21], wurde Eingangs bereits erwähnt.

24    Darüber hinaus war Herr Grzesiak aber auch als Rechtsanwalt für den Stifter und seine Unternehmensgruppe tätig. Es ist unrichtig, wie das Herr Grzesiak im Rahmen seiner Einvernahme im Februar 2025 versucht hat, darzustellen, dass er den Stifter "nie persönlich" anwaltlich vertreten hat. Diese Unwahrheit ergibt sich schon aus seinen eigenen Angaben, wonach er den Stifter (unter anderem) in seinen Scheidungsstreitigkeiten beraten hat. Der dazu geradezu groteske Versuch, dies alles als "freundschaftliche" Dienstleistungen zu deklarieren, um den offensichtlichen Bruch seiner berufsrechtlichen Verschwiegenheitspflicht zu verschleiern zu versuchen, geht schon deshalb fehl, weil es über dieses Anwaltsverhältnis sowohl Urkundenbeweis gibt, als auch das Gesetz im Zweifel von einer anwaltlichen Tätigkeit ausgeht. Mit anderen Worten: Herr Grzesiak hat den Stifter nicht zehn Jahre lang kostenlos in seinen privaten Angelegenheiten "als Freund" beraten- ganz im Gegenteil!

25    Dieses Anwalts- und Beratungsverhältnis ist, wie Eingangs ausgeführt, in einem erheblichen Konflikt geendet. In Polen besteht infolge der erwähnten evidenten Verletzung der Verschwiegenheitspflicht ein gerichtliches Verfahren, in denen sich Herr Grzesiak und der Stifter in widerstreitenden Parteirollen wiederfinden.[22]

26    **Ein ehemals anwaltlicher Rechtsberater des einzigen Begünstigten einer Stiftung mit einem jährlichen Salär über EUR 5.000.000, der die Wirksamkeit der Auflösung dieser geschäftlichen Beziehung bestreitet und nach wie vor aus dieser Geschäftsbeziehung Forderungen in Millionenhöhe gegenüber dem Begünstigten geltend machen will, ist von der Ausübung des Amtes als Stiftungsrat wegen Befangenheit ausgeschlossen.**

27    **Die absehbaren jahrelangen Rechtsstreitigkeiten aus und im Zusammenhang mit dem ehemaligen Beratungs- und Mandatsverhältnis gehen auch nicht vom Stifter aus (und wurden schon gar nicht künstlich geschaffen), sondern sind notwendige Folge des von Herrn Grzesiak gesetzten Verhaltens, seines eingenommenen Standpunkts und seiner unberechtigten Forderungsansprüche, die ihren Ursprung lange vor seiner Bestellung haben. Ein ehemaliger Geschäftspartner, der (unberechtigte) Forderungen in Millionenhöhe persönlich gegen den einzigen Begünstigten einer Stiftung geltend macht, kann nicht gleichzeitig Stiftungsrat der Stiftung sein, dessen Erstbegünstigter der Prozessgegner ist.**

Beweis:    – PV Jaroslaw Grzesiak
            – ZV Jerzy Modrzejewski, wird stellig gemacht
            – wie bisher.

---

[20] Zeugenaussage des Jaroslaw Grzesiak vom 3. Februar 2025, Protokoll (ON 21), S 21 unten (Blg ./BD).

[21] Zeugenaussage des Jaroslaw Grzesiak vom 3. Februar 2025, Protokoll (ON 21), S 24 oben und S 21 f & S 25 (Blg ./BD).

[22] Siehe Klage vom 10. April 2025 (Blg ./BH).

9

c) Strafrechtliche Ermittlungen in Polen

28  Es wurde bereits aufgezeigt, dass Herr Grzesiak in die notorischen Ereignisse des 2. August
2024 tief involviert war. Die genaue Rolle, die Herr Grzesiak im Zusammenhang mit den
Aussagen von Piotr Zak gespielt hat, interessiert die polnischen Strafverfolgungsbehörden.
Aufgrund der Integrität des strafrechtlichen Ermittlungsverfahrens in Polen und der Tatsache,
dass Ermittlungen nach polnischem Recht vertraulich sind, kann der Stifter keine
Informationen offenlegen, ausser denen, die öffentlich in den Medien oder durch offizielle
Erklärungen der Staatsanwaltschaft verfügbar sind.

29  Es ist jedoch eine Tatsache, dass die regionale Staatsanwaltschaft in Warschau am 25. Juli
ein Ermittlungsverfahren wegen des Verdachts eingeleitet hat, dass der Stifter am 1. und 2.
August 2024 in Warschau dazu verleitet wurde, seine Vermögensrechte zu seinem Nachteil
zu übertragen. Diese Rechte standen im Zusammenhang mit der TiVi Foundation und
Solkomtel Foundation. Ziel war es, so der Verdacht, durch die Veranlassung des
Geschädigten zur Abgabe von Willenserklärungen, die zur Übertragung von
Vermögenswerten führten, einen finanziellen Vorteil zu erlangen, wobei der Wert dieser
Vermögenswerte das gesetzliche Schwellenmass für bedeutendes Vermögen um das
Zehnfache überstieg.

30  Die Information über die Einleitung des genannten Ermittlungsverfahrens wurde öffentlich
gemacht und von den polnischen Medien umfassend berichtet.

