# EXHIBIT P

To the
Princely Court of Justice
9490 Vaduz

PRINCELY COURT OF JUSTICE VADUZ

E 08/01/2025 9:34 AM

Mailing: by messenger

APPLICANT:                    Zygmunt Józef Solorz

Haldenweg 18,

9495 Thesen

represented by 1:

SCHURTI : PARTNERS
RECHTSANWÄLTE AG | ATTORNEYS AT LAW LTD

Zollstrasse 2 | 9490 Vaduz | Liechtenstein
Tel. +41 44 244 2000 | mail@schurtipartners.com

(Acting on the basis of the power of attorney pursuant to Article 6
of the Non-Contentious Proceedings Act in conjunction with

Section 28(2) of the Code of Civil Procedure)

represented by 2:

schwarzler
Rechtsanwälte | Attorneys at Law

Schwärzler | Attorneys at Law
Austrasse 42, 9490 Vaduz
(Acting on the basis of the power of attorney pursuant to
Article 6 of the Non-Contentious Proceedings Act in
conjunction with Section 28(2) of the Code of Civil
Procedure)

(Schurti Partners Rechtsanwälte AG as authorized
recipient for service pursuant to Article 82(1) of the
Lawyers' Act)

RESPONDENTS:                  1.  Dr. Peter Schierscher, Attorney-at-Law

Gewerbeweg 5, 9490 Vaduz

represented by:

Ritter Schierscher Rechtsanwälte AG

Gewerbeweg 5, 9490 Vaduz

2.  Jaroslaw Grzesiak

ul. Jaworowska 13, PL-05-510 Konstancin-Jeziorna

represented by:

Oberhuber Jenal Rechtsanwälte AG

Wuhrstrasse 14, 9490 Vaduz

3.  Tomasz Szelag

Agiou Georgiou 32, 4529 Pyrgos Limassol, Cyprus

represented by:

|                          |                                           |
|--------------------------|-------------------------------------------|
|                          | Niedermüller Rechtsanwälte                |
|                          | Werdenbergerweg 11, 9490 Vaduz            |
| AFFECTED LEGAL ENTITY:   | TiVi Foundation (FL-0002.394.367-5)       |
|                          | Industriering 14, 9491 Ruggell            |
|                          | <u>represented by:</u>                    |
|                          | Ritter Schierscher Rechtsanwälte AG       |
|                          | Gewerbeweg 5, 9490 Vaduz                  |
| SUBJECT:                 | Supervisory proceedings (Disputed value: CHF 30,000.00) |

**APPLICATION FOR ANNULMENT OF FOUNDATION BOARD RESOLUTIONS
(CHALLENGE OF RESOLUTIONS)**

<u>Filed in quintuplicate</u>

<u>Exhibits as per list</u>

2

628

In the matter described in more detail above, the Applicant, Founder, and Curator Mr. Zygmunt Solorz (hereinafter: the "**Founder**" or the "**Applicant**"), submits the following

### APPLICATION FOR ANNULMENT OF FOUNDATION BOARD RESOLUTIONS:

1    Subject of the present supervisory proceedings: The Children's plan has (for now) succeeded

[1]    The Applicant is (notoriously) the Founder, Curator, and sole First Beneficiary of the TiVi Foundation (hereinafter: the **"Foundation"**). Between the Founder and his children Aleksandra Zak, Piotr Zak, and Tobias Solorz (hereinafter: the **"Children"**), several legal proceedings are pending before the Princely Court of Justice concerning, in essence, the question of who is entitled to which rights in connection with the Foundation.

[2]    Initially, by means of interim injunctions, provisional legal protection was obtained both domestically and abroad—in Liechtenstein and in Cyprus. Thus, by official order of October 26, 2024[1] in the "TiVi Supervisory Proceedings," which are still pending under file number 06 HG.2024.133 and were initiated by the Founder, a guardian in the person of Dr. Peter Schierscher (hereinafter: the "**Guardian**") was appointed for the Foundation. The Founder on the one hand and the Children on the other were provisionally granted the right to each appoint one member of the Foundation Board, while the Guardian would serve as the third member and Chairman of the Foundation Board. All of this applies until the "TiVi Main Proceedings" are finally concluded with res judicata effect.[2]

[3]    The "Main Proceedings" concerning the TiVi Foundation are those pending under file number 06 HG.2024.210 (and still not finally adjudicated). These main proceedings may be regarded as notorious, as may the parties to the dispute and the respective "protagonists," who are likely already known to the court.

[4]    Summarizing the events since the issuance of the decisive official order of October 26, 2024, the Founder must—mildly put—soberly note how his Children, with the involvement of the courts, have succeeded in gradually implementing their plan to strip him of his powers under the pretext of false allegations. This culminated in the fact that, by resolution of July 21, 2025, the Foundation Board of the Foundation removed the Founder as Chairman of the Supervisory Board of the most important companies of the corporate group, even though holding these positions is statutorily guaranteed to him:

   ▪   **Step 1: Restriction of the Curator's rights without any justification**

[5]    First, by the official order of October 2024, significant (though not all) Curator's rights of the Founder were suspended without any factual justification, even though in the (contested) Statutes amendment declaration of August 2, 2024, drafted by the Children, the existence of these rights was guaranteed by the Children until his actual death. It is precisely the validity of

---

[1] GZ 06 HG.2024.133, ON 71.
[2] GZ 06 HG.2024.133, ON 71.

this amendment declaration that the Children seek to have <u>judicially confirmed</u>.[3] Nevertheless, the Curator's rights explicitly enshrined—and even acknowledged by the Children—in that document were suspended in a decisive part.

6    All this, although the Founder as Curator had never in the past even critically questioned—let alone obstructed—a Foundation Board resolution during a board meeting. Nevertheless, he was "prophylactically" stripped of more rights than he would lose even if the amendment declaration of August 2, 2024, drafted by the Children, were valid.

7    The justification offered at the time by the Princely Court of Justice and the Princely Supreme Court was the preservation of temporary "pacification" or "stabilization" of the underlying subsidiaries.[4] This argument, advanced by the Children at the time under the banner of maintaining the "status quo," proved *ex post* to have been merely pretextual. It was simply the first step toward the complete takeover of control by the Children and the disenfranchisement of the Founder, as the Princely Court of Justice continually allowed itself to be misled by the false and unsubstantiated claims of the Children, who managed to conceal their manipulations effectively.

8    The person who entrusted his billions in assets to the Foundation was, according to the Children's plan, to be relieved step by step of all functions and the Children were to be granted sole control.

▪    **Step 2: Appointment of Jaroslaw Grzesiak to the Foundation Board**

9    Shortly after the week of oral hearings in February 2025, in March 2025, the Children appointed Jaroslaw Grzesiak—the <u>former trusted associate</u> of the Founder, who by his own account was also the custodian of numerous secrets entrusted to him by the Founder[5]—as their representative to the Foundation Board.

10    Owing to the previously suspended Curator's rights and an unfortunately worded (provisional) statutory provision on the formation of the will[6] in the official order of October 26, 2024, Mr. Grzesiak, who as an experienced lawyer can be very persuasive, was placed in a position to act with the Guardian apart from the Founder and, for the most part, even without involving the third Foundation Board member.

11    The severe rupture between the Founder and Mr. Grzesiak is documented in writing. Just a few weeks earlier, in February 2025, during his testimony before the Princely Court of Justice, Mr. Grzesiak had clearly stated that he was committed to the success of the Children and their

---

[3] 06 HG.2024.167.

[4] Cf. 06 HG.2024.133, ON 71, p. 46 mid ("*[…] there is <u>currently great unrest and uncertainty</u> (also in the underlying companies) …*") and ON 106, p. 50 top ("*… the <u>appeasement</u> and <u>balance</u> between the two sides (and their interests) evidently achieved <u>by the challenged official order</u>*").

[5] Due to the unlawful disclosure of these (professional) secrets, the public prosecutor's office in Poland is now also investigating Jaroslaw Grzesiak.

[6] Namely in such a way that circular resolutions can also be passed by two Foundation Board members by majority, so that—according to the practice subsequently adopted and approved by the Princely Court of Justice—the formation of intent <u>by circular resolution</u> *de facto* does not require all three Foundation Board members, but two members can act in concert.

4

interests (arguing *"because the children deserve it"*[7]).

[12]    The Princely Court of Justice took no issue with the breach of trust, the former (undisputed) mandate relationship between Jaroslaw Grzesiak and the Founder, and the fact that the Founder's former confidant now sits on the Foundation Board as the declared representative of the Children's interests. The essence of the court's view was that Jaroslaw Grzesiak would, of course, act only in the best interests of the Foundation. The injunction sought by the Founder against Mr. Grzesiak in the provisional proceedings was rejected.[8]

[13]    Whereas a few months earlier—in October 2024—the mere abstract risk of obstruction by the Curator had sufficed to justify stripping him of rights and taking away more than would have been removed even under the August 2, 2024 amendment declaration, the Princely Court of Justice now accorded Jaroslaw Grzesiak, the former trusted associate and custodian of confidential information of the Founder who was now in open conflict with him, respect and a presumption of trust for his future actions.

> ▪ **Step 3: The remaining Curator's rights are negated**

[14]    The Curator's remaining rights were then ignored, misinterpreted, or—in short—trampled underfoot by the Guardian.[9] The Curator was permitted or able to attend Foundation Board meetings only at first, then partially not at all, and in some cases only after intervention. The Guardian repeatedly considered the remaining rights of the Curator to be "completely suspended"; only after intervention did he concede that merely the right of nomination and the right of approval were suspended.[10] The Princely Court of Justice has (so far) raised no objection to this behavior of the Guardian.[11] Documented and judicially established Curator's rights, as well as the regular formation of the will in general, have thus[12] degenerated into a farce.

[15]    The Guardian and Jaroslaw Grzesiak took the helm and created faits accomplis without the Founder being granted appropriate legal protection.

> ▪ **Step 4: The Founder's warnings about the Children's takeover of control are ignored**

[16]    The Founder repeatedly (most recently also in proceedings 06 HG.2024.72) brought his concerns before the Princely Court of Justice, stating that the Children were on the verge of taking control of the multi-billion-euro Cypriot subsidiaries. The Princely Court of Justice dismissed this imminent danger with a multitude of negative determinations, holding that these were merely *"suspicions of*

---

[7] Cf. statement by Jaroslaw Grzesiak of February 3, 2025 (ON 21 in 06 HG.2024.210), p. 45 bottom.

[8] Cf. resolution of May 27, 2025 (ON 127 in 06 HG.2024.133).

[9] See the detailed analysis of events in the application for removal of the court-appointed Guardian of May 16, 2025 (ON 121 in 06 HG.2024.133), in particular paras. 114 ff., as well as the addendum of July 11, 2025, paras. 26 ff., and paras. 8 ff. of the rejoinder of July 21, 2025.

[10] Cf. also the email exchange between the Founder's counsel and the Guardian around June 17, 2025 (Exhibits ./DS and ./EH in 06 HG.2024.133).

[11] See the rejection of the application for a super-provisional injunction by resolution of May 28, 2025 (ON 8 in 06 HG.2025.73), in particular pp. 80 ff.

[12] By repeatedly and deliberately bypassing the then third Foundation Board member.

*the applicant for protective measures.*"[13] It even found it positive that additional directors were appointed to the subsidiaries in order to protect the Foundation's interests. The Princely Court of Justice likewise took no issue with the manner in which the resolutions of April 10, 2025—which were to form the basis for the takeover of control in Cyprus—were adopted, nor with the way the Guardian treated the Founder as Curator.[14]

- **Step 5: Control in Cyprus is taken over by the Children's trusted associates**

17    Ultimately ("on the second attempt"), the additional directors selected by the Children and Mr. Grzesiak were installed in Cyprus—an action the Princely Court of Justice originally even approved of. It was said to be in the Foundation's interest, allegedly merely ensuring the flow of information and preventing *asset dissipation*. The Children continued to be believed, thereby paving the way for their next step: the complete disenfranchisement of the Founder, for which the appointment of additional directors and the lifting of the Cypriot interim injunction were necessary. The Founder's corresponding applications for protective measures were rejected.[15]

- **Step 6: The Founder is unlawfully removed from <u>all</u> companies in violation of the Statutes**

18    Shortly after the installation of the additional directors, which the Princely Court of Justice approved, came the current climax of all acts of disenfranchisement: by the Foundation Board resolutions of July 21, 2025, the Founder was removed from all companies as Chairman of the Supervisory Board. His wife and other persons (allegedly "closely associated" with him) also had to vacate their seats.

19    Piotr Zak and Tobias Solorz were allowed to remain. The Princely Court of Justice approved this because the written Foundation Board resolution appeared to be reasonably "well-founded" and because Tomasz Szelag, who had originally been appointed to the Foundation Board by the Founder, voted in favor of it.

20    The fact that, in every version of the <u>Statutes</u>—and even in the amendment declaration of August 2, 2024, which <u>the Children seek to have confirmed as valid in separate proceedings</u>—[16]it is expressly <u>stipulated</u> that the Founder shall <u>retain these positions until his actual death</u>, is <u>not even deemed worthy of mention</u> in the legal reasoning of this dismissive decision (even if rendered "only" in provisional proceedings). Likewise ignored is the fact that there is <u>not a single act by the Founder, in his capacity as Chairman of the Supervisory Board, that would justify his removal.</u>

---

[13] Resolution of May 28, 2025 (ON 8 in 06 HG.2025.73), p. 79.

[14] Resolution of May 28, 2025 (ON 8 in 06 HG.2025.73), p. 81 *("[…] not about authorizing the appointment of an indefinite number of directors, but […] the appointment of two independent directors and thus the creation of a <u>balance</u> on the board. […] the possibility of appointing independent directors ultimately serves to protect the Foundation's assets (vis-à-vis <u>both</u> sides).").*

[15] Resolution of May 28, 2025 (ON 8 in 06 HG.2025.73), p. 81 *("[…] creation of a <u>balance</u> on the board […] protection of the Foundation's assets (vis-à-vis <u>both</u> sides).").*

[16] 06 HG.2024.167, application ON 1 (p. 14 bottom and p. 15 top).

[21] Every application by the Founder for protective measures—no matter how clearly the rights to be protected are enshrined in the Statutes and even when the validity of those provisions is sought by the Children themselves in separate proceedings—has been rejected.

[22] Looking at the current situation, precisely what the Founder had always warned against—and fought against by every rule-of-law means available to him—has now occurred: the corporate group he built up has been handed over, on the basis of nebulous "justifications" and unsubstantiated assertions, to the Children's trusted associates and to his declared opponent, Mr. Grzesiak. Apparently, it no longer matters what the Statutes state or what position and rights the law guarantees to the Founder: he is deprived of every right—even the right merely to receive information—on the pretext of a purported "asset dissipation."

[23] While the Founder is constantly accused—without evidence—of exercising indirect control over the Cypriot companies and of posing a threat to the Foundation (through alleged *asset dissipation*), in reality, the very conduct imputed to him is being practiced in mirror image by the Children and by Jaroslaw Grzesiak:

- The Founder is accused of having removed his sons from the companies or of having intended to do so. In fact, the Founder himself has been removed from the companies he built, while Piotr Zak and Tobias Solorz remain in office as operating managers. Thus, precisely the opposite of what the Founder is accused of has occurred—he is being subjected to what he supposedly did. That Piotr Zak and Tobias Solorz were dismissed in certain companies in September 2024 (a) before the issuance of the official order and (especially) (b) not (solely) by the Founder, but by the respective independent governing bodies obligated to act impartially, is simply brushed aside. Everything the Children dislike is attributed to "the Founder."

- The Founder is accused of having caused an improper outflow of assets (keyword: Asseco transaction). There is, to this day, no evidence of this allegation. Quite apart from the fact that the transaction became necessary because of the actions of Mr. Grzesiak and the Children—since the banks, due to their interventions, refused to continue financing the corporate group—the height of audacity is that the very person who levels this accusation against the Founder in the relevant Foundation Board resolution, namely Tomasz Szelag, is the one who initiated the transaction himself. The fact that the Guardian characterized this transaction in spring 2025 as "absolutely necessary" in the interest of the Foundation is swept under the rug, and *ex post* it is pretended that he either knew nothing of it or opposed it. Once again, the true perpetrators present themselves as "representatives of the victims."

- The Founder is repeatedly accused of being in a "general conflict of interest" with the Foundation, without any attempt to specify or prove such a conflict. Insofar as reference is made to the fact that he is an opposing party to the Foundation in several proceedings, it is entirely ignored that Piotr Zak and Tobias Solorz, though themselves parties to litigation, are permitted to retain their positions—and indeed, the Guardian even went out of his way to ensure that Piotr Zak could definitely remain in that post. Again, only the Founder—whose positions are guaranteed by the

7

Statutes and confirmed even by the Children—is said to have a conflict of interest and must therefore be removed, whereas the genuine conflicts of interest of the Children are conveniently tolerated.

▪ Finally, the Foundation Board presumes to decide, in an act of self-help, when a "conflict of interest" with the Founder exists and when he may be excluded from decision-making, instead of leaving such determinations to the independent judiciary. As a result, the Founder is forced, at every opportunity, into the active role of having to assert his rights and claims through litigation (for which he is then, in turn, reproached).

*24* All of this is sanctioned by the Supervisory Court, which, in its most recent order dismissing a request by the Founder for protective measures, vaguely noted "for the sake of completeness" that the Founder still had "rights."[17] Yet <u>what</u> those might be remains highly questionable in light of the intolerable developments so far—especially if even <u>third-party rights expressly enshrined in the Statutes, whose continuing validity is invoked by the opposing party and which the latter seeks to have judicially confirmed, are not to be respected.</u>

*25* Furthermore, it should be clearly emphasized: the issue is not that the Founder "cannot live" with certain (occasionally) unfavorable decisions of the Princely Court of Justice. Adverse decisions are inherent in the rule of law and in judicial proceedings; the Founder does not deny this. Rather, the point is that the Founder <u>foresaw</u> from the outset the scenario desired by the Children, and that the Princely Court of Justice nevertheless failed to halt this premeditated strategy in time—even if some decisions may have appeared necessary to the Court at the respective time of issuance.

*26* This untenable imbalance, created through a "salami tactic," is made particularly evident by the fact that the Children now retain their positions while the Founder must vacate his. <u>Yet</u> the Founder <u>continues</u> to be falsely accused of having sought mere revenge against the Children in the fall of 2024—while, in reality, those very individuals who complain of supposed retaliatory measures are the ones knowingly engaging in them.

*27* Ultimately, what is at stake in these proceedings—this should be stated deliberately—is the enforcement of the rule-of-law–guaranteed rights of a founder of a Liechtenstein foundation. Reviewing the course of events to date, one sees that through an <u>unprecedented, orchestrated maneuver</u>, the founder of a Liechtenstein multibillion foundation has, without factual justification and <u>during still-pending main proceedings</u>, been gradually <u>stripped of his rights and powers</u>. On the basis of <u>mere conjecture</u> and allegations by his litigation opponents, every remaining right of the Founder—regardless of whether it is explicitly stated in the Statutes—is being denied. Conversely, the Founder, who resists the disempowerment strategy of his Children and their auxiliaries, faces insurmountable obstacles, even when all he seeks is to preserve the *status quo*— that very status quo that was originally invoked as the key justification for suspending his most important rights as Curator. Apparently, the status quo matters only when it benefits the Children.

*28* This *status quo*—originally desired and broadly promoted by the Children, and even invoked by

---

[17] Resolution of July 24, 2025 in case 06 NE.2025.8, p. 38.

the Princely Court of Justice as one of the reasons for issuing the official order of October 26, 2024—has been thrown overboard by the Guardian and his aides.

29    Or, to put it bluntly: because of a purely speculative "conflict of interest," the Founder is cut off from all information, and the Children together with Mr. Grzesiak sit alone in the *driver's seat.* This outcome could not be further removed from any notion of pacification or maintenance of the current state of affairs until the final conclusion of the main proceedings; indeed, it grants the Children far more rights than they even seek in those proceedings.

30    Finally, the credibility of the Children's prior and continuing claims regarding the alleged danger of *asset dissipation* is further undermined by the fact that criminal investigations were initiated in Poland against them in connection with the events of August 2, 2024, when they presented to the Founder, for his signature, documents that had been pre-drafted by Piotr Zak. It is therefore incomprehensible that, to this day, the unsubstantiated assertions of the Children continue to be believed, while statutory rights of the Founder explicitly recorded in the Statutes are denied to him.

31    In the present proceedings, the Foundation Board resolutions of July 21, 2025, by which the Founder was—summarizing—removed from his positions as Chairman of the Supervisory Board, are being challenged (or a declaration of nullity is sought). The Founder, by virtue of the Statutes—as a vested third-party right—has a statutory claim to retain his positions as Chairman of the Supervisory Board. The Foundation Board, by disregarding this statutory right in its decision-making, acts unlawfully and contrary to the Statutes. The resolution adopted is void for this reason alone. It is also void—and at the very least contestable—because the fundamental substantive assumptions underlying the resolution are untrue and incorrect, such that the Foundation Board based its decision on a factually erroneous foundation.

32    In detail:

2    The Founder's statutory right to retain his Supervisory Board positions

33    The subject matter of the "TiVi Main Proceedings," as well as of the separate proceedings initiated by the Children,[18] is, as is well known, essentially the legal question of which version of the Statutes and By-Laws is valid and in force[19]: (i) the version dated August 2, 2024, favored by the Children and whose confirmation they seek;[20] (ii) the version dated September 24, 2024, whose confirmation is sought by the Founder;[21] or (iii) possibly the "original version"[22] dated November 29, 2023.

34    Those proceedings likewise concern whether the "Declaration of Death" signed by the Founder on August 2, 2024—by which he, in essence, declared himself "deceased" vis-à-vis his Foundation—

---

[18] 06 HG.2024.167.

[19] See the declaratory proceedings instituted by the Children 06 HG.2024.167, ON 1, requesting inter alia a declaration that the Statutes of the TiVi Foundation in the version of 08/02/2024 are legally effective (see ON 1, p. 14 bottom and p. 15 top).

[20] See also the enclosed Amendment Declaration of August 2, 2024.

[21] See 06 HG.2024.210, most recently (non-final) resolution ON 39.

[22] See the enclosed Statutes and By-Laws in the "original version" of November 29, 2023.

9

is valid, or whether it was later validly revoked.[23]

35    The Statutes of the Foundation—regardless of which version—provide in Article 13(2)(2)(i) that the Founder may, during his lifetime, issue a (revocable) declaration by which, as of a date chosen by him, those provisions of the Statutes shall apply that would otherwise enter into force upon his death ("**Declaration of Death**").

36    For the present challenge of the resolutions, neither (a) the validity of a specific version of the Statutes nor (b) the (in)effectiveness of the Declaration of Death plays any role.

37    In <u>all versions</u> of the Statutes—including that of August 2, 2024, sought by the Children[24], and the prior version of November 29, 2023—the Founder is <u>guaranteed significant statutory rights for life</u>, even in the event that he issues (and that there takes effect) a Declaration of Death.

38    For the case that a Declaration of Death is effective, the Statutes provide in Article 13(2)(2)(3) rules that are to apply for the lifetime of the Founder in such case.[25] The following statutory provisions therefore apply <u>in every event</u>, regardless of (a) the appointment of a Guardian,[26] (b) the outcome of the main proceedings 06 HG.2024.210, and (c) the validity and irrevocability of the Declaration of Death issued on August 2, 2024:

▪    According to **Article 13(2)(2)(3)(i)** of the Statutes, for *"decisions on personnel matters (appointment, removal, suspension, amount of remuneration) concerning the composition of the Foundation Board of the Foundation <u>and the management boards and supervisory boards of companies whose shares or participations are held directly by the Foundation ("Companies"), [...] a prior joint consultation with the Founder is required."</u>*

▪    According to **Article 13(2)(2)(3)(iii)** of the Statutes, the **Founder *"retains the function of Chairman of the Supervisory Boards of the Companies belonging to the Founder's Group [...]"***

39    This provision protecting the Founder applies irrespective of the effectiveness of a Declaration of Death, namely *"<u>as from the date specified</u> in the declaration by the Founder."*[27] Even in the (disputed) amending declaration of August 2, 2024, presented to the Founder by the Children, the validity of which the Children assert and seek to have judicially confirmed in the proceedings initiated by them[28], the following statutory clause is expressly set forth:

---

[23] Pursuant to Article 13(2) point 2 (i) of the Statutes; see also the declaratory request in the proceedings instituted by the Children 06 HG.2024.167, ON 1, requesting inter alia a declaration that the Declaration of Death of August 2, 2024 is valid and effective (see there ON 1, p. 15 top).

[24] 06 HG.2024.167, ON 1.

[25] "(2) 3. *After the date specified in the Declaration, the following provisions apply, which cannot be amended by the Foundation Board under Article 13(3) of the Statutes: [...]*'

[26] The official order of October 26, 2024, ON 71 in 06 HG.2024.133, leaves these statutory provisions unaffected.

[27] While it is <u>expressly disputed</u> that <u>the Declaration of Death is valid and effective</u>. This is irrelevant, however, for the applicability of Article 13(2), because the effectiveness of this protective provision in favor of the Founder depends solely on the "date stated by the Founder" in the instrument (and not its legal effectiveness), and thus on the period after August 2, 2024.

[28] 06 HG.2024.167, ON 1.

*"(iv) The Founder retains the position of Chairman of the supervisory boards of the Companies belonging to the Founder's Group as of the date of amendment of the Statutes of August 10, 2023. He also has the irrevocable right, at his sole discretion, to continue this position for all future terms."*

| Evidence: | – | Statutes of the TiVi Foundation, version dated November 29, 2023 (Exhibit ./A) |
|---|---|---|
| | – | By-Laws of the TiVi Foundation as amended November 29, 2023 (Exhibit ./B) |
| | – | TiVi Amendment Declaration of August 2, 2024 (Exhibit ./C) |
| | – | Statutes of the TiVi Foundation as amended on September 24, 2024 (Exhibit ./D) |
| | – | By-Laws of the TiVi Foundation as amended on September 24, 2024 (Exhibit ./E) |
| | – | Court files 06 HG.2024.210, 06 HG.2024.133, 06 HG.2024.167 |

40    As an interim conclusion, it must therefore be noted that the Founder has a statutory right—independent of the outcome of all pending proceedings and still effective at present[29]—to retain his corporate functions in the Foundation's subsidiaries. This does not constitute a (suspended) founder's right, but a third-party right.[30] Even if it were considered a founder's right, in view of the temporary suspension it would in no way be justifiable to deprive the Founder of his claim as long as there has been no conclusive clarification of the facts that supposedly justify the suspension. Should the latter ultimately fall away, the Founder would automatically have to be reinstated in all positions.

3    The Foundation Board resolution of July 21, 2025

41    By circular resolution of July 21, 2025, the Foundation Board resolved that the Founder should be released from his position as Chairman of the Supervisory Board in the Foundation's subsidiaries in which the Foundation holds direct or indirect participations. Specifically, the Founder was to be removed from all positions in companies in which the Foundation, pursuant to its Articles of Association, holds personal powers to appoint and dismiss the Chairman of the Supervisory Board:

▪    Cyfrowy Polsat S.A.

▪    Netia S.A.

▪    Polkomtel Sp. z o.o. and

▪    Telewizja Polsat Sp. z o.o.

42    These are the core companies of the Founder within the corporate group he built and transferred to the Foundation.

43    The Founder held all positions as Chairman of the Supervisory Board in the above companies prior to August 10, 2023.[31] Specifically, he was appointed as Chairman of the Supervisory Board of (i) Telewizja Polsat Sp. z o.o. on June 15, 2011; (ii) Polkomtel Sp. z o.o. on February 15, 2014; (iii)

---

[29] See already fn. 27.

[30] Cf. on the distinction between genuine Founder's rights and so-called third-party rights: Jakob, Die liechtensteinische Stiftung, paras. 230 ff.

[31] Cf. Article 13(2)(2)(3)(i) and especially (iii) of the Statutes.

Cyfrowy Polsat S.A. on July 29, 2021; and (iv) Netia S.A. on June 8, 2022. Moreover (as should be generally known), these companies are held by Cypriot subsidiaries of the Foundation belonging to the Founder's Group.

Evidence:      –    Extract from the homepage of the Polsat Group (Exhibit ./F)
–    Bundle of register extracts from the companies Netia .S.A., Cyfrowy Polsat S.A., Polkomtel Sp. z o.o., and Telewizja Polsat Sp. z o.o. (Exhibit ./G)
–    Extracts from the financial reports of Netia .S.A., Cyfrowy Polsat S.A., Polkomtel Sp. z o.o., and Telewizja Polsat Sp. z o.o. (Exhibit ./H)
–    Foundation Board resolution of July 21, 2025 concerning Cyfrowy Polsat S.A., and Foundation Board declaration of July 21, 2025 regarding the removal of the Founder and Mr. Mirosław Marian Błaszczyk, and the appointment of two other persons in Cyfrowy Polsat S.A. (Exhibit ./I)
–    Foundation Board resolutions of July 21, 2025 concerning (i) Telewizja Polsat Sp. z o.o., (ii) Netia S.A., and (iii) Polkomtel Sp. z o.o., and the Foundation Board declaration of July 21, 2025 regarding the removal of the Founder in Polkomtel Sp. z o.o. and Telewizja Polsat Sp. z o.o. and the appointment of another person in Telewizja Polsat Sp. z o.o. (Exhibit ./J)

44   **These positions are those for whose retention the Founder has a statutory claim pursuant to Article 13(2)(2)(3)(i) and (iii) of the Statutes—regardless of which version of the Statutes may currently be valid.**

45   These positions are those *"within the Founder's Group"* that he already held as of August 10, 2023.[32]

46   **The Foundation Board resolution of July 21, 2025 therefore clearly violates the express provision of Article 13(2)(2)(3)(iii) [33]and (iv)[34] of the Statutes.**

47   Moreover, there was no prior joint consultation with the Founder regarding the imminent change in the composition of the management and supervisory boards, including the alteration affecting him personally. Without prior consultation with the Founder, a Foundation Board resolution is legally invalid under the Statutes.[35] The Foundation Board even expressly acknowledged in writing that it deliberately refrained from consulting the Founder—specifically for the purpose of preventing him from influencing his own removal from his corporate offices.

48   This provision is likewise not a (suspended) "founder's right" but a prerequisite for the validity of a Foundation Board resolution. The actions of the Foundation Board in question concern the appointment, dismissal, and/or suspension relating to the composition of the management and supervisory boards of companies whose shares or interests are held directly by the Foundation. No consultation or discussion with the Founder took place. Resolutions or legal acts of this kind are therefore null and void. In particular, there is no discernible reason why, with respect to all dismissed persons—including Mirosław Marian Błaszczyk (thus not only the Founder himself)—no prior consultation with the Founder took place.

---

[32] Article 13(2)(2)(3)(iii) of the Statutes; for the time of initial appointment see Exhibit ./H.

[33] as amended November 29, 2023 or September 24, 2024.

[34] as of August 2, 2024.

[35] Arg. *"a prior joint consultation with the Founder is obligatorily required,"* which can only mean the nullity of a Foundation Board resolution contrary to this provision.

