# Exhibit A

[stamp:] GASSER PARTNER
REC. 05/21/25 08:31 AM



PRINCIPALITY OF LIECHTENSTEIN
**PRINCELY**

# COURT OF JUSTICE

Please always quote the file number
<u>06 HG.2024.210</u>

ON 39

# DECISION

## Case

| | |
|---|---|
| **Applicant:** | Zygmunt Jozef Solorz, ▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| | represented by Schurti Partners Rechtsanwälte AG, Zollstrasse 2, LI-9490 Vaduz |
| | additionally represented by Pitkowitz & Partners Pitkowitz Rechtsanwälte GmbH, Schwarzenbergplatz 3, AT-1010 Vienna, <u>authorized recipient</u>: Schurti Partners Rechtsanwälte AG, Zollstrasse 2, LI-9490 Vaduz |

| | |
|---|---|
| **Respondents:** | 1.  TiVi Foundation (FL-0002.394.367-5) represented by Ritter Schierscher Rechtsanwälte AG, Gewerbeweg 5, LI-9490 Vaduz |
| | 2.  Piotr Mateusz Zak, ▮▮▮▮▮▮▮▮▮▮▮▮▮ represented by Roth + Partner Rechtsanwälte AG, Landstrasse 40, P.O. B.oox 408, LI-9495 Triesen |
| | 3.  Aleksandra Jadwiga Zak, ▮▮▮▮▮▮▮▮▮ represented by Gasser Partner Rechtsanwälte, Feldkircher Strasse 31, P.O. Box 246, Ll- 9494 Schaan |
| | 4.  Tobias Markus Solorz, born on ▮▮▮▮▮▮▮▮ |

Page 2

represented by Marxer & Partner Rechtsanwälte,
Heiligkreuz 6, P.O. Box 484, Ll- 9490 Vaduz

**on the grounds of:**  Foundation supervision (BMG: CHF 30,000.00)

1. **The motion as well as the contingent claims of the Applicant of the content:**

   1 **It is hereby established with binding effect between the parties that**

   a. **the articles of association of TiVi Foundation, FL - 0002.394.367 - 5, as filed with the commercial register, in the version of the notarial deed dated September 24, 2024, recorded and certified by notary Mag. Alexander Winkler, notary public with registered office in 1180 Vienna, Weimarer Strasse 5, under GZ 1595, as well as the bylaws of the aforementioned foundation in the version of the notarial deed dated September 24, 2024, recorded and certified by the same notary public under GZ 1597, in accordance with Appendixes ./ AJ and ./AK, which form an integral part of this decision, are valid and legally effective;**

   b. **the Applicant has all rights vis-à-vis the legal entity concerned that as founder, primary beneficiary, or trustee in the aforementioned articles of association and bylaws as amended by notarial deed dated September 24, 2024, recorded and certified by Mag. Alexander Winkler, notary public with registered office in 1180 Vienna, Weimarer Strasse 5, under GZ 1595 and GZ 1597, in accordance with the Appendix ./ AJ and ./AK, which form an integral part of this decision, including, in particular,**

      i. **the right to issue one or more bylaws or regulations and to determine the beneficiaries (Article 5 para 1 and para 2 of the articles of association);**

20



Page 3

ii. the right to appoint or dismiss members of the foundation board and the chairman of the foundation board (Article 6 para. 2 lit. a of the articles of association)

iii. **the right to be the sole trustee of the foundation and, in this capacity, to exercise the rights set out in the articles of association and bylaws, in particular to supervise the foundation board, to have his proposals implemented by the foundation board, to make all decisions of the foundation board subject to his approval as trustee, and to inspect all foundation documents (cf. Article 9. para. 1 of the articles of association, point B), in particular III. and point IV. sub 1) of the bylaws);**

iv. **the right to amend the foundation's deed of foundation, the articles of association, and the bylaws during his lifetime (Article 13 para. 2 point 1 of the articles of association);**

v. **the right to instruct the foundation board to pay all income from the foundation to him (Article 13 para. 2 point 4 of the articles of association).**

**in eventu**

**The articles of association and bylaws of the legal entity concerned, the TiVi Foundation, as filed with the commercial register, FL-0002.394.367-5, in the version dated August 2, 2024, which is amended by the Applicant's statements**

**regarding the amendment of the articles of association (certified in Deed A No. 6223/2024),**
**regarding the "circular resolution" (certified in Deed A No. 6228/2024),**
**and on the statement pursuant to Article 13 (2) 2. (i) of the articles of association (certified in Deed A No. 6235/2024),**

**certified under the aforementioned deed number by Dariusz Wlerzchucki, notary in Warsaw, on this day, are declared legally invalid.**



Page 4

in eventu

> The statements made by the Applicant on August 2, 2024, to the concerned legal entity registered in the commercial register, the TiVi Foundation, FL-0002.394.367-5,
>
> regarding the amendment of the articles of association to Deed A No. 6223/2024,
> regarding the "circular resolution" to Deed A No. 6228/2024, and those pursuant to Article 13 (2) 2. (i) of the articles of association in Deed A No. 6235/2024,
>
> each on that date under the respective deed number, notarized by Dariusz Wierzchucki, notary in Warsaw, are declared legally invalid.

are hereby <u>rejected</u>.

2.  **The Applicant is obliged to pay the sum of CHF 38,253.60 to Respondent as per 2, payable to its designated legal representative, the sum of CHF 45,738.00 to Respondent as per 3, payable to its designated legal representative, and the sum of CHF 40,452.53 to Respondent as per 4, payable to its designated legal representative, within 4 weeks.**

Date reserved:

# Grounds

[hw:] *(GS) June 18, 2025*
Signature [signature]

1.  It is worth noting that the motions in question were initially submitted in contentious proceedings (ref. 06 CG.2024.184).– With the decisions of December 4, 2024 ref. 06 CG.2024.184 (ON 3) and of April 9, 2025 (in ON 35), which have since become legally binding, it was established as final and absolute that the motions set out in the ruling are to be dealt with and decided in non-contentious proceedings.

■    Page 5    ■

Furthermore, it should be noted that various proceedings, in particular supervisory proceedings (Commercial Court) initiated upon request, are pending before the Court of Justice in relation to the Respondent as per 1, the TiVi Foundation, which are closely related to the facts of the case, and which have largely been suspended until these proceedings are concluded. In this context, various provisional measures have already been issued that prohibit one side or the other from doing this or that, some of which are already outdated. The provisional measure most relevant to the proceedings in question is the official order of October 26 2024 ref. 06 HG.2024.133 (ON 71 therein), which dismissed the previous chairman of the board of directors, Philipp Senn, confirmed the two previous members of the foundation board, Tomas Szelag and Katarzyna Tomczuk, in their positions, and appointed attorney Peter Schierscher as assistant with the functions of chairman of the foundation board. The same decision (temporarily) amended the articles of association of the Respondent as per 1.

In the present proceedings, the parties are arguing in particular about which foundation documents are currently valid and who is entitled to which rights on that basis.

2.    The **Applicant** justifies his request as stated in the ruling (insofar as still relevant) essentially as follows:

The Applicant is a successful entrepreneur who became known worldwide in the 1990s by establishing the first private Polish television station (Polsat) and acquiring a mobile phone operator in 2011. He is one of the wealthiest people in Europe.  The Applicant structured the core of his assets, including the Polsat television station, through the TIVI Foundation.  He is the sole founder and primary beneficiary of this foundation.  His children, Respondents as per 2–4, were originally secondary beneficiaries and were supposed to have enjoyed significant control and beneficiary rights upon his death.

23

Page 6

The Applicant established the Respondent as per 1 to ensure the continuation of his group of companies after his death. This and the efficient (and tax-optimized) structuring were the Applicant's main intentions in establishing the foundation.  In 2012 the Applicant was at the height of his entrepreneurial career and at that time there was no talk of a " successor." It was only later—in order to cover all eventualities—that Respondents as per 2–4 introduced into the foundation as secondary beneficiaries, and much later, in 2022, the mechanism of the declaration of death was introduced. In this context, it is certainly true that one of the Applicant's original motives (not the statutory purpose of the foundation) was that the Respondents as per 2–4 would have been entitled to benefit from the assets he had accumulated in the event of his death, if the Applicant had so wished. For this purpose, he also granted corresponding secondary beneficiary status, albeit long after the foundation was established. In addition, Respondents as per 2–4 were to be granted individual rights of control, but only after his death.

In a long-planned "attempted coup," Respondents as per 2–4 allegedly used the family gathering on the occasion of the Applicant's 68th birthday in the fall of 2024 and the temporary absence of his trusted lawyer to trick the Applicant into signing several statements on August 2, 2024, through fraudulent misrepresentation.

Page 7

The Applicant was not advised, informed, or otherwise supported regarding the consequences of the amendment to the articles of association at the chaotic meeting on August 2, 2024. On the contrary: Instead of the already prepared notarial form, the author of the statement on the amendment to the articles of association, the second respondent, submitted a simple signature certification for signing, in order to circumvent the notary's duty to provide information. The Applicant was also not granted any new rights.

These statements meant that the Applicant would not only be legally "declared dead" by his foundation, which would give Respondents as per 2–4 complete control over the foundation,  but the Respondents as per 2–4 also slipped in statements under which the Applicant would have had his irrevocable right to revoke this declaration of death "deleted" from the articles of association (which is not legally possible under the articles of association).  This "self-disqualification of the founder" of August 2, 2024 obtained by the children through fraudulent misrepresentation, is null and void and legally ineffective.

Following these events, the Applicant exercised his (irrevocable) right to amend the articles of association and revoke or reissue his declaration of death, restored his previous legal position, and reinstated the previous articles of association (with one amendment, namely the insertion of a forfeiture clause). Nevertheless, Respondents as per 2–4 continued to attempt to take control of the foundation based on the invalid articles of association of August 2, 2024, in order to gain access to its assets and to exclude the Applicant, as sole founder, from his statutory rights.

Due to this continued behavior, Respondents as per 2–4 had meanwhile lost all beneficiary rights in the foundation in accordance with the forfeiture clause in Article 5 para 5 of the articles of association, and the articles of association and bylaws had been amended accordingly by notarial deed dated September 24, 2024.

25

Page 8

Contrary to the arguments put forward by Respondents as per 2–4, the statements of August 2, 2024, were not prompted by a long-planned succession that was supposed to take place on that particular day, but rather the notarized statement of the Applicant dated July 29, 2024, according to which he wanted to retain full control over his companies, prompted the Respondents as per 2–4 to take immediate action.

The widely touted motive of the Respondents for alleged asset protection in the interests of the foundation or the Applicant is a pretext. The asset protection measure served exclusively the self-interest of Respondents as per 2–4 in gaining access to the Applicant's assets without having any legal claim to them by taking control of the foundation, out of fear that third parties might gain access first.

It was never the Applicant's intention to relinquish control of his foundation and his entire life's work permanently. The Respondents as per 2–4 were well aware of this. The statements dated August 2, 2024, are legally invalid due to malice and error.

Irrespective of this, the Applicant effectively revoked the previously obtained declaration of death pursuant to Article 13 (2) 2 (iii) of the articles of association on August 17, 2024.  The attempted cancellation of this right of revocation, which is enshrined as irrevocable, is legally meaningless because this order was no longer covered by any statutory right to make amendments.

26

The founder's intention to make the declaration of death revocable is expressly confirmed by him. However, this is also evident from the wording and historical interpretation of the articles of association.

The counterarguments of Respondents as per 2–4 are completely unfounded. Their legal opinion is based solely on the fact that the revocability of the declaration of death does not correspond to the "purpose" that they wish to attribute to the provision, without any basis in the articles of association.

The Applicant's legal opinion is supported by case law and literature, as well as by two open-ended legal opinions from two of the most renowned experts on Liechtenstein foundation law, Prof. Jakob and Univ. Prof. Schauer. A dogmatic refutation is not even remotely possible for the Respondents.

The Applicant was therefore able to effectively amend the articles of association of the Respondent as per 1) on August 19, 2024 and September 24, 2024 and would once again be entitled to all rights arising from or in connection with the Respondent as per 1.

3.    The **Respondents as per 2–4** request that the (contingent) claims be dismissed with costs and essentially argue (insofar as still relevant):

The TiVi Foundation was established by the Applicant for the purpose of securing the companies he had created and organizing succession by his children. This intention is reflected in several provisions of the various articles of association (cf. Article 3 and Article 13 of the articles of association dated November 24, 2022). The companies contributed to the foundation were essentially built up by the Applicant during his first and second marriages with the support of his wives. During the divorce proceedings, the Applicant agreed that the Respondents as per 2–4 should be allocated the assets.

27

At the beginning of 2022 the Applicant had to undergo several weeks of medical treatment due to progressive health problems and serious illness. He realized he would eventually no longer be able to run the companies and make decisions independently, and that there would be significant risks if a successor had not already been secured by then. He also had the intention of divorcing his third wife. He discussed these problems with his friend and advisor Jaroslaw Grzesiak during his treatment. Later, during talks lasting several days at the Applicant's premises with his two sons (the Respondents as per 2–4), Jaroslaw Grzesiak, Jerzy Modrzejewski, Tomasz Szelag, and a doctor, the possibility of automatic succession to the Applicant's organizational rights was discussed. Jaroslaw Grzesiak designed and presented the mechanism of a declaration of death with an effective date that can be postponed in advance. Jerzy Modrejewski and Jaroslaw Grzesiak adopted the implementation of this universally approved concept by Jaroslaw Grzesiak in the articles of association of November 24, 2022 (Article 13, para. 2), which were considered final at the time and were signed by the Applicant together with his children. This mechanism for the future change of control was allegedly also prepared at the corporate level, for example with the financing banks, which Tomasz Szelag took over.

The Applicant signed the first declaration of death, co-drafted by notary Dariusz Wierzchucki, on May 29, 2023, with effect from December 15, 2023. Even at that time, it was understood by all parties involved that the Applicant could postpone the effective date further into the future, provided that his health permitted. At that time, Justyna Kulka had gained increasing influence over the Applicant, with whom she had apparently been in a relationship since 2022. In August 2023, it was reported that the Applicant had revoked the declaration of death and introduced the possibility of such a revocation, even retrospectively, into the articles of association—for the first time without consulting the children or Jaroslaw Grzesiak and without explanation. The changes were apparently made in the Applicant's office in the presence of the notary, as well as Justyna Kulka and Jerzy Modrejewski. Jaroslaw Grzesiak expressed concerns about these changes and saw the risk that the transfer of assets to the foundation could be questioned if the Applicant had an unlimited right of revocation.

28

At the end of 2023, the TiVi foundation board therefore commissioned attorney Walch, with the Applicant's consent, to review all amendments to the articles of association since 2012. Following the intervention of the Respondent as per 3 with the Applicant, a number of amendments were made to the articles of association in 2023, and she also received a power of attorney from the Applicant.

In spring 2024, Jaroslaw Grzesiak and Philip Senn met with attorney Walch. It was recognized as a problem that the Applicant had always had the option of reclaiming the assets at any time. The Applicant and his children were informed of the outcome. The latter were increasingly concerned, especially since the contingency plan drawn up in 2022 for a predetermined, definitive change of control had become obsolete with the changes made in August 2023. Later, they learned of their father's secret marriage to Justyna Kulka in March 2024. In fact, she had become the Applicant's right-hand woman, replacing Jaroslaw Grzesiak, and the conflicts between the children and Justyna Kulka had escalated. However, the sole succession of Respondents as per 2–4 in the companies and foundations remained beyond doubt for the Applicant, and in May 2024, the Applicant approved the imminent appointment of his two sons as CEOs in the most important companies.

Page 12

On August 2, 2024, the Applicant made statements before a Polish notary in which he voluntarily and consciously waived his founder's rights, in particular the right to amend the articles of association and bylaws and to amend the declaration of death, as well as the right to appoint and dismiss members of the foundation board, in accordance with the long-term succession plan. With these statements, the Applicant—after detailed discussions and clarification on this matter—expressly ordered that those provisions of the foundation articles of association that are to be applied during his lifetime should no longer be applied with immediate effect.

The Applicant had thus made use of the succession planning mechanism already implemented in 2022. The Applicant was therefore well aware of how the declaration of death worked. The Applicant had been expressly informed that the legal consequences of the declaration of death would take effect immediately upon submission of the statement on August 2, 2024, and that these would become effective immediately. The Applicant was therefore fully aware that all founder's rights that only existed during his lifetime would no longer apply from that point on. On August 2, 2024, the Applicant expressly declared that he wished to implement the succession plan and relinquish control of the foundation.

In a sudden, inexplicable change of heart, the Applicant later initially declared that he wished to revoke the statements made on August 2, 2024. When this proved legally impossible, he then claimed that he had never effectively made the statements, among other things by falsely asserting that he had been deceived when making the statement.

30

These assertions by the Applicant are false. They are also completely unrealistic. This is demonstrated by the background and the functioning of the declaration of death:

In 2022, after extensive consultations, the Applicant introduced the mechanism of "civil death," which enabled him to implement and effect succession within the foundation during his lifetime ("anticipated succession") by submitting a statement (the so-called "declaration of death"). Until the introduction of this mechanism, the succession of Respondents as per 2–4 would only have taken effect upon their natural death or (proven) legal incapacity.

The reason for creating this succession mechanism was the Applicant's deteriorating health condition. Succession by submitting a declaration of death could have taken effect either immediately or on a future date specified in the statement (e.g., the Applicant could have submitted a statement on May 1, 2023, which would have taken effect on December 1, 2023). In the latter case, the Applicant could have changed the date of effect (in the example, December 1, 2023) of the legal succession until the legal succession took effect (in the above example, the Applicant could have postponed the legal succession to a later date—for example, May 1, 2024—in the period between May 1, 2023, and December 1, 2023).

This mechanism should have enabled the Applicant to ensure legal succession during his lifetime by submitting a declaration of death (effective at a specific point in time), thereby preventing a situation in which succession arrangements could no longer be made at a specific point in time because the Applicant was no longer in a fit state of health to do so. As long as the Applicant was able to do so for health reasons, he should therefore have been entitled to postpone the succession.

31

However, once the succession would have become effective—either because the declaration of death should have taken effect immediately upon submission or because the effective date would have arrived—the Applicant would no longer have been able to revoke or postpone the succession. This was for two reasons: This happened for two reasons:

Firstly, the succession in the foundation would effectively lead to a change of control over the entire group of companies held by the foundation from the Applicant to the Respondents as per 2–4. The change of control over such a large group of companies, which would include public companies, companies with external financing, and various obligations to stakeholders and creditors, could only take place in one direction. Once the change of control was made public and took effect, it had to be final. This was because a large number of financing agreements and other contracts would attach significant legal consequences to a "change of control."

Secondly, it was very important to the Applicant to reliably and definitively settle the succession for Respondents as per 2–4 at a time when he was able to do so for health reasons. In doing so, he wanted to rule out the risk that, as a result of his deteriorating physical or mental condition, he might in future no longer be able to determine his succession independently, freely, and seriously. He wanted to rule out any possible disputes over his inheritance. It would not have been possible to ensure this if the Applicant had reserved the right to withdraw from the succession arrangement and to reinstate the provisions applicable during his lifetime, including his right to amend the articles of association and change beneficiaries.

■    Page 15    ■

In May 2023, the Applicant made use of the succession mechanism for the first time and submitted a declaration of death, which was to take effect on December 15, 2023. In August 2023, however, he changed his mind, revoked the declaration of death, and also amended the sophisticated and well-thought-out succession mechanism in Article 13 (2) of the articles of association.

For the first time ever, amendments to the articles of association were not agreed with the Respondents as per 2–4 and were kept secret from them.  The amended provision of the articles of association regarding the declaration of death should then have enabled the Applicant to reverse the succession that had already taken place at any time, even after the date of his civil death.  The Applicant's completely unusual approach suggests that he was already under the influence of his current fourth wife at that time.

The succession mechanism adapted by the Applicant counteracted the original objective in several respects.  Since the new provisions regarding the declaration of death did not provide any stability for the succession and would have been significantly disadvantageous and probably impossible to implement from a business perspective (keyword: "change of control" and clear allocation of control over the group of companies), Respondents as per 2–4 discussed with the Applicant to return to the original succession mechanism as agreed and created in 2022 and to implement this succession mechanism for reasons of asset protection by submitting a declaration of death with immediate effect.

The Applicant agreed to this, and the changes introduced by the Applicant in 2023 were therefore reversed on August 2, 2024, by the Applicant's recent amendment to the articles of association.  The right introduced retrospectively in 2023—and contrary to the aims and purposes of the death mechanism—to be able to withdraw from succession even after the declaration of death had taken effect was revoked by the Applicant. At the same time, additional rights of the Applicant were incorporated into the articles of association, which the Applicant should still be entitled to even after his civil death.

The Applicant deliberately made his statements in the following order:

In a first step, the Applicant exercised his right to amend the articles of association without restriction during his lifetime in accordance with Article 13 (2) 1 and repealed the provision of Article 13 (2) 2 (iii) without replacement.  In a second step, the Applicant then submitted a declaration of death and made it effective with immediate effect.

With the amendment to the articles of association carried out in the first step, the Applicant returned to the original death mechanism from 2022.  The statutory option of subsequently changing or revoking the declaration of death – i.e., even after it had taken effect – was thus eliminated.  With the second step, the succession mechanism was activated. The declaration of death was submitted and took effect immediately, thereby becoming irrevocable.

Upon submission of the declaration of death, all provisions that were applicable during the Applicant's lifetime were declared inapplicable. According to Article 13 (2) 2 (i), the Applicant "declared, by means of a notarized statement of intent, that he rejected the application of the provisions of the articles of association and the bylaws, as applied during his lifetime, from a date specified by him [...]".

In doing so, the Applicant expressly waived the right to amend the articles of association "during his lifetime" in accordance with Article 13 (2) 1. This legal consequence was also perfectly clear to the Applicant. For this reason, the first step was to amend the articles of association and delete Article 13 (2) 2 (iii), because the right to amend the articles of association lapsed when the declaration of death took effect.

Since the statutory basis for amending or revoking the declaration of death had been deliberately and systematically removed with the repeal of Article 13 (2) 2 (iii) without replacement, the Applicant had, by submitting the declaration of death, irrevocably triggered the succession mechanism and ruled out any amendment or revocation of the declaration of death. Article 13 (2) 1 also expressly stipulates that a declaration of death can only be submitted "during the lifetime" of the Applicant.

The Applicant now claims—presumably again under the influence of his fourth wife, with whom he expressly did not want to discuss the changes made on August 2, 2024— that the changes made on August 2, 2024, which dated back to 2022, were not valid and that he did not effectively execute the succession. This legal position is unfounded.



The claim that the Applicant was the victim of deception or error is simply false. The Applicant deliberately amended the articles of association on August 2, 2024, in order to restore the succession mechanism with which he was very familiar and which he himself had introduced in 2022. This time, the Applicant deliberately opted for immediate succession and did not date the declaration of death in the future, but made it effective immediately, granting himself some additional rights in the articles of association to strengthen his own position.

The assertion that the Applicant could still have amended the articles of association after August 2, 2024, regardless of the declaration of death taking effect, is equally incorrect. Once the declaration of death takes effect, the application of the provisions that would apply "during the lifetime" of the Applicant is excluded. With the civil death of the Applicant—which would occur when the declaration of death took effect— all of the Applicant's rights to which he would have been entitled during his lifetime, including the right to amend the articles of association provided for in Article 13 (2) 1, would expire.

Finally, the assertion that the Applicant could not have amended Article 13 (2) 2 (iii), which was only introduced retrospectively in 2023, because it provided that the Applicant was unconditionally entitled to revoke or amend the declaration of death and that this right was "irrevocable" was incorrect.

Rather, it is correct that the Applicant's right to amend the articles of association provided for in Article 13 (2) 1 is not limited in terms of content and that no provisions of the articles of association (other than certain provisions of the bylaws)—in particular Article 13 (2) 2 (iii)—have been declared unamendable.

The right to amend the articles of association is governed exclusively by Article 13 (2) 1. The systematic structure of Article 13 (2) shows that Article 13 (2) 1 conclusively regulates the right to amend the articles of association, while the rest of Article 13 (2) deals exclusively with the mechanism for declaring death.

The right to amend contained in Article 13 (2) 1 of the articles of association dated November 29, 2023 therefore undoubtedly also includes the right to repeal Article 13 (2) 2 (iii) without replacement.

In summary, it can be concluded that, with his civil death on August 2, 2024, brought about by the declaration of death, the Applicant irrevocably waived the right to amend the articles of association and the right to amend or revoke the declaration of death.

4.1    On the basis of the **evidence taken,** namely the documents submitted by the parties:

    <u>Applicant</u>

| | | |
|---|---|---|
| Confirmation of office dated August 22, 2024 | Appendix | A |
| Articles of association of the TiVi Foundation as amended on November 29, 2023 | Appendix | B |
| Bylaws of the TiVi Foundation as amended on November 29, 2023 | Appendix | C |
| Affidavit of the plaintiff dated August 24, 2024 | Appendix | D |
| Affidavit of Jerzy Modrzejewski dated August 24, 2024 | Appendix | E |
| Affidavit of Justyna Kulka dated 24 August 2024 | Appendix | F |
| Statement on the amendment of the articles of association of Solkomtel to deed A no. 6219/2024 ('Solkomtel Amendment Statement") | Appendix | G |
| Statement on the amendment of the articles of association of TiVi to deed A no. 6223/2024 ("TiVi Amendment Statement") | Appendix | H |
| Statement "circular resolution" pursuant to Article 7 of the articles of association of TiVi regarding Deed A No. 6228/2024 ("TiVi's curator's statement") | Appendix | I |
| Declaration pursuant to Article 13 (2) 2 of the Solkomtel articles of association, Document A No. 6229/2024 ("Declaration of Death Solkomtel") | Appendix | J |



Statement pursuant to Article 13 (2) 2. (i) of the articles of association of TiVizu Deed A No. 6235/2024 ("Declaration of Death TiVi") (including translation)    Appendix    K

"Standstill" agreement between the parties dated August 3, 2024 (including translation)    Appendix    L

Plaintiff's declaration of avoidance dated August 13, 2024, including confirmation of receipt from Tomasz Szelag    Appendix    M

E-mails from the second defendant regarding the (invalid) "dismissal" of Tomasz Szelag and Jaroslaw Grzesiak, as well as invalid "statement of appointment" and "statement of acceptance" from the second defendant and Zofia Jedrzeyewska dated August 14, 2024 (including translation)    Appendix    N

Revocation of the plaintiff's declaration of death dated 1August 7, 2024 (notarized and certified under GZ 1557 by the notary public Alexander Winkler)    Appendix    O

Collection of warning letters to the secondary beneficiaries, the foundation board, and the chairman of the foundation board dated August 17, 2024 (including confirmation of dispatch)    Appendix    P

E-mail dated August 18, 2024 regarding the acknowledgement of receipt of the letter dated August 17, 2024 from Tomasz Szelag (including translation)    Appendix    Q

Letter dated August 20, 2024 regarding the acknowledgement of receipt of the letter dated August 17, 2024 from Jaroslaw Grzesiak (including translation)    Appendix    R

E-mail to Philipp Senn dated August 21, 2024 including read receipt    Appendix    S

E-mail from attorney Paweł Rymarz dated August 18, 2024 (including translation)    Appendix    T

Letter from attorney Pawet Rymarz and Krzysztof Sajchta dated August 20, 2024 (including translation)    Appendix    U

Letter from attorney Bernhard Motal dated August 20, 2024    Appendix    V

38

| | | |
|---|---|---|
| Information letter to the secondary beneficiaries about the forthcoming (re)amendment of the articles of association and inclusion of a sunset clause dated August 18, 2024 | Appendix | W |
| Notarial deed dated August 19, 2024 on the amendment of the articles of association of Tivi (GZ 1559) | Appendix | X |
| Notarial deed dated August 19, 2024 regarding the amendment of the bylaws of Tivi (GZ 1560) | Appendix | Y |
| Notarial deed dated August 19, 2024 on the precautionary dismissal and confirmation or affirmation of the valid appointment of the actual members of the foundation board (GZ 1561) | Appendix | Z |
| E-mail from the second defendant dated August 20, 2024 to Philipp Senn including a letter of resignation (including translation) | Appendix | AA |
| Letter to Philipp Senn dated August 20, 2024 including takeover confirmation | Appendix | AB |
| Confirmation of receipt of the original documents from the founder dated August 20, 2024 from the chairman of the foundation board, Philipp Senn | Appendix | AC |
| E-mail correspondence dated August 21 and 22, 2024 between Simon Ott, Philipp Senn and Luca Castellazzi (request to inspect foundation documents) | Appendix | AD |
| Affidavit by attorney Peter Machherndl dated August 25, 2024 | Appendix | AE |
| Collection of power of attorney revocations by TiVi, including e-mails dated August 22, 2024, e-mail from Philipp Senn dated April 9, 2024, e-mail from Philipp Senn dated August 20, 2024, to Ms. Thoele, e-mail from Piotr Zak to Philipp Senn dated August 13, 2024, including translation, circular resolution regarding the powers of attorney of Solkomtel dated June 12, 2024, including translation. | Appendix | AF |
| E-mail from Philipp Senn dated August 23, 2024, 5:14 PM | Appendix | AG |
| Affidavit by Thomas Szelag dated August 25, 2024, including translation | Appendix | AH |
| Information letter on upcoming amendments to the articles of | Appendix | AI |

39

association dated September 20, 2024

Articles of association ofTiVi as amended by the
notarial deed dated September 24, 2024 GZ 1595
recorded by notary Mag. Alexander Winkler ..................................... Appendix    AJ

Bylaws of TiVi as amended by the notarial deed dated
September 24, 2024 GZ 1597 recorded by notary Mag.
Alexander Winkler ..................................... Appendix    AK

(Renewed) revocation of the declaration of death as amended by the
notarial deed of September 24, 2024 GZ 1599 recorded by notary
Mag. Alexander Winkler ..................................... Appendix    AL

Legal opinion of Prof. Jakob ..................................... Appendix    AM

Legal opinion of Prof. Schauer ..................................... Appendix    AN

Legal opinion of Prof. Dr. Jozef Okolski ..................................... Appendix    AO

Bylaws of the TiVi Foundation as amended on March 7, 2012 ..................................... Appendix    AP

Articles of association of the TiVi Foundation as amended on November
24, 2022 ..................................... Appendix    AQ

Declaration of death dated May 29, 2023 ..................................... Appendix    AR

Declaration of death dated August 10, 2023 ..................................... Appendix    AS

Decision by the founder regarding the amendment of the articles of
association of the TiVi Foundation dated August 10, 2023 ..................................... Appendix    AT

Revocation statement dated August 17, 2023, regarding the declaration
of death dated May 29, 2023 ..................................... Appendix    AU

Written transcript of the interview with the founder on January 10,
2025 ..................................... Appendix    AV

Legal opinion by Univ-Prof. Dr. Martin Spitzer dated November 22,
2025 ..................................... Appendix    AW

Medical confirmation dated January 21, 2025 ..................................... Appendix    AX

Statement dated July 29, 2024 ..................................... Appendix    AY

E-mail correspondence between the court-appointed assistant,
Piotr Zak, and the parties' representatives dated December 10,
2024 ..................................... Appendix    AZ

Children's list of demands dated February 19, 2025 ..................................... Appendix    BA

E-mail from Tobias Solorz's representative dated February 21, 2025 ..................................... Appendix    BB

E-mail from the founder's legal representative dated February 24, 2025 ..................................... Appendix    BC

40

| | | |
|---|---|---|
| E-mail from Tobias Solorz's representative dated February 25, 2025 | Appendix | BD |
| Children's list of demands dated March 4, 2025, including accompanying e-mail from Piotr Zak's representative | Appendix | BE |
| Detailed chronology of settlement discussions ("ANNEX") | Appendix | BF |
| Chat history between Justyna Kulka and Tobias Solorz on Whatsapp | Appendix | BG |
| Connection logs of telephone calls between the founder and the children | Appendix | BH |
| Media report by CEC Group (Warsaw) and Pantarhei Corporate Advisors (Vienna) dated December 5, 2024 | Appendix | BI |
| Statement by Edward Miszczak dated October 10, 2024 | Appendix | BJ |
| Notarial statement by Piotr Gawel dated February 21, 2025 | Appendix | BK |
| Statement by Tomasz Gillner dated February 27, 2025 | Appendix | BL |
| Statement by Jerzy Modrzejewski dated March 31, 2025 | Appendix | BM |
| Statement by Paulina Piechocka dated March 12, 2025 | Appendix | BN |
| Forbes interview with the founder in December 2024 | Appendix | BO |
| Further expert opinion by Prof. Jakob dated February 5, 2025 | Appendix | BP |
| Statement by Prof. Martin Schauer dated March 31, 2025 | Appendix | BQ |
| "Proposal" dated March 14, 2025 | Appendix | BR |

Respondent as per 2

| | | |
|---|---|---|
| Official confirmation from TiVi Foundation dated September 23, 2024 | Appendix | 2.1 |
| Official order dated October 26, 2024, ref. 06 HG.2024.133 (ON 71) | Appendix | 2.2 |
| Official order and decision dated October 25, 2024, ref. 06 CG.2024.184 (ON 47 | Appendix | 2.3 |
| TiVi Foundation articles of association dated November 29, 2023 | Appendix | 2.4 |
| TiVi Foundation articles of association dated March 7, 2012 | Appendix | 2.5 |
| Draft articles of association of the TiVi Foundation dated August 2022 | Appendix | 2.6 |
| TiVi Foundation articles of association dated November 24, 2022 | Appendix | 2.7 |
| TiVi Foundation articles of association dated August 10, 2023 | Appendix | 2.8 |
| E-mail from Jerzy Modrzejewsky dated May 30, 2022, including excerpt from attachment | Appendix | 2.9 |
| E-mail from Jerzy Modrzejewsky dated August 19, 2022 | Appendix | 2.10 |
| E-mail from Jerzy Modrzejewsky dated October 20, 2022, including excerpt from attachment | Appendix | 2.11 |



Page 24

| | |
|---|---|
| Affidavit from Aleksandra Zak dated September 20, 2024, including German translation | Appendix  2.12 |
| Declaration of death dated May 29, 2023 | Appendix 2.13 |
| List of supervisory board mandates | Appendix 2.14 |
| Resignation of Jaroslaw Grzesiak dated September 23, 2024 | Appendix 2.15 |
| Notarized statement regarding the amendment of the articles of association of the TiVi Foundation dated August 2, 2024 | Appendix 2.16 |
| Notarized statement on the circular resolution of the foundation board dated August 2, 2024 | Appendix 2.17 |
| Declaration of death in the form of a notarial deed dated August 2, 2024 | Appendix 2.18 |
| Affidavit by Piotr Zak dated September 7, 2024, including German translation | Appendix 2.19 |
| Affidavit by Tobias Solorz dated September 10, 2024, including German translation | Appendix 2.20 |
| Bylaws of the TiVi Foundation dated November 29, 2023 | Appendix 2.21 |
| E-mail from Jaroslaw Grzesiak dated August 7, 2024 | Appendix 2.22 |
| Agreement dated August 12, 2024, including German translation | Appendix 2.23 |
| Draft agreement dated August 12, 2024, including German translation | Appendix 2.24 |
| (Alleged) "Declaration" by the founder dated August 13, 2024 | Appendix 2.25 |
| (Alleged) "articles of association" of the TiVi Foundation dated August 19, 2024 | Appendix 2.26 |
| (Alleged) "articles of association" of the TiVi Foundation dated September 24, 2024 | Appendix 2.27 |
| Official order dated September 10, 2024 (ON 4) regarding 05 NE.2024.4 | Appendix 2.28 |
| Legal opinion by Prof. Dr. hab.  Wojciech Kocot dated September 8, 2024 | Appendix 2.29 |
| E-mail from AG2 dated August 2, 2024 | Appendix 2.30 |

Respondent as per 3

| | |
|---|---|
| Official confirmation from the TiVi Foundation dated November 14, 2024 | Appendix 3.1 |
| Bylaws of the TiVi Foundation dated November 29, 2023 | Appendix 3.2 |

42



Page 25

| | |
|---|---|
| Official order of the Princely Court of Justice dated October 26, 2024, ref. 06 HG.2024.133 (ON 71) | Appendix 3.3 |
| Official order of the Princely Court of Justice dated October 25, 2024, ref. 06 CG.2024.185 (ON 47 | Appendix 3.4 |
| Affidavit by Aleksandra Jadwiga Zak dated September 20, 2024, including German translation | Appendix 3.5 |
| Bylaws of the TiVi Foundation dated November 24, 2022 | Appendix 3.6 |
| Articles of association of the TiVi Foundation dated November 24, 2022 | Appendix 3.7 |
| Articles of association of the TiVi Foundation dated August 10, 2023 | Appendix 3.8 |
| Articles of association of the Tivi Foundation dated November 29, 2023 | Appendix 3.9 |
| Notarized statement regarding the amendment of the articles of association of the TiVi Foundation dated August 2, 2024 | Appendix 3.10 |
| Notarized statement regarding the circular resolution dated August 2, 2024 | Appendix 3.11 |
| Declaration of death in the form of a notarial deed dated August 2, 2024 | Appendix 3.12 |
| Articles of association of the TiVi Foundation dated March 7, 2012/February 12, 2013 | Appendix 3.13 |
| Declaration of death dated May 29, 2023 | Appendix 3.14 |
| Articles of association of the TiVi Foundation dated August 2, 2024 | Appendix 3.15 |
| List of supervisory board mandates | Appendix 3.16 |
| Affidavit by Tobias Markus Solorz dated September 10, 2024, including German translation | Appendix 3.17 |
| Affidavit by Piotr Mateusz Zak dated September 7, 2024, including German translation | Appendix 3.18 |
| Stand-still agreement dated August 3, 2024, including German translation | Appendix 3.19 |
| Agreement dated August 12, 2024, including German translation | Appendix 3.20 |
| Statement by the founder dated August 13, 2024 | Appendix 3.21 |
| Invalid bylaws dated August 19, 2024 | Appendix 3.22 |
| Confirmation of office of the TiVi Foundation dated September 23, 2024 | Appendix 3.23 |


Affidavit by Tobias Markus Solorz dated September 18, 2024,
including German translation                                                      Appendix  3.24

Letter from attorney Pitkowitz dated September 19, 2024                           Appendix  3.24

Gift withdrawals dated 30.11.2024, including German translation                   Appendix  3.26

Expert opinion of Prof. Dr. Wojciech Kocot dated 08.09.2024                       Appendix  3.27

E-mail from Piotr Zak to Jaroslaw Grzesiak dated 01.08.2024
including the draft of the declaration of death dated 01.08.2024
including the attachment to the e-mail including the German
translation                                                                      Appendix  3.28

E-mail from Piotr Zak to Dariusz Wierzchucki dated 01.08.2024 with
German translation                                                               Appendix  3.29

E-mail from Piotr Zak to Dariusz Wierzchucki dated August 2, 2024,
including German translation                                                      Appendix  3.30

Overview of the amendment to the declaration of death and
the articles of association                                                      Appendix  3.31

Powers of attorney from Zygmunt Solorz to Jerzy Modrzejewski,
Darius Wierzchucki, and Piotr Modrzejewski dated April 25, 2024,
including German translation                                                      Appendix  3.32

Respondent as per 4
Motion by the Applicant for the promotion of AG2 and AG4 dated
June 14, 2024                                                                     Appendix  4.1

the hearing of the Applicant Zygmunt Solorz, ON 24 pages 29–38, the Respondents
Piotr Zak, ON 22 pages 3–22, Aleksandra Zak, ON 22 pages 22–34, Tobias Markus
Solorz, ON 35 pages 24–31, and Tomasz Piotr Szelag, ON 35 pages 11–24,

as well as the questioning of witnesses Barbara Walch, ON 21 pages 15–17, Philipp
Senn, ON 21 pages 18–19, Luca Castellazzi, ON 21 pages 19-20, Jaroslaw Grzesiak,
ON 21 pages 20-45, Justyna Kulka, ON 22 pages 34-50, Jerzy Modrejewski, ON 22
pages 50-53 and ON 23 pages 3-38, Dariuz Wierzchucki, ON 23 pages 38-49 and ON
24 pages 3-20, Malorzata Nawrocka, ON 24 pages 20-27 and Prof. Adam Stepien, ON
24 pages 27-29,

the following **facts** have been established as proven:

Parties:

Respondent as per 1, the TiVi Foundation, was established on March 7, 2012, by Allied Finance Trust AG as an indirect representative and entered in the commercial register on March 9, 2012, under registration number FL-0002.394.367-5.  The statutory purpose of the foundation is, in particular, to support, care for, and promote the beneficiaries specified in the bylaws; to cover the costs of education and the promotion of special talents; and, in general, to provide material security and support for the beneficiaries, as well as to assist them in the event of marriage, taking up a profession, or starting a business (Appendix A).

The Applicant, Zygmunt Solorz, born in 1956, is the economic founder and the primary beneficiary of the Respondent as per 1; the Respondents as per 2–4, Piotr and Aleksandra Zak and Tobias Solorz, are his biological children from his first and second marriages (undisputed).  He has been married to Justyna Kulka since March 2024, his fourth marriage.

The Respondent as per 1 holds various (highly valuable) company shares, particularly in the media and telecommunications sectors, some of which are listed on the stock exchange.  As a holding foundation, the Respondent therefore fulfills an important strategic function (undisputed).

The companies transferred to the Respondent as per 1 were essentially built up by the Applicant during his first and second marriages with the support of his then wives.  During the divorce proceedings, it was agreed that the children, i.e. the Respondents as per 2–4, should be allocated the assets.  Accordingly, they were designated as secondary beneficiaries, each receiving 1/3, in the Respondent's bylaws (ZV Jaroslaw Grzesiak in ON 21 S 25; PV Piotr Zak in ON 22 S 22; PV Tobias Solorz in ON 35 S 26).

45

It was the Applicant's declared intention, as he repeatedly expressed to the Respondents as per 2–4, the members of the foundation board, and other persons involved, that the Respondent as per 1 should serve in particular to secure the Respondents as per 2–4 and their descendants and to ensure the continuation of the group of companies. In addition, it was the Applicant's wish that Respondent as per 2 and 3) should gradually assume responsibility and control in the group companies. This concept was also communicated to the financing bank and approved by it. In implementation of this concept, the Respondents as per 2–4 held senior management positions at the highest level of the group of companies until the disputes in question arose in August 2024 (ZV Jaroslaw Grzesiak in ON 21 p. 34; ZV JK in ON 22 p. 37 f; ZV Jerzy Modrejewski in ON 23 p. 8, ZV Malorzata Nawrocka in ON 24 p. 21 et seq; Tomasz Szelag in ON 35 p. 17).

Prior to August 2, 2024, the foundation board of Respondent as per 1 consisted of Philipp Senn as president of the foundation board and Jaroslaw Grzesiak, Tomasz Szelag, and Katarzyna Tomczuk as additional members of the foundation board. In the course of the disputes surrounding August 2, 2024 and by official order dated October 26, 2024, ref. 06 HG. 2024.133 (ON 71 there), the previous chairman of the foundation board, Senn, was dismissed by official order, attorney Peter Schierscher was appointed as assistant (in place of the chairman of the foundation board), and the two members of the foundation board Tomasz Szelag and Katarzyna Tomczuk were confirmed in their positions. The other member of the foundation board, Jaroslaw Grzesiak, had already resigned (in September 2024) (Appendix 2.3; ZV Jaroslaw Grzesiak in ON 21 S 42).

Jerzy Modrejewski served as a member of the foundation board from August 14, 2012, to October 20, 2022, with brief interruptions. He was replaced by Jaroslaw Grzesiak in 2022 (Appendix 2.3; cf. above).

Foundation documents / amendments made

The **articles of association** of the Respondent as per 1 upon establishment on **March 7, 2012** were, insofar as relevant, worded as follows (Appendix 2.5):

## Article 1

DECLARATION OF ESTABLISHMENT AND DEDICATION

[...]

## Article 2

NAME, REGISTERED OFFICE, APPLICABLE LAW, AND PLACE OF JURISDICTION

Under the name

### TiVi FOUNDATION

there is a family foundation with its registered office and place of jurisdiction in Vaduz.

All legal relationships established by the creation, administration, and existence of the foundation are subject to Liechtenstein law.

The foundation has its ordinary place of jurisdiction in Vaduz.

## Article 3

DURATION

The duration of the foundation is not limited in time.

## Article 4

FOUNDATION ASSETS

[...]

## Article 5

PURPOSE

(1)   The purpose of the foundation is to support, care for, and promote the beneficiaries specified in the bylaws; to cover the costs of education and the promotion of special talents; and, in general, to provide material security and support for the beneficiaries, as well as to assist them in the event of marriage, taking up a profession, or starting a business.

(2)   The purpose of the foundation also includes payments to individuals or legal entities, institutions, and the like, insofar as the beneficiaries mentioned in the bylaws benefit from such payments.

(3)   The foundation is authorized to conclude all legal transactions that serve the pursuit and realization of its purpose.

(4)   The foundation does not operate a commercially run business.

## Article 6

BYLAWS AND REGULATIONS, FOUNDATION BENEFICIARIES AND ENFORCEMENT PROVISIONS

(1) The founder may issue bylaws as well as one or more regulation(s).

47

 Page 30

(2) With the enactment of these articles of association, the founder shall establish bylaws on beneficiaries, in which the beneficiaries of the foundation shall be designated either specifically or according to objective criteria.

(3)   In compliance with the external restrictions set by the purpose of the foundation in accordance with Article 5 of these articles of association, the beneficiaries, the extent of the benefits, and further additions are determined in the bylaws on benefits.

(4)   The foundation's benefits and the grants that have been awarded but not yet paid out are strictly personal, non-transferable, non-heritable, and non-encumberable. The creditors of beneficiaries may not withdraw the entitlement to benefits or deferred entitlements obtained by beneficiaries free of charge, or individual claims arising therefrom, by means of preventive detention proceedings, enforcement or bankruptcy.

<u>Article 7</u>

FOUNDATION BOARD

(1)      [...]

<u>Article 8</u>

REPRESENTATION OF THE FOUNDATION

[...]

<u>Article 9</u>

TRUSTEE

(1)  The trustee is an advisor to the foundation board. He or she is entitled to inspect all foundation documents and make copies of them, attend foundation board meetings, and discuss the foundation's affairs.

(2)  Further powers and responsibilities of the trustee are specified by the founder in the bylaws governing the position, rights, and duties of the trustee. These bylaws may expressly stipulate that certain resolutions of the foundation board require the approval of the trustee in order to be effective, and accordingly, these bylaws may restrict the discretionary powers of the foundation board.

(3)  The first trustee is appointed by the founder. The first trustee determines the rules of succession for the trustee in the event of his resignation, incapacity, or death, unless the succession rules have been laid down by the founder in the bylaws on the position, rights, and duties of the trustee.

<u>Article 10</u>

AUDITING BODY

[...]

<u>Article 11</u>

<u>ANNUAL FINANCIAL STATEMENTS</u>

[...]

<u>Article 12</u>

<u>ATTORNEYS AND ADVISORS</u>

[...]

<u>Article 13</u>

<u>AMENDMENT OF THE ARTICLES OF ASSOCIATION AND REVOCABILITY</u>

(1)    Article 5 of the articles of association is unalterable; the foundation board reserves the right to amend it if the purpose of the foundation has become unattainable, unlawful, or unreasonable, or if circumstances have changed to such an extent that the purpose has taken on a completely different meaning or effect, thereby alienating the foundation from the founder's intentions.  In such cases, the foundation board may amend the purpose of the foundation in accordance with the presumed intent of the founder, subject to Section (3) of this article.

The foundation board has the right to amend other provisions of the articles of association and bylaws, provided that this is in line with the foundation's purpose and there is an objectively justified reason for doing so. The right of amendment cannot be exercised if it has been expressly excluded in the bylaws.

(2)    Notwithstanding Article 7, para. 5, resolutions of the foundation board regarding amendments to the articles of association may only be passed unanimously, whereby this may be done by means of a circular resolution.

(3)    The foundation is irrevocable. However, the founder has the right to amend the foundation's deed of foundation. However, upon the death of the founder, the articles of association and bylaws become irrevocable.

<u>Article 14</u>

<u>TRANSFER OF REGISTERED OFFICE, DISSOLUTION, AND CONVERSION</u>

[...]

<u>Article 15</u>

<u>LIQUIDATION</u>

[...]

<u>Article 16</u>

<u>REPRESENTATIVES</u>

49

Page 32

[...]

<u>Article 17</u>

<u>ARBITRATION</u>

(1)       All disputes between the foundation and its stakeholders (in particular between beneficiaries, members of the foundation board, the trustee, the supervisory body, or the auditors) as well as between the stakeholders of the foundation arising from the foundation relationship shall be finally settled by a Liechtenstein arbitration court in accordance with the provisions of the Liechtenstein Code of Civil Procedure (§§ 594 et seq.), to the exclusion of the ordinary courts.

(2)  The arbitration court shall determine its own costs and the advances to be paid.  It shall impose or distribute the costs of the proceedings within the meaning of §§ 40 et seq. of the Liechtenstein Code of Civil Procedure

[...]

The **bylaws** of **March 7, 2012**, which were enacted at the same time, stipulated the following in point "A) on preferential treatment":

I.

Beneficiary

The beneficiary of the foundation with reference to earnings and foundation assets is Mr. Zygmunt Jozef Solorz-Zak

[...]

II.

Ultimate beneficiary

After liquidation of the foundation, the foundation's assets must be distributed to the current beneficiary.

In the event that all natural persons who have been designated as beneficiaries have died or have renounced their benefits in writing, the foundation board shall, after liquidation of the foundation, use the remaining foundation assets at its discretion for charitable institutions in accordance with Article 107 PGR para. 4 a.

50

Point "C) General provisions" then stipulated that the foundation board was entitled to amend the bylaws during the founder's lifetime and in agreement with the trustee (Appendix AP).

The articles of association and bylaws were subsequently amended several times, but only the amendments relevant to the present proceedings (and known to the court) will be discussed here.

In the **articles of association** of **October 29, 2018**, the right to amend the articles of association was amended in Article 13 as follows, and in particular the passage stating that Article 5 was unamendable was removed (undisputed):

<u>Article 13</u>

<u>AMENDMENT OF THE ARTICLES OF ASSOCIATION AND REVOCABILITY OF THE FOUNDATION</u>

(1)      The foundation is irrevocable.

(2)      The founder has the right to amend the foundation's deed of foundation, the articles of association and the bylaws during his lifetime.

(3)      From the date of the founder's death, which must be confirmed on the basis of an official document (death certificate), the foundation's deed of foundation, the articles of association and the bylaws can no longer be amended.

At the beginning of 2022, the Applicant had to undergo several weeks of medical treatment in Switzerland due to ongoing health problems and a severe case of COVID-19. At that time, he realized that he might eventually be unable to exercise control over the foundation for health reasons and that there would be considerable risks if his succession was not secured by then. He also intended to divorce his third wife. He discussed these issues with his then friend and advisor Jaroslaw Grzesiak, who traveled to Switzerland to meet with the Applicant and spent several weeks there. The Applicant asked him to develop a solution for the transfer of control in the event of his incapacity. (ZV Jaroslaw Grzesiak in ON 21 S 26 et seq; ZV Malorzata Nawrocka in ON 24S 21 et seq. and 25)

At the beginning of 2022, during a meeting in Lack lasting several days, attended by the Applicant, Respondents as per 2 and 4), Jaroslaw Grzesiak, Jerzy Modrejewski, Tomasz Szelag, and a medical professional, the possibility of automatic succession to the Applicant's control and organizational rights in the foundation was discussed in detail. Jaroslaw Grzesiak presented the concept of a declaration of death that he had developed, which took into account the wishes of the Applicant, for whom it was very important to be able to decide for themselves when the control and organizational rights should be transferred. He wanted to spare himself the humiliation (from his point of view) of eventually being declared legally incompetent by a court.  With the concept of a declaration of death developed by Jaroslaw Grzesiak, the Applicant retained his autonomy because he could repeatedly extend the deadline before it came into effect, as long as his health permitted.  It was the understanding of those involved at the time that a "point of no return" would be reached after the deadline came into effect (expiry of the deadline) (ZV Jaroslaw Grzesiak in ON 21; ZV Jerzy Modrejewski in ON 22 p. 52; PV Respondent as per 2 in ON 22 p. 3 et seq.; PV Respondent as per 4 in ON 35 p. 26).

Jerzy Modrejewski and Jaroslaw Grzesiak took on the implementation of this universally approved concept in Article 13 (2) of the **articles of association** of **November 24, 2022**, which were considered final at the time. In addition to the implementation of the declaration of death mechanism, several other changes were made to the articles of association, as follows:

[...]

Article 3

FOUNDATION ASSETS

(1)  The foundation capital amounts to CHF 30,000 and is made freely available to the foundation.



(2) (a) The foundation's assets consist of the shares and stocks in the "SPECIAL PURPOSE ENTITIES" defined in the bylaws.

(b)      The assets of the foundation may also consist of shares or stocks in other companies.

(c)      The foundation's assets may also consist of funds, other movable and immovable property and other rights that are necessary for the foundation's activities and the fulfillment of its purpose as set out in Article 4 of the articles of association.

(3)  The foundation is not permitted to sell its shares or stock to the SPECIAL PURPOSE ENTITIES specified in more detail in the bylaws. The foundation board is obliged to ensure that the founding documents (memorandum and articles of association) of all SPECIAL PURPOSE ENTITIES contain provisions that grant the foundation, as a shareholder of the SPECIAL PURPOSE ENTITY, inalienable personal rights to appoint the board of directors and the Supervisory Board of each SPECIAL PURPOSE ENTITY.

(4)  The overriding interest of the foundation, which the foundation board must protect, is to avoid losing control over the SPECIAL PURPOSE ENTITIES "Loss of control" in the above sense means a decrease in the number of votes held by the foundation in each of the SPECIAL PURPOSE ENTITIES specified in the bylaws, namely in total, i.e. directly and indirectly (i.e. through the companies/enterprises dependent on the foundation), to less than 51% of the total number of votes.

(5)  1. The foundation is obliged to reduce the debt-to-capital ratio to a level not exceeding 4.0 within the shortest possible time if the level exceeds 4.0 at the time of the founder's death; it is also obliged to maintain the debt-to-capital ratio at a level that does not exceed 4.0 at any time.

2.    [...]

<u>Article 4</u>

<u>PURPOSE</u>

(1)  The purpose of the foundation is to support, care for, and promote the beneficiaries specified in the bylaws; to cover the costs of education and the promotion of special talents; and, in general, to provide material security and support for the beneficiaries, as well as to assist them in the event of marriage, taking up a profession, or starting a business.

(2)  The purpose of the foundation also includes payments to individuals or legal entities, institutions, and the like, insofar as the beneficiaries mentioned in the bylaws benefit from such payments.

(3) The bylaws may explicitly exclude certain persons or groups of persons as beneficiaries of the foundation.  It is not permissible to directly or indirectly benefit persons or groups of persons who are explicitly excluded as beneficiaries of the foundation in any way whatsoever.

(4)  The foundation is authorized to conclude all legal transactions that serve the pursuit and realization of its purpose.

The foundation does not operate a commercial business.

<u>Article 5</u>

<u>BYLAWS AND REGULATIONS, FOUNDATION BENEFITS, ENFORCEMENT PROVISIONS</u>

(1)  The founder may issue bylaws as well as one or more regulation(s).

(2)  The founder shall draw up bylaws independently of these articles of association, in which, among other things, specific beneficiaries of the foundation or beneficiaries who can be identified on the basis of objective criteria shall be specified.

(3)  Subject to the external restrictions set by the purpose of the foundation in accordance with Article 4 of these articles of association, the bylaws shall specify the beneficiaries, the extent of the benefits, and further additions regarding the benefits in the section on benefits.

(4)  The foundation benefits and the grants that have been awarded but not yet paid out are strictly personal, non-transferable, non-heritable, and non-encumberable. The creditors of beneficiaries may not withdraw the entitlement to benefits or deferred entitlements obtained by beneficiaries free of charge, or individual claims arising therefrom, by means of preventive detention proceedings, enforcement or bankruptcy.

<u>Article 6</u>

<u>FOUNDATION BOARD</u>

(1) The supreme body of the foundation is the foundation board. One member of the foundation board must always be a natural person who meets the requirements of the relevant Article 180a PGR. The members of the foundation board perform their duties personally and do not have the right to appoint an authorized representative to perform these duties on their behalf.

54


(2) (a) The foundation board consists of four members, including a foundation board president.

During his lifetime, the founder appoints and dismisses the members of the foundation board, including the chairman of the foundation board. The dismissal of the chairman of the foundation board by the founder automatically results in the termination of the appointment of his successor within the meaning of Article 6 (2) b below. The founder appoints a natural person who meets the requirements specified in Article 180 a PGR as chairman of the foundation board. The special duties of the chairman of the foundation board include ensuring that the resolutions passed by the foundation board comply with the law, the articles of association, the bylaws, and the document containing the founder's wishes, if such a document has been drawn up.

(b)     From the time of his appointment, the chairman of the foundation board has the duty to appoint his successor in the event of his death, resignation, or complete and permanent incapacity to act. The appointment of a successor then fulfills the same condition of validity and legal effectiveness that applies to the appointment of the chairman of the foundation board. Subject to Article 6 (3) lit a and b below, the successor shall assume the function of the previous chairman of the foundation board upon the occurrence of any of the above-mentioned events.

(c)     Only a natural person who meets the requirements of the applicable Article 180 a PGR can become the successor to the chairman of the foundation board.

(d)     The chairman of the foundation board may change his successor during his lifetime, subject to the provisions of point c) above.

(e)     The above provisions shall also apply to subsequent successors to the chairman of the foundation board.

(3) (a) From the date of death of the founder, based on an official document (death certificate) provided for confirmation, or in the event of his or her complete and permanent incapacity to act, or from the date specified in the statement referred to in Article 13 (2) 2 of the articles of association, each of the secondary beneficiaries named in the bylaws shall acquire the right to occupy one – and only one – seat on the foundation board (with the exception of the office of chairman of the foundation board). Firstly, a secondary beneficiary may dismiss one—and only one—member of the foundation board who was appointed by the founder in accordance with Article 6 (2) a) above. An essential condition for the validity and legal effectiveness of the dismissal initiated by the secondary beneficiary is the appointment by this beneficiary of another member of the foundation board to replace the dismissed member. Secondly, the secondary beneficiary may, within the scope of the space at his or her exclusive disposal, dismiss the member of the

foundation board appointed by him or her as described above. however, the indispensable condition for the validity and legal effectiveness of the dismissal initiated by the secondary beneficiary is the appointment by this beneficiary of another member of the foundation board to replace the dismissed member. This procedure is also used for all further appointments and dismissals. Only persons of legal age may be appointed as members of the foundation board.

(b) After the death of the founder or in the event of his complete and permanent incapacity to act, or from the date specified by the founder in his statement within the meaning of Article 13 (2) 2 of the articles of association, three members of the foundation board (with the exception of the chairman of the foundation board) have the right to unanimously dismiss the incumbent chairman of the foundation board. The dismissal of the incumbent chairman of the foundation board entails the obligation to appoint a new chairman of the foundation board and the obligation to appoint his successor in accordance with Article 6 (2) b) above shall lapse. At the same time as the dismissal, three members of the foundation board are obliged, in accordance with Article 6 (3) a) above, to appoint a new chairman of the foundation board, who can only be a natural person who meets the requirements of the applicable Article 180a PGR. At the same time, the appointment of the new chairman of the foundation board is an essential prerequisite for the valid and effective dismissal of the previous chairman of the foundation board.

The provisions of Article 6 (2) b), c), d), and e) apply to the newly appointed chairman of the foundation board.

(4)  After the date of death of the secondary beneficiary, which is confirmed by an official document (death certificate), the tertiary beneficiaries assume the rights of the deceased secondary beneficiary in accordance with the bylaws, and, if one of the tertiary beneficiaries is also no longer alive on the date of death of the secondary beneficiaries, the fourth beneficiaries, who assume the rights of the deceased tertiary beneficiaries, acquire the right to appoint one—and only one—member of the foundation board, whose seat was at the sole disposal of the secondary beneficiaries as their joint representative. The appointment and dismissal of the members of the foundation board by the entitled third and, if applicable, fourth beneficiaries shall be decided by an absolute majority. The above rules apply accordingly to the appointment and dismissal of one—and only one—member of the foundation board by the beneficiaries of the other grades.

56



Only persons of legal age may be appointed as members of the foundation board.

In each individual case of dismissal of a member of the foundation board on the basis of this para (4), the simultaneous appointment of another member of the foundation board to replace the dismissed member of the foundation board shall be considered an essential condition for the validity and legal effectiveness of the dismissal.

(5)  In the event of the childless death of a secondary beneficiary named in the bylaws, the seat on the foundation board that was reserved for the deceased secondary beneficiary shall be filled in accordance with the preceding para (3) a) by way of unanimous appointments or dismissals, effective as of the date of the childless death of the secondary beneficiaries ("eligible beneficiaries"). If no unanimous agreement can be reached among the aforementioned beneficiaries, the relevant member of the foundation board shall be appointed or dismissed by the chairman of the foundation board, whose decision shall be binding on the eligible beneficiaries, who shall have the right to unanimously object to the decision immediately after it has been taken by the chairman of the foundation board. In the event of an objection, Article 7 (2) d) shall apply accordingly.

(6)  The appointment and dismissal of each member of the foundation Board, including the chairman of the foundation board, and the appointment and dismissal of the successor to the chairman of the foundation board shall be made in writing (with the exception of electronic mail), with the obligation to effect the service of the first-level appeal or dismissal request to the address of the foundation and to deliver it to the chairman of the foundation board and to the other members of the foundation board.

(7)  Any change to the foundation board must be reported to the Office of Justice/Commercial Register (Article 552 § 19 PGR) without delay, but within 30 days at the latest. The notification is made by the chairman of the foundation board.

<u>Article 7</u>

<u>DECISIONS OF THE FOUNDATION BOARD</u>

(1)

a)      [...]

<u>Article 8</u>

<u>REPRESENTATION OF THE FOUNDATION</u>

57

(1)        [...]

<u>Article 9</u>

TRUSTEE

(1)        The trustee is an advisor to the foundation board. He or she is entitled to inspect all foundation documents and make copies of them, attend foundation board meetings, and discuss the foundation's affairs. The trustee also monitors the implementation of the foundation's purpose by the foundation board in accordance with the foundation documents (articles of association, bylaws) and any letter of wishes issued by the founder.

(2)        Further powers and responsibilities of the trustee are specified by the founder in the bylaws, in the section on the function and the rights and duties of the trustee. These bylaws may expressly stipulate that certain resolutions of the foundation board require the approval of the trustee in order to be effective, and accordingly, these bylaws may restrict the discretionary powers of the foundation board.

<u>Article 10</u>

<u>AUDITING BODY</u>

[...]

<u>Article 11</u>

<u>ANNUAL FINANCIAL STATEMENTS</u>

[...]

<u>Article 12</u>

<u>ATTORNEYS AND ADVISORS</u>

[...]

<u>Article 13</u>

<u>AMENDMENT OF THE ARTICLES OF ASSOCIATION AND REVOCABILITY OF THE FOUNDATION</u>

(1)        The foundation is irrevocable.

(2)        1. During his lifetime, the founder has the right to amend the foundation's deed of foundation, the articles of association, the bylaws, and any letter of wishes issued by the founder.

2.        During his lifetime, the founder has the right to declare, by means of a statement of intent in the form of a notarial deed, that he rejects the application of the provisions of the articles of association and bylaws as they apply during his lifetime from a date specified by him, and that provisions shall apply in their place which shall come into force on the day of his death or in the event of complete and permanent incapacity to act. The founder has the right to make the aforementioned statement multiple times, whereby he is in no

 Page 41

way bound by the content of his previous statements when making a further statement.

(3)

a.   From the date of death of the founder, as confirmed by an official document (death certificate), the foundation's statement of formation, the articles of association, and the bylaws may be amended by a unanimous decision of all members of the foundation board, including the chairman of the board, with the exception of Article 6 and 7 of the foundation articles of association and the provisions of A II of the bylaws, to which point b) of this section (3) applies.

b.   Amendments to Article 6 and 7 of the foundation's articles of association and to the provisions set forth in A II of the bylaws may be made by unanimous resolution of the foundation board, including the chairman of the board, subject to the prior unanimous written consent of all beneficiaries.

(4) After each amendment to the articles of association or bylaws, each member of the foundation (including the chairman of the board) is obliged to submit a written statement within seven days of the date of service of documents of the notification of amendment, confirming receipt of the request for amendment and acknowledgment of the content of the amendment.

The chairman of the board shall notify the beneficiaries of any amendment to the articles of association or bylaws without delay, but no later than [7] days after the amendment has been made. The provisions of Article 7 (7) d) and e) shall apply accordingly.

Article 14

REPRESENTATIVES

[...]

Article 15

PLACE OF JURISDICTION

All disputes between the foundation and its members (in particular between the beneficiaries, the members of the foundation board, the trustees, the supervisory body, and the auditors) as well as between the members of the foundation arising from their relationships with one another shall be settled definitively by the competent ordinary courts.



[...]

The articles of association were signed by the Applicant and by Respondents as per 2–4 (Appendixes 2.7 and 3.7; ZV Jaroslaw Grzesiak in ON 21 p. 25 et seq; ZV Jerzy Modrejewski in ON 22 p. 51 f; PV Respondent as per 2 in ON 22 p. 3 et seq., 12 et seq.; ZV Malorzata Nawrocka in ON 24 p. 23).

On **May 29, 2023**, the founder then issued the following **declaration of death** in consultation with, among others, the Respondents as per 2–4, and Jaroslaw Grzesiak (Appendix 2.13):

[...]

§ 2 The Applicant, Zygmunt Solorz, declares that, in accordance with Article 13 (2) 2 of the foundation deed, the provisions of the foundation charter and the supplemental foundation charter applicable during his lifetime shall be repealed as of December 15, 2023, and shall be replaced by the provisions that come into force upon the death of the founder or in the event of his complete and permanent incapacity to act.

§ 3 The person appearing, Zygmunt Solorz, declares that, in accordance with Article 13 (2) 2 of the foundation charter, he reserves the right to make the statement referred to in the aforementioned article of the foundation charter several times until December 14, 2023. If he makes a further statement, he is not bound by the content of the statement covered by this notarial deed.

[...]

On **August 10, 2023**, the **articles of association** were amended to introduce the possibility of revoking the <u>declaration of death</u> in Article 13 (2) 2 (iii) of the articles of association as follows (Appendix 2.8):

<u>Article 13</u>

AMENDMENT OF THE ARTICLES OF ASSOCIATION AND REVOCABILITY OF THE FOUNDATION

(1)     The foundation is irrevocable.



(2)  1. During his lifetime, the founder has the right to amend the foundation's deed of foundation, the articles of association, the bylaws, and any letter of wishes issued by the founder.

2.

(i) During his lifetime, the founder has the right to declare, by means of a statement of intent in the form of a notarial deed, that he rejects the application of the provisions of the articles of association and bylaws as they apply during his lifetime from a date specified by him, and that provisions shall apply in their place which shall come into force on the day of his death.

(ii) Despite submitting the statement, the founder is entitled to the rights provided for in Article 13 para. (2) point 3 of the foundation's articles of association, and Article 13 para. (2) point 3 of the foundation's articles of association applies in full. The rights provided for in para. 13 (2) point 3 of the foundation's articles of association shall be available to the founder for an unlimited period of time, even after the date specified in the statement by the founder, and shall be unconditional and irrevocable.

(iii)  The founder has the right to revoke or amend the statement at any time, even after the date specified by the founder in the statement, without having to provide any reasons. The right to revoke or amend the statement is unconditional for the founder and is irrevocable.

(iv) The right of the founder to revoke or amend the statement pursuant to Article 13 para. (2) point 2. (iii) of the foundation's articles of association is governed by Article 13 para. (2) points 4. and 5. of the foundation's articles of association.

3. After the date specified in the founder's statement, the following provisions shall apply, which cannot be amended by the foundation board in accordance with Article 13 para (3) of the foundation's articles of association.

(i)  When making decisions on personnel matters (appointment, dismissal, suspension, level of remuneration) concerning the composition of the foundation board and the executive boards and supervisory boards of companies whose shares or interests are held by the foundation ("companies"), prior consultation with the founder is mandatory.

(ii)  In the case of decisions regarding dispositions or encumbrances arising from any legal title in relation to the company, the organized part of the company, or assets that constitute a significant part of the company of the foundation itself or of the companies, the prior written consent of the founder is mandatory;

 Page 44

(iii)  The founder shall retain the function of chairman of the Supervisory Board of the companies belonging to the founder's group as at the time of this amendment to the foundation's articles of association, but with the simultaneous right to resign from a function at the founder's sole discretion;

(iv)  The provisions of A I of the current bylaws are unalterable, i.e., they may not be amended, repealed, or excluded in any way.

(v)   In the event of revocation of a statement pursuant to Article 13 para. (2) point 2. (iii) in conjunction with points 4. and 5. of the foundation's articles of association, the founder shall have the unconditional, irrevocable, and unlimited right: (i) to amend the foundation's deed of foundation, (ii) the foundation's articles of association, and/or (iii) the bylaws at his sole discretion.

4. In the event of a revocation of a statement in accordance with Article 13 para (2) point 2. (iii) of the foundation's articles of association, the founder has the right to issue a further statement or further statements in accordance with Article 13 para. (2) point 2. of the foundation's articles of association, whereby the right to revoke or amend each further statement applies in accordance with the conditions set out in para. 13 (2) point 2. (iii) in conjunction with point 5. of the foundation's articles of association.

5. The founder may effectively exercise the right to revoke or amend the statement in accordance with para. 13 (2) point 2. (iii) of the foundation's articles of association:

(i) with regard to statements made after the date of these amendments to the articles of association, and

(ii) with regard to statements already made prior to the date of these amendments to the articles of association, in which case they shall also have full and unconditional legal effect, regardless of whether the right to revoke or amend the statement pursuant to Article 13 para. (2) point 2. (iii) of the articles of association of the foundation was exercised by the founder before or after the date specified in the statement by the founder

(3)

62

    a.    From the date of death of the founder, as confirmed by an official document (death certificate), the foundation's statement of formation, the articles of association, and the bylaws may be amended by a unanimous decision of all members of the foundation board, including the chairman of the board, with the exception of Article 6 and 7 of the foundation articles of association and the provisions of A II of the bylaws, to which point b) of this section (3) applies.

    b.    Amendments to Article 6 and 7 of the foundation's articles of association and to the provisions set forth A II of the bylaws may be made by unanimous resolution of the foundation board, including the chairman of the board, subject to the prior unanimous written consent of all beneficiaries.

(4)    After each amendment to the articles of association or bylaws, each member of the foundation (including the chairman of the board) is obliged to submit a written statement within seven days of the date of service of documents of the notification of amendment, confirming receipt of the request for amendment and acknowledgment of the content of the amendment. The chairman of the board shall notify the beneficiaries of any amendment to the articles of association or bylaws without delay, but no later than [7] days after the amendment has been made. The provisions of Article 7 para. 7 lit. d) and e) shall apply accordingly.

It cannot be determined that the Applicant, with regard to the wording chosen in Article 13 (2) 2 (iii), "The founder has the unconditional and irrevocable right to revoke or amend the statement," wanted this provision of the articles of association, which only applies in the event of a declaration of death already submitted, to be unalterable itself and that the Applicant thus wanted to curtail his right to amend the articles of association.

Subsequently, in **August 2023,** based on the new Article 13 (2) 2 (iii), the Applicant **revoked** the **declaration of death** submitted on May 29, 2023.

63

Unlike previous amendments to foundation documents, the amendment to the articles of association concerning the introduction of the revocation option and the subsequent revocation were not discussed in advance with the Respondents as per 2–4 or Jaroslaw Grzesiak, who only learned of this after the fact (ZV Jaroslaw Grzesiak in ON 21 p. 31; ZV Jerzy Modrejewski in ON 23 p. 6).

When Jaroslaw Grzesiak learned of these changes, he expressed concerns and saw in particular the risk that the transfer of assets to the foundation could be questioned due to the concentration of power in the hands of the Applicant (as founder, primary beneficiary, and trustee) (keyword: asset sacrifice) or that the foundation could be challenged by third parties. Thus, at the end of 2023, the then foundation board, with the consent of the Applicant, attorney Walch, commissioned an audit of all amendments to the articles of association since 2012 (Appendix 2.22; ZV Jaroslaw Grzesiak in ON 23 S 33). Attorney Walch also pointed out the concentration of power in the Applicant as founder, beneficiary, and trustee and the associated problem that third parties could claim that the assets had never actually been transferred to the foundation (ZV Jaroslaw Grzesiak in ON 23S 33).

This result was communicated not only to the Applicant and the rest of the foundation board, but also to the Respondents as per 2–4, who were increasingly concerned, especially since the emergency plan drawn up in 2022 for a predetermined, definitive change of control—i.e., the mechanism of the declaration of death introduced at that time—was no longer in effect due to the changes made in August 2023 (revocability) (ZV Jaroslaw Grzesiak in ON 23 S 33).

With the statement dated **November 23, 2023**, the **articles of association** as amended on August 10, 2023, August 29, 2023, and September 19, 2023, underwent linguistic corrections in particular and read as follows (see, inter alia, Appendix 2.4):

<u>Article 1</u>



NAME, REGISTERED OFFICE, APPLICABLE LAW, AND PLACE OF
JURISDICTION

Under the name

TiVi Foundation

there is a family foundation with its registered office and place of jurisdiction in Vaduz.

All legal relationships established by the creation, administration, and existence of the
foundation are subject to Liechtenstein law.

The foundation has its ordinary place of jurisdiction in Vaduz.

Article 2

DURATION

The duration of the foundation is not limited in time.

Article 3

FOUNDATION ASSETS

(1)  The foundation capital amounts to CHF 30,000 and is made freely available to the
foundation.

(2)  (a) The foundation's assets consist of the shares and stocks in the "SPECIAL
PURPOSE ENTITIES" defined in the bylaws.

(b)  The assets of the foundation may also consist of shares or stocks in other companies.

(c)  The foundation's assets may also consist of funds, other movable and immovable
property and other rights that are necessary for the foundation's activities and the
fulfillment of its purpose as set out in Article 4 of the articles of association.

(3)  The foundation is not permitted to sell its shares or stock to the  SPECIAL PURPOSE
ENTITIES specified in more detail in the bylaws. The foundation board is obliged to
ensure that the founding documents (memorandum and articles of association) of all
SPECIAL PURPOSE ENTITIES contain provisions that grant the foundation, as a
shareholder of the SPECIAL PURPOSE ENTITY, inalienable personal rights to appoint
the chairman of the board of directors and the chairman of the Supervisory Board of each
SPECIAL PURPOSE ENTITY.

(4)  The overriding interest of the foundation, which the foundation board must protect, is
to avoid losing control over the SPECIAL PURPOSE ENTITIES "Loss of control" in the
above sense means a decrease in the number of votes held by the foundation in each of the
SPECIAL PURPOSE ENTITIES specified in the bylaws,

namely in total, i.e. directly and indirectly (i.e. through the companies/enterprises
dependent on the foundation), to less than 51% of the total number of votes.

(5)      [...]

<u>Article 4</u>

PURPOSE

(1) The purpose of the foundation is to support, care for, and promote the beneficiaries specified in the bylaws; to cover the costs of education and the promotion of special talents; and, in general, to provide material security and support for the beneficiaries, as well as to assist them in the event of marriage, taking up a profession, or starting a business.

(2) The purpose of the foundation also includes payments to individuals or legal entities, institutions, and the like, insofar as the beneficiaries mentioned in the bylaws benefit from such payments.

(3) The bylaws may explicitly exclude certain persons or groups of persons as beneficiaries of the foundation. It is not permissible to directly or indirectly benefit persons or groups of persons who are explicitly excluded as beneficiaries of the foundation in any way whatsoever.

(4) The foundation is authorized to conclude all legal transactions that serve the pursuit and realization of its purpose.

(5) The foundation does not operate a commercially run business.

<u>Article 5</u>

FOUNDATION BENEFITS, ENFORCEMENT PROVISIONS

(1) The founder may issue bylaws as well as one or more regulation(s)

(2) The founder shall draw up bylaws independently of these articles of association, in which, among other things, specific beneficiaries of the foundation or beneficiaries who can be identified on the basis of objective criteria shall be specified.

(3) Subject to the external restrictions set by the purpose of the foundation in accordance with Article 4 of these articles of association, the bylaws shall specify the beneficiaries, the extent of the benefits, and further additions regarding the benefits in the section on benefits.

(4) The foundation benefits and the grants that have been awarded but not yet paid out are personal, non-transferable, non-heritable, and non-encumberable. The creditors of beneficiaries may not withdraw the entitlement to benefits or deferred entitlements obtained by beneficiaries free of charge, or individual claims arising therefrom, by means of preventive detention proceedings, enforcement or bankruptcy.

<u>Article 6</u>

FOUNDATION BOARD

(1) The supreme body of the foundation is the foundation board. One member of the foundation board must always be a natural person who meets the requirements of the relevant Article 180a PGR. The members of the foundation board perform their duties personally and do not have the right to appoint an authorized representative to perform these duties on their behalf.

(2) (a) The foundation board consists of four members, including a foundation board president. During his lifetime, the founder appoints and dismisses the members of the foundation board, including the chairman of the foundation board. The dismissal of the chairman of the foundation board by the founder automatically results in the termination of the appointment of his successor within the meaning of Article 6 (2) b below. The founder appoints a natural person who meets the requirements specified in Article 180 a PGR as chairman of the foundation board. The special duties of the chairman of the foundation board include ensuring that the resolutions passed by the foundation board comply with the law, the articles of association, the bylaws, and the document containing the founder's wishes, if such a document has been drawn up.

(b) From the time of his appointment, the chairman of the foundation board has the duty to appoint his successor in the event of his death, resignation, or complete and permanent incapacity to act.        The appointment of a successor then fulfills the same condition of validity and legal effectiveness that applies to the appointment of the chairman of the foundation board. Subject to Article 6 (3) lit a and b below, the successor shall assume the function of the previous chairman of the foundation board upon the occurrence of any of the above-mentioned events.

(c) Only a natural person who meets the requirements of the applicable Article 180 a PGR can become the successor to the chairman of the foundation board.

(d) The chairman of the foundation board may change his successor during his lifetime, subject to the provisions of point c) above.

(e) The above provisions shall also apply to subsequent successors to the chairman of the foundation board.

(3) (a) From the date of death of the founder, as confirmed by an official document (death certificate), or from the date specified by the founder in the statement referred to in Article 13 (2) 2 of the articles of association, each of the secondary beneficiaries named in the bylaws shall acquire the right to occupy one—and only one—seat on the foundation board (with the exception of the office of chairman of the foundation board) Firstly, a secondary beneficiary may dismiss one—and only one—member of the foundation board who was appointed by the founder in accordance with Article 6 (2) a) above. An essential condition for the validity and legal effectiveness of the dismissal initiated by the secondary

67

beneficiaries is the appointment by this beneficiary of another member of the foundation board to replace the dismissed member, provided that it is not permissible to appoint a secondary beneficiary who is "a person from the United States" or any person or any "related or subordinate" legal entity (as defined in the U.S. Internal Revenue Code of 1968, as amended, and in the U.S. tax regulations issued on the basis thereof) in relation to the secondary beneficiaries who are persons from the United States. Secondly, the secondary beneficiaries may, within the scope of the space at his or her exclusive disposal, dismiss the member of the foundation board appointed by him or her as described above. However, the indispensable condition for the validity and legal effectiveness of the dismissal initiated by the secondary beneficiaries is the appointment by this beneficiary of another member of the foundation board to replace the dismissed member, provided that it is not permissible to appoint secondary beneficiaries who are "a person from the United States" or any person or any "related or subordinate" legal entity (as defined in the U.S. Internal Revenue Code of 1968, as amended, and in the U.S. tax regulations issued on the basis thereof) in relation to the secondary beneficiaries who are persons from the United States. This procedure is also used for all further appointments and dismissals. Only persons of legal age may be appointed as members of the foundation board.

After the death of the founder or from the date specified by the founder in a statement within the meaning of Article 13 (2) 2 of the articles of association, three members of the foundation (with the exception of the chairman of the foundation board) have the right to unanimously dismiss the incumbent chairman of the foundation board. The dismissal of the incumbent chairman of the foundation board entails the obligation to appoint a new chairman of the foundation board and the obligation to appoint his successor in accordance with Article 6 (2) b) above shall lapse. At the same time as the dismissal, three members of the foundation board are obliged, in accordance with Article 6 (3) a) above, to appoint a new chairman of the foundation board, who can only be a natural person who meets the requirements of the applicable Article 180a PGR. At the same time, the appointment of the new chairman of the foundation board is an essential prerequisite for the valid and effective dismissal of the previous chairman of the foundation board.

The provisions of Article 6 (2) b), c), d), and e) apply to the newly appointed chairman of the foundation board.



(4)   After the date of death of the secondary beneficiary, which is confirmed by an official document (death certificate), the tertiary beneficiaries assume the rights of the deceased secondary beneficiary in accordance with the bylaws, and, if one of the tertiary beneficiaries is also no longer alive on the date of death of the secondary beneficiaries, the fourth beneficiaries, who assume the rights of the deceased tertiary beneficiaries, acquire the right to appoint one—and only one—member of the foundation board, whose seat was at the sole disposal of the secondary beneficiaries as their joint representative. The appointment and dismissal of the members of the foundation board by the entitled third and, if applicable, fourth beneficiaries shall be decided by an absolute majority. The above rules apply accordingly to the appointment and dismissal of one—and only one—member of the foundation board by the beneficiaries of the other grades.

Only persons of legal age may be appointed as members of the foundation board.

In each individual case of dismissal of a member of the foundation board on the basis of this para (4), the simultaneous appointment of another member of the foundation board to replace the dismissed member shall be an essential condition for the validity and legal effectiveness of the dismissal, subject to the restrictions provided for in the present articles of association.

(5)   In the event of the childless death of a secondary beneficiary named in the bylaws, the seat on the foundation board that was reserved for the deceased secondary beneficiary shall be filled in accordance with the preceding para (3) a) by way of unanimous appointments or dismissals, effective as of the date of the childless death of the secondary beneficiaries ("eligible beneficiaries"). If no unanimous agreement can be reached among the aforementioned beneficiaries, the relevant member of the foundation board shall be appointed or dismissed by the chairman of the foundation board, whose decision shall be binding on the eligible beneficiaries, who shall have the right to unanimously object to the resolution immediately after it has been passed by the chairman of the foundation board. In the event of an objection, Article 7 (2) d) shall apply accordingly.

69



(6)  The appointment and dismissal of each member of the foundation Board, including the chairman of the foundation board, and the appointment and dismissal of the successor to the chairman of the foundation board shall be made in writing (with the exception of electronic mail), with the obligation to effect the service of the first-level appeal or dismissal request to the address of the foundation and to deliver it to the chairman of the foundation board and to the other members of the foundation board.

Any change to the foundation board must be reported to the Office of Justice/Commercial Register (Article 552 § 19 PGR) without delay, but within 30 days at the latest. The notification is made by the chairman of the foundation board.

<u>Article 7</u>

<u>DECISIONS OF THE FOUNDATION BOARD</u>

[...]

<u>Article 8</u>

<u>REPRESENTATION OF THE FOUNDATION</u>

[...]

<u>Article 9</u>

TRUSTEE

(1) The trustee is an advisor to the foundation board. He or she is entitled to inspect all foundation documents and make copies of them, attend foundation board meetings, and discuss the foundation's affairs. The trustee also monitors the implementation of the foundation's purpose by the foundation board in accordance with the foundation documents (articles of association, bylaws) and any letter of wishes issued by the founder.

(2)  Further powers and responsibilities of the trustee are specified by the founder in the bylaws, in the section on the function and the rights and duties of the trustee. These bylaws may expressly stipulate that certain resolutions of the foundation board require the approval of the trustee in order to be effective, and accordingly, these bylaws may restrict the discretionary powers of the foundation board.

70

Article 10

AUDITING BODY

[...]

Article 11

ANNUAL FINANCIAL STATEMENTS

[...]

Article 12

ATTORNEYS AND ADVISORS

[...]

Article 13

AMENDMENT OF THE ARTICLES OF ASSOCIATION AND REVOCABILITY OF
THE FOUNDATION

(1)   The foundation is irrevocable.

(2)   1. During his lifetime, the founder has the right to amend the foundation's deed of
foundation, the articles of association, the bylaws, and any letter of wishes issued by the
founder. All amendments to the foundation's articles of association and amendments to the
foundation's bylaws must be communicated to the secondary beneficiaries in advance.
Amendments to the foundation's articles of association and amendments to the foundation's
bylaws without prior notification to the secondary beneficiaries are invalid.

(2)2.

(i)   During his lifetime, the founder has the right to declare, by means of a notarized
statement of intent, that he rejects the application of the provisions of the articles of
association and bylaws as they apply during his lifetime from a date specified by him, and
that provisions coming into force on the day of his death are to be applied in their place
("Statement").

(ii)   Despite submitting the statement, the founder is entitled to the rights provided for in
Article 13 para. (2) point 3 of the foundation's articles of association, and Article 13 para.
(2) point 3 of the foundation's articles of association applies in full.  These rights provided
for in Article 13 para. (2) (2) point 3 of the foundation's articles of association provide the
founder with the right for an unlimited period of time, even after the date specified in the
statement by the founder, and are also unconditional and irrevocable.

(iii) The founder has the right to revoke or amend the statement at any time, even after the
date specified by the founder in the statement, without having to provide any reasons. The
right to revoke or amend the statement is unconditional for the founder and is irrevocable.

71



(iv)  The right of the founder to revoke or amend the statement pursuant to Article 13 para. (2) point 2. (iii) of the foundation's articles of association is governed by Article 13 para. (2) points 4. and 5. of the foundation's articles of association.

(2) 3. After the date specified in the founder's statement, the following provisions shall apply, which cannot be amended by the foundation board in accordance with Article 13 para (3) of the foundation's articles of association.

(i)   When making decisions on personnel matters (appointment, dismissal, suspension, level of remuneration) concerning the composition of the foundation board and the executive boards and

supervisory boards of companies whose shares or interests are held directly by the foundation ("companies"), prior consultation with the founder is mandatory.

(ii)  In the case of decisions regarding dispositions or encumbrances arising from any legal title in relation to the company, the organized part of the company, or assets that constitute a significant part of the company of the foundation itself or of the companies, the prior written consent of the founder is mandatory;

(iii) The founder shall retain the function of chairman of the Supervisory Board of the companies belonging to the founder's group as at the date of the amendment to the foundation's articles of association on August 10, 2023, but with the simultaneous right to resign from a function at the founder's sole discretion.

(iv)  The provisions of A 1 and A II point 9 of the current bylaws are unalterable, i.e., they may not be amended, repealed, or excluded in any way.

(v)   In the event of revocation of a statement pursuant to Article 13 para. (2) point 2. (iii) in conjunction with points 4. and 5. of the foundation's articles of association, the founder shall have the unconditional, irrevocable, and unlimited right: (i) to amend the foundation's deed of foundation, (ii) the foundation's articles of association, and/or (iii) the bylaws at his sole discretion.

(2)  4. In the event of a revocation of a statement in accordance with Article 13 para (2) point 2. (iii) of the foundation's articles of association, the founder has the right to issue a further statement or further statements in accordance with Article 13 para. (2) point 2. of the foundation's articles of association, whereby the right to revoke or amend each further statement applies in accordance with the conditions set out in para. 13 (2) point 2. (iii) in conjunction with point 5. of the foundation's articles of association.

(2)  5. The founder may effectively exercise the right to revoke or amend the statement in accordance with para. 13 (2) point 2. (iii) of the foundation's articles of association;


Page 55

(i)  with regard to statements made after the amendment of the foundation's articles of association on August 10, 2023

(ii) with respect to statements that were already made prior to the amendment of the foundation's articles of association on August 10, 2023, in which case they shall also have full and unconditional legal effect, regardless of whether the right to revoke or amend the statement pursuant to Article 13 para (2) point 2. (iii) of the foundation's articles of association by the founder before or after the date specified in the statement by the founder.

(3)  a. From the date of death of the founder, as confirmed by an official document (death certificate), the foundation's statement of formation, the articles of association, and the bylaws may be amended by a unanimous decision of all members of the foundation board, including the chairman of the board, with the exception of Article 6 and 7 of the foundation articles of association and the provisions of A II of the bylaws, to which point b) of this section (3) applies.

b. Amendments to Articles 6 and 7 of the foundation's articles of association and to the provisions set forth A II of the bylaws may be made by unanimous resolution of all members of the foundation board, including the chairman of the board, following prior unanimous written consent of all beneficiaries.

(4)  After each amendment to the articles of association or bylaws, each member of the foundation (including the chairman of the board) is obliged to submit a written statement within seven days of the date of service of documents of the notification of amendment, confirming receipt of the request for amendment and acknowledgment of the content of the amendment.

The chairman of the board shall notify the beneficiaries of any amendment to the articles of association or bylaws without delay, but no later than [7] days after the amendment has been made. The provisions of Article 7 (7) d) and e) shall apply accordingly.

(5)  The founder's rights as set out in Article 13 include the right, during the founder's lifetime or as long as he has not waived his rights, to instruct the foundation board to pay all income from the foundation to him at his request.

73

Page 56

Article 14

REPRESENTATIVES

[...]

Article 15

PLACE OF JURISDICTION

All disputes between the foundation and its members (in particular between the beneficiaries, the members of the foundation board, the trustees, the supervisory body, and the auditors) as well as between the members of the foundation arising from their relationships with each other shall be finally settled by the competent ordinary courts of the Principality of Liechtenstein.

With the Applicant's statement of November 29, 2023, the **bylaws** in the earlier versions of August 10, 2023, August 29, 2023, September 18, 2023, and September 19, 2023, were amended to stipulate that the founder may not appoint any new persons in addition to the secondary beneficiaries (Respondents as per 2–4) named in A. II. (Appendix 3.2).

In March 2024, the Applicant married his fourth wife, Justyna Kulka. Respondents as per 2–4 only learned of this after the fact (Applicant's own submission in ON 19 S 7).

In a **statement dated July 29, 2024**, issued in the form of a notarial deed and addressed in particular to the executive bodies of the companies held by the foundation, the Applicant declared as follows (Appendix AY):

STATEMENT

TO WHOM IT MAY CONCERN

§1. I, Zygmunt Solorz, declare that as the owner of a group of companies that I control directly or indirectly (Zygmunt Solorz Group; ZSG) and as the beneficial owner within the meaning of Article 2 para. 2 item 1 of the Act on the Prevention of Money Laundering and Terrorist Financing of March 1, 2018 (UBO), I hereby declare [sic!] and announce that it is my clear intention and firm will to personally exercise all powers vested

74

in me during my lifetime to ensure the smooth functioning and development of ZSG, in particular through the active exercise of owner supervision and the exercise of decisive influence on, among other things, personnel, asset, financial, and structural policy.

§2. I expect (and demand) loyalty, honesty, and diligence in fulfilling the tasks and duties entrusted to me from the members of the bodies of the companies and other entities that make up the ZSG, from the employees, advisors, and consultants, as well as full respect for my position as owner of the ZSG and as UBO, in particular by refraining from undermining or questioning the decisions I make and will make at my own discretion.

§3. Any amendments to this statement must be made in the form of a notarial deed drawn up by notary Dariusz Wierzchucki, who currently runs a notary office at ulica Zimna 2, Top 23 in Warsaw, or, in the event that notary Dariusz Wierzchucki is unable to draw up the notarial deed, by another notary personally appointed by Zygmunt Solorz.

The statement was prepared by Jerzy Modreyevsky. The background to this was speculation about the Applicant's health condition (ZV Jerzy Modrejewski in ON 23 S 8).

During a meeting in Warsaw on the occasion of the Applicant's upcoming 68th birthday, the Applicant and Jerzy Modrejewski presented the Respondent as per 2 and the Respondent as per 3 (the Respondent as per 4 did not arrive until the following day) a will of the Applicant, in which Jerzy Modrejewski was designated as executor, as well as a general power of attorney for Jerzy Modrejewski, already issued by the Applicant in April 2024, which gave him sole representation of the Applicant in all personal rights and thus control over the group of companies, and finally the Applicant's statement of **July 29, 2024**, reproduced above. In this and in the preceding developments, Respondents as per 2–4 saw a threat to the foundation and to the succession of their father, which had always been established and agreed upon.  On the one hand, they feared that the foundation would be vulnerable due to the Applicant's accumulation of power, and on the other hand, that the Applicant would be increasingly influenced by his fourth wife, Justyna Kulka, and Jerzy Modrejewski.  At the same time, however, the Applicant also maintained during this meeting that the foundations

and thus the companies would be left solely to the children. This made the issues of securing succession in the foundations and securing the transfer of assets to the foundations a pressing topic between Respondents as per 2-4 and the Applicant, and the Applicant was prepared to discuss these issues further the following day (see, inter alia, ZV Jerzy Modrejewski in ON 23 p. 12 et seq.; PV Respondent as per 2 in ON 22 p. ).

On the **morning of August 1, 2024**, a brief discussion on this topic took place between, among others, Respondents as per 2–4 and the Applicant in the presence of Jerzy Modrejewski. The discussion was brief because Respondents as per 2–4 had to attend a doctor's appointment with the Applicant. Jerzy Modrejewski explained that he was going on vacation the next day, but that he could also stay. It cannot be determined whether the Respondent as per 3 (and/or the Respondents as per 2 and 4) told Jerzy Modrejewski that it would be perfectly sufficient to discuss the foundation issues after his return from vacation at the end of 2024 (and that he could therefore go on vacation without any worries).

On the **afternoon** of **August 1, 2024,** the meeting continued without Jerzy Modrejewski, but at least in the partial presence of notary Dariusz Wierzchucki. Among other things, the discussions focused on the concern of Respondents as per 2–4 that the foundation could be contested due to the concentration of power in the hands of the Applicant, especially since, for example, the foundation of Polish businessman Jan Wejchert had been declared null and void. It was subsequently agreed that Respondents as per 2-4 would draft proposals for amendments to the articles of association the following day. Respondent as per 2 took on the task of preparing the documents and Jaroslaw Grzesiak was asked to clarify tax and company law issues with external lawyers. The Respondents as per 2 sent the prepared documents, including the amendment to the articles of association, to the notary Dariusz Wierzchucki that same evening, but he did not review them (inter alia, PV Respondent as per 2 in ON 22 p. 16 et seq; ZV Dariusz Wierzchucki in ON 23 p. 42 et seq; ZV Jerzy Modrejewski in ON 23 p. 14; ZV Jaroslaw Grzesiak in ON 21 p. 37 et seq).

76

On **August 2, 2025**, another meeting took place between, among others, the Respondents as per 2–4 and the Applicant, again in the presence of notary Dariusz Wierzchucki.  First, changes to the will and the power of attorney for Jerzy Modrejewski were discussed, followed by the foundation-related documents, i.e., the amendment to the articles of association and the declaration of death.  When the Respondent as per 2 began to read out the amendments to the articles of association, Dariusz Wierzchucki asked to speak with the Applicant, whereupon the Applicant and Dariusz Wierzchucki went into an adjoining room and called Jerzy Modrejewski there.  Dariusz Wierzchucki began to read the planned amendments to Jerzy Modrejewski, whereupon the latter stated that he could not give a reliable assessment without having the documents in front of him.  During this telephone call, Jerzy Modrejewski was also informed that a declaration of death had been prepared (ZV Jerzy Modrejewski in ON 23 S 34).  The conversation was interrupted when the Respondent as per 3 entered the room, although it cannot be determined that she was the reason for this or that she exerted any pressure.  Dariusz Wierzchucki and the Respondent as per 3 returned to the others and asked the Respondent as per 2 questions about the amendments to the articles of association, including the role of the trustee after the amendments had been signed. Dariusz Wierzchucki then shuttled back and forth between the adjoining room and the office and conveyed to the Respondents as per 2 two requests for changes made by the Applicant regarding the amendment to the articles of association, which the Respondent as per 2 implemented accordingly (e.g., deleting blank lines so that no additions could be made, addition of first names, adjustment of the date of publication of law gazettes, etc.).  Afterwards, everyone came back together.  The Applicant stated that he wanted certain guarantees, such as being able to remain chairman of the supervisory board of several companies and extend his term of office without the consent of the Respondents.  The role of the trustee was also discussed again.  Finally, Jaroslaw Grzesiak was contacted to clarify whether the Applicant's right of veto as trustee posed a risk with regard to the contestability of the foundation, which Jaroslaw Grzesiak denied (ZV Jaroslaw Grzesiak in ON 21 p. 39; PV Respondent as per 2 in ON 22 p. 7; PV Respondent as per 3 in ON 22 p. 26f f; ZV Jerzy Modrejewski in ON 23 p. 15)

Once everyone was satisfied with the prepared and amended statements, the Applicant first signed the following statement **regarding the amendment to the articles of association** (Appendix H) on **August 2, 2024**:

Statement August 2, 2024

I, the undersigned, Zygmunt Solorz, PESEL: 56080407253, residing at:  Meierhofstrasse 8, 9495 Triesen, Liechtenstein, hereby, as the sole founder of the TiVi Foundation based in Vaduz, Liechtenstein, ("foundation"), registered in the commercial register of the Office of Justice of the Principality of Liechtenstein under number FL-0002.394.367-5, acting in accordance with Article 13 para. (2) point 1 of the foundation's articles of association, the following resolutions:

- Remove subparagraphs (iii) and (iv) from Article 13 section (2) points 2 of the foundation's articles of association.
- Remove items 3, 4, and 5 from Article 13, Section (2) of the foundation's articles of association.



- Add a new item 3 to Article 13, Section (2) of the foundation's articles of association as follows:

3.

(i)   After the date specified in the founder's statement, the following provisions shall apply, which cannot be amended by the foundation board in accordance with Article 13 para (3) of the foundation's articles of association.

(ii)  When making decisions on personnel matters (appointment, dismissal, suspension, level of remuneration) concerning the composition of the foundation board and the executive boards and supervisory boards of companies whose shares or interests are held by the foundation ("companies"), prior consultation with the founder is mandatory.

(iii) In the case of decisions regarding dispositions or encumbrances arising from any legal title in relation to the company, the organized part of the company, or assets that constitute a significant part of the company of the foundation itself or of the companies, the prior written consent of the founder is mandatory;

(iv) The founder shall retain the function of chairman of the Supervisory Board of the companies belonging to the founder's group as at the date of the amendment to the foundation's articles of association on August 10, 2023. He also has the irrevocable right to continue in this position at his sole discretion for all future terms of office.

(v) The provisions of A 1 and A II point 9 of the current bylaws are unalterable, i.e., they may not be amended, repealed, or excluded in any way.

(vi) The Founder shall remain a trustee even after the above statement has come into effect until death as confirmed by the death certificate.

The Applicant's signature was subsequently notarized by the notary Dariusz Wierzchucki (Appendix H).

The Applicant then submitted the following **declaration of death** in the form of a notarial deed (Appendix J):

79

 Page 62

STATEMENT

§ 1.1 The declarant, Zygmunt Solorz, declares that he is the founder and primary beneficiary of the foundation named Solkomtel Foundation, based in Vaduz, Principality of Liechtenstein, registered in the commercial register of the Office of Justice of the Principality of Liechtenstein under number FL-0002.419.785-2 (hereinafter referred to as "the Foundation").

2. Mr. Zygmunt Solorz declares that the secondary beneficiaries of the foundation are his children Tobias Markus Solorz, Aleksandra Jadwiga Zak, and Piotr Mateusz Zak.

3. Zygmunt Solorz declares that, pursuant to Article 13 (2) 2 of the foundation's articles of association, he has the right to decide during his lifetime, by means of a notarial deed, to revoke the application of the provisions of the articles of association and bylaws applicable during his lifetime and instead to order the application of the provisions applicable at the time of the founder's death.

§ 2. The founder, Zygmunt Solorz, declares that, in accordance with Article 13 (2) 2 of the foundation's articles of association, at the time of signing this document, he waives the application of the provisions of the articles of association and bylaws applicable during his lifetime, ordering instead the application of the provisions that will come into force at the time of the founder's death.

§ 4. All terms used in this document in capital letters shall be interpreted in accordance with the definitions in the foundation's articles of association.

§ 5. Copies of the deed will be issued to the founder and the secondary beneficiaries in any number.

§ 6. The founder shall bear the costs of this deed.

[...]

Before signing the statement, notary Dariusz Wierzchucki reviewed it, read it to the Applicant, and also ensured that the Applicant understood the content and consequences of the statement and signed it voluntarily (ZV Dariusz Wierzchucki in ON 24S 11).

Finally, in his capacity as trustee of the Respondent as per 1, the Applicant also signed a prepared **circular resolution** of the foundation board, in which the latter decided to amend the articles of association in accordance with the above statement, and gave his consent to this. This signature of the Applicant was also notarized by the notary Dariusz Wierzchucki (Appendix I).

The Applicant was aware of the content of the provisions of the articles of association that were to be deleted by the statements of amendment and, when signing the above statement concerning the amendment to the articles of association, the declaration of death and the circular resolution, was aware of the content and consequences of these statements, and the statement also corresponded to his intent. These measures, or the "chance of control," had already been a topic of discussion for months between, among others, the Applicant and Respondents as per 2–4 (ZV Jaroslaw Grzesiak in ON 21 p. 38; also ZV Dariusz Wierzchucki in ON 24 p. 15; PV Respondents as per 2–4.

In the late afternoon of August 2, 2024, members of the foundation board Tomasz Szelag met with the Applicant and asked him whether he should vote in favor of the amendments to the articles of association in the subsequent vote by the foundation board, which the Applicant provided confirmation for. Following this discussion, on the evening of August 2, 2024, the foundation board signed the prepared circular resolution, which had already been signed by the founder, approving the amendment to the articles of association (ZV Tomasz Szelag in ON 35 S 17).

It cannot be established that the Respondents as per 2–4 emphasized and assured the Applicant at the meetings on July 31, August 1, and/or August 2, 2024, that he would not be deprived of any rights, or that they knowingly (or unknowingly) misrepresented to the Applicant that he would not be deprived of any rights. August 2024, emphasized and assured the Applicant that none of his rights would be revoked, or consciously (or unconsciously) made untruthful statements to the Applicant that he would not lose any rights by signing the statements on August 2, 2024, and/or that the purpose was to secure the existence of the foundations after his death.

81



Page 64

It cannot be determined that Respondents as per 2–4 consciously (or unconsciously) gave the Applicant the impression on August 1, 2024 (or on July 31 or August 2, 2024) deliberately (or unintentionally) gave the impression that there was no urgency and/or that the Applicant was not given the opportunity to read through the statements at his leisure and/or to compare them with the previous content of the articles of association, etc.

It cannot be established that Respondents as per 2–4 put the Applicant under massive pressure at the meeting on August 2, 2024, and urgently demanded that he sign the statements immediately and without further consultation with his advisors.

Late in the evening of August 2, 2024, the Applicant discussed the statement concerning the amendment to the articles of association and the declaration of death with Jerzy Modrejewski (ZV Justina Kulka in ON 22 S 41; ZV Jerzy Modrejewski in ON23S 17 et seq.)

On **August 3, 2024**, Justyna Kulka and Jerzy Modrejewski, who traveled to Warsaw from his vacation, informed the Respondents as per 2–4 in the presence of the Applicant that he wished to revoke his statements regarding the foundation. Respondent as per 2-4 found this change of heart bizarre and got the impression that Justyna Kulka and Jerzy Modrejewski had told the Applicant that he no longer had any rights whatsoever with regard to the foundations and the companies (PV Respondents as per 2–4). In order to de-escalate the situation, Respondent as per 3 proposed a provisional **standstill agreement**. Subsequently, on August 3, 2024, the Applicant and Respondents as per 2–4 signed the following agreement (Appendix L):

We, the undersigned, Zygmunt Solorz, as the founder of the TiVi and Solkomtel Foundations, and Aleksandra Zak, Piotr Zak, and Tobias Solorz, as the secondary beneficiaries of the two aforementioned foundations, agree to apply the provisions of the statements amending the articles of association of the two aforementioned foundations, declared in accordance with Article 13 (2) 2 of the articles of association of the two above-mentioned foundations and the resolutions of the foundation board of the above-mentioned foundations, which were already approved by the trustee on August 2, 2024, and,

82

furthermore, not to take any actions or make any decisions related to the above-mentioned documents or based on them until August 16, 2024.

During the period up to August 16, 2024, discussions will be held in good faith to resolve issues relating to the functioning of the two foundations.

On **August 13, 2024**, the Applicant signed the following **declaration of avoidance** (Appendix M):

I, the undersigned, Zygmunt Solorz, personal identification number PESEL 56080407253, hereby contest the following statements of intent as the sole founder of the TiVi Foundation based in Vaduz, Liechtenstein, and as the sole founder of the Solkomtel Foundation based in Vaduz, Liechtenstein:

1) the statement of August 2, 2024, on the amendment of the articles of association of the Solkomtel Foundation, based in Vaduz, under which my signatures were certified by Dariusz Wierzchucki, notary in Warsaw, in Deed A No. 6219/2024 ("Statement 1");

2) the statement of August 2, 2024, on the amendment of the articles of association of the TiVi Foundation, based in Vaduz, under which the signatures were notarized by Dariusz Wierzchucki, notary in Warsaw, in Deed A No. 6223/2024 ("Statement 2")

3) the statement of August 2, 2024, on the amendment of the articles of association of the TiVi Foundation, based in Vaduz, under which the signatures were notarized by Dariusz Wierzchucki, notary in Warsaw, in Deed A No. 6223/2024 ("Statement 2")

4) the statement dated August 2, 2024, "circular resolution" pursuant to Article 7 of the articles of association of the Solkomtel Foundation, Vaduz, under which the signatures were notarized by Dariusz Wierzchucki, notary in Warsaw, in Deed No. 6227/2024; ("Statement 3");

5) the statement dated August 2, 2024, "Resolution by Circulation Procedure" pursuant to Article 7 of the articles of association of the TiVi Foundation, Vaduz, under which the signatures were certified by Dariusz Wierzchucki, notary in Warsaw, in Deed A No. 6228/2024 ("Statement 4");

6) the statement dated August 2, 2024, pursuant to Article 13 (2) 2 of the articles of association of the Solkomtel Foundation, based in Vaduz, notarized by Dariusz Wierzchucki, notary in Warsaw, in Deed A No. 6229/2024 ("Statement 5");

In making these statements of intent (this applies to Statement 1, Statement 2, Statement 3, Statement 4, Statement 5, and Statement 6), I was induced by fraudulent misrepresentation; Statement 1, Statement 2, Statement 3, Statement 4, Statement 5, and Statement 6 are defective and therefore invalid, which is why they have no legal consequences and cannot have any legal consequences in the future.

This statement was handed over in person on the same day to Tomasz Szelag, a member of the foundation's board of trustees, who provided confirmation of receipt on his own behalf and on behalf of the foundation. In addition, the statement was also sent to the other members of the foundation board and Respondents as per 2–4 on the same day.

On **August 14, 2024**, the **Respondent as per 2**, as "secondary beneficiaries pursuant to Article 6 (3) (a) of the articles of association," __resolved to dismiss Tomasz Szelag as a member of the foundation board and to appoint himself as a member of the foundation board__. On August 14, 2024, the Respondent as per 3 as "secondary beneficiaries pursuant to Article 6 (3) (a) of the articles of association," also passed resolutions to dismiss Jaroslaw Grzesiak as a member of the foundation board and to appoint Zofia Maria Jedrzeyewska as a member of the foundation board.

The Respondent as per 2 informed Tomasz Szelag and Jaroslaw Grzesiak by e-mail on August 14, 2024, that they had been dismissed as members of the foundation board. The corresponding resolutions and statements of acceptance were also sent to Philipp Senn by e-mail on August 14, 2024.



Prior to the above decision, the Respondents did not consult with the Applicant, nor did the latter give his consent (as trustee).

In a **statement** dated **August 17, 2024**, issued in the form of a notarial deed, the Applicant stated the following (Appendix O):

STATEMENT

The declarant, Mr. Zygmunt Jozef Solorz, declares that he is the founder and primary beneficiary of the foundation named TM Foundation, based in Vaduz, Principality of Liechtenstein, registered in the commercial register of the Office of Justice of the Principality of Liechtenstein under number FL - 0002.394. 367-5 (hereinafter referred to as "the foundation").

Mr. Zygmunt Jozef Solorz declares that the secondary beneficiaries of the foundation are his children Tobias Markus Solorz, Aleksandra Jadwiga Zak, and Piotr Mateusz Zak.

Mr. Zygmunt Jozef Solorz declares that on August 2, 2024, in Warsaw, he was induced by the secondary beneficiaries of the foundation, through (among other things) fraudulent misrepresentation, to make a statement pursuant to Article 13 (2) 2 of the articles of association, notarized by Dariusz Wierzchucki, notary in Warsaw, under Deed A No. 6235/2024. Even though he considers this statement to be invalid and void, he would like to issue a formal revocation in accordance with Article 13 (2) 2 (iii) of the foundation's articles of association in order to avoid any misunderstandings.

Mr. Zygmunt Jozef Solorz declares that, as founder, he has the right under Article 13 (2) 2 (iii) of the foundation's articles of association to revoke or amend a statement under Article 13 (2) 2 of the articles of association at any time, even after the date specified by the founder in this statement, without having to provide any reasons. The founder has the unconditional and irrevocable right to revoke or amend a statement in accordance with Article 13 (2) 2 of the articles of association.

Mr. Zygmunt Jozef Solorz declares that he withdraws his statement pursuant to Article 13 (2) 2 (iii) 2 of the articles of association of the foundation, filed on August 2, 2024 and notarized by Dariusz Wierzchucki, notary in Warsaw, on Deed A No. 6235/2024. He



therefore expressly does not waive the application of the provisions of the articles of association and bylaws applicable during his lifetime and does not order the application of the provisions that come into force at the time of the founder's death in their place.

All terms used in this document shall be interpreted in accordance with the definitions in the foundation's articles of association.

A copy of this statement will be issued to the founder and each Secondary Beneficiary.

The founder shall bear the costs of this deed.

Similarly, on August 17, 2024, a total of seven warning letters were sent by the Applicant's legal representative to Respondents as per 2–4 and to Philippe Senn, Jaroslaw Grzesiak, Katarzyna Tomczuk, and Tomasz Szelag (Appendix P).

The letters to Philippe Senn, Jaroslaw Grzesiak, Katarzyna Tomczuk, and Tomasz Szelag read as follows (in Appendix P):

[...]
1.   [...]
3.   We are contacting you in your capacity as the foundation board of TiVi and Solkomtel.
4.   Our On August 2, 2024, our client was deliberately and intentionally misled (among other things, fraudulently) by the three secondary beneficiaries of TiVi and Solkomtel to make the following statements:

    (i)    the statement on the amendment of the articles of association of Solkomtel, under which the signatures were certified by Dariusz Wierzchucki, notary in Warsaw, in Deed A No. 6219/2024 ("Statement 1");

    (ii)   the statement on the amendment of the articles of association of TiVi, under which the signatures were notarized by Dariusz Wierzchucki, notary in Warsaw, in Deed A No. 6223/2024 ("Statement 2");

86


Page 69

    (iii)  the statement "Decision by circular resolution" pursuant to Article 7 of Solkomtel's articles of association, under which the signatures were notarized by Dariusz Wierzchucki, notary public in Warsaw, in Deed No. 6227/2024 ("Statement 3");

    (iv)  the statement "circular resolution" pursuant to Article 7 of the TiVi articles of association, under which the signatures were certified by Dariusz Wierzchucki, notary public in Warsaw, in Deed No. 6228/2024 ("Statement 4");

    (v)  the statement pursuant to Article 13 (2) 2 of Solkomtel's articles of association, notarized by Dariusz Wierzchucki, notary public in Warsaw, in Deed No. 6229/2024 ("Statement 5");

    (vi)  the statement pursuant to Article 13 (2) 2. (i) of the Articles of association of TiVi, notarized by Dariusz Wierzchucki, notary in Warsaw, in Deed No. 6235/2024 ("Statement 6").

5.   These statements did not correspond to the true intent of our client. At the time of signing the statements, he was not aware of their content. He had no intention of bringing about an amendment to the articles of association of the respective foundation, nor of issuing a statement in accordance with Article 13 (2) 2. of the articles of association of Solkomtel or Article 13 (2) 2. (i) of the articles of association of TiVi

6.   Accordingly, our client stated in his statement dated August 13, 2024 (which was also served to the foundation board member Tomasz Szelag, among others) that

    (i)  he was induced to make statements 1–6 by fraudulent misrepresentation, and

    (ii)  statements 1–6 are therefore defective and invalid (and therefore void), which is why they have no legal consequences and cannot have any legal consequences in the future.

7.   In disregard of our client's statement dated August 13, 2024, Mr. Piotr Zak sent two e-mails dated August 14, 2024, to the two foundation boards of TiVi and Solkomtel, Jaroslaw Grzesiak and you, Mr. Szelag, informing them that they had been dismissed as foundation board members in accordance with the rights granted to Mr. Piotr Zak as "beneficiary." Mr. Piotr Zak did not consult with our client before sending these e-mails, nor did our client give his consent to this.

87

8.  We maintain that the dismissal of the foundation board members declared by Mr. Piotr Zak was legally invalid and that the two foundation board members are therefore (still) in office.

9.  Against this background, we request that you refrain from exercising any rights and/or taking any action in your capacity as a member of the foundation board (unless this is absolutely necessary to fulfill legal obligations) until you receive an express statement to the contrary from our client.  This applies in particular to actions that would require the founder's statements 1 - 6 to be legally valid (which is not the case).  In particular, we request that you neither recognize the dismissal of existing foundation board members nor the appointment of new foundation board members, nor cooperate with allegedly newly appointed foundation board members.

10.  We request that you take note of this and provide us with written confirmation, signed by you, that you will comply with our requests in this letter.  We request that you provide us with this confirmation by August 20, 2024.

11.  Should you fail to comply with this request, our client expressly reserves the right to take further legal action in this regard (in particular, to assert any claims for damages should any damage arise as a result).

12.  Irrespective of the fact that statements 1–6 made by our client are legally invalid in any case, our client will take the following steps as a precautionary measure, which we hereby inform you of for your information:

    (i)  Our client will make use of its (unrestricted) right to make changes granted to it in Article 13 (2) 1, first sentence, of the articles of association of TiVi and reverse all changes declared on August 2, 2024 (in the disputed event that these should have had legal effect), so that the articles of association will (once again) read as they did before August 2, 2024.  Our client will do the same with Solkomtel..

    (ii)  Furthermore, our client will amend the bylaws of TiVi to the effect that it will remove the company REDDEV INVESTMENTS LIMITED, with its registered office in Limassol, Cyprus, address:  Krinou 3, The Oval, Floor 5, Office 503, registered in the register of the Ministry of Energy, Commerce, and Industry, Department of Business Registration and Intellectual Property in Nicosia under number HE 330471, as a special purpose vehicle under point C) I. of TiVi's bylaws.



13. Furthermore, on August 17, 2024, our client issued a new statement in accordance with Article 13 (2) 2 of Solkomtel's articles of association (which renders all previous statements, in particular Statement 5, irrelevant) and revoked Statement 6.

14. Furthermore, we would like to clarify that, until such time as an explicit statement to the contrary is made, our client expressly refuses (also for the future) to consent to any legal acts or other dispositions or measures affecting TiVi or Solkomtel. Any failure on the part of our client to make a statement shall therefore under no circumstances be construed as (implied) consent to any legal acts or other dispositions or measures.

15. In summary, our client therefore has all (unrestricted) founder's rights as granted to him in the articles of association and bylaws of TiVi and Solkomtel in the version prior to August 2, 2024. Our client will therefore take all available legal steps to fully protect his (founder's) rights and take action against any person who takes steps that could interfere with or jeopardize his legal position.

The letters to the Respondents as per 2–4 were as follows (in Appendix P):

[...]

1. [...]

3. In accordance with Section A) II. 1. b) of the Solkomtel bylaws and Section A) II. 1. b) of the TiVi bylaws, you are the secondary beneficiary of Solkomtel and TiVi. The same applies to your siblings Piotr Zak and Tobias Solorz.

4. With your involvement, our client was induced (maliciously, among other things) on August 2, 2024, to make the following statements:

   (i) the statement on the amendment of the articles of association of Solkomtel, under which the signatures were certified by Dariusz Wierzchucki, notary in Warsaw, in Deed A No. 6219/2024 ("Statement 1");

 Page 72

(ii) the statement on the amendment of the articles of association of TiVi, under which the signatures were notarized by Dariusz Wierzchucki, notary in Warsaw, in Deed A No. 6223/2024 ("Statement 2");

(iii) the statement "Circular resolution" pursuant to Article 7 of Solkomtel's articles of association, under which the signatures were notarized by Dariusz Wierzchucki, notary public in Warsaw, in Deed A No. 6227/2024 ("Statement 3");

(iv) the statement "Circular resolution" pursuant to Article 7 of TiVi's  articles of association, under which the signatures were notarized by Dariusz Wierzchucki, notary public in Warsaw, in Deed A No. 6228/2024 ("Statement 4");

(v) the statement pursuant to Article 13 (2) 2 of Solkomtel's articles of association, notarized by Dariusz Wierzchucki, notary public in Warsaw, in Deed No. 6229/2024 ("Statement 5");

(vi) the statement pursuant to Article 13 (2) 2. (i) of the articles of association of TiVi, notarized by Dariusz Wierzchucki, notary in Warsaw, on Deed A No. 6235/2024 ("Statement 6").

5. These statements did not correspond to the true intent of our client. At the time of signing the statements, he was not aware of their content. He had no intention of bringing about an amendment to the articles of association of the respective foundation, nor of issuing a statement in accordance with Article 13 (2) 2. of the articles of association of Solkomtel or Article 13 (2) 2. (i) of the articles of association of TiVi

6. Accordingly, our client declared in his statement dated August 13, 2024 (which was also subject to service of documents to you, among others) that

(i)  he was induced to make statements 1–6 by fraudulent misrepresentation, and

(ii)  statements 1–6 are therefore defective and invalid (and therefore void), which is why they have no legal consequences and cannot have any legal consequences in the future.

7. In disregard of our client's statement dated August 13, 2024, Mr. Piotr Zak sent two e-mails dated August 14, 2024, to the two foundation boards of TiVi and Solkomtel, Jaroslaw Grzesiak and you, Tomasz Szelag, informing them that they had been dismissed as foundation board members in accordance with the rights granted to Mr. Piotr Zak as "beneficiary." Mr. Piotr Zak did not consult with our client before sending these e-mails, nor did our client give his consent to this.

8.  We maintain that the dismissal of the foundation board members declared by Mr. Piotr Zak was legally invalid and that the two foundation board members are therefore (still) in office.

9.  Against this background, we urge you not to exercise, assert, or otherwise invoke any alleged (and in fact non-existent) rights in your capacity as secondary beneficiary, which would (only) exist if the founder's statements 1–6 were legally valid (which is not the case). We urge you in particular not to announce the dismissal of existing foundation boards or the appointment of new foundation boards.

10. We request that you take note of this and provide us with written confirmation, signed by you, that you will comply with our requests in this letter. We request that you provide us with this confirmation by August.

11. Should you fail to do so, our client expressly reserves the right to take further legal action in this regard.

12. Notwithstanding the fact that statements 1-6 made by our client are legally invalid in any case, our client will take the following precautionary measures, which we hereby notify you of in accordance with Article 13 (2) 1, second sentence, of the TiVi articles of association with regard to TiVi:

    (i)  Our client will make use of its (unrestricted) right to make changes granted to it in Article 13 (2) 1, first sentence, of the articles of association of TiVi and reverse all changes declared on August 2, 2024 (in the disputed event that these should have had legal effect), so that the articles of association will (once again) read as they did before August 2, 2024.  Our client will do the same with Solkomtel..

    (ii) Furthermore, our client will amend the bylaws of TiVi to the effect that it will remove the company REDDEV INVESTMENTS LIMITED, with its registered office in Limassol, Cyprus, address:  Krinou 3, The Oval, Floor 5, Office 503, registered in the register of the Ministry of Energy, Commerce, and Industry, Department of Business Registration and Intellectual Property in Nicosia under number HE 330471, as a special purpose vehicle under point C) I. of TiVi's bylaws.

13. Furthermore, on August 17, 2024, our client issued a new statement in accordance with
    Article 13 (2) 2 of Solkomtel's articles of association (which renders all previous
    statements, in particular Statement 5, irrelevant) and revoked Statement 6.

14. Furthermore, we would like to clarify that, until such time as an explicit statement to
    the contrary is made, our client expressly refuses (also for the future) to consent to any
    legal acts or other dispositions or measures affecting TiVi or Solkomtel. Any failure
    on the part of our client to make a statement shall therefore under no circumstances be
    construed as (implied) consent to any legal acts or other dispositions or measures.

15. Finally, for the sake of good order, we would like to note that our client reserves the
    right to take further legal action.

Both letters were accompanied by the statement signed by the Applicant on August 13,
2024 (cf. above) and the subsequent <u>statement</u> signed by the Applicant on **August 17,
2024**:

The declarant, Mr. Zygmunt Jozef Solorz, declares that he is the founder and primary
beneficiary of the foundation named Solkomtel Foundation, based in Vaduz, Principality
of Liechtenstein, registered in the commercial register of the Office of Justice of the
Principality of Liechtenstein under number FL-0002.419.785-2 (hereinafter referred to as
"the foundation").

Mr. Zygmunt Jozef Solorz declares that the secondary beneficiaries of the foundation are
his children Tobias Markus Solorz, Aleksandra Jadwiga Zak, and Piotr Mateusz Zak.

Mr. Zygmunt Jozef Solorz declares that on August 2, 2024, in Warsaw, he was induced by
the secondary beneficiaries of the foundation, through (among other things) fraudulent
misrepresentation, to make a statement pursuant to Article 13 (2) 2 of the articles of
association, notarized by Dariusz Wierzchucki, notary in Warsaw, under Deed A No.
6229/2024 and No. 6230/2024, respectively. Even though he considers this statement to be
invalid and void, he would like to take formal countermeasures to avoid any
misunderstandings.

Mr. Zygmunt Jozef Solorz declares that, as founder, he has the right under Article 13(2)(2) of the foundation's articles of association to issue a new statement under Article 13(2)(2) of the articles of association at any time.

Mr. Zygmunt Jozef Solorz hereby declares that he revokes his previous statement pursuant to Article 13 (2) 2 of the articles of association, made on August 2, 2024, and notarized by Dariusz Wierzchucki, notary in Warsaw, in Deed A No. 6229/2024 and No. 6230/2024, respectively, in accordance with Article 13 (2) 2 of the foundation's articles of association, with the following new statement pursuant to Article 13 (2) 2 of the articles of association:

> "The founder, Zygmunt Jozef Solorz, declares that, in accordance with Article 13 (2) 2 of the foundation's articles of association, as of January 1, 2035 (January 1, two thousand and thirty-five), he waives the application of the provisions of the articles of association and bylaws of the foundation applicable during his lifetime and that, as of January 1, 2035 (January 1, two thousand and thirty-five), he orders the application of those provisions that come into force at the time of the founder's death."

All terms used in this document shall be interpreted in accordance with the definitions in the foundation's articles of association.

A copy of this statement will be issued to the founder and each Secondary Beneficiary.

The founder shall bear the costs of this deed.

In a letter from the Applicant's legal representative dated August 18, 2024, Respondents as per 2–4 were informed "in accordance with Article 13 (2) 1, second sentence, of the articles of association" that the Applicant "will exercise its (unrestricted) right of amendment granted in Article 13 (2) 1 first sentence of the TiVi articles of association granted unlimited amendment rights and would amend Article 5 of the articles of association by inserting a new para 5, which would read as follows:

93



(5) Anyone (except the founder) who

(i)    challenges the foundation as such, its establishment or existence, its articles of association, bylaws, regulations, financial circumstances, decisions (whether of a fiduciary or business nature), or donations of assets, to whomsoever these may have been made, in whole or in part, before a domestic or foreign public authority or court, or damages the foundation financially or in its reputation, or

(ii)    challenges the legal acts of the founder, in whole or in part, before a domestic or foreign public authority or court, or damages the founder financially or in terms of reputation,

shall lose his or her beneficiary rights.  In this case, all benefits (or other rights) to which the beneficiary would have been entitled shall be distributed pro rata among the remaining beneficiaries of the foundation in accordance with their respective rights to the foundation.

The trustee may, at his or her discretion, reinstate such excluded persons in whole or in part, with ex tune or ex nunc effect, if such persons definitively withdraw their challenge or cease the damage.

In a notarial deed dated **August 19, 2024,** the Applicant, as "founder and initial beneficiary," declared and resolved to confirm the articles of association in the version dated and to supplement Article 5 with the above-mentioned para 5 (**forfeiture clause**) (Appendix X).

With the exception of the addition of the aforementioned forfeiture clause, the revised **articles of association** dated **August 19, 2024** corresponded to the articles of association dated November 29, 2023 (Appendix X).

By notarial deed also dated **August 19, 2024**, the Applicant, as "founder and primary beneficiary," declared and resolved to confirm the **bylaws** in the version dated November 29, 2023 and to supplement point C) "General Provisions," sub-item 1, to the effect that after letter d), a new letter e) is inserted, which reads "e) The company REDDEV INVESTMENT LIMITED [...] (SPECIAL PURPOSE ENTITIES V)." (Appendix Y).

94

By notarial deed also dated **August 19, 2024**, the Applicant "as a precaution" dismissed Piotr Zak and Zofia Jedrzeyewska as members of the foundation board and provided the confirmation of the previous members of the foundation board, Grzesiak and Szelag, as follows (Appendix Z):

STATEMENT AND RESOLUTION

I, Zygmunt Jozef Solorz (hereinafter referred to as the "founder"), am the sole founder and primary beneficiary of the TiVi Foundation, based in Vaduz, Principality of Liechtenstein, registered in the commercial register of the Office of Justice of the Principality of Liechtenstein under number FL - 0002.394. 367-5 (hereinafter referred to as the "foundation") and hereby pass the following resolutions on the basis of Article 6 para. 2 BSt a of the foundation's articles of association:

1)  Precautionary dismissal of an invalidly "appointed" member of the foundation board I would like to state in advance that I never appointed Mr. Piotr Zak or Ms. Zofia Jedrzeyewska as members of the foundation board, and that Mr. Piotr Zak's attempt to appoint himself or third parties as members of the foundation board through (among other things) fraudulent acts was inadmissible and legally invalid. Mr. Piotr Zak and Ms. Zofia Jedrzeyewska never became members of the foundation board. Out of an abundance of caution and to clarify the legal situation vis-à-vis the foundation and for its protection, I hereby dismiss Mr. Piotr Zak, born on September 26, 1992, and Ms. Zofia Jedrzeyewska as members of the foundation board with immediate effect.

2)  Confirmation of the appointment of members of the foundation board I have learned that Mr. Piotr Zak recently attempted to "dismiss" two members of the foundation board in a manner that is legally invalid. Again, solely for the purpose of clarifying the legal situation vis-à-vis the foundation, the following persons are (re)appointed in their capacity as members of the foundation board for a further term of office, and their appointments, which remain valid, are hereby confirmed:

•Mr. Jaroslaw Grzesiak, Polish citizen, in his capacity as member of the foundation board.

• Mr. Tomasz Szelag, Polish citizen, in his capacity as member of the foundation board.

The appointments referred to in point 2) and the precautionary dismissal referred to in point 1) are made with the express non-recognition of any legal basis for the actions taken by the secondary beneficiaries, in particular the non-recognition of the letters of appointment and dismissal sent by Piotr Zak to the members of the foundation board listed in point 2). The appointment confirmed as of today's date shall take effect for a new term of office starting on this day.  Furthermore, as founder, I note that the confirmation and appointment are made in order to protect the foundation and its assets from unjustified attacks and damage in the long term.

All terms used in this document shall be interpreted in accordance with the definitions in the foundation's articles of association.

In accordance with Article 6 para. 6 of the articles of association, the appointment (or confirmation of appointment) must be made in writing to the address of the foundation, with the request for appointment being handed over to the chairman of the foundation board.

The founder shall bear the costs of this deed.

In a **letter of resignation** dated **August 20, 2024**, the **Respondent as per 2** announced his "resignation from [...] office as a member of the foundation board of the Respondent as per 1" and sent the corresponding statement to Philipp Senn by e-mail on the same day (Appendix AA).

In a letter from the Applicant's legal representative dated **September 20, 2024**, Respondents as per 2–4 were informed "in accordance with Article 13(2) 1, second sentence of the articles of association" that the Applicant would exercise its "(unrestricted) right of amendment" granted by Article 13(2) 1, first sentence, of the articles of association of the TiVi Foundation" and would amend the articles of association and bylaws as follows, whereby "for the sake of good order" it was also stated that Respondents as per 2–4 had meanwhile lost all beneficiary rights in accordance with para 5 of Article 5 of the articles of association (Appendix AI):

ARTICLES OF INCORPORATION

96


Page 79

[...]

<u>Article 9</u>

TRUSTEE

(1)    The trustee is an advisor to the foundation board. He or she is entitled to inspect all foundation documents and make copies of them, attend foundation board meetings, and discuss the foundation's affairs. For clarification, it is noted that the trustee is also authorized to call in attorneys and other advisors to meetings of the foundation board or to be represented by them at such meetings. The trustee also monitors the implementation of the foundation's purpose by the foundation board in accordance with the foundation documents (articles of association, bylaws) and any letter of wishes issued by the founder.

- 2    -

[...]

<u>BYLAWS</u>

A)    About the beneficiaries

[...]

II.

Secondary Beneficiaries

1.   There are currently no secondary beneficiaries.

2.   (...)

By notarial deed dated **<u>September 24, 2024</u>** the Applicant as "founder and first beneficiary" declared and resolved to amend the **<u>articles of association</u>** as amended on August 24, 2024 in Article 9 para 1 as reproduced above (Appendix AJ).

With the exception of the addition to Article 9 para. 1 and a few linguistic corrections and reactive amendments, the revised articles of association dated September 24, 2024 corresponded in content to the articles of association dated August 19, 2024 (Appendix AJ).

In a further notarial deed dated **<u>September 24, 2024</u>**, the Applicant, as "founder and primary beneficiary," declared and resolved to amend the **bylaws** as amended on August 19, 2024, as reproduced above, and to <u>remove the Respondents as per 2–4 as secondary beneficiaries</u> and <u>to appoint the Polsat Foundation as secondary beneficiary</u>.

97

Although the Polsat Foundation had already been named in earlier versions of the bylaws, it was only named as a default beneficiary in the event that the founder had no descendants ("after the childless death of the sole (last) beneficiary who is a natural person") and therefore for a time when the purpose of the family foundation would no longer have been achievable due to a lack of descendants.  It was then "clarified" that "the secondary beneficiaries had already lost all beneficiary rights in relation to the foundation at the time of this decision in accordance with Article 5 (para 5) (i) and (ii) of the foundation's articles of association.  Irrespective of the forfeiture pursuant to Article 5 para. 5 (i) and (ii) of the articles of association, the secondary beneficiaries are also deleted from point A) II. 1. of the bylaws by today's resolution, so that the secondary beneficiaries (and their descendants) no longer have any rights in relation to the foundation. Furthermore, some linguistic corrections and editorial changes have been made. [...]" (Appendix AK)

4.2    The established facts are based on the following <u>assessment of evidence</u>:

The established facts are largely based on the evidence cited in parentheses. Insofar as these are documents, they proved to be unobjectionable, which is why they could be used as a basis for the relevant findings.

As far as statements by parties and witnesses are concerned, the fact that both sides have very important interests at stake in the present proceedings and, in particular, that the Applicant is one of the (at least) most financially powerful individuals in Poland must be noted at the outset. When assessing the witness statements, it was then necessary to take into account that the witnesses belonged to the personal or professional circle of one or other of the parties.  Even if the witnesses cannot be accused of deliberate bias, their statements nevertheless revealed a discernible closeness to the viewpoint of the respective party in some cases.  On the Applicant's side, this applies in particular to his fourth wife, Justyna Kulka, and his current legal advisor, Jerzy Modrejewski, but also to the notary Dariusz Wierzchucki and the current member of the foundation board, Tomasz Szelag, who can at least be considered to be on the Applicant's side.  The witnesses Jaroslaw Grzesiak and Malzorata Nawrocka, on

98

the other hand, can be attributed to the Respondent's side. In the overall assessment, it was also necessary to take into account that the witness Jaroslaw Grzesiak (himself an attorney) was not released from his duty of confidentiality by the Applicant and—when he (himself an attorney) nevertheless made a statement—was repeatedly reminded that he was not allowed to do so (cf. ON 21 p. 21 et seq. 43).

The witnesses Dr. Barbara Walch, Philipp Senn, and Luca Castellzzi, who were also offered and traveled to the hearing by the Respondents, were likewise not released from their duty of confidentiality by the Applicant and were therefore unable to make any statements.

As far as the Respondents are concerned, they appeared credible in principle, as did the witnesses, and the court has no reason to doubt their statements, otherwise this would be discussed below. The Applicant himself was, at least on the day of his court hearing, unable to make any substantial statements on the individual topics for health reasons; reference can be made to the minutes in ON 24 S 29 et seq, where this is clearly evident. The Applicant's statements were vague and remained unspecific in terms of content. Although he claimed to have been deceived by his children, he was unable to provide any comprehensible or verifiable information about the nature, extent, or specific circumstances of this alleged deception. This gave the impression that the Applicant was attempting to recite previously prepared statements, but was clearly having difficulty actually understanding the content of this information due to his generally very poor health condition. On the advice of his doctor, the questioning was then stopped (ON 24 p. 38). As regards the verbatim transcript submitted by the Applicant's legal representatives (Appendix AV), this is a series of leading questions, so that this document (irrespective of its admissibility) has no evidential value, or rather, this document provides confirmation of the above impression of the Applicant.


Page 82

In detail:

It is fundamentally undisputed that the assets transferred to the Respondent as per 1 were essentially accumulated during the founder's first two marriages, as is evident from the fact that the foundation was established in 2012.  The fact that, in accordance with the Applicant's wishes, the foundation was intended in particular to provide security for the Respondents and their descendants, and that the Applicant communicated this on an ongoing basis, was confirmed virtually unanimously by the witnesses (cf. ZV Jaroslaw Grzesiak in ON 21 p. 34; ZV Malorzata Nawrocka in ON 24 p. 21 et seq; also ZV Justyna Kulka in ON 22 p. 37 et seq.; ZV Jerzy Modrejewski in ON 23 S 8; Tomasz Szelag in ON 35 S 17) and was already stated in the 2012 articles of association (as well as in all subsequent articles of association) in Article 1 that the Respondent as per 1 was – literally – a "family foundation."   Accordingly, the secondary beneficiaries were also designated as secondary beneficiaries in the bylaws (until September 2024). The court therefore has no doubt that it was the Applicant's intention (and that the Respondent as per 1 was also designed accordingly) that the Respondent should serve in particular to provide financial security for his descendants. There are various conceivable reasons why they are not mentioned in the proposed bylaws of March 7, 2012, which are not necessarily inconsistent with the above, such as the fact that the assets had not yet been contributed at that time and no attention was paid to these (first) bylaws.  This is also supported by the final beneficiary provision contained therein , as it otherwise seems implausible (regardless of the question of legal admissibility) that someone would contribute billions in assets to a foundation without leaving precise instructions as to the specific charitable purposes to which the foundation's assets should be used in the event of his or her death, for example by naming specific areas of support such as medical research.

It is undisputed that the sons gradually assumed responsibility in the companies in accordance with the Applicant's wishes, and this was confirmed by various witnesses, including Tomasz Szelag in ON 35 S S 17, who stated that this concept had also been presented to the financing banks and approved by them cf. ZV Jaroslaw Grzesiak in ON 21 S 34; ZV Justyna Kulka in ON 22 S 37 et seq.; ZV Jerzy Modrejewski in ON 23 S 8, ZV Malorzata Nawrocka in ON 24S 21 et seq.).

The findings regarding the stay in Switzerland are based on the statements made by Jaroslaw Grzesiak and Malorzata Nawrocka in ON 21 S 26 and ON 24 S 21 et seq., especially since they (apart from the Applicant, whereby reference should be made to the introductory remarks) were apparently the only persons who had their own observations on this matter.

As regards the initial introduction of the concept of the declaration of death in August 2022, it should be undisputed, and in any case follows from the various consistent witness and party statements that the concept of the declaration of death was developed by Jaroslaw Grzesiak and that Jerzy Modrejewski, in constant consultation with Jaroslaw Grzesiak, drew up a draft based on this and took over its implementation in the articles of association (Appendixes 2.10 and 2.11; ZV Jaroslaw Grzesiak in ON 21 p. 25 et seq; ZV Malorzata Nawrocka in ON 24 p. 23; PV Respondent as per 2 in ON 22 p. 3 et seq, 12 et seq.; also Jerzy Modrejewski in ON 22 p. 52, ON 23 p. 24 below; PV Respondent as per 4 in ON 35 p. 26). The statements made by Jaroslaw Grzesiak (as "developer") are therefore of great importance when it comes to how the concept of the declaration of death was understood at the time, namely that the possibility of a "time extension" should exist before the law came into force, but not afterwards (cf. the Respondent as per 2 in ON 22 S 23). It was Jaroslaw Grzesiak who took part in the talks in Lack and discussed and explained this concept with the Applicant, among others, while Jerzy Modrejewski, according to his own statements, was only partially present at these talks (ON 22 S 52). Insofar as Jerzy Modrejewski states in his testimony that it was intended that the statement could be revoked or amended at any time even after it came into force, the court is unable to accept this interpretation. Firstly, the Applicant was (undisputedly) seriously ill at the time, so it seems appropriate and

Page 84

understandable that, in view of a possible deterioration in his health condition, timely arrangements were made for an orderly transfer of decision-making powers. On the other hand, the foundation in question "holds" assets worth billions, consisting, among other things, of holdings in listed companies, so that the "market" and the financing banks had and continue to have an obvious interest in clear and stable management structures within the holding foundation.  The Applicant's own submission indicates that any uncertainties regarding management would have a direct impact on the stock market price and lead to losses amounting to millions.  Given this structure, it seems implausible from an economic perspective that there could be a desire to hand over control to the "next generation" but to be able to "take it back" at will.  This would lead to the uncertainties mentioned above and would most likely meet with resistance from the financing banks and the capital market, as it would contradict fundamental requirements for planning reliability and governance. In summary, the court considers it proven that after the effective date (i.e., the expiry of the deadline), a "point of no return" should be reached; i.e., the "change of control" should be irrevocable.

However, from the perspective of possible legal incapacity (and corresponding susceptibility to influence), it also makes perfect sense that the "point of no return" should be reached at some point and should not be revocable at will.

With regard to the subsequent implementation of the revocation option, this is evident from Appendix 2.8.  It is undisputed that revocation subsequently took place. It is also undisputed that, unlike in the case of previous amendments to the articles of association, Respondents as per 2–4 and Jaroslaw Grzesiak were only informed of this after the fact (see also ZV Jaroslaw Grzesiak in ON 21 S 31; ZV Jerzy Modrejewski in ON 23 S 6).

As regards the founder's intention with regard to the wording in Article 13 (2) 2 (iii) "The founder has the unconditional and irrevocable right to revoke or amend the statement," the founder himself was unable to provide any information on this.  Jerzy Modrejewski (in ON 23 S 6) then stated that "unconditionally and irrevocably" meant that the Applicant could not be 'deprived' of this right "on any grounds, on any legal basis," but not that the Applicant also wanted to curtail his right to make changes.  There are also no indications of such an extreme intention on the part of the founder, which would have made it impossible to secure the foundation's assets and any change of control during his lifetime.  In this regard, reference can also be made to the above comments on "change of control."  Given the overall structure, it seems implausible from an economic point of view that it could be desirable to transfer control to the "next generation" but to be able to "take it back" at will.  Jerzy Modrejewski's statements in this regard are not convincing (also) against this background.

With regard to the findings concerning the appointment of Dr. Barbara Walch and the results, the court sees no reason to doubt the statements made by Jaroslaw Grzesiak in this regard (ON 21 S 32 et seq.), especially since the corresponding assessment regarding the transfer of assets is entirely understandable—the Applicant, as founder, trustee, and primary beneficiary, was granted very extensive rights in the articles of association, including extensive rights to amend the articles of association and bylaws. It could therefore be argued that the Applicant, as the founder, did not make any "financial sacrifice." With regard to the (evidential) considerations of the Applicant in his written pleading ON 33 S 11 et seq., the court does not share these considerations, especially since the possibility (which does not exist here) of revoking the foundation is mixed with the described accumulation of power by the Applicant (and the associated far-reaching rights). It goes without saying that, with regard to the concentration of power, it then makes a difference whether a declaration of death that has once been made can be revoked or not. Incidentally, it seems somewhat strange that the Applicant does not release Dr. Barbara Walch from her duty of confidentiality, but then cites her "statement" as evidence (ON 33 p. 14). The fact that this accumulation of power was never previously discussed (if at all) (ZV Jerzy Modrejewski in ON 23 S 9) does not change its existence and may be related to various reasons. The fact that the accumulation of power and the feared vulnerability of the foundation were issues was also confirmed by notary Dariusz Wierzchucki in ON 23 S 43.

The fact that Respondents as per 2–4 were concerned about these developments is evident from the statements made by the Respondents themselves and by Jaroslaw Grzesiak in ON 23 S 33 and is also understandable.

With regard to the events from July 31, 2025, to August 2, 2024, it should be noted that Respondent as per 4 was only involved from August 1, Jerzy Modrejewski was only involved by telephone from the afternoon of August 1, and Jaroslaw Grzesiak was only involved by telephone and e-mail. During his court hearing, the Applicant was unable to make any substantial statements on this matter for health reasons; reference can be made to the introductory remarks (cf. in particular ON 24, et seq). With regard to the

verbatim transcript submitted by the Applicant (Appendix AV), reference can also be made to the introductory remarks on the assessment of evidence, namely that it is merely a series of leading questions with no evidential value. Due to the differing and, in some cases, contradictory statements, it is not possible to determine the events and processes surrounding the days from July 31 to August 2, 2024, in every detail, but only the rough sequence of events.

With regard to July 31, 2024, it is undisputed that the will, the power of attorney, and the Applicant's statement were discussed, and reference can be made to appendixes AY (statement) and 3.32 (power of attorney) with regard to the content. The fact that the Applicants saw a threat to the foundation (concentration of power in the hands of the founder, possible contestation of the foundation) and to the agreed succession as a result of these statements and previous developments (such as the introduction of the possibility of revocation and the revocation that took place without the involvement of the Respondents) is evident from the credible and comprehensible statements of the Respondents themselves (PV Respondent as per 2 in ON 22 p. 4 et seq, 14 et seq.; PV Respondent as per 3 in ON 22 p. 24 et seq., 27) and was at least partially confirmed by Jerzy Modrejewski (ZV Jerzy Modrejewski in ON 23 p. 12 et seq.), although he was not present for the entire evening (late dinner) and therefore did not hear all of the conversation. Jerzy Modrejewski himself stated in ON 23 p. 13 that the declaration of death and the amendment to the articles of association had already been discussed, at least "peripherally," in his presence.

With regard to the morning of August 1, 2024, the statements made by the Respondents and Jerzy Modrejewski, among others, contradict each other with regard to his departure and the content of the conversations. The Respondents state that Jerzy Modrejewski said he was going on vacation and asked the Applicant if he had any objections, to which the Applicant replied in the negative. Jerzy Modrejewski, on the other hand, states that the Respondents suggested to him that there would be sufficient time to clarify the issues discussed that morning after his return in mid-July and that he could go on vacation with peace of mind. As already stated above, the Applicant himself was unable to provide specific details during his hearing. Based on this evidence, it ultimately remains unclear what the specific sequence of events was. In any case, it can be established that Jerzy Modrejewski was only physically present on the morning of August 1 (see, inter alia, ZV Jerzy Modrejewski in ON 23 S 14). As far as the afternoon is concerned, the statements made by notary Dariusz Wierzchucki and the corresponding statements made by the Respondents indicate that the Respondents expressed their concern to the Applicant about the possible contestability of the foundation due to the concentration of power in the hands of the Applicant, and that it was subsequently agreed that that the Respondents should prepare proposals for amendments to the articles of association for the following day. Dariusz Wierzchucki himself stated that he sent these documents to Dariusz Wierzchucki, but that the latter did not look at them because it was already 11 p.m. (ZV Dariusz Wierzchucki in ON 23 S 43).

With regard to August 2, 2024, the relevant findings are based in particular on the credible statements made by Respondents as per 2–4 in ON 22 and ON 35 and by Jaroslaw Grzesiak in ON 21, which were comprehensible and consistent and were also largely subject to confirmation by notary Dariusz Wierzchucki. Among other things, he provided confirmation that Respondents as per 2–4 feared that the foundation could be contestable due to the concentration of power in the hands of the Applicant, and that this was then discussed accordingly (ON 23 p. 43). He also provided confirmation that the Applicant wanted certain adjustments to be made, which were then carried out (ON 23 p. 44 et seq.). He also explained that the Applicant had wanted certain adjustments,

which he then withdrew after discussing them with Respondent as per 2 (ON 24 p. 10). However, his statement that that he did not discuss the amendment to the articles of association with the Applicant or that he does not know whether this was discussed with the Applicant at all—Dariusz Wierzchucki himself stated in ON 23 S 45 that, at the request of the founder, he made or initiated changes to the amendment to the articles of association, such as deleting blank lines, adding the name, etc. The court cannot understand how this is possible if the content of the amendment to the articles of association was not discussed with the Applicant. Overall, the court has no doubt that the events unfolded as described by the Respondents.

The fact that the Applicant was fully aware of the content and consequences of these statements when signing the amendment to the articles of association, the declaration of death, and the circular resolution is evident from the fact that the Applicant was described by all witnesses and parties as a strong-willed and assertive person who does not allow resistance and cannot be pressured, and there is no evidence to suggest that the Applicant's capacity to make judgments or act was impaired on August 2, 2024; on the contrary, otherwise the notary Dariusz Wierzchucki would not have recorded the notarial deed concerning the declaration of death. These measures, or rather the "change of control" in general and Article 13 of the articles of association in particular, had also been a recurring topic of discussion for months.  It is therefore inconceivable that the Applicant should not have been familiar with the (incidentally not very extensive) articles of association of his "life's work" (as generally claimed), or that he should have been misled in this regard or signed something that did not correspond to his will.  The fact that he may have regretted the statements the next day, for whatever reason, is another matter.

With regard to the corresponding negative findings (concerning deception and coercion), it should be noted once again that everyone described the Applicant as a very strong-willed and assertive person. Dariusz Wierzchucki, for example, described him as "a person with a very strong character and personality, who acts with foresight and has a strong business sense." furthermore, "He has strong leadership qualities, although he allows little resistance, but he listens to his advisors.  He has always been a person who makes independent and final decisions on his own." (ON 23 S 39).   Jerzy Modreyevsky also testified, for example: "The Applicant cannot be pressured, especially not by his legal advisor" (ON 23 S 6).  Tomasz Szelag described him as follows:  "As a private individual, the Applicant is a gentle and very emotional person, especially when it comes to family matters.  The Applicant as an entrepreneur and boss is clearly a tough guy with a strong vision and strategic thinking.  Thanks to this, he has achieved what he has achieved in business.  I always joke that although I have a doctorate in economics, I have never read about such a tough management style as the Applicant's in any textbook." (ON 35 S 14).  It is simply inconceivable that a person such as the Applicant, who—as was evident during the hearing and the court examination of the Applicant—is surrounded by x attorneys and advisors, could be deceived by his children—as everyone always emphasizes—regarding his "life's work" and his rights, especially since the Applicant and the Respondents—as confirmed, for example, by Dariusz Wierzchucki in ON 24 S 15 or by Jaroslaw Grzesiak in ON 21 S 38—have been dealing with and exchanging views on the subject of the mechanism of Article 13 and the transfer of control for years with the assistance of their lawyers. Finally, the articles of association of the Respondent as per 1 are relatively straightforward and clear, and it can be assumed that the Applicant was very well aware of his rights—which are so important to him—and their location.

With regard to the findings concerning the events from August 3, 2024 (standstill agreement, declaration of avoidance, dismissal and appointment of new foundation board members by the Respondent as per 2, revocation of the declaration of death, warning letter, amendments to the articles of association and bylaws) are based on the unobjectionable documents listed in parentheses and are also largely undisputed.

5.    **Legally,** the following should be considered:

As stated at the outset, there is a dispute between the parties as to which foundation documents are currently valid and who is entitled to which rights on that basis. In particular, it is disputed whether the statements made by the Applicant on August 2, 2024 (amendment to the articles of association, declaration of death, and approval of the circular resolution) were validly concluded and whether they could be subsequently revoked or amended with effect.

Error and (fraudulent misrepresentation)

The Applicant argues that he made a significant error in his statements on August 2, 2024: The Applicant's true intention was to retain control over the first Respondent as per 1, in particular his rights to appoint and dismiss members of the foundation's board of trustees, whereas the content of these statements was in stark contrast to his intention, as they significantly impaired the Applicant's legal position and considerably restricted his rights in relation to the foundation. In addition, the meaning of the amendments to the articles of association made based on the signed statements was therefore not apparent to the Applicant either, since, in particular, no consolidated version of the articles of association (including the newly adopted amendments) was attached to the statement.

Rather, the statement presented to the Applicant had been deliberately designed to be misleading; those statements intended to curtail or revoke the Applicant's rights had been worded in such a way that only the article designation was included in the statement (without reflecting the content of the articles to be deleted). In contrast, the statement predefined that a (supposedly) new Article 13 (2) 3 would be added, in which certain rights of the founder were specified. However, it was not pointed out that this only affected the rights of the plaintiff, which were already included in the articles of association but were affected by the deletion declared in the previous paragraph. An honest author of the statement would simply not have made the deletions in such a case. The approach of deleting existing rights and then immediately adding them back as alleged new rights proves the intent to deceive on the part of Respondents as per 2–4.

When submitting the statements on August 2, 2024, the Applicant clearly had a specific, significantly different idea of the content of his statements and the legal consequences they would trigger. He was convinced that he would retain his rights as a founder unchanged. This therefore constituted a classic error of statement. This error was caused or adequately brought about by the Respondents as per 2-4 by presenting the plaintiff with the pre-drafted statements and urging him to sign them. On this basis alone, it was clear that their reliance on the validity of the statement was not worthy of protection. In addition, the Applicant's error must have been obvious to Respondents as per 2–4, as they were fully aware of the content of the statements and could easily have recognized the deviation from the Applicant's declared intention. The foundation boards had been informed of the plaintiff's error in good time; prior to this, to the Applicant's knowledge, the foundation boards had not made any relevant dispositions in reliance on the Applicant's statements. The error was also material, as the Applicant would not have been able to make the statements in this form had he been aware of their actual meaning.

There was also fraudulent intent: There was also malicious intent: it was apparent to Respondents as per 2–4 that the Applicant had been misled.  By exploiting the family trust to pressure the Applicant into signing the statement of August 2, 2024, they caused the Applicant to make this mistake and deliberately exploited it.

This view of the Applicant is not supported by the established facts; on the contrary, when signing the statements of August 2, 2024, the Applicant was aware of both the content and the consequences of these statements (amendment of the articles of association, declaration of death, and circular resolution) and they corresponded to his intent.  There is therefore neither a significant fundamental error nor fraudulent intent (§§ 870 ABGB).

Right to amend the articles of association

The Applicant further argues that even if one incorrectly assumes that both the statements of August 2, 2024 are valid and the revocation of the declaration of death is invalid, this does not lead to a different result:

It is undisputed that the Applicant's right to make amendments, as enshrined in Article 13(2)1 of the articles of association, is not affected by the incriminating statements of August 2, 2024. According to the wording of the provision, an amendment is possible as long as the founder is alive ("during his lifetime").  Unlike other provisions of the articles of association, this is not a provision that is to come into force "after the death" of the plaintiff (such as Article 6 of the articles of association), which is the aim of the declaration of death.  Furthermore, there is no provision that is to take effect in its place (in the event of death), as is the case with other provisions (e.g., Article 6 (3) b of the articles of association). Furthermore, the articles of association would meticulously distinguish between rights that arise during the founder's lifetime and expire upon official declaration of death, i.e., the actual death of the plaintiff, and those rights that the founder can already waive (revocably) upon declaration of death. For example, Article 6 of the articles of association expressly distinguishes between these two variants

111

(as in Article 6 (3) a: "From the date of death or from the date specified by the founder in the statement referred to in Article 13 (2) 2 of the articles of association.").  "During his lifetime" within the meaning of Article 13 can therefore only be understood, in accordance with a systematic interpretation of the articles of association, to mean that this right can only expire upon the actual death (and proof thereof by means of an official document in the form of a death certificate of the founder).  Finally, according to the express wording of the articles of association, the declaration of death is not intended to apply "forever" in every case, especially since the plaintiff reserved the right to revoke and amend it at any time.  Based on a literal, systematic interpretation in line with the Applicant's intentions as founder, Article 13(2)(1) in conjunction with the declaration of death can only be understood to mean that the right to make changes remains valid even if he addresses a declaration of death to the foundation.

The Applicant's legal opinion cannot be upheld:

The Applicant's right to amend the articles of association in Article 13 (2) 1 of the articles of association dated October 29, 2018 (also dated November 29, 2023) also included the right to repeal Article 13 (2) 2 (iii) without replacement:

The Applicant had already reserved the right to amend the articles of association in Article 13 (3) of the founding articles of association dated March 7, 2012. Article 13 (1) of these articles of association declared (only) Article 5 on the purpose of the association to be unamendable.

Article 13 of the articles of association was subsequently amended several times at the Applicant's instigation. However, the right to amend the articles of association itself was not restricted; in particular, no provisions of the articles of association were declared unalterable (although some provisions concerning the bylaws were).

Article 13 (2) 2 (iii) of the articles of association dated August 10, 2023 (also dated November 29, 2023) only stated that the founder's right to revoke or amend a declaration of death that had already been submitted was irrevocable. This meant that, according to this provision of the articles of association, the founder should not be able to effectively waive this right of revocation outside the articles of association, for example in the context of a declaration of death itself or at any time thereafter. However, this did not mean that this provision in the articles of association, which only applies in the event of a declaration of death already having been submitted, is itself unalterable and that the founder thereby wished to restrict his right to amend the articles of association; this was simply not stipulated in the articles of association, even in the most extreme sense of the wording of the articles of association, and there are also no indications of such an extreme intention on the part of the founder, which would have made it impossible to secure the foundation's assets and any change of control during his lifetime.

It is therefore clear that on August 2, 2024, the Applicant materially and formally amended the articles of association, including the deletion of Article 13 (2) 2 (iii) (and sub-item iv), confirmed by an identical resolution of the foundation board, and then ordered with immediate effect that the provisions of the articles of association be applied as if he had already died, with the exception of the special rights provided for in Article 13 (2) 3 of the articles of association dated August 2, 2024.

Accordingly, there was no substantive or formal basis for revoking the Applicant's statements of August 2, 2024, including his "declaration of death."

Likewise, there was no substantive or formal basis for the Applicant to revise the articles of association after August 2, 2024. With the declaration of death dated August 2, 2024, which took effect in accordance with Article 13 (2) 2 of the articles of association dated November 29, 2023, the Applicant waived the possibility of exercising statutory founder's rights, including the right to amend the articles of association in accordance with Article 13(1) of the articles of association. This also follows clearly from the wording of the articles of association, which specify the rights of the founder "during his lifetime" (e.g., the right to amend pursuant to Article 13 (2) 1), while in the declaration of death he rejects the application of the provisions as they apply "during his lifetime" (Article 13 (2) 2 (i)).

This legal consequence corresponded precisely to the deliberate step taken by the Applicant on August 2, 2024, which had been prepared over a long period of time. This means that his motion lacks legal basis and the statements dated August 2, 2024 (amendment to the articles of association, declaration of death, and circular resolution) are legally valid. In particular, with the statement of amendment to the articles of association dated August 2, 2024, the Applicant validly and effectively deleted Article 13 (2) 2 (iii) and (iv) from the articles of association, thereby validly and effectively excluding, in particular, the previous (possible) option of revoking a declaration of death that had been submitted. With this declaration of death, the Applicant subsequently lost his (founder's) rights and, in particular, his right to amend the articles of association, with the result that the amendments to the articles of association made on August 19, 2024, August 20, 2024, and September 24, 2024 (as well as any further amendments to the articles of association made after August 2, 2024) remained invalid.

For the sake of completeness

114

Even if the statements of August 2, 2024 were to be deemed invalid, the deletion of Respondents as per 2–4 as secondary beneficiaries in Article A. II. 1. in the version of the bylaws of September 24, 2024 (Appendix AK) would in any case be null and void and the Applicant's request in this regard would have to be rejected.

This is for the following reasons: The TiVi Foundation is a private family foundation. According to Article 2 sentence 1 of the articles of association dated March 7, 2012 (and the subsequent articles of association), the TiVi Foundation is a "family foundation." The purpose of a family foundation is confirmed by Article 5 (1) and (2) of the articles of association.

The beneficiaries are determined by the founder in accordance with the restrictions on purpose set out in Article 5 (cf. Article 6 (3) of the articles of association). The foundation is also established for an indefinite period (Article 3 of the articles of association). The purpose according to Article 5 of the articles of association dated March 7, 2012, is purely for private benefit.

The founder has not reserved the right to change the purpose. According to Article 13 (1) HS 1 of the articles of association dated March 7, 2012, Article 5 of the articles of association (purpose) was unalterable. Article 5 of the articles of association was therefore explicitly excluded from the founder's right to amend the articles of association.

An (objective) interpretation of the founder's rights therefore leads to the clear conclusion that the founder's right to amend the articles of association, as reserved in the original articles of association, did not also cover the purpose of the foundation. The character of the foundation as a family foundation was therefore unalterable. A family foundation is characterized by the fact that it is designed to span generations and be permanent.

Only since the articles of association were amended on October 29, 2018, has the right to amend the articles of association been unrestricted, according to its wording. The right to amend the articles of association was therefore subsequently expanded in terms of content with the enactment of the articles of association of October 29, 2018, which was inadmissible.

115

This extension of the right to make changes—the immutability of the purpose was dropped—is inadmissible. According to doctrine and case law, a reserved right to make changes can be restricted retrospectively, but not extended.  For this reason, the founder's right to make changes never included the right to change the purpose.

The founder's appointment of the non-profit Polsat Foundation as secondary beneficiaries in the bylaws of September 24, 2024 was and is an inadmissible change of purpose because Article 5 does not permit the pursuit of charitable purposes.  According to the bylaws of September 24, 2024, after the founder's death, the purpose of the foundation is no longer to be that of a private family foundation (benefiting the founder's children and their descendants), but rather a charitable one.  This change of purpose is clearly not covered by the founder's right to make changes.

Even if, contrary to the previous statements, the founder, based on the wording of Article 13 (2) sentence 1 in the version of the articles of association dated November 29, 2023, and consider any amendment after August 2, 2024 to be invalid anyway due to the waiver of the right to amend the articles of association, the amendment made to the secondary beneficiaries would still be invalid for the following reason.

In the bylaws of November 29, 2023, it was stipulated in A. II. 9 that the founder may not appoint any new persons in addition to the secondary beneficiaries named in A. II. This ruled out the possibility of extending the group of secondary beneficiaries to include persons other than the children and their descendants, even if these persons were covered by the private-benefit purpose of the foundation or belonged to the founder's family (cf. Article 1, sentence 1 in conjunction with Article 4 of the articles of association).

However, this provision implies that, if at all, only changes within the circle of secondary beneficiaries should be permissible and that not all secondary beneficiaries and their descendants may be removed as beneficiaries.

This interpretation is imperative because otherwise (by excluding all secondary beneficiaries) the founder would change or completely destroy the private purpose of the family foundation—for the period after his death (which would ultimately result in the dissolution of the permanent family foundation).  The exclusion of Respondents as per 2 to 4 and their descendants as secondary beneficiaries is therefore inadmissible, regardless of whether such exclusion would result in the dissolution of the foundation or whether the charitable Polsat Foundation is appointed as beneficiary.

The replacement of the secondary beneficiaries by the Polsat Foundation contradicts both Article 4 (Purpose) of the articles of association dated November 29, 2023, and the provisions of the bylaws cited above.  The establishment of the Polsat Foundation resulted in the private purpose being changed to a charitable purpose at a certain point in time (death of the primary beneficiary), which is inadmissible.

The Applicant also claims to have subsequently inserted a forfeiture clause into the articles of association.  This is inadmissible because, as explained above, he had already effectively waived his right to amend the articles of association at that point in time.

In a letter dated September 19, 2024, the Applicant accused the Respondents of allegedly violating the forfeiture clause—which was not effectively incorporated into the articles of association in the first place—and demanded that they refrain from exercising their rights.

Legal defense in foundation supervisory proceedings initiated by the founder does not fall under the forfeiture clause, which was not effectively incorporated in the first place. Such proceedings are aimed at preserving and enforcing the purpose of the foundation and are therefore not subject to sanctions.

117



In any case, lawsuits or motions for determination of beneficiary status per se, requests for information pursuant to Article 552 § 9 PGR, or motions to the court for dismissal of foundation bodies due to gross breach of duty shall be excluded from the scope of application of forfeiture clauses.  This will limit the forfeiture clause more to its actual purpose, namely, to protect against any challenge to the founder's wishes with regard to the beneficiary provisions.

Incidentally, it should be noted that invoking such a clause—against the backdrop of the known circumstances—is already to be considered willful (LES 2011, 184). Accordingly, anyone who takes legal action even though they should have realized that their position is clearly futile or could cause damage to the other party is acting willfully (cf. Klauser/Kodek, JN-ZPO18, § 408 ZPO E 13 and 16; JBI 1993, 394; wobl 2004/17). The Applicant is using the forfeiture clause in full knowledge of its ineffectiveness and the actual legal situation for the sole purpose of putting pressure on the Respondents.

Even if one were to assume that the forfeiture clause is valid, there is no justification for also excluding the descendants of the secondary beneficiaries as future beneficiaries, especially since such an exclusion of the descendants is not even covered by the wording of the forfeiture clause (LES 2014, 65).  Furthermore, they have not engaged in any conduct related to the foundation, thus ruling out forfeiture per se and resulting in an impermissible change from a private family foundation to a charitable foundation.

118

In the light of the foregoing, the ruling is as follows.

Applicant shall bear the costs correctly recorded by the Respondents, which shall be determined in the amount requested (Article 78 AussStrG).

Princely Court of Justice

Vaduz, May 19, 2025

Diana Kind

Judge of the Princely Court of Justice

I certify the foregoing to be a true and correct copy.

[seal:] PRINCELY                                          [signature]
COURT OF JUSTICE                                          Sidonia Aggeler

119

## Information on the rights of appeal

An appeal against this decision may be lodged with the Princely Court of Appeals in Vaduz within a non-extendable period of four weeks from the service of documents. The appeal must be submitted in writing in duplicate to the Court of Justice It may also be declared orally recorded by parties who are not represented by a lawyer.  The appeal must contain the name of the case, the first and last names and address of the appellant, and the name of the decision against which it is being lodged.  The appeal need not contain a specific request but must adequately state the grounds on which the party considers itself aggrieved and the alternative decision it seeks (appeal request); in case of doubt, the decision against which the appeal has been lodged shall be deemed to have been contested in its entirety.

Date reserved:                    Date reserved:
[hw:] *06/18/25*                  [hw:] *(GS) June 18, 2025*

Signature                         Signature

[signature]                       [signature]



City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the document "**ON 39 – Decision of the Princely Court**" is, to the best of my knowledge and belief, a true and accurate translation from German into English.

Jacqueline Yorke

Sworn to before me this
November 19, 2025

Signature, Notary Public

WENDY POON
Notary Public - State of New York
No. 01PO0000184
Qualified in Queens County
My Commission Expires February 02, 20 27

Stamp, Notary Public



GASSER PARTNER
EING. 21.05.25 08:31



FÜRSTENTUM LIECHTENSTEIN
**FÜRSTLICHES**
LANDGERICHT

Aktenzeichen bitte immer anführen
<u>06 HG.2024.210</u>
ON 39

# BESCHLUSS

## Rechtssache

| | |
|---|---|
| **Antragsteller:** | Zygmunt Jozef Solorz ███████████ ███████ |
| | vertreten durch Schurti Partners Rechtsanwälte AG, Zollstrasse 2, LI-9490 Vaduz |
| | zusätzlich vertreten durch Pitkowitz & Partners Pitkowitz Rechtsanwälte GmbH, Schwarzenbergplatz 3, AT-1010 Wien, |
| | <u>Zustellbevollmächtigte</u>: Schurti Partners Rechtsanwälte AG, Zollstrasse 2, LI-9490 Vaduz |
| **Antragsgegner:** | 1. TiVi Foundation (FL-0002.394.367-5) vertreten durch Ritter Schierscher Rechtsanwälte AG, Gewerbeweg 5, LI-9490 Vaduz |
| | 2. Piotr Mateusz Zak ████████████, ████████ vertreten durch Roth + Partner Rechtsanwälte AG, Landstrasse 40, Postfach 408, LI-9495 Triesen |
| | 3. Aleksandra Jadwiga Zak ███████████ ████████ vertreten durch Gasser Partner Rechtsanwälte, Feldkircher Strasse 31, P.O.Box 246, LI-9494 Schaan |
| | 4. Tobias Markus Solorz, geboren am █████████, ████████████████ |

 Seite 2

vertreten durch Marxer & Partner
Rechtsanwälte, Heiligkreuz 6, Postfach 484, LI-
9490 Vaduz

**wegen:** Stiftungsaufsicht (BMG: CHF 30'000.00)

1. **Die Anträge sowie die Eventualanträge des Antragstellers des Inhalts:**

   1   Es wird mit Wirkung zwischen den Parteien festgestellt, dass

   a.  die Statuten der beim Handelsregister hinterlegten TiVi Foundation, FL - 0002.394.367 - 5, in der Fassung des Notariatsaktes vom 24. September 2024, aufgenommen und beurkundet von Notar Mag. Alexander Winkler, öffentlicher Notar mit dem Amtssitz in 1180 Wien, Weimarer Strasse 5, zu GZ 1595, wie auch die Beistatuten der erwähnten Stiftung in der Fassung des Notariatsaktes vom 24. September 2024, aufgenommen und beurkundet von demselben zu GZ 1597, gemäss Beilagen ./AJ und ./AK, welche einen integrierenden Bestandteil dieses Beschlusses bilden, aufrecht und rechtswirksam sind;

   b.  dem Antragsteller gegenüber der betroffenen Verbandsperson sämtliche Rechte, die ihm als Stifter, Erstbegünstigter oder Kurator in den zuvor genannten Statuten und Beistatuten in der Fassung des Notariatsaktes vom 24. September 2024, aufgenommen und beurkundet von Mag. Alexander Winkler, öffentlicher Notar mit dem Amtssitz in 1180 Wien, Weimarer Strasse 5, zur GZ 1595 und GZ 1597, gemäss Beilage ./AJ und ./AK, welche einen integrierenden Bestandteil dieses Beschlusses bilden, eingeräumt sind, aufrecht zustehen, darunter insbesondere

   i.   das Recht, ein Beistatut oder mehrere Reglemente zu erlassen und die Begünstigten zu bestimmen (Art. 5 Abs. 1 und Abs. 2 der Statuten);

123



ii.      das Recht, Mitglieder des Stiftungsrates und den Stiftungsratspräsidenten zu bestellen oder abzuberufen (Art. 6 Abs. 2 Bst. a der Statuten);

iii.     das Recht, einziger Kurator der Stiftung zu sein und in dieser Funktion die Rechte gemäss den Statuten und Beistatuten auszuüben, insbesondere die Stiftungsräte zu überwachen, seine Vorschläge durch diese umsetzen zu lassen, sämtliche Beschlüsse des Stiftungsrates von seiner Zustimmung als Kurator abhängig zu machen und in alle Stiftungsdokumente Einsicht zu nehmen (vgl. Art. 9. Abs. 1 der Statuten, Punkt B), insbesondere III. und Punkt IV. sub 1) der Beistatuten);

iv.     das Recht, die Stiftungserklärung, die Statuten und die Beistatuten zu seinen Lebzeiten zu ändern (Art. 13 Abs. 2 Punkt 1. der Statuten);

v.      das Recht, den Stiftungsrat anzuweisen, sämtliche Erträge der Stiftung an ihn auszubezahlen (Art. 13 Abs. 2 Punkt 4. der Statuten).

in eventu

Die Statuten und Beistatuten der beim Handelsregister hinterlegten betroffenen Verbandsperson, der TiVi Foundation, FL-0002.394.367-5, in der Fassung vom 2. August 2024, die durch die Erklärungen des Antragstellers

über die Änderung der Statuten (beglaubigt zu Urkunde A Nr. 6223/2024),
über den "Beschluss im Umlaufverfahren" (beglaubigt zu Urkunde A Nr. 6228/2024),
und über die Erklärung gemäss Artikel 13 (2) 2. (i) der Satzung (beglaubigt zu Urkunde A Nr. 6235/2024),

beglaubigt zur jeweils zuvor angeführten Urkundennummer durch Dariusz Wierzchucki, Notar in Warschau, an diesem Tage abgeändert wurden, werden für rechtsunwirksam erklärt.



**in eventu**

> Die Erklärungen des Antragstellers jeweils vom 2. August 2024 gegenüber der beim Handelsregister hinterlegten betroffenen Verbandsperson, der TiVi Foundation, FL-0002.394.367-5,
>
> über die Änderung der Statuten zu Urkunde A Nr. 6223/2024,
> über den "Beschluss im Umlaufverfahren" zu Urkunde A Nr. 6228/2024, und jene gemäss Artikel 13 (2) 2. (i) der Satzung zu Urkunde A Nr. 6235/2024
>
> jeweils an diesem Tage zur jeweils angeführten Urkundennummer notariell beglaubigt durch Dariusz Wierzchucki, Notar in Warschau, werden für rechtsunwirksam erklärt.

**werden <u>abgewiesen</u>.**

2. **Der Antragsteller ist verpflichtet, binnen 4 Wochen dem Antragsgegner zu 2 zuhanden seiner ausgewiesenen Rechtsvertreterin den Betrag von CHF 38'253.60, der Antragsgegnerin zu 3 zuhanden ihrer ausgewiesenen Rechtsvertreter den Betrag von CHF 45'738.00 und dem Antragsgegner zu 4 zuhanden seiner ausgewiesenen Rechtsvertreter den Betrag von CHF 40'452.53 zu bezahlen.**

# Begründung

Termin vorgemerkt:
(GS) 18.06.25
Visa vod/W

1. Vorauszuschicken ist, dass die gegenständlichen Anträge zunächst im streitigen Verfahren (zu 06 CG.2024.184) eingebracht wurden. Mit zwischenzeitlich in Rechtskraft erwachsenen Beschlüssen vom 04.12.2024 zu 06 CG.2024.184 (ON 3) und vom 09.04.2025 (in ON 35) wurde

125

Seite 5

rechtskräftig festgestellt, dass die im Spruch ersichtlichen Anträge im Ausserstreitverfahren zu behandeln und entscheiden sind.

Festzuhalten ist sodann, dass rund um die Antragsgegnerin zu 1, die TiVi Foundation, diverse Verfahren, insbesondere über Antrag eingeleitete Aufsichtsverfahren (HG) beim Landgericht anhängig sind, die mit dem gegenständlichen Sachverhalt im engen Zusammenhang stehen und die grösstenteils bis zur Erledigung des vorliegenden Verfahrens unterbrochen wurden. In diesem Zusammenhang wurden auch schon diverse Provisorialmassnahmen erlassen, die der einen oder anderen Seite dieses oder jenes verbieten und teilweise auch schon wieder überholt sind. Die für das gegenständliche Verfahren wohl relevanteste Provisorialmassnahme stellt der Amtsbefehl vom 26.10.2024 zu 06 HG.2024.133 (dortige ON 71) dar, mit welchem der bisherige Verwaltungsratspräsident Philipp Senn abberufen, die beiden bisherigen Stiftungsratsmitglieder Tomas Szelag und Katarzyna Tomczuk in ihren Ämtern bestätigt, und RA Peter Schierscher zum Beistand mit den Funktionen des Stiftungsratspräsidenten bestellt wurde. Mit selbigem Beschluss wurden die Statuten der Antragsgegnerin zu 1 (einstweilig) abgeändert.

Im vorliegenden Verfahren ist zwischen den Parteien insbesondere strittig, welche Stiftungsdokumente derzeit Geltung haben und wem aufgrund dessen welche Rechte zukommen.

2.  Der **Antragsteller** begründet seine im Spruch ersichtlichen Begehren (soweit noch relevant) im Wesentlichen wie folgt:

Beim Antragsteller handle es sich um einen erfolgreichen Unternehmer, der va in den 1990er Jahren durch den Aufbau des ersten privaten poln Fernsehsenders (Polsat) und die Übernahme eines Mobilfunkbetreibers im Jahr 2011 weltweit bekannt geworden sei. Er zähle zu einer der vermögendsten Personen Europas. Der Kern seines Vermögens – ua die Unternehmung des Fernsehsenders Polsat – habe der Antragsteller über

Seite 6

die TIVI Foundation strukturiert. Er sei alleiniger Stifter und Erstbegünstigter dieser Stiftung. Seine Kinder, die Antragsgegner zu 2 – 4, seien ursprünglich Zweitbegünstigte gewesen und hätten mit dem Zeitpunkt seines Ablebens in den Genuss    massgeblicher Kontroll- und Begünstigtenrechte gelangen sollen.

Der Antragsteller habe die Antragsgegnerin zu 1 zur Sicherstellung der Fortführung seiner Unternehmensgruppe nach seinem Tod errichtet. Dies und die effiziente (sowie steueroptimale) Strukturierung seien die Hauptintentionen des Antragstellers im Zuge der Errichtung gewesen. Im Jahr 2012 sei der Antragsteller in der Blüte seines Unternehmertuns gestanden und zu diesem Zeitpunkt sei von einer „Nachfolge" keine Rede gewesen. Erst später – um alle Eventualitäten abzudecken – seien die Antragsgegner zu 2 -4 als Zweitbegünstigte in die Stiftung eingeführt und sehr viel später, nämlich im Jahr 2022, der Mechanismus der Ablebenserklärung eingeführt worden. Richtig sei in diesem Zusammenhang durchaus, dass ursprünglich eines von mehreren Motiven des Antragstellers (nicht: der statutarische Zweck der Stiftung) es auch gewesen sei, dass die Antragsgegner zu 2 – 4 vom von ihm erwirtschafteten Vermögen im Falle seines Ablebens profitieren hätten dürfen, wenn der Antragsteller dies gewollt hätte. Dafür habe er auch, allerdings erst lange Zeit nach Errichtung der Stiftung, entsprechende Zweitbegünstigtenstellungen eingeräumt. Flankierend sollten den Antragsgegnern zu 2 - 4 auch einzelne Kontrollrecht zukommen, allerdings erst nach seinem Ableben.

In einem von langer Hand geplantem „Putschversuch" hätte die Antragsgegner zu 2 - 4 im Herbst 2024 die familiäre Zusammenkunft aus Anlass des 68. Geburtstags des Antragstellers und die kurzfristige Abwesenheit seines Vertrauensanwaltes dafür genutzt, den Antragsteller am 02.08.2024 durch arglistige Täuschung zur Unterschrift mehrerer Erklärungen zu verleiten.

127

Anlässlich der chaotischen 02.08.2024 Sitzung sei der Antragsteller nicht über die Konsequenzen Statutenänderung beraten, aufgeklärt oder sonst wie unterstützt worden. Im Gegenteil: Vom Urheber der Statutenänderungserklärung, dem Zweitantragsgegner, sei statt der bereits vorbereiteten Notariatsform jene der blossen Unterschriftsbeglaubigung zur Unterschrift vorgelegt worden um die Aufklärungspflicht des Notars zu umgehen. Ebenso wenig seien dem Antragsteller neue Rechte eingeräumt worden.

Durch diese Erklärungen würde sich der Antragsteller als Antragsteller gegenüber seiner Stiftung nicht nur rechtlich äusserstenfalls für „verstorben erklären" lassen, wodurch die Antragsgegner zu 2 - 4 die vollständige Kontrolle über die Stiftung erlangen könnten. Vielmehr hätten ihm die Antragsgegner zu 2 - 4 auch solche Erklärungen untergeschoben, gemäss denen der Antragsteller sein unwiderrufliches Recht auf Rückgängigmachung dieser Ablebenserklärung in den Statuten „löschen" hätte lassen (was infolge der Statuten rechtlich gar nicht möglich sei). Diese von den Kindern durch arglistige Täuschung erschlichene „Selbstausschaltung des Stifters" vom 02.08.2024 sei nichtig und rechtsunwirksam.

Nach diesen Ereignissen habe Antragsteller von seinem (unwiderruflichen) Recht auf Änderung der Statuten und Widerruf bzw Neuabgabe seiner Ablebenserklärung Gebrauch gemacht, sich wieder in seine alte Rechtsposition zurückversetzt und die vorherigen Statuten (mit einer Änderung, nämlich der Einfügung einer Verwirkungsklausel) in Kraft gesetzt. Dennoch hätten die Antragsgegner zu 2 - 4 weiter versucht, auf Basis der unwirksamen Statuten vom 02.08.2024 die Kontrolle über die Stiftung zu übernehmen, um an deren Vermögen zu gelangen, und den Antragsteller als alleinigen Stifter von seinen statutarischen Rechten auszuschliessen.

Aufgrund dieses fortgesetzten Verhaltens hätten die Antragsgegner zu 2 - 4 gemäss der Verwirkungsklausel in Art 5 Abs 5 der Statuten inzwischen

 Seite 8

sämtliche Begünstigtenrechte in der Stiftung verloren und seien die Statuten wie auch die Beistatuten mit Notariatsakt vom 24.09.2024 entsprechend abgeändert worden.

Entgegen dem Vorbringen der Antragsgegner zu 2 – 4 sei den Erklärungen vom 02.08.2024 nicht eine lang geplante Nachfolge zu Grunde gelegen, die gerade an diesem Tag verwirklicht werden hätte sollen, sondern habe die notarielle Erklärung des Antragstellers vom 29.07.2024, wonach er die volle Kontrolle über seine Unternehmen habe behalten wollen, habe die Antragsgegner zu 2 – 4 zum sofortigen Handeln verleitet.

Das breit vorgetragene Motiv der Antragsgegner zu einer angeblichen Asset Protection im Interesse der Stiftung oder des Antragstellers sei vorgeschoben. Die Massnahme der Asset Protection habe ausschliesslich dem Eigeninteresse der Antragsgegner zu 2 bis 4 gedient, sich Zugriff – ohne rechtlichen Anspruch darauf zu haben - auf das Vermögen des Antragstellers zu verschaffen, indem sie die Kontrolle über die Stiftung übernommen hätten – aus der Befürchtung heraus, anderenfalls könnten Dritte zuvor Zugriff erlangen.

Es sei niemals der Wille des Antragstellers gewesen, sich endgültig der Kontrolle seiner Stiftung und seines ganzen Lebenswerkes zu begeben. Das hätten die Antragsgegner zu 2 – 4 ganz genau gewusst. Die Erklärungen vom 02.08.2024 seien wegen Arglist und Irrtum rechtsunwirksam.

Unabhängig davon habe der Antragsteller in jedem Fall die zuvor erschlichene Ablebenserklärung gemäss Art 13 (2) 2 (iii) der Statuten am 17.08.2024 wirksam widerrufen. Die versuchte Löschung dieses – als unwiderruflich verankerten – Widerrufsrechts sei rechtlich bedeutungslos, weil diese Anordnung von keinem statutarischen Änderungsvorbehalt mehr gedeckt gewesen sei.

129

■ Seite 9 ■

Der Stifterwille zur Widerruflichkeit der Ablebenserklärung werde von diesem ausdrücklich bestätigt. Dies ergebe sich aber ohnedies auch aus dem Wortlaut und aus der historischen Interpretation der Statuten.

Das gegenteilige Argumentarium der Antragsgegner zu 2 – 4 entbehre jeder Grundlage. Deren Rechtsauffassung erschöpfe sich darin, dass die Widerrufbarkeit der Ablebenserklärung nicht jenem „Zweck" entspreche, den sie der Bestimmung – ohne Anhaltspunkte in den Statuten – unterstellen wollten.

Diese Rechtsauffassung des Antragstellers werde von der Judikatur und Literatur wie auch von zwei ergebnisoffenen Rechtsgutachten von zwei der renommiertesten Experten zum liechtensteinischen Stiftungsrecht, Prof Jakob und Univ Prof Schauer getragen. Eine dogmatische Entkräftung sei für die Antragsgegner nicht einmal im Ansatz möglich.

Der Antragsteller habe daher am 19.08.2024 bzw am 24.09.2024 die Statuten der Antragsgegnerin zu 1 wirksam ändern können und würden ihm wieder sämtliche Rechte aus oder im Zusammenhang mit der Antragsgegnerin zu 1 zukommen.

3.  Die **Antragsgegner zu 2 – 4** beantragen die kostenpflichtige Abweisung der (Eventual-)Anträge und wenden (soweit noch relevant) im Wesentlichen ein:

Die TiVi Foundation sei vom Antragsteller zwecks Sicherung der von ihm geschaffenen Unternehmen und zur Organisation der Nachfolge durch seine Kinder errichtet worden. Diese Absicht spiegle sich in mehreren Bestimmungen der verschiedenen Statuten (vgl Art 3 und Art 13 der Statuten vom 24.11.2022). Die in die Stiftung eingebrachten Unternehmen seien vom Antragsteller im Wesentlichen während seiner ersten und zweiten Ehe mit Unterstützung seiner Ehefrauen aufgebaut worden. Anlässlich der Scheidungsstreitigkeiten habe der Antragsteller jeweils

130

vereinbart, dass die Antragsgegner zu 2 – 4 das Vermögen zugewiesen bekommen sollten.

Anfangs 2022 habe sich der Antragsteller nach fortschreitenden gesundheitlichen Problemen und wegen schwerer Erkrankung in mehrwöchige ärztliche Behandlung begeben müssen. Er habe die Gefahr erkannt, dass er irgendwann nicht mehr in der Lage sein werde, die Unternehmen zu führen und selbstständig Entscheidungen zu treffen, und dass erhebliche Risiken drohten, falls dann die Nachfolge nicht bereits sichergestellt sei. Zudem habe er die Absicht gehegt, sich von seiner dritten Frau scheiden zu lassen. Diese Probleme habe er während seiner Behandlung mit seinem Freund und Berater Jaroslaw Grzesiak besprochen. Später, im Rahmen einer mehrtätigen Besprechung beim Antragsteller mit dessen beiden Söhnen (den Antragsgegnern zu 2 - 4), Jaroslaw Grzesiak, Jerzy Modrzejewski, Tomasz Szelag und einem Mediziner sei die Möglichkeit einer automatischen Nachfolge bei den Organisationsrechten des Antragsteller erörtert worden. Jaroslaw Grzesiak habe den Mechanismus einer Ablebenserklärung mit effektivem, vorab verschiebbarem Eintrittsdatum in der Zukunft entworfen und präsentiert. Jerzy Modrejewski und Jaroslaw Grzesiak hätten die Implementierung dieses allseits genehmigten Konzepts von Jaroslaw Grzesiak in den damals als final betrachteten Statuten vom 24.11.2022 (Art 13 Abs 2) übernommen, die vom Antragsteller gemeinsam mit seinen Kindern abgezeichnet worden seien. Dieser Mechanismus des künftigen Kontrollwechsels sei auch auf der Ebene der Unternehmen vorbereitet worden, etwa mit den finanzierenden Banken, was Tomasz Szelag übernommen habe.

Die erste Ablebenserklärung, mitgestaltet vom Notar Dariusz Wierzchucki, habe der Antragsteller am 29.05.2023 mit Wirkung per 15.12.2023 unterzeichnet. Es sei schon damals das Verständnis aller Beteiligten gewesen, dass der Antragsteller das effektive Eintrittsdatum jeweils weiter in die Zukunft verschieben könne, sofern dies gesundheitlich möglich sei. Zu dieser Zeit habe Justyna Kulka immer mehr Einfluss auf den

■ Seite 11 ■

Antragsteller gewonnen, mit dem sie offenbar bereits seit 2022 liiert gewesen sei. Im August 2023 sei die Information erfolgt, dass der Antragsteller die Ablebenserklärung widerrufen und in den Statuten die Möglichkeit eines solchen, sogar nachträglichen Widerrufs eingeführt habe – erstmals ohne Konsultation der Kinder oder von Jaroslaw Grzesiak und ohne eine Erklärung. Die Änderungen seien offenbar im Büro des Antragstellers in Anwesenheit des Notars, sowie von Justyna Kulka und Jerzy Modrejewski erfolgt. Jaroslaw Grzesiak habe Bedenken über diese Änderungen geäussert und habe das Risiko gesehen, dass der Vermögensübergang auf die Stiftung bei einem unbeschränkten Widerrufsrecht des Antragstellers angezweifelt werden könnte. Ende 2023 habe der Stiftungsrat der TiVi deshalb mit Einverständnis des Antragstellers RA Walch mit der Prüfung aller Statutenänderungen seit 2012 beauftragt. Über Intervention der Antragsgegnerin zu 3 beim Antragsteller sei es 2023 noch zu einigen Änderungen der Statuten gekommen und sie habe vom Antragsteller auch eine med Vorsorgevollmacht erhalten.

Im Frühjahr 2024 hätten sich Jaroslaw Grzesiak und Philip Senn mit RA Walch getroffen. Als Problem sei erkannt worden, dass der Antragsteller seit jeher die Möglichkeit gehabt habe, die Vermögenswerte jederzeit wieder an sich zu ziehen. Das Ergebnis sei dem Antragsteller und seinen Kindern mitgeteilt worden. Letztere seien in zunehmender Sorge gewesen, zumal der im Jahr 2022 erstellte Notfallplan für eine vorab festgelegten, definitiven Kontrollwechsel mit den Änderungen vom August 2023 ausser Funktion worden sei. Später hätten sie von der heimlichen Heirat ihres Vaters mit Justyna Kulka im März 2024 erfahren. De facto sei sie anstelle von Jaroslaw Grzesiak die rechte Hand des Antragstellers geworden und die Konfliktsituationen zwischen den Kindern und Justyna Kulka hätten sich zugespitzt. Die alleinige Nachfolge der Antragsgegner zu 2 - 4 in den Unternehmen und den Stiftungen sei für den Antragsteller jedoch weiter ausser Zweifel gestanden und im Mai 2024 habe der Antragsteller die baldige Bestellung seiner beiden Söhne zu CEOs in den bedeutendsten Unternehmen genehmigt.

132

Der Antragsteller habe am 02.08.2024 vor einem polnischen Notar Erklärungen abgegeben, mit denen er freiwillig und bewusst und im Einklang mit der langfristig geplanten Nachfolgeplanung auf seine Stifterrechte, insbesondere das Recht zur Änderung der Statuten und Beistatuten und zur Änderung der Ablebenserklärung sowie das Recht zur Bestellung und Abberufung von Stiftungsräten, verzichtet habe. Mit diesen Erklärungen habe der Antragsteller - nach ausführlichen Gesprächen und Aufklärung hierüber - ausdrücklich angeordnet, dass jene Bestimmungen der Stiftungsstatuten, die zu seinen Lebzeiten anzuwenden sind, mit sofortiger Wirkung nicht mehr anzuwenden seien.

Damit habe der Antragsteller von dem bereits im Jahr 2022 implementierten Mechanismus zur Nachfolgeplanung Gebrauch gemacht. Die Funktionsweise der Ablebenserklärung sei dem Antragsteller sohin bestens bekannt gewesen. Auf den Umstand, dass die Rechtsfolgen der Ablebenserklärung unmittelbar mit Abgabe der Erklärung am 02.08.2024 sofort eintrete und diese sofort wirksam würden, sei der Antragsteller ausdrücklich hingewiesen worden. Dem Antragsteller sei daher vollends bewusst gewesen, dass sämtliche Stifterrechte, die nur zu seinen Lebzeiten bestünden, fortan keine Anwendung mehr finden würden. Der Antragsteller habe am 02.08.2024 ausdrücklich erklärt, dass er die Nachfolgeregelung umsetzen und die Kontrolle über die Stiftung abgeben wolle.

In einem plötzlichen, unerklärlichen Sinneswandel habe der Antragsteller später zunächst erklärt, dass er die Erklärungen vom 02.08.2024 wieder rückgängig machen wolle. Nachdem dies rechtlich nicht möglich gewesen sei, habe er sodann behauptet, dass er die Erklärungen niemals wirksam abgegeben habe, unter anderem mit der falschen Behauptung, er sei bei Abgabe der Erklärung getäuscht worden.

133

■    Seite 13    ■

Diese Behauptungen des Antragstellers seien falsch. Sie seien zudem völlig lebensfremd. Dies zeigten der Hintergrund und die die Funktionsweise der Ablebenserklärung:

Im Jahr 2022 habe der Antragsteller - nach ausführlichen Beratungen - den Mechanismus des „zivilrechtlichen Todes" eingeführt, der es ihm ermöglicht habe, durch Abgabe einer Erklärung (die sog „Ablebenserklärung"), die Nachfolge im Rahmen der Stiftung bereits zu seinen Lebzeiten umzusetzen und wirksam werden zu lassen ("vorweggenommene Erbfolge"). Bis zur Einführung dieses Mechanismus hätte die Nachfolge der Antragsgegner zu 2 - 4 erst mit dessen natürlichen Tod oder dessen (nachgewiesener) Geschäftsunfähigkeit eintreten sollen.

Der Grund für die Schaffung dieses Nachfolgemechanismus sei der sich verschlechternde Gesundheitszustand des Antragstellers gewesen. Die Nachfolge durch Abgabe der Ablebenserklärung hätte entweder mit sofortiger Wirkung oder zu einem in der Erklärung genannten zukünftigen Datum erfolgen können (zB hätte der Antragsteller am 01.05.2023 eine Erklärung abgeben können, die am 01.12.2023 wirksam geworden wäre). Im letzteren Fall hätte der Antragsteller den Zeitpunkt des Wirksamwerdens (im Beispielfall der 01.12.2023) der Rechtsnachfolge bis zum Wirksamwerden der Rechtsnachfolge ändern können (im obigen Beispiel hätte der Antragsteller in der Zeit zwischen dem 01.05.023 und dem 01.12.2023 die Rechtsnachfolge auf einen späteren Zeitpunkt - beispielsweise den 01.05.2024 - verschieben können).

Dieser Mechanismus hätte es dem Antragsteller ermöglichen sollen, die Rechtsnachfolge bereits zu Lebzeiten durch Abgabe der Ablebenserklärung (mit Wirksamkeit auf einen bestimmten Zeitpunkt) sicherzustellen und damit zu verhindern, dass eine Nachfolgeregelung zu einem bestimmten Zeitpunkt nicht mehr getroffen werden könne, weil der Antragsteller hierzu gesundheitlich nicht mehr in der Lage sei. Solange der Antragsteller hierzu gesundheitlich in der Lage gewesen

◼ Seite 14 ◼

wäre, hätte er daher auch berechtigt sein sollen, die Nachfolge aufzuschieben.

Sobald die Nachfolge jedoch wirksam geworden wäre - entweder weil die Ablebenserklärung sofort mit Abgabe Wirksamkeit erlangen hätte sollen oder weil der Zeitpunkt der Wirksamkeit eingetreten wäre – habe der Antragsteller die erfolgte Nachfolge nicht mehr aufheben oder aufschieben können. Dies sei aus zwei Gründen geschehen:

Erstens führe die Nachfolge in der Stiftung effektiv zu einem Wechsel der Kontrolle (sog "change of control") über die gesamte von der Stiftung gehaltene Unternehmensgruppe vom Antragsteller auf die Antragsgegner zu 2 - 4. Der Wechsel der Kontrolle über eine so grosse Unternehmensgruppe, zu der öffentliche Unternehmen, Unternehmen mit externer Finanzierung und verschiedenen Verpflichtungen gegenüber Stakeholdern und Gläubigern gehören würden, könne nur in eine Richtung erfolgen. Sobald der Kontrollwechsel öffentlich gemacht und wirksam werde, müsse er endgültig sein. Dies schon deshalb, weil eine Vielzahl von Finanzierungsverträgen und anderen Verträgen bedeutende Rechtsfolgen an einen "change of control" knüpfen würden.

Zweitens sei es dem Antragsteller ein grosses Anliegen gewesen, die Nachfolge für die Antragsgegner zu 2 -4 in einem Zeitpunkt verlässlich und endgültig zu regeln, zu dem er dazu gesundheitlich Gründen in der Lage gewesen sei. Dadurch habe er das Risiko ausschliessen wollen, dass er infolge seines sich verschlechternden oder geistigen Zustandes zukünftige möglicherweise nicht mehr in der Lage sein könnte, unbeeinflusst, frei und ernstlich über die Nachfolge zu bestimmen. Er habe jegliche möglichen Streitigkeiten über sein Erbe ausschliessen wollen. Dies sicherzustellen wäre nicht möglich gewesen, wenn sich der Antragsteller das Recht vorbehalten hätte, von der Nachfolgeregelung zurückzutreten und die zu seinen Lebzeiten anzuwendenden

135

■    Seite 15    ■

Bestimmungen, einschliesslich seines Rechts auf Änderung der Statuten und Änderung von Begünstigten, wiederherzustellen.

Im Mai 2023 habe der Antragsteller erstmals von dem Nachfolgemechanismus Gebrauch gemacht und eine Ablebenserklärung abgegeben, welche am 15.12.2023 wirksam werden hätte sollen. Im August 2023 habe er allerdings seine Meinung geändert, die Ablebenserklärung widerrufen und zudem den ausgefeilten und wohl durchdachten Nachfolgemechanismus in Art. 13 (2) der Statuten geändert.

Zum ersten Mal überhaupt seien Änderungen der Statuten nicht mit den Antragsgegnern zu 2 - 4 abgesprochen und vor diesen verheimlicht worden. Die abgeänderte Statutenbestimmung über die Ablebenserklärung hätte es dem Antragsteller sodann ermöglichen sollen, die bereits durchgeführte Nachfolge jederzeit wieder rückgängig zu machen, und zwar selbst nach dem Stichtag seines zivilrechtlichen Todes. Die - völlig unübliche - Vorgehensweise des Antragstellers spreche dafür, dass er bereits damals unter dem Einfluss seiner jetzigen vierten Frau gestanden sei.

Der vom Antragsteller adaptierte Nachfolgemechanismus habe die ursprüngliche Zielsetzung in mehrfacher Hinsicht konterkariert. Da die neuen Regelungen betreffend die Ablebenserklärung der Nachfolge keinerlei Stabilität verliehen und in geschäftlicher Hinsicht (Stichwort: "change of control" und eindeutige Zuordnung der Kontrolle über die Unternehmensgruppe) erheblich nachteilig und wahrscheinlich gar nicht umsetzbar gewesen wären, hätten Antragsgegner zu 2 - 4 mit dem Antragsteller erörtert, zum ursprünglichen Nachfolgemechanismus zurückzukehren, wie er 2022 vereinbart und geschaffen worden sei und diesen Nachfolgemechanismus aus Gründen der Asset Protection durch Abgabe einer sofort wirksamen Ablebenserklärung mit unmittelbarer Wirkung zu effektuieren.

136

■    Seite 16    ■

Der Antragsteller habe dem zugestimmt, und die im Jahr 2023 vom Antragsteller eingeführten Änderungen seien daher am 02.08.2024 durch die neuerliche Statutenänderung des Antragstellers rückgängig gemacht worden. Das im Jahr 2023 nachträglich - und im Widerspruch mit den Zielen und Zwecken des Ablebensmechanismus eingeführte - Recht, selbst nach dem Wirksamwerden der Ablebenserklärung noch von der Nachfolge zurücktreten zu können, sei vom Antragsteller aufgehoben worden. Zugleich seien zusätzliche Rechte des Antragstellers in die Statuten aufgenommen worden, die dem Antragsteller auch nach seinem zivilrechtlichen Tod noch zustehen sollten.

Der Antragsteller habe seine Erklärungen bewusst in folgender Reihenfolge abgegeben:

In einem ersten Schritt habe der Antragsteller von dem ihm zu Lebzeiten inhaltlich unbeschränkt zustehenden Statutenänderungsrecht gemäss Art 13 (2) 1 Gebrauch gemacht und die Bestimmung des Art 13 (2) 2 (iii) ersatzlos aufgehoben. Mit dem zweiten Schritt habe der Antragsteller sodann eine Ablebenserklärung abgegeben und diese mit sofortiger Wirksamkeit ausgestattet.

Mit der im ersten Schritt durchgeführten Statutenänderung sei der Antragsteller zum ursprünglichen Ablebensmechanismus aus dem Jahr 2022 zurückgekehrt. Die statutarische Möglichkeit, die Ablebenserklärung nachträglich – also auch nach deren Wirksamwerden – wieder zu ändern oder zu widerrufen, sei damit beseitig worden. Mit dem zweiten Schritt sei der Nachfolgemechanismus aktiviert worden. Die Ablebenserklärung sie abgegeben und mit sofortiger Wirksamkeit und damit sofortiger Unwiderruflichkeit ausgestattet worden.

Mit Abgabe der Ablebenserklärung seien sämtliche Bestimmungen, welche zu Lebzeiten des Antragstellers anzuwenden gewesen seien für unanwendbar erklärt worden. Der Antragsteller habe gemäss Artikel 13

137

◼ Seite 17 ◼

(2) 2 (i) "durch Abgabe einer Willenserklärung in Form einer notariellen Urkunde [zu] verfüg[t], dass er ab einem von ihm genannten Datum die Anwendung der Bestimmungen der Statuten und des Beistatuts, wie sie zu seinen Lebzeiten angewendet werden, ablehnt [...]".

Damit habe der Antragsteller ausdrücklich auf das nur "zu seinen Lebzeiten" bestehende Statutenänderungsrecht gemäss Artikel 13 (2) 1 verzichtet. Diese Rechtsfolge sei dem Antragsteller auch vollkommen klar gewesen. Aus diesem Grund sei in einem ersten Schritt die Statutenänderung vorgenommen und Artikel 13 (2) 2 (iii) gelöscht worden, weil das Statutenänderungsrecht mit Wirksamwerden der Ablebenserklärung untergehe.

Da die statutarische Grundlage für eine Abänderung oder einen Widerruf der Ablebenserklärung mit der ersatzlosen Aufhebung von Artikel 13 (2) 2 (iii) planmässig und bewusst beseitigt worden sei, habe der Antragsteller mit Abgabe der Ablebenserklärung den Nachfolgemechanismus zugleich unwiderruflich in Kraft gesetzt und eine Abänderung oder einen Widerruf der Ablebenserklärung ausgeschlossen. Dass eine Ablebenserklärung nur "zu Lebzeiten" des Antragstellers abgegeben werden könne, sei auch ausdrücklich in Artikel 13 (2) 1. angeordnet.

Der Antragsteller behauptet nunmehr - mutmasslich wieder unter dem Einfluss seiner vierten Ehefrau, mit der er die Änderungen vom 02.08.2024 ausdrücklich nicht besprechen habe wollen -, dass die am 02.08.2024 vorgenommenen Änderungen, welche auf das Jahr 2022 zurückgingen, nicht wirksam vorgenommen worden seien und dass er die Nachfolge nicht wirksam vollzogen habe. Dieser rechtliche Standpunkt sei unbegründet.

Die Behauptung, der Antragsteller sei einer Täuschung oder einem Irrtum unterlegen, sei schlicht falsch. Der Antragsteller habe die Statuten am 02.08.2024 bewusst geändert, um den – ihm bestens bekannten und von

■   Seite 18   ■

ihm selbst im Jahr 2022 eingeführten Nachfolgemechanismus wiederherzustellen. Ganz bewusst habe der Antragsteller sich dieses Mal für die sofortige Nachfolge entschieden und die Ablebenserklärung nicht mit einem Datum in der Zukunft ausgestaltet, sondern mit sofortiger Wirksamkeit, wobei er sich zur Stärkung seiner eigenen Stellung einige zusätzliche Rechte in den Statuten eingeräumt habe.

Ebenso falsch sei die Behauptung, der Antragsteller habe die Statuten unabhängig vom Wirksamwerden der Ablebenserklärung nach dem 02.08.2024 noch ändern können. Mit dem Wirksamwerden der Ablebenserklärung sei die Anwendung der Bestimmungen, welche "zu Lebezeiten" des Antragstellers gelten würden, ausgeschlossen. Mit dem zivilrechtlichen Tod des Antragstellers - der mit dem Wirksamwerden der Ablebenserklärung eintrete - würden sämtliche Rechte des Antragsteller, welche diesem zu seinen Lebzeiten zustünden, einschliesslich des in Artikel 13 (2) 1 vorgesehenen Rechts auf Änderung der Statuten erlöschen.

Falsch sei schliesslich die Behauptung, der Antragsteller habe den erst nachträglich im Jahr 2023 eingeführten Artikel 13 (2) 2 (iii) gar nicht ändern können, weil dieser vorsehe, dass die Berechtigung zum Widerruf bzw. zur Änderung der Ablebenserklärung dem Antragsteller bedingungslos zustehe und "unwiderruflich" sei.

Richtig sei vielmehr, dass das in Artikel 13 (2) 1 vorgesehene Statutenänderungsrecht des Antragstellers inhaltlich nicht beschränkt sei und keine Statutenbestimmungen (anderes als gewisse Bestimmungen der Beistatuten) - insbesondere auch nicht Artikel 13 (2) 2 (iii) - für unabänderlich erklärt worden seien.

Das Statutenänderungsrecht sei ausschliesslich in Artikel 13 (2) 1 geregelt. Aus dem systematischen Aufbau von Artikel 13 (2) ergebe sich, dass Artikel 13 (2) 1 das Statutenänderungsrecht abschliessend regle,

139

■    Seite 19    ■

während sich der übrige Artikel 13 (2) ausschliesslich mit dem Mechanismus der Ablebenserklärung befasse.

Das in Artikel 13 (2) 1 der Statuten vom 29.11.2023 enthaltene Änderungsrecht umfasse daher zweifellos auch das Recht, Artikel 13 (2) 2 (iii) ersatzlos aufzuheben.

Zusammenfassend sei festzustellen, dass der Antragsteller mit seinem durch die Ablebenserklärung herbeigeführten zivilrechtlichen Tod am 02.08.2024 unwiderruflich auf das Recht zur Änderung der Statuten und das Recht zur Änderung oder zum Widerruf der Ablebenserklärung verzichtet habe.

4.1  Aufgrund der **aufgenommenen Beweise**, nämlich der von den Parteien vorgelegten Urkunden:

<u>Antragsteller</u>

| | | |
|---|---|---|
| Amtsbestätigung vom 22. August 2024 | Beilage | A |
| Statuten der TiVi Foundation idF vom 29. November 2023 | Beilage | B |
| Beistatuten der TiVi Foundation idF vom 29. November 2023 | Beilage | C |
| Eidesstättige Erklärung des Klägers vom 24. August 2024 | Beilage | D |
| Eidesstättige Erklärung des Jerzy Modrzejewski vom 24. August 2024 | Beilage | E |
| Eidesstättige Erklärung der Justyna Kulka vom 24. August 2024 | Beilage | F |
| Erklärung über die Änderung der Statuten der Solkomtel zu Urkunde A Nr. 6219/2024 ("Änderungserklärung Solkomtel") | Beilage | G |
| Erklärung über die Änderung der Statuten der TiVi zu Urkunde A Nr. 6223/2024 ("Änderungserklärung TiVi") | Beilage | H |
| Erklärung "Beschluss im Umlaufverfahren" gemäss Artikel 7 der Statuten der TiVi zu Urkunde A Nr. 6228/2024 ("Kuratorenerklärung TiVi") | Beilage | I |
| Erklärung gemäss Artikel 13 (2) 2 der Statuten der Solkomtel | | |

Seite 20 

| | | |
|---|---|---|
| zu Urkunde A Nr. 6229/2024 ("Ablebenserklärung Solkomtel") | Beilage | J |
| Erklärung gemäss Artikel 13 (2) 2. (i) der Satzung der TiVi zu | | |
| Urkunde A Nr. 6235/2024 ("Ablebenserklärung TiVi") | | |
| (samt Übersetzung) | Beilage | K |
| "Stand-Still" Vereinbarung der Parteien vom | | |
| 3. August 2024 (samt Übersetzung) | Beilage | L |
| Anfechtungserklärung des Klägers vom 13. August 2024 | | |
| samt Empfangsbestätigung von Tomasz Szelag | Beilage | M |
| E-Mails des Zweitbeklagten zur (unwirksamen) "Abberufung" | | |
| des Tomasz Szelag und Jaroslaw Grzesiak sowie unwirksame | | |
| "Bestellungs-" und "Annahmeerklärungen" des Zweitbeklagten | | |
| und der Zofia Jedrzeyewska vom 14. August 2024 | | |
| (samt Übersetzung) | Beilage | N |
| Widerruf der Ablebenserklärung des Klägers vom | | |
| 17. August 2024 (beurkundet und beglaubigt zur GZ 1557 des | | |
| öffentlichen Notars Mag. Alexander Winkler) | Beilage | O |
| Konvolut an Warnschreiben an die Zweitbegünstigten | | |
| und an den Stiftungsrat sowie an den Stiftungsratspräsidenten | | |
| vom 17. August 2024 (inkl Sendebestätigungen) | Beilage | P |
| E-Mail vom 18. August 2024 betreffend die | | |
| Empfangsbestätigung des Schreibens vom 17. August 2024 | | |
| von Tomasz Szelag (samt Übersetzung) | Beilage | Q |
| Schreiben vom 20. August 2024 betreffend die | | |
| Empfangsbestätigung des Schreibens vom 17. August 2024 | | |
| von Jaroslaw Grzesiak (samt Übersetzung) | Beilage | R |
| E-Mail an Philipp Senn vom 21. August 2024 samt | | |
| Lesebestätigung | Beilage | S |
| E-Mail von RA Paweł Rymarz vom 18. August 2024 | | |
| (samt Übersetzung) | Beilage | T |
| Schreiben von RA Paweł Rymarz und Krzysztof Sajchta vom | | |
| 20. August 2024 (samt Übersetzung) | Beilage | U |
| Schreiben von RA Bernhard Motal vom 20. August 2024 | Beilage | V |
| Informationsschreiben an die Zweitbegünstigten über die | | |
| bevorstehende (Rück-)Änderung der Statuten und | | |

 Seite 21

| | | |
|---|---|---|
| Aufnahme einer Verfallsklausel vom 18. August 2024 | Beilage | W |
| Notariatsakt vom 19. August 2024 über die Änderung der Statuten der Tivi (GZ 1559) | Beilage | X |
| Notariatsakt vom 19. August 2024 über die Änderung der Beistatuten der Tivi (GZ 1560) | Beilage | Y |
| Notariatsakt vom 19. August 2024 über die vorsorgliche Abberufung und Bestätigung bzw. Bekräftigung der aufrechten Bestellung der tatsächlichen Stiftungsratsmitglieder (GZ 1561) | Beilage | Z |
| E-Mail des Zweitbeklagten vom 20. August 2024 an Philipp Senn samt Rücktrittserklärungen (samt Übersetzung) | Beilage | AA |
| Schreiben an Philipp Senn vom 20. August 2024 samt Übernahmebestätigung | Beilage | AB |
| Übernahmebestätigung des Stiftungsratspräsidenten Philipp Senn über den Erhalt der Originaldokumente des Stifters vom 20. August 2024 | Beilage | AC |
| E-Mail Korrespondenz vom 21. und 22. August 2024 zwischen Simon Ott, Philipp Senn und Luca Castellazzi (Aufforderung zur Einsichtnahme in Stiftungsdokumente) | Beilage | AD |
| Eidesstättige Erklärung von RA Peter Machherndl vom 25. August 2024 | Beilage | AE |
| Konvolut der Vollmachtswiderrufe durch die TiVi samt E-Mails vom 22. August 2024, E-Mail von Philipp Senn vom 9. April 2024, E-Mail von Philipp Senn vom 20. August 2024 an Frau Thoele, E-Mail von Piotr Zak an Philipp Senn vom 13. August 2024 – samt Übersetzung, Umlaufbeschluss betreffend die Vollmachten der Solkomtel vom 12. Juni 2024 – samt Übersetzung | Beilage | AF |
| E-Mail von Philipp Senn vom 23. August 2024, 17:14 Uhr | Beilage | AG |
| Eidesstättige Erklärung von Thomas Szelag vom 25. August 2024, samt Übersetzung | Beilage | AH |
| Informationsschreiben über bevorstehende Änderungen der Statuten vom 20. September 2024 | Beilage | AI |
| Statuten der TiVi idF des Notariatsaktes vom 24. September | | |

142



Seite 22

| | | |
|---|---|---|
| 2024 GZ 1595 aufgenommen von | | |
| Notar Mag. Alexander Winkler | Beilage | AJ |
| Beistatuten der TiVi idF des Notariatsaktes vom | | |
| 24. September 2024 GZ 1597 aufgenommen von | | |
| Notar Mag. Alexander Winkler | Beilage | AK |
| (Erneuter) Widerruf der Ablebenserklärung idF | | |
| des Notariatsaktes vom 24. September 2024 GZ 1599 | | |
| aufgenommen von Notar Mag. Alexander Winkler | Beilage | AL |
| Rechtsgutachten Prof. Jakob | Beilage | AM |
| Rechtsgutachten Prof. Schauer | Beilage | AN |
| Rechtsgutachten des Prof. Dr. Jozef Okolski | Beilage | AO |
| Beistatut der TiVi Foundation idF vom 07.03.2012 | Beilage | AP |
| Statuten der TiVi Foundation idF vom 24.11.2022 | Beilage | AQ |
| Ablebenserklärung vom 29.05.2023 | Beilage | AR |
| Ablebenserklärung Änderung vom 10.8.2023 | Beilage | AS |
| Beschluss des Stifters über die Änderung der Statuten der | | |
| TiVi Foundation vom 10.08.2023 | Beilage | AT |
| Widerrufserklärung vom 17.08.2023 bezüglich der | | |
| Ablebenserklärung vom 29.05.2023 | Beilage | AU |
| Schriftliches Protokoll der Befragung des Stifters vom | | |
| 10.01.2025 | Beilage | AV |
| Rechtsgutachten von Univ-Prof. Dr. Martin Spitzer vom | | |
| 22.11.2025 | Beilage | AW |
| Ärztliche Bestätigung vom 21.01.2025 | Beilage | AX |
| Erklärung vom 29.07.2024 | Beilage | AY |
| E-Mail-Verlauf zwischen dem gerichtlich bestellten Beistand, | | |
| Piotr Zak und den Parteienvertretern | | |
| vom 10. Dezember 2024 | Beilage | AZ |
| Forderungspapier der Kinder vom 19. Februar 2025 | Beilage | BA |
| E-Mail des Vertreters von Tobias Solorz vom 21. Februar 2025 | Beilage | BB |
| E-Mail des Rechtsvertreters des Stifters vom 24. Februar 2025 | Beilage | BC |
| E-Mail des Vertreters von Tobias Solorz vom 25. Februar 2025 | Beilage | BD |
| Forderungspapier der Kinder vom 4. März 2025 samt | | |
| Begleitmail des Vertreters von Piotr Zak | Beilage | BE |

 Seite 23

| | | |
|---|---|---|
| Detaillierte Chronologie der Vergleichsgespräche ("ANNEX") | Beilage | BF |
| Chat-Verlauf zwischen Justyna Kulka und Tobias Solorz auf Whatsapp | Beilage | BG |
| Verbindungsprotokolle der Telefonate zwischen dem Stifter und den Kindern | Beilage | BH |
| Medienreport von CEC Group (Warschau) und Pantarhei Corporate Advisors (Wien) vom 5. Dezember 2024 | Beilage | BI |
| Erklärung von Edward Miszczak vom 10. Oktober 2024 | Beilage | BJ |
| Notarielle Erklärung von Piotr Gawel vom 21. Februar 2025 | Beilage | BK |
| Erklärung von Tomasz Gillner vom 27. Februar 2025 | Beilage | BL |
| Erklärung von Jerzy Modrzejewski vom 31. März 2025 | Beilage | BM |
| Erklärung von Paulina Piechocka vom 12. März 2025 | Beilage | BN |
| Forbes Interview des Stifters im Dezember 2024 | Beilage | BO |
| Weiteres Gutachten von Prof. Jakob vom 5. Februar 2025 | Beilage | BP |
| Stellungnahme von Prof. Martin Schauer vom 31. März 2025 | Beilage | BQ |
| "Proposal" vom 14. März 2025 | Beilage | BR |
| | | |
| Antragsgegner zu 2 | | |
| Amtsbestätigung TiVi Foundation vom 23.09.2024 | Beilage | 2.1 |
| Amtsbefehl vom 26.10.2024 zu 06 HG.2024.133 (ON 71) | Beilage | 2.2 |
| Amtsbefehl und Beschluss vom 25.10.2024 zu 06 CG.2024.184 (ON 47) | Beilage | 2.3 |
| Statuten TiVi Foundation vom 29.11.2023 | Beilage | 2.4 |
| Statuten TiVi Foundation vom 07.03.2012 | Beilage | 2.5 |
| Entwurf der Statuten der TiVi Foundation vom August 2022 | Beilage | 2.6 |
| Statuten TiVi Foundation vom 24.11.2022 | Beilage | 2.7 |
| Statuten TiVi Foundation vom 10.08.2023 | Beilage | 2.8 |
| E-Mail von Jerzy Modrzejewsky vom 30.05.2022 samt Ausschnitt aus Anhang | Beilage | 2.9 |
| E-Mail von Jerzy Modrzejewsky vom 19.08.2022 | Beilage | 2.10 |
| E-Mail von Jerzy Modrzejewsky vom 20.10.2022 samt Ausschnitt aus Anhang | Beilage | 2.11 |
| Eidesstattliche Erklärung Aleksandra Zak vom 20.09.2024 samt deutscher Übersetzung | Beilage | 2.12 |

Seite 24



| | |
|---|---|
| Ablebenserklärung vom 29.05.2023 | Beilage 2.13 |
| Aufstellung Aufsichtsratsmandate | Beilage 2.14 |
| Demissionserklärung Jaroslaw Grzesiak vom 23.09.2024 | Beilage 2.15 |
| Notariell beglaubigte Erklärung über die Änderung der Statuten der TiVi Foundation vom 02.08.2024 | Beilage 2.16 |
| Notarielle beglaubigte Erklärung zum Umlaufbeschluss des Stiftungsrates vom 02.08.2024 | Beilage 2.17 |
| Ablebenserklärung in Form einer notariellen Urkunde vom 02.08.2024 | Beilage 2.18 |
| Eidesstattliche Erklärung Piotr Zak vom 07.09.2024 samt deutscher Übersetzung | Beilage 2.19 |
| Eidesstattliche Erklärung Tobias Solorz vom 10.09.2024 samt deutscher Übersetzung | Beilage 2.20 |
| Beistatuten TiVi Foundation vom 29.11.2023 | Beilage 2.21 |
| E-Mail von Jaroslaw Grzesiak vom 07.08.2024 | Beilage 2.22 |
| Vereinbarung vom 12.08.2024 samt deutscher Übersetzung | Beilage 2.23 |
| Entwurf Vereinbarung vom 12.08.2024 samt deutscher Übersetzung | Beilage 2.24 |
| (Angebliche) "Erklärung" des Stifters vom 13.08.2024 | Beilage 2.25 |
| (Angebliche) "Statuten" TiVi Foundation vom 19.08.2024 | Beilage 2.26 |
| (Angebliche) "Statuten" TiVi Foundation vom 24.09.2024 | Beilage 2.27 |
| Amtsbefehl vom 10.09.2024 (ON 4) zu 05 NE.2024.4 | Beilage 2.28 |
| Legal Opinion von Prof. Dr. hab. Wojciech Kocot vom 08.09.2024 | Beilage 2.29 |
| Email des AG2 vom 02.08.2024 | Beilage 2.30 |

Antragsgegnerin zu 3

| | |
|---|---|
| Amtsbestätigung der TiVi Foundation vom 14.11.2024 | Beilage  3.1 |
| Beistatuten der TiVi Foundation vom 29.11.2023 | Beilage  3.2 |
| Amtsbefehl des Fürstlichen Landgerichtes vom 26.10.2024 zu 06 HG.2024.133 (ON 71) | Beilage  3.3 |
| Amtsbefehl des Fürstlichen Landgerichtes vom 25.10.2024 zu 06 CG.2024.185 (ON 47) | Beilage  3.4 |
| Eidesstattliche Erklärung von Aleksandra Jadwiga Zak vom | |

 Seite 25

| | |
|---|---|
| 20.09.2024 samt deutscher Übersetzung | Beilage   3.5 |
| Beistatuten der TiVi Foundation vom 24.11.2022 | Beilage   3.6 |
| Statuten der TiVi Foundation vom 24.11.2022 | Beilage   3.7 |
| Statuten der TiVi Foundation vom 10.08.2023 | Beilage   3.8 |
| Statuten der Tivi Foundation vom 29.11.2023 | Beilage   3.9 |
| Notariell beglaubigte Erklärung über die Änderung der Statuten der TiVi Foundation vom 02.08.2024 | Beilage 3.10 |
| Notariell beglaubigte Erklärung zum Umlaufbeschluss vom 02.08.2024 | Beilage 3.11 |
| Ablebenserklärung in Form einer notariellen Urkunde vom 02.08 2024 | Beilage 3.12 |
| Statuten der TiVi Foundation vom 07.03.2012 /12.02.2013 | Beilage 3.13 |
| Ablebenserklärung vom 29.05.2023 | Beilage 3.14 |
| Statuten der TiVi Foundation vom 02.08.2024 | Beilage 3.15 |
| Aufstellung der Aufsichtsratsmandate | Beilage 3.16 |
| Eidesstattliche Erklärung Tobias Markus Solorz vom 10.09.2024 samt deutscher Übersetzung | Beilage 3.17 |
| Eidesstattliche Erklärung Piotr Mateusz Zak vom 07.09.2024 samt deutscher Übersetzung | Beilage 3.18 |
| "Stand-still Agreement" vom 03.08.2024 samt deutscher Übersetzung | Beilage 3.19 |
| Vereinbarung vom 12.08.2024 samt deutscher Übersetzung | Beilage 3.20 |
| Erklärung des Stifters vom 13.08.2024 | Beilage 3.21 |
| Ungültige Beistatuten vom 19.08.2024 | Beilage 3.22 |
| Amtsbestätigung der TiVi Foundation vom 23.09.2024 | Beilage 3.23 |
| Eidesstattliche Erklärung von Tobias Markus Solorz vom 18.09.2024 samt deutscher Übersetzung | Beilage 3.24 |
| Schreiben von RA Pitkowitz vom 19.09.2024 | Beilage 3.25 |
| Schenkungswiderrufe vom 30.11.2024, samt deutscher Übersetzung | Beilage 3.26 |
| Gutachten von Prof. Dr. Wojciech Kocot vom 08.09.2024 | Beilage 3.27 |
| E-Mail von Piotr Zak an Jaroslaw Grzesiak vom 01.08.2024 samt Entwurf der Ablebenserklärung vom 01.08.2024 samt Anhang zur E-Mail samt deutscher Übersetzung | Beilage 3.28 |

146

■ Seite 26 ■

E-Mail von Piotr Zak an Dariusz Wierzchucki vom 01.08.2024
samt deutscher Übersetzung                                    Beilage 3.29

E-Mail von Piotr Zak an Dariusz Wierzchucki vom 02.08.2024
samt deutscher Übersetzung                                    Beilage 3.30

Übersicht über die Abänderung der Ablebenserklärung sowie
der Statuten                                                  Beilage 3.31

Vollmachten von Zygmunt Solorz an Jerzy Modrzejewski, Darius
Wierzchucki und Piotr Modrzejewski vom 25.04.2024 samt
deutscher Übersetzung                                         Beilage 3.32

Antragsgegner zu 4

Antrag des Antragsteller zur Beförderung der AG2 und AG4
vom 14.6.2024                                                 Beilage   4.1

der Einvernahme des Antragstellers Zygmunt Solorz, ON 24 Seiten 29  –
38, der Antragsgegner Piotr Zak, ON 22 Seiten 3  –  22, Aleksandra Zak,
ON 22 Seiten 22 – 34, Tobias Markus Solorz, ON 35 Seiten 24  –  31 und
Tomasz Piotr Szelag, ON 35 Seiten 11 – 24,

sowie der Einvernahme der Zeugen Barbara Walch, ON 21 Seiten 15  –
17, Philipp Senn, ON 21 Seiten 18  – 19, Luca Castellazzi, ON 21 Seiten 19 –
20, Jaroslaw Grzesiak, ON 21 Seiten 20 – 45, Justyna Kulka, ON 22 Seiten
34 – 50, Jerzy Modrejewski, ON 22 Seiten 50 – 53 und ON 23 Seiten 3 – 38,
Dariuz Wierzchucki, ON 23 Seiten 38 – 49 und ON 24 Seiten 3 – 20,
Malorzata Nawrocka, ON 24 Seiten 20 – 27 und Prof Adam Stepien, ON
24 Seiten 27 – 29,

steht der nachfolgende **Sachverhalt** als erwiesen fest:

Parteien:

Die Antragsgegnerin zu 1, die TiVi Foundation, wurde am 07.03.2012
durch die Allied Finance Trust AG als indirekte Stellvertreterin errichtet
und am 09.03.2012 unter der Registernummer FL-0002.394.367-5 im

147

◼ Seite 27 ◼

Handelsregister hinterlegt. Statutarischer Zweck der Stiftung ist insb die Unterstützung, Fürsorge und Förderung der in den Beistatuten bezeichneten Begünstigten; die Bestreitung von Kosten der Ausbildung und der Förderung besonderer Begabungen sowie allgemein die materielle Sicherung und Förderung der Begünstigten wie auch deren Unterstützung im Fall der Eheschliessung, Ergreifung eines Berufes oder der Gründung eines Unternehmens (Beilage A).

Der Antragsteller, Zygmunt Solorz, geboren im Jahr 1956, ist der wirtschaftliche Stifter und der Erstbegünstigte der Antragsgegnerin zu 1, die Antragsgegner zu 2 – 4, Piotr und Aleksandra Zak und Tobias Solorz, sind seine leiblichen Kinder aus erster- und zweiter Ehe (unbestritten). Seit März 2024 ist er in vierter Ehe mit Justyna Kulka verheiratet.

Die Antragsgegnerin zu 1 hält diverse (sehr werthaltige) Unternehmensbeteiligungen insb im Bereich Medien und Telekommunikation, die teilweise börsenkotiert sind. Die Antragsgegnerin als Holdingstiftung erfüllt daher eine wichtige strategische Funktion (unbestritten).

Die in die Antragsgegnerin zu 1 eingebrachten Unternehmen wurden vom Antragsteller im Wesentlichen während seiner ersten und zweiten Ehe mit Unterstützung seiner damaligen Ehefrauen aufgebaut. Anlässlich der Scheidungsstreitigkeiten wurde vereinbart, dass die Kinder, sohin die Antragsgegner zu 2 – 4, das Vermögen zugewiesen erhalten sollten. Entsprechend wurden sie in den Beistatuten der Antragsgegnerin als Zweitbegünstigte zu je 1/3 vorgesehen (ZV Jaroslaw Grzesiak in ON 21 S 25; PV Piotr Zak in ON 22 S 22; PV Tobias Solorz in ON 35 S 26).

Es entsprach dem erklärten Willen des Antragstellers, wie er ihn auch wiederholt sowohl gegenüber den Antragsgegnern zu 2 – 4 als auch den Mitgliedern des Stiftungsrates sowie anderen beteiligten Personen zum Ausdruck brachte, dass die Antragsgegnerin zu 1 insbesondere der Absicherung der Antragsgegner zu 2 - 4 resp deren Nachkommen sowie

148

■    Seite 28    ■

der Sicherstellung der Fortführung der Unternehmensgruppe dienen sollte. Zudem war es der Wunsch des Antragstellers, dass die Antragsgegner zu 2 und 3 schrittweise Verantwortung und Kontrolle in den Gruppenunternehmen übernehmen sollten. Dieses Konzept wurde auch gegenüber den finanzierenden Bank kommuniziert und von diesen gutgeheissen. In Umsetzung dieses Konzepts waren die Antragsgegner 2 und 4 bis zu den gegenständlichen Streitigkeiten im August 2024 in leitenden Funktionen auf höchster Führungsebene der Unternehmensgruppe tätig  (ZV Jaroslaw Grzesiak in ON 21 S 34; ZV JK in ON 22 S 37 f; ZV Jerzy Modrejewski in ON 23 S 8, ZV Malorzata Nawrocka in ON 24 S 21 ff; Tomasz Szelag in ON 35 S 17).

Vor dem 02.08.2024 setzte sich der Stiftungsrat der Antragsgegnerin zu 1 zusammen aus Philipp Senn als Präsident des Stiftungsrates und Jaroslaw Grzesiak, Tomasz Szelag und Katarzyna Tomczuk als weitere Mitglieder des Stiftungsrates. Im Zuge der Streitigkeiten rund um den 02.08.2024 wurde mit Amtsbefehl vom 26.10.2024 zu 06 HG.2024.133 (dortige ON 71) der bisherige Stiftungsratspräsident Senn abberufen, RA Peter Schierscher als Beistand (an Stelle des Stiftungsratspräsidenten) bestellt und die beiden Stiftungsratsmitglieder Tomasz Szelag und Katarzyna Tomczuk in ihren Ämtern bestätigt. Das weitere Stiftungsratsmitglied Jaroslaw Grzesiak war bereits zuvor (im September 2024) zurückgetreten (Beilage 2.3; ZV Jaroslaw Grzesiak in ON 21 S 42).

Jerzy Modrejewski fungierte vom 14.08.2012 bis 20.10.2022 mit kurzfristigen Unterbrüchen als Mitglied des Stiftungsrates. Er wurde 2022 durch Jaroslaw Grzesiak ersetzt (Beilage 2.3; vgl oben).

Stiftungsdokumente / vorgenommene Änderungen

Die **Statuten** der Antragsgegnerin zu 1 bei Errichtung am **07.03.2012** lauteten soweit relevant wörtlich wie folgt (Beilage 2.5):

Art. 1

149

ERRICHTUNGSERKLÄRUNG UND WIDMUNG

[…]

### Art. 2

NAME, SITZ, ANWENDBARES RECHT UND GERICHTSSTAND

Unter dem Namen

#### TiVi FOUNDATION

besteht eine Familienstiftung mit Sitz und Gerichtsstand in Vaduz.

Alle Rechtsverhältnisse, die durch die Errichtung, die Verwaltung und den Bestand der Stiftung begründet werden, unterliegen liechtensteinischem Recht.

Die Stiftung hat ihren ordentlichen Gerichtsstand in Vaduz.

### Art. 3

DAUER

Die Dauer der Stiftung ist zeitlich nicht begrenzt.

### Art. 4

STIFTUNGSVERMÖGEN

[…]

### Art. 5

ZWECK

(1) Zweck der Stiftung ist die Unterstützung, Fürsorge und Förderung der im Beistatut bezeichneten Begünstigten; die Bestreitung von Kosten der Ausbildung und der Förderung besonderer Begabungen sowie allgemein die materielle Sicherung und Förderung der Begünstigten wie auch deren Unterstützung im Falle der Verheiratung, Ergreifung eines Berufes oder der Gründung eines Unternehmens.

(2) Vom Stiftungszweck erfasst sind ebenso Leistungen an natürliche oder juristische Personen, Institutionen u. ä., soweit die im Beistatut erwähnten Begünstigten durch solch eine Leistung bevorteilt werden.

(3) Die Stiftung ist befugt, alle Rechtsgeschäfte abzuschließen, die der Verfolgung und Verwirklichung ihres Zweckes dienen.

(4) Die Stiftung betreibt kein nach kaufmännischer Art geführtes Gewerbe.

### Art. 6

BEISTATUT UND REGLEMENTE, STIFTUNGSBEGÜNSTIGUNG SOWIE

VOLLSTRECKUNGSRECHTLICHE BESTIMMUNGEN

(1) Der Stifter kann ein Beistatut sowie ein oder mehrere Reglement(e) erlassen.

(2) Mit dem Erlass dieser Statuten wird durch den Stifter ein Beistatut über die


Seite 30

Begünstigung errichtet, in welchem die Bezeichnung der konkreten oder nach objektiven Merkmalen individualisierbaren Begünstigen der Stiftung erfolgt.

(3) Unter Beachtung der durch den Stiftungszweck gesetzten äußeren Schranken gemäß Art. 5 dieser Statuten werden die Begünstigten, das Ausmaß der Begünstigung und weitere Ergänzungen im Beistatut über die Begünstigung bestimmt.

(4) Die Stiftungsbegünstigung sowie die zugesprochenen, noch nicht ausgerichteten Zuwendungen sind höchstpersönlich, unveräusserlich, nicht vererblich und nicht belastbar. Die Gläubiger von Begünstigten dürfen die von Begünstigten unentgeltlich erlangte Begünstigungsberechtigung oder Anwartschaftsberechtigung, bzw. einzelne Ansprüche daraus, auf dem Wege des Sicherungsverfahrens, der Zwangsvollstreckung oder des Konkurses nicht entziehen.

Art. 7

STIFTUNGSRAT
(1)      […]

Art. 8

VERTRETUNG DER STIFTUNG
[…]

Art. 9

KURATOR

(1) Der Kurator ist Berater des Stiftungsrates. Er ist berechtigt, alle Stiftungsdokumente einzusehen und Kopien davon zu nehmen, an den Sitzungen des Stiftungsrates teilzunehmen und die Angelegenheiten der Stiftung zu besprechen.

(2) Weitere Befugnisse und Kompetenzen des Kurators werden durch den Stifter im Beistatut über die Stellung sowie über die Rechte und Pflichten des Kurators festgelegt. Dieses Beistatut kann ausdrücklich vorsehen, dass bestimmte Beschlüsse des Stiftungsrates für ihre Wirksamkeit die Zustimmung des Kurators erfordern, und dementsprechend kann dieses Beistatut die Ermessensbefugnisse des Stiftungsrates einschränken.

(3) Der erste Kurator wird durch den Stifter bestellt. Der erste Kurator legt die Nachfolgeregeln für den Kurator fest im Falle seines Rücktritts, der Handlungsunfähigkeit oder des Todes, sofern die Nachfolgeregelung nicht durch den Stifter im Beistatut über die Stellung sowie über die Rechte und Pflichten des Kurators erfolgte.

Art. 10

REVISIONSSTELLE

■ Seite 31 ■

[...]

Art. 11

JAHRESABSCHLUSS

[...]

Art. 12

RECHTSANWÄLTE UND BERATER

[...]

Art. 13

STATUTENÄNDERUNG UND WIDERRUFBARKEIT

(1) Art. 5 der Statuten ist unabänderlich; Vorbehalten bleibt die Änderung durch den Stiftungsrat, wenn der Zweck der Stiftung unerreichbar, unerlaubt oder vernunftwidrig geworden ist oder sich die Verhältnisse so geändert haben, dass der Zweck eine ganz andere Bedeutung oder Wirkung erhalten hat, so dass die Stiftung dem Willen des Stifters entfremdet ist. In diesen Fällen kann der Stiftungsrat den Stiftungszweck, vorbehaltlich Ziffer (3) dieses Artikels, gemäß dem mutmaßlichen Willen des Stifters ändern.

Der Stiftungsrat hat das Recht, unter Wahrung des Stiftungszweckes, andere Inhalte der Statuten und des Beistatuts zu ändern, wenn dafür ein sachlich gerechtfertigter Grund vorliegt. Das Änderungsrecht kann nicht ausgeübt werden, wenn es ausdrücklich im Beistatut ausgeschlossen worden ist.

(2) Ungeachtet von Art. 7, Abs. 5 können Beschlüsse des Stiftungsrates über Statutenänderungen nur einstimmig gefasst werden, wobei dies auf dem Weg eines Zirkularbeschlusses erfolgen kann.

(3) Die Stiftung ist unwiderruflich. Der Stifter hat jedoch das Recht zur Änderung der Stiftungserklärung. Mit dem Tode des Stifters werden die Statuten und das Beistatut jedoch unabänderbar.

Art. 14

SITZVERLEGUNG, AUFLÖSUNG UND UMWANDLUNG

[...]

Art. 15

LIQUIDATION

[...]

Art. 16

REPRÄSENTANT

■ Seite 32  ■

[…]

Art. 17

SCHIEDSGERICHT

(1) Alle Streitigkeiten zwischen der Stiftung und ihren Beteiligten (insbesondere zwischen Begünstigten, Mitgliedern des Stiftungsrates, dem Kurator, dem Kontrollorgan oder der Revisionsstelle) sowie zwischen den Beteiligten der Stiftung aus dem Stiftungsverhältnis untereinander werden unter Ausschluss der ordentlichen Gerichte durch ein liechtensteinisches Schiedsgericht gemäß den Bestimmungen der liechtensteinischen Zivilprozessordnung (§§ 594 ff.) endgültig entschieden.

(2)      Das Schiedsgericht setzt seine eigenen Kosten und die zu leistenden Vorschüsse fest. Es hat die Prozesskosten im Sinne von §§ 40 ff. der liechtensteinischen Zivilprozessordnung aufzuerlegen bzw. zu verteilen.

[…]

Die gleichzeitig erlassenen **Beistatuten** vom **07.03.2012** sahen in Punkt „A) über die Begünstigung" wörtlich vor wie folgt:

I.

Begünstigter

Der Begünstigte der Stiftung mit Bezug auf Erträgnisse und Stiftungsvermögen ist

Herr Zygmunt Jozef Solorz-Zak

[…]

II.

Letztbegünstigter

Nach der Liquidation der Stiftung ist das Stiftungsvermögen dem aktuellen Begünstigten auszuschütten.

Im Falle, dass alle natürlichen Personen, die als Begünstigte bestimmt worden sind, verstorben sind oder ihre Begünstigung schriftlich ausgeschlagen haben, so hat der Stiftungsrat nach Liquidation der Stiftung das verbleibende Stiftungsvermögen nach seinem Ermessen für karitative Institutionen gemäss Art 107 PGR Abs. 4 a zu verwenden.

◼ Seite 33 ◼

In Punkt „C) Allgemeine Bestimmungen" war sodann vorgesehen, dass der Stiftungsrat zu Lebzeiten des Stifters und im Einvernehmen mit dem Kurator berechtigt ist, die Beistatuten zu ändern (Beilage AP).

Die Statuten wie auch die Beistatuten wurden in der Folge mehrfach abgeändert, wobei nur auf die für das gegenständliche Verfahren relevanten (und dem Gericht bekannten) Änderungen eingegangen wird.

In den **Statuten** vom **29.10.2018** wurde das Statutenänderungsrecht in Art 13 wie folgt geändert, und insbesondere der <u>Passus, dass Art 5 unabänderlich sei, entfernt</u> (unbestritten):

Art 13

ÄNDERUNG DER STATUTEN UND WIDERRUFBARKEIT DER STIFTUNG

(1) Die Stiftung ist unwiderruflich.

(2) Der Stifter hat zu seinen Lebzeiten das Recht zur Änderung der Stiftungserklärung, der Statuten und des Beistatuts.

(3) Ab dem Tag des Todes des Stifters, welcher aufgrund eines offiziellen Dokuments (Sterbeurkunde) zu bestätigen ist, können die Stiftungserklärung, die Statuten und das Beistatut nicht mehr geändert werden.

Anfangs 2022 musste sich der Antragsteller aufgrund fortschreitender gesundheitlicher Beschwerden sowie einer schweren Covid-19-Erkrankung in mehrwöchige ärztliche Behandlung in die Schweiz begeben. Damals erkannte er die Gefahr, dass er irgendwann aus gesundheitlichen Gründen nicht mehr in der Lage sein wird, die die Kontrolle in der Stiftung auszuüben, und dass erhebliche Risiken drohten, sollte die Nachfolge bis dahin nicht sichergestellt sein. Zudem hegte er die Absicht, sich von seiner dritten Frau scheiden zu lassen. Diese Probleme besprach er mit seinem damaligen Freund und Berater Jaroslaw Grzesiak, der damals zum Antragsteller in die Schweiz reiste und mehrere Wochen dort verbrachte. Der Antragsteller bat ihn, eine Lösung für die Kontrollübergabe im Falle seiner Geschäftsunfähigkeit zu

■ Seite 34 ■

entwickeln. (ZV Jaroslaw Grzesiak in ON 21 S 26 f; ZV Malorzata Nawrocka in ON 24 S 21 f und 25)

Anfangs 2022, im Rahmen einer mehrtätigen Besprechung in Lack an welcher der Antragsteller, die Antragsgegner zu 2 und 4, Jaroslaw Grzesiak, Jerzy Modrejewski, Tomasz Szelag und ein Mediziner teilnahmen, wurde die Möglichkeit einer automatischen Nachfolge bei den Kontroll- und Organisationsrechten des Antragstellers in der Stiftung eingehend erörtert. Jaroslaw Grzesiak präsentierte das von ihm entwickelte Konzept der Ablebenserklärung, das die Wünsche des Antragstellers berücksichtigte, welchem es sehr wichtig war, selbstbestimmt darüber entscheiden zu können, wann die Kontroll- und Organisationsrechte übergehen sollten. Er wollte sich die (aus seiner Sicht) Erniedrigung ersparen, irgendwann durch ein Gericht für geschäftsunfähig erklärt zu werden. Mit dem von Jaroslaw Grzesiak entwickelten Konzept der Ablebenserklärung behielt der Antragsteller die Autonomie, weil er die Frist vor Inkrafttreten – soweit gesundheitlich in der Lage - immer wieder verlängern konnte. Es entsprach dem damaligen Verständnis der Beteiligten, das nach Inkrafttreten (Ablauf der Frist) ein „point of no return" erreicht sein sollte (ZV Jaroslaw Grzesiak in ON 21; ZV Jerzy Modrejewski in ON 22 S 52; PV Antragsgegner zu 2 in ON 22 S 3 f; PV Antragsgegner zu 4 in ON 35 S 26).

Jerzy Modrejewski und Jaroslaw Grzesiak übernahmen die Implementierung dieses allseits genehmigten Konzepts in Art 13 (2) der damals als final betrachteten **Statuten** vom **24.11.2022**. Nebst der <u>Implementierung des Mechanismus der Ablebenserklärung</u> wurden noch einige weitere Änderungen an den Statuten vorgenommen wurden, wie folgt:

[...]

Art. 3

STIFTUNGSVERMÖGEN

(1)        Das Stiftungskapital beträgt CHF 30'000.-- und wird der Stiftung zur freien

155

■ Seite 35 ■

Verfügung gestellt.

(2)    (a) Das Vermögen der Stiftung besteht aus den Anteilen und Aktien an den „ZWECKGESELLSCHAFTEN", die im Beistatut definiert sind.

(b) Das Vermögen der Stiftung kann auch aus Anteilen oder Aktien an anderen Gesellschaften bestehen.

(c) Das Vermögen der Stiftung kann darüber hinaus auch aus Geldmitteln, sonstigem beweglichem und unbeweglichem Vermögen sowie sonstigen Rechten bestehen, welche für die Tätigkeit der Stiftung und die Erfüllung ihres in Art. 4 der Statuten festgestellten Zweckes erforderlich sind.

(3)    Eine Veräusserung durch die Stiftung ihrer Geschäftsanteile oder Aktien an den im Beistatut näher bezeichneten ZWECKGESELLSCHAFTEN ist unzulässig. Der Stiftungsrat ist verpflichtet, dafür zu sorgen, dass die Gründungsurkunden (Gesellschaftsvertrag, Statuten) aller ZWECKGESELLSCHAFTEN Bestimmungen enthalten, die der Stiftung als Gesellschafterin/Aktionärin der ZWECKGESELLSCHAFT unveräusserliche persönliche Rechte zur Bestellung des Verwaltungsrats und des Aufsichtsrats einer jeden ZWECKGESELLSCHAFT zuerkennen.

(4)    Als übergeordnetes Interesse der Stiftung, welches der Stiftungsrat zu schützen hat, gilt die Vermeidung des Kontrollverlustes über die ZWECKGESELLSCHAFTEN. Unter „Kontrollverlust" in vorstehendem Sinne, ist eine Abnahme der Anzahl der Stimmen der Stiftung bei jeder der im Beistatut genannten ZWECKGESELLSCHAFTEN zu verstehen, und zwar insgesamt, d.h. unmittelbar und mittelbar (d.h. unter Vermittlung der Gesellschaften/der von der Stiftung abhängigen Unternehmen) unter 51 % im Verhältnis zur Gesamtanzahl der Stimmen.

(5)    1. Die Stiftung ist verpflichtet, den Verschuldungsgrad innerhalb kürzester Frist auf ein Niveau nicht höher als 4.0 zu bringen, falls das Niveau 4.0 zum Todeszeitpunkt des Stifters überschritten wird; ausserdem ist sie verpflichtet, den Verschuldungsgrad auf einem Niveau aufrechtzuerhalten, das zu keinem Zeitpunkt 4.0 überschreitet.

2.    [...]

Art. 4

ZWECK

(1)    Zweck der Stiftung ist die Unterstützung, Fürsorge und Förderung der im Beistatut bezeichneten Begünstigten; die Bestreitung von Kosten der Ausbildung und der Förderung besonderer Begabungen sowie allgemein die materielle Sicherung und Förderung der Begünstigten wie auch deren Unterstützung im Falle der Verheiratung,

■    Seite 36    ■

Ergreifung eines Berufes oder der Gründung eines Unternehmens.

(2)    Vom Stiftungszweck sind ebenso Leistungen an natürliche oder juristische Personen, Institutionen u. ä. erfasst, soweit die im Beistatut erwähnten Begünstigten durch solch eine Leistung bevorteilt werden.

(3)    Im Beistatut können bestimmte Personen oder Personengruppen explizit als Begünstigte der Stiftung ausgeschlossen werden. Es ist unzulässig, als Begünstigte der Stiftung explizit ausgeschlossene Personen oder Personengruppen, direkt oder indirekt und auf welche Art auch immer aus der Stiftung zu bevorteilen.

(4)    Die Stiftung ist befugt, alle Rechtsgeschäfte abzuschließen, die der Verfolgung und Verwirklichung ihres Zweckes dienen.

Die Stiftung betreibt kein nach kaufmännischer Art geführtes Gewerbe.

Art. 5

BEISTATUT UND REGLEMENTE, STIFTUNGSBEGÜNSTIGUNG, VOLLSTRECKUNGSRECHTLICHE BESTIMMUNGEN

(1)    Der Stifter kann ein Beistatut sowie ein oder mehrere Reglement(e) erlassen.

(2)    Der Stifter errichtet unabhängig von diesen Statuten ein Beistatut, in dem u.a. konkrete oder nach objektiven Merkmalen individualisierbare Begünstigte der Stiftung festgelegt sind.

(3)    Unter Beachtung der durch den Stiftungszweck gesetzten äußeren Beschränkungen gemäß Art. 4 dieser Statuten werden im Beistatut, im Teil über die Begünstigung, die Begünstigten, das Ausmaß der Begünstigung und weitere Ergänzungen über die Begünstigung bestimmt.

(4)    Die Stiftungsbegünstigungen sowie die zugesprochenen, noch nicht ausgerichteten Zuwendungen sind streng persönlich, unveräußerlich, nicht vererblich und nicht belastbar. Die Gläubiger von Begünstigten dürfen die von Begünstigten unentgeltlich erlangte Begünstigungsberechtigung oder Anwartschaftsberechtigung, bzw. einzelne Ansprüche daraus, auf dem Wege des Sicherungsverfahrens, der Zwangsvollstreckung oder des Konkurses nicht entziehen.

Art. 6

STIFTUNGSRAT

(1)    Oberstes Organ der Stiftung ist der Stiftungsrat. Ein Mitglied des Stiftungsrates muss dabei immer eine natürliche Person sein, welche die Anforderungen des einschlägigen Art. 180a PGR erfüllt. Die Stiftungsratsmitglieder üben ihre Funktionen persönlich aus, ohne das Recht auf Bestellung eines Bevollmächtigten zur Ausübung

157

 Seite 37

dieser Funktionen in ihrem Namen.

(2)    (a)    Der    Stiftungsrat    besteht    aus    vier    Mitgliedern,    darunter    ein Stiftungsratspräsident.

Zu Lebzeiten des Stifters bestellt und entlässt dieser die Stiftungsratsmitglieder, darunter den Stiftungsratspräsidenten. Die Abberufung des Stiftungsratspräsidenten durch den Stifter bewirkt von sich aus das Erlöschen der Bestellung dessen Nachfolgers im Sinne des nachstehendem Art. 6 (2) b. Der Stifter bestellt zum Stiftungsratspräsidenten eine natürliche Person, welche die in Art. 180 a PGR genannten Anforderungen erfüllt. Zu den besonderen Pflichten des Stiftungsratspräsidenten gehört die Kontrolle der Übereinstimmung der durch den Stiftungsrat gefassten Beschlüsse mit dem Recht, den Statuten, dem Beistatut und mit dem die Wünsche des Stifters enthaltenden Schriftstück, sofern ein solches verfasst wurde.

(b)Der Stiftungsratspräsident hat ab dem Zeitpunkt seiner Bestellung die Pflicht, für den Fall seines Todes, der Amtsniederlegung oder einer vollständigen und dauerhaften Handlungsunfähigkeit seinen Nachfolger zu bestimmen. Die Bestimmung eines Nachfolgers erfüllt dann dieselbe Bedingung der Gültigkeit und Rechtswirksamkeit, wie sie für die Bestellung des Stiftungsratspräsidenten gilt. Vorbehaltlich nachstehendem Art. 6 (3) lit a und b übernimmt der Nachfolger bei Eintritt eines beliebigen der oben genannten Ereignisse die Funktion des bisherigen Stiftungsratspräsidenten.

(c)Nachfolger des Stiftungsratspräsidenten kann nur eine natürliche Person werden, die die Anforderungen des geltenden Art. 180 a PGR erfüllt.

(d)Der Stiftungsratspräsident kann - vorbehaltlich der Bestimmungen in vorstehendem Pkt. c) - zu seinen Lebzeiten seine Nachfolge ändern.

(e)Die obigen Bestimmungen finden auch auf die weiteren Nachfolger des Stiftungsratspräsidenten Anwendung.

(3)    (a) Ab dem Todestag des Stifters, der anhand eines amtlichen Dokuments (Sterbeurkunde) bestätigt wird, oder im Falle seiner vollständigen dauerhaften Handlungsunfähigkeit oder ab dem durch den Stifter in der in Art. 13 (2) 2 der Statuten genannten Erklärung festgelegten Datum erlangt jeder der im Beistatut genannten Zweitbegünstigten das Recht auf Besetzung eines - und nur eines - Platzes im Stiftungsrat (mit    Ausnahme    des    Amts    des    Stiftungsratspräsidenten).    Erstens    kann    ein Zweitbegünstigter ein - und nur ein - Stiftungsratsmitglied abberufen, welches durch den Stifter gemäss vorstehendem Art. 6 (2) a) bestellt wurde. Unerlässliche Bedingung für die Gültigkeit und Rechtswirksamkeit der durch den Zweitbegünstigten veranlassten

■ Seite 38 ■

Abberufung ist die Bestellung durch diesen Begünstigten eines anderen Stiftungsratsmitglieds anstelle des abberufenen Mitglieds. Zweitens kann der Zweitbegünstigte im Rahmen des zu seiner ausschliesslichen Verfügung stehenden Platzes das durch ihn wie vorstehend bestellte Stiftungsratsmitglied abberufen, jedoch ist die unerlässliche Bedingung für die Gültigkeit und Rechtswirksamkeit der betreffenden, vom Zweitbegünstigten veranlassten Abberufung die Bestellung durch diesen Begünstigten eines anderen Stiftungsratsmitglieds anstelle des abberufenen Mitglieds. Dieses Verfahren kommt auch bei allen weiteren Bestellungen und Abberufungen zur Anwendung. Zum Stiftungsratsmitglied dürfen nur volljährige Personen bestellt werden.

(b) Nach dem Tod des Stifters oder im Falle seiner vollständigen und dauerhaften Handlungsunfähigkeit oder ab dem durch den Stifter in seiner Erklärung im Sinne von Art. 13 (2) 2 der Statuten genannten Tag haben drei Stiftungsratsmitglieder (mit Ausnahme des Stiftungsratspräsidenten) das Recht, den amtierenden Stiftungsratspräsidenten einstimmig abzuberufen. Die Abberufung des amtierenden Stiftungsratspräsidenten bedingt die Pflicht zur Bestellung eines neuen Stiftungsratspräsidenten und es erlischt die Pflicht zur Bestellung seines Nachfolgers gemäss vorstehendem Art. 6 (2) b). Zugleich mit der Abberufung sind drei Mitglieder des Stiftungsrates gemäss vorstehendem Art. 6 (3) a) verpflichtet, einen neuen Stiftungsratspräsidenten zu ernennen, der nur eine natürliche Person sein kann, die die Anforderungen des geltenden Art. 180a PGR erfüllt. Gleichzeitig stellt die Berufung des neuen Stiftungsratspräsidenten eine unerlässliche Voraussetzung für die gültige und wirksame Abberufung des bisherigen Stiftungsratspräsidenten dar.

Bei dem neu bestellten Stiftungsratspräsidenten kommen die Bestimmungen von Art. 6 (2) b), c), d) und e) zur Anwendung.

(4)     Nach dem Todestag des Zweitbegünstigten, der durch ein amtliches Dokument (Sterbeurkunde) bestätigt wird, treten die Drittbegünstigten gemäss dem Beistatut in die Rechte des verstorbenen Zweitbegünstigten ein, und, falls am Todestag des Zweitbegünstigten einer der Drittbegünstigten ebenfalls nicht mehr am Leben ist, erlangen die in die Rechte des verstorbenen Drittbegünstigten eintretenden Viertbegünstigten das Recht, ein - und nur ein - Stiftungsratsmitglied zu bestellen, dessen Platz sich in der ausschliesslichen Verfügung des Zweitbegünstigten als ihrem gemeinsamen Vertreter befand. Die Bestellung und Abberufung des Stiftungsratsmitglieds durch die berechtigten Dritt- und gegebenenfalls



Seite 39

Viertbegünstigten erfolgt mit absoluter Mehrheit. Die obigen Regeln kommen entsprechend bei der Bestellung und Abberufung eines - und nur eines - Stiftungsratsmitglieds durch die Begünstigten der weiteren Grade zur Anwendung.

Zum Stiftungsratsmitglied dürfen nur volljährige Personen bestellt werden.

In jedem einzelnen Fall der Abberufung eines Stiftungsratsmitglieds auf der Grundlage dieses Abs. (4) gilt als unerlässliche Bedingung für die Gültigkeit und Rechtswirksamkeit der Abberufung die zeitgleiche Bestellung eines anderen Stiftungsratsmitglieds anstelle des abberufenen Stiftungsratsmitglied.

(5)    Im Falle des kinderlosen Ablebens eines im Beistatut genannten Zweitbegünstigten wird der Platz im Stiftungsrat, der zur Verfügung des verstorbenen Zweitbegünstigten vorgesehen war, gemäss vorstehendem Abs. (3) a) auf dem Wege von einstimmigen Bestellungen oder Abberufungen besetzt, und zwar mit Stand zum Tag des kinderlosen Ablebens des Zweitbegünstigten („berechtigte Begünstigte"). Falls keine Einstimmigkeit bei den vorstehend genannten Begünstigten erreicht wird, wird das betreffende Stiftungsratsmitglied durch den Stiftungsratspräsidenten bestellt bzw. abberufen, dessen Beschluss für die berechtigten Begünstigten verbindlich ist, die das Recht haben, einstimmig Widerspruch gegen den Beschluss einzulegen, und zwar unverzüglich nach Beschlussfassung durch den Stiftungsratspräsidenten. Im Falle eines Widerspruchs findet Art. 7 (2) d) entsprechend Anwendung.

(6)    Die Bestellung und Abberufung eines jeden Stiftungsratsmitglieds, darunter des Stiftungsratspräsidenten, und die Bestellung und Abberufung des Nachfolgers des Stiftungsratspräsidenten erfolgt in Schriftform (mit Ausnahme der elektronischen Post), mit der Pflicht der Zustellung des Berufungs- oder Abberufungsbegehrens an die Adresse der Stiftung und ihrer Aushändigung an den Stiftungsratspräsidenten und an die restlichen Stiftungsratsmitglieder.

(7)    Jede Änderung im Stiftungsrat muss unverzüglich, spätestens aber innerhalb von 30 Tagen, beim Amt für Justiz/Handelsregister (Art. 552 § 19 PGR) angezeigt werden. Die Meldung nimmt der Stiftungsratspräsident vor.

<u>Art. 7</u>

<u>BESCHLÜSSE DES STIFTUNGSRATES</u>

(1)

a)        [...]

<u>Art. 8</u>

<u>VERTRETUNG DER STIFTUNG</u>

160

Seite 40

(1)      [...]

## Art. 9

KURATOR

(1) Der Kurator ist Berater des Stiftungsrates. Er ist berechtigt, alle Stiftungsdokumente einzusehen und Kopien davon zu nehmen, an den Sitzungen des Stiftungsrates teilzunehmen und die Angelegenheiten der Stiftung zu besprechen. Der Kurator überwacht des Weiteren die Verwirklichung des Stiftungszwecks durch den Stiftungsrat gemäß den Stiftungsdokumenten (Statuten, Beistatut) und eines allenfalls erlassenen Wunschschreibens („Letter of Wishes") des Stifters.

(2) Weitere Befugnisse und Kompetenzen des Kurators werden durch den Stifter im Beistatut, im Teil über die Funktion sowie über die Rechte und Pflichten des Kurators, festgelegt. Dieses Beistatut kann ausdrücklich vorsehen, dass bestimmte Beschlüsse des Stiftungsrates für ihre Wirksamkeit die Zustimmung des Kurators erfordern, und dementsprechend kann dieses Beistatut die Ermessensbefugnisse des Stiftungsrates einschränken.

## Art. 10

REVISIONSSTELLE

[...]

## Art. 11

JAHRESABSCHLUSS

[...]

## . Art. 12

RECHTSANWÄLTE UND BERATER

[...]

## Art. 13

ÄNDERUNG DER STATUTEN UND WIDERRUFBARKEIT DER STIFTUNG

(1)   Die Stiftung ist unwiderruflich.

(2) 1. Der Stifter hat zu seinen Lebzeiten das Recht zur Änderung der Stiftungserklärung, der Statuten, des Beistatuts und eines allenfalls erlassenen Wunschschreibens („Letter of Wishes") des Stifters.

2. Der Stifter hat zu seinen Lebzeiten das Recht, durch Abgabe einer Willenserklärung in Form einer notariellen Urkunde zu verfügen, dass er ab einem von ihm genannten Datum die Anwendung der Bestimmungen der Statuten und des Beistatuts, wie sie zu seinen Lebzeiten angewendet werden, ablehnt und dass an ihrer Stelle Bestimmungen

161

 Seite 41

anzuwenden sind, die ab dem Tag seines Todes oder im Falle einer vollständigen und dauerhaften Handlungsunfähigkeit in Kraft treten. Der Stifter hat das Recht, die besagte Erklärung mehrfach abzugeben, wobei er bei der Abgabe einer weiteren Erklärung auf keine Weise an den Inhalt seiner früheren Erklärungen gebunden ist,

(3)

a. Ab dem Todestag des Stifters, der durch ein amtliches Dokument bestätigt wird (Sterbeurkunde), können die Stiftungserklärung, die Statuten und das Beistatut durch einen einstimmig durch alle Ratsmitglieder, einschliesslich des Ratspräsidenten, gefassten Beschluss des Stiftungsrates geändert werden, mit Ausnahme von Art. 6 und 7 der Statuten der Stiftung und der Bestimmungen von A II des Beistatuts, auf deren Änderung der nachstehende Punkt b) dieses Abschnitts (3) Anwendung findet.

b. Änderungen von Art. 6 und 7 der Statuten der Stiftung und der Bestimmungen von A II des Beistatuts können durch einen einstimmig durch alle Ratsmitglieder, einschliesslich des Ratspräsidenten, gefassten Beschluss des Stiftungsrates nach vorheriger schriftlicher einstimmiger Zustimmung aller Begünstigten vorgenommen werden.

(4) Nach jeder Änderung der Statuten oder des Beistatuts ist jedes Stiftungsmitglied (darunter der Ratspräsident) innerhalb einer Frist von 7 Tagen ab dem Tag der Zustellung der Änderungsanzeige zur Abgabe einer schriftlichen Erklärung verpflichtet, mit der die Zustellung des Änderungsbegehrens und die Kenntnisnahme des Inhalts der Änderung bestätigt wird.

Über jede Änderung der Statuten oder des Beistatuts benachrichtigt der Ratspräsident unverzüglich die Begünstigten, jedoch nicht später als innerhalb einer Frist von [7] Tagen nach Vornahme der Änderung. Die Bestimmungen von Art. 7 (7) d) und e) kommen entsprechend zur Anwendung.

Art. 14

REPRÄSENTANT

[…]

Art. 15

GERICHTSSTAND

Alle Streitigkeiten zwischen der Stiftung und ihren Mitgliedern (insbesondere zwischen den Begünstigten, den Stiftungsratsmitgliedern, dem Kurator, dem Kontrollorgan und den Auditoren) sowie zwischen den Stiftungsmitgliedern aus den Beziehungen untereinander werden endgültig durch die zuständigen ordentlichen Gerichte entschieden.

■    Seite 42    ■

[...]

Die Statuten wurden in vom Antragsteller wie auch von den Antragsgegnern zu 2 – 4 unterzeichnet (Beilage 2.7 und 3.7; ZV Jaroslaw Grzesiak in ON 21 S 25 ff; ZV Jerzy Modrejewski in ON 22 S 51 f; PV Antragsgegner zu 2 in ON 22 S 3 ff, 12 f; ZV Malorzata Nawrocka in ON 24 S 23).

Am **29.05.2023** gab der Stifter sodann in Absprache mit ua den Antragsgegnern zu 2 - 4 und Jaroslaw Grzesiak folgende **Ablebenserklärung** ab (Beilage 2.13):

[...]

§ 2 Der Erschienene, Zygmunt Solorz, erklärt, dass gemäss Artikel 13 (2) 2 der Stiftungsurkunde ab dem 15. Dezember 2023 die zu seinen Lebzeiten geltenden Bestimmungen der Stiftungsurkunde und der Stiftungszusatzurkunde aufgehoben werden, und an ihrer Stelle die Bestimmungen anzuwenden sind, die mit dem Tod des Stifters oder im Falle seiner vollständigen und dauerhaften Handlungsunfähigkeit in Kraft treten.

§ 3 Der Erschienene, Zygmunt Solorz, erklärt, dass er sich gemäss Artikel 13 (2) 2 der Stiftungsurkunde das Recht vorbehält, die in dem vorgenannten Artikel der Stiftungsurkunde genannte Erklärung bis zum 14. Dezember 2023 mehrmals abzugeben. Wenn er eine weitere Erklärung abgibt, ist er nicht an den Inhalt der unter diesen Notariatsakt fallenden Erklärung gebunden.

[...]

Am **10.08.2023** wurden die **Statuten** dergestalt geändert, dass in Art 13 (2) 2 (iii) der Statuten die Widerrufsmöglichkeit der <u>Ablebenserklärung</u> wie folgt eingeführt wurde (Beilage 2.8):

<u>Art 13</u>

ÄNDERUNG DER STATUTEN UND WIDERRUFBARKEIT DER STIFTUNG

(1)    Die Stiftung ist unwiderruflich.

163

 Seite 43

(2)   1. Der Stifter hat zu seinen Lebzeiten das Recht zur Änderung der Stiftungserklärung, der Statuten, des Beistatuts und eines allenfalls erlassenen Wunschschreibens („Letter of Wishes") des Stifters.

2.

(i)Der Stifter hat zu seinen Lebzeiten das Recht, durch Abgabe einer Willenserklärung in Form einer notariellen Urkunde zu verfügen, dass er ab einem von ihm genannten Datum die Anwendung der Bestimmungen der Statuten und des Beistatuts, wie sie zu seinen Lebzeiten angewendet werden, ablehnt und dass an ihrer Stelle Bestimmungen anzuwenden sind, die ab dem Tag seines Todes in Kraft treten.

(ii) Trotz Abgabe der Erklärung stehen dem Stifter die in Art. 13 Abs. (2) Punkt 3. der Statuten der Stiftung vorgesehenen Rechte zu und Art. 13 (Abs. (2) Punkt 3. der Statuten der Stiftung gilt vollumfänglich. Diese in Art. 13 Abs. (2) Punkt 3. der Statuten der Stiftung vorgesehenen Rechte stehen dem Stifter zeitlich unbegrenzt, auch nach dem in der Erklärung vom Stifter genannten Datum zu und sind darüber hinaus unbedingt und unwiderruflich.

(iii)Der Stifter hat das Recht, die Erklärung jederzeit, auch nach dem in der Erklärung von dem Stifter angegebenen Datum, ohne Erfordernis einer Begründung zu widerrufen bzw. zu ändern. Die Berechtigung zum Widerruf bzw. zur Änderung der Erklärung steht dem Stifter bedingungslos zu und ist unwiderruflich.

(iv)      Auf die dem Stifter gemäss Art. 13 Abs. (2) Punkt 2. (iii) der Statuten der Stiftung zustehende Berechtigung zum Widerruf bzw. zu Änderung der Erklärung finden Art. 13 Abs. (2) Punkt 4. und 5. der Statuten der Stiftung Anwendung.

3. Nach dem in der Erklärung vom Stifter angegebenen Datum gelten die folgenden Bestimmungen, die auch vom Stiftungsrat nicht gemäss Art. 13 Abs. (3) der Statuten der Stiftung abgeändert werden können.

(i)Bei Entscheidungen in Personalangelegenheiten (Bestellung, Abberufung, Suspendierung, Höhe der Vergütung) über die Zusammensetzung des Stiftungsrates der Stiftung und der Vorstände und Aufsichtsräte von Gesellschaften, deren Aktien oder Anteile die Stiftung hält („Gesellschaften"), ist eine vorherige gemeinsame Beratung mit dem Stifter obligatorisch erforderlich;

(ii) Bei Entscheidungen über Verfügungen bzw. Belastungen aus irgendeinem Rechtstitel in Bezug auf das Unternehmen, den organisierten Teil des

164

 Seite 44

Unternehmens oder Vermögenswerte, die einen wesentlichen Teil des Unternehmens der Stiftung selbst oder der Gesellschaften darstellen, ist eine vorherige schriftliche Zustimmung des Stifters obligatorisch erforderlich;

(iii) Der Stifter behält die Funktion des Vorsitzenden der Aufsichtsräte von den Gesellschaften aus der Gruppe des Stifters nach dem Zustand, zum Zeitpunkt der vorliegenden Änderung der Statuten der Stiftung, allerdings mit dem gleichzeitigen Recht, nach alleinigem Ermessen des Stifters von einer Funktion zurückzutreten;

(iv)       Die Bestimmungen von A I des aktuellen Beistatuts sind unabänderbar, d.h, sie dürfen in keiner Art und Weise abgeändert, aufgehoben oder ausgeschlossen werden.

(v) Im Fall eines Widerrufs einer Erklärung gemäss Art. 13 Abs. (2) Punkt 2. (iii) in Verbindung mit den Punkten 4. und 5. der Statuten der Stiftung hat der Stifter das unbedingte, unwiderrufliche und zeitlich unbegrenzte Recht: (i) die Stiftungserklärung, (ii) die Statuten der Stiftung, und/oder (iii) das Beistatut nach seinem alleinigen Ermessen zu ändern.

4. Im Fall eines Widerrufs einer Erklärung gemäss Art. 13 Abs. (2) Punkt 2. (iii) der Statuten der Stiftung hat der Stifter das Recht, zu jedem von ihm bestimmten Zeitpunkt eine weitere Erklärung oder weitere Erklärungen gemäss Art. 13 Abs. (2) Punkt 2. der Statuten der Stiftung abzugeben, wobei auf jede weitere Erklärung das Recht zum Widerruf oder zur Änderung gemäss den Bedingungen aus Art. 13 Abs. (2) Punkt 2. (iii) in Verbindung mit Punkt 5. der Statuten der Stiftung zu Anwendung gelangt.

5. Das Recht die Erklärung gemäss obigem Art. 13 Abs. (2) Punkt 2. (iii) der Statuten der Stiftung zu widerrufen bzw. zu ändern, kann der Stifter wirksam durchführen:

(i) in Bezug auf Erklärungen, die nach dem Datum der vorliegenden Änderungen der Statuten abgegeben wurden, sowie

(ii) in Bezug auf Erklärungen, die bereits vor dem Datum der vorliegenden Änderungen der Statuten abgegeben wurden, wobei auch in diesem Fall damit voller und unbedingter Rechtswirkung, unabhängig davon, ob das Recht auf Widerruf bzw. Änderung der Erklärung gemäss Art. 13 Abs. (2) Punkt 2. (iii) der Statuten der Stiftung vom Stifter vor oder nach dem in der Erklärung vom Stifter genannten Datum ausgeübt wurde

(3)

165



Seite 45

a. Ab dem Todestag des Stifters, der durch ein amtliches Dokument bestätigt wird (Sterbeurkunde), können die Stiftungserklärung, die Statuten und das Beistatut durch einen einstimmig durch alle Ratsmitglieder, einschliesslich des Ratspräsidenten, gefassten Beschluss des Stiftungsrates geändert werden, mit Ausnahme von Art. 6 und 7 der Statuten der Stiftung und der Bestimmungen von A II des Beistatuts, auf deren Änderung der nachstehende Punkt b) dieses Abschnitts (3) Anwendung findet.

b. Änderungen von Art. 6 und 7 der Statuten der Stiftung und der Bestimmungen von A II des Beistatuts können durch einen einstimmig durch alle Ratsmitglieder, einschliesslich des Ratspräsidenten, gefassten Beschluss des Stiftungsrates nach vorheriger schriftlicher einstimmiger Zustimmung aller Begünstigten vorgenommen werden.

(4) Nach jeder Änderung der Statuten oder des Beistatuts ist jedes Stiftungsmitglied (darunter der Ratspräsident) innerhalb einer Frist von 7 Tagen ab dem Tag der Zustellung der Änderungsanzeige zur Abgabe einer schriftlichen Erklärung verpflichtet, mit der die Zustellung des Änderungsbegehrens und die Kenntnisnahme des Inhalts der Änderung bestätigt wird. Über jede Änderung der Statuten oder des Beistatuts benachrichtigt der Ratspräsident unverzüglich die Begünstigten, jedoch nicht später als innerhalb einer Frist von [7] Tagen nach Vornahme der Änderung. Die Bestimmungen von Art. 7 Abs. 7 lit. d) und e) kommen entsprechend zur Anwendung.

Es kann nicht festgestellt werden, dass der Antragstellers in Bezug auf die in Art 13 (2) 2 (iii) gewählte Formulierung „Die Berechtigung zum Widerruf bzw. zur Änderung der Erklärung steht dem Stifter bedingungslos zu und ist unwiderruflich." wollte, dass diese Statutenbestimmung, die nur für den Fall einer bereits abgegebenen Ablebenserklärung Anwendung findet, selbst unabänderlich ist und dass der Antragsteller damit sein Statutenänderungsrecht beschneiden wollte.

In weiterer Folge erfolgte im **August 2023** gestützt auf den neuen Art 13 (2) 2 (iii) der **Wiederruf** der am 29.05.2023 abgegebenen **Ablebenserklärung** durch den Antragsteller.

166

■    Seite 46    ■

Anders als bei den früheren Änderungen von Stiftungsdokumenten wurden die Statutenänderung betreffend die Einführung der Widerrufsmöglichkeit und der anschliessend erfolgte Widerruf vorgängig weder mit den Antragsgegnern zu 2 – 4 noch Jaroslaw Grzesiak abgesprochen, sondern erfuhren diese erst im Nachhinein davon (ZV Jaroslaw Grzesiak in ON 21 S 31; ZV Jerzy Modrejewski in ON 23 S 6).

Als Jaroslaw Grzesiak von diesen Änderungen erfuhr, äusserte er Bedenken und sah insbesondere das Risiko, dass der Vermögensübergang auf die Stiftung aufgrund der Machthäufung beim Antragstellers (als Stifter, Erstbegünstigter, Kurator) angezweifelt (Stichwort: Vermögensopfer) resp die Stiftung von Dritten angefochten werden könnte. Ende 2023 beauftragte der damalige Stiftungsrat daher mit Einverständnis des Antragstellers RA Walch mit der Prüfung aller Statutenänderungen seit 2012 (Beilage 2.22; ZV Jaroslaw Grzesiak in ON 23 S 33). Auch RA Walch wies auf die Machthäufung beim Antragsteller als Stifter, Begünstigter und Kurator und die damit zusammenhängende Problematik hin, dass Dritte behaupten könnten, das Vermögen sei nie wirklich an die Stiftung übertragen worden (ZV Jaroslaw Grzesiak in ON 23 S 33).

Dieses Ergebnis wurde nebst dem Antragsteller und dem restlichen Stiftungsrat auch den Antragsgegnern zu 2 - 4 mitgeteilt, welche in zunehmender Sorge waren, zumal der im Jahr 2022 erstellte Notfallplan für einen vorab festgelegten, definitiven Kontrollwechsel – also der damals eingeführte Mechanismus der Ablebenserklärung - mit den Änderungen vom August 2023 (Widerrufbarkeit) ausser Funktion war (ZV Jaroslaw Grzesiak in ON 23 S 33).

Mit Erklärung vom **23.11.2023** wurden die **Statuten** idFv 10.08.2023, 29.308.2023 und 19.09.2023 insbesondere sprachlichen Korrekturen unterzogen und lauteten wie folgt (ua Beilage 2.4):

Art. 1

167

■ Seite 47 ■

NAME, SITZ ANWENDBARES RECHT UND GERICHTSSTAND

Unter dem Namen

TiVi Foundation

besteht eine Familienstiftung mit Sitz und Gerichtsstand in Vaduz.

Alle Rechtsverhältnisse, die durch die Errichtung, die Verwaltung und den Bestand der Stiftung begründet werden, unterliegen liechtensteinischem Recht.

Die Stiftung hat ihren ordentlichen Gerichtsstand in Vaduz,

Art.2

DAUER

Die Dauer der Stiftung ist zeitlich nicht begrenzt.

Art.3

STIFTUNGSVERMÖGEN

(1) Das Stiftungskapital beträgt CHF 30'000 - und wird der Stiftung zur freien Verfügung gestellt

(2) (a) Das Vermögen der Stiftung besteht aus den Anteilen und Aktien an den „ZWECKGESELLSCHAFTEN., die im Beistatut definiert sind.

(b) Das Vermögen der Stiftung kann auch aus Anteilen oder Aktien an anderen Gesellschaften bestehen.

(c) Das Vermögen der Stiftung kann darüber hinaus auch aus Geldmitteln, sonstigem beweglichem und unbeweglichem Vermögen sowie sonstigen Rechten bestehen, welche für die Tätigkeit der Stiftung und die Erfüllung ihres in Art. 4 der Statuten festgestellten Zweckes erforderlich sind.

(3) Eine Veräusserung durch die Stiftung ihrer Geschäftsanteile oder Aktien an den im Beistatut näher bezeichneten ZWECKGESELLSCHAFTEN ist unzulässig. Der Stiftungsrat ist verpflichtet, dafür zu sorgen, dass die Gründungsurkunden (Gesellschaftsvertrag, Statuten) aller ZWECKGESSELSCHAFTEN Bestimmungen enthalten, die der Stiftung als Gesellschafterin/Aktionärin der ZWECKGESELLSCHAFT unveräusserliche persönliche Rechte zur Bestellung des Vorsitzenden des Verwaltungsrats und des Vorsitzenden des Aufsichtsrats einer jeden ZWECKGESELLSCHAFT zuerkennen.

(4) Als übergeordnetes Interesse der Stiftung, welches der Stiftungsrat zu schützen hat, gilt die Vermeidung des Kontrollverlustes über die ZWECKGESELLSCHAFTEN. Unter „Kontrollverlust" in vorstehendem Sinne, ist eine Abnahme der Anzahl der Stimmen der Stiftung bei jeder der im Beistatut genannten ZWECKGESELLSCHAFTEN zu verstehen, und zwar insgesamt, d.h. unmittelbar

168

 Seite 48

und mittelbar i (d.h. unter Vermittlung der Gesellschaften/der von der Stiftung abhängigen Unternehmen) unter 51% im Verhältnis zur Gesamtanzahl der Stimmen.

(5) [...]

<u>Art. 4</u>

ZWECK

(1) Zweck der Stiftung ist die Unterstützung, Fürsorge und Förderung der im Beistatut bezeichneten Begünstigten; die Bestreitung von Kosten der Ausbildung und der Förderung besonderer Begabungen sowie allgemein die materielle Sicherung und Förderung der Begünstigten wie auch deren Unterstützung im Falle der Eheschließung, Ergreifung eines Berufes oder der Gründung eines Unternehmens.

(2) Vom Stiftungszweck sind ebenso Leistungen an natürliche oder juristische Personen, Institutionen u. ä. erfasst, soweit die im Beistatut erwähnten Begünstigten durch solch eine Leistung bevorteilt werden.

(3) Im Beistätut können bestimmte Personen oder Personengruppen explizit als Begünstigte der Stiftung ausgeschlossen werden. Es ist unzulässig, als Begünstigte der Stiftung explizit ausgeschlossene Personen oder Personengruppen, direkt oder indirekt und auf welche Art auch immer aus der Stiftung zu bevorteilen.

(4) Die Stiftung ist befugt, alle Rechtsgeschäfte abzuschließen, die der Verfolgung und Verwirklichung ihres Zweckes dienen.

(5) Die Stiftung betreibt kein nach kaufmännischer Art geführtes Gewerbe

<u>Art. 5</u>

STIFTUNGSBEGÜNSTIGUNG, VOLLSTRECKUNGSRECHTLICHE BESTIMMUNGEN

(1) Der Stifter kann ein Beistatut sowie ein oder mehrere Reglement(e) erlassen

(2) Der Stifter errichtet unabhängig von diesen Statuten ein Beistatut, in dem u.a. konkrete oder nach objektiven Merkmalen individualisierbare Begünstigte der Stiftung festgelegt sind.

(3) Beachtung der durch den Stiftungszweck gesetzten äußeren Beschränkungen gemäß Art. 4 dieser STatuten werden im Beistatut, im Teil über die Begünstigung, die Begünstigten, das Ausmaß der Begünstigung und weitere Ergänzungen über die Begünstigung bestimmt.

(4) Die Stiftungsbegünstigungen sowie die zugesprochenen, noch nicht ausgerichteten Zuwendungen sind persönlich, unveräußerlich, nicht vererblich und nicht belastbar. Die Gläubiger von Begünstigten dürfen die von Begünstigten unentgeltlich erlangte Begünstigungsberechtigung oder Anwartschaftsberechtigung, bzw. einzelne Ansprüche

■ Seite 49 ■

daraus, auf dem Wege des Sicherungsverfahrens, der Zwangsvollstreckung oder des Konkurses nicht entziehen.

Art.6

STIFTUNGSRAT

(1) Oberstes Organ der Stiftung ist der Stiftungsrat. Ein Mitglied des Stiftungsrates muss dabei immer eine natürliche Person sein, welche die Anforderungen des einschlägigen Art. 180a PGR erfüllt. Die Stiftungsratsmitglieder üben ihre Funktionen persönlich aus, ohne das Recht auf Bestellung eines Bevollmächtigten zur Ausübung dieser Funktionen in ihrem Namen.

(2) (a) Der Stiftungsrat besteht aus vier Mitgliedern, darunter ein Stiftungsratspräsident. Zu Lebzeiten des Stifters bestellt und entlässt dieser die Stiftungsratsmitglieder, darunter den Stiftungsratspräsidenten. Die Abberufung des Stiftungsratspräsidenten durch den Stifter bewirkt von sich aus das Erlöschen der Bestellung dessen Nachfolgers im Sinne des nachstehendem Art. 6 (2) b. Der Stifter bestellt zum Stiftungsratspräsidenten eine natürliche Person, welche die in Art. 180 a PGR genannten Anforderungen erfüllt. Zu den besonderen Pflichten des Stiftungsratspräsidenten gehört die Kontrolle der Übereinstimmung der durch den Stiftungsrat gefassten Beschlüsse mit dem Recht, den Statuten, dem Beistatut und mit dem die Wünsche des Stifters enthaltenden Schriftstück, sofern ein solches verfasst wurde.

(b) Der Stiftungsratspräsident hat ab dem Zeitpunkt seiner Bestellung die Pflicht, für den Fall seines Todes, der Amtsniederlegung oder einer vollständigen und dauerhaften Handlungsunfähigkeit seinen Nachfolger zu bestimmen. Die Bestimmung eines Nachfolgers erfüllt dann dieselbe Bedingung der Gültigkeit und Rechtswirksamkeit, wie sie für die Bestellung des Stiftungsratspräsidenten gilt. Vorbehaltlich nachstehendem Art. 6 (3) lit. a und b übernimmt der Nachfolger bei Eintritt eines beliebigen der oben genannten Ereignisse die Funktion des bisherigen Stiftungsratspräsidenten.

(c) Nachfolger des Stiftungsratspräsidenten kann nur eine natürliche Person werden, die die Anforderungen des geltenden Art. 180 a PGR erfüllt,

(d) Der Stiftungsratspräsident kann - vorbehaltlich der Bestimmungen in vorstehendem Pkt. c) - zu seinen Lebzeiten seine Nachfolge ändern.

(e) Die obigen Bestimmungen finden auch auf die weiteren Nachfolger des Stiftungsratspräsidenten Anwendung.

(3) (a) Ab dem Todestag des Stifters, der anhand eines amtlichen Dokuments (Sterbeurkunde) bestätigt wird, oder ab dem durch den Stifter in der in Art. 13 (2) 2 der

Seite 50

Statuten genannten Erklärung festgelegten Datum erlangt jeder der im Beistatut genannten Zweitbegünstigten das Recht auf Besetzung eines - und nur eines - Platzes im Stiftungsrat (mit Ausnahme des Amts des Stiftungsratspräsidenten). Erstens kann ein Zweitbegünstigter ein - und nur ein - Sitzungsratsmitglied abberufen, welches durch den Stifter gemäss vorstehendem Art. 6 (2) a) bestellt wurde. Unerlässliche Bedingung für die Gültigkeit und Rechtswirksamkeit der durch den Zweitbegünstigten veranlassten Abberufung ist die Bestellung durch diesen Begünstigten eines anderen Stiftungsratsmitglieds anstelle des abberufenen Mitglieds, jedoch unter der Bedingung, dass es nicht zulässig ist, einen Zweitbegünstigten zu bestellen, der „eine Person aus den Vereinigten Staaten" oder irgendeine Person oder irgendein „verbundener oder untergeordneter" Rechtsträger ist (gemäß der Definition dieser Begriffe aus dem Internal Revenue Code der USA aus 1968 mit nachträglichen Änderungen sowie aus den auf dessen Grundlage erlassenen Steuervorschriften der USA), und zwar im Verhältnis zu dem Zweitbegünstigten, der eine Person aus den Vereinigten Staaten ist. Zweitens kann der Zweitbegünstigte im Rahmen des zu seiner ausschliesslichen Verfügung stehenden Platzes das durch ihn wie vorstehend bestellte Stiftungsratsmitglied abberufen, jedoch ist die unerlässliche Bedingung für die Gültigkeit und Rechtswirksamkeit der betreffenden, vom Zweitbegünstigten veranlassten Abberufung die Bestellung durch diesen Begünstigten eines anderen Stiftungsratsmitglieds anstelle des abberufenen Mitglieds, jedoch unter der Bedingung, dass es nicht zulässig ist, einen Zweitbegünstigten zu bestellen, der „eine Person aus den Vereinigten Staaten" oder irgendeine Person oder irgendein „verbundener oder untergeordneter" Rechtsträger ist (gemäß der Definition dieser Begriffe aus dem Internal Revenue Code der USA aus 1968 mit nachträglichen Änderungen sowie aus den auf dessen Grundlage erlassenen Steuervorschriften der USA), und zwar im Verhältnis zu dem Zweitbegünstigten, der eine Person aus den Vereinigten Staaten ist. Dieses Verfahren kommt auch bei allen weiteren Bestellungen und Abberufungen zur Anwendung. Zum Stiftungsratsmitglied dürfen nur volljährige Personen bestellt werden.

(b) Nach dem Tod des Stifters oder ab dem durch den Stifter in einer Erklärung im Sinne von Art. 13 (2) 2 der Statuten genannten Tag haben drei Stiftungsmitglieder (mit Ausnahme des Stiftungsratspräsidenten) das Recht, den amtierenden Stiftungsratspräsidenten einstimmig abzuberufen. Die Abberufung des amtierenden Stiftungsratspräsidenten bedingt die Pflicht zur Bestellung eines neuen Stiftungsratspräsidenten und es erlischt die Pflicht zur Bestellung-seines Nachfolgers

Seite 51

gemäss vorstehendem Art. 6 (2) b). Zugleich mit der Abberufung sind drei Mitglieder des
Stiftungsrates gemäss vorstehendem Art. 6 (3) a) verpflichtet, einen neuen
Stiftungsratspräsidenten zu ernennen, der nur eine natürliche Person sein kann, die die
Anforderungen des geltenden Art. 180a PGR erfüllt. Gleichzeitig stellt die Berufung des
neuen Stiftungsratspräsidenten eine unerlässliche Voraussetzung für die gültige und
wirksame Abberufung des bisherigen Stiftungsratspräsidenten dar.

Bei dem neu bestellten Stiftungsratspräsidenten kommen die Bestimmungen von Art. 6
(2) b) c) d) und e) zur Anwendung.

(4) Nach dem Todestag des Zweitbegünstigten, der durch ein amtliches Dokument
(Sterbeurkunde) bestätigt wird, treten die Drittbegünstigten gemäss dem Beistatut in die
Rechte des verstorbenen Zweitbegünstigten ein, und, falls am Todestag des
Zweitbegünstigten einer der Drittbegünstigten ebenfalls nicht mehr am Leben ist,
erlangen die in die Rechte des verstorbenen Drittbegünstigten eintretenden
Viertbegünstigten das Recht, ein - und nur ein - Stiftungsratsmitglied zu bestellen, dessen
Platz sich in der ausschliesslichen Verfügung des Zweitbegünstigten als ihrem
gemeinsamen Vertreter befand. Die Bestellung und Abberufung des
Stiftungsratsmitglieds durch die berechtigten Dritt- und gegebenenfalls
Viertbegünstigten erfolgt mit absoluter Mehrheit. Die obigen Regeln kommen
entsprechend bei der Bestellung und Abberufung eines - und nur eines -
Stiftungsratsmitglieds durch die Begünstigten der weiteren Grade zur Anwendung.

Zum Stiftungsratsmitglied dürfen nur volljährige Personen bestellt werden.

In jedem einzelnen Fall der Abberufung eines Stiftungsratsmitglieds auf der Grundlage
dieses Abs (4) gilt als unerlässliche Bedingung für die Gültigkeit und Rechtswirksamkeit
der Abberufung die zeitgleiche Bestellung eines anderen Stiftungsratsmitglieds anstelle
des abberufenen Stiftungsratsmitglied, vorbehaltlich der In den vorliegenden Statuten
vorgesehenen Beschränkungen.

(5) Im Falle des kinderlosen Ablebens eines im Beistatut genannten Zweitbegünstigten
wird der Platz im Stiftungsrat, der zur Verfügung des verstorbenen Zweitbegünstigten
vorgesehen war, gemäss vorstehendem Abs. (3) a) auf dem Wege von einstimmigen
Bestellungen oder Abberufungen besetzt und zwar mit Stand zum Tag des kinderlosen
Ablebens des Zweitbegünstigten („berechtigte Begünstigte"). Falls keine Einstimmigkeit
bei den vorstehend genannten Begünstigten erreicht wird das betreffende
Stiftungsratsmitglied durch den Stiftungsratspräsidenten bestellt bzw' abberufen, dessen

■ Seite 52 ■

Beschluss für die berechtigten Begünstigten verbindlich ist, die das Recht haben einstimmig Widerspruch gegen den Beschluss einzulegen, und zwar unverzüglich nach Beschlussfassung durch den Stiftungsratspräsidenten. Im Falle eines Widerspruchs findet Art 7 (2) dl entsprechend Anwendung.

(6) Die Bestellung und Abberufung eines jeden Stiftungsratsmitglieds, darunter des Stiftungsratspräsidenten, und die Bestellung und Abberufung des Nachfolgers des Stiftungsratspräsidenten erfolgt in Schriftform (mit Ausnahme der elektronischen Post), mit der Pflicht der Zustellung des Berufungs- oder Abberufungsbegehrens an die Adresse der Stiftung und ihrer Aushändigung an den Stiftungsratspräsidenten und an die restlichen Stiftungsratsmitglieder.

Jede Änderung im Stiftungsrat muss unverzüglich, spätestens aber Innerhalb von 30 Tagen beim Amt für Justiz/Handelsregister (Art. 552 § 19 PGR) angezeigt werden. Die Meldung nimmt der Stiftungsratspräsident vor.

Art. 7

BESCHLÜSSE DES STIFTUNGSRATES

[...]

Art. 8

VERTRETUNG DER STIFTUNG

[...]

Art.9

KURATOR

(1) Der Kurator ist Berater des Stiftungsrates. Er ist berechtigt, alle Stiftungsdokumente einzusehen und Kopien davon zu nehmen, an den Sitzungen des Stiftungsrates teilzunehmen und die Angelegenheiten der Stiftung zu besprechen. Der Kurator überwacht des Weiteren die Verwirklichung (des Stiftungszwecks durch den Stiftungsrat gemäß den Stiftungsdokumenten (Statuten, Beistatut) und eines allenfalls erlassenen Wunschschreibens („Letter of Wishes") des Stifters.

(2) Weitere Befugnisse und Kompetenzen des Kurators werden durch den Stifter im Beistatut, im Teil über die Funktion sowie über die Rechte und Pflichten des Kurators, festgelegt. Dieses Beistatut kann ausdrücklich vorsehen, dass bestimmte Beschlüsse des Stiftungsrates für ihre Wirksamkeit die Zustimmung des Kurators erfordern, und

■    Seite 53    ■

dementsprechend kann dieses Beistatut die Ermessensbefugnisse des Stiftungsrates einschränken.

Art. 10

REVISIONSSTELLE

[…]

Art. 11

JAHRESABSCHLUSS

[…]

Art. 12

RECHTSANWÄLTE UND BERATER

[…]

Art. 13

ÄNDERUNGEN DER STATUTEN UND WIDERRUFBARKEIT DER STIFTUNG

(1) Die Stiftung ist unwiderruflich,

(2) 1. Der Stifter hat zu seinen Lebzeiten das Recht zur Änderung der Stiftungserklärung, der Statuten, des Beistatuts und eines allenfalls erlassenen Wunschschreibens („Letter of Wishes") des Stifters. Sämtliche Änderungen der Statuten der Stiftung und Änderungen des Beistatuts der Stiftung bedürfen der vorherigen Mitteilung an die Zweitbegünstigten. Änderungen der Statuten der Stiftung und Änderungen des Beistatuts der Stiftung ohne vorherige Mitteilung an die Zweitbegünstigten sind ungültig.

(2) 2.

(i) Der Stifter hat zu seinen Lebzeiten das Recht, durch Abgabe einer Willenserklärung in Form einer notariellen Urkunde zu verfügen, dass er ab einem von ihm genannten Datum die Anwendung der Bestimmungen der Statuten und des Beistatuts, wie sie zu seinen Lebzeiten angewendet werden, ablehnt und dass an ihrer Stelle Bestimmungen anzuwenden sind, die ab dem Tag seines Todes in Kraft treten („Erklärung").

(ii) Trotz Abgabe der Erklärung stehen dem Stifter die in Art. 13 Abs. (2) Punkt 3. der Statuten der Stiftung vorgesehenen Rechte zu und Art. 13 Abs. (2) Punkt 3. der Statuten der Stiftung gilt vollumfänglich. Diese in Art. 13 Abs. (2) Punkt 3. der Statuten der Stiftung vorgesehenen Rechte stehen dem Stifter zeitlich unbegrenzt, auch nach dem in der Erklärung vom dem Stifter genannten Datum zu und sind darüber hinaus unbedingt und unwiderruflich.

(iii) Der Stifter hat das Recht, die Erklärung jederzeit, auch nach dem in der Erklärung von dem Stifter angegebenen Datum, ohne Erfordernis einer Begründung zu widerrufen

174



Seite 54 

bzw. zu ändern. Die Berechtigung zum Widerruf bzw. zur Änderung der Erklärung steht dem Stifter bedingungslos zu und ist unwiderruflich,

(iv) Auf die dem Stifter gemäss Art. 13 Abs. (2) Punkt 2. (iii) der Statuten der Stiftung zustehende Berechtigung zum Widerruf bzw. zur Änderung der Erklärung finden Art. 13 Abs. (2) Punkt 4. und Punkt 5. der Statuten der Stiftung Anwendung.

(2) 3. Nach dem in der Erklärung vom Stifter angegebenen Datum gelten die folgenden Bestimmungen, die auch vom Stiftungsrat nicht gemäss Art. 13 Abs. (3) der Statuten der Stiftung abgeändert werden kann:

(i) Bei Entscheidungen in Personalangelegenheiten (Bestellung, Abberufung, Suspendierung, Höhe der Vergütung) über die Zusammensetzung des Stiftungsrates der Stiftung und der Vorstände und

Aufsichtsräte von Gesellschaften, deren Aktien oder Anteile die Stiftung direkt hält („Gesellschaften"), ist eine vorherige gemeinsame Beratung mit dem Stifter obligatorisch erforderlich.

(ii) Bei Entscheidungen über Verfügungen bzw. Belastungen aus irgendeinem Rechtstitel in Bezug auf das Unternehmen, den organisierten Teil des Unternehmens oder Vermögenswerte, die einen wesentlichen Teil des Unternehmens der Stiftung selbst oder der Gesellschaften darstellen, ist eine vorherige schriftliche Zustimmung des Stifters obligatorisch erforderlich.

(iii) der Stifter behält die Funktion des Vorsitzenden der Aufsichtsräte von den Gesellschaften aus Gruppe des Stifters nach dem Zustand zum Zeitpunkt der Änderung der Statuten der Stiftung vom 10. August 2023, allerdings mit dem gleichzeitigen Recht, nach alleinigem Ermessen des Stifters von einer Funktion zurückzutreten.

(iv) Die Bestimmungen von A 1 und A II Punkt 9 des aktuellen Beistatuts sind unabänderbar, d.h. sie dürfen in keiner Art und Weise abgeändert, aufgehoben oder ausgeschlossen werden.

(v) Im Fall eines Widerrufs einer Erklärung gemäß Art. 13 Abs. (2) Punkt 2. (iii) in Verbindung mit den Punkten 4. und 5. der Statuten der Stiftung hat der Stifter das unbedingte, unwiderrufliche und zeitlich unbegrenzte Recht: (i) die Stiftungserklärung, (ii) die Statuten der Stiftung, und/oder (iii) das Beistatut nach seinem alleinigen Ermessen zu ändern.

(2) 4. Im Fall eines Widerrufs einer Erklärung gemäß Art. 13 Abs. (2) Punkt 2. (iii) der Statuten der Stiftung hat der Stifter das Recht, zu jedem von ihm bestimmten Zeitpunkt eine weitere Erklärung oder weitere Erklärungen gemäß Art. 13 Abs. (2) Punkt 2. der

 Seite 55

Statuten der Stiftung abzugeben, wobei auf jede weitere Erklärung das Recht zum Widerruf oder zur Änderung gemäß den Bedingungen aus Art. 13 Abs. (2) Punkt 2. (iii) in Verbindung mit Punkt 5. der Statuten der Stiftung zur Anwendung gelangt.

(2) 5. Das Recht, die Erklärung gemäss obigem Art. 13 Abs. (2) Punkt 2. (iii) der Statuten der Stiftung zu widerrufen bzw. zu ändern, kann der Stifter wirksam durchführen;

(i) in Bezug auf Erklärungen, die nach der Änderung der Statuten der Stiftung vom 10. August 2023 abgegeben wurden; sowie

(ii) in Bezug auf Erklärungen, die bereits vor der Änderung der Statuten der Stiftung vom 10. August 2023 abgegeben wurden, wobei auch in diesem Fall mit voller und unbedingter Rechtswirkung, unabhängig davon, ob das Recht auf Widerruf bzw, Änderung der Erklärung gemäß Art. 13 Abs. (2) Punkt 2. (iii) der Statuten der Stiftung vom Stifter vor oder nach dem in der Erklärung vom Stifter genannten Datum ausgeübt wurde.

(3) a. Ab dem Todestag des Stifters, der durch ein amtliches Dokument bestätigt wird (Sterbeurkunde), können die Stiftungserklärung, die Statuten und das Beistatut durch einen einstimmig durch alle Ratsmitglieder, einschliesslich des Ratspräsidenten, gefassten Beschluss des Stiftungsrates geändert werden, mit Ausnahme von Art. 6 und 7 der Statuten der Stiftung und der Bestimmungen von AII des Beistatuts, auf deren Änderung der nachstehende Punkt b) dieses Abschnitts (3) Anwendung findet.

b. Änderungen von Art. 6 und 7 der Statuten der Stiftung und der Bestimmungen von A II des Beistatuts können durch einen einstimmig durch alle Ratsmitglieder, einschliesslich des Ratspräsidenten, gefassten Beschluss des Stiftungsrates nach vorheriger schriftlicher einstimmiger Zustimmung aller Begünstigten vorgenommen werden.

(4) Nach jeder Änderung der Statuten oder des Beistatuts ist jedes Stiftungsmitglied (darunter der Ratspräsident) innerhalb einer Frist von 7 Tagen ab dem Tag der Zustellung der Änderungsanzeige zur Abgabe einer schriftlichen Erklärung verpflichtet, mit der die Zustellung des Änderungsbegehrens und die Kenntnisnahme des Inhalts der Änderung bestätigt wird.

Über jede Änderung der Statuten oder des Beistatuts benachrichtigt der Ratspräsident unverzüglich die Begünstigten, jedoch nicht später als innerhalb einer Frist von [7] Tagen nach Vornahme der Änderung. Die Bestimmungen von Art. 7 (7) d) und e) kommen entsprechend zur Anwendung.

(5)    Die im vorliegenden Art. 13 bestimmten Berechtigungen des Stifters beinhalten das Recht zu Lebzeiten des Stifters oder solange er auf seine Berechtigungen und

Rechte nicht verzichtet hat, dem Stiftungsrat anzuweisen, sämtliche Erträge der Stiftung, auf Auftrag des Stifters hin, an ihn auszuzahlen.

### Art. 14

REPRÄSENTANT

[...]

### Art. 15

GERICHTSSTAND

Alle Streitigkeiten zwischen der Stiftung und ihren Mitgliedern (insbesondere zwischen den Begünstigten, den Stiftungsratsmitgliedern, dem Kurator, dem Kontrollorgan und den Auditoren) sowie zwischen den Stiftungsmitgliedern aus den Beziehungen untereinander werden endgültig durch die zuständigen ordentlichen Gerichte des Fürstentums Liechtenstein entschieden.

Mit Erklärung vom **29.11.2023** des Antragstellers wurden die **Beistatuten** in den früheren Fassungen ua vom 10.08.2023, 29.08.2023, 18.09.2023 und 19.09.2023 geändert, dass der Stifter keine neuen Personen zusätzlich zu den in A. II. genannten Zweitbegünstigten (Antragsgegner 2 – 4) ernennen darf (Beilage 3.2).

Im März 2024 heiratete der Antragsteller seine vierte Ehefrau Justyna Kulka. Die Antragsgegner zu 2 – 4 erfuhren erst im Nachhinein davon (eigenes Vorbringen des Antragsteller in ON 19 S 7).

Mit **Erklärung vom 29.07.2024**, abgegeben in Form eines Notariatsaktes und gerichtet insbesondere an die Organe der von der Stiftung gehaltenen Unternehmen, erklärte der Antragsteller wie folgt (Beilage AY):

ERKLÄRUNG

AN WEN ES ANGEHT

§1. Ich, Zygmunt Solorz, erkläre, dass ich als Eigentümer einer Gruppe von Unternehmen, die direkt oder indirekt von mir kontrolliert sind (Zygmunt Solorz Group;

ZSG) und gleichzeitig wirtschaftlich Berechtigter im Sinne des Art. 2 Abs. 2 Z 1 des Gesetzes zur Verhinderung von Geldwäsche und Terrorismusfinanzierung vom 1. März 2018 (UBO), erkläre [sic!] hiermit und gebe bekannt, dass es meine eindeutige Absicht und mein fester Wille ist, zu meinen Lebzeiten persönlich alle mir übertragenen Befugnisse auszuüben, um das reibungslose Funktionieren und die Entwicklung der ZSG zu gewährleisten, insbesondere durch die aktive Ausübung der Eigentümeraufsicht und die Ausübung eines entscheidenden Einflusses u.a. auf die Personal-, Vermögens-, Finanz- und Strukturpolitik.

§2. Ich erwarte (und verlange) von den Mitgliedern der Organe der Gesellschaften und anderen Einheiten, die die ZSG bilden, von den Mitarbeitern, Beratern und Konsultanten Loyalität, Ehrlichkeit und Sorgfalt bei der Erfüllung der anvertrauten Aufgaben und Pflichten sowie vollen Respekt vor meiner Position als Eigentümer der ZSG und als UBO, insbesondere durch Unterlassung der Untergrabung oder Infragestellung meiner Entscheidungen, die ich nach eigenem Ermessen treffe und treffen werde.

§3. Änderungen dieser Erklärung bedürfen der Form eines durch den Notar Dariusz Wierzchucki, der derzeit eine Notariatskanzlei in der ulica Zimna 2, Top 23 in Warschau führt, angefertigten Notariatsaktes, oder, für den Fall, dass der Notar Dariusz Wierzchucki nicht in der Lage ist, den Notariatsakt zu verfassen, von einem anderen Notar, der von Zygmunt Solorz persönlich benannt wird.

Die Erklärung wurde von Jerzy Modrejewski vorbereitet. Hintergrund waren Spekulationen um den Gesundheitszustand des Antragstellers (ZV Jerzy Modrejewski in ON 23 S 8).

Im Rahmen eines **Treffens** ua anlässlich des bevorstehenden 68. Geburtstag des Antragstellers in Warschau präsentierten der Antragsteller und Jerzy Modrejewski dem Antragsgegner zu 2 und der Antragsgegnerin zu 3 (der Antragsgegner zu 4 reiste erst am Folgetag an) am **31.07.2024** ein Testament des Antragstellers, in dem Jerzy Modrejewski als Testamentsvollstrecker vorgesehen war, weiters eine bereits im April 2024 vom Antragsteller erteilte Generalvollmacht für Jerzy

 Seite 58

Modrejewski, die ihm die alleinige Vertretung des Antragstellers in allen persönlichen Rechten und damit die Kontrolle über die Unternehmensgruppe verschaffte, und schliesslich die oben wiedergegebene Erklärung des Antragstellers vom 29.07.2024. Darin und in den vorangegangenen Entwicklungen sahen die Antragsgegner zu 2 - 4 eine Gefährdung der Stiftung und ihrer seit jeher festgelegten und vereinbarten Nachfolge nach ihrem Vater. Sie befürchteten einerseits, dass die Stiftung aufgrund der Machhäufung beim Antragsteller angreifbar sei, und anderseits, dass der Antragsteller zunehmend von seiner vierten Ehefrau Justyna Kulka und Jerzy Modrejewski beeinflusst werde. Gleichzeitig hielt der Antragsteller aber auch bei dieser Besprechung daran fest, dass die Stiftungen und damit die Unternehmen allein den Kindern gelassen würden. Damit waren die Fragen der gesicherten Nachfolge in den Stiftungen und die Sicherung des Vermögensüberganges auf die Stiftungen ein drängendes Thema zwischen den Antragsgegnern zu 2 – 4 und dem Antragsteller und der Antragsteller war bereit, diese Fragen am Folgetag weiter zu erörtern (ua ZV Jerzy Modrejewski in ON 23 S 12 f; PV Antragsgegner zu 2 in ON 22 S ).

Am **Vormittag** des **01.08.2024** fand ua zu dieser Thematik eine kurze Besprechung zwischen den ua dne Antragsgegnern zu 2 - 4 und dem Antragsteller in Anwesenheit von Jerzy Modrejewski statt. Die Besprechung war nur kurz, weil die Antragsgegner zu 2 – 4 zusammen mit dem Antragsteller zu einem Arzttermin mussten. Jerzy Modrejewski erklärte, dass er am nächsten Tag in die Ferien fahre, er aber auch bleiben könne. Es kann dabei nicht festgestellt werden, dass die Antragsgegnerin zu 3 (und/oder die Antragsgegner zu 2 und 4) Jerzy Modrejewski gegenüber erklärten, dass es völlig ausreichend sei, wenn die Stiftungsthemen nach seiner Rückkehr aus den Ferien Ende 2024 besprochen würden (und er daher ruhig in die Ferien fahren könne).

Am **Nachmittag** des **01.08.2024** wurde die Besprechung jedenfalls ohne Jerzy Modrejewski, aber zumindest teilweise in Anwesenheit des Notar Dariusz Wierzchucki fortgesetzt. Inhalt der Gespräche war ua die Sorge

Seite 59

der Antragsgegner zu 2 – 4, dass die Stiftung aufgrund der Machthäufung beim Antragsteller angefochten werden könnte, zumal bspw auch die Stiftung des polnischen Geschäftsmannes Jan Wejchert für nichtig erklärt worden sei. Es wurde in der Folge vereinbart, dass die Antragsgegner zu 2 – 4 auf den nächsten Tag entsprechende Vorschläge für die Statutenänderung ausarbeiten sollten. Der Antragsgegner zu 2 übernahm die Vorbereitung der Dokumente und Jaroslaw Grzesiak wurde gebeten, mit externen Anwälten Steuerfragen und gesellschaftsrechtliche Fragen abzuklären. Der Antragsgegner zu 2 liess die vorbereiteten Dokumente, ua die Statutenänderung, noch am selben Abend dem Notar Dariusz Wierzchucki zukommen, welcher sie sich aber nicht mehr durchsah (ua PV Antragsgegner zu 2 in ON 22 S 16 ff; ZV Dariusz Wierzchucki in ON 23 S 42 f; ZV Jerzy Modrejewski in ON 23 S 14; ZV Jaroslaw Grzesiak in ON 21 S 37 ff).

Am **02.08.2025** fand ein weiteres Treffen zwischen ua den Antragsgegnern zu 2 – 4 und dem Antragsteller statt, auch diesmal im Beisein des Notars Dariusz Wierzchucki. Zunächst wurden Änderungen am Testament und der Vollmacht für Jerzy Modrejewski besprochen, danach die stiftungsbezogenen Dokumente, also die Statutenänderung und die Ablebenserklärung. Als der Antragsgegner zu 2 begann, die Statutenänderungen vorzulesen, bat Dariusz Wierzchucki um ein Gespräch mit dem Antragsteller, worauf der Antragsteller und Dariusz Wierzchucki sich in ein Nebenzimmer begaben und dort Jerzy Modrejewski anriefen. Dariusz Wierzchucki begann, Jerzy Modrejewski die geplanten Änderungen vorzulesen, worauf dieser erklärte, er könne ohne die Dokumente vor sich zu haben keine verlässliche Einschätzung abgeben. Jerzy Modrejewski wurde bei diesem Telefonat auch darüber informiert, dass eine Ablebenserklärung vorbereitet wurde (ZV Jerzy Modrejewski in ON 23 S 34). Das Gespräch wurde abgebrochen, als die Antragsgegnerin zu 3 das Zimmer betrat, wobei nicht festgestellt werden kann, dass sie der Grund dafür war oder gar Druck ausgeübt hätte. Dariusz Wierzchucki und die Antragsgegnerin zu 3 kehrten zurück zu den anderen und stellten dem Antragsgegner zu 2 Fragen betreffend die

■    Seite 60    ■

Statutenänderungen, ua zur Rolle des Kurators nach Unterzeichnung der Änderungen. Dariusz Wierzchucki pendelte in der Folge zwischen dem Nebenzimmer und dem Büro hin und her und übermittelte dem Antragsgegner zu 2 mehrfach Änderungswünsche des Antragstellers betreffend die Statutenänderung, die der Antragsgegner zu 2 entsprechend umsetzte (etwa die Streichung von Leerzeilen, damit keine Ergänzungen vorgenommen werden können, Ergänzung von Vornamen, Anpassung des Datums der Veröffentlichung von Gesetzesblättern etc). Anschliessend kamen alle wieder zusammen. Der Antragsteller äusserte, er wolle gewisse Sicherheiten, so wolle er weiterhin Vorsitzender des Aufsichtsrats einiger Unternehmen bleiben und seine Amtszeit ohne Zustimmung der Antragsgegner verlängern können. Auch die Rolle des Kurators wurde erneut diskutiert. Schliesslich wurde Jaroslaw Grzesiak kontaktiert, um zu klären, ob das Vetorecht des Antragstellers als Kurator ein Risiko im Hinblick auf die die Anfechtbarkeit der Stiftung darstellt, was Jaroslaw Grzesiak verneinte (ZV Jaroslaw Grzesiak in ON 21 S 39; PV Antragsgegner zu 2 in ON 22 S 7; PV Antragsgegnerin zu 3 in ON 22 S 26f f; ZV Jerzy Modrejewski in ON 23 S 15)

Als alle mit den vorbereiteten und angepassten Erklärungen zufrieden waren unterzeichnete der Antragsteller am **02.08.2024** zunächst nachfolgende **Erklärung betreffend die Statutenänderung** (Beilage H):

Erklärung 02.08.2024

Ich, der Unterzeichnende, Zygmunt Solorz, PESEL: 56080407253, wohnhaft: Meierhofstrasse 8, 9495 Triesen, Liechtenstein, fasse hiermit als einziger Stifter der Stiftung TiVi Foundation mit Sitz in Vaduz, Liechtenstein, („Stiftung"), hinterlegt im Handelsregister, Amt für Justiz, Fürstentum Liechtenstein, unter der Nummer FL-0002.394.367-5, handelnd gemäß Art. 13 Abs. (2) Punkt 1. der Statuten der Stiftung, die folgenden Beschlüsse:

- Aus Artikel 13 Abschnitt (2) Punkte 2 der Statuten der Stiftung, entfernen unterunkt (iii) und (iv).
- Aus Artikel 13 Abschnitt (2) der Statuten der Stiftung, entfernen Punkte 3, Punkte 4 und Punkte 5

181

■ Seite 61 ■

- Einen neuen hinzufügen Artikel 13 Abschnitt (2) Punkte 3 der Statuten der Stiftung wie folgt:

3.

(i) Nach dem in der Erklärung vom Stifter angegebenen Datum gelten die folgenden Bestimmungen, die auch vom Stiftungsrat nicht gemäss Art. 13 Abs. (3) der Statuten der Stiftung abgeändert werden kann:

(ii) Bei Entscheidungen in Personalangelegenheiten (Bestellung, Abberufung, Suspendierung, Höhe der Vergütung) über die Zusammensetzung des Stiftungsrates der Stiftung und der Vorstände und Aufsichtsräte von Gesellschaften, deren Aktien oder Anteile die Stiftung direkt hält („Gesellschaften"), ist eine vorherige gemeinsame Beratung mit dem Stifter obligatorisch erforderlich.

(iii) Bei Entscheidungen über Verfügungen bzw. Belastungen aus irgendeinem Rechtstitel in', Bezug auf das Unternehmen, den organisierten Teil des Unternehmens oder Vermögenswerte, die einen wesentlichen Teil des Unternehmens der Stiftung selbst oder der Gesellschaften darstellen, ist eine vorherige schriftliche Zustimmung des Stifters obligatorisch erforderlich.

(iv) der Stifter behält die Funktion des Vorsitzenden der Aufsichtsräte von den Gesellschaften aus der Gruppe des Stifters nach dem Zustand zum Zeitpunkt der Änderung der Statuten der Stiftung vom 10. August 2023. Er hat außerdem das unwiderrufliche Recht, diese Position nach alleinigem Ermessen für alle zukünftigen Amtszeiten fortzusetzen.

(v) Die Bestimmungen von A 1 und A II Punkt 9 des aktuellen Beistatuts sind unabänderbar, d.h. sie dürfen in keiner Art und Weise abgeändert, aufgehoben oder ausgeschlossen werden.

(vi) Der Stifter bleibt auch nach Inkrafttreten der oben genannten Erklärung Kurator bis zum durch Sterbeurkunde bestätigten Tod.

Die Unterschrift des Antragstellers wurde anschliessend vom Notar Dariusz Wierzchucki beglaubigt (Beilage H).

Danach gab der Antragsteller nachfolgende **Ablebenserklärung** in Form eines Notariatsaktes ab (Beilage J):

■    Seite 62    ■

ERKLÄRUNG

§ 1.1 Der Erklärende Zygmunt Solorz erklärt, dass er der Stifter und Erstbegünstigte der Stiftung mit dem Namen Solkomtel Foundation mit Sitz in Vaduz, Fürstentum Liechtenstein, eingetragen im Handelsregister des Amtes für Justiz des Fürstentums Liechtenstein unter der Nummer FL - 0002.419.785-2 (im Folgenden "die Stiftung") ist.

2. Herr Zygmunt Solorz erklärt, dass die Zweitbegünstigten der Stiftung seine Kinder Tobias Markus Solorz, Aleksandra Jadwiga Zak und Piotr Mateusz Zak sind.

3. Zygmunt Solorz erklärt, dass er gemäß Artikel 13 (2) 2 der Stiftungssatzung das Recht hat, zu Lebzeiten durch eine Erklärung in Form einer notariellen Urkunde zu beschließen, die Anwendung der zu seinen Lebzeiten geltenden Bestimmungen der Statuten und der Beistatuten zu widerrufen und stattdessen die Anwendung der zum Zeitpunkt des Todes des Stifters geltenden Bestimmungen anzuordnen.

§ 2. Der Stifter Zygmunt Solorz erklärt, dass er in Übereinstimmung mit Artikel 13 (2) 2 der Satzung der Stiftung zum Zeitpunkt der Unterzeichnung dieser Urkunde auf die Anwendung der zu seinen Lebzeiten geltenden Bestimmungen der Statuten und der Beistatuten verzichtet, indem er die Anwendung anstelle der Bestimmungen anordnet, die zum Zeitpunkt des Todes des Stifters in Kraft treten.

§ 4. Alle in dieser Urkunde verwendeten Begriffe in Großbuchstaben sind in Übereinstimmung mit den Definitionen in den Stiftungsstatuten auszulegen.

§ 5. Kopien der Urkunde werden dem Stifter und den Zweitbegünstigten in beliebiger Anzahl ausgestellt.

§ 6. Die Kosten dieser Urkunde werden vom Stifter getragen.

[...]

Vor der Unterzeichnung der Erklärung prüfte der Notar Dariusz Wierzchucki diese, las sie dem Antragsteller vor und vergewisserte sich auch, dass der Antragsteller den Inhalt und die Folgen der Erklärung verstanden hatte und sie freiwillig unterzeichnet (ZV Dariusz Wierzchucki in ON 24 S 11).

Schliesslich unterzeichnete der Antragsteller in seiner Eigenschaft als Kurator der Antragsgegnerin zu 1 auch einen vorbereiteten **Umlaufbeschluss** des Stiftungsrates, mit welchem dieser beschloss, die

183



Statutenänderungen gemäss obiger Erklärung vorzunehmen, und erteilte seine Zustimmung hierzu. Auch diese Unterschrift des Antragstellers wurde vom Notar Dariusz Wierzchucki beglaubigt (Beilage I).

Der Antragsteller kannte den Inhalt der Bestimmungen der Statuten, die durch die Änderungserklärungen gestrichen werden sollten, und war sich bei Unterzeichnung der obigen Erklärung betreffend die Statutenänderung, der Ablebenserklärung sowie des Umlaufbeschlusses des Inhalts und der Folgen dieser Erklärungen bewusst und die Erklärung entsprachen auch seinem Willen. Diese Massnahmen resp der „Chance of Control" waren schon über Monate Thema zwischen ua dem Antragsteller und den Antragsgegnern zu 2 - 4 (ZV Jaroslaw Grzesiak in ON 21 S 38; auch ZV Dariusz Wierzchucki in ON 24 S 15; PV Antragsgegner zu 2 - 4).

Am späten Nachmittag des 02.08.2024 traf das Stiftungsratsmitglied Tomasz Szelag den Antragsteller und fragte ihn, ob er in der nachfolgenden Abstimmung des Stiftungsrates für die Statutenänderungen stimmen sollte, was der Antragsteller bestätigte. Im Nachgang zu diesem Gespräch unterzeichnete der Stiftungsrat am Abend des 02.08.2024 den vorbereiteten und vom Stifter bereits unterzeichneten Umlaufbeschluss, mit welchem die Statutenänderung beschlossen wurde (ZV Tomasz Szelag in ON 35 S 17).

Es kann nicht festgestellt werden, dass die Antragsgegner zu 2 – 4 bei den Treffen vom 31.07., 01.08. und/oder 02.08.2024 dem Antragsteller gegenüber betonten und zusicherten, dass ihm keine Rechte entzogen würden resp dem Antragsteller gegenüber bewusst (oder unbewusst) wahrheitswidrig behaupteten, dass er durch die Unterfertigung der Erklärungen am 02.08.2024 an Rechten nichts verliere und/oder dass es darum gehe, die Existenz der Stiftungen nach seinem Tod zu sichern.

Es kann nicht festgestellt werden, dass die Antragsgegner zu 2 – 4 beim Antragsteller am 01.08.2024 (oder auch am 31.07. oder 02.08.2024)



Seite 64

bewusst (oder unbewusst) den Eindruckt erweckten, es bestehe keine Eile, und/oder dem Antragsteller keine Möglichkeit gegeben wurde, die Erklärungen in Ruhe durchzulesen und/oder mit dem bisherigen Inhalt der Statuten zu vergleichen etc.

Es kann nicht festgestellt werden, dass die Antragsgegner zu 2 – 4 den Antragsteller beim Treffen vom 02.08.2024 massiv unter Druck setzten und eindringlich verlangten, dass er die Erklärungen sofort und ohne weitergehende Konsultationen mit seinen Beratern unterfertigen solle.

Am späten Abend des 02.08.2024 besprach der Antragsteller die Erklärung betreffen die Statutenänderung und die Ablebenserklärung mit Jerzy Modrejewski (ZV Justina Kulka in ON 22 S 41; ZV Jerzy Modrejewski in ON 23 S 17 f).

Am **03.08.2024** gaben Justyna Kulka und Jerzy Modrejewski, der dazu aus seinen Ferien nach Warschau reiste, den Antragsgegnern zu 2 - 4 in Gegenwart des Antragstellers bekannt, dass dieser seine Erklärungen betreffend die Stiftung rückgängig machen wolle. Die Antragsgegner zu 2 - 4 empfanden diesen Meinungsumschwung als bizarr und bekamen den Eindruck, dass dem Antragsteller von Justyna Kulka und Jerzy Modrejewski erklärt wurde, dass er überhaupt keine Rechte mehr in Bezug auf die Stiftungen und die Unternehmen mehr habe (PV Antragsgegner zu 2 – 4). Zur Deeskalation schlug die Antragsgegnerin zu 3 ein provisorisches **Stillhalteabkommen** vor. In weiterer Folge unterzeichneten der Antragsteller und die Antragsgegner zu 2 – 4 noch am 03.08.2024 nachfolgende Vereinbarung (Beilage L):

Wir, die Unterzeichneten, Zygmunt Solorz, als der Gründer der TiVi und Solkomtel Stiftung und Aleksandra Zak, Piotr Zak und Tobias Solorz, als die Zweitbegünstigten der beiden oben genannten Stiftungen, vereinbaren die Anwendung der Bestimmungen der Erklärungen zur Änderung der Statuten der beiden oben genannten Stiftungen, erklärt in Übereinstimmung mit Artikel 13 (2) 2 der Statuten der beiden oben genannten Stiftungen und der Beschlüsse des Stiftungsrates der oben genannten Stiftungen, die

 Seite 65

vom Kurator bereits am 2. August 2024 genehmigt wurden, auszusetzen, und darüber hinaus bis zum 16. August 2024 keine Handlungen oder Entscheidungen zu treffen, die mit den oben genannten Dokumenten in Zusammenhang stehen oder auf deren Grundlage getroffen werden.

Während des Zeitraums bis zum 16. August 2024 werden Gespräche nach Treu und Glauben geführt, um Fragen im Zusammenhang mit dem Funktionieren der beiden Stiftungen zu regeln.

Am **13.08.2024** unterzeichnete der Antragsteller nachfolgende **Anfechtungserklärung** (Beilage M):

Ich, der Unterzeichner, Zygmunt Solorz, Personenidentifikationsnummer PESEL 56080407253, fechte hiermit als alleiniger Stifter der TiVi Foundation mit Sitz in Vaduz, Liechtenstein und als alleiniger Stifter der Solkomtel Foundation mit Sitz in Vaduz, Liechtenstein, die folgenden Willenserklärungen an:

1) die Erklärung vom 2. August 2024 über die Änderung der Statuten der Solkomtel Foundation mit Sitz in Vaduz, unter der meine Unterschriften durch Dariusz Wierzchucki, Notar in Warschau, zu Urkunde A Nr. 6219/2024, beglaubigt wurden ("Erklärung 1");

2) die Erklärung vom 2. August 2024 über die Änderung der Statuten der TiVi Foundation mit Sitz in Vaduz, unter der die Unterschriften durch Dariusz Wierzchucki, Notar in Warschau, zu Urkunde A Nr. 6223/2024, notariell beglaubigt wurden ("Erklärung 2")

3) die Erklärung vom 2. August 2024 "Beschluss im Umlaufverfahren" gemäß Artikel 7 der Statuten der Solkomtel Foundation, Vaduz, unter der die Unterschriften durch Dariusz Wierzchucki, Notar in Warschau, zu Urkunde A Nr. 6227/2024, notariell beglaubigt wurden; ("Erklärung 3");

4) die Erklärung vom 2. August 2024 "Beschluss im Umlaufverfahren" gemäß Artikel 7 der Statuten der TiVi Foundation, Vaduz, unter der die Unterschriften durch Dariusz Wierzchucki, Notar in Warschau, zu Urkunde A Nr. 6228/2024, beglaubigt wurden ("Erklärung 4");

186

 Seite 66

5) die Erklärung vom 2. August 2024 gemäß Artikel 13 (2) 2 der Statuten der Solkomtel Foundation mit Sitz in Vaduz, notariell beurkundet durch Dariusz Wierzchucki, Notar in Warschau, zu Urkunde A Nr. 6229/2024 ("Erklärung 5");

6) die Erklärung vom 02. August 2024 gemäß Artikel 13 (2) 2 der Satzung der TiVi Foundation mit Sitz in Vaduz, notariell beurkundet durch Dariusz Wierzchucki, Notar in Warschau, zu Urkunde A Nr. 6235/2024 ("Erklärung 6");

zur Abgabe dieser Willenserklärungen (dies gilt sowohl für Erklärung 1, Erklärung 2, Erklärung 3, Erklärung 4, Erklärung 5 und Erklärung 6) bin ich durch arglistige Täuschung bestimmt worden, Erklärung 1, Erklärung 2, Erklärung 3, Erklärung 4, Erklärung 5 und Erklärung 6 sind mangelhaft und daher unwirksam, weswegen sie keine Rechtsfolgen entfalten und auch in Zukunft keine Rechtsfolgen entfalten können.

Diese Erklärung wurde noch am selben Tag persönlich an das Stiftungsratsmitglied Tomasz Szelag übergeben, welcher den Erhalt in seinem eigenen Namen und im Namen der Stiftung bestätigte. Zudem wurde die Erklärung noch am selben Tag auch an die übrigen Stiftungsratsmitglieder und Antragsgegner zu 2 – 4 versendet.

Am **14.08.2024** fasste der **Antragsgegner zu 2** als „Zweitbegünstigter gemäss Art 6 (3) (a) der Statuten" die **Beschlüsse**, Tomasz Szelag als Stiftungsrat abzuberufen und sich selbst zum Stiftungsrat zu bestellen. Ebenfalls fasste die Antragsgegnerin zu 3 als „Zweitbegünstigter gemäss Art 6 (3) (a) der Statuten" am 14.08.2024 die Beschlüsse, Jaroslaw Grzesiak als Stiftungsrat abzuberufen und Zofia Maria Jedrzeyewska als Stiftungsrätin zu bestellen.

Der Antragsgegner zu 2 teilte Tomasz Szelag und Jaroslaw Grzesiak mit E-Mail vom 14.08.2024 mit, dass sie als Stiftungsräte abberufen worden seien. Die entsprechenden Beschlüsse und Annahmeerklärungen wurden ebenfalls mit Email vom 14.08.2024 an Philipp Senn übermittelt.



Seite 67

Die Antragsgegner haben sich vor obiger Beschlussfassung weder mit dem Antragsteller beraten noch hat dieser seine Zustimmung (als Kurator) erklärt.

Mit in Form eines Notariatsaktes abgegebener vom **Erklärung** vom **17.08.2024** erklärte der Antragsteller wie folgt (Beilage O):

ERKLÄRUNG

Der Erklärende, Herr Zygmunt Jozef Solorz, erklärt, dass er der Stifter und Erstbegünstigte der Stiftung mit dem Namen TM Foundation mit Sitz in Vaduz, Fürstentum Liechtenstein, eingetragen im Handelsregister des Amtes für Justiz des Fürstentums Liechtenstein unter der Nummer FL - 0002.394.367-5 (im Folgenden "die Stiftung") ist.

Herr Zygmunt Jozef Solorz erklärt, dass die Zweitbegünstigten der Stiftung seine Kinder Tobias Markus Solorz, Aleksandra Jadwiga Zak und Piotr Mateusz Zak sind.

Herr Zygmunt Jozef Solorz erklärt, dass er am 2. August 2024 in Warschau von den Zweitbegünstigten der Stiftung durch (unter anderem arglistige) Täuschung dazu veranlasst wurde, eine Erklärung gemäß Artikel 13 (2) 2 der Statuten, notariell beurkundet durch Dariusz Wierzchucki, Notar in Warschau, zu Urkunde A Nr. 6235/2024, abzugeben. Auch wenn er diese Erklärung als unwirksam und nichtig ansieht, möchte er zur Vermeidung von Missverständnissen auch einen förmlichen Widerruf gemäß Artikel 13 (2) 2 (iii) der Statuten der Stiftung erklären.

Herr Zygmunt Jozef Solorz erklärt, dass er als Stifter gemäß Artikel 13 (2) 2 (iii) der Statuten der Stiftung das Recht hat, eine Erklärung gemäß Artikel 13 (2) 2 der Statuten jederzeit, auch nach dem in dieser Erklärung von dem Stifter angegebenen Datum, ohne Erfordernis einer Begründung zu widerrufen bzw. zu ändern. Die Berechtigung zum Widerruf bzw. zur Änderung einer Erklärung gemäß Artikel 13 (2) 2 der Statuten steht dem Stifter bedingungslos zu und ist unwiderruflich.

Herr Zygmunt Jozef Solorz erklärt, dass er in Übereinstimmung mit Artikel 13 (2) 2 (iii) der Statuten der Stiftung seine Erklärung gemäß Artikel 13 (2) 2 der Statuten, abgegeben

188



Seite 68

am 2. August 2024 und notariell beurkundet durch Dariusz Wierzchucki, Notar in Warschau, zu Urkunde A Nr. 6235/2024, widerruft. Er verzichtet somit ausdrücklich nicht auf die Anwendung der zu seinen Lebzeiten geltenden Bestimmungen der Statuten und der Beistatuten und ordnet an deren Stelle nicht die Anwendung der Bestimmungen an, die zum Zeitpunkt des Todes des Stifters in Kraft treten.

Alle in dieser Urkunde verwendeten Begriffe sind in Übereinstimmung mit den Definitionen in den Statuten der Stiftung auszulegen.

Für den Stifter und jeden Zweitbegünstigten wird jeweils eine Kopie dieser Erklärung ausgestellt.

Die Kosten dieser Urkunde gehen zu Lasten des Stifters.

Ebenso wurden am **17.08.2024** insgesamt sieben **Warnschreiben** des Rechtsvertreters des Antragstellers an die Antragsgegner zu 2 – 4 und Philippe Senn, Jaroslaw Grzesiak, Katarzyna Tomczuk und Tomasz Szelag übermittelt (Beilage P).

Die Schreiben an Philippe Senn, Jaroslaw Grzesiak, Katarzyna Tomczuk und Tomasz Szelag lauteten wie folgt (in Beilage P):

[...]
1. [...]
3. Wir wenden uns in Ihrer Funktion als Stiftungsrat der TiVi sowie der Solkomtel an Sie.
4. Unser Mandant wurde - unter bewusstem und gewolltem Zusammenwirken der drei Zweitbegünstigen der TiVi und der Solkomtel - am 02.08.2024 (u.a. arglistig) dazu verleitet, nachfolgende Erklärungen abzugeben:
   (i) die Erklärung über die Änderung der Statuten der Solkomtel, unter der die Unterschriften durch Dariusz Wierzchucki, Notar in Warschau, zu Urkunde A Nr. 6219/2024, beglaubigt wurden ("Erklärung 1");
   (ii) die Erklärung über die Änderung der Statuten der TiVi, unter der die Unterschriften durch Dariusz Wierzchucki, Notar in Warschau, zu Urkunde A Nr. 6223/2024, notariell beglaubigt wurden ("Erklärung 2");

189

 Seite 69

    (iii)    die Erklärung "Beschluss im Umlaufverfahren" gemäß Artikel 7 der Statuten der Solkomtel, unter der die Unterschriften durch Dariusz Wierzchucki, Notar in Warschau, zu Urkunde A Nr. 6227/2024, notariell beglaubigt wurden ("Erklärung 3");

    (iv)    die Erklärung "Beschluss im Umlaufverfahren" gemäß Artikel 7 der Statuten der TiVi, unter der die Unterschriften durch Dariusz Wierzchucki, Notar in Warschau, zu Urkunde A Nr. 6228/2024, beglaubigt wurden ("Erklärung 4");

    (v)    die Erklärung gemäß Artikel 13 (2) 2 der Statuten der Solkomtel, notariell beurkundet durch Dariusz Wierzchucki, Notar in Warschau, zu Urkunde A Nr. 6229/2024 ("Erklärung 5");

    (vi)    die Erklärung gemäß Artikel 13 (2) 2. (i) der Satzung der TiVi, notariell beurkundet durch Dariusz Wierzchucki, Notar in Warschau, zu Urkunde A Nr. 6235/2024 ("Erklärung 6").

5.    Diese Erklärungen entsprachen nicht dem wahren Willen unseres Mandanten. Ihm war zum Zeitpunkt der Unterfertigung der Erklärungen deren Inhalt nicht bewusst. Er hatte weder die Absicht, eine Änderung der Statuten der jeweiligen Stiftung herbeizuführen, noch eine Erklärung gemäß Art. 13 (2) 2. der Statuten der Solkomtel, bzw. gemäß Art. 13 (2) 2. (i) der Statuten der TiVi, abzugeben.

6.    Dementsprechend hat unser Mandant mit seiner Erklärung vom 13.08.2024 (welche u.a. auch dem Stiftungsrat Tomasz Szelag zugestellt wurde) erklärt, dass

    (i)    er zur Abgabe der Erklärungen 1 -6 durch arglistige Täuschung bestimmt wurde, und

    (ii)    die Erklärungen 1 -6 daher mangelhaft und unwirksam (und daher nichtig) sind, weswegen sie keine Rechtsfolgen entfalten und auch in Zukunft keine Rechtsfolgen entfalten können.

7.    Herr Piotr Zak hat unter Missachtung der Erklärung unseres Mandanten vom 13.08.2024 mit zwei E-Mails vom 14.08.2024 an die beiden Stiftungsräte der TiVi und Solkomtel, Jaroslaw Grzesiak und Sie, Herr Szelag, diese darüber in Kenntnis gesetzt, dass diese gemäß den Herrn Piotr Zak als "Begünstigten" eingeräumten Rechte als Stiftungsräte abberufen worden seien. Herr Piotr Zak hat sich vor Versendung dieser E-Mails weder mit unserem Mandanten beraten, noch hat unser Mandant hierzu seine Zustimmung erteilt.

190



Seite 70

8. Wir halten fest, dass die von Herrn Piotr Zak erklärte Abberufung der Stiftungsräte rechtsunwirksam war und die beiden Stiftungsräte daher (nach wie vor) im Amt sind.

9. Vor diesem Hintergrund fordern wir Sie auf, in Ihrer Funktion als Stiftungsrat keine Rechte auszuüben und/oder Handlungen zu setzen (es sei denn, dies wäre zur Erfüllung gesetzlicher Verpflichtungen zwingend erforderlich), bis Sie eine ausdrückliche gegenteilige Erklärung von unserem Mandanten erhalten. Dies betrifft insbesondere Handlungen, die voraussetzen würden, dass die Erklärungen 1 - 6 des Stifters rechtswirksam wären (was nicht der Fall ist). Wir fordern Sie insbesondere auf, weder die Abberufung bestehender Stiftungsräte, noch die Besetzung neuer Stiftungsräte anzuerkennen oder mit angeblich neu bestellten Stiftungsräten zusammenzuwirken.

10. Wir ersuchen um Kenntnisnahme und schriftliche, von Ihnen unterfertige Bestätigung, dass Sie unseren Aufforderungen in diesem Schreiben nachkommen werden. Für den Eingang dieser Bestätigung merken wir uns den 20.08.2024 vor.

11. Sollten Sie dem nicht nachkommen, behält sich unser Mandant weitere rechtliche Schritte in diesem Zusammenhang (insbesondere die Geltendmachung allfälliger Schadenersatzansprüche, sollten hierdurch etwaige Schäden entstehen) ausdrücklich vor.

12. Unabhängig davon, dass die von unserem Mandanten abgegebenen Erklärungen 1 - 6 ohnehin rechtsunwirksam sind, wird unser Mandant aus Gründen der Vorsicht folgende Schritte setzen, die wir Ihnen zu Ihrer Information hiermit mitteilen:

(i) Unser Mandant wird von seinem in Artikel 13 (2) 1 erster Satz der Statuten der der TiVi eingeräumten (unbeschränkten) Änderungsrecht Gebrauch machen und sämtliche am 02.08.2024 erklärten Änderungen (für den bestrittenen Fall, dass diese doch Rechtswirkungen erzeugt haben sollten) rückgängig machen, sodass die Statuten (wieder) wie in der Fassung wie vor dem 02.08.2024 lauten werden. Selbiges wird unser Mandant ebenso bei der Solkomtel vornehmen.

(ii) Weiters wird unser Mandant die Beistatuten der TiVi dahingehend ändern, dass er die Gesellschaft REDDEV INVESTMENTS LIMITED, mit Sitz in Limassol, Zypern, Adresse: Krinou 3, The Oval, Floor 5, Office 503, eingetragen im Register des Ministeriums für Energie, Handel und Industrie, Abteilung für Unternehmensregistrierung und geistiges Eigentum in Nikosia unter der Nummer

191



Seite 71

HE 330471, als Zweckgesellschaft unter Punkt C) I. der Beistatuten der TiVi ergänzen wird.

13. Weiters hat unser Mandant am 17.08.2024 eine neue Erklärung gemäß Artikel 13 (2) 2 der Statuten der Solkomtel abgegeben (womit sämtliche vorhergehende Erklärungen, insbesondere die Erklärung 5, jedenfalls unbeachtlich werden) und die Erklärung 6 widerrufen.

14. Weiters halten wir klarstellend fest, dass unser Mandant - bis zu einer allfälligen ausdrücklichen gegenteiligen Erklärung - seine Zustimmung zu jeglichen Rechtshandlungen oder sonstigen Verfügungen oder Maßnahmen, die die TiVi oder die Solkomtel betreffen, ausdrücklich (auch für die Zukunft) verweigert. Eine mangelnde Äußerung unseres Mandanten darf daher keinesfalls als (konkludente) Zustimmung zu irgendwelchen Rechtshandlungen oder sonstigen Verfügungen oder Maßnahmen gewertet werden.

15. Zusammengefasst verfügt unser Mandant daher über sämtliche (unbeschränkten) Stifterrechte wie ihm in den Statuten und Beistatuten der TiVi und Solkomtel in der Fassung vor dem 02.08.2024 eingeräumt. Unser Mandant wird daher sämtliche zur Verfügung stehenden rechtlichen Schritte setzen, um seine (Stifter-)Rechte umfassend zu wahren und gegen jede Person vorgehen, die Schritte setzt, die in seine Rechtsposition eingreifen oder diese gefährden könnten.

Die Schreiben an die Antragsgegner zu 2 – 4 lauteten wie folgt (in Beilage P):

[...]

1. [...]

3. Sie haben gemäß Punkt A) II. 1. b) des Beistatuts der Solkomtel, sowie Punkt A) II. 1. b) des Beistatuts der TiVi, jeweils die Stellung als Zweitbegünstigte der Solkomtel sowie der TiVi. Selbiges gilt für ihre Geschwister Piotr Zak und Tobias Solorz.

4. Unser Mandant wurde - unter Ihrem Mitwirken - am 02.08.2024 (u.a. arglistig) dazu verleitet, nachfolgende Erklärungen abzugeben:

(i) die Erklärung über die Änderung der Statuten der Solkomtel, unter der die Unterschriften durch Dariusz Wierzchucki, Notar in Warschau, zu Urkunde A Nr. 6219/2024, beglaubigt wurden ("Erklärung 1");

 Seite 72

(ii) die Erklärung über die Änderung der Statuten der TiVi, unter der die Unterschriften durch Dariusz Wierzchucki, Notar in Warschau, zu Urkunde A Nr. 6223/2024, notariell beglaubigt wurden ("Erklärung 2");

(iii) die Erklärung "Beschluss im Umlaufverfahren" gemäß Artikel 7 der Statuten der Solkomtel, unter der die Unterschriften durch Dariusz Wierzchucki, Notar in Warschau, zu Urkunde A Nr. 6227/2024, notariell beglaubigt wurden ("Erklärung 3");

(iv) die Erklärung "Beschluss im Umlaufverfahren" gemäß Artikel 7 der Statuten der TiVi, unter der die Unterschriften durch Dariusz Wierzchucki, Notar in Warschau, zu Urkunde A Nr. 6228/2024, beglaubigt wurden ("Erklärung 4");

(v) die Erklärung gemäß Artikel 13 (2) 2 der Statuten der Solkomtel, notariell beurkundet durch Dariusz Wierzchucki, Notar in Warschau, zu Urkunde A Nr. 6229/2024 ("Erklärung 5");

(vi) die Erklärung gemäß Artikel 13 (2) 2. (i) der Satzung der TiVi, notariell beurkundet durch Dariusz Wierzchucki, Notar in Warschau, zu Urkunde A Nr. 6235/2024 ("Erklärung 6").

5.  Diese Erklärungen entsprachen nicht dem wahren Willen unseres Mandanten. Ihm war zum Zeitpunkt der Unterfertigung der Erklärungen deren Inhalt nicht bewusst. Er hatte weder die Absicht, eine Änderung der Statuten der jeweiligen Stiftung herbeizuführen, noch eine Erklärung gemäß Art. 13 (2) 2. der Statuten der Solkomtel, bzw. gemäß Art. 13 (2) 2. (i) der Statuten der TiVi, abzugeben.

6.  Dementsprechend hat unser Mandant mit seiner Erklärung vom 13.08.2024 (welche u.a. auch Ihnen zugestellt wurde) erklärt, dass

(i) er zur Abgabe der Erklärungen 1 -6 durch arglistige Täuschung bestimmt wurde, und

(ii) die Erklärungen 1 -6 daher mangelhaft und unwirksam (und daher nichtig) sind, weswegen sie keine Rechtsfolgen entfalten und auch in Zukunft keine Rechtsfolgen entfalten können.

7.  Herr Piotr Zak hat unter Missachtung der Erklärung unseres Mandanten vom 13.08.2024 mit zwei E-Mails vom 14.08.2024 an die beiden Stiftungsräte der TiVi und Solkomtel, Jaroslaw Grzesiak und Tomasz Szelag, diese darüber in Kenntnis gesetzt, dass diese gemäß den Herrn Piotr Zak als "Begünstigten" eingeräumten Rechte als Stiftungsräte abberufen worden seien. Herr Piotr Zak hat sich vor Versendung dieser

 Seite 73

E-Mails weder mit unserem Mandanten beraten, noch hat unser Mandant hierzu seine Zustimmung erteilt.

8. Wir halten fest, dass die von Herrn Piotr Zak erklärte Abberufung der Stiftungsräte rechtsunwirksam war und die beiden Stiftungsräte daher (nach wie vor) im Amt sind.

9. Vor diesem Hintergrund fordern wir Sie auf, keine angeblichen (tatsächlich nicht bestehenden) Rechte in Ihrer Eigenschaft als Zweitbegünstige auszuüben, einzufordern oder sich sonst darauf zu berufen, die (nur) bestehen würden, wenn die Erklärungen 1 -6 des Stifters rechtswirksam wären (was nicht der Fall ist). Wir fordern Sie insbesondere auf, weder die Abberufung bestehender Stiftungsräte, noch die Besetzung neuer Stiftungsräte zu erklären.

10. Wir ersuchen um Kenntnisnahme und schriftliche, von Ihnen unterfertige Bestätigung, dass Sie unseren Aufforderungen in diesem Schreiben nachkommen werden. Für den Eingang dieser Bestätigung merken wir uns den 20.08.2024 vor.

11. Sollten Sie dem nicht nachkommen, behält sich unser Mandant weitere rechtliche Schritte in diesem Zusammenhang ausdrücklich vor.

12. Unabhängig davon, dass die von unserem Mandanten abgegebenen Erklärungen 1 -6 ohnehin rechtsunwirksam sind, wird unser Mandant aus Gründen der Vorsicht folgende Schritte setzen, die wir Ihnen gemäß Artikel 13 (2) 1 zweiter Satz der Statuten der TiVi im Hinblick auf die TiVi hiermit mitteilen:

    (i) Unser Mandant wird von seinem in Artikel 13 (2) 1 erster Satz der Statuten der der TiVi eingeräumten (unbeschränkten) Änderungsrecht Gebrauch machen und sämtliche am 02.08.2024 erklärten Änderungen (für den bestrittenen Fall, dass diese doch Rechtswirkungen erzeugt haben sollten) rückgängig machen, sodass die Statuten (wieder) wie in der Fassung wie vor dem 02.08.2024 lauten werden. Selbiges wird unser Mandant ebenso bei der Solkomtel vornehmen.

    (ii) Weiters wird unser Mandant die Beistatuten der TiVi dahingehend ändern, dass er die Gesellschaft REDDEV INVESTMENTS LIMITED, mit Sitz in Limassol, Zypern, Adresse: Krinou 3, The Oval, Floor 5, Office 503, eingetragen im Register des Ministeriums für Energie, Handel und Industrie, Abteilung für Unternehmensregistrierung und geistiges Eigentum in Nikosia unter der Nummer HE 330471, als Zweckgesellschaft unter Punkt C) I. der Beistatuten der TiVi ergänzen wird.



Seite 74

13. Weiters hat unser Mandant am 17.08.2024 eine neue Erklärung gemäß Artikel 13 (2) 2 der Statuten der Solkomtel abgegeben (womit sämtliche vorhergehende Erklärungen, insbesondere die Erklärung 5, jedenfalls unbeachtlich werden) und die Erklärung 6 widerrufen.

14. Weiters halten wir klarstellend fest, dass unser Mandant - bis zu einer allfälligen ausdrücklichen gegenteiligen Erklärung - seine Zustimmung zu jeglichen Rechtshandlungen oder sonstigen Verfügungen oder Maßnahmen, die die TiVi oder die Solkomtel betreffen, ausdrücklich (auch für die Zukunft) verweigert. Eine mangelnde Äußerung unseres Mandanten darf daher keinesfalls als (konkludente) Zustimmung zu irgendwelchen Rechtshandlungen oder sonstigen Verfügungen oder Maßnahmen gewertet werden.

15. Abschließend halten wir der guten Ordnung halber fest, dass sich unser Mandant die Einleitung weiterer rechtlicher Schritte umfassend vorbehält.

Beiden Schreiben war einerseits die vom Antragsteller unterzeichnete Erklärung vom 13.08.2024 (vgl oben) sowie die nachfolgende vom Antragsteller unterzeichnete **Erklärung** vom **17.08.2024** angehängt:

Der Erklärende, Herr Zygmunt Jozef Solorz, erklärt, dass er der Stifter und Erstbegünstigte der Stiftung mit dem Namen Solkomtel Foundation mit Sitz in Vaduz, Fürstentum Liechtenstein, eingetragen im Handelsregister des Amtes für Justiz des Fürstentums Liechtenstein unter der Nummer FL - 0002.419.785-2 (im Folgenden "die Stiftung") ist.

Herr Zygmunt Jozef Solorz erklärt, dass die Zweitbegünstigten der Stiftung seine Kinder Tobias Markus Solorz, Aleksandra Jadwiga Zak und Piotr Mateusz Zak sind.

Herr Zygmunt Jozef Solorz erklärt, dass er am 2. August 2024 in Warschau von den Zweitbegünstigten der Stiftung durch (unter anderem arglistige) Täuschung dazu veranlasst wurde, eine Erklärung gemäß Artikel 13 (2) 2 der Statuten, notariell beurkundet durch Dariusz Wierzchucki, Notar in Warschau, zu Urkunde A Nr. 6229/2024 bzw. Nr. 6230/2024, abzugeben. Auch wenn er diese Erklärung als unwirksam und nichtig ansieht, möchte er zur Vermeidung von Missverständnissen auch eine förmliche Gegenmaßnahme setzen.

Seite 75

Herr Zygmunt Jozef Solorz erklärt, dass er als Stifter gemäß Artikel 13 (2) 2 der Statuten der Stiftung das Recht hat, jederzeit eine neue Erklärung gemäß Artikel 13 (2) 2 der Statuten abzugeben.

Herr Zygmunt Jozef Solorz erklärt somit, dass er seine frühere Erklärung gemäß Artikel 13 (2) 2 der Statuten, abgegeben am 2. August 2024 und notariell beurkundet durch Dariusz Wierzchucki, Notar in Warschau, zu Urkunde A Nr. 6229/2024 bzw. Nr. 6230/2024, in Übereinstimmung mit Artikel 13 (2) 2 der Satzung der Stiftung durch folgende neue Erklärung gemäß Artikel 13 (2) 2 der Statuten ersetzt:

> "Der Stifter Zygmunt Jozef Solorz erklärt, dass er in Übereinstimmung mit Artikel 13 (2) 2 der Satzung der Stiftung ab dem 1. Jänner 2035 (ersten Jänner zweitausendfünfunddreißig) auf die Anwendung der zu seinen Lebzeiten geltenden Bestimmungen der Statuten und der Beistatuten der Stiftung verzichtet und er ab dem 1. Jänner 2035 (ersten Jänner zweitausendfünfunddreißig) die Anwendung jener Bestimmungen anordnet, die zum Zeitpunkt des Todes des Stifters in Kraft treten."

Alle in dieser Urkunde verwendeten Begriffe sind in Übereinstimmung mit den Definitionen in den Statuten der Stiftung auszulegen.

Für den Stifter und jeden Zweitbegünstigten wird jeweils eine Kopie dieser Erklärung ausgestellt.

Die Kosten dieser Urkunde gehen zu Lasten des Stifters.

Mit Schreiben des Rechtsvertreters des Antragstellers vom 18.08.2024 wurden die Antragsgegner zu 2 – 4 „gemäss Artikel 13 (2) 1 zweiter Satz der Statuten" informiert, dass der Antragsteller „zum Schutz der TiVi […] von seinem in Artikel 13 (2) 1 erster Satz der Statuten der TiVi eingeräumten (unbeschränkten) Änderungsrecht" Gebrauch mache und Art 5 der Statuten dahingehend ergänzen werde, dass ein neuer Abs 5 eingefügt werde, der wie folgt laute:

196

 Seite 76

(5) Jeder (mit Ausnahme des Stifters), der

(i)    die Stiftung als solche, ihre Errichtung oder ihren Bestand, ihre Statuten, Beistatuten, Reglemente, finanziellen Verhältnisse, Entscheidungen (ob von treuhänderischer oder betriebswirtschaftlicher Natur), oder Vermögenszuwendungen, an wen auch immer diese erfolgt sind, ganz oder teilweise bei einer in- oder ausländischen Behörde oder einem Gericht anficht oder die Stiftung finanziell oder in ihrer Reputation schädigt, oder

(ii)   Rechtshandlungen des Stifters, ganz oder teilweise bei einer in- oder ausländischen Behörde oder einem Gericht anficht oder den Stifterfinanziell oder in seiner Reputation schädigt,

verliert seine Begünstigungsrechte. In diesem Fall sollen sämtliche Vorteile (oder andere Rechte), auf die der Begünstigte einen Anspruch gehabt hätte, pro-rata zwischen den übrigen Begünstigten der Stiftung im Einklang mit deren jeweiligen Rechten an der Stiftung, aufgeteilt werden.

Der Kurator kann nach freiem Ermessen solche ausgeschlossenen Personen gänzlich oder teilweise, mit ex tune- oder ex nunc-Wirkung, wiedereinsetzen, wenn diese Person das Anfechtungsbegehren definitiv zurückzieht oder die Schädigung beendet.

Mit Notariatsakt vom **19.08.2024** erklärte und beschloss der Antragsteller als „Stifter und Erstbegünstigter" die Statuten idF vom bestätigen und Art 5 um den oben wiedergegebenen Abs 5 (**Verwirkungsklausel**) zu ergänzen (Beilage X).

Die neugefassten **Statuten** vom **19.08.2024** entsprachen mit Ausnahme der Ergänzung der vorgenannten Verwirkungsklausel den Statuten idF vom 29.11.2023 (Beilage X).

Mit Notariatsakt ebenso vom **19.08.2024** erklärte und beschloss der Antragsteller als „Stifter und Erstbegünstigter" die **Beistatuten** idF vom 29.11.2023 zu bestätigen und in Punkt C) „Allgemeine Bestimmungen", Unterpunkt 1, dahingehend zu ergänzen, dass nach Bst d) ein neuer Bst

197



Seite 77

e) eingefügt wird, der lautet „e) Die Gesellschaft REDDEV INVESTMENT LIMITED […] (ZWECKGESELLSCHAFT V)." (Beilage Y).

Mit Notariatsakt ebenso vom <u>**19.08.2024**</u> <u>berief</u> der <u>Antragsteller</u> „vorsichtsweise" <u>Piotr Zak</u> und <u>Zofia Jedrzeyewska als Stiftungsratsmitglieder ab</u> und bestätigte die bisherigen Stiftungsratsmitglieder Grzesiak und Szelag wie folgt (Beilage Z):

ERKLÄRUNG UND BESCHLUSS

Ich, Zygmunt Jozef Solorz (in der Folge: der "Stifter"), bin einziger Stifter und Erstbegünstigter der Stiftung TiVi Foundation mit Sitz in Vaduz, Fürstentum Liechtenstein, hinterlegt im Handelsregister des Amtes für Justiz des Fürstentums Liechtenstein unter der Nummer FL - 0002.394.367-5 (in der Folge: die " Stiftung") und fasse hiermit auf Grundlage des Art. 6 Abs. 2 BSt a der Statuten der Stiftung die folgenden Beschlüsse:

1) Vorsichtsweise Abberufung eines unwirksam "bestellten" Stiftungsratsmitglieds Ich halte vorweg fest, dass ich niemals Herrn Piotr Zak oder Frau Zofia Jedrzeyewska als Stiftungsratsmitglied bestellt habe und der Versuch von Herrn Piotr Zak, durch (unter anderem arglistige) Täuschungshandlungen sich selbst bzw. Dritte als Stiftungsratsmitglieder zu bestellen, unzulässig und rechtsunwirksam war. Herr Piotr Zak und Frau Zofia Jedrzeyewska sind niemals Mitglieder des Stiftungsrates geworden. Allein aus höchstmöglicher Vorsicht und zur Klarstellung der Rechtslage gegenüber der Stiftung und zu deren Schutze berufe ich hiemit Herrn Piotr Zak, geboren am 26. September 1992, und Frau Zofia Jedrzeyewska mit sofortiger Wirkung als Stiftungsratsmitglieder ab.

2) Bestätigung der Bestellung von Stiftungsratsmitgliedern Unter einem ist mir bekannt geworden, dass Herr Piotr Zak zuletzt ebenso versucht hat, zwei Stiftungsratsmitglieder rechtsunwirksam "abzuberufen". Wiederum allein aus den Gründen der Klarstellung der Rechtslage gegenüber der Stiftung werden nachfolgende Personen in ihrer Funktion als Stiftungsratsmitglied für eine weitere Amtszeit (wieder-)bestellt und deren nach wie vor aufrechte Bestellung hiemit bekräftigt:

• Herr Jaroslaw Grzesiak, polnischer Staatsangehöriger, in der Funktion als Mitglied des Stiftungsrates der Stiftung.



Seite 78

• Herr Tomasz Szelag, polnischer Staatsangehöriger, in der Funktion als Mitglied des
Stiftungsrates der Stiftung.

Die vorliegenden Bestellungen zu Punkt 2) und die höchstvorsorgliche Abberufung
zu Punkt 1) erfolgen unter ausdrücklicher Nichtanerkennung irgendeiner
Rechtsgrundlage der von den Zweitbegünstigten gesetzten Handlungen,
insbesondere der Nichtanerkennung der Bestellungs- und Abberufungsschreiben
gerichtet von Piotr Zak an die in Punkt 2) angeführten Mitglieder des Stiftungsrates.

Die mit heutigem Datum bekräftigte Bestellung bewirkt das Anlaufen einer neuen
Amtszeit ab diesem Tage. Weiter halte ich als Stifter fest, dass die Bestätigung und
Bestellung deshalb erfolgt, um die Stiftung und ihr Vermögen langfristig vor
ungerechtfertigten Angriffen und Schäden zu schützen.

Alle in dieser Urkunde verwendeten Begriffe sind in Übereinstimmung mit den
Definitionen in den Statuten der Stiftung auszulegen.

Gemäss Art. 6 Abs. 6 der Statuten hat die Bestellung (bzw die Bestätigung der
Bestellung) in Schriftform gegenüber der Adresse der Stiftung unter Aushändigung
des Bestellungsbegehrens an den Stiftungsratspräsidenten zu erfolgen.

Die Kosten dieser Urkunde gehen zu Lasten des Stifters.

Mit **Rücktrittserklärung** vom **20.08.2024** erklärte der **Antragsgegner zu 2**
seinen „Rücktritt von [...] Amt als Mitglied des Stiftungsrates der
Antragsgegnerin zu 1 und übermittelte die entsprechende Erklärung mit
E-Mail vom selben Tag an Philipp Senn (Beilage AA).

Mit Schreiben des Rechtsvertreters des Antragstellers vom **20.09.2024**
wurden die Antragsgegner zu 2 – 4 „gemäss Artikel 13 (2) 1 zweiter Satz
der Statuten" informiert, dass der Antragsteller von seinem „Artikel 13 (2)
1 erster Satz der Statuten der TiVi Foundation eingeräumten
(unbeschränkten) Änderungsrecht" Gebrauch machen werde und die
Statuten und Beistatuten wie folgt abändern werde, wobei „der guten
Ordnung halber" noch mitgeteilt wurde, dass die Antragsgegner zu 2 – 4
gemäss Art 5 Abs 5 der Statuten inzwischen sämtliche
Begünstigtenrechte verloren hätten (Beilage AI):

STATUTEN

199

■ Seite 79 ■

[...]

Art. 9

KURATOR

(1) Der Kurator ist Berater des Stiftungsrates. Er ist berechtigt, alle Stiftungsdokumente einzusehen und Kopien davon zu nehmen, an den Sitzungen des Stiftungsrates teilzunehmen und die Angelegenheiten der Stiftung zu besprechen. Klarstellend wird festgehalten, dass der Kurator auch dazu befugt ist, Rechtsanwälte und andere Berater zu Sitzungen des Stiftungsrates beizuziehen oder sich dort von diesen vertreten zu lassen. Der Kurator überwacht des Weiteren die Verwirklichung des Stiftungszweckes durch den Stiftungsrat gemäss den Stiftungsdokumenten (Statuten, Beistatut) und eines allenfalls erlassenen Wunschschreibens („Letter of Wishes") des Stifters.

(2) [...]

[...]


BEISTATUT

A)        Über die Begünstigung

[...]

II.

Zweitbegünstigte

1.        Derzeit bestehen keine Zweitbegünstigten.

2.        (...)


Mit Notariatsakt vom **24.09.2024** erklärte und beschloss der Antragsteller als „Stifter und Erstbegünstigter" die **Statuten** idF vom 24.08.2024 in Art 9 Abs 1 wie oben wiedergegeben zu ergänzen (Beilage AJ).

Die neugefassten Statuten vom 24.09.2024 entsprachen mit Ausnahme der Ergänzung in Art 9 Abs 1 und einigen sprachlichen Korrekturen und reaktionellen Änderungen inhaltlich den Statuten idF vom 19.08.2024 (Beilage AJ).

Mit weiterem Notariatsakt vom **24.09.2024** erklärte und beschloss der Antragsteller als „Stifter und Erstbegünstigter" die **Beistatuten** idF vom 19.08.2024 wie oben wiedergegeben abzuändern und die

200



Seite 80

Antragsgegner zu 2 – 4 als Zweitbegünstigte zu entfernen und die Polsat
Stiftung als Zweitbegünstigte einzusetzen. Diese war zwar bereits in den
früheren Fassungen der Beistatuten genannt, allerdings nur als
Ausfallsbegünstigte für den Fall, dass keine Nachkommen des Stifters
mehr vorhanden sind („nach dem kinderlosen Ableben des einzigen
(letzten) Begünstigten, der eine natürliche Person ist") und daher für
einen Zeitpunkt, zu dem der Zweck der Familienstiftung mangels
Nachkommen nicht mehr erreichbar gewesen wäre. „Klarstellend"
wurde sodann festgehalten, „dass die Zweitbegünstigten bereits gemäss
Art 5 Abs 5 (i) und (ii) der Statuten der Stiftung zum Zeitpunkt dieses
Beschlusses sämtliche Begünstigtenrechte in Bezug auf die Stiftung
verloren haben. Unabhängig von der Verwirkung gemäss Art 5 Abs 5 (i)
und (ii) der Statuten werden die Zweitbegünstigten mit dem heutigen
Beschluss zusätzlich auch aus Punkt A) II. 1. der Beistatuten gelöscht,
damit die Zweitbegünstigten (und deren Nachkommen) in keinem Fall
irgendwelche Rechte in Bezug auf die Stiftung mehr haben. Weiters
werden einige sprachliche Korrekturen und redaktionelle Änderungen
vorgenommen. [...]" (Beilage AK)

4.2   Der festgestellte Sachverhalt beruht auf folgender Beweiswürdigung:

Der festgestellte Sachverhalt ergibt sich in grossen Teilen aus den in
Klammern angeführten Beweismitteln. Soweit es sich dabei um Urkunden
handelt, so erwiesen sich diese als unbedenklich, weshalb sie den
betreffenden Feststellungen zugrunde gelegt werden konnten.

Soweit es sich um Aussagen von Parteien und Zeugen handelt, ist
vorauszuschicken, dass es im gegenständlichen Verfahren für beide
Seiten um sehr gewichtige Interessen geht und insbesondere der
Antragsteller zu einem der (zumindest) finanziell mächtigsten Personen in
Polen zählt. Bei Würdigung der Zeugenaussagen war sodann zu
berücksichtigen, dass die Zeugen dem persönlichen bzw beruflichen
Umfeld der einen oder anderen Partei zuzurechnen sind. Auch wenn den
Zeugen keine bewusste Parteilichkeit zu unterstellen ist, war in den

201

 Seite 81

Aussagen teilweise doch eine erkennbare Nähe zur Sichtweise der jeweiligen Partei feststellbar. Der Seite des Antragstellers sind dabei insbesondere seine vierte Ehefrau Justyna Kulka und sein derzeitiger Rechtsberater Jerzy Modrejewski zuzurechnen, aber auch der Notar Dariusz Wierzchucki und das derzeitige Stiftungsratsmitglied Tomasz Szelag sind zumindest eher der Seite des Antragstellers zuzurechnen. Der Seite der Antragsgegner sind hingegen die Zeugen Jaroslaw Grzesiak und Malzorata Nawrocka zuzurechnen. Im Rahmen der Gesamtwürdigung war sodann auch zu berücksichtigen, dass der Zeuge Jaroslaw Grzesiak (selber Rechtsanwalt) seitens des Antragstellers nicht von seiner Verschwiegenheit entbunden wurde und – als er (selber Rechtsanwalt) dennoch eine Aussage tätigte - mehrfach darauf hingewiesen, dass er dies nicht dürfe (vgl ON 21 S 21 f, 43).

Die ebenfalls von den Antraggegnern angebotenen und angereisten Zeugen Dr Barbara Walch, Philipp Senn und Luca Castellzzi wurden seitens des Antragstellers ebenfalls nicht von ihrer Verschwiegenheitpflicht entbunden und konnten daher keine Aussagen tätigen.

Was die Antragsgegner anbelangt, so erschienen diese – wie auch die Zeugen – grundsätzlich glaubwürdig und hat das Gericht keinen Grund, an ihren Aussagen zu zweifeln, ansonsten im Folgenden darauf eingegangen würde. Der Antragsteller selbst war zumindest am Tag seiner gerichtlichen Einvernahme aus gesundheitlichen Gründen nicht in der Lage, substanzielle Aussagen zu den einzelnen Themenbereichen zu tätigen, es kann auf das Protokoll in ON 24 S 29 ff verwiesen werden, wo dies unschwer erkennbar ist. Der Antragsteller äusserte sich nur vage und blieb inhaltlich unkonkret. Zwar erklärte er, von seinen Kindern getäuscht worden zu sein, vermochte jedoch keine nachvollziehbaren oder überprüfbaren Angaben zu Art, Umfang oder konkreten Umständen dieser behaupteten Täuschung zu machen. Dabei entstand der Eindruck, dass der Antragsteller vorbereitete Aussagen wiederzugeben versuchte, aufgrund seines insgesamt sehr geschwächten

202

gesundheitlichen Zustands jedoch erkennbar Schwierigkeiten hatte, den Inhalt dieser Angaben tatsächlich zu verstehen. Aufgrund Anratens seines Arztes wurde die Befragung dann auch beendet (ON 24 S 38). Was das von den Rechtsvertretern des Antragstellers vorgelegte Wortprotokoll (Beilage AV) betrifft, so handelt es sich hier um einen Aneinanderreihung von Suggestivfragen, sodass diesem Dokument (unabhängig von der Zulässigkeit) kein Beweiswert zukommt, resp dieses Dokument wenn dann obigen Eindruck vom Antragsteller bestätigt.

Im Einzelnen:

Dass das in die Antragsgegnerin zu 1 eingebrachte Vermögen im Wesentlichen während den ersten zwei Ehen des Stifters aufgebaut wurde, ist grundsätzlich unbestritten und ergibt sich schon aus dem Umstand, dass die Stiftung 2012 errichtet wurde. Dass die Stiftung nach den Wünschen des Antragstellers insbesondere der Absicherung der Antragsgegner sowie deren Nachkommen dienen sollte und der Antragsteller dies auch laufend kommunizierte wurde von den Zeugen praktisch unisono bestätigt (vgl ZV Jaroslaw Grzesiak in ON 21 S 34; ZV Malorzata Nawrocka in ON 24 S 21 ff; auch ZV Justyna Kulka in ON 22 S 37 f; ZV Jerzy Modrejewski in ON 23 S 8; Tomasz Szelag in ON 35 S 17) und wurde schon in den Statuten 2012 (wie auch in sämtlichen Folgestatuten) in Art 1 festgehalten, dass es sich bei der Antragsgegnerin zu 1 um eine – wörtlich – «Familienstiftung» handle. Entsprechend waren die Zweitbegünstigten in den Beistatuten (bis September 2024) auch als Zweitbegünstigte vorgesehen. Es besteht für das Gericht daher kein Zweifel, dass es dem Willen des Antragstellers entsprach (und die Antragsgegnerin zu 1 auch entsprechend konzipiert wurde), dass die Antragsgegnerin insbesondere der finanziellen Absicherung seiner Nachkommen dienen sollte. Dafür, dass sie in den vorgelegten Beistatuten vom 07.03.2012 nach keine Erwähnung gefunden haben, sind diverse Gründe denkbar, die mit dem oben Ausgeführten nicht in Widerspruch stehen müssen, etwa, dass damals das Vermögen noch nicht eingebracht war und kein Augenmerk auf diese (ersten) Beistatuten

gelegt wurde. Dafür spricht auch die darin enthaltene Letztbegünstigenregelung – denn es erscheint (unabhängig von der Frage der rechtlichen Zulässigkeit) ansonsten wenig plausibel, dass jemand ein Milliardenvermögen in eine Stiftung einbringt, ohne für den Fall seines Ablebens genauere Vorgaben dazu zu hinterlassen, welchen konkreten karitativen Zwecken das Stiftungsvermögen dienen soll, etwa durch die Nennung bestimmter Förderbereiche wie beispielsweise medizinische Forschung.

Dass die Söhne entsprechend dem Wunsch des Antragstellers nach und nach Verantwortung in den Unternehmen übernahmen, dürfte unbestritten sein und wurde von diversen Zeugen bestätigt, so ua Tomasz Szelag in ON 35 S S 17, der erklärte, dass diese Konzept auch den finanzierenden Banken vorgestellt und von diesen gutgeheissen worden sei (vgl auch ZV Jaroslaw Grzesiak in ON 21 S 34; ZV Justyna Kulka in ON 22 S 37 f; ZV Jerzy Modrejewski in ON 23 S 8, ZV Malorzata Nawrocka in ON 24 S 21 ff).

Die Feststellungen zum Aufenthalt in der Schweiz basieren auf den Aussagen des Jaroslaw Grzesiak und der Malorzata Nawrocka in ON 21 S 26 resp ON 24 S 21 f, zumal dies (nebst dem Antragsteller, wobei hier auf die einleitenden Bemerkungen zu verweisen ist) offenbar die einzigen Personen waren, die hierzu über eigene Wahrnehmungen verfügen.

Was die erstmalige Einführung des Konzepts der Ablebenserklärung im August 2022 anbelangt, so dürfte unstrittig sein und ergibt sich dies jedenfalls aus den diversen übereinstimmenden Zeugen- und Parteienaussagen, dass das Konzept der Ablebenserklärung von Jaroslaw Grzesiak entwickelt wurde und Jerzy Modrejewski auf dieser Basis in steter Abstimmung mit Jaroslaw Grzesiak einen Entwurf ausarbeitete und die Implementierung in die Statuten übernahm (Beilagen 2.10 und 2.11; ZV Jaroslaw Grzesiak in ON 21 S 25 ff; ZV Malorzata Nawrocka in ON 24 S 23; PV Antragsgegner zu 2 in ON 22 S 3 ff, 12 f; auch Jerzy Modrejewski in ON 22 S 52, ON 23 S 24 unten; PV

■   Seite 84   ■

Antragsgegner zu 4 in ON 35 S 26). Den Aussagen des Jaroslaw Grzesiak
(als «Entwickler») kommt entsprechend ein hoher Stellenwert zu, wenn es
darum geht, wie das Konzept der Ablebenserklärung damals verstanden
wurde, dass nämlich vor dem Inkrafttreten die Möglichkeit der
«Fristverlängerung» bestehen sollte, danach aber nicht mehr (vgl hierzu
auch den Antragsgegner zu 2 in ON 22 S 23). Es war denn auch Jaroslaw
Grzesiak, der an den Gesprächen in Lack teilnahm und dieses Konzept
mit ua dem Antragsteller diskutierte und erklärte, während Jerzy
Modrejewski gemäss eigenen Aussagen bei diesen Gespräche nur
teilweise anwesend war (ON 22 S 52). Soweit Jerzy Modrejewski in seiner
Aussage ausführt, es sei beabsichtigt gewesen, dass die Erklärung auch
nach ihrem Inkrafttreten jederzeit widerrufen oder abgeändert werden
könne, vermag das Gericht dieser Darstellung nicht zu folgen. Zum einen
war der Antragsteller zum damaligen Zeitpunkt (unbestritten) schwer
erkrankt, sodass es sachgerecht und nachvollziehbar erscheint, dass im
Hinblick auf eine mögliche Verschlechterung seines Gesundheitszustands
rechtzeitig    Vorkehrungen    für    eine    geordnete    Übergabe    der
Entscheidungsbefugnisse getroffen wurden. Zum anderen «beinhaltet»
die gegenständliche Stiftung ein Vermögen in Milliardenhöhe, dass sich
ua aus Beteiligungen an börsenkotierten Gesellschaften zusammensetzt,
sodass seitens des «Marktes» und der finanzierenden Banken ein
naheliegendes Interesse an klaren und stabilen Führungsstrukturen
innerhalb der Holdingstiftung bestand resp besteht. So ist dem Vortrag
des Antragstellers selbst zu entnehmen, dass sich allfällige Unsicherheiten
betreffend die Führung unmittelbar auf den Börsenkurs auswirken und zu
Verlusten in Millionenhöhe führen. Angesichts dieser Struktur erscheint es
bereits aus wirtschaftlicher Sicht wenig plausibel, dass gewollt sein kann,
die Kontrolle an die „nächste Generation" zu übergeben, diese aber
nach Belieben wieder „zurückholen" zu können. Dies würde zu oben
erwähnten    Unsicherheiten    führen    und    würde    mit    hoher
Wahrscheinlichkeiten zu Widerständen bei den finanzierenden Banken
sowie dem Kapitalmarkt führen, da dies grundlegenden Anforderungen
an Planungssicherheit und Governance widerspräche. Zusammengefasst
sieht es das Gericht als erwiesen an, dass nach Inkrafttreten (also Ablauf

205

Seite 85

der Frist) ein „point of no return" erreicht sein sollte; der „change of control" also unwiderrufbar stattfinden sollte.

Aber auch aus Sicht einer allfälligen Geschäftsunfähigkeit (und entsprechender Beeinflussbarkeit) macht es durchaus Sinn, dass der „point of no return" irgendwann erreicht – und eben nicht beliebig widerrufbar sein sollte.

Was die spätere Implementierung der Widerrufsmöglichkeit anbelangt, ergibt sich dies aus der Beilage 2.8. Dass in der Folge ein Wiederruf erfolgte ist unbestritten. Ebenso, dass die Antragsgegner zu 2 – 4 wie auch Jaroslaw Grzesiak – anders als bei den vorherigen Statutenänderungen – erst im Nachhinein darüber informiert wurden (so auch ZV Jaroslaw Grzesiak in ON 21 S 31; ZV Jerzy Modrejewski in ON 23 S 6).

Was den Stifterwillen in Bezug auf die Formulierung in Art 13 (2) 2 (iii) „Die Berechtigung zum Widerruf bzw. zur Änderung der Erklärung steht dem Stifter bedingungslos zu und ist unwiderruflich." anbelangt, so konnte der Stifter selbst hierzu keine Angaben machen.  Jerzy Modrejewski (in ON 23 S 6) hat dann zwar angegeben, mit „bedingungslos und unwiderruflich" sei gemeint gewesen, dass der Antragsteller dieses Rechts „nicht beraubt" werden könne, „aus keinem Titel, auf keiner Rechtsgrundlage", nicht jedoch, dass der Antragsteller damit auch sein Änderungsrecht beschneiden wollte. Es gibt auch keine Anzeichen für einen solchen extremen Stifterwillen, der jede künftige Sicherung des Stiftungsvermögens und jeden Kontrollwechsel zu seinen Lebzeiten verunmöglicht hätte. Es kann diesbezüglich auch auf obige Ausführungen zum „change of control" verwiesen werden. Dass es nämlich angesichts der gesamten Struktur bereits aus wirtschaftlicher Sicht wenig plausibel erscheint, dass gewollt sein kann, die Kontrolle an die „nächste Generation"  zu übergeben, diese aber nach Belieben wieder „zurückholen" zu können. Die diesbezüglichen Angaben des Jerzy Modrejewski überzeugen (auch) vor diesem Hintergrund nicht.

206

■ Seite 86 ■

Was die Feststellungen zur Beauftragung der Dr Barbara Walch und den Ergebnissen betrifft, so gibt es für das Gericht keinen Grund, an den diesbezüglichen Aussagen des Jaroslaw Grzesiak zu zweifeln (ON 21 S 32 f), zumal die entsprechende Einschätzung betreffend Vermögensübergang durchaus nachvollziehbar ist – so wurden dem Antragsteller als Stifter, Kurator und Erstbegünstigtem in den Statuten sehr weitreichende Rechte eingeräumt, ua weitgehende Änderungsrechte in Bezug auf die Statuten und Beistatuten. Es könnte daher durchaus die Meinung vertreten werden, dass der Antragsteller als Stifter kein „Vermögensopfer" erbracht hat. Was die diesbezüglichen (beweiswürdigenden) Überlegungen des Antragsstellers in seinem Schriftsatz ON 33 S 11 f anbelangt, teilt das Gericht diese Überlegungen nicht, zumal dort die (hier nicht gegebene) Möglichkeit, die Stiftung zu wiederrufen, argumentativ mit der beschriebenen Machthäufung beim Antragsteller (und den damit verbundenen weitreichenden Rechten) vermischt wird. Selbstredend macht es im Hinblick auf die Machthäufung sodann einen Unterschied, ob eine einmal abgegebene Ablebenserklärung widerrufen werden kann oder eben nicht. Etwas eigenartig mutet es im Übrigen kann, wenn der Antragsteller Dr Barbara Walch nicht von ihrer Verschwiegenheitspflicht entbindet, ihre «Aussage» dann aber als Beweis anführt (ON 33 S 14). Dass diese Machthäufung zuvor (allenfalls) nie thematisiert wurde (ZV Jerzy Modrejewski in ON 23 S 9), ändert an ihrem Bestehen nichts und mag mit diversen Gründen zusammenhängen. Dass die Machthäufung und befürchtete Angreifbarkeit der Stiftung Thema waren, wurde auch vom Notar Dariusz Wierzchucki in ON 23 S 43 bestätigt.

Dass die Antragsgegner zu 2 – 4 ob dieser Entwicklungen in Sorge waren ergibt sich aus den Aussagen der Antragsgegner selbst wie auch des Jaroslaw Grzesiak in ON 23 S 33 und ist auch nachvollziehbar.

Was die Abläufe vom 31.07.2025 bis 02.08.2024 anbelangt, ist zu festzuhalten, dass der Antragsgegner zu 4 erst ab dem 01.08. dabei war,

207

Jerzy Modrejewski ab dem Nachmittag des 01.08. nur noch telefonisch und Jaroslaw Grzesiak überhaupt nur telefonisch und per E-Mail. Der Antragsteller war bei seiner gerichtlichen Einvernahme aus gesundheitlichen Gründen nicht in der Lage, substantielle Aussagen hierzu tätigen, es kann auf die einleitenden Bemerkungen verwiesen werden (vgl insb ON 24 S 35 ff). Auch zum vom Antragsteller vorgelegten Wortprotokoll (Beilage AV) kann auf die einleitenden Bemerkungen zur Beweiswürdigung verwiesen werden, dass es sich dabei nämlich um eine reine Aneinanderreihung von Suggestivfragen ohne Beweiswert handelt. Aufgrund der unterschiedlichen, sich teilweise auch widersprechenden Aussagen ist es nicht möglich, die Abläufe und Vorgänge rund um die Tage vom 31.07. – 02.08.2024 bis in jedes Detail festzustellen, jedoch der grobe Ablauf.

Was den 31.07.2024 betrifft, ist unbestritten, dass das Testament, die Vollmacht und die Erklärung des Antragstellers besprochen wurden und kann bezüglich des Inhalts auf die Beilagen AY (Erklärung) und 3.32 (Vollmacht) verwiesen werden. Dass die Antragsteller aufgrund dieser Erklärungen und den vorangegangenen Entwicklungen (etwa die Einführung der Widerrufsmöglichkeit und der erfolgte Widerruf ohne Einbezug der Antragsgegner) eine Gefährdung der Stiftung sahen (Machtkonzentration beim Stifter, mögliche Stiftungsanfechtung) und der vereinbarten Nachfolge sahen, ergibt sich aus den glaubhaften und nachvollziehbaren Aussagen der Antragsgegner selbst (PV Antragsgegner zu 2 in ON 22 S 4 ff, 14 f; PV Antragsgegnerin zu 3 in ON 22 S 24 f, 27) und wurde zumindest teilweise auch von Jerzy Modrejewski bestätigt (ZV Jerzy Modrejewski in ON 23 S 12 f), wobei dieser nicht den ganzen Abend (späteres Abendessen) anwesend war und daher nicht sämtliche Gesprächsinhalte mitbekommen hat. Dass die Ablebenserklärung und die Statutenänderung schon in seiner Anwesenheit zumindest «peripher» Thema gewesen sind, hat Jerzy Modrejewski in ON 23 S 13 selbst angegeben.

■ Seite 88 ■

Was den Vormittag des 01.08.2024 anbelangt, widersprechen sich die Aussagen der Antragsgegner und des Jerzy Modrejewski ua hinsichtlich seiner Abreise resp dem Inhalt der Gespräche. Die Antragsgegner geben an, Jerzy Modrejewski habe erklärt, in die Ferien zu fahren, und den Antragsteller gefragt, ob er Einwände habe, was dieser verneint habe. Jerzy Modrejewski hingegen erklärt, die Antragsgegner hätten ihm suggeriert, es bestehe ausreichend Zeit, um die am Vormittag besprochenen Themen nach seiner Rückkehr Mitte Juli zu klären, er könne beruhigt in die Ferien fahren. Der Antragsteller selbst war – wie oben schon ausgeführt – bei seiner Einvernahme nicht in der Lage, konkrete Angaben zu machen. Aufgrund dieser Beweisergebnisse bleibt letztlich offen, wie der konkrete Ablauf war: Festgestellt werden kann jedenfalls, dass Jerzy Modrejewski nur am Vormittag des 01.08. physisch vor Ort war (ua ZV Jerzy Modrejewski in ON 23 S 14). Was den Nachmittag anbelangt, so ergibt sich ua aus den Aussagen des Notars Dariusz Wierzchucki und den insoweit damit übereinstimmenden Aussagen der Antragsgegner, dass die Antragsgegnern gegenüber dem Antragsteller ihre Besorgnis über eine mögliche Anfechtbarkeit der Stiftung aufgrund der Machkonzentration beim Antragsteller ausdrückten und man in der Folge so verblieb, dass die Antragsgegner auf den nächsten Tag Vorschläge für Statutenänderungen vorbereiten sollten. Dass er diese Dokumente Dariusz Wierzchucki zukommen liess, dieser sie aber weil schon 23 Uhr - nicht mehr ansah hat Dariusz Wierzchucki selbst ausgesagt (ZV Dariusz Wierzchucki in ON 23 S 43).

Was den 02.08.2024 anbelangt, so stützen sich die entsprechenden Feststellungen insbesondere auf die glaubhaften Aussagen der Antragsgegner zu 2 – 4 in ON 22 und ON 35 und des Jaroslaw Grzesiak in ON 21, die nachvollziehbar und in sich stimmig waren und in grossen Teilen auch vom Notar Dariusz Wierzchucki bestätigt wurden. So bestätigte dieser ua, dass die Antragsgegner zu 2 – 4 aufgrund der Machtkonzentration beim Antragsteller befürchteten, dass die Stiftung anfechtbar sein könnte, und dies dann entsprechend diskutiert wurde (ON 23 S 43). Auch, dass der Antragsteller gewisse Anpassungen

209

■    Seite 89    ■

wünschte, die dann auch vorgenommen wurden (ON 23 S 44 f). *Auch
erklärte er, dass der Antragsteller gewisse Anpassungen gewollte habe,
von denen er nach Besprechung mit dem Antragsgegner zu 2 wieder
zurückgetreten sei (ON 24 S 10).* Widersprüchlich und nicht
nachvollziehbar ist dann allerdings seine Aussage, er habe die
Statutenänderung nicht mit dem Antragsteller besprochen resp wisse er
nicht, ob diese überhaupt mit dem Antragsteller besprochen worden
seien – so hat Dariusz Wierzchucki in ON 23 S 45 nämlich selbst
angegeben, dass er auf Bitte des Stifters Änderungen bei der
Statutenänderung vorgenommen resp veranlasst habe, etwa das
Ausstreichen von Leerzeilen, die Ergänzung des Namens etc. Wie das
gehen soll, wenn mit dem Antragsteller inhaltlich nicht über die
Statutenänderung gesprochen wurde, erschliesst sich dem Gericht nicht.
Insgesamt bestehen für das Gericht keine Zweifel, dass sich die Dinge so
zutragen haben, wie von den Antragsgegnern geschildert.

Dass sich der Antragsteller bei Unterzeichnung der Statutenänderung,
der Ablebenserklärung und dem Umlaufbeschluss des Inhalts und der
Folgen dieser Erklärungen vollumfänglich bewusst war, ergibt sich schon
daraus, dass der Antragsteller von sämtlichen Zeugen und Parteien als
willens- und durchsetzungsstarke Person, die keine Widerstand zulässt und
die man nicht unter Druck setzen kann, beschrieben wurde und keinerlei
Hinweise vorliegen, dass der Antragsteller am 02.08.2024 in seiner
Urteilsfähigkeit resp Handlungsfähigkeit eingeschränkt gewesen wäre;
ganz im Gegenteil, ansonsten hätte der Notar Dariusz Wierzchucki den
Notariatsakt betreffend die Ablebenserklärung nicht aufgenommen.
Diese Massnahmen resp generell der „Change of control" und gerade
auch der Art 13 der Statuten waren zudem schon seit Monaten und
immer wieder Thema. Es ist daher nicht vorstellbar, dass der Antragsteller
die (im Übrigen nicht sehr umfangreichen) Statuten seines
„Lebenswerkes" (wie allgemein vorgebracht) nicht kennen sollte resp
sich diesbezüglich hätte täuschen lassen oder etwas unterzeichnet hätte,
was nicht seinem Willen entsprochen hätte. Das er die Erklärungen am

■    Seite 90    ■

nächsten Tag aus welchen Gründen auch immer allenfalls bereut hat, steht auf einem anderen Blatt.

Was die entsprechenden Negativfeststellungen (betreffend Täuschung und Unterdrucksetzung) anbelangt, ist noch einmal darauf hinzuweisen, dass alle den Antragsteller als sehr willens- und durchsetzungsstarke Person beschrieben haben, so hat ich Dariusz Wierzchucki als «eine Person mit einem sehr starken Charakter, mit einer starken Persönlichkeit, der vorausschauend agiert und einen starken Geschäftssinn hat» beschrieben; weiter «Er hat starke Führungsqualitäten, wiewohl er wenig Widerstand zulässt, aber er hört auf seine Berater. Er hat immer eine Person gegeben, die eigenständig und endgültig alleine entscheidet.» (ON 23 S 39). Auch Jerzy Modrejewski hat bspw ausgesagt: «Den Antragsteller kann man nicht unter Druck setzen, va nicht sein Rechtsberaten» (ON 23 S 6). Tomasz Szelag hat ihn wie folgt beschrieben: «Der Antragsteller als Privatperson ist eine weiche und sehr rührselige Person, insbesondere in familiären Angelegenheiten. Der Antragsteller als Unternehmer und als Chef ist eindeutig ein harter Kerl mit einer starken Vision und strategischem Denken. Dank dessen hat er geschäftlich erreicht, was er erreicht hat. Ich scherze immer, dass ich zwar ein Doktorat in Wirtschaftswissenschaften habe, einen so harten Führungsstil wie der Antragsteller habe ich jedoch in keinem Lehrbuch gelesen.» (ON 35 S 14). Dass eine solche Person wie der Antragsteller, die – wie sich auch an den Verhandlungstagen und bei der gerichtlichen Einvernahme des Antragstellers gezeigt hat – umgeben ist von x Rechtsanwälten und Beratern, sich von seinen Kindern in Bezug – wie von allen immer betont – auf sein «Lebenswerk» und seine Rechte täuschen lässt, ist schlicht nicht vorstellbar, zumal sich der Antragsteller und die Antragsgegner – wie bspw von Dariusz Wierzchucki in ON 24 S 15 oder von Jaroslaw Grzesiak in ON 21 S 38 auch bestätigt wurde - unter Beizug ihrer Juristen schon seit Jahren mit der Thematik des Mechanismus des Art 13 und des Kontrollüberganges beschäftigten und austauschen. Und zuletzt sind die Statuten der Antragsgegnerin zu 1 auch relativ überschaubar und übersichtlich und ist davon auszugehen, dass der

211

Antragsteller sehr genau über seine – ihm ja so wichtigen – Rechte und deren Verortung Bescheid wusste.

Was die Feststellungen zu den Vorgängen ab dem 03.08.2024 (Stillhaltevereinbarung, Anfechtungserklärung, Abberufung und Bestellung neuer Stiftungsräte durch den Antragsgegner zu 2, Widerruf der Ablebenserklärung, Warnschreiben, Statuten- und Beistatutenänderungen) anbelangt, so basieren diese auf den jeweils in Klammern genannten unbedenklichen Urkunden und sind auch weitestgehend unstrittig.

5.  **Rechtlich** ist wie folgt zu erwägen:

Wie eingangs angeführt, ist zwischen den Parteien strittig, welche Stiftungsdokumente derzeit Geltung haben und wem aufgrund dessen welche Rechte zukommen, dabei ist insbesondere strittig, ob die vom Antragsteller am 02.08.2024 abgegebenen Erklärungen (Statutenänderung, Ablebenserklärung und Zustimmung zum Umlaufbeschluss) wirksam zustande gekommen sind und ob diese nachträglich wirksam widerrufen oder abgeändert werden konnten.

Irrtum und (arglistige Täuschung)

Seitens des Antragstellers wird hierzu vorgebracht, der Antragsteller sei bei Abgabe der Erklärungen vom 02.08.2024 einem beachtlichen Erklärungsirrtum unterlegen: Die wahre Absicht des Antragstellers sei es gewesen, die Kontrolle über die Antragsgegnerin zu 1 zu behalten, insbesondere seine Rechte zur Bestellung und Abberufung von Stiftungsratsmitgliedern, wohingegen der Inhalt dieser Erklärungen mit seiner Absicht in eklatantem Widerspruch stünden, da sie die Rechtsposition des Antragstellers erheblich beeinträchtigten bzw seine Rechte in Bezug auf die Stiftung erheblich einschränkten. Dazu komme, dass der Bedeutungsinhalt der vorgenommenen Statutenänderungen auf Basis der unterfertigten Erklärungen deshalb auch für den

Antragsteller nicht erkennbar gewesen seien, da insbesondere keine konsolidierte Fassung der Statuten (samt den eben neu beschlossenen Änderungen) der Erklärung angeschlossen gewesen seien.

Vielmehr sei die dem Antragsteller vorgelegte Erklärung absichtlich täuschend gestaltet worden; jene Erklärung, mit denen Rechte des Antragstellers beschnitten oder aufgehoben werden sollten, seien textlich so gestaltet worden, dass nur die Artikelbezeichnung in der Erklärung enthalten gewesen seien (ohne den Inhalt der zu löschenden Artikeln abzubilden). Im Gegensatz dazu habe die Erklärung vorgegeben, es werde ein (angeblich) neuer Art 13 (2) 3 hinzugefügt, in welchem gewisse Rechte des Stifters festgelegt worden seien. Dabei sei aber nicht darauf hingewiesen worden, dass dies bloss Rechte des Klägers betroffen habe, die in den Statuten ohnehin bereit, allerdings von der unmittelbar im Absatz davor erklärten Löschung betroffen gewesen seien. Ein redlicher Erklärungsverfasser hätte in so einem Fall die Löschungen schlicht nicht vorgenommen. Die Vorgangsweise, bestehende Rechte zu löschen und sie im nächsten Atemzug als angebliche neue Rechte neu hinzufügen, belege den Täuschungsvorsatz der Antragsgegner zu 2 - 4.

Der Antragsteller habe bei der Abgabe der Erklärungen vom 02.08.2024 offensichtlich eine konkrete, wesentlich abweichende Vorstellung davon gehabt, welchen Inhalt seine Erklärungen hatten und welche Rechtsfolge damit in Gang gesetzt werden. Er sei der Überzeugung gewesen, dass er damit seine Rechte als Stifter unverändert beibehalte. Es liege somit ein klassischer Erklärungsirrtum vor. Dieser Irrtum sei durch die Antragsgegner zu 2 – 4 veranlasst bzw adäquat verursacht worden, in dem sie dem Kläger die vorgefertigten Erklärungen vorgelegt und diesen zur Unterfertigung derselben gedrängt hätten. Bereits auf dieser Grundlage werde klar, dass ihr Vertrauen auf die Gültigkeit der Erklärung nicht schutzwürdig sei. Obendrein hätte der Irrtum des Antragsteller den Antragsgegner zu 2 -4 auf offenbar auffallen müssen, dass diese in voller Kenntnis des Inhalts der Erklärungen gewesen seien und die Abweichung

vom erklärten Willen des Antragstellers für diese einfach zu erkennen gewesen wäre. Den Stiftungsräten sei der Irrtum des Klägers rechtzeitig mitgeteilt worden, davor hätten die Stiftungsräte nach Kenntnis des Antragstellers keine relevanten Verfügungen im Vertrauen auf die Erklärungen des Antragstellers gesetzt. Der Irrtum sei auch wesentlich, da der Antragsteller die Erklärungen bei Kenntnis ihrer tatsächlichen Bedeutung so nicht hätte abgeben können.

Es liege auch Arglist vor: Es sei für die Antragsgegner zu 2 – 4 erkennbar gewesen, dass der Antragsteller einen Irrtum unterlegen sei. Indem sie den Antragsteller durch Ausnutzung des familiären Vertrauens zur Unterfertigung der Erklärung vom 02.08.2024 gedrängt hätten, hätten sie diesen Irrtum beim Antragsteller veranlasst und bewusst ausgenutzt.

Diese Auffassung des Antragstellers findet im festgestellten Sachverhalt keine Stütze, vielmehr waren dem Antragsteller bei Unterzeichnung der Erklärungen vom 02.08.2024 festgestelltermassen sowohl der Inhalt wie auch die Folgen dieser Erklärungen (Statutenänderung, Ablebenserklärung und Umlaufbeschluss) bewusst und entsprachen sie seinem Willen. Es liegen somit weder ein beachtlicher Grundlagenirrtum noch Arglist vor (§§ 870 ABGB).

Statutenänderungsrecht

Weiter     führt der Antragsteller aus, dass, selbst wenn man unrichtigerweise davon ausgehe, dass sowohl die Erklärungen vom 02.08.2024 wirksam als auch der Widerruf der Ablebenserklärung unwirksam wären, dies zu keinem anderen Ergebnis führe:

Unstrittigerweise sei das in den Statuten in Art 13 (2) 1 verankerte Änderungsrecht des Antragstellers von den inkriminierten Erklärungen vom 02.08.2024 nicht betroffen. Schon nach dem Wortlaut der Bestimmung sei eine Änderung solange möglich, als der Stifter am Leben sei ("zu seinen Lebzeiten"). Anders, als andere Bestimmungen das Statuts,

214

Seite 94

handle es sich nicht um eine solche, die "nach dem Tod" des Klägers in Kraft treten solle (etwa Art 6 der Statuten), worauf die Ablebenserklärung aber abziele. Überdies gebe es zu dieser Bestimmung gerade keine solche, die an ihrer Stelle (im Ablebensfall) in Kraft treten solle, wie das wiederum bei anderen Bestimmungen der Fall sei (etwas in Art 6 (3) b der Statuten). Darüber hinaus würden die Statuten penibel genau zwischen Rechten, die zu Lebzeiten entstehen und mit amtlicher Todeserklärung erlöschen, also dem tatsächlichen Ableben des Klägers, und solchen Rechten, auf die der Stifter bereits mit Ablebenserklärung (widerrufbar) verzichten kann, unterscheide. So unterscheide etwa Art 6 der Statuten ausdrücklich zwischen diesen beiden Varianten (so in Art 6 (3) a: "Ab dem Todestag oder ab dem durch den Stifter in der in Art. 13 (2) 2 der Statuten genannten Erklärung festgelegten Datum."). "Zu seinen Lebzeiten" im Sinne des Art 13 könne daher bei systemkonformer Interpretation der Statuten nur so verstanden werden, dass dieses Recht erst mit dem tatsächlichen Ableben (und dem Nachweis desselben mittels eines amtlichen Dokuments im Sinne einer Sterbeurkunde des Stifters erlöschen könne). Schliesslich sei nach dem ausdrücklichen Wortlaut der Statuten die Ablebenserklärung nicht darauf gerichtet, in jedem Fall "für immer" zu gelten, zumal sich der Kläger den jederzeitigen Widerruf und die Abänderung derselben vorbehalten habe. Bei wortlautgetreuer, systematischer und nach dem Willen des Antragstellers als Stifter orientierter Auslegung könne Art 13 (2) 1 in Verbindung mit der Ablebenserklärung nur so verstanden werden, dass das Änderungsrecht auch dann aufrecht bleibe, wenn er eine Ablebenserklärung an die Stiftung richte.

Dieser Rechtsauffassung des Antragstellers ist nicht zu folgen:

Das Statutenänderungsrecht des Antragstellers in Art 13 (2) 1 der Statuten vom 29.10.2018 (auch vom 29.11.2023) umfasste auch das Recht, Art 13 (2) 2 (iii) ersatzlos aufzuheben:

215

Seite 95

Das Statutenänderungsrecht behielt sich der Antragsteller bereits in Art 13 (3) der Gründungsstatuten vom 07.03.2012 vor. Art 13 (1) dieser Statuten erklärte (nur) Art 5 über die Zweckbestimmung für unabänderlich.

Art 13 der Statuten wurde in der Folge über Veranlassung des Antragstellers mehrfach abgeändert. Das Statutenänderungsrecht selbst erfuhr jedoch keine Einschränkung, insbesondere wurden keine Statutenbestimmungen für unabänderlich erklärt (hingegen schon einige Bestimmungen betreffend die Beistatuten).

Art 13 (2) 2 (iii) der Statuten vom 10.08.2023 (auch vom 29.11.2023) besagte nur, dass das Recht des Stifters zum Widerruf oder zur Änderung einer bereits abgegebenen Ablebenserklärung unwiderruflich ist. Das bedeutete, dass der Stifter gemäss dieser Statutenbestimmung nicht ausserstatutarisch, etwa im Rahmen einer Ablebenserklärung selbst oder irgendwann danach, auf dieses Widerrufsrecht wirksam verzichten können sollte. Es bedeutete jedoch nicht, dass diese Statutenbestimmung, die nur für den Fall einer bereits abgegebenen Ablebenserklärung Anwendung findet, selbst unabänderlich ist und dass der Stifter damit sein Statutenänderungsrecht beschneiden wollte; solches wurde in den Statuten schlicht nicht angeordnet, auch nicht im äusserst möglichen Sinn des Wortlauts der Statuten, und es gibt auch keine Anzeichen für einen solchen extremen Stifterwillen, der jede künftige Sicherung des Stiftungsvermögens und jeden Kontrollwechsel zu seinen Lebzeiten verunmöglicht hätte.

Damit ist klar, dass der Antragsteller am 02.08.2024 materiell und formal wirksam die Statuten, einschliesslich des Entfalls von Art 13 (2) 2 (iii) (und Unterpunkt iv), abänderte, bestätigt durch einen gleichlautenden Beschluss des Stiftungsrats, und danach mit sofortiger Wirkung anordnete, dass die Statutenbestimmungen so angewendet werden, als ob er bereits verstorben wäre, mit Ausnahme der in Art 13 (2) 3 der Statuten vom 02.08.2024 angeordneten Sonderrechte.

Seite 96

Daraus folgt, dass es keine materielle oder formale Grundlage für einen Widerruf der Erklärungen des Antragstellers vom 02.08.2024, einschliesslich seiner "Ablebenserklärung", gab.

Ebenso wenig gab es eine materielle oder formale Grundlage für eine Neufassung der Statuten durch den Antragsteller nach dem 02.08.2024. Mit der gemäss Art 13 (2) 2 der Statuten vom 29.11.2023 wirksamen Ablebenserklärung vom 02.08.2024 verzichtete der Antragsteller auf die Möglichkeit der Ausübung von statutarischen Stifterrechten, einschliesslich des Rechts auf Abänderung der Statuten gemäss Art 13 (1) der Statuten. Das folgt ebenfalls klar aus dem Wortlaut der Statuten, die jeweils festlegen, welche Rechte der Stifter "zu seinen Lebzeiten" hat (z.B. das Änderungsrecht gem Art 13 (2) 1), während er mit der Ablebenserklärung die Anwendung der Bestimmungen, wie sie "zu seinen Lebzeiten" angewendet werden, ablehnt (Art 13 (2) 2 (i)).

Genau diese Rechtsfolge entsprach dem über längere Zeit vorbereiteten, bewussten Schritt des Antragstellers vom 02.08.2024. Damit ist seinem Antrag der Boden entzogen und sind die Erklärungen vom 02.08.2024 (Statutenänderung, Ablebenserklärung und Umlaufbeschluss) rechtswirksam. Insbesondere hat der Antragsteller mit der Statutenänderungserklärung vom 02.08.2024 gültig und wirksam Art 13 (2) 2 (iii) und (iv) aus den Statuten gestrichen und damit insbesondere die vorherige (allfällige) Möglichkeit zum Widerruf einer abgegebenen Ablebenserklärung gültig und wirksam ausgeschlossen. Mit dieser Ablebenserklärung ist der Antragsteller in der Folge sein (Stifter-)Recht und damit insbesondere auch sein Statutenänderungsrecht endgültig verlustig gegangen, sodass die am 19.08.2024, am 20.08.2024 und am 24.09.2024 vorgenommenen Statutenänderungen (wie auch allfällige weitere nach dem 02.08.2024 vorgenommene Statutenänderungen) unwirksam geblieben sind.

Der Vollständigkeit halber

217

■ Seite 97 ■

Selbst wenn von der Unwirksamkeit der Erklärungen vom 02.08.2024 ausgegangen würde, wäre die Streichung der Antragsgegner zu 2 - 4 als Zweitbegünstigte in Art. A. II. 1. in der Fassung der Beistatuten vom 24.09.2024 (Beilage AK) jedenfalls nichtig und der diesbezügliche Antrag des Antragstellers abzuweisen.

Dies aus folgenden Gründen: Die TiVi Foundation ist eine privatnützige Familienstiftung. Gemäss Art 2 Satz 1 der Statuten vom 07.03.2012 (und der nachfolgenden Statuten) handelt es sich bei der TiVi Foundation um eine "Familienstiftung". Der Zweck einer Familienstiftung wird durch Art 5 (1) und (2) der Statuten bestätigt.

Die Begünstigten werden unter Beachtung dieser durch Art 5 gesetzten Zweckschranken vom Stifter festgelegt (vgl Art 6 (3) der Statuten). Die Stiftung ist zudem auf unbestimmte Dauer errichtet (Art 3 der Statuten). Der Zweck gemäss Art 5 der Statuten vom 07.03.2012 ist ein rein privatnütziger.

Der Stifter hat sich kein Zweckänderungsrecht vorbehalten. Gemäss Art 13 (1) HS 1 der Statuten vom 07.03.2012 war Art 5 der Statuten (Zweck) unabänderlich. Art. 5 der Statuten war daher vom Statutenänderungsrecht des Stifters explizit ausgenommen.

Eine (objektive) Auslegung der Stifterrechte führt daher zu dem eindeutigen Ergebnis, dass das Änderungsrecht des Stifters, wie es in den ursprünglichen Statuten vorbehalten war, nicht auch den Stiftungszweck erfasste. Der Charakter als Familienstiftung war daher unabänderlich. Eine Familienstiftung ist dadurch charakterisiert, dass sie generationenübergreifend und auf Dauer angelegt ist.
Erst seit der Statutenfassung vom 29.10.2018 ist das Statutenänderungsrecht - seinem Wortlaut nach - unbeschränkt. Das Statutenänderungsrecht wurde daher mit Erlassung der Statuten vom 29.10.2018 nachträglich - unzulässig - inhaltlich erweitert.

Diese Ausdehnung des Änderungsrechts - die Unabänderlichkeit des Zwecks wurde fallen gelassen - ist unzulässig. Nach Lehre und Rechtsprechung kann ein vorbehaltenes Änderungsrecht zwar nachträglich eingeschränkt, nicht aber erweitert werden. Aus diesem Grund erfasste das Änderungsrecht des Stifters zu keinem Zeitpunkt ein Recht zur Zweckänderung.

Die vom Stifter nunmehr in den Beistatuten vom 24.09.2024 vorgenommene Einsetzung der gemeinnützigen Polsat Stiftung als Zweitbegünstigte war und ist eine unzulässige Zweckänderung, weil Art 5 die Verfolgung gemeinnütziger Zwecke nicht zulässt. Gemäss den Beistatuten vom 24.09.2024 soll der Zweck der Stiftung nach dem Ableben des Stifters nicht mehr der einer privatnützigen Familienstiftung sein (Begünstigung der Kinder des Stiftes und deren Nachkommen), sondern ein gemeinnütziger. Diese Zweckänderung ist vom Änderungsrecht des Stifters offensichtlich nicht gedeckt.

Selbst wenn man dem Stifter, entgegen den vorherigen Ausführungen aufgrund des Wortlauts des Art 13 (2) Satz 1 idF der Statuten vom 29.11.2023, unrichtig ein inhaltlich unbeschränktes Statutenänderungsrecht zugestehen wollte - und jegliche Änderung nach dem 02.08.2024 nicht ohnedies aufgrund des Verzichts auf das Statutenänderungsrecht für unwirksam ansehen möchte - so wäre die vorgenommene Änderung der Zweitbegünstigten dennoch aus folgendem Grund unwirksam.

In den Beistatuten vom 29.11.2023 wurde in A. II. 9 festgelegt, dass der Stifter keine neuen Personen zusätzlich zu den in A. II. genannten Zweitbegünstigten ernennen darf. Damit war die Erweiterung des Personenkreises der Zweitbegünstigten auf andere Personen als die Kinder und deren Nachkommen jedenfalls ausgeschlossen, selbst wenn diese Personen vom privatnützigen Stiftungszweck erfasst bzw zur Familie des Stifters gehörten (vgl Art 1 Satz 1 iVm Art 4 der Statuten).

219

Seite 99

Aus dieser Bestimmung ergibt sich aber, dass - wenn überhaupt - nur Änderungen innerhalb des Kreises der Zweitbegünstigten zulässig sein sollten und nicht sämtliche Zweitbegünstigte und ihre Nachkommen als Begünstigte gestrichen werden dürfen.

Diese Auslegung ist schon deshalb zwingend, weil der Stifter andernfalls (durch Ausschluss sämtlicher Zweitbegünstigter) den privatnützigen Zweck der Familienstiftung - für die Zeit nach seinem Ableben - ändern bzw gänzlich vernichten würde (was letztlich die Auflösung der auf Dauer angelegten Familienstiftung zu Folge hätte). Ein Ausschluss der Antragsgegner zu 2 bis 4 und deren Nachkommen als Zweitbegünstigte ist daher unabhängig davon unzulässig, ob ein solcher Ausschluss die Auflösung der Stiftung zur Folge hätte oder die gemeinnützige Polsat Stiftung zur Begünstigten eingesetzt wird.

Die Ersetzung der Zweitbegünstigten durch die Polsat Stiftung widerspricht jedenfalls sowohl Art 4 (Zweck) der Statuten vom 29.11.2023 als auch den soeben zitierten Beistatutenbestimmungen. Durch die Einsetzung der Polsat Stiftung wurde der privatnützige Zweck ab einem bestimmten Zeitpunkt (Ableben des Erstbegünstigten) unzulässigerweise in einen gemeinnützigen geändert.

Der Antragsteller behauptet ausserdem, nachträglich eine Verwirkungsklausel in die Statuten eingefügt zu haben. Dies ist bereits deshalb unzulässig, weil er zu diesem Zeitpunkt - wie ausgeführt - bereits wirksam auf sein Statutenänderungsrecht verzichtet hatte.

Mit Schreiben vom 19.09.2024 warf der Antragsteller den Antragsgegnern vor, durch ihr Verhalten angeblich gegen die - ohnedies nicht wirksam in die Statuten eingefügte - Verwirkungsklausel verstossen zu haben, und forderte sie auf, ihre Rechte nicht weiter auszuüben.

Die Rechtsverteidigung in einem - vom Stifter eingeleiteten - Stiftungsaufsichtsverfahren fällt nicht unter die, ohnedies nicht wirksam


Seite 100

eingefügte, Verwirkungsklausel. Ein solches Verfahren ist auf Wahrung und Durchsetzung des Stiftungszwecks gerichtet und daher nicht sanktionswürdig.

Jedenfalls Klagen bzw Anträge wegen Feststellung der Begünstigtenstellung an sich, Auskunftsbegehren nach Art. 552 § 9 PGR oder Anträge an das Gericht wegen Abberufung von Stiftungsorganen wegen grober Pflichtverletzung werden aus dem Anwendungsbereich von Verwirkungsklauseln auszunehmen sein. Damit wird die Verwirkungsklausel mehr auf den eigentlichen Sinn beschränkt, nämlich auf die Absicherung gegen eine Bestreitung des Stifterwillens mit Bezug auf die Begünstigungsanordnungen.

Im Übrigen ist darauf hinzuweisen, dass bereits die Berufung auf eine solche Klausel  - vor dem Hintergrund der bekannten Umstände-als mutwillig zu qualifizieren ist (LES 2011, 184). Dementsprechend handelt mutwillig, wer Prozesshandlungen vornimmt, obwohl er bei gehöriger Aufmerksamkeit erkennen muss, dass sein Standpunkt evident aussichtslos oder der Gegenseite Schaden zufügen kann (vgl. Klauser/Kodek, JN-ZPO[18], § 408 ZPO E 13 und 16; JBl 1993, 394; wobl 2004/17). Der Antragsteller bedient sich der Verwirkungsklausel in voller Kenntnis ihrer Unwirksamkeit und der tatsächlichen Rechtslage allein zu dem Zweck, die Antragsgegner unter Druck zu setzen.

Selbst wenn man von der Wirksamkeit der Verwirkungsklausel ausgehen wollte, gibt es keine Rechtfertigung dafür, auch die Nachkommen der Zweitbegünstigten als zukünftige Begünstigte auszuschliessen, zumal ein solcher Ausschluss der Nachkommen vom Wortlaut der Verwirkungsklausel auch gar nicht gedeckt ist (LES 2014, 65). Zudem haben diese überhaupt kein Verhalten im Zusammenhang mit der Stiftung gesetzt, sodass eine Verwirkung per se ausgeschlossen ist und wäre damit eine - unzulässige -Änderung von einer privatnützigen Familienstiftung zu einer gemeinnützigen Stiftung verbunden.

221

 Seite 101

Insgesamt ist daher spruchgemäss zu entscheiden.

Die von den Antragsgegnern richtig verzeichneten Kosten sind bei diesem Ausgang des Verfahren vom Antragsteller zu tragen und in der beantragten Höhe zu bestimmen (Art 78 AussStrG).

Fürstliches Landgericht
Vaduz, 19.05.2025
Diana Kind
Fürstliche Landrichterin
Für die Richtigkeit der Ausfertigung



Sidonia Aggeler

222

Seite 102

# Rechtsmittelbelehrung

Gegen diesen Beschluss ist binnen der unerstreckbaren Frist von 4 Wochen ab Zustellung das Rechtsmittel des Rekurses an das Fürstliche Obergericht in Vaduz zulässig. Der Rekurs ist schriftlich in zweifacher Ausfertigung beim Landgericht einzubringen. Er kann von Parteien, die nicht durch einen Rechtsanwalt vertreten sind, auch mündlich zu Protokoll erklärt werden. Der Rekurs hat die Bezeichnung der Sache, Vor- und Familiennamen und Anschrift des Rekurswerbers und die Bezeichnung des Beschlusses zu enthalten, gegen den er erhoben wird. Der Rekurs muss kein bestimmtes Begehren enthalten, aber hinreichend erkennen lassen, aus welchen Gründen sich die Partei beschwert erachtet und welche andere Entscheidung sie anstrebt (Rekursbegehren); im Zweifel gilt der Beschluss, gegen den Rekurs erhoben worden ist, als zur Gänze angefochten.

Termin vorgemerkt:

18.06.25

Visa

Termin vorgemerkt:

(GS) 18.06.25

Visa

223