# Exhibit D



PRINCIPALITY OF LIECHTENSTEIN
**PRINCELY**
# COURT OF JUSTICE

[stamp:] GASSER PARTNER
REC. 05/30/25 08:50 AM

Please always quote the file number
<u>06 HG.2024.133</u>
ON 127

# OFFICIAL ORDER

## Non–Contentious Matter

| | |
|---|---|
| **Applicant:** | **Zygmunt Jozef Solorz** <br> ███████████████ <br> represented by Schurti Partners Rechtsanwälte AG, Zollstrasse 2, 9490 Vaduz and by Pitkowitz & Partners Pitkowitz Rechtsanwälte GmbH, Schwarzenbergplatz 3, AT-1010 Vienna (Schurti Partners Rechtsanwälte AG as authorized recipient pursuant to Art. 82 para. 1 RAG, *Rechtsanwaltsgesetz* [Lawyers Act of Liechtenstein]) |
| **Respondents:** | **1. Yaroslaw Grzesiak** <br> ███████████████ <br> represented by Oberhuber Jenal Rechtsanwälte AG, Wuhrstrasse 14, LI-9490 Vaduz |
| | **2. Tomasz Szelag** <br> ███████████ represented by Niedermüller Rechtsanwälte, Werdenbergerweg 119490 Vaduz |
| | **3. Piotr Mateusz Zak** |

Page2



represented by Roth + Partner Rechtsanwälte
AG, Landstrasse 40, P.O. Box 408, 9495 Triesen

**4.  Aleksandra Jadwiga Zak**



represented by Gasser Partner Rechtsanwälte
AG, Feldkircherstrasse 31, 9494 Schaan

**5.  Tobias Markus Solorz**



represented by Marxer & Partner
Lawyers, Holy Cross 6, 9490 Vaduz

**Legal entity:**              **TiVi Foundation** (FL-0002.394.367-5)
Kirchstrasse 12, 9490 Vaduz
represented by Knight Schierscher
Rechtsanwälte AG, Gewerbeweg 5, 9490 Vaduz

**on the grounds of:**           Foundation supervision
(CHF 30,000.00)

1.    **The motions of the Applicant seeking temporary injunctive relief** with the
following content:

1    **The Office of Justice, Commercial Register Division, is <u>prohibited</u> from accepting,
filing, executing, or issuing official confirmations based on notifications of
changes (in particular those dated March 20, 2025, filed by letter dated April 9,
2025) with regard to the legal entity in question, TiVi Foundation, insofar as this**

257

relates to the appointment of Mr. Jaroslaw Grzesiak as a member of the foundation board of the said foundation.

2    The Respondent as per 1 (against whom a temporary injunction is sought), Mr. Jaroslaw Grzesiak, is **prohibited** from acting as a member of the foundation board for the legal entity in question, TiVi Foundation, or from authorizing or obligating it to act in legal transactions (solely or jointly with other members of the foundation board), and the legal entity in question, TiVi Foundation, is also prohibited from allowing Mr. Jaroslaw Grzesiak to represent it externally as a member of the foundation board.

3    The applicant must initiate legal proceedings to remove Mr. Jaroslaw Grzesiak as a member of the foundation board of the TiVi Foundation within four weeks of being notified of this official order, failing which this protective measure will cease to be effective.

are hereby **rejected**.

2.    The Applicant is obliged to pay the Respondent as per 1 the costs of the proceedings, determined at CHF 1,108.80, the Respondent as per 3 the costs of the proceedings, determined at CHF 1,198.61, the Respondent as per 4 the costs of the proceedings, determined at CHF 1,108.80, and the Respondent as per 5 the costs of the proceedings, determined at CHF 1,108.80, in each case payable to the designated legal representatives.

# Grounds

1.    As a preliminary remark, it should be noted that various legal proceedings are pending in court concerning the TiVi Foundation, with the main point of contention between the Applicant and the Respondents as per 3–5 being which foundation documents relating to the TiVi Foundation are currently valid and who is entitled to which rights on that basis.

Page4

In the present proceedings HG.2024.133, the following decision was made by official order dated October 26, 2024 (ON 71):

The Princely Court of Justice, in its capacity as supervisory court, issues the following official order (Art. 276 et seq EO, *Exekutionsordnung* [Enforcement Order, Act on Enforcement and Injunctive Relief Proceedings of Liechtenstein]) to protect the legitimate interests of the TiVi Foundation:

1.  [...].
2.  [...]
3.  Peter Schierscher, attorney-at-law, Gewerbeweg 5, 9490 Vaduz, is appointed as deputy for the TiVi Foundation in accordance with Art. 190 para. 1 PGR (*Personen- und Gesellschaftsrecht* [Liechtenstein Persons and Companies Act]). The deputy shall replace the chairman of the foundation board, whereby the articles of association shall be amended for the duration of the deputy's appointment such that the following provisions shall now read as follows:

    Art. 7 (1) b Resolutions may be passed at meetings of the foundation board or by circular letter, whereby resolutions passed by circular letter require the agenda covered by the resolution to be served to all members of the foundation board.

    Art. 7 (2) a) Resolutions passed by circular letter require a simple majority and the signatures of at least two members of the foundation board.

    Art. 7 (2) b) The foundation board has a quorum if at least two members are present. Resolutions passed at foundation board meetings require a simple majority and the signatures of at least two members of the foundation board.

    Art. 7 (2) e) The provisions of Art. 7 (2) b do not apply to the appointment and dismissal of members of the Foundation Board in accordance with the rules set out in Art. 7 (7).

    Art. 7 (2) c) and d) are repealed without replacement.

    Article 7 (7) a) Upon receiving information about the death or resignation of member of the foundation board Tomasz Szelag, the chairman of the foundation board shall immediately request the founder, Zygmunt Solorz, and, upon receiving information about the death or resignation of member of the foundation board Katarzyna Tomczuk, Piotr Zak, Aleksandra Zak, and Tobias Solorz, to appoint a new member of the foundation board. The appointment must be made within seven days of the request being served and communicated to the chairman of the foundation board. If the deadline expires without effect, the chairman of the foundation board shall repeat his request. If no appointment is made and no notification is

259

 Page5

sent to the chairman of the foundation board within three days of the second request being served, the chairman of the foundation board shall select and appoint the new member of the foundation board.

Art 7 (7) b) and c) are repealed without replacement.

4.  The current chairman of the foundation board, Philipp Ulrich Senn, is being dismissed.  It is expressly stated that the other members of the foundation board, Tomasz Szelag and Katarzyna Tomczuk, are not being dismissed and will remain in office.

5.  All members of the foundation board and the deputy shall sign collectively in pairs, with the proviso that the members of the foundation board Tomasz Szelag and Katarzyna Tomczuk may only sign together with the deputy.

6.  The right of approval granted to the founder as trustee in accordance with Art. 9 of the articles of association in conjunction with Art. IV of the bylaws is suspended for the duration of the deputy's appointment.

7.  Regulation B) III. para. 1 sentence 2 of the bylaws shall be repealed without substitution for the duration of the deputy's appointment.

8.  Zygmunt Solorz, Piotr Zak, Aleksandra Zak, and Tobias Solorz are hereby prohibited from exercising or attempting to exercise any rights as founders and/or secondary beneficiaries; this includes, in particular, any rights to make changes to the articles of association, bylaws, or other documents of the TiVi Foundation, and to appoint and dismiss members of the foundation board.  The right of appointment pursuant to Article 7 (7) a) of the articles of association, as amended by this resolution, is excluded from this prohibition.

9.1  The Office of Justice is instructed to register the removal of Philipp Senn, the appointment of the deputy, and the determination of signing authority, so that the composition of the foundation board/deputy is shown on the TiVi Foundation's official confirmations as follows: Members of the foundation board Katarzyna Tomczuk (joint signing authority with the deputy, attorney Dr. Peter Schierscher) and Tomasz Szelag (joint signing authority with the deputy, attorney Dr. Peter Schierscher) Deputy:  Attorney Dr. Peter Schierscher (joint signing authority)

9.2



Page6

The Office of Justice is further prohibited from making any entries in the commercial register, whether deletions or entries of members of the foundation board or the chairman of the foundation board, with regard to the TiVi Foundation.

10.    [...]

11.    This official order shall remain in force until four weeks after the final conclusion of the proceedings in question <u>and</u> civil proceedings 06 CG.2024.184, unless otherwise ordered by the court.

12.    The costs are mutually offset.

Another procedure relevant to the present proceedings is procedure HG.2024.210. In those proceedings, the court dismissed the Applicant's motions as follows in its decision of May 19, 2025 (ON 39):

1.    The motion as well as the contingent claims of the Applicant of the content:

1    It is hereby established with binding effect between the parties that

a.    the articles of association of TiVi Foundation, FL - 0002.394.367 - 5, as filed with the commercial register, in the version of the notarial deed dated September 24, 2024, recorded and certified by notary Mag.  Alexander Winkler, notary public with registered office in 1180 Vienna, Weimarer Strasse 5, under GZ 1595, as well as the bylaws of the aforementioned foundation in the version of the notarial deed dated September 24, 2024, recorded and certified by the same notary public under GZ 1597, in accordance with Appendixes ./ AJ and ./AK, which form an integral part of this decision, are valid and legally effective;

b.    the Applicant has all rights vis-à-vis the legal entity in question that as founder, primary beneficiary, or trustee in the aforementioned articles of association and bylaws as amended by notarial deed dated September 24, 2024, recorded and certified by Mag. Alexander Winkler, notary public with registered office in 1180 Vienna, Weimarer Strasse 5, under GZ 1595 and GZ 1597, in accordance with the Appendix ./ AJ and ./AK, which form an integral part of this decision, including, <u>in particular,</u>

261

 Page7

i.      the right to issue one or more bylaws or regulations and to determine the beneficiaries (Article 5 para 1 and para 2 of the articles of association);

ii.     the right to appoint or dismiss members of the foundation board and the chairman of the foundation board (Article 6 para. 2 lit. a of the articles of association)

iii.    the right to be the sole trustee of the foundation and, in this capacity, to exercise the rights set out in the articles of association and bylaws, in particular to supervise the foundation board, to have his proposals implemented by the foundation board, to make all decisions of the foundation board subject to his approval as trustee, and to inspect all foundation documents (cf. Article 9. para. 1 of the articles of association, point B), in particular III. and point IV. sub 1) of the bylaws);

iv.     the right to amend the foundation's deed of foundation, the articles of association, and the bylaws during his lifetime (Article 13 para. 2 point 1 of the articles of association);

v.      the right to instruct the foundation board to pay all income from the foundation to him (Article 13 para. 2 point 4 of the articles of association).

in eventu

The articles of association and bylaws of the legal entity in question, TiVi Foundation, FL-0002, filed with the commercial register. 394.367-5, as amended on August 2, 2024, which were amended by the applicant's statements regarding the amendment of the articles of association (certified in Deed A No. 6223/2024) and the "circular resolution" (certified in Deed A No. 6228/2024),

and on the statement pursuant to Article 13 (2) 2. (i) of the articles of association (certified in Deed A No. 6235/2024),

certified under the aforementioned deed number by Dariusz Wlerzchucki, notary in Warsaw, on this day, are declared legally invalid.

in eventu

The statements made by the Applicant on August 2, 2024, to the concerned legal entity registered in the commercial register, the TiVi Foundation, FL-0002.394.367-5,

regarding the amendment of the articles of association to Deed A No. 6223/2024,

regarding the "circular resolution" ref. in Deed A No. 6228/2024),

and those pursuant to Article 13 (2) 2. (i) of the Articles of Association relating to Deed A No. 6235/2024, each notarized on that date with the respective deed number

262

Page8

by Dariusz Wierzchucki, notary in Warsaw, are declared legally invalid.

are hereby <u>rejected</u>.

2.   [...]

The decision has not yet become legally binding.

Member of the foundation board, Katarzyna Tomczuk, resigned in March 2025.  By resolution of the Respondents as per 3–5 dated March 4, 2025, they unanimously appointed Respondent as per 1, Jaroslaw Grzesiak, as a member of the foundation board to replace Katarzyna Tomczuk.

In a notice of change dated March 20, 2025, the Respondent as per 1's signing authority was registered as the presumed successor to member of the foundation board Katarzyna Tomczuk.  The Applicant filed a precautionary objection to the filing of the notice of change with the Office of Justice, Commercial Register Division. Upon receipt of the notice of change, the Office of Justice requested the Applicant to apply for a preliminary injunction against it within fourteen days.

2.   With the motion submitted on April 22, 2025 (ON 111), the **Applicant** requests the issuance of an official order as stated in the ruling. He gives the following reasons:

[...]

1    Initial situation: Recent events relating to the foundation board of the TiVi Foundation

Page9

1    In the present case, the founder has deliberately subjected himself to the regulatory regime that was created by the official order of October 26, 2024 (ON 71). This provisional regulatory order established an organizational structure for the TiVi Foundation (hereinafter: "**foundation**"), which is intended to establish and maintain the foundation's capacity to act and a "<u>balance</u>" for both parties to the dispute. The top priority for the parties and the foundation board is to respect the <u>balance created</u> and not to undermine the <u>peace and equilibrium achieved</u> between the interests of both sides (the founder and his children).

2    Katarzyna Tomczuk, who was originally confirmed in her position by the aforementioned official order, recently resigned as a member of the TiVi foundation board. The founder naturally respects that, in accordance with the provisional regulatory regime that has been agreed upon, the Respondents, i.e., Aleksandra Zak, Piotr Zak, and Tobias Solorz (hereinafter referred to as "**children**"), now have the right to appoint a successor. The children have a wide range of experts to choose from whom they can trust (and who also enjoy their trust).

3    However, it is nothing short of an ironic twist of fate and self-defeating that the children do not draw from this large pool of available candidates but <u>instead want to fill this vacant position with Mr. Jaroslaw Grzesiak.</u>

4    As a reminder: The founder and Mr. Grzesiak had a long-standing contractual, professional, and friendly relationship until the summer of 2024, when these private and professional ties were severed. The professional relationship, from which Mr. Grzesiak earned an annual fee of over EUR 5 million, was terminated by the founder with immediate effect for good cause. Mr. Grzesiak, as the founder's former closest confidant, then openly and clearly expressed his strong personal dislike for the founder and defamed him in the vilest manner during his interrogation in the "main proceedings" before the court and all those present (at times visibly losing his self-control).

5    His questioning also made it clear that Mr. Grzesiak is solely committed to the (financial) interests of the children (and not those of the foundation) in the present dispute, which he is determined to achieve by any means necessary, including unlawful and unfair methods. In doing so, Mr. Grzesiak does not even shy away from making blatantly false statements as a witness under oath—as documented—to the detriment of the founder, negating and deliberately violating his contractual duty of confidentiality agreed upon with the founder.

264

Page10

6    This motion seeks a <u>temporary injunction against the filing of the amendment notice</u> dated March 20, 2025, submitted by BlueRidge Management AG in a letter dated April 9, 2025, with the Office of Justice, Commercial Register Division, which is intended to note the signing authority of Jaroslaw Grzesiak as the presumed successor to Katarzyna Tomczuk, member of the foundation board. This temporary injunction is necessary to secure the founder's right to have Mr. Grzesiak removed from office by the courts, as Mr. Grzesiak cannot and <u>must not exercise the office of a member of the foundation board due to his notorious and ongoing conflict of interest with the founder.</u>

7    Someone like Mr. Grzesiak

- who is in open private and professional conflict with the primary beneficiary,
- who, as a former confidant and lawyer of the primary beneficiary, openly defames him— even in court,
- who, in this role as former confidant and lawyer of the primary beneficiary, has "switched sides" and thereby unlawfully misused knowledge entrusted to him as a confidant to the detriment of the owner of that knowledge in order to gain unfair "advantages" in the conflict between the beneficiaries on the other side (the children),
- who falsely claims that the primary beneficiary owes him "millions,"
- who deliberately breaks the confidentiality agreements made with the primary beneficiary in order to take sides with the opposing party of the holder of the secret in the conflict between father and children,
- who also breaks this confidentiality obligation vis-à-vis the foundation,
- who testifies in court to documented falsehoods, and

■    Page11    ▮

- who has or will have pending court proceedings in Poland worth millions between himself and the primary beneficiary, which are likely to take years,

cannot hold office as a member of the foundation board in this very foundation, which is the subject of the dispute.  Such a multitude of conflicts of interest—even if they lie outside the foundation's organization—constitute an <u>good cause</u> for dismissing this member of the foundation board, because the pursuit of the foundation's purpose <u>cannot be guaranteed with sufficient certainty</u> if Mr. Grzesiak <u>implements</u> the beneficiary arrangement envisaged by the founder. The founder's right to and interest in injunctive relief, as well as the threat to this relief, are therefore evident.

8    The founder filed a precautionary objection to the filing of the notice of change with the Office of Justice, Commercial Register Division. Upon receipt of the notice of change, the Office of Justice requested the founder to apply for a preliminary injunction against it within fourteen days. This, together with securing the founder's right to dismiss Mr. Grzesiak and safeguarding the welfare and interests of the foundation, also form the subject of this provisional motion.

2    In detail, the misconduct of Mr. Jaroslaw Grzesiaka

a)    Ongoing serious personal rift and ongoing dispute between Mr. Grzesiak and the founder

9    According to his own statements, the founder and Mr. Grzesiak had a close professional and friendly relationship for many years. The founder considered him his closest friend.  Mr. Grzesiak's (or his law firm's) core professional tasks since 2007 had primarily been to provide capital market law advice to the group of companies.

10    However, in 2020, the founder approached Mr. Grzesiak and asked him to act as his "right-hand man" and confidant.  Mr. Grzesiak initially wanted to perform these tasks within the framework of his law firm and thus remain a lawyer; however, the founder demanded that he end his career as a lawyer and be fully available to him for this activity as his "right-hand man."  In this context, Mr. Grzesiak negotiated a consulting fee of EUR 5,000,000.00 per year, plus bonus payments (of around EUR 1,000,000.00 per year).  This was then documented in the agreement concluded between Mr. Grzesiak and the founder on May 8, 2021.

266

*11*    In return for this agreement dated May 8, 2021, with its generous consulting fee, Mr. Grzesiak—according to his own statements—had to give up his position as a "top lawyer in Poland" at the request of the founder.  At the founder's request, he also (allegedly) waived his right to practice law.  Mr. Grzesiak also had to sell his stake in his law firm in order to make his services available exclusively to the founder.

*12*    According to Mr. Grzesiak, this marked the end of his career as a top lawyer in Poland, and he became completely dependent on his advisory relationship with the founder, both financially and economically.  Or, to summarize it in Mr. Grzesiak's own words: "***I gave up everything for the founder.***"

*13*    However, this advisory relationship did not turn out as Mr. Grzesiak had expected (nor as the founder had expected).  As it turned out later in the summer of 2024, Mr. Grzesiak was part of the children's plan to remove their father from power.  Although he received lavish payments in the millions from the founder under the consulting contract, he advised the children (behind the scenes) against his own interests and tried to assert their interests.  Mr. Grzesiak was therefore playing a double game, and when this came to light, it backfired.