Beweis:    –    PV Jaroslaw Grzesiak

d) Bereits vollzogene parteiliche Handlungen und Verletzungen der Pflichten als Stiftungsrat

–   *Entmachtung des Stifters: Abberufung von den statutarisch zugesicherten Positionen*

31  Vorliegend geht es im Übrigen auch nicht nur darum, ob irgendeine Parteilichkeit bloss
"droht" oder der Anschein der Befangenheit gegeben ist. Dass Herr Grzesiak nicht davor
zurückschreckt, aus persönlicher Animosität Vergeltungsmassnahmen gegen den Stifter zu
ergreifen, ergibt sich im Übrigen eindrucksvoll aus den Geschehnissen seit dem 10. April
2025, durch welche der Stifter Stück für Stück entrechtet und zuletzt auch aus der
Unternehmensgruppe entfernt wurde.

32  Der Stifter hat bekanntlich (selbst bei Abgabe einer "Ablebenserklärung") einen statutarisch
gesicherten Anspruch auf Beibehaltung seiner Positionen im Aufsichtsrat.[23] Dieser Anspruch
wurde auch von den Kindern in der von Piotr Zak textierten Änderungserklärung vom
2. August 2024 ausdrücklich bestätigt.[24]

33  Dennoch versucht der Stiftungsrat auf Basis des (angefochtenen) Beschlusses vom 21. Juli
2025, den Stifter aus allen relevanten Aufsichtsratspositionen zu entfernen und hat dies

---

[23] Siehe Art. 13 Abs. 2 3. (iii) der Statuten idF vom 29. November 2023.
[24] Siehe Änderungserklärung vom 2. August 2024, S 2 unten (dort: Punkt (iv)).

10

353

bereits weitgehend faktisch umgesetzt. Die im – derzeit gerichtsanhängig bekämpften – Stiftungsratsbeschluss vom 21. Juli 2025 angeführte "Begründung" ist im Übrigen nicht nur übersät mit Unrichtigkeiten und Unwahrheiten, sie soll ausschliesslich den Anschein bewahren, als hätte der Stiftungsrat ernsthafte Überlegungen angestellt, bevor dieser den statutenwidrigen Rauswurf des Stifters vollziehen will. Tatsächlich ging es Herrn Grzesiak einzig und allein darum, den Stifter zu demütigen und den Plan zugunsten der Kinder zu vollziehen, den der Stifter – was *ex post* mit Bedauern festgehalten werden muss – bereits kurz nach der Bestellung des Herrn Grzesiak antizipiert hat. Hat sich Herr Grzesiak vor wenigen Monaten noch darüber beklagt, dass er wegen dem Stifter seine 45 Posten habe räumen müssen und er keinen Zugriff auf seinen E-Mail Account mehr habe, vergilt er dies nunmehr eins zu eins unter Ausnützung dieses Amtes gegenüber dem Stifter. Dem muss mit seiner Abberufung begegnet werden, will man nicht das Vertrauen in die unabhängige und neutrale Besetzung eines Stiftungsrates vollständig untergraben, indem man den erklärten Gegner des Begünstigten an die Schalthebel der von ihm errichteten Stiftung setzt.

Beweis:    – PV Jaroslaw Grzesiak
           – Beischaffung der Akte 06 HG.2025.122 (Beschlussanfechtung), darin insbesondere Beilage ./A bis ./J sowie die zur hg GZ eingebrachten Anträge auf Abberufung des gerichtlichen Beistands

– *Verweigerte Ausschüttungen zugunsten des Stifters*

34    Die klare Parteilichkeit zulasten des Stifters ergibt sich – abgesehen von der Abberufung desselben aus allen relevanten Aufsichtsratspositionen – auch bei monetärer Betrachtung. Die vom Stifter gestellten Ausschüttungsbegehren gegenüber der TiVi Foundation und der Solkomtel Foundation (bei identer Besetzung des Stiftungsrates) sind seit der Bestellung des Herrn Grzesiak bisher allesamt nach Wochen (!) der "Erwägung" abgelehnt worden. Sofern dem Stifter überhaupt eine Begründung für die ablehnende Haltung mitgeteilt wurde (bzw. ihm die entsprechenden Stiftungsratsbeschlüsse übermittelt wurden), enthielten diese blosse Leerfloskeln und Scheinbegründungen. Für sein jüngste Ausschüttungsbegehren, das abgelehnt wurde, hat er überhaupt keine Begründung erhalten. Dies ist umso unverständlicher, als dass dann gänzlich offenbleibt, warum der Stiftungsrat eine solche lange Dauer zwischen Stellung des Ausschüttungsbegehrens und dem ablehnenden "Zwei-Zeiler" gebraucht haben soll und warum der Stiftungsrat sich nicht – pflichtgemäss – im Detail damit auseinandersetzt, warum ihm diese Begünstigung nicht gewährt werden soll. Des Weiteren hat es der Stiftungsrat auch völlig unterlassen, im Sinne des Stiftungszwecks sowie der Wahrung der Interessen des (unstrittig) alleinigen Erstbegünstigten einen «vermittelnden Gegenvorschlag» für eine Ausschüttung zu machen bzw. sich grds. zu einer solchen bereit zu erklären.