49

50      Insofar as the Foundation Board generally asserts that the Founder has lost all these participatory rights because he is subject to a conflict of interest, the following must be noted: notably, the Foundation Board does not even attempt to specify such a conflict of interest, which makes this claim entirely unsubstantiated and to be classified as a meaningless pretext.

51      The Foundation Board resolution therefore also violates the express statutory provision of Article 13(2)(2)(3)(i) [36]and (ii)[37] of the Statutes.

4       The Foundation Board also based its decision on a factually incorrect basis

52      As already explained, the Foundation Board resolution is null and void due to violation of the Statutes. Nevertheless, the seemingly extensive reasoning of the resolution is factually incorrect, rendering it contestable as well. To highlight just a few of the most untenable assertions:

- The Princely Court of Justice did not *restrict* the Founder's rights as Beneficiary.[38] These continue to exist in full.

- The duration of the suspension of certain Curator's rights is not tied to the duration of the Guardian's provisional appointment, but continues until the main and supervisory proceedings have been finally adjudicated.[39]

- There are no "conflicts of interest" between the Founder and the Foundation that could justify his removal—certainly none that differ from those of the Children, who are allowed to retain their positions. The Foundation is merely a formal party to the pending proceedings; the Foundation Board cannot point to any other "conflicts of interest." Moreover, the Liechtenstein legislature— unlike, for example, the Austrian legislature—deliberately accepts potential conflicts of interest between the Founder (or Curator) and the Foundation. Thus, in Liechtenstein, even a Beneficiary may sit on the Foundation Board, even though every action of the Foundation naturally affects his interests as Beneficiary to a greater or lesser degree. What precise conflicts of interest are supposed to exist vis-à-vis the Founder remains entirely unclear. Merely being a party to proceedings cannot constitute a conflict of interest here, especially since, by the will of the Foundation, Piotr Zak is to remain in operational management. The current court dispute concerns control and influence rights over the Foundation; the fact that the Founder is the sole Beneficiary is undisputed and established. The Founder therefore—being currently the sole Beneficiary—has an inherent personal interest in the sound existence and continued success of the Foundation, whereas the Children's beneficiary status is disputed and at least uncertain.

- There was no "status quo injunction" in September 2024, and the Founder has never violated any

---

[36] as amended November 29, 2023 or September 24, 2024.

[37] as of August 2, 2024.

[38] But incorrectly assumed in point A.1.

[39] 06 HG.2024.133 and 06 HG.2024.210.

interim injunction.[40]

53  These factually incorrect assumptions, present already in the opening sections, run like a red thread throughout the entire reasoning of the resolution (as will be shown below in detail). It is evident that this lengthy justification merely serves to create the appearance that the Foundation Board conducted serious and fact-based "*consideration*."

54  That was by no means the case. Rather, it was simply the next—and so far the most far-reaching—act in a long-planned strategy of disempowerment.

55  The inaccuracies can easily be demonstrated elsewhere as well, without even delving deeply into the matter: if specific (permanent) conflicts of interest between the Founder and the Foundation had actually existed, or if the Founder had in fact violated the official order of October 26, 2024, it would have been the task of the Foundation Board to petition the courts and, if necessary, to seek Mr. Solorz's judicial removal or request enforcement proceedings against him. However, it is not the task nor within the competence of the Foundation Board to exclude the Curator from participation in the Foundation Board's decision-making in the form of self-help or to remove him from all underlying companies. The fact that the Foundation Board deliberately avoided the proper judicial path and instead simply created faits accomplis through self-help shows that its alleged "conflicts of interest" rest on nothing but empty assertions.

56  Since the Curator is still to be excluded from participation in decision-making and cut off from all information—despite being removed from the underlying companies—this shows that the Foundation Board relies on a Janus-faced line of reasoning: either the Founder is excluded from decision-making as Curator, in which case there would be no reason to remove him from the underlying companies (if Piotr Zak remains there); or the Founder is excluded from the underlying companies, in which case there would be no reason to negate his Curator's rights. The fact that the Founder is in reality to be removed from both positions shows that this is purely about disempowerment—and by no means about any genuine conflicts of interest. Nor has any urgency been alleged that could justify an immediate exclusion (and thus also the exclusion of possible judicial review).

57  The remaining assertions or assumptions of the Foundation Board ("consideration"), intended to create the appearance that a fact-based decision-making process took place, are likewise false:

**a)  No improper or impermissible sale of the Foundation's assets**

58  The reasoning of the Foundation Board resolution seeks to convey the false impression that the Founder exerted a controlling "influence" over the management and supervisory boards of the subsidiaries—an influence allegedly extending even beyond his official positions—so far as to have improperly sold assets worth millions. The fact that (once again) no evidence whatsoever is provided for this is, given the Guardian's practice of simply creating faits accomplis, now almost to be expected; this does not, however, make the claim any less untrue.

---

[40] But incorrectly assumed in point B.c.15.

59   It must first be noted that these transactions, which have been alluded to, were <u>by no means secret</u>. Some of them were even reported in the media, and some were explicitly brought to the Guardian's attention. Furthermore, Tomasz Szelag, who signed the Foundation Board resolution and was himself a member of the Foundation Board, was fully informed about all the transactions referred to—meaning that the Foundation, too, must have had full knowledge of them.

60   **Moreover, the Foundation Board has not even claimed—nor would it be correct—that a single one of these transactions was detrimental to the Foundation or that any assets were diverted to the Founder.**

**–   Sale of Asseco Poland S.A.**

61   The assertion that the Foundation had no knowledge of the Asseco Poland S.A. transaction is false. Tomasz Szelag, as a member of the Foundation Board, had complete knowledge of this transaction. The transaction had in fact been under discussion since September 18, <u>2023</u>. Tomasz Szelag knows and knew the facts concerning the background of the pricing of the Asseco shares by Cyfrowy Polsat.

62   Furthermore, the second Foundation Board member, Dr. Peter Schierscher, was also fully informed about the transaction. He was briefed on the urgent background during his stay in Warsaw.

63   The Guardian was also provided with a detailed explanation of the circumstances surrounding the Asseco transaction. Because of interventions at the financing banks, the corporate group was in serious danger of becoming insolvent. The Asseco transaction ensured the liquidity necessary to continue business operations. The Guardian had previously acknowledged this and expressed the view that the Asseco transaction had been necessary in the interest and for the continued operation of the corporate group.

64   In light of this information, there can be no question that the Foundation lacked knowledge or information about the sale of the Asseco shares.

65   The sale of the Asseco shares was also publicly reported. It was therefore by no means the case that any assets of the Foundation were sold "in secret" or to its detriment. No specific allegation or damage is asserted—only a vague, nebulous accusation.

66   The Asseco transaction therefore serves merely as a pretext to push the Founder—disliked by the Children—out of the corporate group he built.

Evidence:    –   Witness statements of Tomasz Szelag and Peter Schierscher
             –   Reports on the Asseco transaction at "Grupa Polsat Plus" (Exhibit ./K)

**–   Sale of assets of the ZE PAK Group**

67   The sale of assets of the ZE PAK Group does not concern the corporate group held by the TiVi Foundation but relates to the Solkomtel Foundation. That alone shows that the Foundation Board

conducted no serious or differentiated deliberations, but simply sought to "oust" the Founder at any cost.

68    Regardless of that, it is again _incorrect_ to claim that the Solkomtel Foundation was not informed about this transaction. There is documented evidence suggesting that an outright falsehood was recorded in writing for evidentiary purposes.

69    On March 14, 2025, a member of the company's management board, Mr. Andrzej Janiszowski, contacted the Guardian and forwarded several documents concerning emerging financing gaps. This written report followed at the Guardian's request during a meeting held on March 5, 2025, with Mr. Janiszowski (and other managers) at ZE PAK's headquarters in Konin, in which the urgent need to obtain financing for the CCGT project and other related options were discussed. Following that meeting, Mr. Janiszowski, as noted, sent the Guardian the above-mentioned correspondence, including a summary of the key points relating to efforts to secure financing for the CCGT gas project.

70    The memorandum thus transmitted contained important information on the project's economic viability as well as the rationale for signing a term-sheet agreement with PGE regarding the possible sale of the investment. The supplementary document was a brief legal opinion prepared by the law firm SKS, which advised ZE PAK on negotiating the EPC contract with the consortium led by Siemens.

71    The document detailed the consequences of ZE PAK's suspension of payments for the construction work performed by the consortium. In his correspondence, Mr. Janiszowski expressly requested the Guardian to make the documents attached to the correspondence available to the other members of the Foundation Board. He also asked for the opportunity to discuss these documents after their review, either in a direct meeting or via an appropriate videoconference with the Foundation Board. He emphasized that it was _crucial for all Foundation Board members to fully understand the critical situation of the project and the need for measures to protect both the project and ZE PAK from significant financial losses due to lack of financing for its continuation or sale to PGE. "_

72    In light of this correspondence and the circumstances, it cannot seriously be claimed that the Solkomtel Foundation—which is being cited here as a basis for the Founder's removal from the subsidiaries of TiVi Foundation—had no knowledge of this transaction. The statement contained in the reasoning of the resolution is also untrue because Tomasz Szelag has been a member of the Supervisory Board of ZE PAK since October 4, 2016, and therefore must have had complete knowledge of the transaction.

73    Moreover, the management board of ZE PAK replied on July 11, 2025, to the letter from Solkomtel Foundation dated June 24, 2025, in which Solkomtel had requested information and documentation regarding this transaction. This, too, confirms that the Solkomtel Foundation was aware of it.

74    In addition, ZE PAK published information about the transaction and related details in accordance

16

with its disclosure obligations under the MAR Regulation. For this reason as well, it cannot be claimed that the Solkomtel Foundation (which, in any event, is not even the subject of the present challenged resolution) had no knowledge of the transaction—since it had been publicly reported from at least January 2025 onward.

75    Finally, the Foundation Board has neither claimed—nor would it be correct—that this transaction caused any disadvantage to the Solkomtel Foundation. On the contrary, reports show that the transaction contributed to a (significant) increase in the value of the ZE PAK shares.

76    **The Foundation (specifically the Solkomtel Foundation, which is not even the subject of the present challenged resolution but is being used as "justification" for the removal of TiVi's subsidiaries) was demonstrably informed of every step of this transaction. Moreover, as of March 5, 2025, the Guardian himself maintained that every possible measure connected with this project should be taken to mitigate the risk of loss of value.**

<u>Evidence:</u>

–    Witness statement of Tomasz Szelag
–    Witness statement of Peter Schierscher
–    Testimony of Andrzej Janiszowski (serviceable address to be provided)
–    Reports on the ZE PAK transaction Nos. 2, 3, and 13/2025 (Exhibit ./L)
–    Reports on the increase in value of ZE PAK shares from Business Insider (Exhibit ./M)
–    Email from Mr. Andrzej Janiszowski dated March 14, 2025 (Exhibit ./N)

–    **Acquisition of Archiplex sp. z o.o.**

77    The claim by the Foundation Board members that the Foundation had no knowledge of the acquisition of Archiplex sp. z o.o. is an **<u>outright falsehood</u>**.

78    Examination of the circular resolution of the company's Supervisory Board dated June 19, 2024, shows **the signatures of (i) Piotr Zak, (ii) Tobias Solorz, (iii) Jaroslaw Grzesiak, and (iv) Tomasz Szelag.**

17

79  **This conduct is <u>outrageous</u> and vividly exposes the true face behind this challenged Foundation Board resolution: through dishonest means and false statements, efforts are made to piece together supposed "justifications" intended to cloak the removal of the creator of the corporate group with a veneer of "reasoning" or "lawfulness."**

80  Quite apart from that, the <u>acquisition</u> of (participating) companies cannot, in and of itself, constitute a violation of any interim injunction that did not prohibit such an acquisition. Furthermore, even here the Foundation Board does not claim—nor would it be true—that this acquisition, which is entirely unremarkable within a corporate group of more than 100 companies, was detrimental to the Foundation. Those who signed the resolution removing the Supervisory Board and who raise this accusation were therefore fully informed about it. The statement cited in the resolution is therefore legally irrelevant and factually an outright falsehood.

Evidence:    –    Circular resolution of Cyfrowy Polsat S.A. dated June 19, 2024, concerning the acquisition of Archiplex sp. z o.o. (Exhibit ./O)

–    Witness statement of Tomasz Szelag

–    Witness statement of Jaroslaw Grzesiak

–    **Sale of assets of EMBUD 2 sp. z o.o. S.K.A.**

81  The sale of the assets of EMBUD 2 sp. z o.o. S.K.A. (hereinafter: **"EMBUD 2"**) again does not concern the TiVi Foundation, but the corporate group of the Solkomtel Foundation. Therefore, what has already been stated above regarding ZE PAK applies here as well. It is incomprehensible why the Founder should be removed from the corporate group of the TiVi Foundation because the Foundation Board of the Solkomtel Foundation was allegedly not informed about some

transaction.

82    Moreover, this transaction was not even remotely detrimental to the Foundation: EMBUD 2 held shares in Modivo S.A. These shares were sold. This represented a one-time opportunity for EMBUD 2 to realize a gain because, on the one hand, it obtained an above-average price through the exercise of option rights, and on the other hand, it also recovered the capital it had invested. Had EMBUD 2 not carried out this transaction, it would have had to organize its exit from this investment on its own, incurring the very real risk of not recovering all invested funds.

83    The transaction effectively guaranteed a return on capital of at least 10% per year (calculated on the basis of the original investment of PLN 500 million). Through the sale of the Modivo shares, EMBUD 2 has already received PLN 615 million (≈ EUR 116 million). As a result, EMBUD 2 made approximately PLN 115 million (≈ EUR 26.8 million) profit compared with the original investment by Cyfrowy Polsat S.A., or a profit of PLN 15 million (≈ EUR 3.5 million) compared with the transfer price of PLN 600 million between Cyfrowy Polsat and EMBUD 2.

84    Once again, it becomes apparent that the Foundation Board resolution is an almost desperate attempt to present ostensible "reasons" which, upon closer examination, prove baseless.

Evidence:    –    Witness statement of Tomasz Szelag

             –    Testimony of Janusz Pliszka, to be presented by the Founder

–    **Result: the Foundation Board was informed of all relevant transactions or could have informed itself**

85    From the foregoing it follows that the transactions set out at length in the Foundation Board resolution were indeed carried out in coordination with the Foundation Board, and in any event Tomasz Szelag, as a member of the Foundation Board, was <u>fully</u> informed about them. It is also apparent that, at the time, the Foundation Board did not take any closer interest in them. The Foundation Board (the Guardian) does not even claim to have sent any instruction or information notice to the underlying subsidiaries stating that it wished to be informed of all transactions—even those clearly and predominantly advantageous to the endowment assets.

86    Nor does the Foundation Board resolution allege that the Founder obtained any pecuniary advantage from any transaction—apart from his status as Beneficiary of the Foundation. <u>The Foundation Board must therefore know precisely that it was informed of all underlying transactions and, in particular, that these were undertaken clearly and predominantly for the benefit of the Foundation to finance the corporate group.</u>

87    In the clear light of day, the Foundation Board is attempting to cobble together a semblance of impermissible "influence" by the Founder from a collection of corporate events that are neither unusual nor disadvantageous. This is false and incorrect, and the Foundation Board must also know this precisely.

b)    **Incorrect application of the Persons and Companies Act**

19

645

88    In its considerations, the Foundation Board relies, inter alia, on Article 186(1) of the Persons and Companies Act. This provision requires that, in the *"conclusion of legal transactions of the legal entity in which a member of the management is interested, such as in concluding legal transactions with oneself, [...] this [member] may not participate by operation of law, except in cases of urgency."* "

89    In the present case, the Foundation Board did not intend to conclude any legal transaction with the Founder; rather, it intended to <u>remove the Founder from the supervisory board in (grand)subsidiaries</u>. This has nothing to do with the "conclusion of legal transactions of the legal entity" with the member concerned. The Foundation expressly did not wish to conclude a legal transaction with the Founder. Moreover, under the wording of the provision, it is undisputed that Article 186 of the Persons and Companies Act does not apply to foundations.

90    No particular urgency is even alleged in the resolution. A prior consultation with the Founder (also provided for in the Statutes) would therefore have been both possible and required. The mere fact of a (purported) potential conflict between Curator and Foundation likewise does not mean that the Founder must relinquish his rights guaranteed by the Statutes in the subsidiaries. Similarly, the cited Article 552 Section 9(2) of the Persons and Companies Act, which provides for the suspension or restriction of access to information, does not provide for any such right of the Foundation (nor any such duty of the Founder). Statutory provisions are simply being cited to maintain the false appearance that serious deliberations or considerations played a role here.

91    The resolution contains no comprehensible statement of reasons for removing the Founder from his office as Chairman of the Supervisory Board of Telewizja Polsat sp. z o.o. ("**Telewizja Polsat**"), Cyfrowy Polsat S.A. ("**Cyfrowy Polsat**"), and Polkomtel sp. z o.o. ("**Polkomtel**"). That the Foundation Board did not examine in any detail the grounds for the Founder's removal from <u>corporate office</u> is also evident from the fact that <u>no reasons whatsoever were given for the removal of Mirosław Błaszczyk</u>. The objective is therefore clearly identified: the disempowerment of the Founder without any factual or legal basis.

<u>Evidence:</u>    –    Foundation Board resolution of July 21, 2025 concerning Cyfrowy Poslat S.A. and Foundation Board declaration of July 21, 2025 regarding the removal of the Founder and Mr. Mirosław Marian Blaszczyk, as well as the appointment of two other persons in Cyfrowy Poslat S.A. (Exhibit ./I)
    –    Foundation Board resolutions of July 21, 2025 concerning (i) Telewizja Polsat Sp. z o.o., (ii) Netia S.A., and (iii) Polkomtel Sp. z o.o., and Foundation Board declaration of July 21, 2025 regarding the removal of the Founder in Polkomtel Sp. z o.o. and Telewizja Polsat Sp. z o.o. and the appointment of another person in Telewizja Polsat Sp. z o.o. (Exhibit ./J)

**c)    No violation by the Founder of interim injunctions; no (impermissible) "weakening" of the Foundation's position in its subsidiaries**

92    The Foundation Board resolution falsely asserts that the Founder took *"various steps"* to weaken the Foundation's position with respect to the appointment of the management board chair of the companies held by the Foundation. It further alleges that the Founder violated "various interim

injunctions issued both by the Princely Court of Justice and by the Cypriot district court."[41]

93  <u>Which</u> violation is supposed to lie in <u>which specific act</u> is, of course, left unaddressed (because there was none). While the Guardian who signed this resolution violated enforceable protective orders (and the Founder rightly applied for enforcement proceedings against him), he is in no way able to specify any such alleged misconduct by the Founder. In short: there was no violation by the Founder of any interim injunction. Even if there had been, it would have been the Foundation's task to seek judicial relief to prevent violations; at the latest then it would have become apparent that, aside from empty buzzwords, not even a single violation can be alleged.

94  In Section B, under item (a), the Foundation Board asserts that the Founder acted to the detriment of the Foundation, in that amendments were made to the Statutes of subsidiaries.

95    It is fundamentally unclear what the Founder is supposed to have had to do with convening general meetings (among other things) to amend articles of association, or what precise accusation is to be made against him on that basis. Whether the intended amendments are disadvantageous to the Foundation is legally disputed (as the Guardian, moreover, states in his submission in file no. 06 HG.2024.133). In any case, the fact is that the amendment of the Statutes was adopted unanimously by all shareholders and was not subsequently challenged. Piotr Zak rather refused, in breach of duty, to provide the necessary cooperation for the registration of the amendments in the commercial register.

96    Moreover, the assumptions of the Foundation Board members in the resolution are also incorrect:

- **There is no veto right of the management board chairman ("President").[42]**

- **There is no subordination of the management board to the supervisory board and no power of instruction by the Foundation over the management board; the change then made or intended to the basic rule of corporate governance does not—and did not— alter this basic rule.[43]**

---

[41] See Section B I of the Foundation Board resolution.

[42] With respect to the Polsat management board, the Foundation has a personal right limited exclusively to the appointment and removal of the management board chair; this right <u>does not</u> include any right of the Foundation to veto the company's management in any way. The statements contained in the challenged board resolution, however, lead to the false thesis that the Foundation has an alleged veto right consisting in arbitrarily blocking all activities relating to the company's representation via the chair subordinated to it. <u>No</u> such right arises from the Articles of Association. (cf. Exhibit ./P).

[43] When adopting resolutions of the management board of Telewizja Polsat, the Articles of Association do not grant the chair any substantive rights. First, the assertions that the chair has a veto right with respect to the company's affairs are incorrect— such a veto would have to be expressly provided in the Articles of Association. There is no provision whereby a management board resolution would not be adopted on the basis of a unilateral decision of the chair.

The sole guideline for the conduct of a member of the management board of a limited liability company is the company's interest—not the interest of the board member or of the entity that entrusted him with that office—and the duty of loyalty to the company. The Articles of Association therefore contain no provision that would authorize the management board or any of its members (including the chair) to act in the interest of any entity other than Telewizja Polsat itself. Nor do the Articles of Association contain any provision that the company's management board shall act in the interest of or at the request of the Foundation. Polish corporate law precludes any interpretation of the Articles of Association whereby the company's management board chair could refuse the company's representation based on the Foundation's interests. Polish law likewise precludes any restriction of the principle of loyalty of management board members to the company. Moreover, members of the management board are obliged to abstain from adopting resolutions on matters that could bring their particular interests

97    While only a few weeks ago, in his submission concerning his removal, the Guardian stated that
the (alleged) restriction of the rights of the TiVi Foundation is disputed by the Founder, and he
himself submitted the memorandum supporting this legal position, the Foundation Board resolution
does not explain at all why the Board (apparently) wishes to rely exclusively on the statement by
the Children's counsel (Clifford Chance) and Prof. Opalski.

98    Once again: what any of this has concretely to do with the Founder—or wherein the personal
accusation against him is supposed to lie that must result in his (statutorily unlawful) removal—
remains unaddressed by the Foundation Board.

99    **The upshot is that every event of the past months from which the Foundation (potentially)
feels disadvantaged is indiscriminately attributed to the Founder, and arbitrary grounds for
removal are constructed therefrom—regardless of whether the matter was within the
Founder's responsibility.**

Evidence:    –    Letter from Dr. Pitkowitz dated April 29, 2025, with memorandum attached (Exhibit ./P)
        –    Expert opinion to be obtained on Polish corporate law

### d)  Irrelevance of the removal of Katarzyna Tomczuk

100    The Foundation Board resolution states that the Founder asked Ms. Tomczuk to resign from
her position as a member of the Foundation Board. When she refused, she was removed on
September 11, 2024, as a management board member of Polsat Media sp. z o.o. by the
supervisory board consisting of Mr. Solorz, Ms. Justyna Kulka, and Mr. Tomasz Szelag,
without further justification. At the same time, the management level was instructed to
terminate her employment contract, which occurred upon her return from sick leave on June
11, 2025.

101    It is incorrect that Ms. Tomczuk's removal from any subsidiary of the Foundation is causally
connected with any personal disappointment of the Founder regarding her conduct. Apart from
the fact that, once again, Tomasz Szelag—who signed the Foundation Board resolution here—
voted for her removal at the time and now, in the spirit of *venire contra factum proprium*, seeks
to hold against the Founder his own identical vote, it follows from the Foundation Board's own
statements that Ms. Tomczuk was on sick leave for months (in total over half a year). As is
known, Ms. Tomczuk also resigned of her own accord in March 2025—thus during her sick
leave—from her position as a Foundation Board member, so that even an alleged request by
the Founder a few months earlier that she step down would not appear in any questionable
light. Moreover, even a mere "request" by the Founder would not *per se* constitute
reproachable conduct that could be sanctioned by his removal from all other companies.

102    It is particularly telling that the Foundation Board seriously wishes to complain that her removal
was justified merely by an unspecified "conflict of interest," while choosing precisely the same
approach against the Founder.

---

(or the interests of related persons) into conflict with the company's interests. Piotr Zak therefore cannot "represent the
Foundation's interests." (cf. Exhibit ./P).

[103] In short: any vote by the Founder for Ms. Tomczuk's removal from a single position in some subsidiary can never justify the statutorily unlawful removal of the Founder from all companies whose retention is guaranteed to him by the Children's own declarations in the Statutes. These assertions are untrue and concern unrelated events that are merely being forced into a single narrative.

Evidence:    –    Testimony of Justyna Kulka, on behalf of the Founder
             –    Witness statement of Tomasz Szelag, on behalf of the Foundation

### e)  Irrelevance of the removal of Jaroslaw Grzesiak

[104] The Foundation Board resolution states that on September 11, 2024—the same day that Ms. Tomczuk was removed—the Founder and his wife personally approached Mr. Grzesiak and, in essence, threatened that if he did not vote in favor of the removal of Piotr Zak, he would be dismissed from all positions within the corporate group.

[105] The Foundation Board resolution, however, neither specifies from which positions Jaroslaw Grzesiak was actually removed, nor mentions that the removal in Cyfrowy Polsat was not decided by the Founder alone.

[106] When the reasoning further states that the removal of Piotr Zak, Tobias Solorz, and Mr. Grzesiak (as well as the appointment of Ms. Kulka and her "assistants") allegedly weakened the Foundation's influence, the true nature of the Foundation Board resolution becomes evident: the removal of the Founder from all companies constitutes nothing but an act of retaliation, while the Foundation Board now equates the personal interests of Piotr Zak and Tobias Solorz with those of the Foundation as a legal entity.

[107] Under Polish law, the supervisory board must act independently of third parties and loyally toward the company to which it belongs. The assumption contained in the Foundation Board resolution—that the dismissal of Piotr Zak, Tobias Solorz, and Mr. Grzesiak significantly weakened the Foundation's influence and deprived it of the ability to exercise control within the group structure—clearly shows that the Foundation has interfered with the members of the supervisory bodies of the group companies and treated them as its "representatives." Such an assumption directly contradicts Polish corporate law and also violates fundamental economic principles.

[108] **Once again, it becomes apparent that the Foundation Board is no longer capable of distinguishing between the interests of the Foundation and those of the litigating parties. One side of the dispute—namely Piotr Zak and Tobias Solorz—is now being elevated to the status of representing the Foundation's interests. Nothing remains of the "neutrality" originally invoked as the reason for the Guardian's appointment.**

23

<u>Evidence:</u>    –    Testimony of Justyna Kulka, on behalf of the Founder

**f)   The alleged attempts to remove Piotr Zak from his position as CEO of Polsat are due to his own conduct**

[109]    It is documented and can easily be proven through the testimony of numerous witnesses that Piotr Zak has displayed outrageous behavior as CEO of Polsat.

[110]    For instance, on February 8, 2025, during a management meeting, he attempted to influence Tomasz Gillner, one of the authorized representatives within the Polkomtel and Cyfrowy Polsat corporate group (hereinafter also referred to as the **"Manager")**. During this meeting, Piotr Zak behaved as though he were the triumphant successor to the Founder (despite the ongoing court proceedings) and demanded the *"full cooperation"* of the current management teams. Furthermore, he announced *"personnel changes in senior positions"* within the companies and threatened that *"any attempt to obstruct this process would have consequences for those responsible."*

[111]    Another incident occurred on February 17, 2025. Piotr Zak contacted Mr. **Piotr Gaweł,** Vice President of the Management Board of Polsat Media, a subsidiary of Telewizja Polsat (hereinafter also referred to as the **"Management Board").** Piotr Zak asked him whether he was aware that the Founder and his wife, Justyna Kulka, would be getting married in a church ceremony in the coming days. Piotr Zak claimed to have heard that this upcoming ceremony would be conducted by Cardinal Kazimierz Nycz and attended by the Management Board. The Management Board member replied that he had no knowledge of this and was not involved.

[112]    Piotr Zak then asked further whether the Management Board member was aware *"how badly the last hearing for Zygmunt Solorz and Justyna Kulka in Liechtenstein had gone."* He followed this suggestive question with unpleasant remarks about the court hearing, the statements made, and the Founder's condition. <u>Piotr Zak told the Management Board member in this context that he would "**either win or destroy everything."**</u>

[113]    The Management Board member responded cautiously, whereupon Piotr Zak tried to win him over *("I want you to work for me")* and to turn him against the Founder, asking whether he had not been disappointed with the Founder when he was dismissed from Polkomtel. He also attempted to "motivate" him financially by offering a *"very good financial package in the form of a long-term and secure contract."*

[114]    When the Management Board member refused, Piotr Zak again threatened that he would **_"hunt him to the end"_** if it turned out that he had *"helped his father and Justyna Kulka to receive the sacrament of marriage through a church wedding."*

24

650

Evidence:     –    Notarized declaration of Piotr Gaweł dated February 21, 2025 (Exhibit ./BK in 06 HG.2024.210)
              –    Declaration of Tomasz Gillner dated February 27, 2025 (Exhibit ./BL in 06 HG.2024.210)

115    Thus, while Piotr Zak complained <u>in court</u> on February 4, 2025 that he *"wished to resolve the conflict*[44]," was "*very concerned,*"[45] hoped *"that we could be a family again,*"[46] and *"would not allow others to destroy what he had built,*"[47] he revealed his true nature just days later by threatening and intimidating the top management, declaring that <u>he</u> would *"either win*" or "*destroy everything."*

116    The Management Board member stated in his notarized declaration of February 21, 2025, that such behavior by Piotr Zak is intolerable.

117    The Supervisory Board of Polsat is therefore legally obliged to take appropriate measures in the presence of such misconduct. Unlike the Founder, Piotr Zak is evidently unable to prevent the foundation-related dispute from spilling over into the operational corporate group. As a result of these and other incidents, the Management Board of Cyfrowy Polsat S.A. contacted the Guardian:

118    By <u>email dated May 2, 2025, at 11:12 a.m.</u>, the Management Board of Cyfrowy Polsat S.A. sent a letter to the Guardian. The letter addressed the corporate duty to protect the interests and value of the entire capital group, including all subsidiaries.

119    The Guardian was informed that, in the course of a group-wide management review initiated by the Supervisory Board, serious misconduct by Mr. Piotr Zak had come to light. The misconduct was described in detail in the letter, and several documents were attached as evidence.[48] These materials demonstrated that Mr. Piotr Zak had violated Polish law, the company's internal policies, and other statutory provisions, and that he must be held accountable (also in the interest of the Foundation as a shareholder). Moreover, his conduct caused significant reputational risk to TV Polsat and the entire group.

120    In <u>the Foundation's response letter of the same date (May 2, 2025)</u>, the Guardian and Jaroslaw Grzesiak, on behalf of the Foundation, stated that the allegations "should be taken seriously," but expressed concern that the investigation procedure should "comply with international standards." They requested the cancellation or postponement of the upcoming TV Polsat general meeting on this topic and proposed the following (freely translated):

> "<u>We</u> [the Foundation Board] <u>*propose the establishment of an internal commission*</u> *to conduct an internal investigation. The Foundation and Cyfrowy Polsat will each appoint members with appropriate experience and qualifications. The task of the commission*

---

[44] Cf. the statement of Piotr Zak in the minutes (ON 22) of February 4, 2025, p. 11 bottom.
[45] Cf. the statement of Piotr Zak in the minutes (ON 22) of February 4, 2025, p. 11 bottom.
[46] Cf. the statement of Piotr Zak in the minutes (ON 22) of February 4, 2025, p. 11 bottom.
[47] Cf. the statement of Piotr Zak in the minutes (ON 22) of February 4, 2025, p. 11 bottom.
[48] Declaration of Piotr Gaweł, Tomasz Gillner, and Edward Miszczak, as well as two legal opinions that analyze these and call for consequences.