*14*    **When Mr. Grzesiak's scheming and conflicts of interest were "exposed," the founder terminated the consulting contract on September 13, 2024, with immediate effect and effectively "showed Mr. Grzesiak the door."**

*15*    This led to an open rift between the founder and Mr. Grzesiak, who obviously felt offended in his honor and honorable work, which the Princely Court of Justice was able to see for itself when Mr. Grzesiak made extremely aggressive, emotional, and defamatory remarks about the founder.

*16*    In any case, Mr. Grzesiak sees the founder as the sole source of evil and the reason why he has now, in his opinion, fallen between two stools:  from his point of view, he has ultimately given up his career as a "top lawyer in Poland" and lost his consulting contract with the founder, which was supposed to secure him a corresponding remuneration.  After selling his shares in the law firm (again, allegedly at the founder's request) and Mr. Grzesiak no longer practicing law (to this day), he lost (through his own fault, mind you) his most lucrative source of income, worth millions of euros.



Page13

17    As a result of this dispute, Mr. Grzesiak now claims, among other things, to have claims "amounting to millions" against the founder.  The founder, in turn, has had to initiate legal proceedings against Mr. Grzesiak in Poland in order to obtain (at least partial) compensation for Mr. Grzesiak's serious misconduct and breaches of duty under the former consulting agreement, which have caused the founder considerable damage and disadvantage.  Due to the qualified breaches of duty, the founder also has claims for reimbursement of fees against Mr. Grzesiak, which in turn are pending in court in Poland.

18    In short: In his statement of February 3, 2025, Mr. Grzesiak made no secret of the fact that he harbors <u>deep personal animosity</u> toward the founder, for whom he (in his view) senselessly "gave up everything."  He harbors massive personal animosity, which he cannot and will not ignore as a member of the foundation board.  Furthermore, legal disputes are pending between the parties mentioned above, and further proceedings are also in preparation.  These disputes go far beyond the "balance" sought by the official order of October 26, 2024, which stipulated that one member of the foundation board should be appointed from the "camp" of the children and one from that of the founder. Mr. Grzesiak is not merely to be classified as belonging to the children's "camp," but also has a glaring and insurmountable conflict of interest with the founder, which could hardly have been the regulatory objective of this official order and consequently also jeopardizes the interests of the foundation. The massive personal conflict alone constitutes an insurmountable obstacle to the exercise of the office as a member of the foundation board.

19    However, the openly conducted dispute ultimately makes it evident that Mr. Grzesiak will abuse his position as a member of the foundation board to take retaliatory measures against the founder (or at least that there is a real danger of this happening) in order to "get back" at the founder what the founder, in Mr. Grzesiak's mistaken view, had "done" to him.  In any case, it is impossible for Mr. Grzesiak to set aside all this personal animosity—which was clearly evident from his aggressive statement—and remain neutral when forming the will of the foundation as a member of the foundation board.

■    Page14    ■

b)    Knowing violation of contractual confidentiality obligations vis-à-vis the founder

20    Following the rift between Stifter and Mr. Grzesiak and the termination of the consulting agreement in late summer 2024, Mr. Grzesiak—now deprived of this source of income—was named as a witness by the children in case 06 HG.2024.210.  He then gave his testimony in this case on February 3, 2025.  <u>Before</u> giving his testimony, Mr. Grzesiak—as a practicing lawyer and former "top attorney" who was already aware of this—was reminded by the court of his obligation to tell the truth.

21    The founder then did <u>not</u> release Mr. Grzesiak from his confidentiality obligation, and Mr. Grzesiak was expressly informed of this lack of release.  Mr. Grzesiak then testified as a witness under oath that he *<u>"was not bound by any confidentiality obligation, there is nothing from which I would need to be released.</u>  [...]"* The witness then made his extensive statement at the request of the children and to the detriment of the founder (and spread numerous untruths, which, however, play only a minor role here).  In addition, Mr. Grzesiak had also said that he considered it his duty to appear in court and answer "your questions" (meaning those of the royal district judge) but then answered almost exclusively questions from the Respondent's representatives.

22    However, this claim (along with many others) was an outright falsehood: According to the agreement dated September 19, 2023, Mr. Grzesiak expressly (*"unconditionally and with immediate effect"*) undertook vis-à-vis the founder not to "<u>*disclose, disseminate, or comment on the decisions made or to be made by the founder regarding the foundation [...] in any form*</u>" to anyone. Furthermore, Mr. Grzesiak has undertaken not to disclose, disseminate, comment on, or make any use of the information he has "*obtained or will obtain about [the founder] or in connection with [the founder], regardless of its form [...]*". Mr. Grzesiak has confirmed his obligation to "*strict compliance*" and waive*d* "*all rights to judicial or extrajudicial measures*" that could lead to a reduction in his extensive duty of confidentiality.

269

23     <u>In short</u>: There was, of course, a comprehensive confidentiality agreement between the founder and Mr. Grzesiak, to which Mr. Grzesiak was bound.  The fact that Mr. Grzesiak—also during his interrogation—was very well <u>aware</u> of his existing confidentiality obligation, which he knowingly intended to breach, is undoubtedly evident from the fact that, in the dispute with the founder's legal representatives (arg: "Go on, *Columbus*!"), who asked him to refrain from making his statement, he himself referred to this obligation.

24     To make matters worse, it is precisely this confidentiality obligation, which was terminated on September 19, 2023, that is connected to his role as a member of the foundation board at the time.  The crystal-clear breach of this obligation is therefore not only <u>unlawful and culpable misconduct towards the founder and primary beneficiary</u>, but also, in particular, <u>a serious breach of duty towards the foundation</u> (which is also covered by this confidentiality agreement with protective effect in favor of third parties).

25     Ultimately, Mr. Grzesiak openly "changed sides" and committed himself exclusively to the advancement of the children, while now openly treating the founder with rejection and contempt following their rift.  However, Mr. Grzesiak has information about the founder and his group of companies from his previous job, which he could misuse as a member of the foundation board to try to gain unfair capital for the benefit of the children or at least to take revenge for his perceived offense caused by the break with the founder.  Here, too, it is inconceivable that Mr. Grzesiak will simply "ignore" this in the exercise of his duties and focus solely on the welfare of the foundation and the equal treatment of those involved in it.

Page16

26    Finally, we would like to briefly refer to the following: As stated, during his examination as a witness, Mr. Grzesiak responded to the statement that he was not released from his duty of confidentiality by saying, among other things, that he was "not bound by any duty of confidentiality; there is nothing from which I would need to be released." [...]." In fact, Mr. Grzesiak initially denied that any confidentiality obligation existed ("there is nothing from which I would need to be released").   Only later—when confronted again by the legal representatives—did he vaguely admit that there was an agreement, but that it was not subject to attorney-client privilege.  Mr. Grzesiak falsely concealed the fact that he would also have had to be released from this confidentiality obligation after it had been concluded.  Mr. Jaroslaw Grzesiak therefore made false statements to the court—regarding his confidentiality obligation alone—according to which there had been no confidentiality obligation from which he would have had to be released.

c)    Legal disputes are pending between the founder and Mr. Grzesiak in Poland

27    As outlined above, there are legal disputes in Poland between the founder and Mr. Grzesiak that are directly related to i) the consultancy agreement dated May 8, 2021 and ii) the deliberate breach of his duty of confidentiality by agreement dated September 19, 2023.

28    The founder is suing Mr. Grzesiak for a declaration that the latter has violated his attorney-client privilege. The founder will subsequently sue Mr. Grzesiak for damages resulting from this breach of confidentiality.   Conversely, Mr. Grzesiak (also during his last hearing on March 3, 2025) incorrectly claimed to have millions in claims against the founder. Realistically, it will take years for these legal disputes to be resolved.

29    It is inconceivable that Mr. Grzesiak, in exercising his duties as a member of the foundation board, could simply ignore this serious dispute with the founder or even attempt to do so.  On the contrary: Mr. Solorz's opponent in the lawsuit is being put at the helm of the foundation to which Mr. Solorz has transferred his billion-dollar empire, thereby subjecting the founder to the obviously biased and prejudiced intent of Mr. Grzesiak.

271

d)    Therefore: A declared opponent of the primary beneficiary cannot be a member of the foundation board.

*30*    If the children's plan goes ahead, Mr. Grzesiak will now determine the fate and management of the foundation established by the founder, even though he is now the founder's <u>declared opponent</u> as a result of the estrangement and dispute. A person who, just a few weeks ago, publicly defamed the founder, trustee, and primary beneficiary in the courtroom cannot, as a result of this inherent conflict of interest, be a member of this foundation board.

*31*    Mr. Grzesiak's relationship with the legal entity in question is further compounded by the fact that he has already attempted to cause them significant harm. Over the past few months, Mr. Grzesiak has left no stone unturned in his attempts to exert negative influence on his personal contacts at the highest management level at various credit institutions. These credit institutions are (or were) in constant business contact with the subsidiaries of TiVi, which threatened to jeopardize the group's existing financing.

*32*    Mr. Grzesiak deliberately sought to ensure that the foundation's subsidiaries (and thus also the foundation itself) were threatened with the termination or non-renewal of current loan agreements, or in some cases even had such measures implemented. The aim was to put pressure on the group of companies and the founder. His plan was only prevented (at least for the time being) through the extreme efforts of the operational management level.

*33*    Briefly: Not only is Mr. Grzesiak personally unsuitable for the position of foundation board, and his appointment inadmissible due to an ongoing conflict of interest with the foundation and its founder, but if he were to remain in office, there would be a risk that he would abuse this position to cause further damage to the foundation and, in particular, to its founder—his declared opponent—even further damage.

*34*    A person who has openly expressed personal animosity toward the founder, trustee, and primary beneficiary of a foundation, caused damage to the foundation, and completely overstepped the bounds of appropriate behavior in terms of volume and tone, and has also knowingly and willingly violated obligations to the foundation for the benefit of one party to the conflict and to the detriment of the foundation, cannot be a member of the foundation board of this very TiVi Foundation that is the subject of the dispute.



Page18

3    From a legal perspective

a)    According to doctrine and case law, a clear and ongoing conflict of interest is a clear reason for dismissal.

35    The dismissal of a foundation board member by the supervisory court may also occur without any specific breach of duty ("only") based on the appearance of a conflict of interest. Conflicts of interest—even if they lie <u>outside</u> the foundation organization—constitute a good cause for dismissing a member of the foundation board if the pursuit of the foundation's purpose <u>cannot be guaranteed with sufficient certainty</u> <u>when implementing</u> the beneficiary provisions intended by the founder. Even the appearance of a conflict of interest must be avoided.

36    Even conflicts of interest that do not (yet) reach the level of incompatibility expressly stipulated by law constitute a good cause for dismissing a member of the foundation board if, as a result of these conflicts of interest, the pursuit of the foundation's purpose cannot be <u>guaranteed with sufficient certainty</u> when implementing the beneficiary provisions intended by the founder.

37    It is evident that Mr. Grzesiak's role and his openly declared hostility toward the founder mean that the implementation of the beneficiary provisions (and thus the fulfillment of the foundation's purpose) cannot be guaranteed with sufficient certainty, but rather that he would abuse his role as a member of the foundation board to the detriment of the foundation and to the detriment of the founder.

38    If, as in this case, there is a serious conflict, there is an <u>obvious risk of the foundation's purpose being compromised</u>, because <u>equal treatment</u> of beneficiaries in the respective beneficiary class (in this case: the proper treatment of the primary beneficiary with all his rights) is generally a <u>core element of any foundation</u>. As recent events have shown (see point c) below), Mr. Grzesiak does not intend to exercise his role as a member of the foundation board independently and impartially—in the spirit of equal treatment—as evidenced by the fact that, just a few days after his appointment, he already wants to install the children's representatives in the operating companies in Cyprus at their request.

273

Page19

39   Apart from the conflicts between Mr. Grzesiak and the founder outside the foundation organization described above, years of disputes between a member of the foundation board and the primary beneficiary can also jeopardize or at least endanger the achievement of the foundation's purpose, thereby necessitating his dismissal.  In this case, the court must, at the request of any party involved in the foundation, dismiss individual members of the foundation board or the entire foundation board who are subject to this conflict of interest, which jeopardizes the foundation.

40   As stated above, there has been an open conflict between Mr. Grzesiak and the founder since the summer of 2024.  Legal proceedings are pending that will take years to resolve. Mr. Grzesiak has betrayed the founder's trust.  He has openly changed sides, violating his duties under the consulting agreement and his confidentiality obligation (including vis-à-vis the foundation).  Mr. Grzesiak has abused the trust of the founder (and the primary beneficiary) to the utmost and will continue to do so in order to try to gain advantages for the founder's opponents in the legal proceedings in connection with this foundation.

41   Such a breach of trust and such a long-standing dispute between the foundation board and the foundation's primary beneficiary constitutes, rather, a good cause that makes it necessary to dismiss this foundation board member.

42   Or, to sum it up (in a slightly exaggerated way): The children could have appointed themselves to the foundation board if one were unwilling to see any conflict in Mr. Grzesiak's role and statements and his dismissive attitude toward the founder.

b)   Claim to be secured / legal relationship to be safeguarded / standing to sue

43   The founder is not only the founder and trustee, but also the primary beneficiary of the foundation.  He is therefore a participant in the foundation within the meaning of Art. 552 § 3 PGR and is naturally entitled to submit motions to the supervisory court (in this case, motions for dismissal).  Particularly when a member of the foundation board is in open and ongoing conflict with the primary beneficiary and founder, retaining his position is contrary to the appropriate management and use of the foundation's assets and also to the achievement of the foundation's purpose.

274

■    Page20    ■

44    The claims to be secured in this case are to be seen in the claims of the founder in his capacity as sole initial beneficiary, but also as founder and trustee, that the assets of the foundation are used and managed in accordance with the articles of association and bylaws for the benefit of the initial beneficiary.  This claim is based in particular on para. 9 (2) of the articles of association and Art. A I. and B. 1) of the bylaws.

45    With the motion for Mr. Grzesiak's judicial dismissal still to be filed, the founder will enforce this claim for the appropriate use and management of assets.  This is the subject of foundation supervision (Art. 552 § 29 PGR).  According to Art. 270 para. 3 EO, claims to be asserted in non-contentious proceedings can be secured by means of a preliminary injunction (also ex officio).  The founder's claim and his legitimacy to file a judicial dismissal motion (including the present motion for the granting of an official order) are therefore beyond doubt.

c)    Endangerment / regulatory interest

46    In addition to a right or legal relationship to be secured, the issuance of an official order pursuant to Art. 276 para. 1 lit. b EO requires an objective threat.  According to case law, such a threat is already assumed if the legal or factual circumstances are disputed, unclear, or indefinite.  It is therefore sufficient if a legal relationship is either disputed by the Respondent or disrupted by an action of the Respondent.  There is no need for further machinations or dispositions or actions by the Respondent that are contrary to the claim to be secured.  Accordingly, the Princely Supreme Court stated the following in the above-cited decision of January 12, 2018:

> *"For the provisional claim to be examined here, it is decisive that there is uncertainty regarding the question of the lawful exercise of rights at the general meeting on May 18, 2017, which is to be settled for the duration of the main proceedings.  For this reason alone, the requested provisional ruling prohibiting the Office of Justice from implementing the changes decided at the general meeting on May 18, 2017, in particular deleting the registration of the current board members and registering the allegedly newly elected board members (third-party prohibition within the meaning of Art. 277 lit. g EO), is justified.  The mere exercise of management by an unauthorized person constitutes an irreparable disadvantage."*

275

Page21

47    Similarly, the Austrian Supreme Court ruled that the disposal of shares or the exercise of shareholder rights (by an unauthorized person) regularly poses a threat of irreparable damage to the company, so that no further risk certification is required for this reason alone. In the event of the imminent exercise of rights (in some cases already exercised) (by Mr. Grzesiak), the risk required for the application for a protective injunction is therefore obvious in any case

48    In the present case, however, there are also other specific circumstances that not only make it (objectively) likely that the claim will be jeopardized, but Mr. Grzesiak, together with the court-appointed d, has already taken significant actions that counteract the founder's claims and rights:

49    Mr. Grzesiak recently misled the court-appointed deputy (presumably) and "pushed through" a draft resolution (against the vote and clear recommendation of Tomasz Szelag) at the foundation board meeting on April 10, 2025. If this draft resolution (which is in any case void) is implemented, the foundation would find itself in a dead end with regard to the Cypriot preliminary injunctions and its interests would no longer be protected there. In particular, the draft resolution pushed through by Mr. Grzesiak (as well as the corresponding motion filed with the Cypriot court) only provides for the amendment of the Cypriot preliminary injunction to allow the appointment of the additional directors he named, but not their dismissal. This would massively impair the interests in the proper management of the losing companies, because in the event of breaches of duty or conflicts of interest on the part of the new directors, their dismissal would be prohibited by the Cypriot preliminary injunction.

■    Page22    ■

50    A few days after this (void and also contestable) majority decision, this plan—although not covered by any decision wording—was attempted in Cyprus, with Mr. Grzesiak and the court-appointed deputy taking action without involving or informing the third member of the foundation board and submitting the motions, which had not been agreed upon by the foundation board, to the District Court of Limassol in Cyprus. This is despite the fact that Mr. Grzesiak's signing authority has not even been entered in the commercial register. It is obvious that the aim must have been to establish facts as quickly as possible before the founder could obtain legal protection.

51    What is more, the legal actions taken in Cyprus on behalf of the foundation (the motions submitted) <u>are not covered by any proposed resolution</u>, not even by the majority resolution of April 10, 2025:

■    Item 4) on the agenda, which provided for a "*resolution on the appointment [...] of two additional directors [...]*," was **rejected** at the foundation board meeting.

■    **It was decided,** with Tomasz Szelag voting against, that *"the Cypriot lawyers of the foundation should be instructed to <u>file a motion for amendment of the Cypriot preliminary injunction, which would enable the appointment of additional directors of Reddev.</u>"*

In this (void) "adopted" resolution, neither was the person to be appointed to the Executive Board specified in detail (this resolution had just been rejected), nor was it decided that the appointment or nomination should take place *uno actu*. <u>The decision was merely to initiate the necessary "preparatory work" in Cyprus, not to implement it in full immediately.</u>

■    This was **implemented** by the foundation board (by Mr. Grzesiak and the court-appointed deputy—completely bypassing Tomasz Szelag) without any resolution or consultation with the foundation board—that a motion was filed with the Cypriot court requesting that a) the Cypriot preliminary injunction not only be amended, but that a motion for judicial appointment be made, and b) George Sphiktos and Maria Kannava (from the children's camp), who were never covered by the draft resolution, be appointed as directors immediately.