35    Das *procedere* ist stets das gleiche: Der Stifter stellt ein Ausschüttungsbegehren, der Stiftungsrat der betroffenen Stiftung lässt Wochen vergehen, um dann mit einer kurzen Scheinbegründung diesem Begehren eine Absage zu erteilen. Dass die Stiftung den ausschliesslichen Zweck hat, dem derzeit einzigen Begünstigten (dem Stifter) zu dienen, scheint völlig in den Hintergrund zu rücken. Ordnet man das Handeln des Herrn Grzesiak und die Begründung rechtlich ein, soll offenbar die Stiftung zum Selbstzweck verkommen, deren einzige Aufgabe es sei, das Vermögen für sich selbst zu vermehren. Dasselbe gilt im

Übrigen für Informationsbegehren, die seitens des Stiftungsrats ebenfalls pauschal abgelehnt, oder völlig unbeantwortet bleiben.

36  Die Parteilichkeit ergibt sich damit letztlich auch aus diesem Blickwinkel, indem Herr Grzesiak seinen Kontrahenten – den Stifter als einzigen Begünstigten – von jedem Profit abschneiden möchte. Dafür bedient er sich stets des Scheinarguments, das "Interesse der Stiftung" gebe diese Ausschüttung nicht her. Lässt man Herrn Grzesiak derart gewähren und erkennt nicht die offenkundige Konfliktsituation, wird Missbrauch und Willkür in der Ausübung des Amtes als Stiftungsrat Tür und Tor geöffnet, indem unüberprüfbare Leerfloskeln zur Abweisung eines vom Stiftungszweck klar umfassten Ausschüttungsbegehrens ausreichen sollen.

Beweis:  – PV Jaroslaw Grzesiak
– Ausschüttungsbegehren hinsichtlich der Solkomtel Foundation vom 30. Juli 2025 (Beilage ./EL)
– Umlaufbeschluss des Stiftungsrates der Solkomtel Foundation vom 18. August 2025 (Beilage ./EM)
– Ausschüttungsbegehren hinsichtlich der TiVi Foundation vom 5. September 2025 (Beilage ./EN)
– Ausschüttungsbegehren hinsichtlich der Solkomtel Foundation vom 5. September 2025 (Blg ./EO)
– Konvolut E-Mail Korrespondenz zwischen dem Rechtsvertreter des Stifters und dem Beistand im Zusammenhang mit Ausschüttungsbegehren und der Einholung der Stiftungsratsbeschlüsse diesbezüglich (Beilage ./EP)

–  ***Bewusste Umgehung des dritten Stiftungsratsmitglieds, sofern dies zur Umsetzung des Tatplans der Kinder erforderlich ist***

37  Die eindeutige Schlagseite der Handlungen des Herrn Grzesiak und seine Parteilichkeit ergibt sich letztlich auch daraus, dass die derzeit mit Amtsbefehl vom 26. Oktober 2024 angepassten Statuten der Stiftung in der Praxis erhebliche Defizite für die ordnungsgemässe Willensbildung bei der Beschlussfassung im Umlaufwege aufweisen. Diese Defizite wurden von Herrn Grzesiak bewusst ausgenützt, um Namens der Stiftung für den Stifter nachteilige Handlungen zu setzen.

38  Wie bereits in den vorliegenden Anträgen[25] im Detail ausgeführt, war Herr Grzesiak Teil der von ihm indoktrinierten Strategie, bei Stiftungsratsbeschlüssen, die zum Nachteil des Stifters gefasst werden sollen, das dritte Stiftungsratsmitglied bewusst zu umgehen. Die Handlungen im Zeitraum vom 10. April 2025 bis zum 21. Juli 2025 sind bereits in den erwähnten Anträgen ausführlich dargelegt worden, mit denen Herr Grzesiak die ordnungsgemässe Willensbildung (die Beschlussfassung unter angemessener Beteiligungsmöglichkeit aller Organmitglieder) ausgehebelt hat.

39  Zur Vermeidung von Wiederholungen wird auf die bereits erstatteten Schriftsätze des Stifters, in denen die Chronologie der Ereignisse samt E-Mail Verkehr und Willensbildung zu einzelnen Beschlusspunkten umfangreich dargelegt wurde, und die dort angeführten

---

[25] Siehe Abberufungsantrag des Stifters vom 16. Mai 2025 (ON 121), Nachtrag zum Abberufungsantrag vom 11. Juli 2025 (ON 142), Replik zur Äusserung des gerichtlich bestellten Beistandes vom 21. Juli 2025 und Ergänzende Äusserung zum Antrag auf Abberufung des gerichtlichen Beistandes vom 14. August 2025. Sofern es aus Sicht des Fürstlichen Landgerichts (wider Erwarten) erforderlich sein sollte, auch im vorliegenden Verfahren sämtliche Ereignisse im Gremium des Stiftungsrates im Vorbringen Wort für Wort wiederzugeben, wird um vorherige Erörterung und Manuduktion ersucht.

Beweismittel verwiesen und dieses Vorbringen zum Vorbringen im vorliegenden Verfahren um die Abberufung des Herrn Grzesiak erhoben.