*will be to prepare a report for review by the Foundation and Cyfrowy Polsat before a corresponding resolution is voted on by Telewizja Polsat ESM." "*

121    In a letter dated May 5, 2025, Cyfrowy Polsat welcomed the idea of an investigative commission. It stated that the initiated procedure, involving two independent neutral experts, was "state-of-the-art," and addressed the concerns raised by the Guardian and Jaroslaw Grzesiak in their letter of May 2, 2025 (to the extent these were sufficiently specific to respond to). Cyfrowy Polsat also asked the Guardian and Jaroslaw Grzesiak to provide details regarding the commission they themselves had proposed on May 2, 2025, and listed a number of questions that should be answered for that purpose. However, by June 10, 2025, Cyfrowy Polsat had not received any substantive response from the Foundation.

122    In an email dated May 15, 2025, the Guardian informed that the Foundation Board meeting scheduled for May 15, 2025, at which the May 5, 2025 letter from Cyfrowy Polsat was to be discussed, had been cancelled. The Guardian requested that the shareholders' meeting be postponed until the Foundation Board had made its decision on establishing the commission.

123    Subsequently, further shareholders' meetings of TV Polsat took place, most recently postponed to Tuesday, June 17, 2025, at 9:30 a.m.

124    To avoid further delays, the Guardian was again urged at the beginning of June to finally take action: in a subsequent letter dated June 10, 2025, Cyfrowy Polsat stated that, to prevent further delays, the proposal of the Guardian and Jaroslaw Grzesiak would be accepted—an investigative commission should be established to examine the allegations against Piotr Zak. Until then, the decision on the consequences to be drawn by the shareholders from Mr. Piotr Zak's conduct would be postponed.

125    Since the matter had remained "pending" for over a month, Cyfrowy Polsat urged the Guardian to act so that a corresponding report could be presented by June 30, 2025. The planned structure and mandate of the commission were attached. The Foundation Board was asked to designate a representative of the Foundation for the commission so that it could be established without delay. Should the Foundation fail to appoint a representative or continue to delay the process, it was announced that, due to urgency, the investigative commission would proceed without a representative appointed by the TiVi Foundation.

126    However, the Foundation (the Guardian and Jaroslaw Grzesiak) did not wish to establish such an investigative commission. Instead, by letter of June 13, 2025, it informed Cyfrowy Polsat essentially that the Foundation rejected the company's proposal to participate in the committee in the proposed form and, in particular, would not designate a member for the committee (as recommended by Cyfrowy Polsat). The Foundation plainly intended to delay the matter further.

127    Cyfrowy Polsat was surprised by this conduct of the Foundation, which was largely orchestrated by Jaroslaw Grzesiak. In a letter dated June 19, 2025, it expressed its incomprehension that the Foundation would not participate in the commission as proposed, but would instead allow itself to be guided by Jaroslaw Grzesiak—i.e., a person who, among

26

other things, not only represents Piotr Żak within the Foundation but also pursues his interests. The Foundation's apparent intention was not to clarify the actual misconduct involving Piotr Zak that occurred at Telewizja Polsat (and the evidence for which had been known to the Foundation for months) and to take appropriate remedial measures, but rather to obfuscate the matter.

128    It did so by clearly prolonging the adoption of necessary measures, formulating further unjustified procedural demands, and gradually expanding the scope of the investigation to areas that had never been the subject of any complaints by anyone.

129    It was thus plainly intended by the Foundation (Jaroslaw Grzesiak and the Guardian) not to "investigate" the conduct of Piotr Zak about which the company complained, but rather to make "other cases," for which there were no complaints at all, the subject of the commission. In retrospect, this was an obvious attempt to seize upon Piotr Zak's misconduct as a pretext to "search for" alleged (never the subject of any complaint) "misconduct" by the Founder.

130    **The Foundation—which by that time clearly exhibited a bias in favor of the Children— had no interest whatsoever in clarifying Piotr Zak's material misconduct.**

131    That the Foundation is now pursuing solely the interests of Piotr Zak or the Children, while sweeping Piotr Zak's misconduct under the rug, is evident from another angle as well: at Cyfrowy Polsat's general meeting on June 26, 2025, the Foundation supported the discharge of all members of the management board and the supervisory board for the year 2024 and raised no motions or objections to the approved annual financial statements concerning the company's activities or the company's supervisory board.

132    Both Zygmunt Solorz and Mirosław Błaszczyk were granted discharge for 2024. This means that the Foundation had no doubts or comments regarding the actions of these persons— actions which it now seeks to reproach them with. The discharge, and especially the vote "in favor" of discharge, thus signifies approval of the actions of the members of the governing bodies in 2024, including those relating to changes in the governing bodies of the group companies, and releases those persons from any liability for those actions. The Foundation Board's desire to rely on these (allegedly impermissible) actions—actions for which it had just granted discharge—shows that this is purely about retaliation against the Founder (and not about safeguarding the Foundation's interests).

133    In addition, the alleged attempts to remove Piotr Zak from his position as CEO of Polsat were never put to a vote; the corresponding assertions are therefore entirely untrue. It should again be noted that the Foundation misunderstands Polish corporate law: the function of a member of the management board of a particular group company obliges that person to be loyal to that company (and not to the Foundation). Once again, the Foundation incorrectly equates the exercise of a function with the exercise of control by the Foundation.

134    Even if one were to set all these inaccuracies aside: why Piotr Zak should be beyond all conflicts of interest and able to exercise only the Foundation's interests in the operating

companies, while "conflicts of interest" on the part of the Founder are supposed to lead to his removal from all supervisory board positions, remains the Foundation Board's secret. Again: this is only about the Children's interests, not the objective corporate interests of the Foundation.

Evidence:

- – Letter from Cyfrowy Polsat dated May 2, 2025 (Exhibit ./T)
- – Letter from the Guardian and Jaroslaw Grzesiak dated May 2, 2025 (Exhibit ./U)
- – Letter from Cyfrowy Polsat dated May 5, 2025 (Exhibit ./V)
- – Letter from Cyfrowy Polsat dated June 10, 2025 (Exhibit ./W)
- – Letter from the Guardian and Jaroslaw Grzesiak dated June 13, 2025 (Exhibit ./X)
- – Letter from Cyfrowy Polsat dated June 19, 2025 (Exhibit ./Y)

### g) No attempt by the Founder to block the appointment of independent directors of Cypriot companies

135    Stasalco Limited, Karswell Limited, and WBN Holding Limited constitute the principal assets of the Solkomtel Foundation, not of the TiVi Foundation. Yet again, asset and interest spheres are simply blended and mixed to suit the Foundation Board members' arguments.

136    The Foundation Board resolution (freely translated) states the following: *the boards of the Foundation decided to appoint independent members to the boards of the Cypriot companies (i.e., Reddev, Stasalco Ltd, Karswell Ltd, and WBN Holding Ltd) in order to protect their interests (and those of the Foundation).*

137    However, no objective reason was given as to why appointments to the boards of the Cypriot companies by the TiVi Foundation were necessary to protect the interests of those companies and **the interests of the TiVi Foundation**, since three of these companies are not subsidiaries of the TiVi Foundation but of the Solkomtel Foundation. That fact alone shows that "off-the-shelf" arguments were cobbled together to preserve the appearance of orderly decision-making.

138    Nor was it explained in the slightest why the changes should apply precisely to the four companies mentioned. The (notorious[49]) attempt by the Guardian and Jaroslaw Grzesiak to appoint additional directors of Reddev Investments Ltd is no coincidence—it is the most valuable subsidiary of the TiVi Foundation, through which the Foundation holds shares in Cyfrowy Polsat. The attempt to change the director thus does not serve the Foundation but the takeover of control over Cyfrowy Polsat.

139    The fact that not a single word could even suggest why the two additional directors proposed by Jaroslaw Grzesiak were supposed to be "independent" shows that the aim at the time was not "independent" directors, but those who would implement the Children's will (or at least—equally contrary to corporate norms—the will of the Foundation Board) without question. The

---

[49] Cf. 09 NE.2025.3 and 08 EX.2025.1715; with respect to the "sister foundation," the Solkomtel Foundation, also 15 NE.2025.4 and 08 EX.2025.1715, as well as 05 NE.2025.6.

corresponding statements in the Foundation Board resolution are therefore incorrect.

140    Finally, this labored (untenable) argument that the Founder "blocked" the appointment of additional directors—and that this constitutes a ground for removal—falls on its face for a simple reason: resorting to judicial and administrative assistance (apart from rare cases of frivolousness) can never *per se* constitute a reason justifying removal from all companies. This argument in the Foundation Board resolution thus collapses as well, unless one wishes to deny the Founder the use of legal means of redress and defense required by the rule of law.

Evidence:    –    as previously submitted

### h) Alleged violations during the general meetings of Polish companies

141    Under item (f) of the Foundation Board resolution, an extensive account is given of purported deficiencies in the conduct of general meetings (annual general meetings) of the subsidiaries.

142    At bottom, the Foundation complains that its "instructions" passed on to the subsidiaries were not followed ("*issued clear and specific voting instructions to various companies in connection with their respective Annual General Meetings [...] These instructions were systematically disregarded by representatives of CP, thereby undermining the corporate governance framework of the group. This conduct constitutes a deliberate and hostile act against TiVi's expressly stated interests.*").

143    On this point as well, the entire Foundation Board resolution rests on the incorrect premise that the Foundation can issue legally binding instructions to the underlying companies.

144    From the perspective of Polish law, there is no basis for members of the management boards of companies to be bound by instructions from the Foundation in connection with general meetings. On the contrary, the provisions of Polish law state that the management board is not bound by instructions from the general meeting or the supervisory board—and certainly not by instructions from a shareholder holding a one-per-mille stake.

145    Polish companies are therefore not bound by the Foundation's instructions; the possibility of issuing such instructions arises solely from the Articles of Association of the TiVi Foundation, which are in no way binding on Polish companies. To the contrary: Polish companies may not accept instructions from the Foundation regarding the management of the company, including the exercise of voting rights attached to interests in subsidiaries. Rather, the management board must decide, taking into account the autonomous interests of its company and after taking the measures provided for in the Articles of Association, how it will vote at meetings of subsidiaries.

146    The Articles of Association of the TiVi Foundation are binding on the Foundation and the Foundation Board, but not on the companies in its group and their organs.

147    Nor did the management boards of the underlying companies act "blindly" or rely merely on vague information: in connection with receiving instructions from the Foundation, there was

29

active exchange with the Foundation Board, and legal opinions were obtained to determine—taking into account the instructions received—the safest and most advantageous course of action for Cyfrowy Polsat.

148    The opinions of the law firms make it clear that there are no legal or contractual grounds obliging Cyfrowy Polsat to comply with the instructions in question. For this reason, Cyfrowy Polsat decided to make no changes to the voting instructions for the general meeting of Telewizja Polsat, the general meeting of Polkomtel, and the general meeting of Netia S.A., which had been adopted by Cyfrowy Polsat's management board and agreed with the company's supervisory board in accordance with the company's applicable regulations.

149    The Foundation Board resolution alleges that, during *the general meeting, Cyfrowy Polsat voted against the appointment of Mr. Tadeusz Komosa as chairman and proposed Mr. Jerzy Modrzejewski, a known ally of Mr. Solorz, as candidate for chairman of the general meeting and voted for his election—contrary to TiVi's explicit demand that the general meeting be chaired by* an independent person.

150    What is entirely ignored, however, is that the Foundation's "preferred candidate"—<u>Tadeusz Komosa</u>—<u>does not meet the statutory independence criterion</u> because he is a <u>partner at the law firm Andersen</u>, in which <u>Jarosław Kotkowski</u>—who is subject to a conflict of interest—is also a partner. This Andersen partner, Mr. Jarosław Kotkowski, worked between 2000 and 2016—i.e., for 16 years—on the closest team of Paweł Rymarz, the Polish attorney of Tobias Solorz, and was his closest associate there. He therefore has plainly the closest ties to the Children's Polish counsel and is thus likewise highly conflicted, such that Tadeusz Komosa cannot be regarded in this matter as acting "independently" in the interest of the Foundation.

151    It is, however, telling that the Foundation wishes to impose requirements on others that it cannot itself meet with respect to its own "preferred candidates." In effect, the Foundation seeks to introduce an asymmetric concept of independence, so that these arguments (here as elsewhere) amount to pure double standards. It must therefore be noted that the Foundation Board is not guided by the welfare of the Foundation or the companies of the group, but is merely attempting, by this approach, to take sides with one party to the dispute.

152    The fact that Jerzy Modrzejewski was elected through a voting procedure and enjoyed the confidence of the majority of shareholders who voted for the resolution on his election as chairman has nothing to do with any ground for removing the Founder. The fact that the Foundation, as a shareholder with a one-per-mille stake, disagrees with this election has no impact on the validity and effectiveness of the resolution and likewise does not constitute a ground for removing the Founder.

153    Moreover, it should be noted that the fact cited by the Foundation concerning the interruption of the internet connection in connection with the general meeting—that there were no disruptions in Cyfrowy Polsat's customer service—does not mean that there were no local problems with configuration of the transmission or access to technical resources in the meeting room. A data center and a fiber-optic infrastructure are not automatically a guarantee of

656

transmission availability in every situation.

154    In sum, the broadly alleged events surrounding the annual or general meetings of the subsidiaries cannot, in and of themselves, provide any grounds to remove the Founder from all positions—especially since the course of action desired by the Foundation, namely to issue *"voting instructions"* to the underlying companies, would have clearly violated Polish corporate law.

Evidence:    –    Minutes of the general meeting (to be submitted)

i)    **Alleged refusal to register members of the Foundation Board as beneficial owners of companies and failure to correct the entry in the VwBPG**

155    In brief, on p. 10 (bottom) and p. 11 of the Foundation Board resolution, the Foundation Board members complain that the underlying companies did not follow the instruction to make correct entries in the register of beneficial owners. The Foundation Board fails to recognize, on the one hand, that it itself neglected to correct the entry in the VwBPG (Register of the Beneficial Owners of Legal Entities), and, on the other hand, that the Polish regulations on disclosure of beneficial owners in the CRBO evidently differ in this respect. The set of persons required to report is different. In Poland, every beneficial owner must be reported, whereas under VwBPG / RBOA those who exercise control are, at first, the persons required to report.

156    Finally, the Foundation Board also seems to overlook that the duty to make entries in the VwBPG rests with the respective governing bodies in the respective countries, and that, as organs of the parent entity, they have no power to issue directives with respect to country-specific due-diligence obligations.

157    Specifically, the following facts occurred:

158    Acceding to the Children's wish to be personally registered as beneficial owners of the Underlyings in the relevant registers, the Guardian circulated new "UBO letters" to the Foundation Board by email on June 3, 2025, at 4:48 p.m., noting that only Tomasz Szelag's signature was still missing. It is thus obvious that there must already have been extensive prior correspondence, particularly with Mr. Grzesiak, who—as the Children's representative on the Foundation Board—had drafted these declarations. The declarations related to subsidiaries, were apparently drafted by Mr. Grzesiak, and had never before been discussed by the Foundation Board.

▪    It was and remains unclear why entirely new UBO declarations for the subsidiaries in Poland and Cyprus were suddenly required, which also differ substantially in content from the previous ones. The legal status of the respective persons had not changed, nor had it changed by the official order of October 26, 2024, which the Foundation Board cites as the reason.

31

- In particular, the instruction and order contained in the declarations directed to the subsidiaries in Cyprus and Poland is inexplicable—namely that "within two (2) business days from the date of this letter a written confirmation [must be] provided that the relevant application has been submitted to the competent register authorities." As already indicated, the aim was to try to ram through this registration initiative for the Children in the registers at the drop of a hat.

- Furthermore, the letter contained directions to the subsidiaries that go far beyond the scope of a mere UBO letter. Instead of merely setting out the situation in Liechtenstein—as would be customary for a UBO letter from the Foundation Board and as has also been done in the past—the new draft contains concrete instructions to a direct or indirect subsidiary of the Foundation <u>to make changes in the national UBO register</u>. In doing so, the Guardian attempted knowingly to exceed the powers of the Foundation Board by—in short—interfering in the national compliance matters of the subsidiaries in order to achieve register entries for the Children, which they evidently very much desired.

159    Tomasz Szelag's legal representative objected, noting that it is the sole responsibility and competence of the managing directors of the individual group companies to ensure that the local UBO register is maintained in accordance with local legal requirements. He also stated that the matter of the UBO letters is an explicit agenda item for the Foundation Board meeting of June 11, 2025, and must therefore be discussed and decided there (and not by circular). Furthermore, Tomasz Szelag's counsel reviewed the entry of the Foundation in Liechtenstein's VwBPG and determined that, even under Liechtenstein law (in the absence of beneficiary entitlement or current discretionary benefit), the Children are[50] not to be registered and that the current entry is therefore incorrect. Accordingly, by email of July 3, 2025, the Guardian was requested on behalf of Tomasz Szelag to correct the entry in the VwBPG.

160    In a 180-degree about-face, Tomasz Szelag—who, on the one hand, had himself concluded under Liechtenstein law that the Children are not to be registered as UBOs and expressly <u>opposed</u> this interference in the national affairs of the subsidiaries—now wishes to invoke this as a reason for removing the Founder from his supervisory positions (?). It is obvious that this is a sham justification.

161    It remains particularly obscure what the (allegedly) incorrect UBO filings are supposed to have to do with the Founder's removal, especially since it should be undisputed that—quite apart from any corporate offices—he does not personally attend to the fulfillment of due diligence

---

[50] Under the relevant statutory provisions of Article 2(1)(b)(4) of the Ordinance on the Act on the Register of Beneficial Owners of Legal Entities, only the "Beneficiaries" are to be indicated in the UBO register. The Ministry of Justice's guidelines on this point make clear that only beneficiaries entitled to benefits are to be named, or, if these do not exist, the discretionary beneficiaries are to be listed in that section as a group of beneficiaries. Merely potential future beneficiaries (<u>expectancy holders,</u> ultimate beneficiaries, etc.), however, are <u>not</u> to be indicated as beneficiaries in the UBO register, as they are clearly neither beneficiaries entitled to benefits nor discretionary beneficiaries. The Children (and also their descendants) are— even if they were to prevail in the main proceedings—neither beneficiaries entitled to benefits nor discretionary beneficiaries in any of the foundations (for a possible future discretionary beneficiary is by definition not a beneficiary within the meaning of foundation law). <u>Their naming in the UBO register therefore does not meet the statutory requirements.</u>

obligations.

162    The fact that the Foundation Board devotes so much space to this "reason"—which could not be further removed from any legitimate ground for removal in the subsidiaries—and that Tomasz Szelag levels against the Founder an accusation he himself defended only a few weeks earlier, shows that the Foundation Board is desperately attempting to preserve some semblance of "considerations" that led to the removal. They do not succeed, because even if the subsidiaries had unlawfully refused to comply with the "instructions" *(quod non),* this is not the Founder's concern.

Evidence:    –    Email from Dr. Niedermüller dated June 3, 2025, 10:25 p.m., together with the Guardian's email of June 3, 2025, 4:48 p.m. (Exhibit ./Q)
    –    Email from Dr. Niedermüller dated July 3, 2025, 12:50 p.m. (Exhibit ./R)
    –    Witness statement of Tomasz Szelag

### j)    The creation of new corporate structures by the Founder likewise cannot justify removal

163    Finally, it remains incomprehensible how the Founder's formation of additional companies is supposed to justify his removal as a supervisory board member. The "reasons" cited by the Foundation Board are limited to reproducing register documents without deriving therefrom any comprehensible justification for a current risk or the like.

164    This is admitted even in the Foundation Board resolution itself, where para. 5 (p. 13 top) repeatedly speaks only of conjectures (arg.: *"[...] may be aimed at [...] which may result in a loss of any control [...] could lose any effective control [...] may have serious [...] implications").* The formation of new companies is neither unusual for a figure like the Founder nor did it arise for the first time in connection with the foundation-law dispute.

165    Quite the contrary: the Founder is the direct and indirect owner of numerous companies, establishments, and comparable structures. As the Founder and chief architect of the Polsat group, over the years—directly or through subsidiaries—he has built hundreds of companies, foundations, and holding structures that formed the basis for his activities in the areas of investment, media, and telecommunications. It should be noted that the Founder also holds assets and investments outside the Liechtenstein foundations.

166    Why the mere formation of companies should now constitute a legitimate ground for removal is neither understandable nor (rightly) explained in the Foundation Board resolution.

### k)    Credit institutions – No actions by the Founder that endangered bank financing

167    The Foundation's allegations that the actions of the Founder and his attorney Radosław Kwaśnicki led to a paralysis of the operations of financial institutions, including banks, are not only incorrect, but also an attempt to distract from the true cause of the problem.

168    The cause of the looming financial predicament lies solely in the conduct of the Children—

particularly their statement of September 23, 2024 to the management and supervisory boards of Cyfrowy Polsat, Netia, Polkomtel, and Telewizja Polsat concerning their relationship with their father—which was the first event to create turmoil and uncertainty among financial institutions.

169    This (utterly useless) statement was an expression of disloyalty toward these companies. As a result of the Children's conduct, there was extensive media coverage and severe damage to the Foundation. The Foundation Board apparently wishes to forget all this.

Evidence:    –    Excerpt from media coverage (Exhibit *.IS)*

170    This affected not only the personal reputation of the Founder but also the reputation of the companies belonging to the two holding companies he established, which was severely damaged. This is confirmed by the drastic decline in Cyfrowy Polsat's share price at the end of September and beginning of October 2024.

171    By removing the Founder—the creator of the corporate group—from <u>all</u> positions, the Foundation Board inflicted severe damage on the Foundation. The share price of the Foundation's most valuable company, Cyfrowy Polsat S.A., plummeted massively.



172    While on Friday, July 18, 2025, the price was still about **EUR 3.74 per share,** it subsequently collapsed significantly. As of July 31, 2025, the share is quoted at only about **EUR 3.39 per share,** representing a **price and value loss of around 9.3%, for which the Foundation Board alone is responsible.**

173    If the conduct of the Children described above—and the associated media frenzy—had already caused significant unrest in the banking sector and among financial institutions, the Foundation Board, with this utterly useless and unjustified action, has further harmed the Foundation. It is nothing short of outrageous: for months, the Founder has repeatedly been accused—without substantiation—of "acting against the interests of the Foundation," with never a concrete allegation to back up this buzzword. Conversely, the Foundation Board, under the direction of the Guardian and Jaroslaw Grzesiak, has caused damage to the Foundation in the millions solely to exact retribution for the Founder's (alleged) use of influence in fall 2024 to remove Piotr Zak and Tobias Solorz.

174    As a result of these media-driven activities—originally launched by the Children and now brought to a new low by the Foundation Board through the removals—interest in the ownership structure increased, which even then led to operational constraints and the need to undertake additional explanatory measures with financial institutions. Owing to the Children's original activities, Cyfrowy Polsat's finance department, inter alia, introduced a regular newsletter for banks under the provisions of the SFA, informing them about the situation in the Polsat group. This report provided, inter alia, information on all circumstances that could potentially lead to changes in the group's ownership structure. That the Foundation Board now wishes to cite the relationship with financing banks—already damaged by media coverage—as a <u>ground for the Founder's removal</u>, thereby further harming that relationship and causing the Foundation millions in losses, is untenable.

175    It was the "leaked" foundation dispute—attributable to the Children—that also affected the companies' relationships with their business partners, who, given the group's situation, requested explanations and assurances regarding the implementation of important projects and the continuation of cooperation.

176    **Not a single act of the Founder—who, as the sole Beneficiary, has a fundamental personal interest in the Foundation's sound progress—has even remotely impaired, let alone damaged, relations with credit institutions.**

177    It is therefore incorrect to claim that a single interview by the Founder's Polish attorney caused the banks of a multi-billion-euro group to get "cold feet." Rather, it is the media campaign launched by the Children (to which the interview was a response) that bears responsibility for the damage in this regard. It is therefore disingenuous—and again reveals the untenable double standards—when the Foundation Board seriously seeks to use a single interview by a Polish attorney as a ground for removing the Founder from all companies, while attaching no significance whatsoever to the conduct of the Children and that of Mr. Grzesiak.

<u>Evidence:</u>    –    Should the price loss and causal link to the removals be disputed, an expert opinion in the field of stock exchange matters will be obtained.

35

661

5    Legal analysis

## a) Procedural matters

178    Against administration and use of assets by the foundation bodies that contravene the foundation purpose, any foundation participant may, pursuant to Article 552 Section 29 of the Persons and Companies Act, apply to the judge in non-contentious proceedings for the ordering of appropriate measures under para. 3 of that provision. By way of example, these include (i) supervision and removal of foundation bodies, (ii) the conduct of special audits, or (iii) annulment of resolutions of foundation bodies.

179    As set out above, Mr. Solorz is simultaneously the Founder, the Curator, and the Primary Beneficiary of the TiVi Foundation and thus is, of course, a foundation participant within the meaning of Article 552 Section 3 of the Persons and Companies Act. Mr. Solorz is therefore unquestionably entitled to bring the present applications, and the Princely Court of Justice, sitting as the supervisory court, has jurisdiction over judicial supervisory matters within the meaning of Article 552 Section 29 of the Persons and Companies Act in non-contentious proceedings.[51]

## b) Challenge of the resolutions

180    That the annulment of Foundation Board resolutions falls within the competence of the non-contentious (i.e., supervisory) judge follows directly from Article 552 Section 29 of the Persons and Companies Act, which explicitly lists "annulment of resolutions of foundation bodies" as a possible supervisory measure. The Princely Supreme Court has also made it unmistakably clear that, in addition, "an application for a declaration of nullity of Foundation Board resolutions is a matter for foundation supervision and thus for non-contentious proceedings."[52]

181    In a doctrinal treatment of the supervisory court's control of resolutions, *Lorenz* essentially argues as follows: since foundations have no supreme body, the challenge regime from the general part of the Persons and Companies Act that applies to supreme bodies cannot, as a doctrinal matter, be applied to foundations. In the technical sense, there are no "challengeable" resolutions of foundation bodies; rather, defective resolutions are **void.** Although resolutions that contravene the law or the Statutes do not have legal force in the case of foundations—and there is therefore no (time-limited) obligation to bring a challenge on pain of preclusion—they do have a factual effect: there is an evident risk of implementation. The nullity of such resolutions does not change the fact that, due to the inherent need for legal protection, they can be attacked within the framework of supervisory proceedings. It is the task of the supervisory court to ensure proper administration and use of foundation assets. Defective

---

[51] See, for example: *Geisselmann,* Die Frage nach dem richtigen Rechtsweg im Kontext des liechtensteinischen Stiftungsrechts, 2022, pp. 46 ff.: "A largely uniform line of case law has been pursued by the OGH since the entry into force of the new foundation law, in that it qualifies the annulment and setting aside of foundation board resolutions as 'subject matter of foundation supervision' […].

cf., for example, OGH 02/05/2016, 05 HG.2015.123, LES 2016, 66.

[52] OGH 07.09.2018, 07 HG.2017.31, LES 4/18, 267.

resolutions jeopardize precisely that objective. From a supervisory standpoint, there is therefore a need to "annul" even void resolutions. Ultimately, judicial supervision is meant to protect the foundation against errant bodies. Strictly speaking, this is not an "annulment" in the technical sense, but the removal of the outward appearance of a valid resolution.[53] Whether the applicant seeks annulment or (more precisely) removal of the outward appearance of a valid resolution is, in any case, immaterial given the low formal requirements of non-contentious proceedings, and the debate may be left there.

182    A Foundation Board resolution adopted in violation of the Statutes must in every case be set aside by the supervisory court. The respective resolutions of the Foundation's Foundation Board dated July 21, 2025, whereby

- the Foundation, invoking the right personally vested in it under the Articles of Association of the respective addressed company, ordered the removal of Mr. Zygmunt Solorz

    i.   in Cyfrowy Poslat S.A.,

    ii.  in Telewizja Polsat Sp. z o.o., and

    iii. in Polkomtel Sp. z o.o.,

    iv.  and also in Netia S.A.,

as Chairman of the Supervisory Board (hereinafter in the singular: the **"Foundation Board Resolution"),** are therefore **null and void** and, in any event, **unlawful and thus contestable.**

– **Nullity due to violation of the Statutes**

183    As shown above, the resolution violates the express provision of Article 13(2)(2)(3)(iii) [54]and (iv)[55] of the Statutes. From the wording that these provisions—benefiting the Founder— *"may not be amended even by the Foundation Board,"* it follows that Foundation Board resolutions that contradict these provisions are null and void.

184    The resolution likewise violates the express provision of Article 13(2)(2)(3)(i) [56]and (ii)[57] of the Statutes. From the wording that, in the event of a change in the posts specified there, *"a prior joint consultation with the Founder is obligatorily required,"* it follows that any resolution that violates this obligatory requirement of consultation with the Founder is null and void. Moreover, the resolution is null and void because the Founder, as Curator, was not included in the relevant decision-making. The opportunity to participate in the adoption of resolutions is mandatory law. Resolutions in which not all Foundation Board members were able to

---

[53] *Lorenz,* Anfechtung von Stiftungsratsbeschlüssen im liechtensteinischen Recht? in JEV 2023, 72 – issue 2 of 08/31/2023.
[54] as amended November 29, 2023 or September 24, 2024.
[55] as of August 2, 2024.
[56] as amended November 29, 2023 or September 24, 2024.
[57] as of August 2, 2024.

participate are null and void.[58]

185   Under Article 9 of the generally known Statutes, the Founder, as Curator, is an advisor to the Foundation Board. He is entitled, inter alia, to attend meetings of the Foundation Board and to discuss the affairs of the Foundation. Furthermore, the Curator (inter alia) monitors the realization of the Foundation's purpose by the Foundation Board in accordance with the Foundation documents. Under the statutory provisions—still in force and undisputed—the Curator therefore has the right to participate in the Foundation Board's formation of intent and its subsequent adoption of resolutions. These Curator's rights, expressly and by their very terms, do not consist merely in being informed after the fact of the Foundation Board's already completed (and already being implemented) formation of intent, as occurred with the aforementioned null (and contestable) Foundation Board resolution.

186   The resolution is therefore also null and void because the Founder, as Curator, was unlawfully excluded from the deliberations regarding this project. The Curator's participation and influence rights—recently reaffirmed by the Princely Court of Appeal[59]—were wrongfully disregarded, evidently for the purpose of presenting the Curator with a fait accompli.

   –   **Contestability due to violation of substantive law**

187  Even if one does not in any case assume absolute nullity, the Foundation Board resolution adopted in violation of the Statutes is, in any event, contestable for the reasons set out above. Foundation Board resolutions that violate the Statutes are per se contrary to the proper administration and use of the Foundation's assets.[60] The Foundation Board resolution is therefore also contestable on grounds of substantive unlawfulness.

188  As a Foundation participant, the Founder has a formative right to challenge this Foundation Board resolution or to have its nullity judicially declared.