277



**Immediate implementation was therefore not covered by the (void) majority decision or any other proposed resolution. On the contrary: The implementation was expressly rejected.**

52    In addition, there is the following: In its recent decision on the founder's criticism that, without a corresponding obligation to include items on the agenda, a majority decision could simply be taken, the Princely Court of Appeals states the following: *If the appellant expresses concern that a circular resolution could now be passed by two members of the foundation board within a very short period of time without discussion or consultation with the third member of the foundation board, it should be noted that the provision of Art. 7 e of the a, according to which the chairman of the foundation board must convene a meeting of the foundation board at the request of a member of the foundation board (or, if the chairman of the foundation board fails to do so, the applicant may convene the meeting himself), remains in force and valid. The "third" member of the foundation board, as defined in the appeal, may therefore request that a meeting of the foundation board be convened after the project covered by a circular resolution has been delivered, in particular if, in his opinion, the deadline for comments or approval is "too short," in order to discuss the content of the resolution in detail.*

53    However, the court-appointed deputy and Mr. Grzesiak did not simply pass a circular resolution without discussing it with the foundation board but completely bypassed the third member of the foundation board and the founder as trustee and created a de facto situation through their supposed power of representation in Cyprus. For this very reason, the issuance of a temporary official order is urgently required, because otherwise there is a risk that the court-appointed deputy, together with Mr. Grzesiak, will take further actions contrary to the interests of the foundation in disregard of the predefined requirements for decision-making.

54    Incidentally, it is remarkable how much the recent actions involving the court-appointed deputy contradict the OG decision that has just been handed down: The decision is clearly based on the tenor that the status quo should be maintained and that the foundation should remain neutral during the dispute between the founder and his children.  And it is precisely this status quo and the predefined neutrality that are being thrown overboard by the actions of the court-appointed deputy (who originally did not want to contest the preliminary injunction on the basis of this neutrality) and Mr. Grzesiak, in disregard of all statutory and corporate law requirements.

278

Page24

55    The founder has also sought provisional legal protection against this action, which violates all the basic principles of proper decision-making.  It is obvious that  Mr. Grzesiak wants to immediately implement the children's wishes by unfair means and present the founder with a fait accompli.  Unfortunately, the court-appointed deputy has been misled and misguided in this regard.  In any case, there is no doubt that the founder's claim is at risk, as Mr. Grzesiak will take action externally and create *a fait accompli*.

56    For the above reasons, there is an <u>urgent need for action</u> and an objective threat to the rights of the founder and primary beneficiary.

d)    Securing means

57    It is well known that the provisions of Art. 276 et seq EO are also applied in non-contentious foundation supervisory proceedings to secure the claims asserted therein.  On the basis of the precautionary objection lodged by the founder on March 10, 2025, the Office of Justice then ordered, by decision of April 10, 2025 (delivered on April 14, 2025) to obtain a precautionary order from the Princely Court of Justice within 14 days, *"prohibiting the filing of the notification of change dated March 20, 2025, submitted to the Office of Justice by letter dated April 9, 2025, with regard to the TiVi Foundation, Vaduz."*

58    The appropriate securing means in this case is to prohibit the Office of Justice, Commercial Register Division, from filing any notices of change relating to Mr. Grzesiak's appointment as a member of the foundation \board until the conclusion of the justification proceedings (motion for the judicial dismissal of Mr. Grzesiak) that are still to be brought.

59    Furthermore, as a result of recent events, it is necessary to provisionally prohibit Mr. Grzesiak from acting on behalf of the foundation in order to secure the founder's right to judicial dismissal.  Recent events have shown that Mr. Grzesiak does not care in the slightest whether there is internal consensus within the foundation board.  He simply creates facts.  Therefore, in order to secure the claim, Mr. Grzesiak must also be temporarily prohibited from acting on behalf of the foundation and signing on its behalf.  Otherwise, although the deposit with the Office of Justice will not be made, this will not prevent Mr. Grzesiak from counteracting the founder's claims.

279



Page25

60    This also <u>does not constitute any interference with the proper decision-making of the foundation</u>, especially since the foundation board is and remains fully capable of acting through the legal counsel and Tomasz Szelag.  Of course, there is also the possibility that the children will persuade Mr. Grzesiak to resign from office and, in accordance with the principle of appeasement and "*keeping quiet*", appoint another person to the foundation board who is free of the obvious conflicts of interest described above.  However, the children deliberately chose Mr. Grzesiak, knowing that he would exercise his function exclusively to the detriment of the founder, even if this would be detrimental to the foundation.

61    Conversely, it would therefore be an irretrievable loss of the founder's rights if Mr. Grzesiak were to be granted a temporary injunction until a final decision had been made on his request for dismissal.  Only the protective measures sought here will prevent bona fide third parties from relying on such an incorrect entry or Mr. Grzesiak from continuing to act on behalf of the foundation.

e)    No hearing of the Respondents

62    In view of the foregoing, it is not possible in the present case to grant the respondents a prior hearing with regard to the application for a protective injunction without defeating the purpose of the requested official order. If the Respondents were to be granted a prior hearing, it is clear from the recent actions in Cyprus that Mr. Grzesiak will use the remaining time to create irreversible facts and thwart the founder's claims.

63    Furthermore, Mr. Grzesiak, who is not currently represented by a lawyer in Liechtenstein, would have to be served in Poland, while the other parties to the proceedings (insofar as they are relevant to these provisional proceedings) would certainly receive service earlier at their respective lawyers' offices.  The decree does not entail any irreparable disadvantage without prior consultation with the Respondents, especially since the foundation remains fully capable of acting through the court-appointed deputy, Tomasz Szelag.

Page26

3.    In their written submissions dated May 8, 2025 (ON 117, 118, and 119), the **Respondents as per 3–5** essentially argue and contend that, contrary to the allegation made by the Applicant, there is no evidence of bias or partiality on the part of the Respondent as per 1. Rather, the long-standing professional and personal relationship with the Applicant paints a nuanced and positive picture: The Respondent as per 1 had acted as a lawyer, advisor, and confidant to the Applicant since 2007.  A friendly relationship gradually developed, which included joint vacations, family contact, and, in professional terms, involvement in strategic structural issues.  Since 2007, the Respondent as per 1 has acted as an advisor in connection with the Applicant's asset succession.

In spring 2024, the Applicant confirmed his trust in the work of the Respondent as per 1 by stating that he was doing a good job and that it was his duty to ensure that no one deprived his children of their inheritance. This statement clearly shows that the Applicant was keen to have the Respondent as per 1's cooperation.  A conflict of interest or even "hostility," as described by the Applicant, was neither apparent nor certified.  The fact that political shifts subsequently took place within the sphere of influence of the Applicant, or that the Applicant itself initiated proceedings in Poland against the Respondent as per 1, does not constitute grounds for subsequent bias.

■ Page27 ■

The appointment of the Respondent as per 1 to the foundation board of the TiVi Foundation was not made for strategic reasons, but was an obvious step: The Respondent as per 1 had already been a member of the foundation board of the TiVi Foundation from October 20, 2022, to December 27, 2024, and had been represented on supervisory boards in most Polish companies. He was therefore very familiar with the structure, objectives, and organization of the TiVi Foundation and the companies it held. Against the backdrop of the ongoing disputes, his reappointment was a necessary measure to stabilize and protect the interests of the TiVi Foundation.

The Applicant accuses the Respondent as per 1 of giving false testimony because he stated that he was not bound by any duty of confidentiality. This assertion is clearly misguided, as the statement clearly referred to professional confidentiality obligations within the meaning of § 321 ZPO (*Zivilprozessordnung* [German Code of Civil Procedure]). Private confidentiality agreements with the applicant for the injunction did not override the procedural duty of truthfulness. On the contrary: the Respondent as per 1 had referred to existing private agreements in court, but correctly stated that these did not entitle him to refuse to testify. The Respondent as per 1 had expressly clarified that his former client relationship with the Applicant had been terminated in 2021, which is why, for this reason alone, no professional duty of confidentiality could have been affected. This point was not only misrepresented by the Applicant, but also assessed incorrectly from a legal perspective.

The alleged "serious legal disputes" consist exclusively of civil proceedings—not certified by the Applicant—which the Applicant itself initiated against the Respondent as per 1 on April 10, 2025. This is therefore a unilaterally initiated proceeding, the mere existence of which cannot constitute a conflict of interest.

282

Page28

As documented in the minutes of the foundation board meeting concerning the Solkomtel Foundation on April 10, 2025, the foundation board dealt with operational issues relating to the protection of the underlying companies. The resolutions served to secure the assets of the Foundation. Neither the choice of topics nor the voting behavior would suggest biased or unethical conduct. The allegation that the Respondent as per 1 misled the deputy is completely unfounded. The deputy is an experienced lawyer appointed by the court, whose judgment has not been questioned by the Applicant.

The current composition of the foundation board was established by court decisions (ON 71, ON 106). It provides for one representative each from the founder and the children, as well as a neutral, court-appointed deputy. This balance was deliberately created and is not upset by the appointment of the Respondent as per 1. It is contradictory for the Applicant to recognize this structural model on the one hand, but on the other hand to selectively oppose the persons proposed by the other party, even though he himself has appointed a member.

The motion for the granting of an official order (ON 111) suffers from a significant lack of substantiation. There is no concrete, fact-based allegation. The alleged bias is based exclusively on subjective assessments and assumed motives. No evidence is even offered on key points, in particular the alleged hostility, the alleged endangerment of the foundation's assets, or the proceedings in Poland. The court proceedings in Poland cited by the Applicant were initiated by the Applicant himself and cannot be considered to the detriment of the Respondent as per 1. The unilateral initiation of civil proceedings by the Applicant alone cannot constitute an objective reason for dismissal, as otherwise it would be possible for a founder to remove members of the foundation board he dislikes at any time by initiating foreign proceedings. Finally, the appointment of the Respondent as per 1 as a member of the foundation board of the TiVi Foundation did not pose any risk in this case, especially since the appointment of an independent, qualified advisor already provided sufficient security. The assistant performs the duties and powers of the

Page29

chairman of the foundation board, which ensures that no decisions can be made without his involvement.   In addition, the balance in the foundation board is guaranteed by member of the foundation board Tomasz Szelag, who was appointed by the Applicant.  Please note that, in addition to the minutes of the foundation board meeting, only one further motion for the granting of an official order has been submitted as evidence of the alleged danger. It is already questionable whether such a motion can be considered as independent evidence.  In any case, it does not prove any concrete threat.

The issuance of an official order requires the prima facie evidence of a specific claim to be secured and an actual threat to this claim.  This is not even remotely the case here.   Rather, the motion clearly serves to politically or tactically prevent unwelcome appointments to the foundation board.

4.   The **foundation** itself announced in a written pleading dated May 8, 2025 (ON 116) that it would refrain from commenting on the content of the Applicant's motions.

Page30

5.  The **Respondent as per 2, Tomaz Szelag**, declared in a written pleading dated May 8, 2025 (ON 120) that he would not oppose the Applicant's motion.

6.  On the basis of the documents submitted by the parties, namely

Applicant

| | |
|---|---|
| Resignation statement by Katarzyna Tomczuk dated March 3, 2025 | Appendix  CG |
| "Appointment" of Mr. Grzesiak's children dated March 4, 2025 | Appendix  CH |
| Witness statement by Jaroslaw Grzesiak dated February 3, 2025, protocol ON 21 in the proceedings to GZ 06 HG. 2024.210 | Appendix  CI |
| Precautionary objection by the founder dated March 10, 2025 | Appendix  CJ |
| Order by the Office of Justice dated April 10, 2025 | Appendix  CK |
| Confidentiality agreement dated September 19, 2023 | Appendix  CL |
| Lawsuit dated April 10, 2025 including a rough German translation | Appendix  CM |
| Minutes of the foundation board meeting dated April 10, 2025 | Appendix  CN |
| Motion for the granting of an official order dated April 22, 2025 | Appendix  CO |

Respondent as per 2:

| | |
|---|---|
| Minutes of the TS dated February 3, 2024, regarding 06 HG.2024.210 | Appendix 3.26 |

Respondent as per 4:

| | |
|---|---|
| HR extract TiVi Foundation dated March 7, 2025 | Appendix  8.1 |
| Official order dated October 26, 2024, ref. 06 HG.2024.133 (ON 71) | Appendix  8.2 |
| Decision by the Court of Appeals dated April 3, 2025, regarding 06 HG.2024.133 (ON 106) | Appendix  8.3 |

the following **facts** are certified, in addition to those stated at the beginning:

285



As stated in the introduction, by order of the Court of Justice dated October 24, 2024, ON 71, attorney Peter Schierscher was appointed as deputy with the function of chairman of the foundation board, and the two previous members of the foundation board, Katarzyna Tomczuk and Tomasz Szelag, were confirmed in their positions (Appendix 8.1). At the same time, Art. 7 (7) a of the TiVi articles of association was amended to read as follows (provisionally) (ON 71):

Article 7 (7) a) Upon receiving information about the death or resignation of member of the foundation board Tomasz Szelag, the chairman of the foundation board shall immediately request the founder, Zygmunt Solorz, and, upon receiving information about the death or resignation of member of the foundation board Katarzyna Tomczuk, Piotr Zak, Aleksandra Zak, and Tobias Solorz, to appoint a new member of the foundation board. The appointment must be made within seven days of the request being served and communicated to the chairman of the foundation board. If the deadline expires without effect, the chairman of the foundation board shall repeat his request. If no appointment is made and no notification is sent to the chairman of the foundation board within three days of the second request being served, the chairman of the foundation board shall select and appoint the new member of the foundation board.

Resolution ON 71 prohibited Solorz and the Respondents as per 3–5 from exercising or attempting to exercise any rights as founders and/or secondary beneficiaries; in particular, any rights to make changes to the articles of association, bylaws, or other documents of the TiVi Foundation and to appoint and dismiss members of the foundation board. The right to appoint members pursuant to Art. 7 (7) a) of the (amended) articles of association (ON 71) was exempted from this prohibition.

Member of the foundation board, Katarzyna Tomczuk, resigned in March 2025 (Appendix CG). By resolution of the Respondents as per 3–5 dated March 4, 2025, they unanimously appointed Respondent as per 1, Jaroslaw Grzesiak, as a member of the foundation board to replace Katarzyna Tomczuk (Appendix CH). The Respondent as per 1 was already a member of the TiVi Foundation's foundation board from October 20, 2022, to December 27, 2024, and has in-depth knowledge of the foundation, its structure, and its processes.

Page32

The Applicant and the Respondent as per 1 had enjoyed a close professional and friendly relationship for many years. In 2020, the Applicant asked the Respondent as per 1 to become his "right-hand man" and confidant and to terminate his work as a lawyer. In this context, the Respondent as per 1 received a consulting fee of EUR 5 million. The termination of the consulting agreement by the Applicant was based on the fact that the Respondent as per 1 refused to cooperate in the dismissal of the Respondents as per 3 and 5 from the executive positions intended for them by the Applicant (Appendix CI, p. 42).

It cannot be concluded that the Respondent as per 1 was "part of the children's plan to strip their father of his powers." Nor can it be established that there was an "open rift" between the Applicant and the Respondent as per 1 and/or that the Respondent as per 1 "made extremely aggressive, emotional, and defamatory remarks about the founder [Applicant]" and/or that there has been an "open conflict" between the Applicant and the Respondent as per 1 since summer 2024, that the Respondent as per 1 "treats the Applicant with deep personal animosity" and/or that there is "massive personal animosity which he cannot and will not ignore as a member of the foundation board" against the Applicant, and/or the Respondent 1, as a former confidant and lawyer of the Applicant, has "changed sides" and thereby "illegally misused knowledge entrusted to him as a confidant to the detriment of the owner of the secret in order to gain unfair advantages for the beneficiaries of the other side (the children) in the conflict."

In a statement dated September 19, 2023, the Applicant and the Respondent as per 1 issued the following statement/confirmation (Appendix CL):

 Page33

INSTRUCTIONS FROM THE FOUNDER

I, the undersigned Zygmunt Solorz (personal identification number PESEL 56080407253), residing at Meierhofstrasse 8, 9495 Triesen, Principality of Liechtenstein, acting as founder of the foundation under the name TiVi Foundation, based in Vaduz, Principality of Liechtenstein ("Foundation"), hereby prohibit Mr. Jaroslaw Grzesiak, unconditionally and with immediate effect, from disclosing, disseminating, or commenting on any decisions I have made or will make regarding the Foundation to any legal entities or persons in any form whatsoever; Furthermore, he is prohibited from disclosing, disseminating, commenting on, or making any use of any information about me or in connection with me, regardless of its form, obtained or to be obtained by Mr. Jaroslaw Grzesiak in any way whatsoever, to any legal entities or persons, with the exception of use necessary for the proper performance of the function of a member of the foundation board.

[Signature illegible]

Zygmunt Solorz

Founder

I acknowledge receipt of the founder's instructions dated September 18, 2023, and undertake to comply strictly with them, together with an irrevocable and unconditional waiver of all rights to take legal or extrajudicial action that violates or could violate the prohibitions set out in the founder's instructions or my obligation to comply strictly with them.

First and last name: Yaroslaw Grzesiak

Date: 09/19/2023

Signature: [illegible]


In proceedings 06 HG.2024.210, after being instructed by the court, the Respondent as per 1 to the security declared, pursuant to § 321 ZPO—and after the Applicant had stated for the record that he did not release the Respondent as per 1 to the security from his obligation of confidentiality—that he was not bound by any professional confidentiality obligations (and subsequently made a statement as a witness) (Appendix CI).

Page34

In April 2025, the Applicant filed a civil lawsuit against the Respondent as per 1 in Poland, seeking, among other things, a declaration that the Respondent as per 1 had violated his professional duty of confidentiality (Appendix CM). It cannot be determined whether further proceedings are pending or have been/will be brought.

It cannot be determined that the Respondent as per 1 "misled" the assistant and "pushed through" a draft resolution to the detriment of the foundation at the foundation board meeting on April 10, 2025.

<u>Regarding the assessment of evidence</u>: The facts accepted as certified are essentially based on the unobjectionable documents attached in brackets.

As regards the negative findings concerning the alleged conflict of interest of the Respondent as per 1 ("part of the children's project," "open rift" between the Applicant and the Respondent as per 1, etc.), <u>none</u> of this is apparent from the statement in 06 HG.2024.210-21. It is also not true that the Respondent as per 1 is 'aggressive, emotional, and defamatory about the founder' in this statement, nor is it otherwise comprehensible how the Applicant comes to the conclusion that the Respondent as per 1 treats him with deep aversion, that they have switched sides, etc.

With regard to misleading the deputy and "pushing through" a proposed resolution, the court assumes that the counsel, as a very experienced lawyer practicing in Liechtenstein, would not be so easily "misled;" in any case, this claim was not substantiated by the Applicant. As documented in Appendix CN, the foundation board dealt with operational issues concerning the underlying companies; it is not clear to what extent this is to the detriment of the foundation.  As regards the motion for the granting of an official order (Appendix CO), this reflects the applicant's position in the proceedings—no less, but also no more.

**Legally,** the following should be considered:

The provisions of Art. 276 et seq EO are also applied in non-contentious foundation supervisory proceedings to secure the claims asserted therein.