Beweis:
– PV der Antragsgegner
– Angeführte Anträge des vorliegenden Aktes 06 HG.2024.133 insbesondere im Hinblick auf die angeführten (vom Stifter und Herrn Szelag eingebrachten) Schriftsätze zur Abberufung des Peter Schierscher und die dort angeführten Beweismittel

– ***Zwischenergebnis: Herr Grzesiak hat gar nicht vor, dieses Amt mit der gebotenen Neutralität und Unparteilichkeit auszuüben, wie seine bisherigen Handlungen belegen***

40    Aus dieser Vorgehensweise des Herrn Grzesiak, wonach unmittelbar nach seiner Bestellung (i) der Stifter keine Ausschüttungen mehr erhält, (ii) der Stifter statutenwidrig aus allen Aufsichtsratspositionen entfernt wird und (iii) auch der Willensbildungsmechanismus ausgehebelt wird, sofern das zur Durchsetzung für den Stifter nachteilige Handlungen erforderlich ist, ergibt sich, dass nicht nur die Gefahr droht, dass Herr Grzesiak "Vergeltungsmassnahmen" gegenüber dem Stifter – seinem nunmehrigen Kontrahenten – ergreift. Diese Befangenheit und Parteilichkeit hat sich vielmehr bereits verwirklicht. Letztlich liefert Herr Grzesiak durch seine Taten selbst den besten Beweis dafür, dass er in der Ausübung dieses Amtes seinen persönlichen wie auch beruflichen Konflikt mit dem Stifter (dem einzigen Begünstigten der Stiftung) nicht ausblenden kann.

e)  Bewusste Verletzung der Treue- und Verschwiegenheitspflicht zur Stiftung

41    Dass Herr Grzesiak seine berufs- und vertragsrechtliche Verschwiegenheitspflicht (gleich nach mehreren Rechtsordnungen) gebrochen hat, um zu versuchen, den Kindern im Verfahren 06 HG.2024.210 einen Vorteil zu verschaffen, wurde bereits oben aufgezeigt. Massgeblich für den vorliegenden Abberufungsantrag ist aber insbesondere, dass Herr Grzesiak ohne jedwedes Schamgefühl auch Stiftungsinterna, die ihm Kraft seines Amtes als Stiftungsrat zugekommen sind, rechtswidrig in seiner Einvernahme vom 3. Februar 2025 zu Lasten der Stiftung offenbart hat. Diese Verletzung wiegt umso schwerer, als dass die Rechtswidrigkeit seines Vorgehens Herr Grzesiak als studierter und praktizierender Jurist ganz genau gewusst haben muss, wurde doch lautstark – vor Beginn seiner Einvernahme – über den Umfang und das Bestehen seiner ihn treffenden Verschwiegenheitspflicht diskutiert.[26]

42    Obwohl (i) der Stifter Herrn Grzesiak ausdrücklich nicht von der Verschwiegenheitspflicht entbunden hat und obwohl (ii) auch die Stiftung Herrn Grzesiak nicht von seiner Verschwiegenheitspflicht entbunden hat[27] (sehr wohl hat die Stiftung aber andere damals einvernommene Zeugen entbunden, sodass dies gerade kein "Versehen" nur bei Herrn Grzesiak war[28]), hat dieser dennoch auf Zuruf der Kinder weitwendig Stiftungsinterna offenbart. Die Grenze der Offenbarung zog dieser bloss bei "Geschäftsgeheimnissen", ganz

---

[26] Siehe Zeugenaussage des Jaroslaw Grzesiak vom 3. Februar 2025, Protokoll (ON 21), S 20 f.

[27] Siehe Zeugenaussage des Jaroslaw Grzesiak vom 3. Februar 2025, Protokoll (ON 21), S 20 f, wonach keine Entbindung Seitens der Stiftung ersichtlich ist (sehr wohl aber hinsichtlich der anderen Zeugen, vgl S 16 oben [ZV Walch], S 18 oben [ZV Senn], S 19 oben [ZV Castellazzi].

[28] Siehe Protokoll vom 3. Februar 2025 (ON 21), S 16 oben [ZV Walch], S 18 oben [ZV Senn], S 19 oben [ZV Castellazzi].

bewusst aber nicht bei allen sonstigen Geheimnissen, die ihm kraft seines Amtes als Stiftungsrat anvertraut oder zur Kenntnis gelangt sind, die aber – so von Herrn Grzesiak gewollt – dem Stifter im Prozess schaden sollten. Dass er diese Aussage als "Pflicht" deklarieren will, heilt diesen glasklaren gesetzlichen Verstoss freilich nicht.