   **c)  Directive or order to the Foundation Board**

189   The list of supervisory measures in Article 552 Section 29(3) of the Persons and Companies Act is not exhaustive. Orders or directions are also possible. This allows the court to intervene and correct an identified deficiency in the foundation through a specific directive, thereby avoiding more drastic measures such as removal of foundation bodies. By means of a directive, the supervisory judge orders an act, an omission, or a tolerance. Only the participants (i.e. the parties under Section 2(1) of the Non-Contentious Proceedings Act) in supervisory proceedings can be affected by such a directive. According to *Hammermann*, possible examples include instructions regarding asset management, examination of compensation claims against responsible foundation bodies, and the holding of Foundation

---

[58] U 03/07/2014, 05 CG.2012.409, PSR 2014/43 – GE 2014, 313; StGH 09/17/2007, StGH 2007/040, GE 2009, 304.

[59] Resolution of the Princely Court of Appeal of April 3, 2025 (06 HG 2024.133 ON 106), p. 50 bottom and p. 51 top (re TiVi Foundation); likewise decision of FL OG 06 HG.2024.149 (ON 30) p. 43 regarding the Solkomtel Foundation.

[60] Supreme Court, 09/07/2018, 7 HG.2017.31, LES 2018, 267.

Board meetings.[61]

190   The declaration of nullity or annulment of the Foundation Board resolutions of July 21, 2025 does not by itself eliminate the statutorily unlawful state of affairs: a directive or order to the Foundation Board members is required to reverse these removals and restore the lawful state—meaning the reappointment of the Founder in the underlying companies.

6     Applications

For all these reasons, the Founder submits the following

## APPLICATIONS:

The Princely Court of Justice, acting as supervisory court, is requested—after holding an oral hearing—to

1   determine with effect between the parties that the Foundation Board resolutions of TiVi Foundation adopted on July 21, 2025, directed at the removal of Mr. Zygmunt Solorz as Chairman of the Supervisory Board of (a) Cyfrowy Poslat S.A., (b) Telewizja Polsat Sp. z o.o., (c) Polkomtel Sp. z o.o., and (d) Netia S.A., are null and void;

*in the alternative*

to declare the Foundation Board resolutions of TiVi Foundation adopted on July 21, 2025, directed at the removal of Mr. Zygmunt Solorz as Chairman of the Supervisory Board of (a) Cyfrowy Poslat S.A., (b) Telewizja Polsat Sp. z o.o., (c) Polkomtel Sp. z o.o., and (d) Netia S.A., legally ineffective, or, *in the alternative*, to annul them;

2   issue directives or orders to the Foundation Board members of TiVi Foundation that, in the aforementioned companies,

i)   the declarations of July 21, 2025 stating that the Founder is removed as Chairman of the Supervisory Board be revoked;

ii)   the person(s) appointed in place of the Founder as Chairman of the Supervisory Board be removed;

iii)   the Founder be reappointed as Chairman of the Supervisory Board;

3     order the opposing parties to reimburse the Founder's procedural costs, payable to his designated legal representatives, within four weeks on pain of execution.

Vaduz, August 1, 2025
SOT/AGO/fen

---

[61] Hammermann in Heiss/Lorenz/Schauer, Kommentar zum liechtensteinischen Stiftungsrecht, 2nd ed., p. 1352 with further references.

39

665

Costs are recorded:
(Amount in dispute: CHF 30,000.00)

| | | |
|---|---|---|
| Statement TP 3A, 40% ES, | CHF | 1,108.80 |
| 25% stamp duty surcharge | CHF | 277.20 |
| VAT 8.1% | CHF | 112.26 |
| **Total** | **CHF** | **1,498.26** |

### LIST OF EXHIBITS

| | |
|---|---|
| Statutes of the TiVi Foundation, as amended on November 29, 2023 | **./A** |
| By-Laws of the TiVi Foundation as amended November 29, 2023 | **./B** |
| TiVi Amendment Declaration of August 2, 2024 | **./C** |
| Statutes of the TiVi Foundation as amended on September 24, 2024 | **./D** |
| By-Laws of the TiVi Foundation as amended on September 24, 2024 | **./E** |
| Excerpt from the Polsat Group website | **./F** |
| Bundle of register excerpts from Netia S.A., Cyfrowy Polsat S.A., Polkomtel Sp. z o.o., and Telewizja Polsat Sp. z o.o. | **./G** |
| Extracts from the financial reports of Netia .Excerpts from the financial reports of Netia S.A., Cyfrowy Polsat S.A., Polkomtel Sp. z o.o., and Telewizja Polsat Sp. z o.o. | **./H** |
| Foundation Board resolution of July 21, 2025 concerning Cyfrowy Polsat S.A., and Foundation Board declaration of July 21, 2025, regarding the removal of the Founder and Mr. Mirosław Marian Błaszczyk, and the appointment of two other persons in Cyfrowy Polsat S.A. | **./I** |
| Foundation Board resolutions of July 21, 2025 concerning (i) Telewizja Polsat Sp. z o.o., (ii) Netia S.A., and (iii) Polkomtel Sp. z o.o., and the Foundation Board declaration of July 21, 2025 regarding the removal of the Founder in Polkomtel Sp. z o.o. and Telewizja Polsat Sp. z o.o. and the appointment of another person in Telewizja Polsat Sp. z o.o. | **./J** |
| Reports on the Asseco transaction at "Grupa Polsat Plus" | **./K** |
| Reports on the ZE PAK transaction Nos. 2, 3, and 13/2025 | **./L** |
| Reports on the increase in value of ZE PAK shares from Business Insider | **./M** |
| Email from Mr. Andrzej Janiszowski dated March 14, 2025 | **./N** |
| Circular resolution of Cyfrowy Polsat S.A. dated June 19, 2024, concerning the acquisition of Archiplex sp. z o.o. | **./O** |
| Letter from Dr. Pitkowitz dated April 29, 2025, with memorandum attached | **./P** |
| Email from Dr. Niedermüller dated June 3, 2025, 10:25 p.m., together with the Guardian's email of June 3, 2025, 4:48 p.m. | **./Q** |
| Email from Dr. Niedermüller dated July 3, 2025, 12:50 p.m. | **./R** |
| Excerpt from media coverage | **./S** |
| Letter from Cyfrowy Polsat dated May 2, 2025 | **./T** |
| Letter from the Guardian and Jaroslaw Grzesiak dated May 2, 2025 | **./U** |
| Letter from Cyfrowy Polsat dated May 5, 2025 | **./V** |
| Letter from Cyfrowy Polsat dated June 10, 2025 | **./W** |
| Letter from the Guardian and Jaroslaw Grzesiak dated June 13, 2025 | **./X** |
| Letter from Cyfrowy Polsat dated June 19, 2025 | **./Y** |

An das
Fürstliche Landgericht
9490 Vaduz



ANTRAGSTELLER:

Zygmunt Józef Solorz
Haldenweg 18
9495 Triesen

vertreten durch 1:

**SCHURTI · PARTNERS**
RECHTSANWÄLTE AG | ATTORNEYS AT LAW LTD

Zollstrasse 2 | 9490 Vaduz | Liechtenstein
Tel +41 44 244 2000 | mail@schurtipartners.com

(Berufung auf die erteilte Vollmacht gemäss Art. 6
AussStrG iVm § 28 Abs. 2 ZPO)

vertreten durch 2:

**schwarzler**
Schwarzler Rechtsanwälte
Rechtsanwälte | Attorneys at Law
Austrasse 42, 9490 Vaduz
Austrasse 42, liechtenstein@s-law.com
(Unter Berufung auf die erteilte Vollmacht gemäss Art. 6
AussStrG iVm § 28 Abs. 2 ZPO)

(Schurti Partners Rechtsanwälte AG als
Zustellbevollmächtigte gemäss Art. 82 Abs 1 RAG)

ANTRAGSGEGNER:

1.  Dr. Peter Schierscher, Rechtsanwalt
    Gewerbeweg 5, 9490 Vaduz

    vertreten durch:

    Ritter Schierscher Rechtsanwälte AG
    Gewerbeweg 5, 9490 Vaduz

2.  Jaroslaw Grzesiak
    ul. Jaworowska 13, PL-05-510 Konstancin-Jeziorna

    vertreten durch:

    Oberhuber Jenal Rechtsanwälte AG
    Wuhrstrasse 14, 9490 Vaduz

3.  Tomasz Szelag
    Agiou Georgiou 32, 4529 Pyrgos Limassol, Cyprus

    vertreten durch:

    Niedermüller Rechtsanwälte
    Werdenbergerweg 11, 9490 Vaduz

BETROFFENE VERBANDSPERSON:

TiVi Foundation (FL-0002.394.367-5)
Industriering 14, 9491 Ruggell

<u>vertreten durch:</u>

Ritter Schierscher Rechtsanwälte AG
Gewerbeweg 5, 9490 Vaduz

WEGEN:                    Aufsichtsverfahren (Streitwert: CHF 30'000.00)

## ANTRAG AUF AUFHEBUNG VON STIFTUNGSRATSBESCHLÜSSEN (BESCHLUSSANFECHTUNG)

<u>5-fach</u>
<u>Beilagen lt. Verzeichnis</u>

2

668

In umseits näher bezeichneter Rechtssache stellt der Antragsteller, Stifter und Kurator Herr Zygmunt Solorz (in der Folge: "**Stifter**" oder "**Antragsteller**"), nachstehenden

### ANTRAG AUF AUFHEBUNG VON STIFTUNGSRATSBESCHLÜSSEN:

1    Worum es im vorliegenden Aufsichtsverfahren geht: Der Plan der Kinder ging (vorerst) auf

*1*    Der Antragsteller ist (notorischerweise) Stifter, Kurator und alleiniger Erstbegünstigter der TiVi Foundation (in der Folge: "**Stiftung**"). Zwischen dem Stifter und seinen Kindern Aleksandra Zak, Piotr Zak und Tobias Solorz (in der Folge: "**Kinder**") behängen im Zusammenhang mit der Stiftung mehrere gerichtliche Verfahren am Fürstlichen Landgericht im Kern zur Frage, wem welche Rechte an dieser zukommen.

*2*    Ursprünglich wurde durch einstweilige Verfügungen im In- und Ausland sowohl in Liechtenstein als auch in Zypern provisorischer Rechtsschutz erwirkt: So wurde mit Amtsbefehl vom 26. Oktober 2024[1] im "Aufsichtsverfahren TiVi". das nach wie vor zur Geschäftszahl 06 HG.2024.133 behängt und das vom Stifter eingeleitet wurde, für die Stiftung ein Beistand *in persona* Dris. Peter Schierscher (in der Folge: "**Beistand**") bestellt. Dem Stifter einerseits und den Kindern andererseits wurde provisorisch zugestanden, ein Stiftungsratsmitglied zu bestimmen, während der Beistand als drittes Mitglied das Amt des Stiftungsratspräsidenten übernimmt. Dies alles, bis das "Hauptverfahren TiVi" rechtskräftig abgeschlossen ist.[2]

*3*    Beim "Hauptverfahren" betreffend die TiVi Foundation handelt es sich um jenes, das zur Geschäftszahl 06 HG.2024.210 behängt (und nach wie vor nicht rechtskräftig erledigt ist). Dieses Hauptverfahren kann ebenso als notorisch vorausgesetzt werden, wie auch überhaupt die Streitteile und die jeweiligen "Protagonisten" in der vorliegenden gerichtlichen Auseinandersetzung bereits gerichtsbekannt sein dürften.

*4*    Fasst man die bisherigen Ereignisse seit Erlass dieses massgeblichen Amtsbefehls vom 26. Oktober 2024 zusammen, so muss der Stifter – milde ausgedrückt – ernüchternd festhalten, wie es seinen Kindern gelingt, ihren Plan zu seiner Entmachtung – unter Mitwirkung der Gerichte – scheibchenweise und unter Vorspiegelung falscher Behauptungen, umzusetzen. Dies gipfelte darin, dass der Stiftungsrat der Stiftung mit Beschluss vom 21. Juli 2025 den Stifter als Vorsitzenden des Aufsichtsrats der bedeutendsten Gesellschaften der Unternehmensgruppe abberief, obwohl dem Stifter die Innehabung dieser Positionen statutarisch zugesichert ist:

- **Schritt 1: Einschränkung der Kuratorenrechte ohne jedweden Anlass**

*5*    Zunächst werden durch den Amtsbefehl von Oktober 2024 ohne jedwede sachliche Rechtfertigung massgebliche (jedoch: nicht alle) Kuratorenrechte des Stifters suspendiert,

---

[1] GZ 06 HG.2024.133, ON 71.

[2] GZ 06 HG.2024.133, ON 71.

obwohl selbst in der von den Kindern textierten (umstrittenen) Statutenänderungserklärung vom 2. August 2024 das Bestehen dieser Rechte bis zu seinem tatsächlichen Ableben von den Kindern zugesichert wird. Gerade die Wirksamkeit dieser Statutenänderungserklärung wollen die Kinder als wirksam bestehend feststellen lassen.[3] Dennoch wurden die dort ausdrücklich – auch von den Kindern – verankerten und zugestandenen Kuratorenrechte im entscheidenden Teil suspendiert.

6    All dies, obwohl der Stifter als Kurator in der Vergangenheit niemals eine Beschlussfassung des Stiftungsrates im Rahmen einer Stiftungsratssitzung auch nur kritisch betrachtet – geschweige denn einen Stiftungsratsbeschluss tatsächlich torpediert – hat. Dennoch wurden ihm gleich "prophylaktisch" mehr Rechte abgenommen, als er selbst bei Wirksamkeit der von den Kindern textierten Statutenänderungserklärung vom 2. August 2024 überhaupt verlieren würde.

7    Als Begründung wurde vom Fürstlichen Landgericht und auch vom Fürstlichen Obergericht damals die Wahrung der einstweiligen "Befriedung" bzw die "Beruhigung" der unterliegenden Tochtergesellschaften ins Treffen geführt.[4] Dieses damals von den Kindern bemühte Argument der Wahrung des "status quo" war, wie sich *ex post* zeigen wird, bloss vorgeschoben. Es war dies bloss der erste Schritt, der zur vollständigen Kontrollübernahme durch die Kinder und zur Entrechtung des Stifters führte, weil sich das Fürstliche Landgericht stets von den unwahren und unbelegten Behauptungen der Kinder in die Irre hat führen lassen und die Kinder ihre Machenschaften gut kaschieren konnten.

8    Derjenige, der der Stiftung sein Milliardenvermögen anvertraut hat, sollte nach dem Plan der Kinder Schritt für Schritt aus allen Funktionen entbunden und die Kinder an die alleinige Kontrolle gelassen werden.

   ▪ **Schritt 2: Bestellung von Jaroslaw Grzesiak in den Stiftungsrat**

9    Kurz nach der mündlichen Verhandlungswoche im Februar 2025 wurde nämlich sodann im März 2025 von den Kindern Jaroslaw Grzesiak – der nachgewiesen ehemalige Vertraute des Stifters und nach seinen eigenen Angaben auch Inhaber zahlreicher ihm vom Stifter anvertrauter Geheimnisse[5] – als deren Interessenvertreter in den Stiftungsrat bestellt.

10   Durch die zuvor suspendierten Kuratorenrechte und eine für die ordnungsgemässe Willensbildung unglücklich formulierte (provisorische) Statutenbestimmung[6] im Amtsbefehl vom 26. Oktober 2024 wurde Herr Grzesiak, der als erfahrener Jurist sehr überzeugend sein

---

[3] 06 HG.2024.167.

[4] Vgl 06 HG.2024.133, ON 71, S 46 Mitte ("*[…] herrscht derzeit grosse Unruhe und Unsicherheit (auch in den unterliegenden Gesellschaften) […]*") und ON 106, S 50 oben ("*[…] durch den angefochtenen Amtsbefehl offensichtlich erreichte Befriedung und geschaffene Ausgewogenheit zwischen den (Interessen der) beiden Seiten […]*").

[5] Aufgrund der widerrechtlichen Offenlegung dieser (Berufs)Geheimnisse ermittelt mittlerweile auch die Staatsanwaltschaft in Polen gegen Jaroslaw Grzesiak.

[6] Nämlich dergestalt, dass auch Umlaufbeschlüsse durch zwei Stiftungsratsmitglieder im Mehrheitswege gefasst werden können, sodass nach der nachfolgend an den Tag gelegten und vom Fürstlichen Landgericht gebilligten Praxis *de facto* die Willensbildung im Umlaufwege nicht alle drei Stiftungsratsmitglieder benötigt, sondern zwei Stiftungsratsmitglieder gemeinsame Sachen machen können.

kann, in die Position versetzt, abseits des Stifters und über weite Strecken sogar ohne Involvierung des dritten Stiftungsrats mit dem Beistand agieren zu können.

11    Der massive Bruch zwischen Stifter und Herrn Grzesiak ist urkundlich belegt. Wenige Wochen zuvor hat Herr Grzesiak im Februar 2025 im Rahmen seiner zeugenschaftlichen Einvernahme dem Fürstlichen Landgericht gegenüber überdies klar zum Ausdruck gebracht, dass er sich dem Obsiegen der Kinder und deren Interessen verschrieben hat (arg "*weil die Kinder es verdient haben*"[7]).

12    Am Vertrauensbruch, der ehemaligen (unbestrittenen) Mandatsbeziehung zwischen Jaroslaw Grzesiak und daran, dass nun der ehemalige Vertraute des Stifters als erklärter Interessenvertreter der Kinder im Stiftungsrat sitzt, fand das Fürstliche Landgericht keinen Anstoss. Freilich würde Jaroslaw Grzesiak nur zum Besten für die Stiftung handeln, so die Quintessenz. Das vom Stifter im Provisorialverfahren beantragte Verbot gegenüber Herrn Grzesiak wurde abgewiesen.[8]

13    Während wenige Monate zuvor – im Oktober 2024 – bei der Suspendierung der Kuratorenrechte schon die bloss abstrakte Gefahr der Blockadehaltung des Kurators als Begründung dafür ausreichte, den Kurator zu entrechten und mehr Rechte wegzunehmen, als ihm am 2. August 2024 überhaupt entzogen werden sollten, zollte das Fürstliche Landgericht Jaroslaw Grzesiak als urkundlich belegten ehemaligen Mandats- und Geheimnisträger des Stifters, der mit ihm im Clinch liegt, Respekt und Vertrauensvorschüsse für seine künftige Tätigkeit.

- **Schritt 3: Die verbliebenen Kuratorenrechte werden negiert**

14    Die verbliebenen Rechte des Kurators werden sodann vom Beistand negiert, verkannt oder – kurz gesagt – mit Füssen getreten.[9] An Stiftungsratssitzungen durfte oder konnte der Kurator nur Anfangs, sodann teilweise gar nicht, teilweise nur über Intervention teilnehmen. Der Beistand hat die verbliebenen Rechte des Kurators mehrmals als "ganz ausgesetzt" angesehen; erst über Intervention musste er zugestehen, dass nur das Vorschlagsrecht und der Zustimmungsvorbehalt suspendiert sind.[10] Auch an diesem Verhalten des Beistands hatte das Fürstliche Landgericht (bisher) nichts auszusetzen.[11] Urkundlich und gerichtlich festgelegte Kuratorenrechte, wie auch die die ordentliche Willensbildung insgesamt[12] verkommen zur Farce.

---

[7] Vgl Aussage des Jaroslaw Grzesiak vom 3. Februar 2025 (ON 21 in 06 HG.2024.210), S 45 unten.

[8] Vgl Beschluss vom 27. Mai 2025 (ON 127 in 06 HG.2024.133).

[9] Siehe dazu die detaillierte Aufarbeitung der Ereignisse im Antrag auf Abberufung des gerichtlich bestellten Beistandes vom 16. Mai 2025 (ON 121 in 06 HG.2024.133), insbesondere Rz 114 ff sowie Nachtrag vom 11. Juli 2025, Rz 26 ff und Rz 8 ff der Replik vom 21. Juli 2025.

[10] Vgl dazu auch E-Mail Verlauf zwischen dem Rechtsvertreter des Stifters und dem Beistand rund um den 17. Juni 2025 (Beilage ./DS und ./EH in 06 HG.2024.133).

[11] Siehe Abweisung des Antrags auf Erlass einer superprovisorischen Verfügung durch Beschluss vom 28. Mai 2025 (ON 8 in 06 HG.2025.73), dort insbesondere Seite 80 ff.

[12] Indem das damals dritte Stiftungsratsmitglied mehrfach und bewusst übergangen wurde.

5

671

15    Der Beistand und Jaroslaw Grzesiak übernehmen das Ruder und schaffen Fakten, ohne
dass dem Stifter entsprechender Rechtsschutz gewährt wurde.

- **Schritt 4: Die Warnungen des Stifters über die Kontrollübernahme durch die Kinder
werden ignoriert**

16    Der Stifter hat immer wieder (zuletzt etwa auch im Verfahren 06 HG.2024.72) seine
Bedenken an das Fürstliche Landgericht herangetragen, wonach die Kinder unmittelbar
davorstehen, die Kontrolle über die milliardenschweren zypriotischen Tochterunternehmen
zu übernehmen. Das Fürstliche Landgericht hat diese drohende Gefahr mit einer Fülle
an Negativfeststellungen abgeschmettert. Es handle sich um blosse "*Vermutungen des
Sicherungswerbers.*"[13] Es sei ja positiv, dass zusätzliche Direktoren in die unterliegenden
Gesellschaften zur Wahrung des Stiftungsinteresses bestellt würden. An der Art und Weise
der Beschlussfassung vom 10. April 2025, die die Basis für die Kontrollübernahme in Zypern
bieten soll, und an der Behandlung des Stifters als Kurator durch den Beistand fand das
Fürstliche Landgericht ebenso keinen Anstoss.[14]

- **Schritt 5: Die Kontrolle in Zypern wird von den Vertrauensleuten der Kinder
übernommen**

17    Schliesslich werden ("im zweiten Anlauf") die von den Kindern und Herrn Grzesiak
ausgewählten zusätzlichen Direktoren in Zypern installiert, was das Fürstliche Landgericht
ursprünglich sogar goutierte. Das sei im Interesse der Stiftung, es gehe ja bloss um die
Sicherung des Informationsflusses und der Verhinderung einer *asset dissipation,* so der
Tenor. Weiterhin wird den Kindern Glauben geschenkt und ihnen damit der Weg für ihren
nächsten Schritt geebnet: Die vollständige Entrechtung des Stifters, für das es die
zusätzlichen Direktoren und die Abschaffung der zypriotischen einstweiligen Verfügung
benötigt. Die entsprechenden Sicherungsanträge des Stifters werden abgewiesen.[15]

- **Schritt 6: Der Stifter wird statutenwidrig aus allen Gesellschaften entfernt**

18    Kurz nach der Installation der zusätzlichen Direktoren, die das Fürstliche Landgericht
absegnete, kommt es zum bisherigen Gipfel aller Entrechtung: Der Stifter wird durch die
nachfolgend gefassten Stiftungsratsbeschlüsse vom 21. Juli 2025 aus allen Gesellschaften
als Vorsitzender des Aufsichtsrates entlassen. Seine Ehefrau und (vermeintlich ihm
"nahestehende") weitere Personen müssen ebenfalls den Sessel räumen.

---

[13] Beschluss vom 28. Mai 2025 (ON 8 in 06 HG.2025.73), S 79.
[14] Beschluss vom 28. Mai 2025 (ON 8 in 06 HG.2025.73), S 81 *("[…] nicht um die Ermächtigung von Ernennung einer
unbestimmten Anzahl an Direktoren, sondern […] die Ernennung zweier unabhängiger Direktoren und damit der Schaffung
eines Gleichgewichts im Vorstand geht. […] dient der Möglichkeit der Ernennung unabhängiger Direktoren zur Schaffung
eines Gleichgewichtes im Vorstand der Reddev Investment Limited letztlich dem Schutz des Stiftungsvermögens
(gegenüber beiden Seiten).")*
[15] Beschluss vom 28. Mai 2025 (ON 8 in 06 HG.2025.73), S 81 *("[…] Schaffung eines Gleichgewichts im Vorstand […]
dem Schutz des Stiftungsvermögens (gegenüber beiden Seiten).")*

6

19    Piotr Zak und Tobias Solorz dürfen bleiben. Das Fürstliche Landgericht segnet dies ab, weil der schriftlich gefasste Stiftungsratsbeschluss vernünftig "begründet" anmutet und auch Tomasz Szelag, der vom Stifter ursprünglich in den Stiftungsrat bestellt wurde, dafür gestimmt hat.

20    Dass in jedweder Fassung der Statuten und auch in der Änderungserklärung vom 2. August 2024, welche die Kinder in einem eigenen Verfahren als wirksam bestehend feststellen lassen wollen,[18] ausdrücklich angeordnet wird, dass der Stifter diese Positionen bis zu seinem tatsächlichen Ableben beibehält, findet das Fürstliche Landgericht in der rechtlichen Begründung dieser abweislichen Entscheidung – wenn auch "nur" im Rahmen eines Provisorialverfahrens – nicht einmal einer Erwähnung wert. Ebenso, dass es keine einzige Handlung des Stifters in der Ausübung dieser Funktionen als Aufsichtsratsvorsitzender gibt, die seine Abberufung rechtfertigen würden.

21    Jeder darauf gerichtete Sicherungsantrag des Stifters, und seien die zu sichernden Ansprüche auch noch so klar in den Statuten festgeschrieben und sogar dann, wenn die Wirksamkeit dieser Statutenbestimmung von den Kindern selbst in einem eigenen Verfahren begehrt wird, wird abgewiesen.

22    Sieht man sich den derzeitigen Stand der Dinge an, ist genau das eingetreten, wovor der Stifter stets gewarnt und mit allen rechtstaatlich ihm zur Verfügung stehenden Mitteln dagegen gekämpft hat: Die von ihm aufgebaute Unternehmensgruppe wird mit nebulösen "Begründungen" und unbelegten Behauptungen den Vertrauensleuten der Kinder und seinem erklärten Gegner, Herrn Grzesiak überlassen. Es ist offenbar gleichgültig, was in den Statuten steht oder welche Stellung und Ansprüche das Gesetz dem Stifter zusichert: Es wird ihm jedwedes Recht – und sei es nur das Recht auf Information – genommen oder bestritten, weil irgendeine "asset dissipation" herbeigeredet wird.

23    Während man dem Stifter ständig (und unbelegt) mit leeren Behauptungen vorwirft, er würde mittelbare Kontrolle über die zypriotischen Gesellschaften ausüben und es drohe durch ihn eine Gefahr für die Stiftung (der *asset dissipation*), wird geradezu spiegelbildlich genau dieses Verhalten, das man ihm vorwirft, von den Kindern und Jaroslaw Grzesiak durchexerziert:

- Dem Stifter wird vorgeworfen, seine Söhne aus den Unternehmen entfernt zu haben oder deren Entfernung in die Wege leiten zu wollen. Tatsächlich wird der Stifter aus seinen von ihm aufgebauten Unternehmen entfernt, während Piotr Zak sowie Tobias Solorz als operative Manager im Amt verbleiben. Das genaue Gegenteil dessen, was dem Stifter vorgeworfen wird, ist also eingetreten und das Vorgeworfene wird ihm angetan. Dass Piotr Zak und Tobias Solorz in einzelnen Gesellschaften im September 2024 a) vor Erlass des Amtsbefehls und (vor allem) b) nicht (nur) im Alleingang vom Stifter, sondern von den jeweils zur Unabhängigkeit verpflichtenden Organen abberufen wurden, wird einfach beiseite gewischt. Alles, was den Kindern missfällt, "war der Stifter".

---

[18] 06 HG.2024.167, dort Antrag ON 1 (S 14 unten und S 15 oben).

- Dem Stifter wird vorgeworfen, dass es unter seiner Ägide zu einem unzulässigen Vermögensabfluss gekommen sei (Stichwort: Asseco-Transaktion). Einen Beleg für diesen Vorwurf gibt es bis heute nicht. Ganz abgesehen davon, dass die Transaktion durch das Verhalten des Herrn Grzesiak und der Kinder erforderlich wurde, weil die Banken wegen derer Interventionen die weitere Finanzierung der Unternehmensgruppe verweigerten. Die grösste Chuzpe dabei ist allerdings, dass derjenige, der dem Stifter diese Transaktion (im hier massgeblichen Stiftungsratsbeschluss) vorwirft – nämlich Tomasz Szelag – diese Transaktion selbst lanciert hat. Dass der Beistand diese Transaktion damals im Frühjahr 2025 als "unbedingt erforderlich" im Interesse der Stiftung qualifiziert hat, wird ebenso unter den Tisch gekehrt, sondern ex post so getan, als ob er davon nichts gewusst oder sich dagegengestellt hätte. Wiederum maskieren sich die eigentlichen Verursacher als "Opfervertreter".

- Dem Stifter wird immer und immer wieder vorgeworfen, in einem "pauschalen Interessenkonflikt" zur Stiftung zu stehen, ohne diesen überhaupt näher beschreiben (geschweige denn beweisen) zu können. Soweit darauf Bezug genommen werden soll, dass er in mehreren Verfahren Gegenpartei der Stiftung ist, bleibt freilich völlig unerwähnt, dass Piotr Zak und Tobias Solorz als Streitpartei ihre Posten behalten dürfen, ja mehr noch, der Beistand ist geradezu hilfsbereit ausgeritten, um Piotr Zak unbedingt in dieser Position behalten zu können. Wiederum soll nur beim Stifter – dem die Statuten diese Positionen garantieren und auch von den Kindern diese so zugesichert wurden – ein Interessenkonflikt ausgemacht und dieser entlassen werden, während ein solcher Interessenwiderstreit umgekehrt bei den Kindern, wo er tatsächlich besteht, in Kauf genommen wird.

- Schliesslich schickt sich der Stiftungsrat auch an, in einer Anmassung von Selbstjustiz entscheiden zu dürfen, wann ein "Interessenkonflikt" mit dem Stifter vorliegt und wann er von der Willensbildung ausgeschlossen werden darf, oder wann nicht, anstatt die unabhängige Justiz damit zu betrauen. Der Stifter wird dadurch bei jeder sich bietenden Gelegenheit in die Aktivrolle gedrängt, seine Rechte und Ansprüche durch Einleitung von Verfahren durchsetzen zu müssen (was ihm in der weiteren Folge dann wieder vorgeworfen wird)

24    All dies wird vom Aufsichtsgericht dadurch abgesegnet, dass es im jüngsten Beschluss zur Abweisung einer Sicherungsverfügung des Stifters "der Vollständigkeit halber" vage festhält, dass der Stifter doch noch "Rechte" habe.[17] Allein welche, bleibt nach den bisherigen unhaltbaren Ereignissen geradezu fraglich, wenn nicht einmal mehr statutarisch festgeschriebe Drittrechte, auf deren aufrechtes Bestehen sich die Gegenpartei selbst beruft und diese gerichtlich festgestellt werden haben möchte, respektiert werden sollen.

25    Im Übrigen möge dazu klar festgehalten werden: Es geht nicht darum, dass der Stifter mit für ihn (da und dort) negativen Entscheidungen des Fürstlichen Landgerichts nicht "leben" kann. Abweisliche Entscheidungen liegen in der Natur des Rechtsstaates und der gerichtlichen

---

[17] Beschluss vom 24.07.2025 im Verfahren zu 06 NE.2025.8, S 38.