In addition to a right or legal relationship to be secured, the issuance of an official order pursuant to Art. 276 para. 1 lit. b EO requires an objective threat.  According to case law, such a threat is already assumed if the legal or factual circumstances are disputed, unclear, or indefinite.  It is therefore sufficient if a legal relationship is either disputed by the Respondent or disrupted by an action of the Respondent. There is no need for further machinations or dispositions or actions by the Respondent that are contrary to the claim to be secured.

In the present case, the Applicant wishes to secure the right to dismiss the Respondent as per 1 and to ensure the appropriate management and use of the foundation's assets, essentially asserting the existence of conflicts of interest and a threat to the foundation's assets.

However, in the present case, there is a lack of both certification of the claim and of the threat:

Page36

Thus, the facts of the case, which are assumed to be certified, do not give rise to any personal animosity or similar feelings on the part of the Respondent as per 1 towards the Applicant, nor to any conflict of interest or action to the detriment of the foundation.

The court proceedings in Poland cited by the Applicant were initiated by the Applicant itself and cannot be considered to the detriment of the Respondent as per 1.  The unilateral initiation of legal proceedings by the Applicant alone cannot constitute an objective reason for dismissal, otherwise the Applicant, as founder, would be able to remove unpopular members of the foundation board at any time by initiating foreign proceedings.

Incidentally, it should be noted that the current composition of the foundation board was established by court decision (ON 71).  It provides for one representative each from the Applicant (founder) and the Respondents as per 3–5 (children) as well as a neutral, court-appointed deputy.  This balance is not upset or jeopardized by the appointment of the Respondent as per 1.

The motion must therefore be dismissed.

The Applicant must bear the <u>costs</u> correctly recorded by the Respondents, in accordance with Art. 286 EO.

Princely Court of Justice
Vaduz, May 27, 2025
Diana Kind
Judge of the Princely Court of Justice

Page37

[seal:] PRINCELY
COURT OF
JUSTICE

I certify the foregoing to be a true and correct copy.

[signature]

Sidonia Aggeler

 Page38

# Information on the rights of appeal

An appeal against this decision may be lodged with the Princely Court of Appeals in Vaduz within a non-extendable period of 14 days from the service of documents. The appeal must be submitted in writing in duplicate to the Court of Justice It may also be declared orally recorded by parties who are not represented by a lawyer.  The appeal must contain the name of the case, the first and last names and address of the appellant, and the name of the decision against which it is being lodged.  The appeal need not contain a specific request but must adequately state the grounds on which the party considers itself aggrieved and the alternative decision it seeks (appeal request); in case of doubt, the decision against which the appeal has been lodged shall be deemed to have been contested in its entirety.

|  |  |
|---|---|
| Date reserved: | Date reserved: |
| [hw:] *06/13/2025* | [hw:] *(GS) June 13, 2025* |
| **Signature** [signature] | **Signature** [signature] |

293



City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the document "**ON 127 Court decision**" is, to the best of my knowledge and belief, a true and accurate translation from German into English.

Jacqueline Yorke

Sworn to before me this
November 20, 2025

Signature, Notary Public

WENDY POON
Notary Public - State of New York
No. 01PO0000184
Qualified in Queens County
My Commission Expires February 02, 20 **27**

Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS
1250 BROADWAY, 32ND FLOOR, NEW YORK, NY 10001  |  T 212.400.8840  |  F 212.689.1059  |  WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

294



FÜRSTENTUM LIECHTENSTEIN
**FÜRSTLICHES**
LANDGERICHT

GASSER PARTNER
EING. 30.05.25 08:50

Aktenzeichen bitte immer anführen
<u>06 HG.2024.133</u>
ON 127

# AMTSBEFEHL

## Ausserstreitsache

**Sicherungswerber:**          **Zygmunt Jozef Solorz**

██████████████████

vertreten durch Schurti Partners
Rechtsanwälte AG, Zollstrasse 2, 9490 Vaduz
und durch Pitkowitz & Partners Pitkowitz
Rechtsanwälte GmbH, Schwarzenbergplatz 3,
AT-1010 Wien
(Schurti Partners Rechtsanwälte AG als
Zustellbevollmächtigte gemäss Art. 82 Abs. 1
RAG)

**Sicherungsgegner:**        1.   **Jaroslaw Grzesiak**

██████████████

██████████████████

vertreten durch Oberhuber Jenal
Rechtsanwälte AG, Wuhrstrasse 14, LI-9490
Vaduz

2.   **Tomasz Szelag**

██████████████

████████████████

vertreten durch Niedermüller Rechtsanwälte,
Werdenbergerweg 119490 Vaduz

3.   **Piotr Mateusz Zak**

Seite 2



vertreten durch Roth + Partner Rechtsanwälte
AG, Landstrasse 40, Postfach 408, 9495 Triesen

**4. Aleksandra Jadwiga Zak**



vertreten durch Gasser Partner Rechtsanwälte
AG, Feldkircherstrasse 31, 9494 Schaan

**5. Tobias Markus Solorz**



vertreten durch Marxer Partner
Rechtanwälte, Heiligkreuz 6, 9490 Vaduz

**Verbandsperson:**   **TiVi Foundation** (FL-0002.394.367-5)
Kirchstrasse 12, 9490 Vaduz
vertreten durch Ritter Schierscher
Rechtsanwälte AG, Gewerbeweg 5, 9490
Vaduz

**wegen:**   Stiftungsaufsicht
(CHF 30'000.00)

## 1.   Die Anträge des Sicherungswerbers des Inhalts

1      Dem Amt für Justiz, Abteilung Handelsregister, wird <u>untersagt</u>,
hinsichtlich der betroffenen Verbandsperson TiVi Foundation
Änderungsanzeigen (insbesondere diejenige vom 20. März 2025,
hinterlegt mit Schreiben vom 9. April 2025) entgegenzunehmen, zu
hinterlegen, zu vollziehen oder auf deren Basis Amtsbestätigungen

296

Seite 3

auszustellen, sofern dies die Bestellung des Herrn Jaroslaw Grzesiak als Stiftungsrat der erwähnten Stiftung zum Gegenstand hat.

2    Dem Sicherungsgegner zu 1., Herrn Jaroslaw Grzesiak wird <u>untersagt</u>, für die betroffene Verbandsperson TiVi Foundation als Stiftungsratsmitglied aufzutreten oder diese rechtsgeschäftlich (allein oder gemeinsam mit anderen Mitgliedern des Stiftungsrates) zu berechtigen oder zu verpflichten, wie auch der betroffenen Verbandsperson TiVi Foundation untersagt wird, Herrn Jaroslaw Grzesiak als Mitglied des Stiftungsrates nach aussen hin auftreten zu lassen.

3    Der Antragsteller hat binnen vier Wochen nach Verständigung von diesem Amtsbefehl bei Gericht ein gerichtliches Abberufungsverfahren hinsichtlich des Herrn Jaroslaw Grzesiak als Stiftungsratsmitglied der TiVi Foundation einzuleiten, widrigenfalls diese Sicherungsmassnahme ihre Wirksamkeit verliert.

**werden <u>abgewiesen</u>.**

**2.    Der Sicherungswerber ist verpflichtet, binnen vier Wochen dem Sicherungsgegner zu 1 die mit CHF 1'108.80 bestimmten Kosten des Verfahrens, dem Sicherungsgegner zu 3 die mit CHF 1'198.61 bestimmten Kosten des Verfahrens, der Sicherungsgegnerin zu 4 die mit CHF 1'108.80 bestimmten Kosten des Verfahrens und dem Sicherungsgegner zu 5 die mit CHF 1'108.80 bestimmten Kosten des Verfahrens jeweils zuhanden der ausgewiesenen Rechtsvertreter zu bezahlen.**

# Begründung

1.    Vorauszuschicken ist, dass rund um die TiVi Foundation diverse Verfahren bei Gericht anhängig sind, wobei zwischen dem Sicherungswerber und den Sicherungsgegner zu 3 – 5 im Wesentlichen strittig ist, welche

297

Seite 4

Stiftungsdokumente betreffend die TiVi Foundation derzeit Gültigkeit haben und wem aufgrund dessen welche Rechte zukommen.

Im gegenständlichen Verfahren HG.2024.133 wurde mit Amtsbefehl vom 26.10.2024 (ON 71) wie folgt entschieden:

Das Fürstliche Landgericht in seiner Funktion als Aufsichtsgericht erlässt zur Wahrung der berechtigten Interessen der TiVi Foundation  nachfolgenden Amtsbefehl (Art 276 ff EO):

1.    […].

2.    […]

3.    Für die TiVi Foundation wird in der Person von RA Peter Schierscher, Gewerbeweg 5, 9490 Vaduz, ein Beistand nach Art 190 Abs 1 PGR bestellt. Der Beistand tritt an die Stelle des Stiftungsratspräsidenten, wobei die für die Dauer der Beistandsbestellung die Statuten dergestalt angepasst werden, dass die nachfolgenden Bestimmungen neu wie folgt lauten:

Art 7 (1) b Die Beschlüsse können an den Sitzungen des Stiftungsrates oder auf dem Zirkularweg erfolgen, wobei die auf dem Zirkularweg gefassten Beschlüsse die Zustellung des von dem Beschluss erfassten Vorhabens an alle Mitglieder des Stiftungsrates erfordern.

Art 7 (2) a) Die Beschlussfassung auf dem Zirkularweg erfordert einfache Mehrheit und Unterzeichnung durch mindestens zwei Stiftungsratsmitglieder.

Art 7 (2) b) Der Stiftungsrat ist beschlussfähig, sofern mindesten zweit Mitglieder anwesend sind. Die Beschlussfassung an der Stiftungsratssitzung erfordert einfache Mehrheit und Unterzeichnung durch mindestens zwei Stiftungsratsmitglieder.

Art 7 (2) e) Die Bestimmungen von Art 7 (2) b findet nicht auf die Bestellungen und Abberufungen von Stiftungsratsmitgliedern nach den in Art 7 (7) genannten Regeln Anwendung.

Art 7 (2) c) und d) werden ersatzlos aufgehoben.

Art 7 (7) a) Der Stiftungsratspräsident wird nach Erhalt der Information über den Tod oder die Amtsniederlegung des Stiftungsratsmitglieds Tomasz Szelag den Stifter Zygmunt Solorz und im Fall des Erhalts der Information über den Tod oder die Amtsniederlegung des Stiftungsratsmitglieds Katarzyna Tomczuk Piotr Zak, Aleksandra Zak und Tobias Solorz unverzüglich zur Bestellung eines neuen

298

■    Seite 5    ■

Stiftungsratsmitglied auffordern. Die Bestellung hat innerhalb von 7 Tagen ab Zustellung der Aufforderung zu erfolgen und dem Stiftungsratspräsidenten mitzuteilen. Im Fall des wirkungslosen Ablaufs der Frist, wiederholt der Stiftungsratspräsident seine Aufforderung. Erfolgt binnen 3 Tagen ab Zustellung dieser zweiten Aufforderung keine Bestellung und Mitteilung an den Stiftungsratspräsidenten, so erfolgt die Auswahl und die Bestellung des neuen Stiftungsratsmitglieds durch den Stiftungsratspräsidenten.

Art 7 (7) b) und c) werden ersatzlos aufgehoben.

4.  Der derzeitige Stiftungsratspräsident Philipp Ulrich Senn wird abberufen. Die weiteren Stiftungsratsmitglieder Tomasz Szelag und Katarzyna Tomczuk werden ausdrücklich nicht abberufen, sondern verbleiben im Amt.

5.  Sämtliche Stiftungsratsmitglieder wie auch der Beistand zeichnen kollektiv zu zweien und zwar dergestalt, dass die Stiftungsratsmitglieder Tomasz Szelag und Katarzyna Tomczuk nur zusammen mit dem Beistand zeichnen können.

6.  Das dem Stifter als Kurator gemäss Art 9 der Statuten iVm Art IV. der Beistatuten zukommende Zustimmungsrecht wird für die Dauer der Beistandsbestellung ausgesetzt.

7.  Die Bestimmung B) III. Abs 1 Satz 2 der Beistatuten wird für die Dauer der Beistandsbestellung ersatzlos aufgehoben.

8.  Zygmunt Solorz wie auch Piotr Zak, Aleksandra Zak und Tobias Solorz wird ab sofort verboten, etwaige Rechte als Stifter und/oder Zweitbegünstigte auszuüben oder auszuüben zu versuchen; dies umfasst insbesondere etwaige Rechte auf die Vornahme von Änderungen an den Statuten, Beistatuten oder sonstige Dokumente der TiVi Foundation und auf Bestellung und Abberufung von Stiftungsratsmitgliedern. Das Bestellungsrecht gemäss dem mit diesem Beschluss abgeänderten Art 7 (7) a) der Statuten ist von diesem Verbot ausgenommen.

9.1  Dem Amt für Justiz wird aufgetragen, die Löschung des Philipp Senn, die Bestellung des Beistandes sowie die Festsetzung des Zeichnungsrechtes einzutragen, sodass die Zusammensetzung des Stiftungsrates / Beistand auf Amtsbestätigungen der TiVi Foundation ausgewiesen wird wie folgt:

Mitglieder des Stiftungsrates: Katarzyna Tomczuk (Kollektivzeichnungsrecht zu zweien mit dem Beistand RA Dr Peter Schierscher) und Tomasz Szelag (Kollektivzeichnungsrecht zu zweien mit dem Beistand RA Dr Peter Schierscher)

Beistand: RA Dr Peter Schierscher (Kollektivzeichnungsrecht zu zweien)

299

■ Seite 6 ■

9.2   Dem Amt für Justiz wird weiter untersagt, Anmeldungen im Handelsregister, gleichgültig ob Löschungen oder Eintragungen von Stiftungsratsmitgliedern oder des Stiftungsratspräsidenten, hinsichtlich der TiVi Foundation vorzunehmen.

10.   […]

11.   Der gegenständliche Amtsbefehl gilt vorbehaltlich einer anderslautenden Anordnung des Gerichts bis vier Wochen nach rechtskräftiger Erledigung des gegenständlichen Verfahrens und des Zivilverfahrens 06 CG.2024.184.

12.    Die Kosten werden gegenseitig aufgehoben.

Ein weiteres für das gegenständliche Verfahren relevantes Verfahren ist das Verfahren HG.2024.210. In jenem Verfahren hat das Gericht mit Beschluss vom 19.05.2025 (ON 39) die dortigen Anträge des Sicherungswerbers wie folgt abgewiesen:

1.    Die Anträge sowie die Eventualanträge des Antragstellers des Inhalts:

    1    Es wird mit Wirkung zwischen den Parteien festgestellt, dass

    a.    die Statuten der beim Handelsregister hinterlegten TiVi Foundation, FL - 0002.394.367 - 5, in der Fassung des Notariatsaktes vom 24. September 2024, aufgenommen und beurkundet von Notar Mag. Alexander Winkler, öffentlicher Notar mit dem Amtssitz in 1180 Wien, Weimarer Strasse 5, zu GZ 1595, wie auch die Beistatuten der erwähnten Stiftung in der Fassung des Notariatsaktes vom 24. September 2024, aufgenommen und beurkundet von demselben zu GZ 1597, gemäss Beilagen ./AJ und ./AK, welche einen integrierenden Bestandteil dieses Beschlusses bilden, aufrecht und rechtswirksam sind;

    b.    dem Antragsteller gegenüber der betroffenen Verbandsperson sämtliche Rechte, die ihm als Stifter, Erstbegünstigter oder Kurator in den zuvor genannten Statuten und Beistatuten in der Fassung des Notariatsaktes vom 24. September 2024, aufgenommen und beurkundet von Mag. Alexander Winkler, öffentlicher Notar mit dem Amtssitz in 1180 Wien, Weimarer Strasse 5, zur GZ 1595 und GZ 1597, gemäss Beilage ./AJ und ./AK, welche einen integrierenden Bestandteil dieses Beschlusses bilden, eingeräumt sind, aufrecht zustehen, darunter insbesondere

300

 Seite 7

    i.     das Recht, ein Beistatut oder mehrere Reglemente zu erlassen und die Begünstigten zu bestimmen (Art. 5 Abs. 1 und Abs. 2 der Statuten);

    ii.    das Recht, Mitglieder des Stiftungsrates und den Stiftungsratspräsidenten zu bestellen oder abzuberufen (Art. 6 Abs. 2 Bst. a der Statuten);

    iii.   das Recht, einziger Kurator der Stiftung zu sein und in dieser Funktion die Rechte gemäss den Statuten und Beistatuten auszuüben, insbesondere die Stiftungsräte zu überwachen, seine Vorschläge durch diese umsetzen zu lassen, sämtliche Beschlüsse des Stiftungsrates von seiner Zustimmung als Kurator abhängig zu machen und in alle Stiftungsdokumente Einsicht zu nehmen (vgl. Art. 9. Abs. 1 der Statuten, Punkt B), insbesondere III. und Punkt IV. sub 1) der Beistatuten);

    iv.   das Recht, die Stiftungserklärung, die Statuten und die Beistatuten zu seinen Lebzeiten zu ändern (Art. 13 Abs. 2 Punkt 1. der Statuten);

    v.    das Recht, den Stiftungsrat anzuweisen, sämtliche Erträge der Stiftung an ihn auszubezahlen (Art. 13 Abs. 2 Punkt 4. der Statuten).

in eventu

Die Statuten und Beistatuten der beim Handelsregister hinterlegten betroffenen Verbandsperson, der TiVi Foundation, FL-0002.394.367-5, in der Fassung vom 2. August 2024, die durch die Erklärungen des Antragstellers

über die Änderung der Statuten (beglaubigt zu Urkunde A Nr. 6223/2024),

über den "Beschluss im Umlaufverfahren" (beglaubigt zu Urkunde A Nr. 6228/2024),

und über die Erklärung gemäss Artikel 13 (2) 2. (i) der Satzung (beglaubigt zu Urkunde A Nr. 6235/2024),

beglaubigt zur jeweils zuvor angeführten Urkundennummer durch Dariusz Wierzchucki, Notar in Warschau, an diesem Tage abgeändert wurden, werden für rechtsunwirksam erklärt.

in eventu

Die Erklärungen des Antragstellers jeweils vom 2. August 2024 gegenüber der beim Handelsregister hinterlegten betroffenen Verbandsperson, der TiVi Foundation, FL-0002.394.367-5,

über die Änderung der Statuten zu Urkunde A Nr. 6223/2024,

301

■  Seite 8  ■

> über den "Beschluss im Umlaufverfahren" zu Urkunde A Nr. 6228/2024,
> und jene gemäss Artikel 13 (2) 2. (i) der Satzung zu Urkunde A Nr. 6235/2024
> jeweils an diesem Tage zur jeweils angeführten Urkundennummer notariell
> beglaubigt durch Dariusz Wierzchucki, Notar in Warschau, werden für
> rechtsunwirksam erklärt.

> werden <u>abgewiesen</u>.

2.      [...]

Der Beschluss ist noch nicht in Rechtskraft erwachsen.