43    Eng verbunden mit der Treuepflicht bzw. eine weitere Ausprägung derselben ist bekanntlich die dem Stiftungsrat obliegende im Gesetz nicht explizit geregelte Verschwiegenheitspflicht. Innerhalb der Grenzen des Gesetzes, der Stiftungsdokumente und der sich aus seiner Tätigkeit sonst ergebenden Pflichten obliegt aber einem jeden Stiftungsrat die Pflicht, hinsichtlich **aller** ihm anvertrauten oder sonst, zufällig oder in Ausübung seines Mandates, bekannt gewordenen Stiftungsinterna gegenüber **jedermann Stillschweigen** zu wahren und auch sicherzustellen, dass die Stiftungsakten Unbefugten nicht zur Kenntnis gelangen. Als vertraulich zu behandeln sind alle Informationen, bezüglich welcher die Stiftung objektiv ein Interesse daran hat, dass sie Aussenstehenden nicht zur Kenntnis gelangen. **Die Verschwiegenheitspflicht obliegt dem Stiftungsrat über die Beendigung seines Mandates hinaus**.[29]

44    **Diese Pflicht hat Herr Grzesiak – wie sich aus seiner zeugenschaftlichen Einvernahme vom 3. Februar 2025 eindrucksvoll ergibt – wissentlich und willentlich verletzt. Auch diese Verletzung ist ein weiterer Mosaikstein und Beleg dafür, dass Herr Grzesiak, soweit es darum geht, dem Stifter (als einzigen Begünstigten der Stiftung) schaden zuzufügen, keinerlei Pflichten respektieren und Grenzen einhalten kann. Wer schon vor seiner Bestellung Stiftungsinterna rechtswidrig offenbart, weil er in offensichtlichem persönlichen und beruflichen Konflikt zum Stifter und einzigen Begünstigten steht, wird diesen Weg umso mehr gehen, wenn er das Amt als Stiftungsrat erst wieder bekleidet.**

Beweis:              –   PV des Jaroslaw Grzesiak
                     –   Protokoll vom 3. Februar 2025 (ON 21 zu 06 HG.2024.210)

f)   Zusammenfassende Ergebnisse: Die Summe der Konflikte gibt den Ausschlag

45    Interessenkonflikte müssten nicht in einem einzelnen Ereignis oder einem einzigen Umstand auftreten. Manche dieser Umstände oder Ereignisse für sich allein genommen mögen – für sich allein genommen – noch nicht das "Level" eines Abberufungsgrundes erreichen. Betrachtet man allerdings die Summe an Konflikten und Interessenwiderstreit hinsichtlich der Person des Herrn Grzesiak, zeigt sich, dass die damalige rechtliche Begründung des Fürstlichen Landgerichts (freilich nur im Provisorialverfahren) unrichtig war: Es geht nicht um "ein Gerichtsverfahren" in Polen gegen Herrn Gzesiak, das den Abberufungsgrund darstellen soll. Es geht auch nicht darum, dass Herr Grzesiak allenfalls Vertrauensmann der Kinder im Stiftungsrat ist. Jeder dieser Punkte für sich allein genommen ist freilich unproblematisch. Es gilt als wohlverstanden, dass jede Seite einen "Vertrauensmann" bestellen können soll.

---

[29] *Heiss/Lorenz/Schauer*, Liechtensteinisches Stiftungsrecht[2] Art 220 Rz 40; LES 2014, 19.

14

46 Vielmehr geht es zur Person des Herrn Grzesiak um eine <u>Kumulierung von unzähligen Umständen und persönlichen Verwerfungen</u> des Herrn Grzesiak zum einzigen Erstbegünstigten der Stiftung, den Stifter, wonach Herr Grzesiak seine persönliche Abneigung gegenüber dem Stifter und auch die von ihm anvertrauten Geheimnisse im Zuge der Ausübung dieses Amtes nicht ausblenden kann und auch nicht ausgeblendet hat.

47 Es geht darum, dass die Kinder Herrn Grzesiak <u>nicht</u> (nur) deshalb <u>bestellt</u> haben, weil er ihr <u>Vertrauen geniesst</u>. Sondern es geht darum, dass die Kinder Herrn Grzesiak ganz bewusst deshalb ausgewählt haben, <u>weil</u> er das <u>Vertrauen zum Stifter gebrochen</u> hat und von diesem gewissermassen vor die Türe gesetzt wurde.

48 Herr Grzesiak <u>weiss</u> auch um diesen Interessenkonflikt: In seiner zeugenschaftlichen Einvernahme gab er nämlich an, dass er damals als Stiftungsrat von Piotr Zak konfrontiert und (zugestimmtermassen) entlassen wurde, "*nachdem er mich gefragt hatte, ob ich bei den zukünftigen Streitigkeiten die Kinder vertreten würde [...]*"[30] Dieses Ansuchen lehnte Herr Grzesiak damals ab und liess sich lieber abberufen, weil er eben vom Stifter "*eingestellt*" worden sei. Spannenderweise scheint dieser Interessenkonflikt bei Herrn Grzesiak, den er damals noch erkannte, wie verflogen zu sein, seit er seinen mit vielen Millionen Euro dotierten Beratungsvertrag verloren hat.

49 Das ehemalige jahrelange berufliche wie auch private Vertrauensverhältnis des Herrn Grzesiak zum Stifter, das schwere Zerwürfnis im Herbst 2024, der andauernde Konflikt über das Millionen-Euro-schwere Beratungsverhältnis mitsamt angeblich offener Forderungen und der daraus resultierende offensichtliche Argwohn gegenüber dem Stifter erreichen daher in ihrer Summe ein solches Gewicht, das die Beibehaltung dieses Amtes unzumutbar macht, um den Stiftungszweck – die Begünstigung des Stifters – nicht zu gefährden.