Auseinandersetzung; der Stifter verkennt dies nicht. Es geht vielmehr darum, dass der Stifter von Anfang an dieses von den Kindern gewünschte Szenario vorhergesehen hat und das Fürstliche Landgericht dieser – von Anfang an geplanten – Taktik der Kinder dennoch nicht rechtzeitig Einhalt geboten hat, mag auch die eine oder andere Entscheidung zum jeweiligen Zeitpunkt des Erlasses aus Sicht des Gerichts damals erforderlich gewesen sein.

26      Diese in einer "Salamitaktik" geschaffene unhaltbare Schieflage wird besonders dadurch deutlich, dass nunmehr die Kinder ihren Posten behalten, der Stifter diesen aber räumen soll; und dennoch wirft man dem Stifter wahrheitswidrig weiter vor, er habe im Herbst 2024 bloss Vergeltung gegen die Kinder üben wollen, während hier von jenen Personen, die sich über angebliche Vergeltungsmassnahmen beklagen, gerade jene – sehenden Auges – üben.

27      Im Ergebnis steht im vorliegenden Verfahren – das möge bewusst so formuliert werden – die Durchsetzung der rechtstaatlich garantierten Rechte eines Stifters einer liechtensteinischen Stiftung auf dem Spiel. Sieht man sich den bisherigen Verlauf der Ereignisse an, wurde mit einem beispiellosen orchestrierten Vorgehen der Stifter einer liechtensteinischen Milliardenstiftung – ohne sachliche Rechtfertigung – während eines noch laufenden Hauptverfahrens Stück für Stück entrechtet und entmachtet, indem auf blosse Mutmassungen und Behauptungen seiner Prozessgegner hinaus jedwede verbliebene Recht des Stifters – ganz gleichgültig, ob dies sogar in den Stauten steht – ihm abgesprochen werden soll. Umgekehrt werden dem Stifter, der sich gegen die Entmachtungsstrategie seiner Kinder und ihrer Hilfskräfte wehrt, unerreichbare Hürden auferlegt, auch wenn es ihm nur darum geht, den *status quo* aufrechtzuerhalten, der ursprünglich als zentrale Begründung herbeigeredet wurde, um ihm seine wichtigsten Rechte als Kurator zu suspendieren. Offenbar ist der status quo nur dann von Bedeutung, wenn er den Kindern zum Vorteil gereicht.

28      Dieser *status quo* – dessen Beibehaltung ursprünglich von den Kindern gewünscht und weitwendig propagiert und auch vom Fürstlichen Landgericht als ein Grund für den Erlass des Amtsbefehls vom 26. Oktober 2024 herangezogen wurde – ist vom Beistand und seinen Helfern über Bord geworfen worden.

29      Oder, um es auf den Punkt zu bringen: Der Stifter ist wegen eines ins Blaue hinein behaupteten "Interessenkonflikts" von jedweder Information abgeschnitten und die Kinder mit Herrn Grzesiak sind alleine im *driver's seat*. Von einer Befriedung und Beibehaltung des derzeitigen Zustands bis zum rechtskräftigen Abschluss des Hauptverfahrens könnte dieses Ergebnis nicht weiter entfernt sein, gewährt es den Kindern sogar weit mehr Rechte, als sie im von ihnen angestrengten Hauptverfahren überhaupt begehren.

30      Letztlich ist es zur Unglaubwürdigkeit der bisherigen (und andauernden) Behauptungen der Kinder zur angeblichen Gefahr einer "*asset dissipation*" auch von entscheidender Bedeutung, dass in Polen wegen der Ereignisse des 2. August 2024, bei welchen die Kinder dem Stifter bekanntlich die von Piotr Zak vortextierten Unterlagen zur Unterschrift vorgelegt haben, strafrechtliche Ermittlungen gegen diese aufgenommen wurden. Insofern ist es auch nicht nachvollziehbar, dass bis heute immer bei blossen Behauptungen der Kinder stets

9

diesen geglaubt wird, während dem Stifter selbst statutarisch festgeschriebene Rechte nicht zukommen sollen.

31    Im vorliegenden Verfahren werden die Beschlüsse des Stiftungsrates vom 21. Juli 2025, wonach – zusammengefasst – der Stifter von seinen Positionen als Aufsichtsrat entfernt werden soll, angefochten (bzw. die Feststellung der Nichtigkeit begehrt). Der Stifter hat infolge der Statuten – als verankertes Drittrecht – einen statutarischen Anspruch darauf, seine Posten als Aufsichtsratsvorsitzender zu behalten. Der Stiftungsrat, der dieses statutarische Recht im Rahmen der Beschlussfassung missachtet, agiert gesetz- und statutenwidrig. Der gefasste Beschluss ist schon aus diesem Grund nichtig. Er ist aber auch deshalb nichtig und jedenfalls anfechtbar, weil die ganz grundsätzlichen unhaltbaren inhaltlichen Annahmen in der Beschlussbegründung unwahr und unrichtig sind, sodass der Stiftungsrat von einer faktenwidrigen Entscheidungsgrundlage ausgegangen ist.

32    Im Einzelnen:

2    Der statutarische Anspruch des Stifters auf Beibehaltung seiner Aufsichtsratspositionen

33    Gegenstand des "Hauptverfahrens TiVi" und auch jenes des von den Kindern angestrengten Verfahrens[18] ist bekanntlich im Kern die Lösung der Rechtsfrage, ob die Statuten und Beistatuten in der von den Kindern gewünschten (und von den Kindern zur Feststellung begehrten[19]) Fassung i) vom 2. August 2024,[20] ii) in jener vom Stifter zur Feststellung begehrten Fassung vom 24. September 2024[21] oder aber (allenfalls iii) in der "Urfassung" vom 29. November 2023[22] aufrecht und wirksam sind.

34    Ebenso ist dort Gegenstand, ob die vom Stifter am 2. August 2024 unterfertigte "Ablebenserklärung", wonach der Stifter sich gegenüber seiner Stiftung sinngemäss für "verstorben" erklärt, wirksam ist, oder aber später wirksam widerrufen wurde.[23]

35    Die Statuten der Stiftung – unabhängig in welcher Fassung – sehen in ihrem Art. 13 Abs. 2 Punkt 2. (i) nämlich die Möglichkeit vor, dass der Stifter gegenüber der Stiftung zu seinen Lebzeiten eine (widerrufbare) Erklärung abgeben kann, infolge derer ab einem von ihm gewählten Datum jene Bestimmungen der Statuten anzuwenden sind, die ab dem Tag seines Todes in Kraft treten würden ("**Ablebenserklärung**").

---

[18] 06 HG.2024.167.

[19] Siehe von den Kindern angestrengtes Feststellungsverfahren 06 HG.2024.167, ON 1, wonach ua festgestellt werden möge, dass die Statuten der TiVi Foundation in der Fassung vom 02.08.2024 rechtswirksam seien (siehe ON 1, S 14 unten und S 15 oben).

[20] Siehe dazu die beigelegte Änderungserklärung vom 2. August 2024.

[21] Siehe 06 HG.2024.210, zuletzt (nicht rechtskräftiger) Beschluss ON 39.

[22] Siehe beigelegte Statuten und Beistatuten in der "Urfassung" vom 29. November 2023.

[23] Gemäss Art. 13 Abs. 2 Punkt 2 (i) der Statuten; siehe dazu auch das Feststellungsbegehren des von den Kindern eingeleiteten Verfahrens 06 HG.2024.167, ON 1, wonach ua festgestellt werden möge, dass die Ablebenserklärung vom 2. August 2024 aufrecht und wirksam sei (siehe dort ON 1, S 15 oben).

36    Für die vorliegende Beschlussanfechtung spielt die a) Wirksamkeit einer bestimmten Fassung der Statuten oder b) die (Un-)Wirksamkeit der Ablebenserklärung aber keine Rolle:

37    In allen Fassungen der Statuten – sohin auch in jener von den Kindern begehrten[24] Fassung vom 2. August 2024 und in der Vorfassung vom 29. November 2023 – werden dem Stifter auch für den Fall der Abgabe (und Wirksamkeit) einer Ablebenserklärung massgebliche statutarische Rechte auf Lebenszeit zugesichert.

38    Für den Fall der Wirksamkeit einer Ablebenserklärung sehen die Statuten nämlich in ihrem Art. 13 Abs. 2 (2) Punkt 3. Regelungen vor, die diesfalls auf Lebenszeit des Stifters zur Anwendung gelangen sollen.[25] Nachfolgende statutarischen Regelungen gelten daher in jedem Fall, unabhängig a) von der Beistandsbestellung,[26] b) unabhängig vom Ausgang des Hauptverfahrens 06 HG.2024.210 und auch c) im Fall der Wirksamkeit und Unwiderruflichkeit der am 2. August 2024 abgegebenen Ablebenserklärung:

- Gemäss **Art. 13 Abs. 2 (2) 3. (i)** der Statuten ist bei "*Entscheidungen in Personalangelegenheiten (Bestellung, Abberufung, Suspendierung, Höhe der Vergütung) über die Zusammensetzung des Stiftungsrates der Stiftung und der Vorstände und Aufsichtsräte von Gesellschaften, deren Aktien oder Anteile die Stiftung direkt hält ('Gesellschaften'). […] eine vorherige gemeinsame Beratung mit dem Stifter erforderlich.*"

- Gemäss **Art. 13 Abs. 2 (2) 3. (iii)** der Statuten behält der Stifter "*die Funktion des Vorsitzenden der Aufsichtsräte von den Gesellschaften aus der Gruppe des Stifters […]*"

39    Diese den Stifter schützende Bestimmung kommt unabhängig von der Wirksamkeit einer Ablebenserklärung zur Anwendung, und zwar "*nach dem in der Erklärung vom Stifter angegebenen Datum*".[27] Selbst in der von den Kindern dem Stifter vorgelegten (strittigen) Änderungserklärung vom 2. August 2024, deren Wirksamkeit von den Kindern in dem von diesen angestrengten Verfahren behauptet und zur Feststellung begehrt[28] wird, wird ausdrücklich nachfolgende Statutenbestimmung festgeschrieben:

"*(iv) der Stifter behält die Funktion des Vorsitzenden der Aufsichtsräte von den Gesellschaften aus der Gruppe des Stifters nach dem Zustand zum Zeitpunkt der Änderung der Statuten der Stiftung vom 10. August 2023. Er hat außerdem*

---

[24] 06 HG.2024.167, ON 1.

[25] "*(2) 3. Nach dem in der Erklärung vom Stifter angegebenen Datum gelten die folgenden Bestimmungen, die auch vom Stiftungsrat nicht gemäss Art. 13 Abs. (3) der Statuten der Stiftung abgeändert werden kann: […]*"

[26] Der Amtsbefehl vom 26. Oktober 2024, ON 71 in 06 HG.2024.133 lässt diese statutarischen Regelungen unberührt.

[27] Wobei ausdrücklich bestritten bleibt, dass die Ablebenserklärung aufrecht und wirksam ist. Das spielt aber für die Anwendbarkeit des Art. 13 Abs. (2) keine Rolle, weil es für die Wirksamkeit dieser Schutzbestimmung zugunsten des Stifters bloss auf das "vom Stifter angegebene Datum" der Urkunde (und nicht deren Rechtswirksamkeit) ankommt, somit auf den Zeitraum nach dem 2. August 2024.

[28] 06 HG.2024.167, ON 1.

*das unwiderrufliche Recht, diese Position nach alleinigem Ermessen für alle zukünftigen Amtszeiten fortzusetzen."*

Beweis:
– Statuten der TiVi Foundation idF vom 29. November 2023 (Beilage ./A)
– Beistatuten der TiVi Foundation idF vom 29. November 2023 (Beilage ./B)
– Änderungserklärung TiVi vom 2. August 2024 (Beilage ./C)
– Statuten der TiVi Foundation idF vom 24. September 2024 (Beilage ./D)
– Beistatuten der TiVi Foundation idF vom 24. September 2024 (Beilage ./E)
– hg Akt 06 HG.2024.210, 06 HG.2024.133, 06 HG.2024.167

40    Als Zwischenergebnis ist daher festzuhalten, dass der Stifter einen – vom Ausgang sämtlicher anhängiger Verfahren unabhängigen, auch derzeit aufrechten[29] – statutarisch gesicherten Anspruch auf Beibehaltung seiner organschaftlichen Funktionen in den Tochtergesellschaften der Stiftung hat. Dabei handelt es sich auch nicht um ein (suspendiertes) Stifterrecht, sondern um ein Drittrecht.[30] Selbst wenn es sich um ein Stifterrecht handeln sollte, wäre es in Anbetracht der temporären Suspendierung keineswegs rechtfertigbar, dem Stifter seinen Anspruch zu entziehen, solange nicht abschliessende Klärung zu den die Suspendierung rechtfertigenden Sachverhalten vorliegen. Sollte Letztere letztlich dahinfallen, wäre der Stifter wieder automatisch in alle Positionen einzusetzen.

3    Der Stiftungsratsbeschluss vom 21. Juli 2025

41    Mit Umlaufbeschluss vom 21. Juli 2025 hat der Stiftungsrat beschlossen, dass der Stifter von seiner Funktion als Vorsitzender des Aufsichtsrats in den Tochtergesellschaften der Stiftung, an der diese mittelbar und unmittelbare Anteile hält, entbunden werden soll. Konkret soll der Stifter von allen Funktionen der Unternehmen entbunden werden, in denen die Stiftung gemäss der Satzung persönliche Befugnisse zur Ernennung und Entlassung des Vorsitzenden des Aufsichtsrats hat:

- Cyfrowy Polsat S.A.

- Netia S.A.

- Polkomtel Sp. z o.o. sowie

- Telewizja Polsat Sp. z o.o.

42    Das sind die Kernunternehmen des Stifters in der von ihm aufgebauten und der Stiftung übertragenen Unternehmensgruppe.

43    Der Stifter hatte sämtliche Positionen als Vorsitzender des Aufsichtsrats in den oben genannten Gesellschaften vor dem 10. August 2023[31] inne: So wurde er jeweils als Vorsitzender des Aufsichtsrats i) am 15. Juni 2011 der Telewizja Polsat Sp. z o.o. ii) am

---

[29] Siehe dazu bereits FN 27.
[30] Vgl. zur Abgrenzung von genuinen Stifterrechten und sog. Drittrechten Jakob, Die liechtensteinische Stiftung, Rz. 230 ff.
[31] Vgl für Art. 13 Abs. 2 (2) 3. (i) und vor allem (iii) der Statuten.

12

678

15. Februar 2014 der Polkomtel Sp. z o.o.  iii) am 29. Juli 2021 der Cyfrowy Polsat S.A. und iv) am 8. Juni 2022 der Netia S.A. bestellt. Es handelt sich überdies (was ohnedies notorisch sein sollte) um von zypriotischen Tochtergesellschaften der Stiftung gehaltene Gesellschaften aus der Gruppe des Stifters.

Beweis:
– Auszug aus der Homepage der Polsat Gruppe (Beilage ./F)
– Konvolut Registerauszüge aus den Gesellschaften Netia .S.A. , Cyfrowy Polsat S.A., Polkomtel Sp. z. o. o. und Telewizja Polsat Sp. z.o.o. (Beilage ./G)
– Auszüge aus den Finanzberichten der Netia .S.A. , Cyfrowy Polsat S.A., Polkomtel Sp. z. o. o. und Telewizja Polsat Sp. z.o.o. (Beilage ./H)
– Beschluss des Stiftungsrats vom 21. Juli 2025 betreffend Cyfrowy Poslat S.A sowie Erklärung des Stiftungsrates vom 21. Juli 2025 über die Abberufung des Stifters und des Herrn Miroslaw Marian Blaszczyk sowie die Ernennung von zwei anderen Personen in Cyfrowy Poslat S.A. (Beilage ./I)
– Beschlüsse des Stiftungsrats vom 21. Juli 2025 betreffend i) Telewizja Polsat Sp. z o.o, ii) Netia S.A. sowie iii) Polkomtel Sp. z o.o. sowie Erklärung des Stiftungsrates vom 21. Juli 2025 über die Abberufung des Stifters in der Polkomtel Sp. z o.o. und Telewizja Polsat Sp. z.o.o. und über die Ernennung einer anderen Person in Telewizja Polsat Sp. z o.o. (Beilage ./J)

44   **Bei diesen Positionen handelt es sich um solche, auf deren Beibehaltung der Stifter gemäss Art. 13 Abs. 2 (2) 3. (i) und (iii) der Statuten – und zwar ganz unabhängig in welcher Fassung diese Statuten derzeit gelten mögen – einen statutarischen Anspruch hat.**

45   Denn diese Positionen sind solche "*aus der Gruppe des Stifters*", die er bereits zum Zeitpunkt des 10. August 2023 innehatte.[32]

46   **Der Beschluss des Stiftungsrates vom 21. Juli 2025 verstösst daher evidentermassen gegen die ausdrückliche Bestimmung des Art. 13 Abs. 2 (2) 3. (iii)[33] bzw. des (iv)[34] der Statuten.**

47   Darüber hinaus hat auch keinerlei vorherige gemeinsame Beratung mit dem Stifter über die unmittelbar drohende Änderung der Zusammensetzung der Vorstände und Aufsichtsräte, darunter die Veränderung ihn selbst betreffend, stattgefunden. Ohne vorherige Konsultation mit dem Stifter ist ein Stiftungsratsbeschluss *qua* statutarischer Anordnung rechtsunwirksam.[35] Der Stiftungsrat hat sich sogar schriftlich ausdrücklich dazu bekannt, dass bewusst keine Konsultation mit dem Stifter stattfand, eben gerade mit dem Ziel ihn davor abzuhalten Einfluss auf seine eigene Entfernung aus den Organpositionen zu nehmen.

48   Diese Bestimmung ist auch kein (suspendiertes) "Stifterrecht", sondern für die Beschlussfassung im Stiftungsrat ein Wirksamkeitserfordernis. Die angeführten Handlungen des Stiftungsrats sind solche, die auf die Bestellung, Abberufung und/oder Suspendierung über die Zusammensetzung der Vorstände und Aufsichtsräte von Gesellschaften gerichtet

---

[32] Art. 13 Abs. 2 (2) 3. (iii) der Statuten; zum Zeitpunkt der erstmaligen Ernennung siehe Beilage ./H.

[33] idF vom 29. November 2023 bzw. 24. September 2024.

[34] idF vom 2. August 2024.

[35] Arg "*ist eine vorherige gemeinsame Beratung mit dem Stifter obligatorisch erforderlich*", was nur die Nichtigkeit eines Stiftungsratsbeschlusses entgegen dieser Bestimmung bedeuten kann.

13

sind, deren Aktien oder Anteile die Stiftung direkt hält. Eine Konsultation oder Beratung mit dem Stifter hat nicht stattgefunden. Beschlüsse oder Rechtshandlungen in diesem Sinne sind daher <u>nichtig und unwirksam</u>. Insbesondere ist keinerlei Grund ersichtlich, warum hinsichtlich <u>aller</u> abberufenen Personen, einschliesslich etwa des Miroslaw Marian Blaszczyk (also nicht nur des Stifters selbst) keinerlei vorherige Konsultation mit dem Stifter stattgefunden hat.

49

50    Soweit sich der Stiftungsrat pauschal auf den Standpunkt stellt, der Stifter habe all diese Mitwirkungsrechte verloren, weil er einem Interessenskonflikt unterliege, ist auf Folgendes hinzuweisen: Bezeichnenderweise bemüht sich der Stiftungsrat nicht einmal, einen solchen Interessenskonflikt zu spezifizieren, weshalb die Behauptung völlig unsubstaniiert und als unbeachtliche Scheinbegründung zu qualifizieren ist.

51    Der Beschluss des Stiftungsrates verstösst daher auch gegen die ausdrückliche statutarische Bestimmung des Art. 13 Abs. 2 (2) 3. (i)[36] bzw. des (ii)[37] der Statuten.

4    Der Stiftungsrat ist auch von einer faktenwidrigen Entscheidungsgrundlage ausgegangen

52    Wie bereits ausgeführt, ist der Stiftungsratsbeschluss bereits wegen Verstosses gegen die Statuten nichtig. Ungeachtet dessen ist die – nur scheinbare – ausführliche Beschlussbegründung aber inhaltlich <u>unrichtig, sodass der Beschluss auch anfechtbar ist</u>. Um ein paar besondere Unhaltbarkeiten herauszugreifen:

- Das Fürstliche Landgericht hat <u>nicht</u> die Rechte des Stifters als <u>Begünstigter</u> eingeschränkt ("*restricted*").[38] Diese bestehen vollumfänglich weiter aufrecht.

- Die Dauer der Suspendierung von Teilen der Kuratorenrechte richtet sich <u>nicht</u> nach der Dauer der provisorischen Bestellung des Beistands, sondern bis zur rechtskräftigen Erledigung des Haupt- und Aufsichtsverfahrens.[39]

- Es gibt keine "Interessenkonflikte" zwischen dem Stifter und der Stiftung, die eine Abberufung rechtfertigen würden, jedenfalls nicht solche, die sich von jenen der Kinder – die ihre Posten behalten dürfen – unterscheiden. Die Stiftung ist bloss Formalpartei in den behängenden Verfahren; andere "Interessenkonflikte" kann der Stiftungsrat auch gar nicht anführen. Abgesehen davon: Der liechtensteinische Gesetzgeber nimmt (anders, als etwa der österreichische Gesetzgeber) potentielle Interessenkonflikte zwischen dem Stifter (oder dem Kurator) und der Stiftung bewusst in Kauf. Daher kann in Liechtenstein etwa auch ein Begünstigter im Stiftungsrat Einsitz nehmen, obwohl freilich jedwedes Handeln der Stiftung seine Interessen als Begünstigter – einmal mehr, einmal weniger – berührt. <u>Welche</u> Interessenkonflikte

---

[36] idF vom 29. November 2023 bzw. 24. September 2024.
[37] idF vom 2. August 2024.
[38] So aber unrichtigerweise die Annahme in Punkt A.1.
[39] 06 HG.2024.133 und 06 HG.2024.210.

14

680

das genau im Verhältnis zum Stifter sein sollen, bleibt ebenso im Dunkeln. In der blossen Stellung als Verfahrenspartei kann hier kein Interessenkonflikt gesehen werden, weil nach dem Willen der Stiftung Piotr Zak gerade im operativen Management verbleiben soll. Die derzeitige gerichtliche Auseinandersetzung betrifft die Kontroll- und Einflussrechte auf die Stiftung; dass der Stifter der einzige Begünstigte ist, steht ausser Streit und fest. Immerhin hat der Stifter daher – als derzeit einziger Begünstigter – ein immanentes Eigeninteresse am gedeihlichen Bestehen und Fortkommen der Stiftung, während die Begünstigtenstellung der Kinder bestritten und (zumindest) ungewiss ist.

- Es gab im September 2024 keine "status quo injunction" und der Stifter hat niemals gegen eine einstweilige Verfügung verstossen.[40]

53    Diese bereits in der Einleitung befindlichen faktenwidrigen Annahmen ziehen sich wie ein roter Faden weiter durch die gesamte Beschlussbegründung (dazu noch unten im Detail). Eindrucksvoll lässt sich daraus entnehmen, dass mit dieser seitenweisen Begründung nur der Anschein gewahrt werden soll, als ob der Stiftungsrat ernsthafte und auf Faktenbasis beruhende "Erwägungen" ("consideration") vorgenommen hätte.

54    Mitnichten war das der Fall. Es wurde schlichtweg der nächste und bisher tiefgreifendste Akt einer bereits seit langem geplanten Entmachtungsstrategie gesetzt.

55    Die Unrichtigkeiten lassen sich auch andernorts – ohne in die Tiefe gehen zu müssen – leicht aufgreifen: Würden etwa konkrete (dauerhafte) Interessenkonflikte zwischen Stifter und Stiftung vorliegen oder hätte der Stifter tatsächlich gegen den Amtsbefehl vom 26. Oktober 2024 verstossen, wäre es doch Aufgabe des Stiftungsrates gewesen, die Gerichte anzurufen und Herrn Solorz allenfalls gerichtlich abzuberufen oder die Exekution wider diesen zu beantragen. Nicht Aufgabe und keine Kompetenz des Stiftungsrates ist es aber, den Kurator in Form von Selbstjustiz i) von sich aus von der Willensbildung im Stiftungsrat auszuschliessen und ii) ihn in allen unterliegenden Gesellschaften abzuberufen. Dass der Stiftungsrat diesen gebotenen justiziellen Weg bewusst nicht geht, sondern einfach Fakten schafft und Selbstjustiz übt, zeigt, dass der Stiftungsrat seine "Interessenkonflikte" mit nichts ausser leeren Behauptungen aufzufüllen vermag.

56    Nachdem der Kurator auch weiterhin – trotz Abberufung von den unterliegenden Gesellschaften – von der Willensbildung ausgeschlossen und von jeglichen Informationen abgeschnitten werden soll, zeigt dies, dass sich der Stiftungsrat sich einer janusköpfigen Begründung bedient: Entweder, der Stifter wird als Kurator von der Willensbildung ausgeschlossen; dann gäbe es aber keinen Grund, ihn auch in den unterliegenden Gesellschaften zu entfernen (wenn man Piotr Zak dort beibehält). Oder aber, der Stifter wird in den unterliegenden Gesellschaften ausgeschlossen, dann gäbe es aber keinen Grund, seine Kuratorenrechte zu negieren. Nachdem der Stifter aber gerade von beiden Positionen faktisch entfernt werden soll, zeigt dies, dass es nur um reine Entmachtung (und mitnichten um irgendwelche Interessenkonflikte) geht. Es wurde auch keine Dringlichkeit behauptet, die

---

[40] So aber unrichtigerweise die Annahme in Punkt B.c.15

einen sofortigen Ausschluss (und damit auch den Ausschluss eines allfälligen Gerichtswegs) rechtfertigen würde.

57    Auch die übrigen Behauptungen oder Annahmen des Stiftungsrates ("consideration"), mit denen der Anschein gewahrt werden soll, dass eine faktenbasierte Willensbildung stattgefunden habe, sind <u>falsch</u>:

### a) Kein anrüchiger oder gar unzulässiger Verkauf von Vermögenswerten der Stiftung

58    In der Begründung des Stiftungsratsbeschlusses wird versucht, den unrichtigen Eindruck zu erwecken, als käme dem Stifter ein – sogar über die organschaftliche Stellung hinausgehender – bestimmender "Einfluss" auf die Vorstände und Aufsichtsräte der Tochtergesellschaften zu, der sogar so weit ginge, dass unzulässigerweise Vermögensbestandteile in Millionenhöhe veräussert worden seien. Dass dafür (wiederum) jedweder Beleg fehlt, ist bei der vom Beistand gewählten Vorgehensweise, einfach einmal Fakten zu schaffen, mittlerweile geradezu erwartbar; an der Unwahrheit dieser Behauptung ändert dies jedoch nichts.

59    Zunächst ist dazu festzuhalten, dass diese in den Raum gestellten Transaktionen <u>mitnichten ein Geheimnis</u> waren. Diese Transaktionen wurden teilweise sogar medial kolportiert und teilweise dem Beistand ausdrücklich zur Kenntnis gebracht. Darüber hinaus war auch – der den Stiftungsratsbeschluss unterfertigende – Tomasz Szelag als Mitglied des Stiftungsrates über alle angegebenen Transaktionen informiert, was bedeutet, dass auch die Stiftung in voller Kenntnis darüber gewesen sein musste.

60    **Überdies: Dass eine einzige Transaktion zum Nachteil der Stiftung gewesen sein soll oder Vermögenswerte dem Stifter zugekommen seien, wird noch nicht einmal vom Stiftungsrat behauptet.**

### – Verkauf von Asseco Poland S.A.

61    Die Behauptung, dass die Stiftung keine Kenntnis von der Transaktion der Asseco Poland S.A. gehabt habe, ist nicht wahr. Tomasz Szelag hat als Mitglied des Stiftungsrats beste Kenntnis über diese Transaktion gehabt. Die Transaktion war darüber hinaus bereits seit 18. September <u>2023</u> ein Thema. Tomasz Szelag kennt und kannte auch die Fakten über die Hintergründe der Festlegung des Preises der Asseco-Aktien durch Cyfrowy Polsat.

62    Darüber hinaus war auch das zweite Mitglied des Stiftungsrates, Dr. Peter Schierscher, über die Transaktion genauestens informiert. Er wurde während seines Aufenthalts in Warschau über die dringenden Hintergründe informiert.

63    Dem Beistand wurden die Hintergründe der Asseco-Transaktion zudem im Detail erklärt. Die Unternehmensgruppe lief aufgrund der Interventionen bei den finanzierenden Banken in die begründete Gefahr, zahlungsunfähig zu werden. Durch die Asseco-Transaktion wurde die entsprechende Liquidität zur Fortführung des Geschäftsbetriebs gesichert. Dies leuchtete in

16

682

der Vergangenheit auch dem Beistand ein, der sich dahingehend äusserte, dass die Asseco-Transaktion im Interesse und Fortführung der Unternehmensgruppe notwendig gewesen sei.

64    Angesichts dieser Informationen kann keine Rede davon sein, dass die Stiftung keine Kenntnis und Informationen über den Verkauf der Asseco-Anteile hatte.

65    Über den Verkauf der Asseco-Anteile wurde auch öffentlich berichtet. Es ist also mitnichten der Fall, dass hier im "Geheimen" irgendwelche Vermögenswerte der Stiftung zu ihrem Nachteil veräussert worden sein sollen. Ein konkreter Vorwurf oder Schaden wird auch nicht erhoben, sondern schlicht eine nebulöse Behauptung in den Raum gestellt.

66    Die Asseco-Transaktion ist daher nur vorgeschoben, um den – aus Sicht der Kinder missliebigen – Stifter aus der von ihm aufgebauten Unternehmensgruppe zu drängen.

Beweis:    –    PV Tomasz Szelag sowie PV Peter Schierscher
           –    Berichte über die Asseco Transaktion bei "Grupa Polsat Plus" (Beilage ./K)

–    **Verkauf von Vermögenswerten der ZE PAK-Gruppe**

67    Der Verkauf von Vermögenswerten der ZE PAK-Gruppe bezieht sich nicht auf die von der TiVi Foundation gehalten Unternehmensgruppe, sondern auf die Solkomtel Foundation. Allein das zeigt, dass der Stiftungsrat keinerlei ernste Erwägungen und differenzierte Überlegungen angestellt hat, sondern den Stifter bloss um jeden Preis "hinauswerfen" wollte.

68    Unabhängig davon ist es – wiederum – nicht richtig, dass die Solkomtel Foundation nicht über diese Transaktion informiert wurde. Es besteht der urkundlich belegte Verdacht, dass hier die glatte Unwahrheit in einem schriftlichen Dokument für Beweiszwecke festgehalten werden sollte:

69    Am 14. März 2025 hat sich ein Vorstandsmitglied des Unternehmens, Herr Andrzej Janiszowski an den Beistand gewandt und ihm mehrere Dokumente betreffend die aufgetretenen Finanzierungslücken übermittelt. Diese schriftliche Berichterstattung erfolgte auf Wunsch des Beistands in der Besprechung am 5. März 2025 mit Herrn Janiszowski (und anderen Managern) am Hauptsitz von ZE PAK in Konin, in welcher bereits die dringende Notwendigkeit zur Beschaffung von Finanzmitteln für das CCGT-Projekt bzw. weitere Optionen iZm diesem Projekt besprochen wurde. Im Anschluss an dieses Treffen sandte Herr Janiszowski, wie ausgeführt, dem Beistand die oben genannte Korrespondenz zu, der er eine Beschreibung der wichtigsten Punkte im Zusammenhang mit den Aktivitäten zur Beschaffung von Finanzmitteln für das CCGT-Gasprojekt beifügte.