Das Stiftungsratsmitglied Katarzyna Tomczuk demissionierte im März 2025.
Mit Beschluss der Sicherungsgegner zu 3 – 5 vom 04.03.2025 bestellten
dieses anstelle der demissionierten Katarzyna Tomczuk einstimmig den
Sicherungsgegner zu 1, Jaroslaw Grzesiak, zum Stiftungsratsmitglied.

Mit Änderungsanzeige vom 20.03.2025 wurde die Anmerkung der
Zeichnungsberechtigung des Sicherungsgegners zu 1 als präsumtiver
Nachfolger des Stiftungsratsmitglieds Katarzyna Tomczuk angemeldet.
Gegen die Hinterlegung der Änderungsanzeige hat der
Sicherungswerber einen vorsorglichen Einspruch beim Amt für Justiz,
Abteilung Handelsregister eingebracht. Das Amt für Justiz hat den
Sicherungswerber nach Einlangen der Änderungsanzeige daraufhin
aufgefordert, binnen vierzehn Tagen eine einstweilige Verfügung
dagegen zu beantragen.

2.      Mit dem am 22.04.2025 eingebrachten Antrag (ON 111) beantragt der
**Sicherungswerber** den Erlass eines Amtsbefehles wie aus dem Spruch
ersichtlich. Begründend bringt er vor:

[...]

1       Ausgangslage: Die jüngsten Ereignisse im Zusammenhang mit dem Stiftungsrat der
        TiVi Foundation

302

Seite 9



1   Der Stifter hat sich vorliegend ganz bewusst dem Regelungsregime unterworfen, das mit dem Amtsbefehl vom 26. Oktober 2024 (ON 71) bekanntermassen geschaffen wurde. Durch diese einstweilige Regelungsverfügung wurde für die TiVi Foundation (in der Folge: **"Stiftung"**) eine Organstruktur errichtet, welche die Handlungsfähigkeit der Stiftung und ein "<u>Gleichgewicht</u>" für beide Streitteile herstellen und bewahren soll. Oberstes Gebot für die Parteien und den Stiftungsrat ist, das dadurch <u>geschaffene Gleichgewicht</u> zu respektieren und diese <u>erreichte Befriedung und Ausgewogenheit</u> zwischen den Interessen der beiden Seiten (dem Stifter und seinen Kindern) nicht zu konterkarieren.

2   Vor kurzem hat Katarzyna Tomczuk, die ursprünglich mit dem vorerwähnten Amtsbefehl in ihrem Amt bestätigt wurde, als Mitglied des Stiftungsrats der TiVi demissioniert. Der Stifter respektiert selbstverständlich, dass – gemäss dem getroffenen provisorischen Regelungsregime – nunmehr den Antragsgegnern, *i.e.* Aleksandra Zak, Piotr Zak und Tobias Solorz (in der Folge: **"Kinder"**) das Recht zukommt, einen Nachfolger für diese zu bestellen. Dazu stehen den Kindern eine Vielzahl an fachkundigen Personen zur Auswahl, denen sie sich anvertrauen können (und die auch ihr Vertrauen geniessen).

3   Es ist aber geradezu ein Treppenwitz der Geschichte und selbstentlarvend, dass die Kinder aus diesem grossen Pool an verfügbaren Personen nicht schöpfen, sondern <u>allen Ernstes diese vakante Position justament mit Herrn Jaroslaw Grzesiak besetzen wollen</u>.

4   Zur Erinnerung: Zwischen dem Stifter und Herrn Grzesiak bestand ein jahrelanges Vertrags-, Mandats- und Freundschaftsverhältnis, bis es im Sommer 2024 zum offenen Bruch dieser privaten wie auch beruflichen Beziehungen kam. Das Mandatsverhältnis, aus dem Herr Grzesiak ein jährliches Honorar in Höhe von über EUR 5 Mio lukrieren konnte, wurde vom Stifter aus wichtigem Grund mit sofortiger Wirkung aufgelöst. Herr Grzesiak hat daraufhin – als ehemaliger engster Vertrauter des Stifters – im Rahmen seiner Einvernahme im "Hauptverfahren" gegenüber dem Gericht und allen Anwesenden (teils unter sichtbarem Verlust der Selbstbeherrschung) offen und deutlich zum Ausdruck gebracht, mit welch ausgeprägter persönlicher Abneigung er dem Stifter begegnet und diesen übelst diffamiert.

5   Ebenso wurde durch seine Einvernahme deutlich, dass Herr Grzesiak sich in der vorliegenden Auseinandersetzung ausschliesslich den (Vermögens-)Interessen der

Seite 10

Kinder (und nicht jener der Stiftung) verpflichtet hat, denen er – überdies – mit rechtswidrigen und unlauteren Mitteln ungebremst zum Durchbruch verhelfen will. Dabei schreckt Herr Grzesiak nicht einmal davor zurück, als wahrheitsbelehrter Zeuge – urkundlich belegt – glatt unwahre Zeugenaussagen zum Nachteil des Stifters abzulegen und seine vertraglich mit dem Stifter vereinbarte Verschwiegenheitspflicht zu negieren und bewusst zu verletzen.

6  Der vorliegende Antrag richtet sich auf die <u>einstweilige Untersagung der Hinterlegung der Änderungsanzeige</u> vom 20. März 2025, übermittelt von der BlueRidge Management AG per Schreiben vom 9. April 2025, beim Amt für Justiz, Abteilung Handelsregister, mit der die Zeichnungsberechtigung von Jaroslaw Grzesiak als präsumtiver Nachfolger des Stiftungsratsmitglieds Katarzyna Tomczuk angemerkt werden soll. Diese einstweilige Untersagung ist zur Sicherung des Anspruchs des Stifters auf gerichtliche Abberufung des Herrn Grzesiak erforderlich, der wegen des <u>notorischen und andauernden Interessenkonflikts mit dem Stifter das Amt eines Stiftungsratsmitglieds nicht ausüben kann und nicht ausüben darf</u>.

7  Jemand wie Herr Grzesiak

- der im offenen privaten und beruflichen Bruch und Konflikt zum Erstbegünstigten steht,
- der als ehemaliger Vertrauter und Anwalt des Erstbegünstigten diesen offen – sogar vor Gericht – diffamiert,
- der in dieser Rolle als ehemaliger Vertrauter und Anwalt des Erstbegünstigten die "Seiten gewechselt" und dadurch ihm als Geheimnisträger anvertrautes Wissen rechtswidrig zu Lasten des Geheimnisherrn missbraucht, um im Konflikt der Begünstigten der anderen Seite (den Kindern) unlautere "Vorteile" zu verschaffen,
- der unwahr behauptet, der Erstbegünstigte schulde ihm "Millionen",
- der bewusst die mit dem Erstbegünstigten getroffene Verschwiegenheitsvereinbarungen bricht, um wiederum im Konflikt zwischen Vater und Kinder Partei für die gegnerische Seite des Geheimnisherrn zu ergreifen,
- der diese Verschwiegenheitsverpflichtung auch gegenüber der Stiftung bricht,
- der urkundlich belegte Unwahrheiten vor Gericht aussagt, und

304

Seite 11

- zwischen dem und dem Erstbegünstigten Gerichtsverfahren in Millionenhöhe in Polen anhängig sind bzw. anhängig gemacht werden, die wohl Jahre dauern werden,

kann kein Amt als Stiftungsrat in justament dieser streitverfangenen Stiftung ausüben. Denn eine solche Vielzahl an Interessenkonflikten – auch dann, wenn sie ausserhalb der Stiftungsorganisation liegen – stellen einen <u>wichtigen Grund</u> für die Abberufung dieses Stiftungsrats dar, weil die Verfolgung des Stiftungszwecks <u>bei Vollziehung</u> der vom Stifter vorgesehenen Begünstigtenregelung durch Herrn Grzesiak <u>nicht mit ausreichender Sicherheit gewährleistet</u> ist. Der Sicherungsanspruch und das Sicherungsinteresse des Stifters, wie auch dessen Gefährdung, sind damit evident.

8    Gegen die Hinterlegung der Änderungsanzeige hat der Stifter einen vorsorglichen Einspruch beim Amt für Justiz, Abteilung Handelsregister eingebracht. Das Amt für Justiz hat den Stifter nach Einlangen der Änderungsanzeige daraufhin aufgefordert, binnen vierzehn Tagen eine einstweilige Verfügung dagegen zu beantragen. Dies und die Sicherung des Anspruchs des Stifters auf Abberufung des Herrn Grzesiak, wie auch die Sicherung des Wohles und der Interessen der Stiftung, bilden ebenso den Gegenstand dieses Provisorialantrags.

2    Die Verfehlungen des Herrn Jaroslaw Grzesiak im Einzelnen

a)    Andauernder schwerer persönlicher Bruch und andauernde Auseinandersetzung zwischen Herrn Grzesiak und dem Stifter

9    Zwischen dem Stifter und Herrn Grzesiak bestand – schon nach seinen eigenen Angaben – über viele Jahre ein enges berufliches wie auch freundschaftliches Verhältnis. Der Stifter habe ihn als engsten Freund gesehen. Berufliche Kernaufgaben des Herrn Grzesiak (bzw. seiner Kanzlei) seien zunächst seit dem Jahr 2007 vor allem kapitalmarktrechtliche Beratungen der Unternehmensgruppe gewesen.

10    Der Stifter habe sich aber im Jahr 2020 an Herrn Grzesiak gewandt und ihn ersucht, dass er als "rechte Hand" und Vertrauensperson für diesen tätig werden möge. Herr Grzesiak wollte diese Aufgaben zunächst ebenso im Rahmen seiner Kanzlei abwickeln und damit jedenfalls Anwalt bleiben; der Stifter habe aber verlangt, dass er für diese Tätigkeit als "rechte Hand" seine Karriere als Rechtsanwalt beenden und voll und ganz für ihn zur Verfügung stehen müsse. In diesem Zusammenhang hat Herr Grzesiak ein Beratungshonorar in Höhe von

305

■ Seite 12 ■

jährlich EUR 5'000'000.00 ausverhandelt, wohlgemerkt zuzüglich Bonuszahlungen (von rund EUR 1'000'000.00 jährlich). Dies sei dann in der zwischen Herrn Grzesiak und dem Stifter geschlossenen Vereinbarung vom 8. Mai 2021 dokumentiert worden.

11  Im Gegenzug für diese Vereinbarung vom 8. Mai 2021 mit dem üppigen Beratungshonorar habe Herr Grzesiak – nach seinen Angaben – auf Verlangen des Stifters seine Position als "Topanwalt in Polen" aufgeben müssen. Er habe auf Wunsch des Stifters (angeblich) auch auf seine Berechtigung zur Ausübung der Anwaltschaft verzichtet. Ebenso habe Herr Grzesiak seine Beteiligung an seiner Anwaltskanzlei verkaufen müssen, um seine Dienste exklusiv dem Stifter zur Verfügung zu stellen.

12  Damit war – nach den Angaben des Herrn Grzesiak – seine Karriere als Topanwalt in Polen beendet und er war finanziell und wirtschaftlich zur Gänze vom Beraterverhältnis zum Stifter abhängig. Oder, um es mit den Worten des Herrn Grzesiak plakativ zusammenzufassen: "*Ich habe alles für den Stifter aufgegeben.*"

13  Allerdings verlief dieses Beratungsverhältnis nicht so, wie von Herrn Grzesiak erwartet (und auch nicht so, wie dies der Stifter sich erwartet hatte). Herr Grzesiak war nämlich – wie sich später im Sommer 2024 herausstellte – Teil des Vorhabens der Kinder, deren Vater zu entmachten. Er hat zwar vom Stifter üppige Millionenzahlungen aus dem Beratervertrag erhalten, jedoch entgegen seiner Interessen (im Hintergrund) die Kinder beraten und deren Interessen durchzusetzen versucht. Herr Grzesiak spielte also ein doppeltes Spiel, und dieser Schuss ging – als dies aufflog – nach hinten los.

14  **Denn als diese Machenschaften und Interessenkollisionen des Herrn Grzesiak "aufgeflogen" sind, hat der Stifter den Beratervertrag am 13. September 2024 mit sofortiger Wirkung aufgelöst und Herrn Grzesiak gewissermassen "vor die Türe" gesetzt.**

15  Dadurch kam es zum offenen Bruch zwischen dem Stifter und Herrn Grzesiak, der sich in seiner Ehre und honorigen Tätigkeit offensichtlich gekränkt fühlte, wovon sich das Fürstliche Landgericht im Übrigen selbst ein Bild machen konnte, indem Herr Grzesiak äusserst aggressiv, emotional und diffamierend über den Stifter geradezu hergezogen ist.

16  Herr Grzesiak sieht im Stifter jedenfalls das alleinige Übel und die Ursache darin, dass er sich – seiner Ansicht nach – nun zwischen zwei Stühle gesetzt hat: Aus

306

■  Seite 13  ■

seiner Sicht hat er im Ergebnis sowohl seine Karriere als "Topanwalt in Polen" aufgegeben als auch seinen Beratungsvertrag mit dem Stifter verloren, der ihm eine entsprechende Entlohnung sichern sollte. Nachdem er seine Anteile an der Kanzlei (wiederum auf angebliches Verlangen des Stifters) verkauft habe und Herr Grzesiak (bis heute) nicht mehr praktizierender Rechtsanwalt sei, ist ihm (wohlgemerkt: selbstverschuldet) damit die lukrativste Einkommensquelle im Millionen-Euro-Bereich abhandengekommen.

17    Infolge dieser Auseinandersetzung behauptet Herr Grzesiak nun unter anderem, gegenüber dem Stifter Forderungen "in Millionenhöhe" zu haben. Der Stifter hat wiederum in Polen ein Gerichtsverfahren gegen Herrn Grzesiak anhängig machen müssen, um (zumindest ansatzweise) Kompensation für die schweren Verfehlungen und Pflichtwidrigkeiten des Herrn Grzesiak aus dem ehemaligen Beratervertrag erhalten zu können, die zu erheblichen Schäden und Nachteilen beim Stifter geführt haben. Durch die qualifizierten Pflichtwidrigkeiten hat der Stifter auch Honorarrückersatzansprüche gegenüber Herrn Grzesiak, die wiederum in Polen gerichtsanhängig werden.

18    Kurz gesagt: Herr Grzesiak machte schon bei seiner Aussage vom 3. Februar 2025 keinen grossen Hehl daraus, dass er dem Stifter, für den er (aus seiner Sicht) sinnloserweise "alles aufgegeben" habe, <u>mit tiefer persönlicher Abneigung begegnet</u>. Er hegt massive persönliche Animositäten, die er als Stiftungsrat nicht ausblenden kann und nicht ausblenden wird. Zwischen den Genannten sind – überdies – gerichtliche Auseinandersetzungen anhängig und auch die Einleitung weiterer Verfahren in Vorbereitung. Diese Auseinandersetzungen gehen weit über die vom Amtsbefehl vom 26. Oktober 2024 angestrebte "Balance" hinaus, mit der jeweils ein Stiftungsratsmitglied aus dem "Lager" der Kinder und des Stifters bestellt werden sollte. Herr Grzesiak ist nicht bloss dem "Lager" der Kinder zuzurechnen, sondern steht in einem eklatanten und unüberwindbaren Interessenkonflikt zum Stifter, was wohl keinesfalls das Regelungsziel dieses Amtsbefehls sein konnte und in Konsequenz auch das Stiftungsinteresse gefährdet. Allein schon die massive persönliche Auseinandersetzung stellt faktisch ein unüberbrückbares Hindernis für die Ausübung des Amtes als Stiftungsrat dar.

19    Durch die offen ausgetragene Auseinandersetzung ist es letztlich aber auch evident, dass Herr Grzesiak sein Amt als Stiftungsratsmitglied zur Ergreifung von Vergeltungsmassnahmen gegen den Stifter missbrauchen wird (oder zumindest

307

diese Gefahr konkret sich zu verwirklichen droht), um dem Stifter das "heimzuzahlen", was der Stifter – aus der falschen Sicht des Herrn Grzesiak – ihm "angetan" habe. Jedenfalls ist es ausgeschlossen, dass Herr Grzesiak bei der organschaftlichen Willensbildung als Stiftungsrat all diese persönliche Abneigung – die sich aus der aggressiven Aussage eindeutig ergab – ausblenden und sich neutral verhalten kann.

b)  Wissentlicher Verstoss gegen vertragliche Verschwiegenheitsverpflichtungen gegenüber dem Stifter

20  Nach dem Bruch zwischen Stifter und Herrn Grzesiak und der Auflösung des Beratervertrages im Spätsommer 2024 wurde Herr Grzesiak – nunmehr ohne diese Einkommensquelle ausgestattet – im Verfahren 06 HG.2024.210 von den Kindern als Zeuge namhaft gemacht. In diesem Verfahren hat er sodann am 3. Februar 2025 seine Zeugenaussage abgelegt. Vor Ablegung seiner Zeugenaussage wurde Herr Grzesiak – als praktizierender Jurist und ehemaliger "Topanwalt" ohnedies in Kenntnis darüber – vom Gericht auf die bestehende Wahrheitspflicht hingewiesen.

21  Der Stifter hat sodann Herrn Grzesiak nicht von seiner Verschwiegenheitsverpflichtung entbunden und Herr Grzesiak wurde ausdrücklich auf diese fehlende Entbindung hingewiesen. Daraufhin sagte Herr Grzesiak als Zeuge unter Wahrheitspflicht aus, dass er "*an keine Verschwiegenheitsflicht gebunden [sei], es gibt nichts, wovon ich entbunden werden müsste. [...]*" Anschliessend hat der Zeuge seine umfangreiche Aussage auf Zuruf der Kinder und zum Nachteil des Stifters abgelegt (und zahlreiche Unwahrheiten verbreitet, die hier jedoch nur eine untergeordnete Rolle spielen). Zudem hatte Herr Grzesiak noch gesagt, er würde es als seine Pflicht ansehen, vor Gericht zu erscheinen und "Ihre Fragen" (gemeint jene der Fürstlichen Landrichterin) beantworten, sodann jedoch fast ausschliesslich Fragen der Antragsgegnervertreter beantwortet.

22  Allerdings war diese Behauptung (nebst vielem anderen) die glatte Unwahrheit: Gemäss Vereinbarung vom 19. September 2023 hat sich nämlich Herr Grzesiak gegenüber dem Stifter ausdrücklich ("*bedingungslos und mit sofortiger Wirkung*") dazu verpflichtet, keinesfalls gegenüber jemandem die vom Stifter "*getroffenen oder zu treffenden Entscheidungen über die Stiftung [...] in jeglicher Form preiszugeben, zu verbreiten oder zu kommentieren*". Weiters hat sich Herr Grzesiak dazu verpflichtet, keinesfalls gegenüber irgendjemanden die von ihm

Seite 15

*"eingeholten oder einzuholenden Informationen über [die Person des Stifters] oder in Zusammenhang mit [der Person des Stifters] ungeachtet deren Form preiszugeben, zu verbreiten, zu kommentieren oder jeglichen Gebrauch daraus zu machen [...]".*Herr Grzesiak hat die Verpflichtung zur *"strikten Einhaltung"* bekräftigt und *"auf alle Rechte auf gerichtliche oder ausssergerichtliche Massnahmen"* verzichtet, die zu einer Schmälerung seiner umfangreichen Verschwiegenheitspflicht führen könnten.