3 Rechtliches

50 Interessenkonflikten bei Ausübung des Amtes als Stiftungsrat wird durch den Gesetzgeber primär damit begegnet, dass das betroffene Stiftungsratsmitglied bei der Willensbildung im Einzelfall in Ausstand treten muss. Dass diese Form der Konfliktlösung im vorliegenden Fall nicht ausreichend ist, zeigt sich bereits darin, dass Herr Grzesiak kein einziges Mal bei einer Beschlussfassung bisher in Ausstand getreten ist. Herr Grzesiak sieht daher in seiner Person offenkundig keinerlei Interessenwiderstreit zum Stifter als einzigen Begünstigten.

51 Zu prüfen ist daher als zweiter Schritt die *ultima ratio,* die Abberufung. Es ist daher näher zu untersuchen, unter welchen Umständen die Rechtsprechung Interessenkonflikte anerkennt und wie mit dem Umstand sodann zu begegnen ist, wenn und soweit solche Interessenkonflikte dauerhaft bestehen und nicht durch eine Einzelmassnahme beseite geschafft werden können.

52 Soweit es um Interessenkonflikte bei Verbandspersonen geht, ist zunächst anerkannt, dass gerade <u>bei Stiftungen ein höherer Schutzstandard</u> geboten ist, weil in diesen Fällen

---

[30] Zeugenaussage des Jaroslaw Grzesiak vom 3. Februar 2025, Protokoll (ON 21), S 41 unten.

Interessenkonflikte "gefährlicher" sind.[31] Interessenkollisionen im Verhältnis zu Begünstigten der Stiftung sind unbedingt zu vermeiden.[32] Hernach ist der Stiftungsrat verpflichtet, einen Widerstreit <u>seiner</u> Interessen mit denjenigen der Stiftung und der Stiftungsbeteiligten zu vermeiden und, soweit ein solcher bereits eingetreten ist, zu beseitigen.[33] Eine Interessenkollision kann bereits vorliegen, wenn der Grad einer Unvereinbarkeit noch nicht erreicht ist.[34] Fortdauernde Interessenkonflikte, wie etwa ein Rechtsstreit mit Begünstigten der Stiftung, können dazu führen, dass das betroffene Stiftungsratsmitglied für seine Position untragbar wird und abzuberufen ist.[35] (Nichts Anderes kann im Übrigen bei erheblichen persönlichen Auseinandersetzung zwischen Begünstigten und Stiftungsräten gelten.)

53    Der Oberste Gerichtshof fordert seit jeher eine <u>neutrale</u> Besetzung des Stiftungsrates.[36] Es muss eine unbefangene und ausschliesslich am Interesse der Stiftung orientierte Amtsausübung <u>gewährleistet</u> (und <u>nicht</u>: bloss <u>anzunehmen</u>) sein,[37] um die Objektivität der Amtsausübung zu wahren und um Interessenkollisionen zu vermeiden.[38] Personen, die einem permanenten Interessenkonflikt ausgesetzt sind, müssen abberufen werden.[39] Der Stiftungsrat hat nämlich – anders als dies dem Stifter gegenüber in letzter Zeit kommuniziert wird – im Rahmen und in den Grenzen des Stiftungszwecks **dem Begünstigten (und niemanden sonst) zu dienen.** Eine Selbstzweckstiftung, welcher Eindruck durch die jüngsten Scheinbegründungen des Stiftungsrates mit einem abstrakten "Interesse der Stiftung" zuletzt vermittelt wurde, ist überhaupt verboten.[40]

54    Hat ein Stiftungsratsmitglied wegen Auseinandersetzungen mit einem Begünstigten keinen objektiven Blick, unterliegt es einer Interessenkollision.[41] Lediglich "künstlich" geschaffene Abberufungsgründe sollen dann keine Rolle spielen.[42] Dass vorliegend keine "künstlich" geschaffenen Abberufungsgründe vorliegen, ist schon damit belegt, dass der Konflikt zwischen Herrn Grzesiak und dem Stifter schon lange <u>vor</u> seiner Bestellung als Stiftungsrat ausgebrochen ist. Niemand hat die Kinder gezwungen, ausgerechnet Herrn Grzesiak als Stiftungsrat zu bestellen und niemand hat Herrn Grzesiak – als bereits damals im Konflikt mit dem Stifter stehend – gezwungen, dieses Amt, das er ablehnen hätte müssen, anzunehmen.

55    Für die Abberufung eines Stiftungsratsmitglieds muss also ein wichtiger Grund vorliegen, der entweder die Belange der Stiftung gefährdet oder ihr die Beibehaltung der aufrechten Bestellung des Organmitglieds unzumutbar macht. Ob ein wichtiger Grund vorliegt, ist immer unter dem Gesichtspunkt des Funktionierens der Privatstiftung zu sehen, letztlich unter dem

---

[31] *Heiss/Lorenz/Schauer*, Liechtensteinisches Stiftungsrecht[2] Art 186 FN 23.

[32] LES 2010, 7; *Heiss/Lorenz/Schauer*, Liechtensteinisches Stiftungsrecht[2] Art 186 FN 27.

[33] Art 932a § 66 Abs. 1 PGR.

[34] *Gasser*, Liechtensteinisches Stiftungsrecht[2] Art 552 § 24 Rz 43a mwN zu B 07.09.2017, 07 HG.2015.270, LES 2017, 180, mit Verweis auföOGH in RIS-Justiz RS0114598.