70    Dieses übermittelte Memorandum enthielt wichtige Informationen zur Wirtschaftlichkeit des Projekts sowie die Begründung für die Unterzeichnung einer Term-Sheet-Vereinbarung mit PGE über den möglichen Verkauf dieser Investition. Das ergänzende Dokument war ein kurzes Rechtsgutachten der Anwaltskanzlei SKS, die ZE PAK bei der Aushandlung des EPC-Vertrags mit dem von Siemens geführten Konsortium rechtlich beraten hatte.

17

683

71    Das Dokument legt ausführlich die Folgen der Einstellung der Zahlungen von ZE PAK für die vom Konsortium ausgeführten Bauarbeiten dar. Herr Janiszowski hat den Beistand in der Korrespondenz ausdrücklich gebeten, die in der Korrespondenz beigefügten Unterlagen enthaltenen Informationen auch den anderen Mitgliedern des Stiftungsrats zugänglich zu machen. Herr Janiszowski bat um die Möglichkeit, diese Unterlagen nach Kenntnisnahme im Rahmen eines direkten Treffens oder einer entsprechenden Videokonferenz mit dem Stiftungsrat zu erörtern. Er wies auch darauf hin, dass *es von entscheidender Bedeutung sei, dass alle Mitglieder des Stiftungsrats die kritische Situation, in der sich dieses Projekt befindet, sowie die Notwendigkeit von Massnahmen zum Schutz sowohl des Projekts als auch von ZE PAK vor erheblichen finanziellen Verlusten aufgrund der fehlenden Finanzierung für dessen Fortsetzung oder Verkauf an PGE vollständig verstehen."*

72    Angesichts des oben genannten Schriftverkehrs und der Umstände kann nicht ernsthaft behauptet werden, dass die Solkomtel Foundation – auf die hier als Grund für die Abberufung des Stifters von Tochtergesellschaften der TiVi Foundation Bezug genommen werden soll – keine Kenntnis von dieser Transaktion hatte. Die in der Beschlussbegründung angeführte Behauptung ist auch deshalb unwahr, weil Tomasz Szelag seit dem 4. Oktober 2016 Mitglied des Aufsichtsrats von ZE PAK ist, sodass er auch aus diesem Grunde vollständige Kenntnis von dieser Transaktion gehabt haben muss.

73    Darüber hinaus hat der Vorstand von ZE PAK am 11. Juli 2025 auf das Schreiben der Solkomtel Foundation vom 24. Juni 2025 geantwortet, in dem Solkomtel Informationen und Unterlagen zu dieser Transaktion angefordert hatte. Auch deshalb muss die Solkomtel Foundation Kenntnis davon gehabt haben.

74    Ungeachtet dessen hat ZE PAK Informationen über die Transaktion und damit zusammenhängende Details auch gemäss der Offenlegungspflicht im Sinne der MAR-Verordnung veröffentlicht. Auch aus diesem Grunde kann keine Rede davon sein, dass die Solkomtel Foundation (um die es hier nicht einmal geht) keine Kenntnis über die Transaktion gehabt hätte, weil spätestens seit Januar 2025 aus öffentlich zugänglichen Quellen darüber berichtet wurde.

75    Schliesslich wird weder vom Stiftungsrat behauptet, noch wäre es richtig, dass diese Transaktion einen Nachteil für die Solkomtel Foundation bewirkt hätte. Im Gegenteil: Aus den Berichten ist zu entnehmen, dass diese Transaktion zu einer (erheblichen) Wertsteigerung der ZE PAK-Aktien beigetragen hat.

76    **Auch zu dieser Transaktion war die Stiftung (und zwar die Solkomtel Foundation, um die es im hier angefochtenen Beschluss gar nicht geht, die jedoch als "Begründung" zur Abberufung von TiVi Tochtergesellschaften herangezogen wird) über jeden Schritt nachweislich informiert war. Im Übrigen vertrat der Beistand am 5. März 2025 noch die Meinung, dass alle möglichen Schritte iZm diesem Projekt unternommen werden müssten, um das Risiko eines Wertverlusts zu mitigieren.**

18

684

Beweis:    –    PV Tomasz Szelag
           –    PV Peter Schierscher
           –    ZV Andrzej Janiszowski, dessen ladungsfähige Adresse noch bekanntgegeben wird
           –    Berichte über die ZE PAK Transaktion Nr. 2, 3 und 13/2025 (Beilage ./L)
           –    Berichte über die Wertsteigerungen der ZE PAK Aktien aus Business Insider (Beilage ./M)
           –    E-Mail des Herrn Andrzej Janiszowski vom 14. März 2025 (Beilage ./N)


   –   **Erwerb von Archiplex sp. z o.o.**

77    Die Behauptung der Stiftungsräte, dass die Stiftung keine Kenntnis von der Übernahme von
      Archiplex sp. z o.o. gehabt hatte, ist die **glatte Unwahrheit**.

78    Sieht man sich den Zirkularbeschluss des Aufsichtsrats der Gesellschaft vom 19. Juni 2024
      an, so finden sich dort unter anderem **die Unterschriften von i) Piotr Zak, ii) Tobias Solorz,
      iii) Jaroslaw Grzesiak, und iv) Tomasz Szelag**.

| Wiceprzewodniczący Rady Nadzorczej | Tobias Solorz | ZA, PRZECIW, WSTRZYMUJĘ SIĘ,* | |
|---|---|---|---|
| Wiceprzewodniczący Rady Nadzorczej | Piotr Żak | ZA, PRZECIW, WSTRZYMUJĘ SIĘ,* | |

| Członek Rady Nadzorczej | Jarosław Grzesiak | ZA, PRZECIW, WSTRZYMUJE SIĘ,* | |
|---|---|---|---|
| Członek Rady Nadzorczej | Tomasz Szelag | ZA, PRZECIW, WSTRZYMUJĘ SIĘ,* | |

79    **Diese Vorgehensweise ist <u>ungeheuerlich</u> und desmarkiert das wahre Gesicht hinter
      diesem angefochtenen Stiftungsratsbeschluss mit aller Eindrücklichkeit: Es wird mit
      unlauteren Mitteln und wahrheitswidrigen Angaben versucht, irgendwelche
      "Begründungen" zusammenzutragen, welche die Abberufung des Schöpfers der
      Unternehmensgruppe mit dem Anstrich irgendeiner "Erwägung" oder
      "Rechtmässigkeit" versehen soll.**

80    Ganz abgesehen davon, kann der <u>Erwerb</u> von (Beteiligungs-)Gesellschaften schon *per se*
      keinen Verstoss gegen eine einstweilige Verfügung bedeuten, die diesen Erwerb nicht
      untersagten. Darüber hinaus wird vom Stiftungsrat auch hier nicht einmal behauptet, dass
      dieser Erwerb – der im Rahmen einer Unternehmensgruppe von über 100 Unternehmen
      nichts Ungewöhnliches ist – zum Nachteil der Stiftung war. Diejenigen, der hier die

19

685

Unterschrift zur Abberufung des Aufsichtsrates setzten und diesen Vorwurf erheben, waren daher bestens darüber informiert. Die im Beschluss angeführte Behauptung ist daher sowohl rechtlich bedeutungslos, als auch faktisch die glatte Unwahrheit.

Beweis:
  – Zirkularbeschluss der Cyfrowy Polsat S.A. vom 19. Juni 2024 über den Erwerb der Archiplex Sp. z o.o. (Beilage ./O)
  – PV Tomasz Szelag
  – PV Jaroslaw Grzesiak

### – Verkauf von Vermögenswerten der EMBUD 2 sp. z o.o. S.K.A.

81    Der Verkauf der Vermögenswerte von EMBUD 2 sp. z o.o. S.K.A. (in der Folge: "**EMBUD 2**") bezieht sich wiederum nicht auf die TiVi Foundation, sondern auf die Unternehmensgruppe der Solkomtel Foundation. Es gilt daher das bereits oben zur ZE PAK Gesagte. Warum der Stifter aus der Unternehmensgruppe der TiVi Foundation abberufen werden soll, weil der Stiftungsrat der Solkomtel Foundation über irgendeine Transaktion nicht informiert worden wäre, ist nicht nachvollziehbar.

82    Darüber hinaus war auch diese Transaktion nicht einmal im Ansatz für die Stiftung nachteilig: Die EMBUD 2 hielt Anteile an der Modivo S.A. Diese Anteile wurden veräussert. Dabei handelte es sich um eine einmalige Gewinnchance für die EMBUD 2, weil sie einerseits einen überdurchschnittlich guten Preis durch Ausübung von Optionsrechten, andererseits aber auch das von ihr investierte Kapital zurückerhalten hat. Hätte die EMBUD 2 diese Transaktion nicht durchgeführt, hätte sie den Ausstieg aus dieser Investition selbst organisieren müssen und dabei das sehr reale Risiko eingegangen, nicht alle investierten Mittel zurückzuerhalten.

83    Die Transaktion garantierte effektiv eine Kapitalrendite von mindestens 10 % pro Jahr (berechnet auf Basis der ursprünglichen Investition in Höhe von 500 Millionen PLN). Durch den Verkauf der Modivo-Anteile hat EMBUD 2 bereits 615 Mio. PLN (= ca. EUR 116 Mio) erhalten. Im Ergebnis hat die EMBUD 2 in etwa 115 Mio. PLN (= EUR 26,8 Mio) Gewinn gegenüber der ursprünglichen Investition von Cyfrowy Polsat S.A. bzw. einen Gewinn in Höhe von 15 Mio. PLN (= EUR 3,5 Mio) Gewinn gegenüber dem Übertragungspreis von 600 Mio. PLN zwischen Cyfrowy Polsat und EMBUD 2 gemacht.

84    Wiederum zeigt sich, dass im Stiftungsratsbeschluss geradezu verzweifelt scheinbare "Gründe" darzulegen versucht wird, die sich bei näherer Betrachtung als haltlos erweisen.

Beweis:
  – PV Tomasz Szelag
  – ZV Janusz Pliszka, der vom Stifter stellig gemacht wird

### – Ergebnis: Über alle relevanten Transaktionen war der Stiftungsrat informiert oder hätte sich informieren können

85    Aus dem Vorgesagten ergibt sich, dass die im Stiftungsratsbeschluss breit dargelegten Transaktionen sehr wohl in Abstimmung mit dem Stiftungsrat erfolgten und jedenfalls

Tomasz Szelag als Mitglied des Stiftungsrates <u>bestens</u> über diese informiert war. Ebenfalls zeigt sich, dass der Stiftungsrat sich damals dafür gar nicht näher interessiert hat. Dass der Stiftungsrat (der Beistand) eine entsprechende Weisungs- oder Informationsmitteilung an die unterliegenden Tochtergesellschaften übermittelt habe, wonach er etwa über sämtliche Transaktionen, seien sie auch zum klaren und überwiegenden Vorteil des Stammvermögens, informiert werden wolle, wird von ihm nicht einmal behauptet.

86      Ebensowenig wird im Stiftungsratsbeschluss behauptet, dass der Stifter aus irgendeiner Transaktion – abgesehen von seiner Begünstigtenstellung der Stiftung – einen vermögenswerten Vorteil (Geld) erhalten hätte. <u>Der Stiftungsrat muss daher ganz genau wissen, dass er über sämtliche unterliegenden Transaktionen informiert war und insbesondere auch, dass diese zum klaren und überwiegenden Vorteil der Stiftung zur Unternehmensfinanzierung erfolgten.</u>

87      Bei Lichte betrachtet versucht der Stiftungsrat vielmehr, aus dem Zusammentragen aller gesellschaftsrechtlich (weder unüblichen, noch nachteiligen) Ereignisse den Anschein einer unzulässigen "Einflussnahme" des Stifters zu erzeugen. Dies ist unwahr und unrichtig, und auch das muss der Stiftungsrat ganz genau wissen.

### b) Unrichtige Anwendung des Personen- und Gesellschaftsrechts

88      Der Stiftungsrat stützt sich in seinen Erwägungen unter anderem auf Art. 186 Abs. 1 PGR. Diese Bestimmung, verlangt, dass beim "*Abschluss von Rechtsgeschäften der Verbandsperson, an denen ein Mitglied der Verwaltung interessiert ist, wie beispielsweise beim Abschluss von Rechtsgeschäften mit sich selbst, […] dieses [Mitglied] von Gesetzes wegen nicht mitwirken [darf], ausser im Falle der Dringlichkeit.*"

89      Vorliegend hat der Stiftungsrat keinen Abschluss eines Rechtsgeschäfts mit dem Stifter beabsichtigt, sondern er beabsichtigte vielmehr, den Stifter <u>in (Enkel-)Tochtergesellschaften aus dem Aufsichtsrat zu entfernen</u>. Das hat mit einem "Abschluss von Rechtsgeschäften der Verbandsperson" mit dem betroffenen Mitglied selbst nichts zu tun. Die Stiftung wollte gerade kein Rechtsgeschäft mit dem Stifter abschliessen. Im Übrigen ist es nach den Buchstaben der Bestimmung unstrittig, dass Art. 186 PGR keine Anwendung auf Stiftungen findet.

90      Eine besondere Dringlichkeit wird noch nicht einmal im Beschluss behauptet. Eine (auch statutarisch vorgesehene) vorherige Konsultation mit dem Stifter wäre daher sowohl möglich, als auch geboten gewesen. Die blosse Tatsache eines (behaupteten) potentiellen Konflikts zwischen Kurator und Stiftung bedeutet auch nicht, dass der Stifter seine statutarisch zugesicherten Rechte in den Tochtergesellschaften räumen müsse. Ebenso sieht der zitierte Art. 552 § 9 Abs. 2 PGR, der die Aussetzung oder Einschränkung des Zugangs zu Informationen vorsieht, kein solches Recht der Stiftung (und ebensowenig eine solche Pflicht des Stifters) vor. Hier werden einfach gesetzliche Bestimmungen angeführt, um den unrichtigen Anschein zu wahren, dass hier ernsthafte Erwägungen oder Überlegungen Einfluss genommen hätten.

91    Der Beschluss enthält vielmehr keine nachvollziehbare Angabe der Gründe für die Entlassung des Stifters aus dem Amt des Aufsichtsratsvorsitzenden der Telewizja Polsat sp. z o.o. („**Telewizja Polsat**"), Cyfrowy Polsat S.A. („**Cyfrowy Polsat**") und Polkomtel sp. z o.o. („**Polkomtel**"). Dass sich der Stiftungsrat überhaupt nicht näher damit auseinandergesetzt hat, was die Erwägungen für die organschaftliche Abberufung des Stifters waren, ergibt sich auch daraus, dass es keinerlei Gründe für die Abberufung von Mirosław Błaszczyk angegeben wurden. Das Ziel ist damit eindeutig identifiziert: Entmachtung des Stifters ohne sachliche oder rechtliche Grundlage.

Beweis:    –   Beschluss des Stiftungsrats vom 21. Juli 2025 betreffend Cyfrowy Poslat S.A sowie Erklärung des Stiftungsrates vom 21. Juli 2025 über die Abberufung des Stifters und des Herrn Miroslaw Marian Blaszczyk sowie die Ernennung von zwei anderen Personen in Cyfrowy Poslat S.A. (Beilage ./I)
    –   Beschlüsse des Stiftungsrats vom 21. Juli 2025 betreffend i) Telewizja Polsat Sp. z o.o., ii) Netia S.A. sowie iii) Polkomtel Sp. z o.o. sowie Erklärung des Stiftungsrates vom 21. Juli 2025 über die Abberufung des Stifters in der Polkomtel Sp. z o.o. und Telewizja Polsat Sp. z o.o. und über die Ernennung einer anderen Person in Telewizja Polsat Sp. z o.o. (Beilage ./J)

### c) Kein Verstoss des Stifters gegen einstweilige Verfügungen; keine (unzulässige) "Schwächung" der Position der Stiftung in ihren Tochtergesellschaften

92    Im gegenständlichen Stiftungsratsbeschluss wird unrichtigerweise behauptet, dass der Stifter "*verschiedene Schritte*" unternommen habe, um die Position der Stiftung im Hinblick auf die Besetzung der Vorstandsvorsitzenden von der Stiftung gehaltenen Gesellschaften zu schwächen. Darüber hinaus habe der Stifter auch gegen "verschiedene einstweilige Verfügungen sowohl erlassen vom Fürstlichen Landgericht als auch vom zypriotischen Bezirksgericht verstossen".[41]

93    Welcher Verstoss in welcher konkreten Handlung gelegen sein soll, bleibt freilich unerörtert (weil es einen solchen nicht gab). Während der Beistand, der diesen Beschluss unterschrieben hat, gegen vollstreckbare Sicherungsverfügungen verstossen hat (und der Stifter zu Recht die Exekutionsführung wider diesen beantragt hat), kann er mitnichten ein solches angebliches Fehlverhalten des Stifters konkretisieren. Kurzum: Es gab keinen Verstoss des Stifters gegen eine einstweilige Verfügung. Selbst wenn es einen solchen gegeben hätte, wäre es Aufgabe der Stiftung, die Gerichte zur Hintanhaltung der Verstösse zu bemühen; spätestens dann wäre aber offenbar geworden, dass ausser leeren Worthülsen noch nicht ein einmal ein einziger Verstoss behauptet werden kann.

94    Unter Abschnitt B führt der Stiftungsrat als unter Unterpunkt a) aus, dass der Stifter zum Nachteil der Stiftung gehandelt hätte, in dem es zu Änderungen in den Statuten von Tochtergesellschaften gekommen sei.

95    Es bleibt schon ganz grundsätzlich unerfindlich, was der Stifter mit der Einberufung von Generalversammlungen (unter anderem) zur Abänderung von Satzungsbestimmungen zu tun haben oder welcher Vorwurf ihm daraus genau gemacht werden soll. Ob die

---

[41] Siehe Abschnitt B I des Stiftungsratsbeschlusses.

beabsichtigten Änderungen für die Stiftung zum Nachteil gereichen, ist rechtlich umstritten (wie der Beistand im Übrigen in seiner zur GZ 06 HG.2024.133 eingebrachten Äusserung selbst anführt). Fakt ist jedenfalls, dass die Statutenänderung einstimmig von sämtlichen Aktionären gefasst und nachträglich nicht angefochten wurde. Piotr Zak hat sich vielmehr pflichtwidrig geweigert, die notwendige Mitwirkung bei der Eintragung der Änderungen in das Handelsregister vorzunehmen.

96    Im Übrigen sind die Annahmen der Stiftungsräte im Stiftungsratsbeschluss auch unrichtig:

- **Es gibt kein Vetorecht des Vorstandsvorsitzenden ("Präsidenten").[42]**

- **Es gibt keine Unterordnung des Vorstandes unter den Aufsichtsrat und keine Weisungsbefugnis der Stiftung an den Vorstand; die damals vorgenommene bzw. beabsichtigte Änderung der Grundregel der Corporate Governance ändert bzw. änderte diese Grundregel nicht.[43]**

97    Während der Beistand vor wenigen Wochen noch in seiner Äusserung zu seiner Abberufung anführt, dass die (angebliche) Beschränkung der Rechte der TiVi Foundation vom Stifter bestritten wird und er selbst das Memorandum, das diese Rechtsauffassung untermauert, vorlegt, wird im Stiftungsratsbeschluss mit keinem Wort näher erläutert, warum sich der Stiftungsrat (offenkundig) ausschliesslich auf jene Stellungnahme der Anwälte der Kinder (Clifford Chance) bzw. Prof. Opalski verlassen will.

98    Noch einmal: Was all dies mit dem Stifter konkret zu tun haben bzw. worin ihm persönlich der Vorwurf gemacht werden soll, das seine (statutenwidrige) Abberufung zur Folge haben muss, bleibt im Stiftungsrat unterörtert.

99    **Es wird im Ergebnis einfach jedwedes Ereignis der letzten Monate, aus dem sich die Stiftung (potentiell) benachteiligt fühlt, pauschal dem Stifter zugeschrieben und**

---

[42] Die Stiftung hat hinsichtlich des Vorstandes von Polsat ein persönliches Recht, das sich ausschliesslich auf die Ernennung und Abberufung des Vorstandsvorsitzenden bezieht; dieses Recht umfasst nicht das Recht der Stiftung, in irgendeiner Weise ein Veto gegen die Geschäftsführung der Gesellschaft einzulegen. Die im angefochtenen Beschluss enthaltenen Aussagen führen jedoch zu der falschen These, dass die Stiftung ein angebliches Vetorecht habe, das darin bestehe, über den ihr unterstellten Vorstandsvorsitzenden alle Tätigkeiten im Zusammenhang mit der Vertretung der Gesellschaft willkürlich blockieren zu können. Ein solches Recht ergibt sich jedoch nicht aus der Satzung. (vgl Blg ./P).

[43] Bei der Fassung von Beschlüssen des Vorstands von Telewizja Polsat werden dem Vorstandsvorsitzenden durch die Satzung keine materiellen Rechte eingeräumt. Zunächst einmal sind die Behauptungen, dass der Vorstandsvorsitzende ein Vetorecht in Bezug auf die Angelegenheiten der Gesellschaft habe, unrichtig – ein solches Vetorecht müsste ausdrücklich in der Satzung angegeben sein. Es gibt keine Regelung, wonach aufgrund einer Einzelentscheidung des Vorstandsvorsitzenden ein Beschluss des Vorstands nicht gefasst wird.

Die einzige Richtlinie für das Verhalten eines Mitglieds des Vorstands einer Gesellschaft mit beschränkter Haftung ist das Interesse der Gesellschaft und nicht das Interesse des Vorstandsmitglieds oder des Unternehmens, das es mit dieser Funktion betraut hat, sowie die Verpflichtung zur Loyalität gegenüber der Gesellschaft. Daher enthält die Satzung keine Bestimmung, die den Vorstand oder einzelne Vorstandsmitglieder (einschliesslich des Vorstandsvorsitzenden) berechtigen würde, im Interesse einer anderen Gesellschaft als Telewizja Polsat selbst zu handeln. Die Satzung enthält auch keine Bestimmung, wonach der Vorstand der Gesellschaft im Interesse oder auf Wunsch der Stiftung handeln soll. Das polnische Gesellschaftsrecht schliesst jede Auslegung der Satzung aus, wonach der Vorstandsvorsitzende der Gesellschaft die Vertretung der Gesellschaft aufgrund der Interessen der Stiftung verweigern könnte. Ebenso schliesst das polnische Recht eine Einschränkung des Grundsatzes der Loyalität der Vorstandsmitglieder gegenüber der Gesellschaft aus. Darüber hinaus sind die Mitglieder des Vorstands verpflichtet, sich der Beschlussfassung über Angelegenheiten zu enthalten, die ihre besonderen Interessen (oder die Interessen mit ihnen verbundener Personen) mit den Interessen der Gesellschaft in Konflikt bringen könnten. Piotr Zak kann daher gar nicht "die Interessen der Stiftung" vertreten. (vgl Blg ./P).

**daraus willkürliche Abberufungsgründe konstruiert, ganz gleichgültig, ob dies in der Verantwortung des Stifters lag oder nicht.**

Beweis:    – Schreiben Dris. Pitkowitz vom 29. April 2025 samt Memorandum in der Anlage (Beilage ./P)
          – Einzuholendes Sachverständigengutachten zum polnischen Gesellschaftsrecht

### d) Irrelevanz der Abberufung von Katarzyna Tomczuk

100    Im Stiftungsratsbeschluss wird angeführt, der Stifter habe von Frau Tomczuk verlangt, dass sie von ihrer Position als Mitglied des Stiftungsrates zurücktreten solle. Als sie sich geweigert habe, sei sie am 11. September 2024 als Vorstandsmitglied der Polsat Media sp. z o.o. durch den Aufsichtsrat bestehend aus Herrn Solorz, Frau Justyna Kulka und Herrn Tomasz Szelag ohne nähere Begründung abberufen worden. Gleichzeitig sei die Vorstandsebene angewiesen worden, den Dienstvertrag mit ihr aufzukündigen, was nach ihrer Rückkehr aus dem Krankenstand am 11. Juni 2025 geschehen sei.

101    Es ist unrichtig, dass die Abberufung von Frau Tomczuk aus irgendeiner Tochtergesellschaft der Stiftung in einem kausalen Zusammenhang mit einer allfälligen persönlichen Enttäuschung des Stifters über ihr Verhalten steht. Abgesehen davon, dass wiederum Tomasz Szelag – der hier den Stiftungsratsbeschluss unterfertigt – damals _für_ ihre Abberufung gestimmt hat und hier wiederum im Sinne eines _venire contra factum proprium_ dem Stifter seine eigene gleichlautende Stimmabgabe vorhalten will, ergibt sich schon aus den eigenen Angaben des Stiftungsrates, dass Frau Tomczuk über Monate (insgesamt über ein halbes Jahr) in Krankenstand war. Bekanntlich hat Frau Tomczuk überdies im März 2025 – sohin während ihres Krankenstandes – als Stiftungsratsmitglied von sich aus demissioniert, sodass selbst eine angebliche Aufforderung des Stifters wenige Monate zuvor zur Zurücklegung ihres Amtes in keinem anrüchigen Licht zu sehen wäre. Im Übrigen wäre selbst ein blosses "Verlangen" des Stifters schon _per se_ kein vorwerfbares Verhalten, das mit seiner Abberufung aus allen übrigen Gesellschaften sanktioniert werden könnte.

102    Besonders bezeichnend ist es aber, dass sich der Stiftungsrat allen Ernstes darüber beschweren will, dass ihre Abberufung bloss mit einem nicht näher erörterten "Interessenkonflikt" begründet worden sei, umgekehrt aber genau dieses Vorgehen beim Stifter wählt.

103    Kurzum: Die allfällige Stimmabgabe des Stifters _für die Abberufung von Frau Tomczuk_ in irgendeinem Tochterunternehmen _aus einer einzigen Position_ rechtfertigt niemals die statutwidrige _Abberufung des Stifters in allen Unternehmen_, deren Beibehaltung ihm durch die eigenen Erklärungen der Kinder statutarisch garantiert wird. Es handelt sich bei diesen Ausführungen um Unwahrheiten und nicht im Zusammenhang stehende Ereignisse, die bloss versucht werden, in ein gemeinsames Bild zu rücken.

Beweis:        –   ZV Justyna Kulka, pA des Stifters
               –   PV Tomasz Szelag, pA der Stiftung

### e) Irrelevanz der Abberufung von Jaroslaw Grzesiak

104   Im Stiftungsratsbeschluss wird angeführt, dass der Stifter und seine Ehefrau sich am
      11. September 2024 – das ist der gleiche Tag, an dem Frau Tomczuk abberufen worden
      sei – persönlich auch an Herrn Grzesiak gewandt hätten und ihm zusammengefasst gedroht
      hätten, dass wenn er nicht für die Abberufung von Piotr Zak stimme, er von allen Positionen
      aus der Unternehmensgruppe entfernt werden würde.

105   Im Stiftungsratsbeschluss wird im Übrigen weder konkretisiert, von welchen Positionen
      Jaroslaw Grzesiak dann tatsächlich abberufen wurde, noch wird erwähnt, dass die
      Abberufung in der Cyfrowy Polsat nicht vom Stifter allein entschieden wurde.

106   Wenn dann allerdings noch als Begründung angeführt wird, dass die <u>Abberufung von Piotr
      Zak, Tobias Solorz und des Herrn Grzesiak</u> (sowie die Ernennung von Frau Kulka und ihrer
      "Hilfskräfte") eine <u>Schwächung des Einflusses der Stiftung</u> bedeutet hätte, <u>zeigt sich das
      wahre Gesicht</u>, das sich hinter diesem Stiftungsratsbeschluss verbirgt: Nicht nur, dass <u>die
      Abberufung des Stifters</u> aus allen Unternehmen eine <u>reine Vergeltungsmassnahme</u> darstellt,
      <u>setzt der Stiftungsrat mittlerweile die Interessen des  Piotr Zak und des Tobias Solorz mit den
      Interessen der Stiftung als Verbandsperson gleich.</u>

107   Der Aufsichtsrat muss nach polnischem Recht unabhängig von Dritten und loyal gegenüber
      dem Unternehmen sein, dem es angehört. Die im Stiftungsratsbeschluss enthaltene
      Annahme, dass die Entlassung von Piotr Zak, Tobias Solorz und des Herrn Grzesiak den
      Einfluss der Stiftung erheblich geschwächt und ihr die Möglichkeit genommen habe,
      innerhalb der Konzernstruktur Kontrolle auszuüben, zeigt deutlich, dass die Stiftung Einfluss
      auf die Mitglieder der Aufsichtsorgane der Konzerngesellschaften genommen und diese als
      ihre „Stellvertreter" behandelt hat. Eine solche Annahme steht in direktem Widerspruch zum
      polnischen Gesellschaftsrecht und verstösst darüber hinaus auch gegen grundlegende
      wirtschaftliche Prinzipien.

108   **Es zeigt sich ein weiteres Mal, dass der Stiftungsrat überhaupt keine Grenzen mehr
      zwischen den Interessen der Stiftung und jenen der Streitparteien zu erkennen
      vermag. Eine Seite der Streitteile, nämlich Piotr Zak und Tobias Solorz, werden
      mittlerweile schon zu Interessenvertreter der Stiftung stilisiert. Von der ursprünglich
      propagierten "Neutralität", für die der Beistand bestellt wurde, ist nichts mehr
      vorhanden.**

Beweis:        --   ZV Justyna Kulka, pA des Stifters

691

**f) Angebliche Versuche, Piotr Zak aus seiner Position als Vorstandsvorsitzender von Polsat zu entlassen, hat er sich und seinem Verhalten zuzuschreiben**

109     Es ist urkundlich belegt und durch Einvernahme einer ganzen Reihe von Zeugen leicht beweisbar, dass Piotr Zak ein ungeheuerliches Verhalten als Vorstandsvorsitzender der Polsat an den Tag legt.

110     So hat er etwa am 8. Februar 2025 im Rahmen eines Management-Meetings unter anderem auf Tomasz Gillner, einer der bevollmächtigten Personen im Konzern der Unternehmensgruppe Polkomtel und Cyfrowy Polsat (in der Folge auch: "**Manager**") einzuwirken versucht. Piotr Zak gerierte sich bei diesem Treffen als siegessicherer Nachfolger des Stifters (ungeachtet des noch immer anhängigen Gerichtsverfahrens) und verlangte "*umfassende Zusammenarbeit*" der derzeitigen Geschäftsleitungen. Darüber hinaus wurden von ihm "*personelle Veränderungen in Spitzenpositionen*" der Unternehmen angekündigt und angedroht, dass "*jeder Versuch, diesen Prozess zu behindern, mit Konsequenzen für die Verantwortlichen verbunden sein werde*".