23    <u>Kurz gesagt</u>: Zwischen dem Stifter und Herrn Grzesiak bestand selbstverständlich eine umfangreiche Verschwiegenheitsverpflichtung, an die Herr Grzesiak gebunden war. Dass Herr Grzesiak – auch im Rahmen seiner Einvernahme – sehr wohl <u>in bester Kenntnis</u> über seine bestehende Verschwiegenheitsverpflichtung gewesen ist, die er gerade wissentlich zu brechen beabsichtigte, ergibt sich unzweifelhaft daraus, dass er im Streitgespräch mit den Rechtsvertretern des Stifters (arg: *"Go on, Columbus!"*), die ihn zur Unterlassung seiner Aussage aufgefordert haben, auf diese Verpflichtung selbst Bezug nahm.

24    Erschwerend kommt hinzu, dass justament diese am 19. September 2023 abgeschossene Verschwiegenheitsverpflichtung im Konnex mit seiner Rolle als damaliger Stiftungsrat der Stiftung steht. Der glasklare Verstoss gegen diese Verpflichtung ist daher nicht nur ein <u>rechtswidriges und schuldhaftes Fehlverhalten gegenüber dem Stifter und Erstbegünstigten</u>, sondern gerade <u>auch</u> eine <u>schwere Pflichtwidrigkeit gegenüber der Stiftung</u> (die von dieser Verschwiegenheitsvereinbarung mit Schutzwirkung zugunsten Dritter ebenso erfasst ist).

25    Schliesslich hat Herr Grzesiak offen "die Seiten gewechselt" und sich ausschliesslich dem Fortkommen der Kinder verpflichtet, während er dem Stifter nunmehr nach seinem Bruch ganz offen mit Ablehnung und Verachtung entgegentritt. Herr Grzesiak hat aber aus seiner früheren Tätigkeit Informationen über den Stifter und seine Unternehmensgruppe, welches er als Stiftungsrat missbrauchen könnte, um daraus unlauter Kapital zugunsten der Kinder zu schlagen zu versuchen oder zumindest Vergeltung für seine empfundene Kränkung durch den Bruch mit dem Stifter zu üben. Auch hier ist es ausgeschlossen, dass dies Herr Grzesiak bei Ausübung seines Amtes einfach "ausblenden" und bloss das Wohl der Stiftung und die Gleichbehandlung der Stiftungsbeteiligten im Blick haben wird.

 Seite 16

26  Schliesslich sei noch kurz auf das Folgende verwiesen: Herr Grzesiak hat – wie ausgeführt – im Rahmen seiner zeugenschaftlichen Einvernahme auf den Hinweis, dass er von seiner Verschwiegenheitspflicht nicht entbunden werde, unter anderem ausgesagt, dass er "an keine Verschwiegenheitsflicht gebunden [sei], es gibt nichts, wovon ich entbunden werden müsste. [...]". Der Sache nach hat Herr Grzesiak zunächst negiert, dass überhaupt eine Verschwiegenheitsverpflichtung existiere ("es gibt nichts, wovon ich entbunden werden müsste"). Erst später – noch einmal von den Rechtsvertretern konfrontiert – hat er nebulös zugegeben, dass es eine Vereinbarung gebe, die jedoch nicht dem Anwaltsgeheimnis unterliege. Dass er nach der geschlossenen Verschwiegenheitsverpflichtung auch von dieser entbunden werden hätte müssen, hat Herr Grzesiak wahrheitswidrig verschwiegen. Herr Jaroslaw Grzesiak hat daher – allein schon seine Verschwiegenheitsverpflichtung betreffend – vor dem Gericht wahrheitswidrige Angaben gemacht, wonach es keine Verschwiegenheitsverpflichtung gegeben hätte, von der er entbunden werden hätte müssen.

c)  Zwischen dem Stifter und Herrn Grzesiak sind Rechtsstreitigkeiten in Polen anhängig

27  Wie oben bereits skizziert behängten in Polen Rechtsstreitigkeiten zwischen dem Stifter und Herrn Grzesiak, die in unmittelbarem Zusammenhang mit i) dem Beratervertrag vom 8. Mai 2021 und ii) der bewussten Verletzung seiner Verschwiegenheitspflicht per Vereinbarung vom 19. September 2023 stehen.

28  Der Stifter klagt Herrn Grzesiak auf Feststellung, dass Letzterer seine anwaltliche Verschwiegenheitsverpflichtung verletzt hat. In der weiteren Folge wird der Stifter Herrn Grzesiak auf Schadenersatz aus diesem Geheimnisbruch klagen. Umgekehrt hat Herr Grzesiak (auch im Rahmen seiner letzten Einvernahme am 3. März 2025) unrichtigerweise behauptet, gegenüber dem Stifter Millionenforderungen zu haben. Bis diese Rechtsstreitigkeiten geklärt sind, werden realistischerweise Jahre vergehen.

29  Es ist undenkbar, dass Herr Grzesiak in der Ausübung dieses Amtes als Stiftungsratsmitglied diese schwerwiegende Auseinandersetzung mit dem Stifter einfach ausblenden kann oder dies auch nur versuchen würde. Im Gegenteil: Man setzt gerade den Prozessgegner des Herrn Solorz an das Ruder jener Stiftung, der Herr Solorz sein Milliardenimperium übertragen hat, und unterwirft somit dem

310



Seite 17

Stifter dem offenkundig unsachlichen und voreingenommenen Willen des Herrn Grzesiak.

d)   Daher: Ein erklärter Gegner des Erstbegünstigten kann nicht Stiftungsrat sein

30   Geht es nach dem Vorhaben der Kinder, soll nun dieser Herr Grzesiak über die Geschicke und Gebarung der vom Stifter errichteten Stiftung bestimmen, obwohl er infolge der Entfremdung und Auseinandersetzung nunmehr der erklärte Gegner des Stifters ist. Eine Person, die vor wenigen Wochen noch *coram publico* im Gerichtssaal polternd den Stifter, Kurator und Erstbegünstigten diffamiert hat, kann infolge dieses immanenten Interessekonflikts nicht justament diesem Stiftungsrat angehören.

31   Abgerundet wird das Verhältnis des Herrn Grzesiak zur betroffenen Verbandsperson im Übrigen dadurch, dass er diese bereits massiv zu schädigen versuchte. So hat Herr Grzesiak die letzten Monate nichts unversucht gelassen, um bei seinen persönlichen Kontakten auf höchster Geschäftsleitungsebene bei verschiedensten Kreditinstituten negativ zu intervenieren. Diese Kreditinstitute stehen (bzw. standen) in ständiger Geschäftsverbindung mit den Tochtergesellschaften der TiVi, wodurch bestehende Finanzierungen der Unternehmensgruppe zu platzen drohten.

32   Herr Grzesiak hat es ganz bewusst darauf angelegt, dass den Tochtergesellschaften der Stiftung (und damit auch der Stiftung) die Kündigung bzw. Nichtverlängerung laufender Kreditverträge angedroht oder teilweise sogar eine solche vollzogen wurde. Ziel war es, die Unternehmensgruppe und den Stifter unter Druck zu setzen. Sein Vorhaben konnte nur durch äusserste Bemühungen der operativen Managementebene (zumindest vorerst) verhindert werden.

33   Kurzum: Herr Grzesiak ist für die Bekleidung des Amtes als Stiftungsrat nicht nur persönlich ungeeignet und seine Bestellung ist wegen eines andauernden Interessenkonfliktes zur Stiftung und zum Stifter unzulässig, sondern es droht – würde man ihn dort belassen – darüber hinaus vielmehr die Gefahr, dass er dieses Amt missbrauchen werden wird, um der Stiftung und insbesondere dem Stifter – seinem erklärten Gegner – noch weiteren Schaden zuzufügen.

34   Eine Person, die offen unsachliche persönliche Abneigungen gegen den Stifter, Kurator und Erstbegünstigten einer Stiftung geäussert, der Stiftung Schaden zugefügt und sich in Lautstärke und Tonalität im Aussageverhalten völlig vergriffen hat, und darüber hinaus Verpflichtungen gegenüber der Stiftung wissentlich und

311

■ Seite 18 ■

willentlich zum Vorteil einer Konfliktpartei und zum Nachteil der Stiftung verletzt
hat, kann nicht dem Stiftungsrat gerade dieser streitverfangenen TiVi Foundation
angehören.

3    Rechtliches

a)   Der klare und andauernde Interessenkonflikt ist nach Lehre und Rechtsprechung
     ein klarer Abberufungsgrund

35   Die Abberufung eines Stiftungsrates durch das Aufsichtsgericht kann auch ohne
     konkrete Pflichtverletzung ("nur") aufgrund des Anscheins einer Interessenskollision
     erfolgen. Interessenkonflikte – auch dann, wenn sie <u>ausserhalb</u> der
     Stiftungsorganisation liegen – stellen einen wichtigen Grund für die Abberufung
     eines Stiftungsrats dar, wenn die Verfolgung des Stiftungszwecks <u>bei Vollziehung</u>
     der vom Stifter vorgesehenen Begünstigtenregelung <u>nicht mit ausreichender</u>
     <u>Sicherheit gewährleistet</u> ist. Selbst der Anschein eines Interessenkonflikts ist zu
     vermeiden.

36   Auch solche Interessenkollisionen, die (noch) nicht den Grad einer gesetzlich
     ausdrücklich normierten Unvereinbarkeit erreichen, stellen einen wichtigen Grund
     für die Abberufung eines Stiftungsrats dar, wenn aufgrund dieser
     Interessenkollisionen die Verfolgung des Stiftungszwecks bei Vollziehung der vom
     Stifter vorgesehenen Begünstigtenregelung nicht mit <u>ausreichender Sicherheit</u>
     <u>gewährleistet</u> werden kann.

37   Dass durch die Rolle des Herrn Grzesiak und seine offen erklärte Feindschaft zum
     Stifter die Vollziehung der Begünstigtenregelung (und damit die Zweckerfüllung
     der Stiftung) nicht mit ausreichender Sicherheit gewährleistet ist, sondern –
     gerade im Gegenteil – er diese Rolle als Stiftungsrat zum Nachteil der Stiftung und
     zur Zufügung von Nachteilen dem Stifter missbrauchen werden würde, ist evident.

38   Besteht – wie hier – ein gravierenden Konflikt, so ist die <u>Gefahr der</u>
     <u>Beeinträchtigung</u> des Zwecks der Stiftung offensichtlich, weil die
     <u>Gleichbehandlung</u> der Begünstigten in der jeweiligen Begünstigtenklasse (hier:
     die ordnungsgemässe Behandlung des Erstbegünstigten mit all seinen Rechten) in
     aller Regel ein <u>Kernelement jeder Stiftung</u> ist. Herr Grzesiak hat schon ausweislich
     der jüngsten Ereignisse (siehe dazu unten Punkt c) nicht vor, seine Rolle als
     Stiftungsrat unabhängig und unparteiilich – im Sinne der Gleichbehandlung –
     auszuüben, was sich bereits daraus ergibt, dass er wenige Tage nach seiner

312



Seite 19

Bestellung bereits auf Zuruf der Kinder deren Vertrauensleute in den operativen
Gesellschaften in Zypern installieren will.

39    Abgesehen von den oben dargestellten ausserhalb der Stiftungsorganisation
liegenden Konflikten zwischen Herrn Grzesiak und dem Stifter können aber auch
jahrelange Auseinandersetzungen zwischen einem Stiftungsrat und dem
Erstbegünstigten die Erreichung des Zwecks der Stiftung in Frage stellen bzw
zumindest gefährden und damit seine Abberufung notwendig machen. Das
Gericht hat diesfalls auf Antrag jedes Stiftungsbeteiligten einzelne
Stiftungsratsmitglieder oder den gesamten Stiftungsrat abzuberufen, welche
diesem Interessenkonflikt unterliegen, welcher die Stiftung gefährdet.

40    Wie oben ausgeführt, besteht seit Sommer 2024 ein offen ausgetragener Konflikt
zwischen Herrn Grzesiak und dem Stifter. Es sind gerichtliche Prozesse anhängig,
die Jahre dauern werden. Herr Grzesiak ist dem Stifter als Vertrauensperson in den
Rücken gefallen. Er hat offen die Seiten gewechselt, seine Pflichten aus dem
Beratervertrag und seine Verschwiegenheitsverpflichtung (auch gegenüber der
Stiftung) verletzt. Herr Grzesiak hat das Vertrauen des Stifters (und des
Erstbegünstigten) auf das Äusserste missbraucht und wird es auch weiter
missbrauchen, um justament den Prozessgegnern des Stifters – im Zusammenhang
mit dieser Stiftung – Vorteile zu verschaffen zu versuchen.

41    Ein solcher Vertrauensbruch und eine solche jahrelange Auseinandersetzung des
Stiftungsrates mit dem Erstbegünstigten der Stiftung stellt vielmehr einen wichtigen
Grund dar, der die Abberufung dieses Stiftungsrates notwendig macht.

42    Oder, um es (etwas überspitzt) auf den Punkt zu bringen: Die Kinder hätten sich
auch gleich selbst in den Stiftungsrat bestellen können, wenn man in der Rolle
und den Äusserungen des Herrn Grzesiak und seinem ablehnenden Auftreten
gegenüber dem Stifter keinerlei Konflikt erkennen wollen würde.

b)    Zu sichernder Anspruch / zu sicherndes Rechtsverhältnis / Antragslegitimation

43    Der Stifter ist nicht nur Stifter und Kurator, sondern auch Erstbegünstigter der
Stiftung. Er ist damit Stiftungsbeteiligter iSd Art. 552 § 3 PGR und selbstredend zur
Stellung von Anträgen an das Aufsichtsgericht (wie hier relevant: eines
Abberufungsantrags) legitimiert. Gerade dann, wenn sich ein Stiftungsratsmitglied
in offenem und dauerndem Konflikt mit dem Erstbegünstigten und Stifter befindet,
steht die Beibehaltung seiner Funktion einer zweckgemässen Verwaltung und

313

■ Seite 20 ■

Verwendung des Stiftungsvermögens und auch der Erreichung des Stiftungszwecks entgegen.

44    Die vorliegend zu sichernden Ansprüche sind in den Ansprüchen des Stifters in seiner Eigenschaft als alleiniger Erstbegünstigter, aber auch als Stifter und Kurator zu sehen, dass das Vermögen der Stiftung statuten- und beistatutenkonform zu Gunsten des Erstbegünstigten verwendet und verwaltet wird. Dieser Anspruch gründet sich insbesondere auf Art. 9 Abs 2 der Statuten sowie Art. A I. und B. 1) der Beistatuten.

45    Mit dem noch einzubringenden Antrag auf gerichtliche Abberufung des Herrn Grzesiak wird der Stifter diesen Anspruch auf zweckgemässe Vermögensverwendung und Verwaltung zum Durchbruch verhelfen. Dies ist Gegenstand der Stiftungsaufsicht (Art. 552 § 29 PGR). Gemäss Art. 270 Abs. 3 EO können im Ausserstreitverfahren geltend zu machende Ansprüche mit einstweiliger Verfügung (auch von Amts wegen) gesichert werden. Der Anspruch des Stifters und seine Legitimation auf Stellung eines gerichtlichen Abberufungsantrags (einschliesslich des vorliegenden Antrags auf Erlass eines Amtsbefehls) sind daher unzweifelhaft.

c)    Gefährdung / Regelungsinteresse

46    Nebst einem zu sichernden Recht oder Rechtsverhältnis setzt die Erlassung eines Amtsbefehls nach Art. 276 Abs. 1 lit. b EO eine objektive Gefährdung voraus. Eine solche wird nach der Rechtsprechung bereits angenommen, wenn die rechtlichen oder faktischen Verhältnisse strittig, unklar oder unbestimmt sind. Es genügt also, wenn ein Rechtsverhältnis entweder vom Sicherungsgegner bestritten oder durch eine Handlung des Sicherungsgegners gestört wird. Darüberhinausgehender Machenschaften oder dem zu sichernden Anspruch zuwiderlaufender Verfügungen oder Handlungen des Sicherungsgegners bedarf es nicht. Entsprechend hielt der Fürstliche Oberste Gerichtshof in der oben zitierten Entscheidung vom 12. Januar 2018 das Folgende fest:

> "Für den hier zu prüfenden Provisorialanspruch ist massgebend, dass über die Frage der rechtmässigen Rechtsausübung anlässlich der Generalversammlung vom 18.05.2017 Unklarheit herrscht, die für die Dauer des Hauptverfahrens geschlichtet werden soll. Allein deshalb ist die beantragte einstweilige Zustandsregelung mit dem Verbot an das Amt für Justiz, die anlässlich der Generalversammlung vom 18.05.2017

314

■    Seite 21    ■

*beschlossenen Änderungen vorzunehmen, insbesondere die Eintragung der*
*derzeitigen Verwaltungsräte zu löschen und die angeblich neu gewählten*
*Verwaltungsräte einzutragen (Drittverbot im Sinne des Art. 277 lit. g EO),*
*gerechtfertigt. <u>Schon die Ausübung der Geschäftsführung durch einen</u>*
*<u>Unbefugten stellt nämlich einen unwiederbringlichen Nachteil dar.</u>"*

47    Ähnlich judiziert der österreichische Oberste Gerichtshof, dass in der Verfügung
über Geschäftsanteile bzw die Ausübung von Gesellschafterrechten (durch einen
Unberechtigten) regelmässig eine Bedrohung mit einem unwiederbringlichen
Nachteil für die Gesellschaft liegt, sodass insoweit schon deshalb keine weitere
Gefahrenbescheinigung erforderlich ist. Bei drohender (hier zum Teil ja sogar
bereits geschehener) Ausübung von Rechten (durch Herrn Grzesiak) liegt
demnach die für den Sicherungsantrag notwendige Gefährdung ohnedies auf
der Hand.

48    Im vorliegenden Fall liegen aber auch weitere konkrete Umstände vor, die eine
Gefährdung des Anspruchs nicht nur (objektiv) wahrscheinlich machen, <u>sondern</u>
<u>es wurden von Herrn Grzesiak gemeinsam mit dem gerichtlich bestellten Beistand</u>
<u>bereits massgebliche Handlungen gesetzt, welche die Ansprüche und Rechte des</u>
<u>Stifters konterkarieren:</u>

49    Herr Grzesiak hat zuletzt den gerichtlich bestellten Beistand (wohl) in die Irre
geführt und in der Stiftungsratssitzung vom 10. April 2025 ein Beschlussvorhaben
(gegen die Stimme und klare Empfehlung von Tomasz Szelag) "durchgeboxt". Wird
dieses (ohnedies auch nichtige) Beschlussvorhaben umgesetzt, würde sich die
Stiftung mit Blick auf die zypriotischen einstweiligen Verfügungen in eine
Sackgasse begeben und ihre Interessen würden dort nicht mehr gewahrt werden
können. Insbesondere sieht das von Herrn Grzesiak durchgeboxte
Beschlussvorhaben (sowie der entsprechende vor dem zypriotischen Gericht
gestellte Antrag) lediglich die Abänderung der zypriotischen einstweiligen
Verfügung zur Erlaubnis der Bestellung der von ihm genannten zusätzlichen
Direktoren vor, nicht jedoch auch deren Abberufung. Dadurch würden die
Interessen an einer ordnungsgemässen Geschäftsführung der unterliegenden
Gesellschaften massiv beeinträchtigt, weil im Falle von Pflichtwidrigkeiten oder
Interessenkonflikten der neuen Direktoren eine Abberufung durch die zypriotische
einstweilige Verfügung untersagt wäre.