[35] *Heiss/Lorenz/Schauer*, Liechtensteinisches Stiftungsrecht[2] Art 186 FN 29.

[36] LES 2010, 7 = GE 2009, 46, EwGr 7.2.; *Heiss/Lorenz/Schauer*, Liechtensteinisches Stiftungsrecht[2] Art 552 § 24 Rz 24.

[37] *Heiss/Lorenz/Schauer*, Liechtensteinisches Stiftungsrecht[2] Art 186 Rz 17 und FN 30.

[38] *Gasser*, Liechtensteinisches Stiftungsrecht[2] Art 552 § 24 Rz 8 mwN zu LES 2010, 7.

[39] *Heiss/Lorenz/Schauer*, Liechtensteinisches Stiftungsrecht[2] Art 552 § 24 Rz 24; LES 2010, 7 = GE 2009, 46, EwGr 7.2.;

[40] *Bösch*, Liechtensteinisches Stiftungsrecht (2005) 209; *Schwärzler/Hermann/Sahranavard,* PSR 2019/19, 98.

[41] *Heiss/Lorenz/Schauer*, Liechtensteinisches Stiftungsrecht[2] Art 186 Rz 16.

[42] *Heiss/Lorenz/Schauer*, Liechtensteinisches Stiftungsrecht[2] Art 186 Rz 16.

Gesichtspunkt, <u>ob die Verfolgung des Stiftungszwecks mit ausreichender Sicherheit in Zukunft gewährleistet ist</u>.[43]

56      Zur Erinnerung, weil dieser Grundsatz vom Stiftungsrat zuletzt unter den Tisch fallen gelassen wurde: Die Stiftung ist auf den dauerhaften <u>Vollzug der ihr vom Stifter vorgegebenen Zwecke</u>, zu denen vorrangig <u>die Begünstigten zählen</u>, angelegt. Ihren Organen kommen im Allgemeinen nur Verwaltungsbefugnisse zu und sie haben in erster Linie den Stiftungszweck, der als Herzstück der Stiftung gilt, zu erfüllen.[44] <u>Dieses Herzstück ist hier die Begünstigung des Stifters (und nicht die Begünstigung der Stiftung selbst).</u>

57      Gerade wenn es – wie hier – um Honorarstreitigkeiten zwischen Begünstigten und Rechtsberatern oder um "Seitenwechsel" von Rechtsberatern geht, ist die Rechtsprechung schon wegen der drohenden Doppelrolle besonders kritisch: So darf ein Verwaltungsrat der treuhänderischen Stiftung einer Stiftung auch als Rechtsanwalt nicht einen Rechtsnachfolger des wirtschaftlichen Stifters <u>gegen</u> einen anderen derartigen Rechtsnachfolger vertreten.[45] Das Verbot eines solchen "Seitenwechsels" gebietet eigentlich schon der "gesunde Hausverstand". Ein Rechtsanwalt als Stiftungsrat muss darüber hinaus von vornherein, wenn er rechtsfreundlich die Interessen eines Begünstigten vertritt und hieraus Honoraransprüche erwachsen (können), auf eine klare, regelmässig schriftliche Regelung seines Honorars, dessen allfällige Sicherstellung und auf eine zeitnahe Bezahlung bedacht sein.[46] Es zählt zur Kardinalspflicht des betroffenen Stiftungsrates, sich von Interessenkollisionen von Anfang an fernzuhalten. Gelingt dies nicht oder drohen jahrelange Auseinandersetzungen zwischen einem Stiftungsrat und den Begünstigten der Stiftung, wird regelmässig die Erreichung des Zwecks der Stiftung in Frage stehen bzw zumindest gefährdet sein. Bereits das potenzielle (theoretische) Risiko eines Interessenkonflikts schliesst den Rechtsberater von der Annahme bzw Ausübung des Mandats aus.[47]

58      Darauf, ob Herr Grzesiak dieses Wissen tatsächlich gegen die Interessen der Stiftung (deren Zweck es ist, den Stifter zu begünstigen) nützt, oder nicht, oder ob tatsächlich die Ergreifung von Vergeltungsmassnahmen durch Herrn Grzesiak drohen, kommt es im Übrigen nicht an. Durch die oben skizzierten bisherigen Handlungen ist aber ohnedies offenbar, dass genau diese drohende Gefahr sich bereits mehrfach verwirklicht hat.

59      Umgemünzt auf den vorliegenden Fall bedeutet dies, dass schon jeder einzelne oben näher dargelegte Konflikt für sich allein genommen zur Abberufung des Herrn Grzesiak führen muss. Selbst wenn man aber da oder dort nicht die entsprechende "Höhe" an "Level" für eine Abberufung erkennen können möchte, so liegt in der Summe der obigen Gründe eine solche schwerwiegende Konfliktsituation, die mit der Abberufung des betroffenen Stiftungsratsmitglieds einhergehen muss. Für die Stiftung und auch für die Kinder kann damit

---

[43] LES 2010, 218 (219).

[44] *Gasser*, Liechtensteinisches Stiftungsrecht[2] Art 552 § 24 Rz 2 mwN zu LES 2002, 94.

[45] *Gasser*, Liechtensteinisches Stiftungsrecht[2] Art 552 § 24 Rz 9 mwN B 27.11.1995, Hp 4/94-29, LES 1996, 150.