111     Ein weiterer Vorfall geschah am 17. Februar 2025. Piotr Zak suchte Kontakt zu Herrn **Piotr Gawel**, Vizepräsident des Vorstandes von Polsat Media, einer Tochtergesellschaft von Telewizja Polsat (in der Folge auch: "**Vorstand**"). Piotr Zak wandte sich an diesen, um zu erfragen, ob er Kenntnis davon habe, dass der Stifter und seine Ehefrau, Justyna Kulka, in den nächsten Tagen kirchlich heiraten würden. Piotr Zak sei nämlich zu Ohren gekommen, dass diese bevorstehende kirchliche Heirat durch Kardinal Kazimierz Nycz und den Vorstand begleitet werden solle. Der Vorstand antwortete darauf, dass er keinerlei Kenntnis davon habe und nicht daran beteiligt sei.

112     Daraufhin fragte Piotr Zak weiter nach, ob dem Vorstand denn bewusst sei, "*wie schlecht die letzte Verhandlung für Zygmunt Solorz und Justyna Kulka in Liechtenstein verlaufen sei*". Er ergänzte sodann seine Suggestivfrage mit unangenehmen Bemerkungen zur gerichtlichen Verhandlung, zu den Aussagen und zur Verfassung des Stifters. Piotr Zak sagte zum Vorstand in diesem Zusammenhang, dass er **entweder gewinne, oder alles kaputt machen werde**.

113     Der Vorstand reagierte verhalten, woraufhin Piotr Zak versuchte, ihn auf seine Seite zu ziehen ("*Ich will, dass du für mich arbeitest.*") und ihn gegen den Stifter aufzustacheln, indem er den Vorstand etwa fragte, ob er denn nicht enttäuscht vom Stifter gewesen sei, als er ihn bei Polkomtel entlassen habe. Er versuchte weiters, ihn durch ein "*sehr gutes finanzielles Angebot in Gestalt eines langfristigen und sicheren Vertrags*" auch monetär zu "motivieren" und an sich zu binden.

114     Als der Vorstand dies ablehnte, drohte Piotr Zak diesem noch einmal, ihn "***bis zum Ende zu jagen***", wenn sich herausstellt, dass er "*seinem Vater und Justyna Kulka geholfen hätte, das Sakrament der Ehe durch eine kirchliche Trauung einzugehen.*"

26

692

Beweis:    –   Notarielle Erklärung von Piotr Gawel vom 21. Februar 2025 (Beilage ./BK in 06 HG.2024.210)
           –   Erklärung von Tomasz Gillner vom 27. Februar 2025 (Beilage ./BL in 06 HG.2024.210)

115   Während Piotr Zak am 4. Februar 2025 also noch vor Gericht beklagt, dass er etwa "den Konflikt lösen möchte",[44] er "sehr besorgt"[45] sei, er sich wünsche, "dass wir wieder eine Familie werden"[46] und er "nicht zulassen" werde, "dass andere das zerstören, was er aufgebaut hat",[47] zeigt er wenige Tage später sein wahres Gesicht, in dem er das Management auf höchster Ebene bedroht und unter anderem ankündigt, dass er "entweder gewinne" oder "alles kaputt machen" werde.

116   Der Vorstand hält in seiner notariellen Erklärung vom 21. Februar 2025 fest, dass ein solches Verhalten des Piotr Zak untragbar ist.

117   Der Aufsichtsrat von Polsat ist sohin gesetzlich verpflichtet, bei Vorliegen von Missständen entsprechende Massnahmen zu ergreifen. Anders als der Stifter ist Piotr Zak nämlich offenkundig nicht in der Lage, zu vermeiden, dass die stiftungsrechtliche Auseinandersetzung in die operative Unternehmensgruppe getragen wird. Aus diesen und anderen Ereignissen hat sich der Vorstand von Cyfrowy Polsat S.A. an den Beistand gewandt:

118   Mit E-Mail vom 2. Mai 2025, 11:12 Uhr übermittelte der Vorstand von Cyfrowy Polsat S.A. ein Schreiben an den Beistand. Dieses Schreiben richtete sich an diesen im Zusammenhang mit der organschaftlichen Verpflichtung, die Interessen und den Wert der gesamten Kapitalgruppe, einschliesslich aller Tochtergesellschaften, zu schützen.

119   Der Beistand wurde darüber informiert, dass (im Rahmen des vom Aufsichtsrat eingeleiteten konzernweiten Management-Review-Prozesses) schwerwiegende Verfehlungen des Herrn Piotr Zak zutage getreten sind. Die Verfehlungen wurden in diesem Schreiben ausführlich beschrieben und mehrere Dokumente beigefügt, die dies belegen.[48] Aus diesen Unterlagen ging hervor, dass Herr Piotr Zak gegen polnisches Recht, die internen Richtlinien des Unternehmens und weitere gesetzliche Bestimmungen verstossen hat und (auch im Interesse der Stiftung als Aktionärin) zur Verantwortung zu ziehen ist. Darüber hinaus hat sein Verhalten ein erhebliches Reputationsrisiko für TV Polsat und die gesamte Gruppe verursacht.

120   Mit Antwortschreiben der Stiftung vom selben Tag (2. Mai 2025) erklärten der Beistand und Jaroslaw Grzesiak namens der Stiftung, dass die Vorwürfe "ernst genommen" werden sollten, äusserten jedoch Bedenken, dass das Verfahren zur Untersuchung dieser Vorwürfe "internationalen Standards" entsprechen müsse. Es wurde die Absage oder Vertagung der

---

[44] Vgl. Aussage des Piotr Zak im Protokoll (ON 22) vom 4. Februar 2025, S 11 unten.
[45] Vgl. Aussage des Piotr Zak im Protokoll (ON 22) vom 4. Februar 2025, S 11 unten.
[46] Vgl. Aussage des Piotr Zak im Protokoll (ON 22) vom 4. Februar 2025, S 11 unten.
[47] Vgl. Aussage des Piotr Zak im Protokoll (ON 22) vom 4. Februar 2025, S 11 unten.
[48] Erklärung von Piotr Gawel, Tomasz Gillner und Edward Miszczak sowie zwei Rechtgutachten, die diese analysieren und Konsequenzen fordern.

bevorstehenden Hauptversammlung von TV Polsat zu diesem Thema verlangt und Folgendes (frei übersetzt) vorgeschlagen:

> „*Wir*" (der Stiftungsrat, Anm.) "*schlagen vor, eine interne Kommission einzurichten, die eine interne Untersuchung durchführt. Die Stiftung und Cyfrowy Polsat werden jeweils Mitglieder mit entsprechender Erfahrung und Qualifikation benennen. Die Aufgabe der Kommission besteht darin, einen Bericht zur Prüfung durch die Stiftung und Cyfrowy Polsat zu erstellen, bevor über einen entsprechenden Beschluss von Telewizja Polsat ESM abgestimmt wird.*"

121    Mit <u>Schreiben vom 5. Mai 2025</u> wurde Seitens Cyfrowy Polsat die Idee einer Untersuchungskommission positiv aufgenommen. Es wurde mitgeteilt, dass das eingeleitete Verfahren unter Einbeziehung zweier unabhängiger neutraler Sachverständiger „auf dem neuesten Stand der Technik" ist, und die Gesellschaft hat die weiteren Bedenken, die der Beistand und Jaroslaw Grzesiak in dem Schreiben vom 2. Mai 2025 geäussert hatten (soweit diese konkret genug waren, um darauf einzugehen), entkräftet. Cyfrowy Polsat hat den Beistand und Jaroslaw Grzesiak ausserdem gebeten, Einzelheiten zu der <u>von diesen selbst am 2. Mai 2025 vorgeschlagenen Kommission</u> vorzulegen, und eine Reihe von Fragen aufgelistet, die dafür beantwortet werden mögen. Bis zum 10. Juni 2025 hat Cyfrowy Polsat darauf jedoch keine substanzielle Antwort der Stiftung mehr erhalten.

122    Mit <u>E-Mail vom 15. Mai 2025</u> hat der Beistand mitgeteilt, dass die für den 15. Mai 2025 anberaumte Sitzung des Stiftungsrats, in der das Schreiben von Cyfrowy Polsat vom 5. Mai 2025 behandelt werden sollte, abgesagt wurde. Der Beistand hat darum gebeten, die Gesellschafterversammlung zu verschieben, bis der Stiftungsrat seine Entscheidung über das Einsetzen der Kommission getroffen hat.

123    In der Folge fanden weitere Gesellschafterversammlungen von TV Polsat statt, die zuletzt auf Dienstag, den 17. Juni 2025, um 9:30 Uhr vertagt wurden.

124    Um weitere Verzögerungen zu vermeiden, wurde der Beistand Anfang Juni erneut aufgefordert, endlich zu reagieren: So teilte Cyfrowy Polsat im weiteren <u>Schreiben vom 10. Juni 2025</u> mit, dass zur Vermeidung von weiteren Verzögerungen <u>der Vorschlag des Beistandes</u> und Jaroslaw Grzesiak <u>akzeptiert</u> wird: Es soll eine Untersuchungskommission eingesetzt werden, welche die Vorwürfe gegenüber Piotr Zak zu prüfen hat. Bis dahin soll die Entscheidung über die Konsequenzen, die die Gesellschafter aufgrund des Verhaltens von Herrn Piotr Zak zu ziehen haben, verschoben werden.

125    Nachdem die Angelegenheit seit über einem Monat "liegen geblieben" ist, forderte Cyfrowy Polsat den Beistand auf, nunmehr zu handeln, sodass ein entsprechender Bericht bis zum 30. Juni 2025 vorgelegt werden kann. In der Anlage wurde die geplante Struktur und das Mandat der Kommission übermittelt. Der Stiftungsrat wurde aufgefordert, einen Vertreter für die Stiftung in der Kommission bekanntzugeben, damit die Kommission unverzüglich gebildet werden kann. Sollten die Stiftung keinen Vertreter benennen oder den Prozess weiter

verzögern, wurde angekündigt, infolge der Dringlichkeit die Untersuchungskommission ohne Beteiligung eines von der TiVi Foundation benannten Vertreters fortzuführen.

126    Die Stiftung (der Beistand und Jaroslaw Grzesiak) wollte jedoch nicht eine solche Untersuchungskommission einsetzen, sondern hat sich mit Schreiben vom 13. Juni 2025 an Cyfrowy Polsat gewandt und im Wesentlichen mitgeteilt, dass die Stiftung den Vorschlag des Unternehmens zur Teilnahme an dem Ausschuss in der vorgeschlagenen Form ablehnt und insbesondere kein Mitglied für den Ausschuss benennen werde (wie von Cyfrowy Polsat empfohlen). Die Stiftung wollte die Angelegenheit offenkundig weiter hinauszögern.

127    Über dieses von Jaroslaw Grzesiak massgeblich orchestrierte Verhalten der Stiftung war Cyfrowy Polsat überrascht. Mit Schreiben vom 19. Juni 2025 wurde Unverständnis darüber geäussert, dass die Stiftung nicht in der Kommission, wie vorgeschlagen, teilnehmen wird, sondern sich von Jaroslaw Grzesiak, d. h. eine Person, die unter anderem Piotr Żak nicht nur innerhalb der Stiftung vertritt und dessen Interessen verfolgt, leiten lässt. Die Absicht der Stiftung bestand offenkundig nicht darin, die tatsächlichen Missstände im Zusammenhang mit Piotr Zak, die bei Telewizja Polsat stattgefunden haben (und deren Beweise der Stiftung seit Monaten bekannt waren), aufzuklären und angemessene Abhilfemassnahmen zu ergreifen, sondern die Angelegenheit zu verschleiern.

128    Dies, indem sie die Ergreifung der notwendigen Massnahmen eindeutig in die Länge zieht, weitere ungerechtfertigte Verfahrensforderungen formuliert und den Umfang des Untersuchungsgegenstandes schrittweise auf Bereiche ausweitet, die nie Gegenstand irgendwelcher Beschwerden von irgendjemandem waren.

129    Es wurde von der Stiftung (Jaroslaw Gzresiak und dem Beistand) also offenkundig intendiert, nicht das Verhalten von Piotr Zak zu "untersuchen", über das sich die Gesellschaft beschwerte, sondern bemüht "andere Fälle", über die es gar keine Beschwerden gab, zum Gegenstand der Kommission zu machen. Bei heutiger Betrachtung war dies ein offenkundiger Versuch, das Fehlverhalten des Piotr Zak zum Anlass zu nehmen, um angebliches (nie beschwerdegegenständliches) "Fehlverhalten" beim Stifter "zu suchen".

130    **An einer Aufklärung des massgeblichen Fehlverhaltens des Piotr Zak hat die Stiftung, die zu diesem Zeitpunkt bereits eindeutig eine Interessenschlagseite zugunsten der Kinder aufwies, überhaupt kein Interesse gehabt.**

131    Dass nunmehr die alleinigen Interessen des Piotr Zak bzw. der Kinder durch die Stiftung verfolgt werden, während das Fehlverhalten von Piotr Zak unter den Teppich gekehrt wird, ergibt sich auch aus einem anderen Blickwinkel: Auf der Hauptversammlung von Cyfrowy Polsat am 26. Juni 2025 hat die Stiftung die Entlastung aller Mitglieder des Vorstands und des Aufsichtsrats für das Jahr 2024 unterstützt und keine Anträge oder Einwände zu den genehmigten Jahresabschlüssen über die Geschäftstätigkeit der Gesellschaft oder den Aufsichtsrat der Gesellschaft gestellt.

132    Sowohl Zygmunt Solorz als auch Mirosław Błaszczyk wurde für das Jahr 2024 die Entlastung erteilt. Dies bedeutet, dass die Stiftung keine Zweifel oder Anmerkungen zu den Handlungen

29

695

dieser Personen hatte, die man ihnen nunmehr vorzuwerfen versucht. Die Entlastung und vor allem die Abstimmung „für" die Entlastung bedeutet somit die Billigung der Handlungen der Mitglieder der Leitungsorgane im Jahr 2024, einschliesslich derjenigen im Zusammenhang mit Veränderungen in den Leitungsorganen der Konzerngesellschaften, und die Entbindung dieser Personen von jeglicher Haftung für diese Handlungen. Dass sich der Stiftungsrat auf diese (angeblich unzulässigen) Handlungen berufen will, für die er kurz zuvor noch die Entlastung erteilt hat, zeigt, dass es um reine Vergeltungsmassnahmen gegen den Stifter (und nicht um die Wahrung der Interessen der Stiftung) geht.

133    Hinzu kommt, dass angebliche Versuche, Piotr Zak aus seiner Position als Vorstandsvorsitzender von Polsat zu entlassen, nie zur Abstimmung gebracht wurden: Die diesbezüglichen Behauptungen sind daher völlig unwahr. Es sei jedoch erneut darauf hingewiesen, dass die Stiftung das polnische Gesellschaftsrecht missversteht: Die Funktion eines Mitglieds des Vorstandes (der Geschäftsführung) einer bestimmten Konzerngesellschaft verpflichtet dieses, diesem Unternehmen gegenüber loyal zu sein (und nicht der Stiftung gegenüber). Ein weiteres Mal setzt die Stiftung unrichtigerweise die Ausübung einer Funktion mit der Ausübung der Kontrolle durch die Stiftung gleich.

134    Selbst wenn man all diese Unrichtigkeiten beiseitelassen wollte: <u>Warum</u> Piotr Zak über alle Interessenkonflikte erhaben sein und nur die Interessen der Stiftung in den operativen Gesellschaften ausüben können soll, während beim Stifter die "Interessenkonflikte" zur Abberufung aus allen Aufsichtsratspositionen führen sollte, bleibt wiederum das Geheimnis des Stiftungsrates. Wiederum: Es geht nur um die Interessen der Kinder, nicht um die objektivierbaren Verbandsinteressen der Stiftung.

<u>Beweis:</u>    –    Schreiben von Cyfrowy Polsat vom 2. Mai 2025 (Beilage ./T)
          –    Schreiben des Beistands und Jaroslaw Grzesiak vom 2. Mai 2025 (Beilage ./U)
          –    Schreiben von Cyfrowy Polsat vom 5. Mai 2025 (Beilage ./V)
          –    Schreiben von Cyfrowy Polsat vom 10. Juni 2025 (Beilage ./W)
          –    Schreiben des Beistands und Jaroslaw Grzesiak vom 13. Juni 2025 (Beilage ./X)
          –    Schreiben von Cyfrowy Polsat vom 19. Juni 2025 (Beilage ./Y)

### g)    Kein Versuch des Stifters, die Ernennung unabhängiger Mitglieder des Verwaltungsrats zyprischer Unternehmen zu blockieren

135    Stasalco Limited, Karswell Limited und WBN Holding Limited stellen die Hauptvermögenswerte der Solkomtel-Stiftung dar, nicht der TiVi Foundation. Ein weiteres Mal werden Vermögens- und Interessensphären einfach vermengt und vermischt, wie es für die Argumentation der Stiftungsratsmitglieder gerade passt.

136    Im Stiftungsratsbeschluss wird (frei übersetzt) Nachfolgendes angeführt: *Die Vorstände der Stiftung haben beschlossen, unabhängige Mitglieder in den Vorstand der zyprischen Unternehmen (d. h. Reddev, Stasalco Ltd, Karswell Ltd und WBN Holding Ltd) zu berufen, um deren Interessen (und die der Stiftung) zu schützen.*

30

696

137    Es wurde jedoch kein objektiver Grund dafür angegeben, warum die Ernennung der Mitglieder des Verwaltungsrats der zyprischen Unternehmen durch die TiVi Foundation zum Schutz der Interessen der zyprischen Unternehmen und **der Interessen der TiVi Foundation** erforderlich ist, da drei dieser Unternehmen nicht Tochtergesellschaften der TiVi Foundation, sondern der Solkomtel Foundation sind. Allein das zeigt, dass hier "blanko" irgendwelche "Argumente" zusammengewürfelt wurden, um den Anschein einer ordnungsgemässen Willensbildung zu wahren.

138    Es wurde auch nicht einmal im Ansatz erläutert, warum die Änderungen genau für die vier genannten Unternehmen gelten sollen. Der (notorische[49]) Versuch vom Beistand und Jaroslaw Grzesiak, zusätzliche Mitglieder des Verwaltungsrats von Reddev Investments Ltd zu ernennen, ist kein Zufall – es handelt sich um die wertvollste Tochtergesellschaft der TiVi Foundation, über welche die Stiftung Anteile an Cyfrowy Polsat hält. Der Versuch, den Direktor zu wechseln, dient daher nicht der Stiftung, sondern der Übernahme der Kontrolle über Cyfrowy Polsat.

139    Dass mit keinem einzigen Wort auch nur angedeutet werden kann, warum gerade die von Jaroslaw Grzesiak vorgeschlagenen zwei weiteren Direktoren "unabhängig" sein sollen, zeigt, dass es damals nicht um "unabhängige" Direktoren ging, sondern um solche, die den Willen der Kinder (oder zumindest – ebenso gesellschaftswidrig – den Willen der Stiftungsräte) ohne Nachfragen umsetzen. Die diesbezüglichen Ausführungen im Stiftungsratsbeschluss sind daher unrichtig.

140    Schliesslich kann dieses bemühte (unhaltbare) Argument, wonach der Stifter die Ernennung von weiteren Direktoren "blockiert" habe und darin ein Abberufungsgrund liege, aber schon aus einem einfachen Grund auf sich beruhen: Die Inanspruchnahme gerichtlicher und behördlicher Hilfe (von wenigen Fällen etwa der Mutwilligkeit abgesehen) kann *per se* schon niemals einen solchen Grund darstellen, der die Abberufung aus allen Gesellschaften rechtfertigt. Auch dieses im Stiftungsratsbeschluss angeführte Argument fällt daher in sich zusammen, will man dem Stifter nicht auch noch die Ergreifung rechtsstaatlich gebotener Rechts- und Verteidigungsmittel absprechen versuchen.

Beweis:    –    wie bisher

### h) Angebliche Verstösse während der Hauptversammlungen polnischer Unternehmen

141    Unter Punkt f) des Stiftungsratsbeschlusses wird breit ausgeführt, welche (angeblichen) Unzulänglichkeiten im Rahmen der Abhaltung von Generalversammlungen (Hauptversammlungen) der Tochtergesellschaften geschehen seien sollen.

142    Im Kern beschwert sich die Stiftung darüber, dass ihre an die Tochtergesellschaft weitergegebenen "Instruktionen" nicht befolgt worden seien (*"[...] issued clear and specific*

---

[49] Vgl dazu 09 NE.2025.3 sowie 08 EX.2025.1715; vgl zur "Schwester-Stiftung", der Solkomtel Foundation, auch 15 NE.2025.4 sowie 08 EX.2025.1715, wie auch 05 NE.2025.6.

*voting instructions to various companies in connection witht heir respective Annaual General Meetings [...] These instructions were systematically disregarded by representatives of CP, thereby undermining the corporate governance framework of the group. This conduct constitutes a deliberate and hostile act against TiVi's expressly stated interests.*").

143    Der gesamte Stiftungsratsbeschluss ist auch in diesem Punkt von der unrichtigen Prämisse getragen, die Stiftung könne rechtsverbindliche Weisungen an die unterliegenden Gesellschaften erteilen.

144    Aus Sicht des polnischen Rechts gibt es keine Grundlage, wonach Mitglieder des Vorstands von Gesellschaften an Weisungen der Stiftung im Zusammenhang mit Hauptversammlungen gebunden wären. Im Gegenteil, die Bestimmungen des polnischen Rechts besagen, dass der Vorstand nicht an Weisungen der Hauptversammlung oder des Aufsichtsrats gebunden ist, und erst recht nicht an Weisungen eines Aktionärs, der einen Anteil von einem Promille der Aktien hält.

145    Polnische Unternehmen sind daher nicht an die Anweisungen der Stiftung gebunden; die Möglichkeit, solche Anweisungen zu erteilen, ergibt sich lediglich aus der Satzung der TiVi Foundation, die jedoch für polnische Unternehmen in keiner Weise bindend ist. Im Gegenteil: Polnische Unternehmen dürfen keine Weisungen der Stiftung hinsichtlich der Führung der Geschäfte der Gesellschaft, einschliesslich der Ausübung der mit Anteilen an Tochtergesellschaften verbundenen Stimmrechte, annehmen. Der Vorstand muss vielmehr unter Berücksichtigung der autonomen Interessen seiner Gesellschaft und nach Vornahme der in der Satzung vorgesehenen Massnahmen im Einzelfall entscheiden, wie er in den Versammlungen der Tochtergesellschaften abstimmt.

146    Die Satzung der TiVi Foundation ist für die Stiftung und den Stiftungsrat verbindlich, nicht jedoch für die Unternehmen ihrer Gruppe und deren Organe.

147    Der Vorstand der unterliegenden Gesellschaften hat auch nicht etwa im "Blindflug" agiert oder sich bloss auf vage Informationen verlassen: Im Zusammenhang mit dem Erhalt von Weisungen der Stiftung gab es regen Austausch mit dem Stiftungsrat und es wurden Rechtsgutachten eingeholt, um unter Berücksichtigung der erhaltenen Weisungen das für Cyfrowy Polsat sicherste und vorteilhafteste Vorgehen zu ermitteln.

148    Die Stellungnahmen der Anwaltskanzleien zeigen eindeutig, dass keine rechtlichen oder vertraglichen Gründe vorliegen, die Cyfrowy Polsat zur Befolgung der enthaltenen Weisungen verpflichten würden. Aus diesem Grund hat Cyfrowy Polsat beschlossen, keine Änderungen an den Abstimmungsanweisungen für die Hauptversammlung von Telewizja Polsat, die Hauptversammlung von Polkomtel und die Hauptversammlung von Netia S.A. vorzunehmen, die vom Vorstand von Cyfrowy Polsat beschlossen und mit dem Aufsichtsrat der Gesellschaft gemäss den geltenden Vorschriften der Gesellschaft vereinbart wurden.

149    Im Stiftungsratsbeschluss wird behauptet, dass Cyfrowy Polsat während *der Hauptversammlung gegen die Ernennung von Herrn Tadeusz Komosa zum Vorsitzenden gestimmt und Herrn Jerzy Modrzejewski, einen bekannten Verbündeten von Herrn Solorz,*

32

*als Kandidaten für den Vorsitz der Hauptversammlung vorgeschlagen und für dessen Wahl gestimmt habe, entgegen der ausdrücklichen Forderung von TiVi, dass die Hauptversammlung von einer unabhängigen Person geleitet werden müsse.*

150    Völlig übergangen wird dabei aber, dass der "Wunschkandidat" der Stiftung – Tadeusz Komosa – das gesetzlich vorgesehene Unabhängigkeitskriterium nicht erfüllt, da er Partner der Anwaltskanzlei Andersen ist, in der auch Jarosław Kołkowski – der einem Interessenkonflikt unterliegt – Partner ist. Dieser Partner der Kanzlei Andersen, Herr Jaroslaw Kolkowski, hat im Zeitraum zwischen 2000 und 2016, sohin 16 Jahre lang, im engsten Team von Pawel Rymarz – dem polnischen Anwalt des Tobias Solorz – gearbeitet und war dort sein engster Mitarbeiter. Er hat daher offensichtlich engste Verbindungen zum polnischen Anwalt der Kinder, ist somit ebenfalls in hohem Masse befangen und Tadeusz Komosa kann in dieser Angelegenheit nicht als "unabhängig" im Interesse der Stiftung agierend angesehen werden.

151    Es ist jedoch bezeichnend, dass die Stiftung Anforderungen an andere stellen möchte, die es selbst im Hinblick auf ihre "Wunschkandidaten" nicht erfüllen kann. Die Stiftung will im Ergebnis ein asymmetrisches Konzept der Unabhängigkeit einführen, sodass diese Ausführungen (hier wie andernorts) reine Doppelmoral darstellen. Es ist daher festzuhalten, dass der Stiftungsrat gerade nicht vom Wohl der Stiftung oder der Unternehmen der Gruppe geleitet wird, sondern mit dieser Vorgehensweise bloss versucht, Partei für eine Seite der Streitteile zu ergreifen.

152    Dass Jerzy Modrzejewski im Rahmen eines Abstimmungsverfahrens gewählt wurde und das Vertrauen der Mehrheit der Aktionäre genoss, die für den Beschluss über seine Wahl zum Vorsitzenden gestimmt haben, hat mit einem Abberufungsgrund des Stifters nichts zu tun. Die Tatsache, dass die Stiftung als Aktionär mit einem Anteil von einem Promille dieser Aktien mit dieser Wahl nicht einverstanden ist, hat keinen Einfluss auf die Gültigkeit und Wirksamkeit des Beschlusses und stellt auch keinen Abberufungsgrund des Stifters dar.

153    Im Übrigen ist anzumerken, dass die von der Stiftung angeführte Tatsache hinsichtlich der Unterbrechung der Internetversorgung im Zusammenhang mit der abgehaltenen Generalversammlung, wonach es keine Störungen im Kundendienst von Cyfrowy Polsat gegeben habe, nicht bedeutet, dass es keine lokalen Probleme mit der Konfiguration der Übertragung oder dem Zugang zu technischen Ressourcen im Sitzungssaal gab. Ein Rechenzentrum und eine Glasfaserinfrastruktur sind nicht automatisch eine Garantie für die Verfügbarkeit der Übertragung in jeder Situation.

154    Zusammengefasst können die weitwendig behaupteten Ereignisse rund um die Haupt- bzw. Generalversammlungen der Tochtergesellschaften schon *per se* keinerlei Grund liefern, den Stifter aus allen Positionen zu entfernen, umso weniger, als dass das von der Stiftung gewünschte Vorgehen, irgendwelche "*voting instructions*" den unterliegenden Gesellschaften aufzugeben, glasklar gegen polnisches Gesellschaftsrecht verstossen hätte.

<u>Beweis:</u>    –    Noch vorzulegendes Protokoll der Generalversammlung

### i) Angebliche Verweigerung der Eintragung von Mitgliedern des Stiftungsrats als wirtschaftlich Berechtigte von Unternehmen und mangelnde Richtigstellung der Eintragung im VwbPG

155    Die Stiftungsräte beklagten sich auf S 10 unten und S 11 des Stiftungsratsbeschlusses zusammengefasst darüber, dass die unterliegenden Gesellschaften sich nicht an die Anweisung gehalten hätten, richtige Eintragungen im Register der wirtschaftlichen Eigentümer vorzunehmen. Der Stiftungsrat verkennt einerseits, dass er es selbst verpasst hat, die Eintragung im VwBPG richtig zu stellen, und andererseits, dass die polnische Regelung zur Offenlegung der wirtschaftlich Berechtigten im CRBO sich in dieser Hinsicht offenbar unterscheidet. Der Kreis der meldepflichtigen Personen ist unterschiedlich. In Polen muss jeder wirtschaftlich Berechtigte gemeldet werden, während nach VwbP / RBOA vorderhand Personen, die Kontrolle ausüben, meldepflichtig sind.

156    Schliesslich scheinen die Stiftungsräte auch zu verkennen, dass die Pflicht, Eintragungen im VwBPG die jeweiligen Organe in den jeweiligen Ländern treffen und ihnen als Organe der Muttergesellschaft gar keine Weisungsrechte hinsichtlich länderspezifischer Sorgfaltspflichten zukommen.

157    Konkret hat sich folgender Sachverhalt zugetragen:

158    Dem Wunsch der Kinder nachkommend, persönlich als wirtschaftlich Berechtigte der Underlyings in den entsprechenden Registern eingetragen zu werden, hat der Beistand mit <u>E-Mail vom 3. Juni 2025, 16:48 Uhr</u> im Stiftungsrat neue "UBO letters" zirkuliert und darauf hingewiesen, dass nur noch die Unterschrift von Tomasz Szelag fehle. Es ist sohin offensichtlich, dass es bereits umfassende Vorkorrespondenz, insb. mit Herrn Grzesiak gegeben haben muss, der – als Interessensvertreter der Kinder im Stiftungsrat - diese Erklärungen entworfen hatte. Die Erklärungen betrafen Tochtergesellschaften, wurden offensichtlich von Herrn Grzesiak entworfen und wurden niemals zuvor im Stiftungsrat diskutiert.

- Es war und ist unklar, warum plötzlich völlig neue UBO-Erklärungen für die <u>Tochtergesellschaften</u> in Polen und Zypern erforderlich sein sollen, die sich inhaltlich auch erheblich von den bisherigen unterscheiden. An der rechtlichen Stellung der jeweiligen Personen hat sich <u>nichts</u> geändert, auch nicht durch den Amtsbefehl vom 26. Oktober 2024, der als Grund dafür vom Stiftungsrat angeführt wird.

- Insbesondere ist die in den Erklärungen angeführte Aufforderung und Anweisung an die Tochtergesellschaften in Zypern und Polen nicht nachvollziehbar, wonach „innerhalb von zwei (2) Werktagen nach Datum dieses Schreibens eine schriftliche Bestätigung vorzulegen [sei], dass der entsprechende Antrag bei den zuständigen

34

700

Registerbehörden gestellt wurde". Wie bereits indiziert, sollte versucht werden, dieses Vorhaben der Registereintragung für die Kinder Knall auf Fall durchzuboxen.