315

■    Seite 22    ■

50    Wenige Tage nach diesem (nichtigen und auch anfechtbaren) Mehrheitsbeschluss wurde dieses Vorhaben – wenngleich von keinem Beschlusswortlaut gedeckt – in Zypern umzusetzen versucht, indem Herr Grzesiak und der gerichtliche Beistand ohne das dritte Stiftungsratsmitglied einzubinden oder zu informieren zur Tat geschritten sind und beim Bezirksgericht Limassol in Zypern die im Stiftungsrat unabgestimmten Anträge einbringen liessen. Dies obwohl die Zeichnungsberechtigung des Herrn Grzesiak noch nicht einmal im Handelsregister hinterlegt wurde. Es liegt auf der Hand, dass das Ziel gewesen sein muss, so schnell wie möglich Fakten zu schaffen bevor der Stifter Rechtsschutz erlangen kann.

51    Dem nicht genug, sind die in Zypern vorgenommenen Rechtshandlungen für die Stiftung (die eingebrachten Anträge) von keinerlei Beschlussvorhaben gedeckt, auch nicht von jenem Mehrheitsbeschluss vom 10. April 2025:

- **Abgelehnt** wurde in der Stiftungsratssitzung Punkt 4.) der Traktandenliste, wonach "*Beschlussfassung über die Ernennung […] von zwei zusätzlichen Direktoren […]*" vorgesehen war.

- **Beschlossen** wurde gegen die Stimme von Tomasz Szelag, dass "*die zypriotischen Rechtsanwälte der Stiftung instruiert werden sollen, einen Antrag auf Abänderung der zypriotischen einstweiligen Verfügung einzubringen, wodurch die Ernennung von zusätzlichen Direktoren der Reddev ermöglicht werden soll.*"

    In diesem (nichtigen) "angenommenen" Beschluss wurde weder die Person, die zum Vorstand bestellt werden soll, näher determiniert (dieser Beschluss wurde eben zuvor abgelehnt), noch wurde beschlossen, dass *uno actu* auch gleich die Ernennung oder Bestellung erfolgen soll. Beschlossen wurde bloss die Einleitung der erforderlichen "Vorarbeiten" in Zypern, nicht gleich die vollständige Umsetzung.

- **Umgesetzt** wurde vom Stiftungsrat (von Herrn Grzesiak und dem gerichtlich bestellten Beistand – dies unter vollkommener Übergehung von Tomasz Szelag) – ohne irgendeinen Beschluss oder den Stiftungsrat damit zu befassen – jedoch, dass beim zypriotischen Gericht ein Antrag eingebracht wurde, wonach a) die zypriotische einstweilige Verfügung nicht nur angepasst, sondern ein Antrag auf gerichtliche Ernennung gestellt wurde, und b) die niemals vom Beschlussvorhaben gedeckten Personen George Sphiktos und

316

Maria Kannava (aus dem Lager der Kinder) gleich als Direktoren ernannt werden sollen.

**Die sofortige Umsetzung war daher weder vom (nichtigen) Mehrheitsbeschluss, noch von sonst einem Beschlussvorhaben gedeckt. Im Gegenteil: Die Umsetzung wurde ausdrücklich abgelehnt.**

52    Hinzu kommt noch das Folgende: Das Fürstliche Obergericht führt in der jüngst ergangenen Entscheidung zur Kritik des Stifters, dass ohne entsprechende Traktandierungspflicht einfach ein Mehrheitsbeschluss gefasst werden könnte, das Folgende aus: *"Wenn der Rekurswerber die Befürchtung äussert, dass nunmehr binnen kürzester Frist ein Zirkularbeschluss von zwei Stiftungsräten ohne Diskussion oder Anhörung des dritten Stiftungsrats gefasst werden könnte, ist darauf zu verweisen, dass die Bestimmung des Art. 7 (1) e der Statuten, wonach der Stiftungsratspräsident auf Antrag eines Stiftungsratsmitglieds eine Stiftungsratssitzung einzuberufen hat (bzw. bei Säumnis des Stiftungsratspräsidenten der Antragsteller selbst die Sitzung einberufen kann), nach wie vor aufrecht und gültig ist. Das - im Sinne der Rekursausführungen - „dritte" Stiftungsratsmitglied kann also nach Zustellung des von einem Zirkularbeschluss erfassten Vorhabens - insbesondere bei Setzung einer seiner Meinung nach „zu kurzen" (Äusserungs- bzw. Zustimmungs-)Frist - die Einberufung einer Stiftungsratssitzung beantragen, um den Beschlussinhalt im Detail besprechen zu können."*

53    Der gerichtlich bestellte Beistand und Herr Grzesiak haben jetzt aber nicht einmal einfach einen Zirkularbeschluss ohne entsprechende Erörterung im Stiftungsrat gefasst, sondern das dritte Stiftungsratsmitglied und den Stifter als Kurator vollständig umgangen und durch ihre vermeintliche Vertretungsbefugnis auf Zypern faktische Verhältnisse geschaffen. Genau aus diesem Grund ist der Erlass eines einstweiligen Amtsbefehls auch dringend angezeigt, weil ansonsten die Gefahr besteht, dass der gerichtlich bestellte Beistand zusammen mit Herrn Grzesiak weitere Handlungen zuwider den Interessen der Stiftung unter Missachtung der vorgegebenen Willensbildungsvoraussetzungen setzen werden.

54    Im Übrigen ist es bemerkenswert, wie sehr die jüngsten Handlungen unter Einbeziehung des gerichtlich bestellten Beistandes im Widerspruch zur eben ergangenen OG Entscheidung stehen: Die Entscheidung ist klar vom Tenor getragen, dass der Status Quo beibehalten und die Stiftung während der

317

■ Seite 24 ■

Auseinandersetzung zwischen Stifter und seinen Kindern neutral sein soll. Und genau dieser Status Quo und die vorgegebene Neutralität werden durch die Handlungen vom gerichtlich bestellten Beistand (der die einstweilige Verfügung ursprünglich unter Vorgabe dieser Neutralität nicht bekämpfen wollte) und Herrn Grzesiak unter Missachtung sämtlicher statutarischen und gesellschaftsrechtlichen Vorgaben über Bord geschmissen.

55   Gegen dieses – sämtliche Grundprinzipien der ordnungsgemässen Willensbildung übergehende – Vorgehen hat der Stifter auch provisorialen Rechtsschutz begehrt. Es ist offensichtlich: Herr Grzesiak will sofort den Willen der Kinder mit unlauteren Mitteln umsetzen und den Stifter vor vollendete Tatsachen stellen. Bedauerlicherweise hat sich der gerichtliche Beistand in diesem Sinne in die Irre führen und dafür verleiten lassen. Jedenfalls gibt es damit keinerlei Zweifel an einer konkreten Gefährdung des Anspruchs des Stifters, dass Herr Grzesiak nach Aussen hin Handlungen setzen und vollendete Tatsachen schaffen wird.

56   Aus den obigen Gründen ergibt sich der <u>dringendst gebotene Handlungsbedarf</u> und die objektive Gefährdung der Rechte des Stifters und Erstbegünstigten.

d)   Sicherungsmittel

57   Bekanntlich werden auch im ausserstreitigen Stiftungsaufsichtsverfahren die Bestimmungen der Art 276 ff EO zur Sicherung der dort geltend gemachten Ansprüche angewandt. Aufgrund des am 10. März 2025 erhobenen vorsorglichen Einspruchs des Stifters hat das Amt für Justiz sodann mit Verfügung vom 10. April 2025 (zugestellt am 14. April 2025) diesem aufgetragen, binnen 14 Tagen beim Fürstlichen Landgericht eine vorsorgliche Verfügung zu erwirken, *"mit welcher die Hinterlegung der mit Schreiben vom 09.04.2025 beim Amt für Justiz eingereichten Änderungsanzeige vom 20.03.2025, hinsichtlich der TiVi Foundation, Vaduz, untersagt wird"*.

58   Geeignetes Sicherungsmittel ist gegenständlich das Verbot an das Amt für Justiz, Abteilung Handelsregister, bis zum Abschluss des noch einzubringenden Rechtfertigungsverfahrens (Antrag auf gerichtliche Abberufung des Herrn Grzesiak) keinerlei Änderungsanzeigen zu hinterlegen, welche die Bestellung des Herrn Grzesiak als Stiftungsrat beinhalten.

59   Darüber hinaus ist es infolge der jüngsten Ereignisse – zur Sicherung des Anspruchs des Stifters auf gerichtliche Abberufung – erforderlich, Herrn Grzesiak auch einstweilen zu verbieten, für die Stiftung zu handeln. Aus den jüngsten Ereignissen

318

■    Seite 25    ■

ergibt sich, dass Herr Grzesiak keinen Deut darauf gibt, ob es eine interne
Willensbildung im Stiftungsrat gibt. Er schafft einfach Tatsachen. Daher hat zur
Sicherung des Anspruchs auch das einstweilige Verbot an Herrn Grzesiak zu
erfolgen, für die Stiftung aufzutreten und für diese zu zeichnen. Andernfalls
unterbleibt zwar die Hinterlegung beim Amt für Justiz, dies hindert aber Herrn
Grzesiak nicht, die Ansprüche des Stifters zu konterkarieren.

60    Es liegt darin auch <u>kein Eingriff auf die ordnungsgemässe Willensbildung der
Stiftung</u>, zumal der Stiftungsrat durch den gerichtlichen Beistand und Tomasz
Szelag voll handlungsfähig ist und bleibt. Es besteht selbstverständlich auch die
Möglichkeit, dass die Kinder Herrn Grzesiak zur gebotenen Amtsniederlegung
bewegen und sie – gemäss dem Gebot der Befriedung und des *"Füsse Stillhaltens"*
– eine andere Person als Stiftungsrat bestellen, die frei von den oben
beschriebenen evidenten Interessenkonflikten ist. Die Kinder haben aber Herrn
Grzesiak ganz bewusst ausgewählt, in dem Wissen, dass dieser seine Funktion
ausschliesslich zum Nachteil des Stifters ausüben wird, auch wenn dies einen
Nachteil für die Stiftung bedeuten würde.

61    Umgekehrt läge daher vielmehr ein unwiederbringlicher Verlust der Rechte des
Stifters vor, würde man Herrn Grzesiak – sinngemäss – einstweilen gewähren
lassen, bis über seinen Abberufungsantrag rechtskräftig entschieden worden ist.
Erst durch die hier angestrebten Sicherungsmassnahmen wird verhindert, dass
gutgläubige Dritte sich auf eine solche unrichtige Eintragung verlassen würden
oder Herr Grzesiak weiter für die Stiftung handelt.

e)    Keine Anhörung der Sicherungsgegner

62    Angesichts des Vorgesagten ist es vorliegend nicht möglich, den
Sicherungsgegnern vorgängig das rechtliche Gehör in Bezug auf den
gegenständlichen Sicherungsantrag einzuräumen, ohne den Zweck des
beantragten Amtsbefehls zu vereiteln. Wollte man den Sicherungsgegnern
vorgängig das rechtliche Gehör gewähren, so ist gerade durch die jüngsten
Handlungen in Zypern offensichtlich, dass Herr Grzesiak die verbleibende Zeit
nützen wird, um unumkehrbare Tatsachen zu schaffen und die Ansprüche des
Stifters zu vereiteln.

63    Darüber hinaus wäre Herrn Grzesiak, der bisher in Liechtenstein anwaltlich nicht
vertreten ist, in Polen zuzustellen, während die übrigen Verfahrensbeteiligten
(soweit für dieses Provisorialverfahren relevant) sehr wohl Zustellungen früher an

■    Seite 26    ■

ihre jeweilige anwaltliche Vertretung erhalten würden. Ein unwiederbringlicher
Nachteil geht durch den Erlass ohne vorherige Anhörung der Sicherungsgegner
nicht einher, zumal die Stiftung durch den gerichtlichen Beistand mit Tomasz
Szelag voll handlungsfähig bleibt.

3.  Die **Sicherungsgegner zu 3 – 5** bringen in ihren Schriftsätzen vom
08.05.2025 (ON 117, 118 und 119) im Wesentlichen vor und wenden ein,
dass entgegen dem vom Sicherungswerber erhobenen Vorwurf keine
Anhaltspunkte für eine Voreingenommenheit oder Befangenheit des
Sicherungsgegners zu 1 bestünden. Vielmehr ergebe sich aus der
langjährigen beruflichen und persönlichen Beziehung zum
Sicherungswerber ein differenziertes und positives Bild: Der
Sicherungsgegner zu 1 fungierte seit 2007 als Anwalt, Berater und
Vertrauensperson des Sicherungswerbers. Es habe sich sukzessive eine
freundschaftliche Beziehung entwickelt, die gemeinsame Urlaubsreisen,
familiären Kontakt und in beruflicher Hinsicht die Mitwirkung an
strategischen Strukturfragen umfasst habe. Seit dem Jahr 2007 fungiere
Sicherungsgegner zu 1 als Berater im Zusammenhang mit der
Vermögensnachfolge des Sicherungswerbers.

Noch im Frühjahr 2024 habe der Sicherungswerber gegenüber dem
Sicherungsgegner zu 1 sein Vertrauen in dessen Arbeit damit bestätigt,
dass er eine gute Arbeit mache und es seine Aufgabe sei, dafür zu
sorgen, dass niemand seinen Kindern ihr Vermächtnis vorenthalte. Diese
Äusserung belege unmissverständlich, dass dem Sicherungswerber an
einer Mitwirkung des Sicherungsgegners zu 1 gelegen gewesen sei. Ein
Interessenkonflikt oder gar wie vom Sicherungswerber dargestellte
"Feindschaft" sei weder ersichtlich noch bescheinigt. Dass später
politische Verschiebungen innerhalb des Umfelds des Sicherungswerbers
erfolgt seien oder gar von diesem selbst gegen den Sicherungsgegner zu
1 ein Verfahren in Polen eingeleitet worden sei, vermöge keine
nachträgliche Befangenheit zu begründen.

320

■ Seite 27 ■

Die Bestellung des Sicherungsgegners zu 1 in den Stiftungsrat der TiVi Foundation sei nicht aus strategischen Motiven erfolgt, sondern sei ein naheliegender Schritt gewesen: So sei der Sicherungsgegner zu 1 bereits von 20.10.2022 bis 27.12.2024 Mitglied des Stiftungsrats der TiVi Foundation und in den meisten polnischen Unternehmen in Aufsichtsgremien vertreten gewesen. Er sei daher mit der Struktur, der Zielsetzung und der Organisation der TiVi Foundation sowie den von dieser gehaltenen Unternehmen bestens vertraut. Vor dem Hintergrund der laufenden Auseinandersetzungen erweise sich seine Wiederbestellung als sachlich gebotene Massnahme zur Stabilisierung und Wahrung der Interessen der TiVi Foundation.

Der Sicherungswerber unterstelle dem Sicherungsgegner zu 1 eine falsche Zeugenaussage, weil dieser erklärt habe, nicht an eine Verschwiegenheitspflicht gebunden zu sein. Diese Behauptung sei offenkundig verfehlt, da sich die Aussage klar auf berufliche Verschwiegenheitspflichten im Sinne von § 321 ZPO bezogen habe. Private Geheimhaltungsvereinbarungen mit dem Sicherungswerber würden die prozessuale Wahrheitspflicht nicht aufheben. Im Gegenteil: Der Sicherungsgegner zu 1 habe vor Gericht auf bestehende private Vereinbarungen verwiesen, aber zutreffend festgestellt, dass diese nicht zur Aussageverweigerung berechtigen würden. Der Sicherungsgegner zu 1 habe ausdrücklich klargestellt, dass sein früheres Mandatsverhältnis mit dem Sicherungswerber im Jahr 2021 beendet worden sei, weshalb bereits aus diesem Grund keine berufsrechtlich geschützten Verschwiegenheitspflichten mehr betroffen sein hätten können. Dieser Punkt sei vom Sicherungswerber nicht nur falsch dargestellt, sondern auch rechtlich unzutreffend gewürdigt worden.

Die behaupteten „schwerwiegenden rechtlichen Auseinandersetzungen" bestünden ausschliesslich in einem - vom Sicherungswerber nicht bescheinigten -Zivilverfahren, das der Sicherungswerber selbst am 10.04.2025 gegen den Sicherungsgegner zu 1 angestrengt habe. Es handle sich insofern um ein einseitig eingeleitetes

321

Verfahren, dessen blosse Existenz keinen Interessenkonflikt zu begründen vermöge.

Der Stiftungsrat habe sich - wie im Protokoll der Stiftungsratssitzung betreffend die Solkomtel Stiftung vom 10.04.2025 dokumentiert - mit operativen Fragen zum Schutz der unterliegenden Gesellschaften befasst. Die Beschlüsse hätten der Sicherung der Vermögenswerte der Stiftung gedient. Weder die Wahl der Themen noch das Abstimmungsverhalten würden auf ein parteiisches oder pflichtwidriges Verhalten schliessen lassen. Die Behauptung, der Sicherungsgegner zu 1 habe „den Beistand in die Irre geführt", entbehre jeder Grundlage. Der Beistand sei ein erfahrener, vom Gericht eingesetzter Rechtsanwalt, dessen Urteilsfähigkeit vom Sicherungswerber selbst nicht in Zweifel gezogen worden sei.

Die derzeitige Zusammensetzung des Stiftungsrates sei durch gerichtliche Entscheidungen (ON 71, ON 106) geschaffen worden. Sie sehe eine Besetzung mit je einem Vertreter des Stifters und der Kinder sowie einem neutralen, gerichtlich bestellten Beistand vor. Dieses Gleichgewicht sei bewusst hergestellt worden und werde durch die Bestellung des Sicherungsgegners zu 1 nicht aufgehoben. Es sei widersprüchlich, wenn der Sicherungswerber einerseits dieses Strukturmodell anerkenne, andererseits jedoch selektiv gegen die von der Gegenseite vorgeschlagenen Personen opponiere, obwohl er selbst ein Mitglied bestellt habe.