[46] *Gasser*, Liechtensteinisches Stiftungsrecht[2] Art 552 § 24 Rz 9.

[47] *Gasser*, Liechtensteinisches Stiftungsrecht[2] Art 552 § 24 Rz 9 mwN zu U 07.01.2009, 1 CG.2006.303, LES 2009, 202.

17

360

überhaupt kein Nachteil einhergehen, weil diese schlichtweg einen konfliktfreien Stiftungsrat bestellen können, der nicht dieses Amt für Vergeltungsmassnahmen missbrauchen will.

60    Als Ergebnis ist daher festzuhalten:

- **Das persönliche und tiefgreifende persönliche Zerwürfnis und der berufliche Konflikt zwischen dem Stifter und Herrn Grzesiak ist lange <u>vor</u> seiner Bestellung als Stiftungsrat ausgebrochen. Damit ist eine "künstliche" Schaffung von Abberufungsgründen durch den Stifter ausgeschlossen.**

- **Der Beratervertrag, aus denen Herr Grzesiak nach wie vor Millionenforderungen gegen den Stifter geltend machen möchte, ist ebenso <u>vor</u> seiner Bestellung abgeschlossen und auch <u>davor</u> aufgelöst worden.**

- **Herr Grzesiak ist als bereits konfliktbehafteter, mit persönlichem Argwohn gegenüber dem Stifter ausgestatteter Stiftungsrat bestellt worden und hätte bei Berücksichtigung der oben angeführten Rechtsprechung dieses Mandat niemals annehmen dürfen. Dass er einem Interessenkonflikt in der vorliegenden Auseinandersetzung unterliegt, hat er im Rahmen seiner Einvernahme am 3. Februar 2025 selbst zugestanden.[48]**

- **Selbst wenn man all die persönlichen Verwerfungen und beruflichen Konflikte einfach beiseite lassen wollen würde, kann Herr Grzesiak in jedem Fall dieses Amt – solange das strittige Rechtsverhältnis mit dem Stifter über seine (angeblichen) Millionenforderungen nicht bereinigt ist – nicht unbefangen ausüben. Der Vollzug des Stiftungszweckes ist nicht nur konkret gefährdet, sondern es ist aus den oben angeführten Umständen belegt, dass Herr Grzesiak diesen aus Vergeltungsdrang konterkarieren möchte.**

- **Diesen Vergeltungsdrang hat er bereits Taten folgen lassen: Seit seiner Bestellung hat der Stifter als einziger Begünstigter keinerlei Ausschüttungen mehr aus dem Stiftungsvermögen erhalten. Der Stifter wurde aus allen relevanten Aufsichtsratspositionen abberufen bzw. die Entfernung aus weiteren Positionen ist in vollem Gange.**

- **Der für einen Stiftungsrat gebotene objektive Blick ist bei Herrn Grzesiak wegen der Fülle an Verwerfungen und Verwicklungen und seiner persönlichen negativen Einstellung zum Stifter als Erstbegünstigten nicht vorhanden, was zu seiner Abberufung führen muss.**

4    Anträge

Aus all diesen Gründen stellt der Stifter den

ANTRAG

---

[48] Zeugenaussage des Jaroslaw Grzesiak vom 3. Februar 2025, Protokoll (ON 21), S 41 unten.

18

das Fürstliche Landgericht als Stiftungsaufsicht möge

1. im vorliegenden Abberufungsverfahren als Hauptverfahren eine mündliche Verhandlung zur Durchführung des Beweisverfahrens und Erörterung der Rechtslage anberaumen;

2. Herrn Jaroslaw Grzesiak als Stiftungsratsmitglied der TiVi Foundation abberufen;

3. diesem Abberufungsbeschluss vorläufige Vollstreckbarkeit zuerkennen;

4. und die Antragsgegner zur ungeteilten Hand zum Ersatz der Verfahrenskosten zu Handen der ausgewiesenen Vertretung des Antragstellers verpflichten.

Vaduz, 13. Oktober 2025
SOT/AGO/fen

Kosten werden verzeichnet:
(Streitwert: CHF 30'000.00)

| | | |
|---|---|---|
| Antrag TP 3A, 40% ES, | CHF | 1'108.80 |
| 25% StGZ | CHF | 277.20 |
| MwSt 8,1% | CHF | 112.26 |
| **Gesamt** | **CHF** | **1'498.26** |

**BEILAGENVERZEICHNIS**

| | |
|---|---|
| Ausschüttungsbegehren hinsichtlich der Solkomtel Foundation vom 30. Juli 2025 | ./EL |
| Umlaufbeschluss des Stiftungsrates der Solkomtel Foundation vom 18. August 2025 | ./EM |
| Ausschüttungsbegehren hinsichtlich der TiVi Foundation vom 5. September 2025 | ./EN |
| Ausschüttungsbegehren hinsichtlich der Solkomtel Foundation vom 5. September 2025 | ./EO |
| Konvolut E-Mail Korrespondenz zwischen dem Rechtsvertreter des Stifters und dem Beistand im Zusammenhang mit Ausschüttungsbegehren und der Einholung der Stiftungsratsbeschlüsse diesbezüglich | ./EP |