▪ Darüber hinaus enthielt das Schreiben Anweisungen an die Tochtergesellschaften, die weit über den Rahmen eines blossen UBO-Schreibens hinaus gehen. Anstatt lediglich die Situation in Liechtenstein darzulegen, wie es für ein UBO-Schreiben des Stiftungsrates üblich wäre und auch in der Vergangenheit geschehen ist, enthält der neue Entwurf konkrete Anweisungen an eine direkte oder indirekte Tochtergesellschaft der Stiftung, <u>Änderungen im nationalen UBO-Register vorzunehmen</u>. Damit versuchte der Beistand, die Befugnisse des Stiftungsrats wissentlich zu überschreiten, indem er sich – kurz gesagt – in nationale Compliance-Angelegenheiten der Tochtergesellschaften einzumischen versucht, um die Registereintragung für die Kinder – die sie sich offensichtlich sehr wünschten – zu erreichen.

159    Der Rechtsvertreter des Tomasz Szelag protestierte und hielt fest, dass es in der alleinigen Verantwortung und Zuständigkeit der Geschäftsführer der einzelnen Konzerngesellschaften liegt, dafür zu sorgen, dass das lokale UBO-Register gemäss den lokalen gesetzlichen Anforderungen geführt wird. Ebenso, dass die Frage der UBO-Schreiben ein expliziter Tagesordnungspunkt für die Sitzung des Stiftungsrats am 11. Juni 2025 ist und daher dort (und nicht im Umlaufwege) diskutiert und beschlossen werden muss. Des Weiteren setzte analysierte der Rechtsvertreter von Tomasz Szelag die in Liechtenstein erfolgte Eintragung der Stiftung im VwBPG und stellte fest, dass die Kinder auch nach Liechtensteinischem Recht (mangels Begünstigungsberechtigung oder aktueller Ermessensbegünstigung)[50] nicht einzutragen wären und der aktuelle Eintrag deshalb unrichtig ist. Entsprechend wurde der Beistand im Namen von Tomasz Szelag mit E-Mail vom 3. Juli 2025 aufgefordert, den Eintrag im VwBPG zu korrigieren.

160    In einer 180-Grad Kehrtwende will nun gerade Tomasz Szelag, der einerseits selbst nach Liechtensteinischem Recht zum Ergebnis gekommen ist, dass die Kinder nicht als UBO's einzutragen sind und der sich explizit <u>gegen</u> diese Einmischung in nationale Angelegenheiten der Tochtergesellschaften aussprach, nun dies als Grund ins Treffen dafür führen, dass der Stifter aus seinen Aufsichtsratspositionen abzuberufen sei (?). Dass es sich dabei um eine Scheinbegründung handelt, ist offensichtlich.

161    Schleierhaft bleibt insb. auch, was die (angeblich) unrichtigen UBO-Meldungen mit der Abberufung des Stiftes zu tun haben sollen, zumal wohl unbestritten sein dürfte, dass er sich

---

[50] Gemäss den einschlägigen gesetzlichen Bestimmungen von Art. 2 Abs. 1) b) 4) VWBPV sind nur die „Begünstigten" im UBO-Register anzugeben. Die Leitlinien des Justizministeriums zu diesem Punkt stellen klar, dass nur Begünstigungsberechtigte namentlich anzugeben sind oder, falls diese nicht existieren, die Ermessensbegünstigten in diesem Abschnitt als Gruppe von Begünstigten anzuführen sind. Bloss potenzielle zukünftige Begünstigte (<u>Anwartschaftsberechtigte</u>, Letztbegünstigte usw.) sind jedoch <u>nicht</u> als Begünstigte im UBO-Register anzugeben, da sie eindeutig weder Begünstigungsberechtigte noch Ermessensbegünstigte sind. Die Kinder (und auch deren Nachkommen) sind aber – selbst wenn sie im Hauptverfahren obsiegen sollten – weder berechtigte Begünstigte noch Ermessensbegünstigte in einer der Stiftungen (denn ein möglicher zukünftiger Ermessensbegünstigter ist per definitionem kein Begünstigter iSd Stiftungsrechts). <u>Deren Nennung im UBO-Register entspricht daher nicht den gesetzlichen Anforderungen.</u>

– ganz unabhängig von irgendwelchen Organpositionen – nicht persönlich um die Erfüllung von Sorgfaltspflichten kümmert.

162    Dass der Stiftungsrat diesem "Grund" – der von einem legitimen Abberufungsgrund in den Tochtergesellschaften nicht weiter entfernt sein könnte – dermassen breiten Raum widmet und Tomasz Szelag hier einen Vorwurf gegen den Stifter erhebt, den er vor wenigen Wochen noch verteidigte, zeigt, dass der Stiftungsrat mit Verzweiflung versucht, irgendeinen Anschein von "Erwägungen", die zur Abberufung geführt haben, zu wahren. Allein dies gelingt ihnen nicht, weil selbst wenn die Tochtergesellschaften sich unzulässig geweigert haben sollten, den "Anweisungen" zu entsprechen (*quod non*), ist dies nicht Sache des Stifters.

Beweis:    –    E-Mail Dris. Niedermüller vom 3. Juni 2025, 22:25 Uhr samt E-Mail des Beistandes vom 3. Juni 2025, 16:48 Uhr (Beilage ./Q)
           –    E-Mail Dris. Niedermüller vom 3. Juli 2025, 12:50 Uhr (Beilage ./R)
           –    PV Tomasz Szelag

### j)    Die Schaffung neuer Unternehmensstrukturen durch den Stifter kann ebensowenig die Abberufung rechtfertigen

163    Schliesslich bleibt es auch unerfindlich, wie die Gründung von weiteren Gesellschaften durch den Stifter seine Abberufung als Aufsichtsrat rechtfertigen soll. Die im Stiftungsrat angeführten "Gründe" beschränken sich auf die Wiedergabe der Registerdokumente, ohne, dass dadurch irgendeine nachvollziehbare Begründung für eine bestehende Gefahr oder Ähnliches abgeleitet werden kann.

164    Das wird auch im Stiftungsratsbeschluss eingestanden, wenn in Rz 5 (S 13 oben) immer wieder von Mutmassungen die Rede ist (arg: "*[…] may be aimed at […] which may result in a loss of any control […] could lose any effective control […] may have serious […] implications*"). Die Gründung von neuen Gesellschaften ist für eine Persönlichkeit wie den Stifter weder ungewöhnlich, noch trat dies erstmals im Zusammenhang mit der stiftungsrechtlichen Auseinandersetzung auf.

165    Ganz im Gegenteil: Der Stifter ist unmittelbarer und mittelbarer Eigentümer zahlreicher Gesellschaften, Anstalten und vergleichbaren Strukturen. Er hat als Stifter und Chefarchitekt der Polsat-Gruppe im Laufe der Jahre – direkt oder über Tochtergesellschaften – hunderte von Unternehmen, Stiftungen und Holdingstrukturen aufgebaut, die die Grundlage für seine Aktivitäten in den Bereichen Investitionen, Medien und Telekommunikation bildeten. Angemerkt sei, dass der Stifter allerdings auch ausserhalb der Liechtensteinischen Stiftungen noch Vermögen und Investitionen hält.

166    Weshalb nunmehr die blosse Gründung von Gesellschaften einen legitimen Abberufungsgrund darstellen soll, ist weder verständlich, noch wird dies im Stiftungsratsbeschluss (zu Recht) erläutert.

36

**k) Kreditinstitute – Keine Massnahmen des Stifters, die die Bankfinanzierung gefährden**

167    Die Behauptungen der Stiftung, dass die Handlungen des Stifters und seinem Anwalt Radoslaw Kwaśnicki zu einer Lähmung der Geschäftstätigkeit von Finanzinstituten, darunter auch Banken, geführt hätten, sind nicht nur unrichtig, sondern stellen auch einen Versuch dar, von der eigentlichen Ursache des Problems abzulenken.

168    Ursache für die drohende finanzielle Misere ist allein das Verhalten der Kinder, insbesondere ihre Erklärung vom 23. September 2024 gegenüber den Vorständen und Aufsichtsräten von Cyfrowy Polsat, Netia, Polkomtel und Telewizja Polsat bezüglich ihrer Beziehung zu ihrem Vater, die als erste Ereignisse für Aufruhr und Unsicherheit bei den Finanzinstituten sorgten.

169    Diese (völlig nutzlose) Erklärung war ein Ausdruck der Illoyalität gegenüber diesen Unternehmen. Aufgrund dieses Verhaltens der Kinder kam es zu umfangreicher Medienberichterstattung und zu schweren Schäden für die Stiftung. All das will der Stiftungsrat offenbar vergessen haben.

<u>Beweis:</u>    –   Auszug aus der Medienberichterstattung (Beilage ./S)

170    Dies hatte nicht nur Auswirkungen auf den persönlichen Ruf des Stifters, sondern auch auf den Ruf der Unternehmen, die zu den beiden von ihm gegründeten Holdinggesellschaften gehören, der schwer beschädigt wurde. Dies wird durch den drastischen Kursverfall der Cyfrowy Polsat-Aktien Ende September und Anfang Oktober 2024 bestätigt.

171    Durch die Abberufung des Stifters als Schöpfer der Unternehmensgruppe aus <u>allen</u> Positionen hat der Stiftungsrat der Stiftung schweren Schaden zugefügt. Der Börsekurs der wertvollsten Gesellschaft der Stiftung, der Cyfrowy Polsat S.A., brach massiv ein.



172    Während am Freitag, 18. Juli 2025 der Kurs noch bei etwa **EUR 3,74 pro Aktie lag**, brach dieser anschliessend massiv ein. Zum 31. Juli 2025 notiert die Aktie derzeit nur noch bei etwa **EUR 3,39 pro Stück**, was einen **Kurs- und Wertverlust von rund 9,3% bedeutet, der allein vom Stiftungsrat zu verantworten ist**.

173    Haben schon das vorbeschriebene Verhalten der Kinder und der damit verbundene Medienrummel für erhebliche Unruhe im Bankensektor und bei Finanzinstituten gesorgt, hat der Stiftungsrat mit dieser – völlig nutzlosen und ungerechtfertigten – Aktion die Stiftung noch

37

703

weiter geschädigt. Es ist geradezu ungeheuerlich: Dem Stifter wird seit Monaten immer wieder vorgeworfen, er würde "gegen die Interessen der Stiftung" handeln, wobei ausser dieser Worthülse niemals ein konkreter Vorwurf substantiiert werden kann. Umgekehrt schädigt der Stiftungsrat unter Direktive des Beistandes und Jaroslaw Grzesiak die Stiftung in Millionenhöhe, nur um Vergeltung dafür zu üben, dass der Stifter (angeblich) im Herbst 2024 seinen Einfluss dafür nützte, um Piotr Zak und Tobias Solorz abzuberufen.

174   Infolge dieser medienwirksamen – ursprünglich von den Kindern lancierten, vom Stiftungsrat nunmehr durch die Abberufung zu einem neuen Tiefpunkt gebrachten – Aktivitäten stieg das Interesse an der Eigentümerstruktur, was bereits damals zu operativen Einschränkungen und der Notwendigkeit führte, zusätzliche Erklärungsmassnahmen gegenüber Finanzinstituten zu ergreifen. Aufgrund der ursprünglichen Aktivitäten der Kinder führte u. a. die Finanzabteilung von Cyfrowy Polsat auf der Grundlage der Bestimmungen des SFA einen regelmässigen Newsletter für Banken ein, in dem über die Situation in der Polsat-Gruppe informiert wurde. Im Rahmen dieses Berichts wurden u. a. Informationen über alle Umstände bereitgestellt, die möglicherweise zu Änderungen in der Eigentümerstruktur der Gruppe führen könnten. Dass der Stiftungsrat nunmehr das durch die Medienberichterstattung beschädigte Verhältnis zu den finanzierenden Banken als <u>Abberufungsgrund</u> für den Stifter anführen will, wodurch gerade dieses Verhältnis weiter geschädigt wird und die Stiftung Millionenverluste erleidet, ist unhaltbar.

175   Es war der in der Verantwortung der Kinder liegende "geleakte" Stiftungsstreit, der sich auch auf die Beziehungen der Unternehmen zu ihren Geschäftspartnern auswirkte, die angesichts der Unternehmenssituation innerhalb der Gruppe um Erklärungen und Zusicherungen hinsichtlich der Umsetzung wichtiger Projekte und der Fortsetzung der Zusammenarbeit baten.

176   **Keine einzige Handlung des Stifters, der am gedeihlichen Fortkommen der Stiftung als einziger Begünstigter ein elementares Eigeninteresse hat, hat das Verhältnis zu den Kreditinstituten auch nur im Ansatz beeinträchtigt, geschweige denn geschädigt.**

177   Es ist daher unrichtig, dass ein einziges Interview des polnischen Anwalts des Stifters dazu geführt haben soll, dass die Banken eines Milliardenkonzerns "kalte Füsse" bekommen haben sollen. Vielmehr ist es die von den Kindern lancierte Medienkampagne (auf die das Interview eine Antwort gibt), die den diesbezüglichen Schaden zu verantworten hat. Es ist daher unredlich und zeigt die unhaltbare Doppelmoral wiederum auf, wenn der Stiftungsrat allen Ernstes ein einzelnes Interview eines polnischen Anwalts als Abberufungsgrund für den Stifter in allen Unternehmen verwenden will, dem Verhalten der Kinder und jenes des Herrn Grzesiak aber keinerlei Bedeutung beimisst.

<u>Beweis:</u>   –   Im Bestreitungsfall über Kursverlust und kausales Verhalten der Abberufung dazu einzuholendes Sachverständigengutachten aus dem Fachbereich Börsewesen.

38

5    Rechtliches

### a) Formelles

178    Gegen eine dem Stiftungszweck widersprechende Verwaltung und Verwendung des Vermögens durch die Stiftungsorgane kann jeder Stiftungsbeteiligte gemäss Art 552 § 29 PGR beim Richter im Ausserstreitverfahren die Anordnung der gebotenen Massnahmen nach Abs 3 leg cit beantragen. Beispielhaft werden hierzu (i) die Kontrolle und Abberufung der Stiftungsorgane, (ii) die Durchführung von Sonderprüfungen oder (iii) die Aufhebung von Beschlüssen der Stiftungsorgane genannt.

179    Wie oben ausgeführt, handelt es sich bei Herrn Solorz gleichzeitig um den Stifter, den Kurator und den Erstbegünstigten der TiVi Foundation, weswegen dieser selbstverständlich Stiftungsbeteiligter iSd Art 552 § 3 PGR ist. Herr Solorz ist sohin zweifellos zur Stellung der gegenständlichen Anträge legitimiert und ist das Fürstliche Land- als Aufsichtsgericht in richterlichen Aufsichtssachen im Sinne des Art. 552 § 29 PGR im Ausserstreitverfahren zuständig.[51]

### b) Anfechtung der Beschlüsse

180    Dass die Aufhebung von Stiftungsratsbeschlüssen in die Kompetenz des Ausserstreit- respektive Aufsichtsrichters fällt, ergibt sich direkt aus Art 552 § 29 PGR, der die "Aufhebung von Beschlüssen der Stiftungsorgane" explizit als mögliche Aufsichtsmassnahme nennt. Dass hierneben auch "das Begehren auf Feststellung der Nichtigkeit von Stiftungs- ratsbeschlüssen Gegenstand der Stiftungsaufsicht und damit des Ausserstreitverfahrens ist" stellte der Fürstliche Oberste Gerichtshof unmissverständlich bereits fest.[52]

181    *Lorenz* führt in einer dogmatischen Aufarbeitung der Beschlusskontrolle des Aufsichtsgericht hierzu das Folgende sinngemäss aus: Da Stiftungen kein oberstes Organ haben, kann man dogmatisch betrachtet auch das Anfechtungsregime aus dem allgemeinen Teil des PGR, das für oberste Organe gilt, nicht auf Stiftungen anwenden. Im technischen Sinne gibt es keine "anfechtbaren" Beschlüsse von Stiftungsorganen. Fehlerhafte Beschlüsse sind vielmehr **nichtig**. Gesetz- und statutenwidrige Beschlüsse entfalten bei Stiftungen zwar keine Rechtskraft und es besteht daher kein (fristgebundener) Anfechtungszwang bei sonstiger Präklusion, aber sie zeigen eine faktische Kraft. Es besteht evidente Umsetzungsgefahr. Die Nichtigkeit solcher Beschlüsse ändert daher nichts daran, dass sie aufgrund des inhärenten Rechtsschutzbedürfnisses bekämpft werden können im Rahmen des Aufsichtsverfahrens. Aufgabe des Aufsichtsgerichts ist es nämlich, für die zweckentsprechende Verwaltung und Verwendung des Stiftungsvermögens zu sorgen. Fehlerhafte Beschlüsse gefährden genau

---

[51] Siehe etwa: *Geisselmann*, Die Frage nach dem richtigen Rechtsweg im Kontext des liechtensteinischen Stiftungsrechts, 2022, S. 46 ff: "Eine weitestgehend einheitliche Rsp-Linie verfolgt der OGH seit Inkrafttreten der neuen Stiftungsrechts darin, dass er die Nichtigerklärung und Aufhebung von Stiftungsratsbeschlüssen als "Gegenstand der Stiftugnsaufsicht" qaulifiziert [...].

vgl. etwa OGH 05.02.2016, 05 HG.2015.123, LES 2016, 66.

[52] OGH 07.09.2018, 07 HG.2017.31, LES 4/18, 267.

dieses Ziel. Aufsichtsrechtlich besteht daher ein Bedürfnis, auch nichtige Beschlüsse "aufzuheben". Ultimativ soll die Gerichtsaufsicht die Stiftung vor fehlbaren Organen schützen. Genau genommen handelt es sich dabei zwar nicht um eine "Aufhebung" im technischen Sinne, sondern um die Beseitigung des äusseren Anscheins eines gültigen Beschlusses.[53] Ob schliesslich die Aufhebung oder (korrekt) die Beseitigung des äusseren Anscheins eines gültigen Beschlusses vom Antragsteller begehrt wird, ist aufgrund der geringen Formstrenge des Ausserstreitverfahrens ohnehin nicht schädlich und darf diese Diskussion auf sich beruhen bleiben.

182    Ein wider der Statutenbestimmungen ergangener Stiftungsratsbeschluss ist in jedem Fall vom Aufsichtsgericht aufzuheben: Die jeweils gefassten Beschlüsse des Stiftungsrates der Stiftung vom 21. Juli 2025, wonach

- die Stiftung unter Berufung auf das ihr persönlich zustehende Recht gemäss der Satzung der jeweils adressierten Gesellschaft die Abberufung des Herrn Zygmunt Solorz

       i.  in der Cyfrowy Poslat S.A.

      ii.  in der Telewizja Polsat Sp. z o.o. und

     iii.  in der Polkomtel Sp. z o.o.

     iv.  und auch in der Netia S.A.

als Vorsitzenden des Aufsichtsrates anordnen (in der Folge im Singular: "**Stiftungsratsbeschluss**") sind daher **nichtig** und jedenfalls **rechtswidrig und damit anfechtbar**.

  –  **Nichtigkeit wegen Verstosses gegen die Statuten**

183    Wie oben aufgezeigt, verstösst der Beschluss gegen die ausdrückliche Bestimmung des Art. 13 Abs. 2 (2) 3. (iii)[54] bzw. des (iv)[55] der Statuten. Aus der Wortfolge, wonach diese den Stifter begünstigenden Bestimmungen "*auch vom Stiftungsrat nicht […] abgeändert werden*" können, folgt, dass diesen Bestimmungen widersprechende Stiftungsratsbeschlüsse nichtig sind.

184    Ebenso verstösst der Beschluss gegen die ausdrückliche Bestimmung des Art. 13 Abs. 2 (2) 3. (i)[56] bzw. der (ii)[57] der Statuten. Aus der Wortfolge, dass im Anwendungsfall der dort näher umschriebenen Postenumbesetzung "*eine <u>vorherige</u> gemeinsame Beratung mit dem Stifter <u>obligatorisch erforderlich</u>*" ist, geht die Rechtsfolge einher, dass ein Beschluss, der gegen dieses "obligatorisch[e]" Erfordernis der Beratung und Konsultation mit dem Stifter verstösst, nichtig ist. Der Beschluss ist im Übrigen auch deshalb nichtig, weil der Stifter als Kurator in

---

[53] *Lorenz*, Anfechtung von Stiftungsratsbeschlüssen im liechtensteinischen Recht? in JEV 2023, 72 · Heft 2 v. 31.8.2023.
[54] idF vom 29. November 2023 bzw. 24. September 2024.
[55] idF vom 2. August 2024.
[56] idF vom 29. November 2023 bzw. 24. September 2024.
[57] idF vom 2. August 2024.

die bezughabende Willensbildung nicht miteinbezogen wurde. Die <u>Mitwirkungsmöglichkeit</u> bei der Beschlussfassung ist <u>zwingendes Recht</u>. Beschlüsse, bei denen nicht sämtliche Stiftungsratsmitglieder mitwirken konnten, sind nichtig.[58]

185    Gemäss Art. 9 der notarischen Statuten ist der Stifter als Kurator <u>Berater des Stiftungsrates</u>. Er ist unter anderem berechtigt, <u>an den Sitzungen des Stiftungsrates teilzunehmen und die Angelegenheiten der Stiftung zu besprechen</u>. Weiters überwacht der Kurator (unter anderem) die Verwirklichung des Stiftungszwecks durch den Stiftungsrat gemäss den Stiftungsdokumenten. Gemäss den – nach wie vor und unbestritten in Kraft stehenden – Statutenbestimmungen hat der Kurator daher das <u>Recht auf Mitwirkung bei der Willensbildung des Stiftungsrates</u> und der anschliessenden Beschlussfassung. Diese Rechte des Kurators erschöpfen sich schon *expressis verbis* gerade nicht darin, bloss im Nachhinein über die bereits erfolgte (und sich bereits in Umsetzung befindliche) Willensbildung des Stiftungsrates informiert zu werden, wie dies mit dem oben angeführten nichtigen (und anfechtbaren) Stiftungsratsbeschluss geschehen ist.

186    Der Beschluss ist daher auch deshalb nichtig, weil der Stifter als Kurator von der Willensbildung über dieses Vorhaben rechtswidrig ausgeschlossen wurde. Die (vom Fürstlichen Obergericht jüngst bekräftigten)[59] Teilnahme- und Einflussrechte des Kurators wurden pflichtwidrig missachtet, wohl eindeutig deshalb, um den Kurator vor vollendete Tatsachen zu stellen.

–    **Anfechtbarkeit wegen Verletzung des materiellen Rechts**

187    Sofern man nicht ohnehin von absoluter Nichtigkeit ausgeht, ist der statutenwidrig gefasste Stiftungsratsbeschluss aber jedenfalls auch aus den oben angeführten Gründen anfechtbar. Stiftungsratsbeschlüsse, die gegen die Statuten verstossen, stehen per se der zweckgemässen Verwaltung und Verwendung des Stiftungsvermögens entgegen.[60] Der Stiftungsratsbeschluss ist daher auch wegen <u>materieller Rechtswidrigkeit</u> anfechtbar.

188    Der Stifter als Stiftungsbeteiligter hat einen Rechtsgestaltungsanspruch darauf, diesen Stiftungsratsbeschluss anzufechten bzw. die Nichtigkeit desselben gerichtlich feststellen zu lassen.

c)    **Weisung bzw. Anordnung an den Stiftungsrat**

189    Die Aufzählung der aufsichtsrechtlichen Massnahmen in Art 552 § 29 Abs 3 PGR ist nicht abschliessend. So sind u.a. Anordnungen bzw. Weisungen möglich. Dies ermöglicht ein richterliches Eingreifen, um einen erkannten Missstand in der Stiftung mittels Anordnung konkret zu beheben, damit ein einschneidendes Vorgehen wie z.B. die Abberufung von Stiftungsorganen vermieden werden kann. Mittels einer Weisung wird ein Tun, Unterlassen

---

[58] U 07.03.2014, 05 CG.2012.409, PSR 2014/43 - GE 2014, 313; StGH 17.09.2007, StGH 2007/040, GE 2009, 304.
[59] Beschluss des Fürstlichen Obergerichts vom 3. April 2025 (06 HG 2024.133 ON 106), S 50 unten und S 51 oben (zur TiVi Foundation), ebenso Beschluss des FL OG 06 HG.2024.149 (ON 30) S 43 zur Solkomtel Foundation.
[60] OGH, 07.09.2018, 7 HG.2017.31, LES 2018, 267.

oder Dulden von Seiten des Aufsichtsrichters angeordnet. Betroffen von einer Weisung können nur die Beteiligten (Parteien laut § 2 Abs 1 AussStrG) eines Aufsichtsverfahrens sein. Denkbar seien gemäss *Hammermann* etwa Vorgaben betreffend die Vermögensverwaltung, die Prüfung von Schadenersatzansprüchen gegenüber verantwortlichen Stiftungsorganen wie auch die Durchführung von Stiftungsratssitzungen.[61]

190    Mit der Nichtigerklärung bzw. Aufhebung der Stiftungsratsbeschlüsse vom 21. Juli 2025 ist der statutenwidrige Zustand nicht aus der Welt geschafft: Es bedarf einer Weisung bzw. Anordnung an die Stiftungsräte, diese Abberufungen rückgängig zu machen und den rechtsmässigen Zustand - im Sinne von Wiedernennung des Stifters in den unterliegenden Gesellschaften – wiederherzustellen.

6    Anträge

Aus all diesen Gründen stellt der Stifter die

## ANTRÄGE:

Das Fürstliche Land- als Aufsichtsgericht möge nach Durchführung einer mündlichen Verhandlung

1    mit Wirkung zwischen den Parteien feststellen, dass die am 21. Juli 2025 gefassten Stiftungsratsbeschlüsse der TiVi Foundation gerichtet auf die Abberufung von Herrn Zygmunt Solorz als Vorsitzenden des Aufsichtsrates der a) Cyfrowy Poslat S.A., der b) Telewizja Polsat Sp. z o.o., der c) Polkomtel Sp. z o.o und der d) Netia S.A. nichtig sind;

*in eventu*

die am 21. Juli 2025 gefassten Stiftungsratsbeschlüsse der TiVi Foundation gerichtet auf die Abberufung von Herrn Zygmunt Solorz als Vorsitzenden des Aufsichtsrates der a) Cyfrowy Poslat S.A., der b) Telewizja Polsat Sp. z o.o., der c) Polkomtel Sp. z o.o. und der d) Netia S.A. für rechtsunwirksam erklären, *in eventu* aufheben;

2    Weisungen bzw. Anordnungen an die Stiftungsräte der TiVi Foundation erteilen, dass in den vorgenannten Gesellschaften

i)    die Erklärungen vom 21. Juli 2025, wonach der Stifter als Vorsitzender des Aufsichtsrates abberufen werde, widerrufen

ii)   die Person(en), welche anstelle des Stifters als Vorsitzender des Aufsichtsrates bestellt wurde(n), abberufen,

iii)  der Stifter als Vorsitzender des Aufsichtsrates wiederbestellt werde;

---

[61] Hammermann in Heiss/Lorenz/Schauer, Kommentar zum liechtensteinischen Stiftungsrecht, 2. Auflage, S. 1352 mWN.

42

708

3    die Antragsgegner zum Ersatz der Verfahrenskosten des Stifters zu Handen seiner ausgewiesenen Rechtsvertretung binnen vier Wochen bei sonstiger Exekution verpflichten.

Vaduz, 1. August 2025
SOT/AGO/fen

Kosten werden verzeichnet:
(Streitwert: CHF 30'000.00)

| | | |
|---|---|---|
| Äusserung TP 3A, 40% ES, | CHF | 1'108.80 |
| 25% StGZ | CHF | 277.20 |
| MwSt 8,1% | CHF | 112.26 |
| **Gesamt** | **CHF** | **1'498.26** |

### BEILAGENVERZEICHNIS

| | |
|---|---|
| Statuten der TiVi Foundation idF vom 29. November 2023 | ./A |
| Beistatuten der TiVi Foundation idF vom 29. November 2023 | ./B |
| Änderungserklärung TiVi vom 2. August 2024 | ./C |
| Statuten der TiVi Foundation idF vom 24. September 2024 | ./D |
| Beistatuten der TiVi Foundation idF vom 24. September 2024 | ./E |
| Auszug aus der Homepage der Polsat Gruppe | ./F |
| Konvolut Registerauszüge aus den Gesellschaften Netia .S.A. , Cyfrowy Polsat S.A., Polkomtel Sp. z. o. o. und Telewizja Polsat Sp. z.o.o. | ./G |
| Auszüge aus den Finanzberichten der Netia .S.A. , Cyfrowy Polsat S.A., Polkomtel Sp. z. o. o. und Telewizja Polsat Sp. z.o.o. | ./H |
| Beschluss des Stiftungsrats vom 21. Juli 2025 betreffend Cyfrowy Poslat S.A sowie Erklärung des Stiftungsrates vom 21. Juli 2025 über die Abberufung des Stifters und des Herrn Miroslaw Marian Blaszczyk sowie die Ernennung von zwei anderen Personen in Cyfrowy Poslat S.A. | ./I |
| Beschlüsse des Stiftungsrats vom 21. Juli 2025 betreffend i) Telewizja Polsat Sp. z o.o, ii) Netia S.A. sowie iii) Polkomtel Sp. z o.o. sowie Erklärung des Stiftungsrates vom 21. Juli 2025 über die Abberufung des Stifters in der Polkomtel Sp. z o.o. und Telewizja Polsat Sp. z o.o. und über die Ernennung einer anderen Person in Telewizja Polsat Sp. z o.o. | ./J |
| Berichte über die Asseco Transaktion bei "Grupa Polsat Plus" | ./K |
| Berichte über die ZE PAK Transaktion Nr. 2, 3 und 13/2025 | ./L |
| Berichte über die Wertsteigerungen der ZE PAK Aktien aus Business Insider | ./M |
| E-Mail des Herrn Andrzej Janiszowski vom 14. März 2025 | ./N |
| Zirkularbeschluss der Cyfrowy Polsat S.A. vom 19. Januar 2024 über den Erwerb der Archiplex Sp. z o.o. | ./O |
| Schreiben Dris. Pitkowitz vom 29. April 2025 samt Memorandum in der Anlage | ./P |
| E-Mail Dris. Niedermüller vom 3. Juni 2025, 22:25 Uhr samt E-Mail des Beistandes vom 3. Juni 2025, 16:48 Uhr | ./Q |
| E-Mail Dris. Niedermüller vom 3. Juli 2025, 12:50 Uhr | ./R |
| Auszug aus der Medienberichterstattung | ./S |
| Schreiben von Cyfrowy Polsat vom 2. Mai 2025 | ./T |
| Schreiben des Beistands und Jaroslaw Grzesiak vom 2. Mai 2025 | ./U |
| Schreiben von Cyfrowy Polsat vom 5. Mai 2025 | ./V |
| Schreiben von Cyfrowy Polsat vom 10. Juni 2025 | ./W |
| Schreiben des Beistands und Jaroslaw Grzesiak vom 13. Juni 2025 | ./X |
| Schreiben von Cyfrowy Polsat vom 19. Juni 2025 | ./Y |

43

709