Der Antrag auf Erlass eines Amtsbefehls (ON 111) leide an erheblichem Substantiierungsmangel. Es mangle an einem konkreten, tatsachenbasierten Vorwurf. Die behauptete Befangenheit werde ausschliesslich mit subjektiven Bewertungen und unterstellten Motiven unterlegt. Zu wesentlichen Punkten - insbesondere zur behaupteten Feindschaft, zur angeblichen Gefährdung des Stiftungsvermögens oder zum Verfahren in Polen - werde nicht einmal ein Bescheinigungsmittel angeboten. Das vom Sicherungswerber zitierte Gerichtsverfahren in

Polen sei von diesem selbst angestrengt worden und könne nicht zum Nachteil des Sicherungsgegners zu 1 gewertet werden. Allein die einseitige Einleitung eines Zivilverfahrens durch den Sicherungswerber könne kein objektiver Abberufungsgrund darstellen, da es ansonsten einem Stifter jederzeit möglich wäre, ihm missliebige Stiftungsratsmitglieder durch die Einleitung ausländischer Verfahren zu beseitigen. Schliesslich bestehe gegenständlich durch die Bestellung des Sicherungsgegners zu 1 als Mitglied des Stiftungsrats der TiVi Foundation auch keine Gefährdung, zumal bereits durch die Bestellung des unabhängigen, qualifizierten Beistands für ausreichende Sicherung gesorgt sei. Der Beistand nehme die Aufgaben und Befugnisse des Stiftungsratspräsidenten wahr, womit sichergestellt sei, dass ohnehin keine Entscheidungen ohne dessen Mitwirkung getroffen werden könnten. Darüber hinaus sei das Gleichgewicht im Stiftungsrat durch das Stiftungsratsmitglied Tomasz Szelag, welcher vom Sicherungswerber eingesetzt worden sei, ohnehin gewährleistet. Nota bene werde für die behauptete Gefährdung als Bescheinigungsmittel neben dem Protokoll der Stiftungsratssitzung lediglich ein weiterer Antrag auf Erlass eines Amtsbefehls vorgelegt. Es erscheine bereits fraglich, ob einem solchen Antrag überhaupt ein eigenständiger Bescheinigungswert zukommen könne. Jedenfalls vermöge er keine konkrete Gefährdung zu belegen.

Der Erlass eines Amtsbefehls setze die Glaubhaftmachung eines konkret zu sichernden Anspruchs und eine tatsächliche Gefährdung dieses Anspruchs voraus. Dies sei hier nicht einmal im Ansatz gegeben. Vielmehr diene der Antrag offensichtlich dazu, unliebsame Besetzungen im Stiftungsrat politisch oder taktisch zu unterbinden.

4.  Die **Stiftung** selber teilte mit Schriftsatz vom 08.05.2025 (ON 116) mit, auf eine inhaltliche Äusserung zum Antrag des Sicherungswerbers zu verzichten.

323

■ Seite 30 ■

5. Der **Sicherungsgegner zu 2, Tomaz Szelag**, erklärte mit Schriftsatz vom 08.05.2025 (ON 120) dem Antrag des Sicherungswerbers nicht entgegenzutreten.

6. Aufgrund der von den Parteien vorgelegten Urkunden, nämlich

   Sicherungswerber

| | |
|---|---|
| Demissionserklärung der Katarzyna Tomczuk vom 3. März 2025 | Beilage  CG |
| "Bestellung" der Kinder des Herrn Grzesiak vom 4. März 2025 | Beilage  CH |
| Zeugenaussage des Jaroslaw Grzesiak vom 3. Februar 2025, Protokoll ON 21 im Verfahren zu GZ 06 HG.2024.210 | Beilage  CI |
| Vorsorglicher Einspruch des Stifters vom 10. März 2025 | Beilage  CJ |
| Verfügung des Amtes für Justiz vom 10. April 2025 | Beilage  CK |
| Verschwiegenheitsverpflichtung vom 19. September 2023 | Beilage  CL |
| Klage vom 10. April 2025 samt deutscher Arbeitsübersetzung | Beilage  CM |
| Protokoll der Stiftungsratssitzung vom 10. April 2025 | Beilage  CN |
| Antrag auf Erlass eines Amtsbefehls vom 22. April 2025 | Beilage  CO |

   Sicherungsgegner zu 2:

| | |
|---|---|
| Protokoll der TS vom 03.02.2024 zu 06 HG.2024.210 | Beilage 3.26 |

   Sicherungsgegnerin 4:

| | |
|---|---|
| HR Auszug TiVi Foundation vom 07.03.2025 | Beilage  8.1 |
| Amtsbefehl vom 26.10.2024 zu 06 HG.2024.133 (ON 71) | Beilage  8.2 |
| Beschluss OG vom 03.04.2025 zu 06 HG.2024.133 (ON 106) | Beilage  8.3 |

ist über den eingangs angeführten, der folgende **Sachverhalt** bescheinigt:

324

■ Seite 31 ■

Wie einleitend festgehalten, wurde mit Beschluss des Landgerichtes vom 24.10.2024, ON 71, RA Peter Schierscher zum Beistand mit der Funktion des Stiftungsratspräsidenten bestellt und die beiden bisherigen Stiftungsratsmitglieder Katarzyna Tomczuk und Tomasz Szelag in ihren Ämtern bestätigt (Beilage 8.1). Gleichzeitig wurde ua Art 7 (7) a der Statuten der TiVi dergestalt abgeändert, dass dieser neu (vorläufig) lautet wie folgt (ON 71):

Art 7 (7) a) Der Stiftungsratspräsident wird nach Erhalt der Information über den Tod oder die Amtsniederlegung des Stiftungsratsmitglieds Tomasz Szelag den Stifter Zygmunt Solorz und im Fall des Erhalt der Information über den Tod oder die Amtsniederlegung des Stiftungsratsmitglieds Katarzyna Tomczuk Piotr Zak, Aleksandra Zak und Tobias Solorz unverzüglich zur Bestellung eines neuen Stiftungsratsmitglied auffordern. Die Bestellung hat innerhalb von 7 Tagen ab Zustellung der Aufforderung zu erfolgen und dem Stiftungsratspräsidenten mitzuteilen. Im Fall des wirkungslosen Ablaufs der Frist, wiederholt der Stiftungsratspräsident seine Aufforderung. Erfolgt binnen 3 Tagen ab Zustellung dieser zweiten Aufforderung keine Bestellung und Mitteilung an den Stiftungsratspräsidenten, so erfolgt die Auswahl und die Bestellung des neuen Stiftungsratsmitglieds durch den Stiftungsratspräsidenten.

Dem Solorz wie auch den Sicherungsgegnern zu 3 - 5 wurde mit Beschluss ON 71 verboten, etwaige Rechte als Stifter und/oder Zweitbegünstigte auszuüben oder auszuüben zu versuchen; insbesondere etwaige Rechte auf die Vornahme von Änderungen an den Statuten, Beistatuten oder sonstigen Dokumente der TiVi Foundation und Bestellung und Abberufung von Stiftungsratsmitgliedern. Ausgenommen von diesem Verbot wurde das Bestellungsrecht gemäss Art 7 (7) a) der (abgeänderten) Statuten (ON 71).

Das Stiftungsratsmitglied Katarzyna Tomczuk demissionierte im März 2025 (Beilage CG). Mit Beschluss der Sicherungsgegner zu 3 – 5 vom 04.03.2025 bestellten dieses anstelle der demissionierten Katarzyna Tomczuk einstimmig den Sicherungsgegner zu 1, Jaroslaw Grzesiak, zum Stiftungsratsmitglied (Beilage CH). Der Sicherungsgegner zu 1 war bereits

325

■    Seite 32    ■

vom 20.10.2022 bis zum 27.12.2024 Mitglied des Stiftungsrates der TiVi
Foundation und verfügt über fundierte Kenntnisse der Stiftung resp
Struktur und der Abläufe.

Zwischen dem Sicherungswerber und dem Sicherungsgegner zu 1
bestand über viele Jahre ein enges berufliches wie auch
freundschaftliches Verhältnis. 2020 bat der Sicherungswerber den
Sicherungsgegner zu 1, seine „rechte Hand" und Vertrauensperson zu
werden und seine Tätigkeit als Anwalt zu beenden. In diesem
Zusammenhang hat der Sicherungsgegner zu 1 ein Beratungshonorar in
Höhe von EUR 5 Mio erhalten. Die Auflösung des Beratervertrages durch
den Sicherungswerber lagt darin begründet, dass der Sicherungsgegner
zu 1 sich weigerte, bei der Abberufung der Sicherungsgegner zu 3 und 5
aus ihnen vom Sicherungswerber zugedachten Organpositionen
mitzuwirken (Beilage CI, S 42).

Es kann nicht festgestellt werden, dass der Sicherungsgegner zu 1 „Teil
des Vorhabens der Kinder [war], deren Vater zu entmachten". Ebenso
wenig, dass es „zum offenen Bruch" zwischen dem Sicherungswerber
und dem Sicherungsgegner zu 1 kam und/oder der Sicherungsgegner zu
1 „äussert aggressiv, emotional und diffamierend über den Stifter
[Sicherungswerber] geradezu hergezogen ist" und/oder seit Sommer
2024 ein „offen ausgetragener Konflikt" zwischen dem Sicherungswerber
und dem Sicherungsgegner zu 1 besteht, der Sicherungsgegner zu 1
dem Sicherungswerber „mit tiefer persönlicher Abneigung begegnet"
und/oder „massive persönliche Animositäten, die er als Stiftungsrat nicht
ausblenden kann und nicht ausblenden wird" gegen den
Sicherungswerber bestehen, und/oder der Sicherungsgegner zu 1 als
ehemaliger Vertrauter und Anwalt des Sicherungswerbers die „Seiten
gewechselt" und dadurch „ihm als Geheimnisträger anvertrautes Wissen
rechtswidrig zu Lasten des Geheimnisherren missbraucht, um im Konflikt
der Begünstigten der anderen Seite (den Kindern) unlautere Vorteile zu
verschaffen".

326

■    Seite 33    ■

Mit Erklärung vom 19.09.2023 gaben der Sicherungswerber und der Sicherungsgegner zu 1 nachfolgende Erklärung / Bestätigung ab (Beilage CL):

ANWEISUNG DES STIFTERS

Ich, der Unterzeichnete Zygmunt Solorz (Personenidentifikationsnummer PESEL 56080407253). wohnhaft: Meierhofstrasse 8, 9495 Triesen, Fürstentum Liechtenstein, handelnd als Stifter der Stiftung unter dem Namen TiVi Foundation mit Sitz in Vaduz, Fürstentum Liechtenstein („Stiftung"), verbiete ich hiermit Herrn Jaroslaw Grzesiak, und zwar bedingungslos und mit sofortiger Wirkung, die von mir getroffenen oder zu treffenden Entscheidungen über die Stiftung, gegenüber jeglichen Rechtsträgern und Personen in jeglicher Form preiszugeben, zu verbreiten oder zu kommentieren; ferner wird ihm verboten, gegenüber jeglichen Rechtsträgern und Personen, die von Herrn Jaroslaw Grzesiak in welcher Weise auch immer eingeholten oder einzuholenden Informationen über meine Person oder in Zusammenhang mit meiner Person ungeachtet deren Form preiszugeben, zu verbreiten, zu kommentieren oder jeglichen Gebrauch daraus zu machen - mit Ausnahme des Gebrauchs, der für die ordnungsmäßige Ausübung der Funktion des Stiftungsratsmitglieds notwendig ist.

[Unterschrift unleserlich]

Zygmunt Solorz

Stifter

Ich bestätige den Empfang der Stifteranweisung vom 18. September 2023 und verpflichte mich zu deren strikten Einhaltung, verbunden mit dem unwiderruflichen und bedingungslosen Verzicht auf alle Rechte auf gerichtliche oder außergerichtliche Maßnahmen, die gegen die in der Stifteranweisung vorgesehenen Verbote oder meine Verpflichtung zu ihrer strikten Einhaltung verstoßen oder verstoßen könnten.

Vor- und Zuname: Jaroslaw Grzesiak

Datum: 19/09/2023

Unterschrift: [unleserlich]

Im Verfahren 06 HG.2024.210 erklärte der Sicherungsgegner zu 1 nach Belehrung durch das Gericht gem § 321 ZPO – und nachdem der Sicherungswerber zu Protokoll gegeben hatte, dass er der Sicherungsgegner zu 1 nicht von seiner Verschwiegenheitsverpflichtung

327

◼ Seite 34 ◼

entbinde    -,    dass    er    an    keine    beruflichen Verschwiegenheitsverpflichtungen gebunden sei (und tätigte in der Folge eine Aussage als Zeuge) (Beilage CI).

Der Sicherungswerber hat gegen den Sicherungsgegner zu 1 in Polen im April 2025 eine Zivilklage erhoben, mit welchem er ua die Feststellung begehrt, dass der Sicherungsgegner zu 1 gegen seine berufliche Verschwiegenheitspflicht verstossen habe (Beilage CM). Dass noch weitere Verfahren anhängig sind oder anhängig gemacht wurden/werden, kann nicht festgestellt werden.

Es kann nicht festgestellt werden, dass der Sicherungsgegner zu 1 den Beistand „in die Irre geführt" hat und in der Stiftungsratssitzung vom 10.04.2025 ein Beschlussvorhaben zum Schaden der Stiftung „durchgeboxt" hat.

Zur Beweiswürdigung: Der als bescheinigt angenommene Sachverhalt ergibt sich im Wesentlichen aus den jeweils in Klammern angefügten unbedenklichen Urkunden.

Was die Negativfeststellungen zur behaupteten Interessenskollision des Sicherungsgegners zu 1 („Teil des Vorhabens der Kinder", „offenen Bruch" zwischen Sicherungswerber und Sicherungsgegner zu 1 etc) anbelangt, so ergibt sich dies alles aus dessen Aussage zu 06 HG.2024.210-21 nicht. Weder ist der Sicherungsgegner zu 1 dort „aggressiv, emotional und diffamierend über den Stifter" hergezogen noch ist ansonsten nachvollziehbar, wie der Sicherungswerber zum Schluss kommt, dass der Sicherungsgegner 1 ihm mit tiefer Abneigung begegnet, die Seiten gewechselt haben soll etc.

Was die Irreführung des Beistandes und das „Durchboxen" eines Beschlussvorhabens anbelangt, so geht das Gericht davon aus, dass sich der Beistand als sehr erfahrener in Liechtenstein tätiger Rechtsanwalt nicht so leicht „in die Irre" führen lässt, jedenfalls wurde diese

328

■    Seite 35    ■

Behauptung durch den Sicherungswerber nicht bescheinigt. Der
Stiftungsrat hat sich – wie in Beilage CN dokumentiert – mit operativen
Fragen betreffend die unterliegenden Gesellschaften befasst, inwieweit
das zum Schaden der Stiftung sein soll, ergibt sich daraus nicht. Was den
Antrag auf Erlass eines Amtsbefehles betrifft (Beilage CO), so gibt dieser
den dortigen Prozessstandpunkt des Antragstellers wieder – nicht
weniger, aber auch nicht mehr.

**Rechtlich** ist wie folgt zu erwägen:

Auch im ausserstreitigen Stiftungsaufsichtsverfahren werden die
Bestimmungen der Art 276 ff EO zur Sicherung der dort geltend
gemachten Ansprüche angewandt.

Nebst einem zu sichernden Recht oder Rechtsverhältnis setzt die
Erlassung eines Amtsbefehls nach Art. 276 Abs. 1 lit. b EO eine objektive
Gefährdung voraus. Eine solche wird nach der Rechtsprechung bereits
angenommen, wenn die rechtlichen oder faktischen Verhältnisse strittig,
unklar oder unbestimmt sind. Es genügt also, wenn ein Rechtsverhältnis
entweder vom Sicherungsgegner bestritten oder durch eine Handlung
des Sicherungsgegners gestört wird. Darüberhinausgehender
Machenschaften oder dem zu sichernden Anspruch zuwiderlaufender
Verfügungen oder Handlungen des Sicherungsgegners bedarf es nicht.

Vorliegend möchte der Sicherungswerber den Anspruch auf Abberufung
des Sicherungsgegners zu 1 resp die zweckentsprechende Verwaltung
und Verwendung des Stiftungsvermögens gesichert haben und macht
im Wesentlichen das Bestehen von Interessenskollisionen und eine
Gefährdung des Stiftungsvermögens geltend.

Es mangelt vorliegend allerdings sowohl an der Bescheinigung des
Anspruchs als auch der Gefährdung:

329

Seite 36

So ergibt sich aus dem als bescheinigt angenommenen Sachverhalt weder eine persönliche Feindschaft oder ähnliches des Sicherungsgegners zu 1 zum Sicherungswerber bzw eine Interessenskollision noch ein Handeln zum Schaden der Stiftung.

Das vom Sicherungswerber angeführte Gerichtsverfahren in Polen wurde von diesem selbst angestrengt und kann nicht zum Nachteil des Sicherungsgegners zu 1 gewertet werden. Allein die einseitige Einleitung eines Gerichtsverfahrens durch den Sicherungswerber kann kein objektiver Abberufungsgrund darstellen, ansonsten es dem Sicherungswerber als Stifter jederzeit möglich wäre, missliebige Stiftungsratsmitglieder durch die Einleitung ausländischer Verfahren zu beseitigen.

Im Übrigen ist festzuhalten, dass die derzeitige Zusammensetzung des Stiftungsrates durch gerichtliche Entscheidung (ON 71) geschaffen wurde. Sie sieht eine Besetzung mit je einem Vertreter des Sicherungswerbers (Stifters) und der Sicherungsgegner zu 3 – 5 (Kinder) sowie einem neutralen, gerichtlich bestellten Beistand vor. Dieses Gleichgewicht wird durch die Bestellung des Sicherungsgegners zu 1 nicht aufgehoben oder gefährdet.

Der Antrag ist entsprechend abzuweisen.

Die von den Sicherungsgegnern richtig verzeichneten Kosten sind gemäss Art 286 EO vom Sicherungswerber zu tragen.

Fürstliches Landgericht
Vaduz, 27.05.2025
Diana Kind
Fürstliche Landrichterin

330

Seite 37



Für die Richtigkeit der Ausfertigung

Sidonia Aggeler

 Seite 38

# Rechtsmittelbelehrung

Gegen diesen Beschluss ist binnen der unerstreckbaren Frist von 14 Tagen ab Zustellung das Rechtsmittel des Rekurses an das Fürstliche Obergericht in Vaduz zulässig. Der Rekurs ist schriftlich in zweifacher Ausfertigung beim Landgericht einzubringen. Er kann von Parteien, die nicht durch einen Rechtsanwalt vertreten sind, auch mündlich zu Protokoll erklärt werden. Der Rekurs hat die Bezeichnung der Sache, Vor- und Familiennamen und Anschrift des Rekurswerbers und die Bezeichnung des Beschlusses zu enthalten, gegen den er erhoben wird. Der Rekurs muss kein bestimmtes Begehren enthalten, aber hinreichend erkennen lassen, aus welchen Gründen sich die Partei beschwert erachtet und welche andere Entscheidung sie anstrebt (Rekursbegehren); im Zweifel gilt der Beschluss, gegen den Rekurs erhoben worden ist, als zur Gänze angefochten.

Termin vorgemerkt:
13.06.2025
**Visa** reb/

Termin vorgemerkt:
(GS) 13.06.2025
**Visa** reb/

332